CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 1 of 70

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) CASE NO 1:07-CV-01170 | |
| | ) JUDGE BATES | |
| | ) | |
| COMMONWEALTH OF AUSTRALIA et al. | ) | |
| | ) | |
| Defedants | | |

**MOTION OF THE PLAINTIFF NARA AVALON SINGHDEREWA OPPOSITION TO COMMONWEALTH OF AUSTRALIA MOTION TO DISMISS WITH MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF JURISDICTION BASED ON FSIA.**

The plaintiff shows she submits to the jurisdiction of the court and the plaintiff is an Australian citizen and that the matter at hand the decision focuses on the applicability of an exception to immunity under the FSIA for actions seeking rights in illegally expropriated property. Specifically, the FSIA provides for an exception to immunity in cases in which rights in property taken in violation of international law are at issue and the property at stake is owned or operated by an agency or instrumentality of the foreign state that is engaged in a commercial activity in the United States. It is claimed that the defendants illegally expropriated property the plaintiff's property and the inheritance of the plaintiffs, the commercial property of plaintiffs, the intellectual property of the

plaintiffs among other property rights.  The defendants will in the foreseeable future and in the past have conducted commercial activity with the plaintiff Jugvir Inder Singh and the plaintiff Nara Avalon Singh Derewa, N-Life Inc. where plaintiff is majority stockholder, and Sarah-James, being held in trust for Nara. Then the plaintiff claims Degrading Treatment and Cruel and Inhuman Treatment and Torture. The 1984 U.N. Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment--The Convention defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." The claim gives the Court Universal Jurisdiction.  It is undisputed that universal jurisdiction exists over grave breaches of the Geneva Conventions and the first Additional Protocol of 1977.  "Grave breaches" of the Geneva Conventions and the first Additional Protocol include such things as: willful killing; torture or inhuman treatment, including biological experiments; willfully causing great suffering, or serious injury to body or health, extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly; compelling a prisoner of war or other protected person to serve in the forces of a hostile power; willfully depriving a prisoner of war or other protected person of the rights of fair and regular trial; taking of hostages; making the civilian population or individual civilians the object of attack;

launching an indiscriminate attack in the knowledge that it will cause excessive loss of

life, injury to civilians or damage to civilian objects; the transfer by an occupying power

of parts of its own civilian population into the territory it occupies, or the transfer of all or

parts of the population of the occupied territory within or outside this territory. In

addition to universal jurisdiction, many countries give their courts competence to punish

a crime committed abroad against one of their nationals (the "passive nationality" or

"passive personality" basis of jurisdiction), usually on the condition that the conduct is

also criminal in the country where it occurred but was not punished there. Thus, the cases

against Pinochet in Belgium, France, and Switzerland are based on complaints from

nationals of those countries who were allegedly harmed by Pinochet in Chile. The

existence of victims among its own citizens, of course, also gives the country a greater

political interest in prosecuting the case.  The plaintiffs will show that the defendants

have not and will not prosecute the alleged violations although it is a criminal conduct in

the defendant's country.

Public officials, as such, do not have immunity under international law, however. Indeed,

the Convention against Torture, for instance, makes the participation of a state official or

another person acting in an official capacity an element of the crime of torture.

In most cases, senior officials will not have participated personally in torture or killings.

They can, of course, be prosecuted if they actually ordered the crime. In addition, under

the doctrine of command responsibility, someone who had control over subordinates and

knew or should have known that a crime was about to be committed and did not stop it,

or did not try to prevent it or did not punish those responsible, is also criminally liable.

This doctrine applies both to military authorities and civilians in a position of superior

authority. The plaintiffs will show that defendants issued a business and work permit and under the business and work permit the plaintiff Nara Avalon was covered by the CenterLink provisions of a family in Australia, while the plaintiff Jugvir Inder Singh was covered by the Internal Revenue Code of United States and Social Security Code of the United States in the conduct of his business. Further in the development of the business property and all exports of the plaintiffs intellectual property was governed by the Export Control Act of United States and under this provision at trial the plaintiff will show that the United States Patent and Trade Mark office required the plaintiff to sign for e-filing from Australia. Further the ABN of Sarah-James will show that the defendant extracted taxes for and governed the conduct of the company in the Australia although Sarah-James is a subsidiary of a United States Company N-Life incorporated in Delaware where the plaintiff is the majority stock holder. We recognize the Ninth Circuit has recently held that the expropriation exception to the FSIA, 28 U.S.C. § 1605(a) (3), may be applied retroactively to activities of the German and Austrian governments in the 1930s and 1940s. *See Altmann v. Republic of Austria*, 317 F.3d 954 (2002). The Ninth Circuit reasoned "that the Austrians could not have had any expectation, much less a settled expectation, that the State Department would have recommended immunity as a matter of 'grace and comity' for the wrongful appropriation of Jewish property." *Id.* at 965. As such the defendants have violated the following laws which can not lead them to expectations, that the State department would have recommended immunity as a 'matter of grace and comity' for wrongful taking of the plaintiff's one from the other and their property:

1.    Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 5 of 70

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and (d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1.    23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2.    24. Violated and derogated the Constitutional Right of the Plaintiffs

3.    25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements  and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity" of the defendant and examine how the pattern of conduct of  defendant in defying the agreements it claims it has signed.   The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom,

Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status,

Yet the defendants continue to defy and thumb its nose at civilized society and claims it has the right to whatever it wants to whoever it wants and it cannot be sued in any court for violation of treaties and the defendant has used its power to avoid prosecution for the genocide of the aborigines, the genocide of families thrown overboard warships and murdered at sea, prisons full of minor children being held in contracts with little tiny islands, a white apartheid policy, and most recently shipping tons of wheat to a rogue nation, IRAQ, at war with the United States of America, creating massive oil deals with the companies controlled by the sons of Saddam Hussein, see Cole Commission Report and Volcker Report and bribing officials both Jordan, and IRAQ to file reports to the United Nations and United Nations Security Council to create a WORLD war.

At trial the plaintiff will show that Australian Wheat Board is the world largest monopoly and that all its shipments were authorized by the defendant's agents accepting false documents in Australia to fool the world.

That in the same pattern the defendants largest mining company in world BHP BILLITON with full knowledge, had traded with the rogue nation seeking to partner with sons of Saddam Hussein's sons controlled TIGRIS OIL and took nearly 300 million dollars worth of Gold from the coffers of Saddam Hussein and fly it to the Perth Mint in Australia.  See the Cole Report.

The defendants deceived the world blatantly with power and influence and seem that it is above the law even in the violation and derogation of even Child Rights Convention.


S/

_____

JUGVIR INDER SINGH

FOR PLAINTIFF

NARA SINGHDEREWA MINOR CHILD

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 9 of 70

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | ) | |

**MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF JURISDICTION BASED ON FSIA.**

## ARGUMENT I

The plaintiffs at trial will show:

1.      1.      Chrishma Hunter Singh Derewa, half brother to Nara Singhderewa, was born in Greenwich Ct. and is the son of the plaintiff Jugvir Inder Singh, is an American Citizen and was a resident of the District of Columbia during the time claimed in the complaint.

2.      2.      Chinkara Ashely Singh Derewa is the half sister to Nara Avalon Singh Derewa, a plaintiff and, was born in Greenwich Ct. and is the daughter of the plaintiff

Jugvir Inder Singh Derewa and is an American Citizen and was a resident of California during the time alleged in the complaint.

3.    3.    That Troy Chola Paris was born in Greenwich Ct. USA, is the half brother of the plaintiff Nara Avalon Singh Derewa and is the son of the plaintiff Jugvir Inder Singh and is an American Citizen.

4.    4.    That the plaintiff Jugvir Inder Singh was resident of California and was a permanent Registered Alien since 1974 and pays his taxes in United States of America since 1974, and no other nation and has a majority of his family and business in United of America.  Department had previously designated the foreign sovereign as a "state sponsor of terrorism" or did so based on the event in question; (2) the victim or plaintiff was a U.S. national when the event took place; and (3) "the foreign sovereign engaged in conduct that falls within the ambit of the statute."  *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158

(D.D.C. Mar. 28, 2006).  Therefore, the only issue remaining is whether Jugvir Inder Singh qualifies as a United States national.  The term "U.S. national" embraces both United States citizens and non-citizens who owe permanent allegiance to the United States. 8 U.S.C. § 1101(a)(22) (2006).  In this case, the evidence shows that Jugvir Inder Singh clearly is a U.S. national.  First, though a citizen of the India, Jugvir Inder Singh was granted permanent registered Alien Status in the United States when he was twenty six years old.  As a part of his commitment to becoming a member of the United States Registered Alien, plaintiff Jugvir Inder Singh was required to take an oath to defend and uphold the

Constitution of the United States, which he has upheld for 32 years. Once registered, he established a family described above and acquired a social security number and Federal Identification Number and paid taxes and was always under the jurisdiction of the United States of America.  He remained a member United Stated Registered Alien of the United State and remained continuously in the United States of America from April 1975 time until his departure to Australia in 2001. His oath, the oath of his family plaintiffs, Hunter, Ashely, Troy establishes beyond any doubt that Jugvir Inder Singh allegiance to the United States is permanent.  Therefore, this Court will find that Jugvir Inder Singh was a United States national at the time his minor child Nara Avalon Singh Derewa was kidnapped, held hostage concealed from the plaintiff.  Accordingly, Jugvir Inder Singh has standing under the FSIA to recover against the defendants.

5.  There still remains the issue of what law governs Jugvir Inder Singh claims.  In light of the fact that he was in San Diego, California, before going to Queensland, Australia, this Court will find that California is the state with which plaintiff had the closest and most substantial connection. Therefore, the law of California shall govern plaintiffs Jugvir Inder Singh' wrongful  claims.


ARGUMENT II

1.  The plaintiff claim restitution, of the inheritance, property, intellectual property and other rights expropriated from since April of 2005 to present.  Specifically,

the FSIA provides for an exception to immunity in cases in which rights in
property taken in violation of international law are at issue and the property at
stake is owned or operated by an agency or instrumentality of the foreign state
that is engaged in a commercial activity in the United States.  In the motion to
dismiss the defendant admits that it operates and owns the rights surrounding
the minor plaintiff, being the daughter of the plaintiff and that the defendants
have the exclusive rights to conceal, own, feed, brain wash, school, buy and
sell or exchange in the United with the plaintiff any and all of her property and
inheritance being that Nara, the minor child of the plaintiff is Australian.

2.  The Courts have applied the anti-terrorism amendment to assert jurisdiction and
in some cases issue judgments against a number of "rogue" governments for
extraterritorial terrorist acts: *See Flatow*, 999 F. Supp. at 19-23 (holding that a
foreign state is not a "person" for due process purposes but finding minimum
contacts in any event); *Daliberti*, 97 F. Supp. 2d at 48-49 (suggesting that a
foreign state is not a "person"); *see also* World Wide Minerals v. Republic of
Kazakhstan, 116 F. Supp. 2d 98, 103 (D.D.C. 2000) (holding in a case involving
the commercial activity exception that no minimum contacts analysis was
required for the foreign state defendants involved); *cf*. Price v. Socialist People's
Libyan Arab Jamahiriya, 110 F. Supp. 2d 10, 14 (D.D.C. 2000) ("the process of
obtaining personal jurisdiction under the FSIA does not follow the traditional ap-
proach outlined in *International Shoe Co*."). Iraq, for committing acts of torture
against four Americans.  It will be shown at trial, introducing both the Volcker
Report on the United Nations in the Oil for Food program that the defendant was

trading with the Rogue Nation and was providing Wheat.  That the defendant and it agents changed the contents of the ships leaving the shipyards in Australia, lodged and accepted these shipments with the defendants agencies and aided and abetted an enemy of the United States of America.  The Cole Commission Reports will be introduced at trial that will show that the largest Mining Company in the world, owned by Australians, also were present in the rogue state and were operating a OIL deal through BHP BILLITON an ASX AND SEC registered company, where charges of corruption and trading with the Enemy have already been declared in Australia. This sizable force of Australian, having been given false documents, it will shown at trial were operating inside of IRAQ and moving gold from the coffers of Saddam Hussein, first to Jordan and then into the Mint in Perth Australia and the movement of gold and the underlying transactions were concealed from the Securities and Exchange Commission and Australian Securities Exchange.  While at the same time it will be shown at trial that the defendant has murdered innocent children at sea and the matter is before the Investigation of the Criminal Court in The Hague.  In this case children were taken aboard the HMS Adelaide and then thrown overboard and warship. Multiple cases of child murder and genocide are the centre of an investigation in the Hague ICC and this evidence will be introduced at trial or as an exhibit.

1.    3.    Worse still, like in this matter, the defendant convinced the world, while huge shiploads and truckloads of Australian wheat were racing back and forth under contracts with Saddam Controlled Tigris Oil and other criminals that these ships and trucks contained Weapons of Mass destruction, just as they would convince the world

that this plaintiff's minor child has NO rights to a father, because it is defendants

sovereign right to say who is father and who is NOT.  Similar to a truck contain wheat

being told the world being Weapons of Mass destruction, while the plaintiffs children

were all eligible to defend the nation for the atrocity of 9/11 this defendant was

reinforcing by selling, buying and building oil infrastructure deals in the rogue nation and

overall the actions itself is covered by Patriot Act.

2.      4.      The plaintiffs have already, one being Australian, a minor brought a case

against the defendant. The defendant minor is being represented by the plaintiff Jugvir

Inder Singh.

3.      5.      FSIA as enacted in 1976 provided an exception to immunity in five cases:


waiver, commercial activity, expropriation (the exception at issue in


*Altmann*), the determination of rights in property present in the United States, and certain

torts occurring within U.S. territory.   . *See* 28 U.S.C. § 1605(a)(2) (1994). 33. *See* 28

U.S.C. § 1605(a)(3) (1994); *see also supra* note 5 and accompanying text. 34. *See* 28

U.S.C. § 1605(a)(4) (1994). *See* 28 U.S.C. § 1605(a)(5) (1994). Although the language of

the statute refers to injury occurring in the United States, courts have interpreted this

exception to immunity as requiring that the tortious act occur in the United States as well.

*See* Olsen v. Republic of Mexico, 729 F.2d 641, 645 (9th Cir. 1984) (stating that the

legislative history of the tort exception indicates that the "tortious act or omission must

occur within the jurisdiction of the United States").


1.      6.      In other words, Section 1605(a)(2) requires that the action be based on one

of three types of U.S.-based conduct: (i) continuous activity within the United States; (ii) an act conducted within the United States; or (iii) an act conducted outside the United States which has a "direct effect" in the United States. Each of the permissible bases for jurisdiction outlined in the commercial activity exception thus requires either U.S.-based conduct or conduct that directly affects the United States.

7.    Under existing case law in 1988, a number of courts had held that the waiver exception of the FSIA applied to agreements to submit a dispute to international arbitration, but other courts had disagreed with this interpretation. The arbitration amendment was designed to resolve this conflict between courts, and to comply with the United States's obligations under international agreements relating to the recognition and enforcement of foreign arbitral awards.  45. *See infra* note 263 and accompanying text. Note that a finding of implied waiver of immunity from an international arbitration agreement also may extend to any action brought to enforce the arbitration award. *See* GEORGES R. DELAUME, TRANSNATIONAL CONTRACTS APPLICABLE LAW AND SETTLEMENT

OF DISPUTES (A STUDY IN CONFLICT AVOIDANCE) 73 (1990). see These agreements include in particular the Inter-American Convention, *supra* note 42, the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, *opened for signature* Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159 [hereinafter ICSID Convention], and the New York Convention, *supra* note 43. The United States became a signatory to the New York Convention effective Dec. 29, 1970. For a discussion of U.S. obligations under the New York Convention, see *infra* note 260 and accompanying text.

2.    8. Congress amended the FSIA a second time as part of the Anti-Terrorism and

47

Effective Death Penalty Act of 1996 (antiterrorism amendment), this time to add an exception to immunity for certain terrorist activities. This anti-terrorism amendment to the FSIA provides an exception to sovereign immunity in certain personal injury or wrongful death actions against a foreign state involving either torture, extrajudicial killing, aircraft sabotage, hostage taking, "or the provision of material support or resources" for such an act.   Under this provision IRAQ is a rogue state and from within United States the defendant was dealing with the enemy and deriving income from IRAQ transactions and then using this income to conceal, hold hostage, deny all the rights guaranteed by the United Nations on the ground that the plaintiffs child is Australian and the defendant has full control of the property of the plaintiff. Nara Avalon Singh Derewa and the plaintiff father may never see her if thy so desire.

9. Senator Arlen Specter, in particular, noted that under international customary law, piracy and torture are considered international crimes covered by the principle of universal jurisdiction: Somebody who commits torture may be prosecuted wherever that person may be found . . . . [W]here a foreign government is a co-conspirator, an accessory before the fact or an accessory after the fact, it is just unconscionable that we should not allow our citizens to utilize our courts. *Id*. at 22-23 (testimony of Sen. Arlen Specter). For a discussion of universal jurisdiction and how it relates to the anti-terrorism amendment, see Part IV.B.

10. As the Supreme Court stated in *World-Wide Volkswagen*, assessing reasonableness entails weighing a number of factors, including the burden on the defendant, the forum's interest in adjudicating, and the plaintiff's interest in suing in the forum, judicial efficiency, and other policy considerations. *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d Cir. 1981), the Second Circuit held that, given the special service of process provision in the FSIA (similar to the securities and antitrust statutes, providing for worldwide service of process), the relevant area in finding contacts is the entire United States, as opposed to just the State of New York. Professor

11. *Here in the motion dismiss the defendant admit that in order to solve the problem of the alleged violations between the plaintiffs Australian property and American property right, supreme Court held that the level of contacts necessary to exercise general jurisdiction had to be "continuous and systematic" in order to satisfy due process and the defendants will be in this continuous and systematic process for* the next 13 years till the minor plaintiff is 18. 76. *See, e.g.*, Olsen v. Republic of Mexico, 729 F.2d 641 (9th Cir. 1984) (discussing general jurisdiction but finding contacts on the basis of specific jurisdiction); Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 690 F. Supp. 682 (N.D. Ill. 1988) (finding jurisdiction based on the commercial activity exception in a suit to enforce payment for medical services provided in the United States, where payment was arranged through a U.S. bank); Meadows v. Dominican Republic, 628 F. Supp. 599 (N.D. Cal. 1986) (finding jurisdiction based on the commercial activity exception in a suit to enforce sovereign's obligation to pay dollar-denominated commission to

.U.S. plaintiff at bank of plaintiff's choosing); *cf.* El-Hadad v. United Arab Emirates, 69 F. Supp. 2d 69 (D.D.C. 1999), *rev'd on other grounds*, 216 F.3d 29 Thereby exercising jurisdiction over that state in connection this matter would satisfy "traditional notions of fair play and substantial justice."see Int'l Shoe Co.

.v. Washington, 326 U.S. 310, 316 (1945) (quoting Mil-liken v. Meyer, 311 U.S. 457, 463 (1940)), cited in Bederman, supra note 74, **R** at 275. An analogy can be drawn to a line of cases from the District of Columbia establishing the "government contacts" exception to personal jurisdiction. See, e.g., World Wide Minerals v. Republic of Kazakhstan, 116 F. Supp. 2d 98, 105 (D.D.C. 2000); Mallinckrodt Med., Inc. v. Sonus Pharm., Inc., 989 F. Supp. 265, 271 (D.D.C. 1998). Because of the importance of citizens retaining unfettered access to petition the federal government, these decisions hold that a defendant's contacts with U.S. government instrumentalities in the District of Columbia (e.g., filing an application with a government agency or petitioning Congress) are not relevant for purposes of finding minimum contacts. See Mallinckrodt, 989 F. Supp. at 271.

12. Notwithstanding any differences between a foreign and a domestic defendant, or between a sovereign state and a private person, for purposes of the Due Process Clause, the court in *Texas Trading* found no compelling reason to treat a foreign state differently from other persons in the constitutional framework. In particular, the court reasoned that the commercial branch of a foreign state should be subjectto the same jurisdictional test as that applicable to a foreign corporation.

13. *Texas Trading* is the leading case for the idea that a foreign state is a "person" for

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 19 of 70

personal jurisdiction purposes.For almost ten years following the Second Circuit's ruling in *Texas Trading*, courts applying the FSIA generally assumed that a due process scrutiny is necessary.

*14.* The Restatement (Third) of Foreign Relations Law of the United States first sets forth the general principle of international law that any extraterritorial exercise of jurisdiction to adjudicate must be reasonable and then lists specific instances where such jurisdiction would be reasonable, including familiar factors such as presence of the defendant or property within the territory, nationality or residence of the defendant, the carrying out of regular activity by the defendant within the state, and the consent of the defendant.

*.a.* Paragraph (2) of Restatement (Third) section 421 provides in full: In general, a state's exercise of jurisdiction to adjudicate with respect to a person or thing is reasonable if, at the time jurisdiction is asserted:

*.b.* (a) the person or thing is present in the territory of the state, other than transitorily; (b) the person, if a natural person, is domiciled in the state; (THIS POINT is asserted in the complaint and realleged.)

*.c.* (c) the person, if a natural person, is resident in the state; (the plaintiff has alleged he is a U.S. National.

*.d.* d) the person, if a natural person, is a national of the state; (plaintiff has alleged he is a US NATIONAL)

*.e.* (e) the person, if a corporation or comparable juridical person, is organized pursuant to the law of the state; (plaintiff has alleged the corporation plaintiff N-Life was incorporated in Delaware.)

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 20 of 70

.f.    (f) a ship, aircraft or other vehicle to which the adjudication relates is registered under the laws of the state;

.g.    (g) the person, whether natural or juridical, has consented to the exercise of jurisdiction; (plaintiff and minor child Nara consent to courts Jurisdiction)

.h.    (h) the person, whether natural or juridical, regularly carries on business in the state; The plaintiff has children and businesses in the United States and a patent that allows him protection for the next 8 years, social security that protects his till death, inheritance etc.

.i.    the person, whether natural or juridical, had carried on activity in the state, but only in respect of such activity;

15. The Constitution, federal statutes, and treaties are the "supreme law" of the United States.[164]  In addition to these, the Supreme Court recognized a century ago in *The Paquete Habana* that the rules of international law are also part of U.S. law:

International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction . . . . [W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations . .. Thus according to Judge Calabresi, conducting a "minimum contacts" test to determine personal jurisdiction under the commercial activity exception to the FSIA would be superfluous, since the language of the statute already incorporates the same test. *See also* S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1304 (11th Cir. 2000) ("The 'direct

effects' language of section 1605(a)(2) closely resembles the 'minimum contacts' language of constitutional due process and these two analyses have overlapped."); *cf. In re* Papandreou, 139 F.3d 247, 253 (D.C. Cir. 1998) (holding that, as for the first prong of § 1605(a)(2), the commercial activity on which the action is based must have "substantial contact" with the United States, which is "more than the minimum contacts sufficient to satisfy due process in establishing personal jurisdiction").

16. The plaintiffs has a contract to both conduct business and work in the United States and Australia, the defendant country and pay taxes where due and continue to take benefit from the state sponsored defendants CENTERLINK and under the Fait Trade

Agreement Act and various and sundry international protections.

2.    17. Another ambiguity that opens the door to extraterritorial assertions of jurisdiction is the third prong of the commercial activity exception—the prong of FSIA section 1605(a)(2) that allows jurisdiction where an act outside of the United States causes a "direct effect" in the United States. The Supreme Court's interpretation of this prong

of the commercial activity exception in *Republic of Argentina v. Weltover*, in contrast to its holding in *Nelson*, arguably exceeds international norms.  Until the Supreme Court decided *Weltover* in 1992, courts tended to interpret the "direct effect" language to mean that the effect also had to be "substantial and foreseeable" in

200

order to support jurisdiction. This interpretation was based in part on the legislative history of the 1976 statute, which states that the "direct effect" prong of the commercial

activity exception should be applied in a manner "consistent with the principles set forth in" the Restatement (Second) of Foreign Relations Law, and, in particular, the section describing limits on a state's jurisdiction to prescribe law. *See* FLOWERS, JURISDICTION OF UNITED STATES COURTS IN SUITS AGAINST FOREIGN STATES, H.R. No. 94-1487, at 19 (1976).

18. The plaintiffs have on going business with the United States and this business and commercial activity will be continuous and ongoing include paying of death taxes of the plaintiff and the inheritance taxes or the gifting of property held by the plaintiffs in various counties of the world. In *Weltover*, the Supreme Court dispensed with the idea that the "direct effect" requirement of the commercial activity exception must be substantial or foreseeable. With no explanation (other than describing the Restatement section cited in the legislative history as "a bit of a *non sequitur*" since it deals with prescriptive rather than adjudicative jurisdiction), the Court simply rejected the requirement that effects must besubstantial or foreseeable. While agreeing that "purely trivial effects" in the United States would not be sufficient to confer jurisdiction, the Court held that an effect is sufficiently "direct" if it follows "as an immediate consequence of the defendant's . . . activity." It is particularly notable that the Court reached this conclusion because it was not necessary to the outcome of the case. Since the debt obligation at issue was to be performed in New York, Argentina's failure to repay that obligation in a timely fashion produced an effect in the United States that was both substantial and foreseeable.

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 23 of 70

**ARGUMENT III**

1.    19. The expropriation exception is an additional assertion that may result in

extraterritorial assertions of jurisdiction. It is a more narrow exception to immunity than

the commercial activity exception and therefore is litigated less frequently. It only applies

where "rights in property" have been taken in violation of international law and where

one of two jurisdictional nexus requirements apply: (i) the expropriated property (or its

proceeds) is present in the United States in connection with the commercial activity of the

foreign state or (ii) such property is owned or operated by an agency or instrumentality of

the foreign state engaged in commercial activity in the United States. *See* 28 U.S.C. §

1605(a)(3).

2.    20. Indeed, since the statutory language of the expropriation exception does

          *not* require expressly that the action be "based upon" the commercial activity of

the agency or instrumentality, courts have held that the jurisdictional nexus requirement

in the expropriation exception only requires that the agency or instrumentality be "doing

business" in the United States.*See* Vencedora Oceanica Navigacion, S.A. v. Compagnie

Nationale Algerienne de Navigation, 730 F.2d 195, 202 (5th Cir. 1984) (per curiam)

(observing, in a case arising before *Nelson*, that the expropriation exception, unlike the

commercial activity exception, "clearly embodies a 'doing business' test"); *cf.* Zappia

Middle E. Constr. Co. v. Emirate of Abu Dhabi, 1996 WL 413680, at *6 (S.D.N.Y. July

24, 1996) ("The second prong of the expropriation exception permits lesser contacts with

the United States than ordinarily would be required to comply with due process.").

     21. Here the basis of defendants expropriation exception was premised on taking of

          all the plaintiffs company, computers, software, patents, inheritance, automobiles,

credit cards, property, marketing, telephones, internet systems, Australian business in real estate, cattle, Whey Protein, tourism, scram engine and Rocket data, Atlanta Nasa Merit System Protection Board Data, diamond ring configurations, all amounting to more that 100 million dollars of tangible property, because the plaintiff minor child is an Australian.  Taking of the plaintiffs saris, Ganesh, Buddha carvings, and other religious and family items including video equipment, eye surgery equipment, hard disks and copyrighted books being only left on the hard disk and irreplaceable concern Refractive Surgery, Adaptive Optics and other material exclusively controlled by the defendants. Being in excess of 1 million United States Dollars.


ARGUMENT IV


22. the anti-terrorism amendment allows an exception to immunity for torture, extrajudicial killing, aircraft sabotage, hostage taking, or the "provision of material support or resources" for such act. In contrast with the exceptions to immunity listed in the 1976 statute, the antiterrorism amendment has no jurisdictional nexus requirement other than a requirement that either the claimant or the victim be a U.S. national at the time that the criminal act was perpetrated. Because of the very broad extraterritorial scope of the amendment, courts applying it are presented squarely with the question of whether jurisdiction may be asserted against a foreign state under the FSIA if the state lacks "minimum contacts" with the United States. the anti-terrorism amendment is supported by international law under the passive

personality principle or under universal jurisdiction. While there is still substantial disagreement over the scope of universal jurisdiction, a credible argument can be made that at least some of the crimes listed in the anti-terrorism amendment (in particular, torture, aircraft sabotage, and hostage taking) fall within the doctrine of universal jurisdiction. Even if Congress has jurisdiction to prescribe the offenses listed in the amendment, however, there is a difference between jurisdiction to prescribe and jurisdiction to adjudicate. U.S. cases basing extraterritorial jurisdiction on the passive personality principle involve jurisdiction to prescribe law to punish crimes or other wrongs committed by individuals or corporations. Similarly, recent cases suggesting an expansion of universal jurisdiction tend to involve criminal actions against individual defendants who were either extradited or served with process while residing in or visiting the adjudicating jurisdiction. The passive personality principle and universal jurisdiction relate to a state's authority to define and punish crimes committed by individual persons, and thus may not be applicable to the issue of state responsibility. the Hague Convention for the Suppression of Unlawful Seizure of Aircraft and the International Convention against the Taking of Hostages, and stating that the Convention against Torture and other Cruel, Inhuman and Degrading Treatment or Punishment "in effect provides for universal jurisdiction"). *See also* Randall, *supra* note 162, at 816–27 (considering whether **R** these conventions create rights or obligations vis-à-vis nonsignatory states). 241. *See, e.g.*, United States v. Felix-Gutierrez, 940 F.2d 1200 (9th Cir. 1991) (finding jurisdiction to apply the penal statute for kidnapping and murder of a DEA agent); United States v. Romero-Galue, 757 F.2d 1147 (11th Cir. 1985) (finding jurisdiction to apply the Marijuana on the High Seas Act to foreign residents whose vessel was seized on the high

seas); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 494 F. Supp. 1161 (E.D. Penn. 1980) (finding jurisdiction to apply an antitrust statute to an alleged conspiracy among Japanese companies). 242. *See, e.g.*, Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995) (upholding jurisdiction to hear genocide, torture, and other claims under the Alien Tort Act against Bosnian war criminal Radovan Karadzic); Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (affirming an almost $2 billion judgment in a class action suit under the Alien Tort Act for acts of torture and summary execution committed under the command of former Phillipines ruler Ferdinand Marcos); Demjanjuk v. Petrovsky, 776 F.2d 571 (6th Cir. 1985) (upholding the extradition to Israel of "Ivan the Terrible," a former SS guard at the Treblinka concentration camp, under the principle of universal jurisdiction); Filartiga v. Pe~na-Irala, 630 F.2d 876 (2d Cir. 1980) (upholding jurisdiction to hear a wrongful death claim under the Alien Tort Act against a Paraguayan police official who allegedly tortured plaintiffs' son). On the international level, jurisdiction increasingly has been asserted over individuals for the commission of international crimes. *See, e.g.*, Regina v. Bow St. Stipendiary Magistrate, *ex parte* Pinochet Ugarte, 3 W.L.R. 1456

> (H.L. 1998), *available at* 1998 WL 1043992 (1998) (holding that former Chilean dictator Gen. Augusto Pinochet could not assert immunity for torture and hostage taking); Marlise Simons, *An Awful Task: Assessing 4 Roles in Death of Thousands*, N.Y. TIMES, Apr. 30, 2001, at A3 (describing proceedings conducted in Belgium against four Rwandans for their complicity in the 1994 massacre of a half million people in Rwanda).

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 27 of 70

23. A argument will might justify assertion of jurisdiction under the anti-terrorism amendment could be made in cases where the foreign state violated a *jus cogens* norm. A *jus cogens* norm of international law is one that is "accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted." The general idea is that certain practices—for example genocide or slavery—are so universally condemned that any civilized nation would regard the practice as criminal. At least one prominent U.S. judge has argued that a foreign state that violates a *jus cogens* norm waives its immunity from suit. In a case involving a claim of an Auschwitz survivor against the Federal Republic of Germany, Judge Wald of the Circuit Court of the District of Columbia argued in a dissenting opinion that Germany implicitly waived its immunity defense to plaintiff's reparations claims:

Jus cogens norms are by definition nondero gable, and thus when a state thumbs its nose at such a norm, in effect overriding the collective will of the entire inter national community, the state cannot be performing

a sovereign act entitled to immunity. Princz v. Federal Republic of Germany, 26 F.3d 1166, 1182 (D.C. Cir. 1994) (Wald, J., dissenting) (citing Adam C. Belsky et al., *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law*, 77 CAL. L. REV. 365, 396 (1989)). The majority in *Princz*, however, rejected Judge Wald's position, refusing to find that the violation of a *jus cogens* norm amounts to an implied waiver of immunity under the waiver exception to the FSIA. *Princz*, 26 F.3d at 1173-74. The federal courts that have recently considered

this question have followed the majority in *Princz*, rejecting Judge Wald's argument that

the violation of a *jus cogens* norm amounts to a waiver of sovereign immunity. *See*

Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1151-55 (7th Cir. 2001)

(considering and rejecting Judge Wald's position); Hwang Guem Joo v. Japan, 172 F.

Supp. 2d 52, 60-61 (D.D.C. 2001) (same); Abrams v. Societe Nationale des Chemins de

Fer Francais, 175 F. Supp. 2d 423 (E.D.N.Y. 2001) (same). 251. Siderman de Blake v.

Republic of Argentina, 965 F.2d 699, 714-17 (9th Cir. 1992). In an eloquent passage, the

court stated:

> The crack of the whip, the clamp of the thumb screw, the crush of  the iron maiden,
> and, in these more efficient modern times, the  shock of the electric cattle prod are
> forms of torture that the inter national order will not tolerate. . . . That states
> engage in official torture cannot be doubted, but all states believe it is wrong, all
> that  engage in torture deny it, and no state claims a sovereign right to  torture its
> own citizens. *Id*. at 717. The court in *Siderman*, however, ultimately held,

citing *Argentine Republic v. Amerada Hess Shipping*, 488 U.S. 428, 434 (1989), that the

FSIA is the sole basis under U.S. law for finding an exception to sovereign immunity. *See*

*id*. at 718-19. 252. The commission of such crimes effectively represents a waiver of the

right to object to a court's assertion of personal jurisdiction. *See infra* notes 264-65 and

accompanying text. Indeed, this idea is implicit in Judge Wald's **R** analysis, since the

*Princz* facts also implicated the issue of extraterritorial assertion of personal jurisdiction

over Germany. *See Princz*, 26 F.3d at 1176-85 (Wald, J., dissenting).

ARGUMENT V

*Jus      cogens*   norms    are    by    definition    nonderogable,    and
thus    when    a    state    thumbs    its    nose    at    such    a    norm,    in
effect    overriding    the    collective    will    of    the    entire    inter
national    community,    the    state    cannot    be    performing
a sovereign act entitled to immunity.

1.        24. The plaintiffs will argue that Nara Avalon von Neumann Singh Derewa was

zygote in San Diego and was conceived in Southport Queensland and is the natural and

legal child of the plaintiff Jugvir Inder Singh and that the fundamental right to control

one's own intellect and mental processes is protected by the First Amendment, and is

eviscerated if courts permit the sovereigns to forcibly kidnap and conceal it citizens from

plaintiff based on being sovereign. If government agents, with the concurrence of the

courts, can constitutionally order the forcible manipulation of Plaintiffs mind in order that

he may surrender to government control then any accused defendant, who poses no

danger to self or others, is also at jeopardy of losing his or her First Amendment right to

freedom of thought.

2.        25. FORCIBLY ADMINISTERING POLICY FOR PURPUSFUL SEPERATION

OF   MINOR   CHILD   FROM   A   FATHER   TO   SOLELY   TO   RENDER   HIM

POWERLESS TO THE SOVEREIGN AND TO CLAIM FULL CONTOL OVER HIS

LIFE IS UNCONSTITUTIONAL


### A. The First Amendment Guarantees Freedom of Thought

The First Amendment, which Professor Tribe terms "the Constitution's most

majestic guarantee," provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. CONST. AMEND. I. [2] nd Laurence Tribe, AMERICAN CONSTITUTIONAL LAW, § 12-1, 785 (2 ed. 1988).

While "[t]he First Amendment literally forbids the abridgment only of 'speech,'" this Court has "long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson,* 491 U.S. 397, 404 (1989); *See also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) ("[W]e have long eschewed any 'narrow, literal conception' of the [First] Amendment's terms, …for the Framers were concerned with broad principles….").

This Court has repeatedly observed that there are derivative and corollary rights that are essential to effectuate the purposes of the First Amendment, or which are inherent in the rights expressly enumerated in the Amendment. For example, in *Lamont v. Postmaster Gen*., 381 U.S. 301, 308 (1965), Justice Brennan, in his concurring opinion explained:

> It is true that the First Amendment contains no specific guarantee of access to publications. However, the protection of the Bill of Rights goes beyond the specific guarantees to protect from congressional abridgement those equally fundamental personal rights necessary to make the express guarantees fully

meaningful.   Likewise, in *Globe* this Court observed that "[t]he First

Amendment is…broad enough to encompass those rights that, while not

unambiguously enumerated in the very terms of the Amendment, are

nonetheless necessary to the enjoyment of other First Amendment rights."

*Globe,* 457 U.S. at 604. Thus, in 1982, this Court recognized a "right to

receive information and ideas," locating the right as "an inherent corollary of

the right of free speech and press" guaranteed by the First Amendment. *Board*

*of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion). Freedom of

thought, while not expressly guaranteed by the First Amendment, is one of

those fundamental rights necessary to make the express guarantees

meaningful. As Justice Benjamin Cardozo extolled, "freedom of thought…is

the matrix, the indispensable condition, of nearly every other form of freedom.

With rare aberrations a pervasive recognition of that truth can be traced in our

history, political and legal." *Palko*

*v. Connecticut,* 302 U.S. 319, 326-27 (1937). As this Court noted as

recently as 2002, "[t]he right to think is the beginning of freedom,

and speech must be protected from the government because speech

is the beginning of thought." *Ashcroft v. Free Speech Coalition* 533

U.S. 234 (2002). "The

guarantee of free expression," notes Professor Tribe, "is inextricably linked to the

protection and preservation of open and unfettered mental activity… ." L. Tribe, *supra,* §

[nd3] 15-7, at 1322 (2 ed. 1988).

Repeatedly, this Court has recognized that freedom of thought is one of the most elementary and important rights inherent in the First Amendment.

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), this Court, in an 8-1 decision, invalidated a school requirement that compelled a flag salute on the ground that it was an unconstitutional invasion of "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from official control." *Id*. at 642. The First Amendment, declared this Court, gives a constitutional preference for "individual freedom of mind" over "officially disciplined uniformity for which history indicates a disappointing and disastrous end."

Professor Emerson makes the same point. Situating freedom of thought as the foundation of the First Amendment, he explains:

> Forming or holding a belief occurs prior to expression. But it is the first stage in the processes of expression, and it tends to progress into expression. Hence safeguarding the right to form and hold beliefs is essential in maintaining a system of freedom of expression. Freedom of belief, therefore, must be held included within the protection of the First Amendment. Thomas Emerson, THE SYSTEM OF FREEDOM OF EXPRESSION 21-22 (1970). *Id*. at 637. At the center of our American freedom, is the "freedom to be intellectually and spiritually diverse." *Id*. at 641. "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds," this Court explained, "only at the price of occasional eccentricity and abnormal attitudes." *Id*. at 641-42.

This principle, that freedom of thought is central to the First Amendment and

protected thereby, has guided other important decisions of this Court. In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court invalidated a New Hampshire statute that required all noncommercial vehicle license plates to bear the state motto "Live Free or Die," finding the requirement inconsistent with "the right of freedom of thought protected by the First Amendment." *Id.* at 714.

In *Stanley v. Georgia*, 394 U.S. 557 (1969), this Court struck down a Georgia law that banned the private possession of obscene material, finding the law "wholly inconsistent with the philosophy of the First Amendment." *Id.* at 565-66. "Our whole constitutional heritage," explained this Court, "rebels at the thought of giving government the power to control men's minds." *Id.* at 565.

Justice Harlan, concurring in *United States v. Reidel*, 402 U.S. 351 (1971), characterized the Constitutional right protected in *Stanley* as "the First Amendment right of the individual to be free from governmental programs of thought control, however such programs might be justified in terms of permissible state objectives," and as the "freedom from governmental manipulation of the content of a man's mind…." *Id.* at 359 (Harlan J., concurring).

In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), this Court invalidated a statute forcing public school teachers to contribute money to a union that advanced partisan political views. This Court characterized the case as one concerning "freedom of belief" and emphasized "freedom of belief is no incidental or secondary aspect of the First Amendment's protections… [A]t the heart of the First Amendment," noted this Court, "is the notion that an individual should be free to believe as he will, and

that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.* at 234

The Government's Forcible and Direct Aiding and Abetting a Sovereign partner to kidnap, hold hostage, conceal from the father a minor child of  Mental Processes Violates the First Amendment

The defendant is claiming that is has an international agreement with the United States government where it is seeking to directly modify the fundamental relation of a father with his minor child and while holding her captive and separated from the father has the power to control the thoughts and thought processes by forcibly administering separations policies s designed to manipulate the chemistry of the plaintiffs brain and thereby change the way they thinks. The forcible administration separation policies is not an effort to control the plaintiff's behavior, with merely an incidental effect on his thinking. It is an effort aimed *directly* at changing his *mind* and *mental processes* by forcibly manipulating his brain chemistry. As such, this Court should recognize it as a serious affront to the First Amendment's protection of freedom of thought.

Sixty years ago this Court opined "[f]freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind." *Jones v. Opelika*, 316 U.S. 584, 618 (1942). Since the advent of powerful antipsychotic drugs in the 1950s (as well as other technologies discussed in Section C2, *infra*), the government now *does have* the capability to "control the inward workings of the mind." The issue to whether plaintiffs rights under the First, Fifth, and Sixth Amendments are violated by allowing the government conspire with a sovereign to administer kidnap, hostage taking and separation policies against his will in order to subject the plaintiff to

absolute sovereign control for no reason know to man is a violation of the First

Amendment right to freedom of thought, the CCLE observes and other constitutional

guarantees (federal and state) including the right to privacy, the rights guaranteed by the

Fourth, Fifth, Sixth, Ninth, Tenth and Fourteenth Amendments, as well as International

resolutions, laws, and treaties such as the UNIVERSAL DECLARATION OF HUMAN

RIGHTS, adopted by the United Nations General Assembly. *See, e.g.,* William J.

Brennan, *State Constitutions and the Protection of Individual Rights*, 90 HARV. L.

Then the plaintiffs claim if at If "at the heart of the First Amendment is the notion

that…in a free society one's beliefs should be shaped by his mind and his conscience

rather than coerced by the State" (*Abood,* 431 U.S. at 234-235), then there can be no

doubt that the government infringes on the First Amendment when     .(1) The First

Amendment protects communication of virtually all kinds, whether in written, verbal,

pictorial, or any symbolic form, and whether cognitive or emotive in nature.    .(2)

Communication entails the transmission and reception of whatever is communicated.

  .(3) Transmission and reception necessarily involves mentation on the part of both the

person transmitting and the person receiving.     .(4) It is in fact impossible to distinguish

in advance mentation that will be involved in or necessary to transmission and reception

from mentation that will not.     .(5) If communication is to be protected, *all* mentation

(regardless of its potential involvement in transmission or reception) must therefore be

protected. Michael Shapiro,

The plaintiffs will show that the sovereigns conduct in India, in Iraq, and before the

International United Nations is one that it can do whatever it feels like to whoever it feels

like even if it means that no written, verbal, pictorial, or any symbolic form, and whether

cognitive or emotive in nature will ever be exchanged between a father and her minor

plaintiff child because she is the defendants control and a such absolutely none has

occurred one between the other.

The First Amendment protects the communication of ideas, which itself implies protection of the

capacity to produce ideas.

Continuing, the Tenth Circuit in *Bee* observed:


    "In a society whose 'whole constitutional heritage rebels at the thought of giving

    government the power to control men's minds,' the governing institutions, and

    especially the courts, must not only reject direct attempts to exercise forbidden

    domination over mental processes; they must strictly examine as well oblique

    intrusions likely to produce, or designed to produce, the same result." L. Tribe,

    [*supra*] at 899 (1978) (quoting *Stanley,* [*supra*] 394

    U.S. 557, 565…). *Bee,* 744 F.2d at 1394.


The 20  century imagination is peppered with ruminations on the coercive potential of

electronic and chemical technologies. Variations on theme form the basis for countless

dystopian novels, most notably NINETEEN EIGHTY-FOUR. ("Don't you see that the

whole aim of Newspeak is to narrow the range of thought?…Every year fewer and fewer

words, and the range of consciousness always a little smaller"). George Orwell,

NINETEEN EIGHTY-FOUR 46 (Harcourt, Brace 1949); *see also*, *id*., Appendix "The

Principles of Newspeak;" A psychoactive drug named "Soma" controls citizens' behavior

in the novel BRAVE NEW WORLD. Aldous Huxley, BRAVE NEW WORLD,

(Doubleday 1932); In A CLOCKWORK ORANGE, the protagonist, Alex, is conditioned into a docile model citizen through aversion therapy. Anthony Burgess, A CLOCKWORK ORANGE, (W. W. Norton 1963); In THE TERMINAL MAN, a man's violent tendencies are controlled by implanting electrodes into his brain. Michael Crichton, THE TERMINAL MAN, (Knopf 1972); In THIS PERFECT DAY inhabitants are genetically engineered and drugged daily into a calm state of mind. Ira Levin, THIS PERFECT DAY, (Random House 1970); In WOMAN ON THE EDGE OF TIME, the heroine is incarcerated in a mental hospital and subjected to a panoply of forced-drugs and is subjected to electrode implantation in the brain. Marge Piercy, (Knopf 1976); In SYNNERS, socket nanotechnology allows imperceptibly small brain implants to directly interface with a readily available cybernetic information network. Pat Cadigan, SYNNERS, (Bantam Spectra 1991); In MINDPLAYERS, mind-to-mind technology works by infusing a chemical bath of sedatives to the brain, then engaging skull caps connected directly to neurons. For the central character, this experience has the effect of "producing a change in brain chemistry that felt as natural as changing your mind" Pat Cadigan, MINDPLAYERS 4, (Bantam Books 1987); *See generally* Kenneth Melvin, Stanley Brodsky and Raymond Fowler, Jr., eds. PSY-FI ONE: AN ANTHOLOGY OF PSYCHOLOGY IN SCIENCE FICTION (1st ed.: Random House, 1977). *Federal Agency Views on the Potential Application of "Brain Fingerprinting*." REPORT GAO-02-22, (Oct. 2001).

**Violating a Person's Fundamental Right to Freedom of Thought Solely to Advance**

**the Government's Interest in Adjudicating FISA  Does Not Withstand Strict**

**Scrutiny**

To infringe on a fundamental right such as the First Amendment right to freedom of thought, the government must justify its action by no less a standard than strict scrutiny. *See N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963) ("The decisions of this Court have consistently held that only a compelling state interest…can justify limiting First Amendment freedoms."); *Brandon,* 158 F.3d at 957 ("[T]o forcibly medicate [a non-dangerous pretrial detainee] the government must satisfy strict scrutiny review and demonstrate that its proposed approach is narrowly tailored to a compelling interest.").

**1. The Government's Interest in         Adjudicating Crimes Is, Standing Alone, Insufficiently Compelling to Justify Forcible Alteration of a Defendant's Thought Processes**

To survive strict scrutiny, the governmental interest advanced "must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). Here, the sole interest asserted by the state is its "interest in FSIA Act."  While this is undeniably a *legitimate* governmental interest, the plaintiffs submits that it is insufficiently *compelling, by itself,* to override a person's First Amendment right to freedom of thought.

As this Court observed nearly 100 years ago: There is…a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. *Jacobson v.*

*Massachusetts*, 197 U.S. 11, 29 (1905).

A person's intellect is surely within that protected sphere. The right of a person to liberty, autonomy and privacy over his or her own thought processes is situated at the core of what it means to be a free person. It is essential to the most elementary concepts of human freedom, dignity, and self-expression, and demands this Court's steadfast protection. The right to sovereignty over one's own thought processes is the quintessence of freedom, and is protected by the First Amendment.


**Argument VI**


On March 29, 2005, this Court issued a Memorandum Opinion and Order that contained several holdings regarding the causes of action that can be asserted against a foreign state or instrumentality in the wake of Acree and Cicippio-Puleo.  This Court held, inter alia, that a plaintiff may bring any action against a foreign state or instrumentality through section 1606 of the FSIA that the plaintiff could bring against a private individual in like circumstances, Mem. Op. at 20-31; that a plaintiff may therefore state a claim against a foreign state in a section 1605(a)(7) case under state common law or statutory law, Mem. Op. at 31-41; that the District of Columbia supplies the choice of law principles for a state law section 1605(a)(7) case, Mem. Op. at 32-34, ……….


See Modderno v. King, 82 F.3d 1059, 1063 (D.C. Cir. 1996) ("[T]he complaint

must, to survive a motion to dismiss, give the defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests." (quotation omitted)); see also Krieger v.

Fadely, 211 F.3d 134, 136 (D.C. Cir. 2000) (stating only that complaints "need not plead

law or match facts *to every element of a legal theory"* (emphasis added))  An FSIA action

raises the somewhat unusual prospect of a wide range of potential causes of action and

sources of law for a single legal claim. The D.C. Circuit could reasonably have concluded

that allowing a plaintiff to allege a vague tort claim without disclosing the exact nature of

the claim, and forcing a foreign state to anticipate and defend against a variety of

indeterminate legal claims, is neither a fair nor sensible result, particularly given the

already sensitive nature of suits against foreign states for alleged sponsorship of

terrorism.   This opinion interprets the federal criminal prohibition against torture

codified at 18

U.S.C. §§ 2340-2340A. It supersedes in its entirety the August 1, 2002 opinion of this

Office entitled Standards of Conduct under 18 U.S.C. §§ 2340-2340A.

That statute prohibits conduct "specifically intended to inflict severe physical or

mental pain or suffering." This opinion concludes that "severe" pain under the statute is

not limited to "excruciating or agonizing" pain or pain "equivalent in intensity to the pain

accompanying serious physical injury, such as organ failure, impairment of bodily

functions, or even death."

The statute also prohibits certain conduct specifically intended to cause "severe

physical suffering" distinct from "severe physical pain."

Torture is abhorrent both to American law and values and to international norms.

This universal repudiation of torture is reflected in our criminal law, for example, 18

U.S.C. §§ 2340-2340A; international agreements, exemplified by the United Nations Convention Against Torture (the "CAT") (1); customary international law (2); centuries of Anglo-American law (3); and the longstanding policy of the United States. Then the defendant in the Motion to Dismiss admits that the plaintiff Nara Avalon singhderewa is under the defendants control and Section 2340A provides that "[w]hoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life." (9) Section 2340(1) defines "torture" as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." (10)

The CAT defines "torture" so as to require the intentional infliction of "severe pain or suffering, whether physical or mental." Article 1(1) of the CAT provides: For the purposes of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent

or acquiescence of a public official or other person acting in an official

capacity. It does not include pain or suffering arising only from, inherent

in or incidental to lawful sanctions.

And the plaintiffs have alleged from the about April of 2005 to

present the defendants have conducted the following torture on

the plaintiffs:

.• hyper-suggestibility, whereby plaintiffs  accept suggestions at deep levels of consciousness making the plaintiffs believe one is dead for the other. Where the common link between most situations of hyper-suggestibility appears to be a narrow selective focus of attention resulting from such diverse conditions as sensory isolation, relaxed attentiveness or extreme fear suggesting the parent and

.child forever remain vanished.  Many do not recognize the state of hypnosis because what they expect is to become unconscious. Language itself is infected with the unconscious to the point where language is a collective unconscious dream.  The dream of the inalienable right and those guaranteed by the Rights of the child have been made to vanish by the defendants.

.    •    If the plaintiff Nara is alive then her Automatic activities like taking a shower or driving a car allow daydreaming and favor states of hypersuggestibility. Drifting from an alert state into a different level of consciousness, brain activity shifts as these states change. Everyone goes through altered states of consciousness at least twice a day—when you awaken and when you go to sleep are in part controlled by the defendants where she is never allowed to communicate with her plaintiff father and the school systems and other systems of the defendants have been manipulated to Being

aware of things going on around you, doesn't mean you're not hypnotized. Even when in hypnosis, you remain conscious of everything that is going on. Experiencing this light or medium hypnotic state is generally more effective than deep level hypnosis for purposes of behavior and habit control. Becoming more conditioned to the hypnotic state through successive sessions, the subject will continue to go deeper into trance each time which is primarily the death of the plaintiff one for the other.

.• Truisms linked to an indirect suggestion that presupposes the subjects will go into an altered state, linked to a physiological inevitability make the hypnotic response seem impersonalized and hence automatic. By disassociating and de

.personalizing processes normally thought to be validations of our consciousness, and overloading the conscious mind through self-referentiality Senso-Linguistic infiltration makes it easier to stop trying to do anything consciously. As the map is not the territory, internal representations carry some reality but do not reflect what actually happened. Internal representations and physiology are linked in a cybernetic loop. As subjects are told what to think, their behavior is a result of the state they are in. as such the father plaintiff is made to vanish in the pattern done millions of times with Aborigine Families creating a nations of the LOST GENERATION totally in STATE control. The plaintiffs at trial will show the defendant is skilled in this manner and uses this method in Baxter Prison systems, Christmas Island and other offshore Prison system driving minor children insane.

. • Defendants have applied Hyper state control mechanisms convey ideas that guide the focus of attention through language to make the father and minor child vanish one for the other. Defendants have made plaintiffs fix your attention on, you get

more of. When subjects focus their attention, they have less of it left for external sensory stimuli as words paint pictures in their mind. The frame of perception influences meaning and the success of hypnotic induction. Meaning is created by the frames you choose to use, the context you create. A given perspective with its inherent dimensional distortions is loaded with visual interpretation and is a major effect of many optical illusions. Individuals with the biggest variety of choices would be the ones who have the broadest range of ways to look at things and hence the greatest scope for control. Reframing can decrease opportunities, which in turn decreases flexibility and power.

A typical move for a political influence group would be to set up news services for metadata-manipulation and subpropaganda. Intelligence Agencies put their intelligence into cooking infobytes from raw data for the editorial section of newspapers. Journalists or editorial boards benefit from lines they did not have to write up and willingly accept them when issued from a neutral front organization. Who needs censorship, when "extraintelligence" infobody styling is available? Power itself is invisible, is experienced by its effects only. The question of who or what is in control remains unanswered as only its representation appears and what lies behind it is lost. (Ambassadorial systems are costly but highly effective inducers.) The war of representation systems is fought over standards and references. Hyper state control is a means of heightening motivation by programming the subconscious mind to work in active cooperation with implanted conscious desires and is therefore extremely effective in helping to create behavior modification. By this application

the state has manipulated the plaintiff minor daughter to make her father

vanish and change her identity so that she remains vanished and has

implanted secret fathers and secret men into her tender life.  The defendant

have mastered this technique and at trial it will show that they have used

this method widely in state controlled prisons mainly holding children.

.        •        An information-menu is a special form of map. Symbolic orientation

systems attributed with the aura of objectivity are a traditional subject of military and

extra-intelligence. Distortions from dimensional effects and the use of perspective have

always been an instrument of power and topographic maps are processed and

manipulated for strategic reasons. In world maps, projections of a 3-D sphere onto the

plane are propagandistically used regarding size and the center of power. The trapdoors

of perception are wide open for travelers on territorial maps. With the complexity of a

non-linear information system, as in hypermedia one can expect not only enhanced

retrievability of data but also a field for manipulation of a higher order. A major threat in

modern life is being killed by your own defense system, which has been triggered too

often by direct and indirect hypnotic suggestions. Automatic clusters of deep trance

phenomena that act as our patterns of defense.

.        •        The concept of memory as a tool and set of techniques that can be learned

and skillfully applied to form mental and ideological spaces has a long tradition. Its use

as a weapon to establish symbolic orders can be traced back to the earliest records of

domination. Pre-modern societies based their social memory on the interaction of oral

transmission and information in pictorial code. Artificial memory is established through

places and images, a virtual psycho-geography of synreal systems, strengthened and

confirmed by training. Regulated by the state through an education system controlled by priestly elite, sensory perception can be harnessed through the visual representations of extremes or analogies which will then be methodologically applied in the creation of mental scenarios and punctuate the individual's development through ritualistic ceremonies. A monologic tyranny of monuments radiating the wonders and mysteries of the symbolic order, memorials of a spectacular reconfiguration of memory. These scenarios introduce an "arrow of time" and an inherently political narrative logic to a mental structure of psycho-civilization, dependent on collective ritual re-enactment and performance, reinforcing hyperlinks of cognitive associations within the ideational bunker within which the defendants has tried to make vanish the minor for the father and the father for the minor cause suffering and pain.

.    •    The defendant through the manipulation in Courts and nations has made the plaintiff relinquish their autonomy, people find it difficult to accept that individuals can be hypnotized to perform an act that is against their moral principles. On the contrary they concluded that people could be induced to commit acts contrary to their morality if their reality was distorted by hypnotic state control. One of the experiments involved trying to manipulate a normal, stable army private to attack a superior officer, a cardinal sin in the military. While in deep trance he was told that the officer sitting across from him was an enemy soldier who was going to attempt to kill him. In the private's mind, it was a "kill or be killed" situation. The private immediately jumped up and grabbed the officer by the throat. The experiment was repeated several times.  It is the purpose of the defendant to carry on this torture on the plaintiffs so that they may grow up to ROBOTS for the state and have no control at all over who the father is and only regurgitate "YES

MINISTER".

- The defendant has tortured and manipulated The middle levels of hyper state control are the ones in which behavior modification will occur most easily and the ones in which one is most susceptible to posthypnotic suggestion. More important than what has happened in someone's life is how it is interpreted. Brainwashing is not necessarily achieved by punishment or reward but by changing the self-image, reprogramming and breaking psycho-cybernetic loops, control circuits of affirmation and denial. Humans can tolerate only small amounts of discrepancy between their thoughts and behavior. Goals or outcomes are related to certain behaviors and/or physical things—the way you feel about something. They have made vanish the plaintiff for a minor child.

. • Using the hostage and concealment methods the defendants have used Hyper State control as a political tool uses psychologically coercive techniques in order to indoctrinate subjects. The end justifies the means to form an elitist, totalitarian society. If you make a person behave the way you want, you can make that person believe what you want. Hyper-State control techniques are based on the same principles as mind control techniques studied in social control systems of cult groups and social bodies in general. Among them are practices of isolation, regression, meta-communication (implanting subliminal messages by stressing keywords or phrases in long, confusing explanations), and group pressure. The aim is alertness reduction, programmed confusion and flattening of the mind. The chthonic will express itself against the conscious mind, when ordinary thinking is silenced, distracted, or thoroughly deranged.

.    •    The Senate attached the following understanding to its resolution of advice and consent to ratification of the CAT:

.    •    The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

.    •    S. Exec. Rep. No. 101-30, at 36 (1990). This understanding was deposited with the U.S. instrument of ratification, see 1830 U.N.T.S. 320 (Oct. 21, 1994), and thus defines the scope of the United States' obligations under the treaty. See Relevance of Senate Ratification History to Treaty Interpretation, 11 Op. O.L.C. 28, 32-33 (1987). The criminal prohibition against torture that Congress codified in 18 U.S.C. §§ 2340-2340A generally tracks the prohibition in the CAT, subject to the U.S. understanding.

.    •    Further, the CAT distinguishes between torture and "other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1." CAT art. 16. The CAT thus treats torture as an "extreme form" of cruel, inhuman, or degrading treatment. See S. Exec. Rep. No. 101-30, at 6, 13; see also J. Herman

Burgers & Hans Danelius, The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment 80 (1988) ("CAT Handbook") (noting that Article 16 implies "that torture is the gravest form of [cruel, inhuman, or degrading] treatment [or] punishment") (emphasis added); Malcolm D. Evans, Getting to Grips with Torture, 51 Int'l & Comp. L.Q. 365, 369 (2002) (The CAT "formalises a distinction between torture on the one hand and inhuman and degrading treatment on the other by attributing different legal consequences to them."). (14) The Senate Foreign Relations Committee emphasized this point in its report recommending that the Senate consent to ratification of the CAT. See S. Exec. Rep. No. 101-30, at 13 ("'Torture' is thus to be distinguished from lesser forms of cruel, inhuman, or degrading treatment or punishment, which are to be deplored and prevented, but are not so universally and categorically condemned as to warrant the severe legal consequences that the Convention provides in the case of torture. . . . The requirement that torture be an extreme form of cruel and inhuman treatment is expressed in Article 16, which refers to 'other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture . . . .'").

Drawing distinctions among gradations of pain (for example, severe, mild, moderate, substantial, extreme, intense, excruciating, or agonizing) is obviously not an easy task, especially given the lack of any

precise,

(

objective scientific criteria for measuring pain. [18]    We are, however, aided

in this task by judicial interpretations of the Torture Victims Protection

Act ("TVPA"), 28 U.S.C. § 1350 note (2000). The TVPA, also enacted to

implement the CAT, provides a civil remedy to victims of torture. The

TVPA defines "torture" to include:

> any act, directed against an individual in the offender's
>
> custody or physical control, by which *severe pain or*
>
> *suffering* (other than pain or suffering arising only from or
>
> inherent in, or incidental to, lawful sanctions), *whether*
>
> *physical or mental*, is intentionally inflicted on
>
> that individual for such purposes as obtaining from
>
> that individual or a third person information or a
>
> confession, punishing that individual for an act
>
> that individual or a third person has committed or
>
> is suspected of having committed, intimidating or
>
> coercing that individual or a third person, or for
>
> any reason based on discrimination of any kind . . .
>
> .

28 U.S.C. § 1350 note, § 3(b)(1) (emphases added). The emphasized

language is similar to section 2340's "severe physical or mental pain or

(

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 51 of 70

suffering."[19] As the Court of Appeals for the District of Columbia Circuit

has explained:

> The severity requirement is crucial to ensuring that the
> conduct proscribed by the [CAT] and the TVPA is
> sufficiently extreme and outrageous to warrant the
> universal condemnation that the term "torture" both
> connotes and invokes. The drafters of the [CAT], as well as
> the Reagan Administration that signed it, the Bush
> Administration that submitted it to Congress, and the
> Senate that ultimately ratified it, therefore all sought to
> ensure that "only acts of certain gravity shall be considered
> to constitute torture."
>
> The critical issue is the degree of pain and suffering that the
> alleged torturer intended to, and actually did, inflict upon the victim. The
> more intense, lasting, or heinous the agony, the more likely it is to be
> torture.

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92-93

(D.C. Cir. 2002) (citations omitted). That court concluded that a complaint that alleged

beatings at the hands of police but that did not provide details concerning "the severity of

plaintiffs' alleged beatings, including their frequency, duration, the parts of the body at

which they were aimed, and the weapons used to carry them out," did not suffice "to

ensure that [it] satisfy[ied] the TVPA's rigorous definition of torture." *Id*. at 93.

• In *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230 (D.C. Cir. 2003), the D.C. Circuit again considered the types of acts that constitute torture under the TVPA definition. The plaintiff alleged, among other things, that Libyan authorities had held her incommunicado and threatened to kill her if she tried to leave. *See id.* at 232, 234. The court acknowledged that "these alleged acts certainly reflect a bent toward cruelty on the part of their perpetrators," but, reversing the district court, went on to hold that "they are not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the [TVPA]." *Id.* at 234. Cases in which courts have found torture suggest the nature of the extreme conduct that falls within the statutory definition. *See, e.g.*, *Hilao v. Estate of Marcos*, 103 F.3d 789, 790-91, 795 (9th Cir. 1996) (concluding that a course of conduct that included, among other things, severe beatings of plaintiff, repeated threats of death and electric shock, sleep deprivation, extended shackling to a cot (at times with a towel over his nose and mouth and water poured down his nostrils), seven months of confinement in a "suffocatingly hot" and cramped cell, and eight years of solitary or near-solitary confinement, constituted torture); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1332-40, 1345-46 (N.D. Ga. 2002) (concluding that a course of conduct that included, among other things, severe beatings to the genitals, head, and other parts of the body with metal pipes, brass knuckles, batons, a baseball bat, and various other items; removal of teeth with pliers; kicking in the face and ribs; breaking of bones and

ribs and dislocation of fingers; cutting a figure into the victim's forehead; hanging the victim and beating him; extreme limitations of food and water; and subjection to games of "Russian roulette," constituted torture); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22-23 (D.D.C. 2001) (entering default judgment against Iraq where plaintiffs alleged, among other things, threats of "physical torture, such as cutting off . . . fingers, pulling out . . . fingernails," and electric shocks to the testicles); *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 64-66 (D.D.C. 1998) (concluding that a course of conduct that included frequent beatings, pistol whipping, threats of imminent death, electric shocks, and attempts to force confessions by playing Russian roulette and pulling the trigger at each denial, constituted torture.

.   •   Section 2340 defines "severe mental pain or suffering" to mean:

.   •   the prolonged mental harm caused by or resulting from--

.   •   (A) the intentional infliction or threatened infliction of severe physical pain or suffering;

.   •   (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

.   •   (C) the threat of imminent death; or

.   •   (D) the threat that another person will imminently be subjected to death,

severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality[.]

.• An important preliminary question with respect to this definition is whether the statutory list of the four "predicate acts" in section 2340(2)(A)-(D) is exclusive. We conclude that Congress intended the list of predicate acts to be exclusive--that is, to constitute the proscribed "severe mental pain or suffering" under the statute, the prolonged mental harm must be caused by acts falling within one of the four statutory categories of predicate acts. We reach this conclusion based on the clear language of the statute, which provides a detailed definition that includes four categories of predicate acts joined

.by the disjunctive and does not contain a catchall provision or any other language suggesting that additional acts might qualify (for example, language such as "including" or "such acts as"). (23) Congress plainly considered very specific predicate acts, and this definition tracks the Senate's understanding concerning mental pain or suffering when giving its advice and consent to ratification of the CAT. The conclusion that the list of predicate acts is exclusive is consistent with both the text of the Senate's understanding, and with the fact that it was adopted out of concern that the CAT's definition of torture did not otherwise meet the requirement for clarity in defining crimes. See supra note 21. Adopting an interpretation of the statute that expands the list of predicate acts for "severe mental pain or

suffering" would constitute an impermissible rewriting of the statute and would introduce the very imprecision that prompted the Senate to adopt its understanding when giving its advice and consent to ratification of the CAT.

.•    Another question is whether the requirement of "prolonged mental harm" caused by or resulting from one of the enumerated predicate acts is a separate requirement, or whether such "prolonged mental harm" is to be presumed any time one of the predicate acts occurs. Although it is possible to read the statute's reference to "the prolonged mental harm caused by or resulting from" the predicate acts as creating

.a statutory presumption that each of the predicate acts always causes prolonged mental harm, we do not believe that was Congress's intent. As noted, this language closely tracks the understanding that the Senate adopted when it gave its advice and consent to ratification of the CAT:

.    •    in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be

subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

.•    S. Exec. Rep. No. 101-30, at 36. We do not believe that simply by adding the word "the" before "prolonged harm," Congress intended a material change in the definition of mental pain or suffering as articulated in the Senate's understanding to the CAT. The legislative history, moreover, confirms that sections 2340-2340A were intended

.to fulfill--but not go beyond--the United States' obligations under the CAT: "This section provides the necessary legislation to implement the [CAT]. . . . The definition of torture emanates directly from article 1 of the [CAT].   The definition for 'severe mental pain and suffering' incorporates the [above mentioned] understanding." S. Rep. No. 103-107, at 58-59 (1993). This understanding, embodied in the statute, was meant to define the obligation undertaken by the United States. Given this understanding, the legislative history, and the fact that section 2340(2) defines "severe mental pain or suffering" carefully in language very similar to the understanding, we do not believe that Congress intended the definition to create a presumption that any time one of the predicate acts occurs, prolonged mental harm is deemed to result.

.•       Turning to the question of what constitutes "prolonged mental harm caused by or resulting from" a predicate act, we believe that Congress intended this phrase to

require mental "harm" that is caused by or that results from a predicate act, and that has some lasting duration. There is little guidance to draw upon in interpreting this phrase. (24) Nevertheless, our interpretation is consistent with the ordinary meaning of the statutory terms. First, the use of the word "harm"--as opposed to simply repeating "pain or suffering"--suggests some mental damage or injury. Ordinary dictionary definitions of "harm," such as "physical or mental damage: injury," Webster's Third

.New International Dictionary at 1034 (emphasis added), or "[p]hysical or psychological injury or damage," American Heritage Dictionary of the English Language at 825 (emphasis added), support this interpretation. Second, to "prolong" means to "lengthen in time" or to "extend in duration," or to "draw out," Webster's Third New International Dictionary at 1815, further suggesting that to be "prolonged," the mental damage must extend for some period of time. This damage need not be permanent, but it must continue for a "prolonged" period of time. (25) Finally, under section 2340(2), the "prolonged mental harm" must be "caused by" or "resulting from" one of the enumerated predicate acts. (26)

.    •    Although there are few judicial opinions discussing the question of "prolonged mental harm," those cases that have addressed the issue are consistent with our view. For example, in the TVPA case of Mehinovic, the court explained that:

.    •    [The defendant] also caused or participated in the plaintiffs' mental torture. Mental torture consists of "prolonged mental harm caused by or resulting from: the

intentional infliction or threatened infliction of severe physical pain or suffering; . . . the threat of imminent death . . . ." As set out above, plaintiffs noted in their testimony that they feared that they would be killed by [the defendant] during the beatings he inflicted or during games of "Russian roulette." Each plaintiff

continues to suffer long-term psychological harm as a result of the

ordeals they suffered at the hands of defendant and others.

•     198 F. Supp. 2d at 1346 (emphasis added; first ellipsis in original). In reaching its conclusion, the court noted that the plaintiffs were continuing to suffer serious mental harm even ten years after the events in question: One plaintiff "suffers from anxiety, flashbacks, and nightmares and has difficulty sleeping. [He] continues to suffer thinking about what happened to him during this ordeal and has been unable to work as a result of the continuing effects of the torture he endured." Id. at 1334. Another plaintiff "suffers from anxiety, sleeps very little, and has frequent nightmares. . . . [He] has found it impossible to return to work." Id. at 1336. A third plaintiff "has frequent nightmares. He has had to use medication to help him sleep. His experience has made him feel depressed and reclusive, and he has not been able to work since he escaped from this ordeal." Id. at 1337

.38.    And the fourth plaintiff "has flashbacks and nightmares, suffers from nervousness, angers easily, and has difficulty trusting people. These effects directly impact and interfere with his ability to work." Id. at 1340. In each case, these mental effects were continuing years after the infliction of the predicate acts.

.•    And in Sackie v. Ashcroft, 270 F. Supp. 2d 596 (E.D. Pa. 2003), the individual

had been kidnapped and "forcibly recruited" as a child

.soldier at the age of 14, and over the next three to four years had been

forced to take narcotics and threatened with imminent death. Id. at

597-98, 601-02. The court concluded that the resulting mental harm,

which continued over this three-to-four-year period, qualified as

"prolonged mental harm." Id. at 602.

.    •    Conversely, in Villeda Aldana v. Fresh Del Monte Produce, Inc., 305

F. Supp. 2d 1285 (S.D. Fla. 2003), the court rejected a claim under the TVPA brought by

individuals who had been held at gunpoint overnight and repeatedly threatened with

death. While recognizing that the plaintiffs had experienced an "ordeal," the court

concluded that they had failed to show that their experience caused lasting damage,

noting that "there is simply no allegation that Plaintiffs have suffered any prolonged

mental harm or physical injury as a result of their alleged intimidation." Id. at 1294-95.

.    •    (4) The meaning of "specifically intended."

.    •    It is well recognized that the term "specific intent" is ambiguous and

that the courts do not use it consistently. See 1 Wayne R. LaFave, Substantive Criminal

Law § 5.2(e), at 355 & n.79 (2d ed. 2003). "Specific intent" is most commonly

understood, however, "to designate a special mental element which is required above and

beyond any mental state required with respect to the actus reus of the crime." Id. at 354;

see also Carter v. United States, 530 U.S. 255, 268 (2000) (explaining that general intent,

as opposed to specific intent, requires "that the defendant possessed knowledge [only] with respect to the actus reus of the crime"). As one respected treatise explains:

.    •    With crimes which require that the defendant intentionally cause a specific result, what is meant by an "intention" to cause that result? Although the theorists have not always been in agreement . . . , the traditional view is that a person who acts . . . intends a result of his act . . . under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.

.    •    1 LaFave, Substantive Criminal Law, § 5.2(a), at 341 (footnote omitted).

.•    As noted, the cases are inconsistent. Some suggest that only a conscious desire to produce the proscribed result constitutes specific intent; others suggest that even reasonable foreseeability suffices. In United States v. Bailey, 444 U.S. 394 (1980), for example, the Court suggested that, at least "[i]n a general sense," id. at 405, "specific intent" requires that one consciously desire the result. Id. at 403-05. The Court compared the common law's mens rea concepts of specific intent and general intent to the Model Penal Code's mens rea concepts of acting purposefully and acting knowingly. Id. at 404-05.                                    "[A] person who causes a particular result is said to act purposefully," wrote the Court, "if 'he consciously desires that result, whatever the likelihood of that result happening from his conduct.'" Id. at 404 (internal quotation marks omitted). A person "is said to act knowingly," in contrast, "if he is aware 'that that result is practically

CASE 1:07 cv-01170-JDB    Document 17    Filed October 29, 2007    Page 61 of 70

certain to follow from his conduct, whatever his desire may be as to that result.'" Id. (internal quotation marks omitted). The Court then stated: "In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." Id. at 405.

.    •    In contrast, cases such as United States v. Neiswender, 590 F.2d 1269 (4th Cir. 1979), suggest that to prove specific intent it is enough that the defendant simply have "knowledge or notice" that his act "would have likely resulted in" the proscribed outcome. Id. at 1273. "Notice," the court held, "is provided by the reasonable foreseeability of the natural and probable consequences of one's acts." Id.

.•    We do not believe it is useful to try to define the precise meaning of "specific intent" in section 2340. (27) In light of the President's directive that the United States not engage in torture, it would not be appropriate to rely on parsing the specific intent element of the statute to approve as lawful conduct that might otherwise amount to torture.

.Some observations, however, are appropriate. It is clear that the specific intent element of section 2340 would be met if a defendant performed an act and "consciously desire[d]" that act to inflict severe physical or mental pain or suffering. 1 LaFave, Substantive Criminal Law § 5.2(a), at 341. Conversely, if an individual acted in good faith, and only after reasonable investigation establishing that his conduct would not inflict severe physical or mental pain or suffering, it appears

unlikely that he would have the specific intent necessary to violate sections 2340-2340A. Such an individual could be said neither consciously to desire the proscribed result, see, e.g., Bailey, 444 U.S. at 405, nor to have "knowledge or notice" that his act "would likely have resulted in" the proscribed outcome, Neiswender, 590 F.2d at 1273.

.     •          Two final points on the issue of specific intent: First, specific intent must be distinguished from motive. There is no exception under the statute permitting torture to be used for a "good reason." Thus, a defendant's motive (to protect national security, for example) is not relevant to the question whether he has acted with the requisite specific intent under the statute. See Cheek v. United States, 498 U.S. 192, 200-01 (1991). Second, specific intent to take a given action can be found even if the defendant will take the action only conditionally. Cf., e.g., Holloway v. United States, 526 U.S. 1, 11 (1999) ("[A] defendant may not negate a proscribed intent by requiring the victim to comply with a condition the defendant has no right to impose."). See also id. at 10-11 & nn. 9-12; Model Penal Code § 2.02(6). Thus, for example, the fact that a victim might have avoided being tortured by cooperating with the perpetrator would not make permissible actions otherwise constituting torture under the statute. Presumably that has frequently been the case with torture, but that fact does not make the practice of torture any less abhorrent or unlawful. (28)


• Now the defendant in the motion to dismiss has admitted the plaintiff Nara being five

years old is an Australian Child of the plaintiff Jugvir inder Singh and has admitted that

Nara is in defendants control and then  18 U.S.C. § 2340A (2000).

10. Section 2340 provides in full:

> As used in this chapter--

>> (1) "torture" means an act committed by a person acting under color of
>> law specifically intended to inflict severe physical or mental pain
>> or suffering (other than pain or suffering incidental to lawful
>> sanctions) upon another person within his custody or physical
>> control;

This approach--distinguishing torture from lesser forms of cruel, inhuman, or degrading

treatment--is consistent with other international law sources. The CAT's predecessor, the

U.N. Torture Declaration, defined torture as "an aggravated and deliberate form of cruel,

inhuman or degrading treatment or punishment." Declaration on the Protection of All

Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading

Treatment or Punishment, U.N. Res. 3452, art. 1(2) (Dec. 9, 1975) (emphasis added); see

also S. Treaty Doc. No. 100-20 at 2 (The U.N. Torture Declaration was "a point of

departure for the drafting of the [CAT]."). Other treaties also distinguish torture from

lesser forms of cruel, inhuman, or degrading treatment. See, e.g., European Convention

for the Protection of Human Rights and Fundamental Freedoms, art. 3, 213 U.N.T.S. 221

(Nov. 4, 1950) ("European Convention") ("No one shall be subjected to torture or to

inhuman or degrading treatment or punishment."); Evans, Getting to Grips with Torture,

51 Int'l & Comp. L.Q. at 370 ("[T]he ECHR organs have adopted . . . a 'vertical' approach

. . . , which is seen as comprising three separate elements, each representing a progression of seriousness, in which one moves progressively from forms of ill-treatment which are 'degrading' to those which are 'inhuman' and then to 'torture'. The distinctions between them is [sic] based on the severity of suffering involved, with 'torture' at the apex."); Debra Long, Association for the Prevention of Torture, Guide to Jurisprudence on Torture and Ill-Treatment: Article 3 of the European Convention for the Protection of Human Rights 13 (2002) (The approach of distinguishing between "torture," "inhuman" acts, and "degrading" acts has "remained the standard approach taken by the European judicial bodies. Within this approach torture has been singled out as carrying a special stigma, which distinguishes it from other forms of ill-treatment."). See also CAT Handbook at 115-17 (discussing the European Court of Human Rights ("ECHR") decision in Ireland v. United Kingdom, 25 Eur. Ct. H.R. (ser. A) (1978) (concluding that the combined use of wall-standing, hooding, subjection to noise, deprivation of sleep, and deprivation of food and drink constituted inhuman or degrading treatment but not torture under the European Convention)). Cases decided by the ECHR subsequent to Ireland have continued to view torture as an aggravated form of inhuman treatment. See, e.g., Aktas v. Turkey, No. 24351/94 ¶ 313 (E.C.H.R. 2003); Akkoc v. Turkey, Nos. 22947/93 & 22948/93 ¶ 115 (E.C.H.R. 2000); Kaya v. Turkey, No. 22535/93 ¶ 117 (E.C.H.R. 2000). Section 3(b)(2) of the TVPA defines "mental pain or suffering" similarly to the way that section 2340(2) defines "severe mental pain or suffering." . The phrase "prolonged mental harm" does not appear in the relevant medical literature or elsewhere in the United States Code. The August 2002 Memorandum concluded that to constitute "prolonged mental harm," there must be "significant psychological harm of significant

duration, e.g., lasting for months or even years." Id. at 1; see also id. at 7. Although we believe that the mental harm must be of some lasting duration to be "prolonged," to the extent that that formulation was intended to suggest that the mental harm would have to last for at least "months or even years,"


ARGUMENT VII

For the purposes of the present CHILD RIGHTS Convention, a child means every human being below the age of eighteen years unless under the law applicable to the child, majority is attained earlier and plaintiff is the natural daughter of the plaintiff Jugvir Inder Singh, born in Southport, Queensland, Australia on May 28 2002.

The defendant has signed Article 2

1.  States Parties shall respect and ensure the rights set forth in the present Convention to each child within their jurisdiction without discrimination of any kind, irrespective of the child's or his or her parent's or legal guardian's race, colour, sex, language, religion, political or other opinion, national, ethnic or social origin, property, disability, birth or other status and derogated my rights and violated and battered me by keeping me hostaged and concealed from my father the plaintiff.

2.  At trial, and part of discovery will show that the defendants singned Article where the child, plaintiff shall be registered immediately after birth and shall have the right from birth to a name, the right to acquire a nationality and. as far as possible, the right to know and be cared for by his or her parents and defendants conspired with CENTERLINK to change the identity of the plaintiffs and did so

by making the plaintiff father vanish.

3.  At trial it will be shown that the defendants signed Article wherr States Parties
    undertake to respect the right of the child to preserve his or her identity, including
    nationality, name and family relations as recognized by law without unlawful
    interference and conspired to change her name to Simmons from Singhderewa
    and make an Aaron Paul Simmons natural father of the plaintiff.

4.  Then the at trial it will be shown, as subject is still in Discovery that defendants
    signed Article 9 where as a States Parties shall ensure that a child shall not be
    separated from his or her parents against their will, except when competent
    authorities subject to judicial review determine, in accordance with applicable law
    and procedures, that such separation is necessary for the best interests of the child.
    Such determination may be necessary in a particular case such as one involving
    abuse or neglect of the child by the parents, or one where the parents are living
    separately and a decision must be made as to the child's place of residence. It is
    will be shown that the defendants conspired to keep me kidnapped, held hostage,
    concealed to violate me and my rights and be deprived of my father plaintiff.

5.  It will be shown at trial, as the discovery is still outsanding that the defendant as a
    States Parties shall respect the right of the child who is separated from one or both
    parents to maintain personal relations and direct contact with both parents on a
    regular basis, except if it is contrary to the child's best interests. 4. Where such
    separation results from any action initiated by a State Party, such as the detention,
    imprisonment, exile, deportation or death (including death arising from any cause
    while the person is in the custody of the State) of one or both parents or of the

child, that State Party shall, upon request, provide the parents, the child or, if appropriate, another member of the family with the essential information concerning the whereabouts of the absent member(s) of the family unless the provision of the information would be detrimental to the well-being of the child. States Parties shall further ensure that the submission of such a request shall of itself entail no adverse consequences for the person(s) concerned.   That in derogation and violation has concealed me from my father, kept me hostage and kidnapped and denied all contact whatsoever with my father and I am told he is dead.

6. Perhaps in its Motion dismiss the defendants seemed to tell the court that it is not a party or a signatory to Article 10 where. In accordance with the obligation of States Parties under article 9, paragraph 1, applications by a child or his or her parents to enter or leave a State Party for the purpose of family reunification shall be dealt with by States Parties in a positive, humane and expeditious manner. States Parties shall further ensure that the submission of such a request shall entail no adverse consequences for the applicants and for the members of their family. Seeing, the pattern of genocide of Aborigine Children, throwing children and murdering them at sea in SIEV programs, keeping minors locked up for years in offshore prisons, killing innocents by claiming wheat trucks are weapons of mass destruction the term humane might in the mind of the defendant become equivalent to torture and inhuman treatment.

7. 2. A child whose parents reside in different States shall have the right to maintain on a regular basis, save in exceptional circumstances personal relations and direct

contacts with both parents. Towards that end and in accordance with the obligation of States Parties under article 9, paragraph 1, States Parties shall respect the right of the child and his or her parents to leave any country, including their own, and to enter their own country. The right to leave any country shall be subject only to such restrictions as are prescribed by law and which are necessary to protect the national security, public order (ordre public), public health or morals or the rights and freedoms of others and are consistent with the other rights recognized in the present Convention.

8. In seeking to be above the law and soverign in representing me as an Australian the defendant might have omitted to supply to the court Article 16  No child shall be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honour and reputation.   So where is my father the plaintiff?

9. And The child has the right to the protection of the law against such interference or attacks not requests for protection of immunity.

10. As alleged the defendants have actively kidnapped me and held me hostage but if it were known that I am alive for my father the plaintiff then Article 18

11. 1. States Parties shall use their best efforts to ensure recognition of the principle that both parents have common responsibilities for the upbringing and development of the child. Parents or, as the case may be, legal guardians, have the primary responsibility for the upbringing and development of the child. The best interests of the child will be their basic concern.

12. 2. For the purpose of guaranteeing and promoting the rights set forth in the

present Convention, States Parties shall render appropriate assistance to parents and legal guardians in the performance of their child-rearing responsibilities and shall ensure the development of institutions, facilities and services for the care of children.

13. The defendant has been extremely selective in showing the court what agreements and treaties it has signed and what it has concealed. But in all cases no treaty can withstand the violation of the constitutional guarantees and fundamental freedoms and if so signed would be and illegal treaty.

14. Such a treaty as claimed by the defendant in the motion to dismiss, where the defendant has the right to violate in collusion with the United States of America, the constitutional Rights of American Nationals, the Civil Liberties of American Nationals and come into the United States and flaunt all about 25 laws and conspire, like in IRAQ with the other defendants, this AMAZING treaty is required to be registered with the United Nations.


CONCLUSION


Once an exception to immunity is found, the FSIA provides that a foreign state may be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606 (Supp. V 1999).    The plaintiffs have claimed exception to immunity in five cases: waiver (being that minor Nara Avalon Singhderewa being an Australian consents to the jurisdiction of the court,  commercial activity (being that CENTERLINK is a state Organization and the benefits to both the child and father

plaintiff will stem from the State and all the business and tangible and intangible ongoing business, expropriation (the exception at issue in Altmann) coupled with the Taking clause the determination of rights in property present in the United States, and certain torts occurring within U.S. territory being nearly 28 violations including, Inalienable, Fundamental Civil, Constitutional International Guarantees derogated. It is significant that each of the exceptions to immunity under the 1976 statute (other than the waiver and maritime lien exceptions) contains a jurisdictional nexus requirement—that is, a requirement that the property at issue or the conduct surrounding the claim bears a territorial connection to the United States. The nexus of direct impact on the United States is iron clad and will be proven in trial as un impeachable. The House Report accompanying the FSIA suggests that this requirement was included to ensure that due process concerns were met before asserting personal jurisdiction over a foreign state.

This complaint and the Memorandum Points and Authority give the Court Jurisdiction through the exceptions in FSIA.


S/' _____

NARA AVALON SINGHDEREWA

Represented by

JUGVIR INDER SINGH

LV 6000 - Left Front Bay



LV 6000 – Right Bay





LV 6000- Right Bay Top View





LV 6000- Computer Assembly 6109-1360 (32): Top View



LV 6000- Computer Assembly 6109-1360 (32): Rear View



LV 6000 – Transmitter 6109-1532 (28)



LV 6000 - SSC 6109-1354 (30) : Rear Bay



LV 6000 - SSC 6109-1354 (30) : Front View



LV 6000 - Analog Processor Assembly 6109-1349 (25)



LV 6000 – Flexlator Control Chasis 6109-1296 (85)



Rear View Exploded



Front View Exploded



LV 6000 Galvo Assembly 6109-1351 (27) Right Bay : Front View



LV 6000 – UPS Left Bay Rear View



94

LV 6000 - Bed Control 6109-1353 (29)



91

24

24

23

22

21

20

19

58



**Petitions Unit**
**TCB/OHCHR**

# <u>Friday, January 13, 2006</u>

**THE EVIDENCE IN THIS CASE IS QUITE CLEAR AS INCLUDED IN EXHIBIT 1 BELOW IN EVIDENCE THAT 10 DEFENDANTS ARE STATE ACTORS.**

**I NEED YOU TO TELL ME THAT THESE 10 DEFENDANTS LISTED IN THE EXHIBIT BELOW ARE NOT "STATE ACTOR"**

**PLEASE IN A COMPELETY NEW EMAIL POST UNDER YOUR LETTERHEAD THAT THE ACTORS LISTED 10 OF THEM ARE NOT STATE ACTORS.**

NOW IN EXHIBIT 2 WHICH IS A SUPREME DECISION PLEASE NOTE THAT THE DEFENDANTS ARE STATE ACTORS ONLY.

## JUGVIR INDER SINGH

PETITONER

# EXHIBIT FOR EVIDENCE BEFORE THE TB-petitions OHCHR" <tb-petitions@ohchr.org

# THE NATIONAL HUMAN RIGHTS COMMISSION

# NEW DELHI INDIA

# IN THE MATTER OF:

CASE NO 17/99/2005-2006

**KARUNA BISHNOI**
**MR ADRONA**
**MRS GROVER**
**MR. KOFI ANAN**
**UNICEF**
**LODHI ESTATE**
**NEW DELHI INDIA**

**DEFENDANT NO 1**

**SENATOR KAY PATTERSON**
**FAMILY ASSISTANCE**
**CANBERRA, AUSTRALIA**

**DEFENDANT NO 2**

**HON PETER BEATTIE**
**PREMIER & MINISTER FOR TRADE QLD. GOVT.**
**LEVEL 15 EXECUTIVE BUILDING, GEORGE ST.**
**BRISBANE, QLD. 4000**

**DEFENDANT NO 3**

**CONSTABLE EDMONDS**
**SOUTHPORT POLICE FORCE**
**96 SCARBROUGH STREET**
**SOUTHPORT, QUEENSLAND 4218**

**DEFENDANT NO 4**

**THE HON JOHN HOWARD MP.**
**PREMIER OF THE COMMONWEALTH OF AUSTRALIA**
**PARLIAMENT HOUSE**
**CANBERRA AUSTRALIA 2600**
**DEFENDANT NO 5**

**HON JUDY SPENCE,MP**
**MEMBER FRO MT GRAVATT**
**MINISTER FOR POLICE AND CORRECTIVE SERVICES**
**24TH FLOOR, STATE LAW BUILDING**
**50 ANN STREET, BRISBANE QLD 4000**

**DEFENDANT NO 6**

**MR. BRIAN PULLEN**
**MR. SHAKER NAMBIA**
**MR. GREWAL**
**AUSTRALIAN HIGH COMMISSION**
**1/50 G SHANTIPATH**
**CHANAKYAPURI**
**NEW DELHI 110 021**

**DEFENDANT NO 7**

**HON. MIKE REYNOLDS, AM,MP**
**MEMBER FOR TOWNSVILLE**
**MINSTER FOR CHILD SAFETY**
**7TH FLOOR 111 GEORGE STREET,**
**BRISBANE, QLD. 4001**

**DEFENDANT NO 8**

**CENTRELIN**
**GOVERNMENT OF AUSTRALIA**
**SOUTHPORT**
**QLD. AUSTRALIA**

**DEFENDANT NO 9**

**PHILLIP UDDOCK**
**ATTORNEY GENERAL**
**COMMONWEALTH OF AUSTRALIA**
**ROBERT GURAN OFFICES, NATIONAL CIRCUIT**
**BARTON ACT.  2600**

**DEFENDANT NO 10**

**GOLD CITY COUNCIL**
**GOLD COAST MC**
**QUEENSLAND 9729**

**DEFENDANT NO 11.**

**EXHIBIT 2:**

# IN THE SUPREME COURT OF INDIA
# CIVIL ORIGINAL JURISDICTION

### WRIT PETITION  (CIVIL)  447 OF 2005

## IN THE MATTER OF :

JUGVIR INDER SINGH

PETITIONOR

VS.

MINISTRY OF EXTERNAL AFFAIRS
THROUGH NATWAR SINGH

AND

COMMONWEALTH OF AUSTRALIA
(RESPONDENTS ON PAGE 26)

RESPONDENTS

**SENATOR KAY PATTERSON**
**FAMILY ASSISTANCE**
**CANBERRA, AUSTRALIA**


**HON PETER BEATTIE**
**PREMIER & MINISTER FOR TRADE QLD. GOVT.**
**LEVEL 15 EXECUTIVE BUILDING, GEORGE ST.**
**BRISBANE, QLD. 4000**


**CONSTABLE EDMONDS**
**SOUTHPORT POLICE FORCE**
**96 SCARBROUGH STREET**
**SOUTHPORT, QUEENSLAND 4218**

**THE HON JOHN HOWARD MP.**
**PREMIER OF THE COMMONWEALTH OF AUSTRALIA**
**PARLIAMENT HOUSE**
**CANBERRA AUSTRALIA 2600**


**HON JUDY SPENCE,MP**
**MEMBER FRO MT GRAVATT**
**MINISTER FOR POLICE AND CORRECTIVE SERVICES**
**24TH FLOOR, STATE LAW BUILDING**
**50 ANN STREET, BRISBANE QLD 4000**


**MR. BRIAN PULLEN**
**MR. SHAKER NAMBIA**
**MR. GREWAL**
**AUSTRALIAN HIGH COMMISSION**
**1/50 G SHANTIPATH**
**CHANAKYAPURI**
**NEW DELHI 110 021**


**HON. MIKE REYNOLDS, AM,MP**
**MEMBER FOR TOWNSVILLE**
**MINSTER FOR CHILD SAFETY**
**7TH FLOOR 111 GEORGE STREET,**
**BRISBANE, QLD. 4001**


**CENTRELIN**
**GOVERNMENT OF AUSTRALIA**
**SOUTHPORT**
**QLD. AUSTRALIA**


**PHILLIP RUDDOCK**
**ATTORNEY GENERAL**
**COMMONWEALTH OF AUSTRALIA**
**ROBERT GURAN OFFICES, NATIONAL CIRCUIT**
**BARTON ACT.  2600**

**DEFENDANT NO 10**

**GOLD CITY COUNCIL**
**GOLD COAST MC**
**QUEENSLAND 9729**


**PLEASE PROVE TO ME THAT ONE OF THESE RESPONDENTS IS A PRIVATE ACTOR.**

**The directions from both courts are available,**

**Child Ri**



**Yours truly,**

# JUGVIR INDER SINGH

PETITONER

Police Minister

Hon Judy Spence

**police@ministerial.qld.gov.au**


Friday, June 24, 2005


Dear Police Minister,


<u>KIDNAPPED MIINOR CHILD NARA SINGHDEREWA</u>


<u>2nd Police Complaint</u>


<u>EMERGENCY RESPONSE REQUIRED</u>


I called your office today to inform you of this kidnapping matter. I was given a chance to talk to an officer at that time and I am sorry I was so distraught that I was unable to do so in the afternoon. I thank you for your concern.


Hon Mike Reynolds at Child Safety has been provided with this complaint and a larger file with the entire background on this complaint. The file was first sent to Senator Kay Paterson and Hon Bob Hawkes who sent the file over to Attorney General Phillip Ruddock's Office. In essence I talked to my wife Sarah Newman, on May 28th 2005 who being under great duress, informed me that she was under a CentreLink Investigation and then she disappeared with my child. The complaint is against Mr. Peter Whalan, who has orchestrated and arranged for the removal of my child Nara. The Senator, Centrelink, and I have tried to contact Sarah and Peter Whalan or other living at this residence about my 3 year old minor child and I still dont know if NARA is alive or dead. It is under these conditions that the Senator transferred this file to Attorney General. I am pleading with you to locate and report on the condition of NARA as I make emergency plans to return home.



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

I am sorry if I have placed any reference material as to substantiate the legal basis of my allegation and my complaint.  There are included as reference.  Please take appropriate action.

**COMPLAINT**

Mr. Peter Whalan, 10 COUNTY CT. Parkwood, QLD. 4214 at phone number 07 55 71 6269of Queensland, Australia has kidnapped and detained my minor 3 year daughter child Nara Singhderewa and has retained and concealed her from me, the father, in his home at 10 County Ct. Parkwood, QLD for the last two odd months.  Now the child seems to have disappeared.

Pursuant to Family Law Rule 2.04 regarding the **NOTICE OF CHILD ABUSE OR RISK OF A CHILD ABUSE** Constable Edmonds of the Southport Police, Queensland Police Department was called 6/11/2005 11:16 PM at 07 55 375 099 and he was informed about the wrongful conduct of the alleged incident.  Constable Edmonds was given the name of Mr. Peter Whalan and his particulars were described.  The incident was reported and the phone call was recorded twice and the incident was described and was explained to Constable Edmonds in detail.  Pursuant to **Section 67Z of the FAMILY LAW ACT** Constable Edmonds of Southport Police Force has been informed of the Risk of Child Abuse. Southport is the Central Reporting Agency and the undersigned has met his reporting requirements.

**ALLEGATION AND STATEMENT OF FACT**

1.  Peter Whalan has participated in a Child Snatching.
2.  He has NO custody rights over Nara Singhderewa who is my 3-year-old daughter child.



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

3. He has threatened my being and interfered with my right to visit my child NARA and concealed her in his home at 10 County Ct Parkwood, QLD. and he has violated the Hague Convention.

4. The undersigned has never given any permission to Peter Whalan or his wife Jane Whalan or to Sarah Newman the undersigned's wife to make 10 County Place, Parkwood his daughter NARA's residence for any length of time.  This is not NARA's home.

5. The undersigned has complained to this forum and has filed Human Rights Violation to international forums that Peter Whalan has effectively kidnapped my child NARA.

6. Peter Whalan has denied access to the Undersigned father and has violated the convention. Thus, the Convention seeks to protect visitation rights in addition to custody rights. The primary focus is returning wrongfully or retained children to me the father.

7. Peter Whalan has participated in the wrongful act of kidnapping and retention my child Nara Singhderewa and as such committed a wrongful Act.  A retention (or "removal") of a child is wrongful under the Convention and is a "breach of custody rights attributed to a person, an institution or any other body, either jointly or alone, under the law of the State of Queensland, Convention, Article 3.

8. Peter Whalan is presently aiding and abetting a kidnapping since he is aware that as a general proposition both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. If one parent interferes with the other's equal rights by unilaterally removing or retaining the child without consent of the other parent, such interference constitutes wrongful conduct within the meaning of the Convention and the laws of Queensland.

9. Peter Whalan has caused the infliction of physical pain and suffering on me the father and his daughter, committed within Australia's jurisdiction, which are offences under Australia's criminal law. Acts constituting cruel, inhuman or degrading treatment or punishment are also offences under Australian law.

10. The undersigned alleges Peter Whalan acts are cruel, inhuman and degrading treatment to Nara and Nara' father.



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

11. No court in the world has given Peter Whalan any order to act on behalf of Nara Singhderewa, my daughter.


## POLICE REPORTING REQUIREMENTS AND Jurisdiction

1. A victim of a wrongful abduction or retention, or of a denial of access, who resides in a Contracting State, can request assistance through his country's Central Authority or he can initiate a direct contact with the Central Authority where the child is located.

2. The Convention's ultimate beneficiaries are children who have bee wrongfully abducted or retained or who have been denied the opportunity to visit with a noncustodial spouse.

3. An abduction (or "removal") or retention of a child is wrongful under the Convention if is a "breach of custody rights attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitual resident immediately before the removal or retention; the rights of custody...may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, Article 3.

4. As a general proposition both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. If one parent interferes with the other's equal rights by unilaterally removing or retaining the child abroad without consent of the other parent, such interference could constitute wrongful conduct within the meaning of the Convention.

5. Article 12 of the Convention provides that when proceedings for the return of the child are commenced within 1 year of the wrongful removal or retention, the judicial or administrative authority of the contracting State where the child is located "shall order the return of the child forthwith."

6. In addition to actions designed to secure the child's return, the Convention requires Contracting States to assist in locating the child, to undertake cooperative

ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

efforts to prevent harm or abuse from befalling the child, and to arrange for the child's safety during his or her return.

7. Under UCCJA section 23, these provisions may be invoked in cases, in child custody disputes where the plaintiff has engaged in reprehensible conduct, which may include unilaterally removing a child from a family home.

8. Acts constituting torture which involve the infliction of physical pain and suffering committed within Australia's jurisdiction are offences under Australia's criminal law. Acts constituting cruel, inhuman or degrading treatment or punishment are also offences under Australian law.

9. Child Protection Act 1999, the Children's Services Tribunal Act 2000, the Commission for Children and Young People Act 2000, and the Child Protection (International Measures) Act 2003.

Queensland
Criminal Code 1899
    s. 75
    Threatening violence
    2 years
    s. 200
    Refusal by public officer to perform duty
    2 years
    s. 229
    Unauthorized removal of children and young people
    200 penalty units
    s. 227
    Child and young person abuse
    200 penalty units

I swear that these statements are true facts under the perjury of law of the Commonwealth of Australia this Sunday, June 12, 2005.

SENT BY FAX TO THE SOUTHPORT POLICE IN QUEENSLAND AT 07 55 812 897

JUGVIR INDER SINGH
c/o Steven Kim
Villa 6 26/34 Sapium Road
Benowa 4218



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

Presently in India on Business:


please address correspondence to:
c/o S. Dutt
13 Babur Place
New Delhi India
or Phone : 9891779441




Signed:
Nara Avalon v.n. Singhderewa
10 County Ct.
Parkwood, QLD. Australia 4214
0401232338

Father:


cc:  Senator Kay Patterson
02 6277 7560
senator.kcpatterson@aph.gov.au


cc: Hon Peter Beattie
07 322 44 500
Brisbane.Central@parliament.qld.gov.au

cc: Hon Mike Reynolds
**Hon Mike Reynolds, AM, MP**
Member for Townsville
**Minister for Child Safety**
7th Floor, 111 George Street, Brisbane QLD 4000
GPO Box 806, Brisbane QLD 4001
CDE M4



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

Tel:  322 47036

childsafety@ministerial.qld.gov.au                childsafety@qld.gov.au

possible concealment areas:


1. Lawrence NSW
2. Brisbane Chelsea Thomas or Tess or Scott Newman
3. Mclean Lex Newman
4. Delinquin Dave Wilson
5. Grafton Julie Wilson
6. Maimi Billy Jean
7. Mermaid Waters Corrina
8. Robin in Arundel
9.



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

JUDY SPENCE
**POLICE MINISTER**

**AUSTRALIAN FEDERAL POLICE**

MIKE REYNOLDS
CHILD SAFETY

**SOUTHPORT POLICE GOLD COAST
QUEENSLAND**

# COMPLAINT AND

# REQUEST FOR ARREST

COMES NOW this complainant states that **AARON PAUL SIMMONS**, 11
BALMORAL  CT. POTTSVILLE, NSW Australia has aided and abeeted in kidnapped
my minor 3 year daughter child Nara Singhderewa and has retained and concealed her
from me, the father.

THE PERERTATOR OF THIS CRIME **AARON PAUL SIMMONS** IS DETAILED
BELOW



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND





ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND



Pursuant to **Section 67Z of the FAMILY LAW ACT** you been informed of the Risk of Child Abuse. Southport is the Central Reporting Agency and the undersigned has met his reporting requirements.

### ALLEGATION AND STATEMENT OF FACT

1. Aaron Simmons has participated in a Child Snatching.
2. He has NO custody rights over Nara Singhderewa who is my 3-year-old daughter child.
3. He has attempted to alter identification and interfered with my right to visit my child NARA and concealed her.

ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND



4. He has violated the Hague Convention on the Civil Aspects of International Child Abduction.

5. The undersigned has never given any permission to Aaron Paul Simmons, Peter Whalan or his wife Jane Whalan or to Sarah Newman the undersigned's wife to make 10 County Place, Parkwood his daughter NARA's residence for any length of time.

6. The undersigned has complained to this forum and has filed Human Rights Violation to international forums that Peter Whalan has effectively kidnapped my child NARA. . Aaron Paul Simmons has colluded with Whalan in concealing the child

7. Peter Whalan has denied access to the Undersigned father and has violated the convention. Thus, the Convention seeks to protect visitation rights in addition to custody rights. The primary focus is returning wrongfully abducted or retained children to custodians. Aaron Paul Simmons has colluded with Whalan in concealing the child

8. Peter Whalan has participated in the wrongful act of kidnapping and retention my child Nara Singhderewa and as such committed a wrongful Act.  An abduction (or "removal") or retention of a child is wrongful under the Convention and is a "breach of custody rights attributed to a person, an institution or any other body, either jointly or alone, under the law of the State of Queensland, Convention, Article 3. Aaron Paul Simmons and Peter Whalan has participated in the wrongful act of kidnapping and retention my child Nara Singhderewa and as such committed a wrongful Act.

9. Peter Whalan is presently aiding and abetting a kidnapping since he is aware that as a general proposition both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. If one parent interferes with the other's equal rights by unilaterally removing or retaining the child without consent of the other parent, such interference constitutes wrongful conduct within the meaning of the Convention and the laws of Queensland. Aaron Paul Simmons and Peter Whelan have colluded to kidnap my child NARA.

10. Peter Whalan has caused the infliction of physical pain and suffering on me the father and his daughter, committed within Australia's jurisdiction which are offences under Australia's criminal law. Acts constituting cruel, inhuman or degrading treatment or punishment are also offences under Australian law. . Aaron Paul Simmons has colluded with Whalan in concealing the child has caused the infliction of physical pain and suffering on me the father and his daughter, committed within Australia's jurisdiction which are offences under Australia's criminal law. Acts constituting cruel, inhuman or degrading treatment or punishment are also offences under Australian law. .

11. The undersigned alleges Peter Whalan acts are cruel, inhuman and degrading treatment to Nara and Nara' father. Aaron Paul Simmons and Peter Whalan have colluded to kidnap my child NARA

## POLICE REPORTING REQUIREMENTS AND Jurisdiction

1. A victim of a wrongful abduction or retention, or of a denial of access, who resides in a Contracting State, can request assistance through his country's Central Authority or he can initiate a direct contact with the Central Authority where the child is located.

2. The Convention's ultimate beneficiaries are children who have bee wrongfully abducted or retained or who have been denied the opportunity to visit with a noncustodial spouse.

3. An abduction (or "removal") or retention of a child is wrongful under the Convention if is a "breach of custody rights attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitual resident immediately before the removal or retention; the rights of custody...may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, Article 3.

4. As a general proposition both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. If one parent interferes with the other's equal rights by unilaterally removing or

ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

retaining the child abroad without consent of the other parent, such interference could constitute wrongful conduct within the meaning of the Convention.

5. Article 12 of the Convention provides that when proceedings for the return of the child are commenced within 1 year of the wrongful removal or retention, the judicial or administrative authority of the contracting State where the child is located "shall order the return of the child forthwith."

6. In addition to actions designed to secure the child's return, the Convention requires Contracting States to assist in locating the child, to undertake cooperative efforts to prevent harm or abuse from befalling the child, and to arrange for the child's safety during his or her return.

7. Under UCCJA section 23, these provisions may be invoked in international cases, in child custody disputes where the plaintiff has engaged in reprehensible conduct, which may include unilaterally removing a child from a family home.

8. Acts constituting torture which involve the infliction of physical pain and suffering committed within Australia's jurisdiction are offences under Australia's criminal law. Acts constituting cruel, inhuman or degrading treatment or punishment are also offences under Australian law.

9. As NARA complainant's child is believed to be in Australia, Hague Convention country, OCI, as the U.S. Central Authority for the Convention, can request its foreign counterpart to "discover the whereabouts of a child who has been wrongfully removed or retained." (Art. 7(a), Hague Convention) The Convention requires the foreign central authority to take steps to locate the child. There need be neither a criminal warrant as to the abductor nor a custody order. A left-behind parent or the U.S. Central Authority can also ask the foreign central authority to report on the child's condition.

10. The premise of the Hague Convention is that the abducted child's custody should be determined by a court in the child's country of



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

```
habitual residence and not by the unilateral actions of one
parent. The goal is to restore the child to his or her home
country for further custody proceedings in the courts there. A
return order does not represent a decision regarding the merits
of custody. By denying abductors the opportunity to litigate
custody in their country of choice and promptly restoring the
child to his or her habitual residence, the Convention is
intended to deter abductions from occurring in the first place. A
key feature of the Convention is that a parent does not need a
custody order to seek a child's return. This is very important
because so many abductions occur before a custody order has been
issued.
```

11.

12. Child Protection Act 1999, the Children's Services Tribunal Act 2000, the
    Commission for Children and Young People Act 2000, and the Child Protection
    (International Measures) Act 2003.

Queensland
Criminal Code 1899
    s. 75
    Threatening violence
    2 years
    s. 200
    Refusal by public officer to perform duty
    2 years
    s. 229
    Unauthorized removal of children and young people
    200 penalty units
    s. 227
    Child and young person abuse
    200 penalty units

I swear that these statements are true facts under the perjury of law of the Commonwealth

of Australia this Wednesday, June 29, 2005

SENT BY FAX TO THE SOUTHPORT POLICE IN QUEENSLAND AT 07 55 812 897

JUGVIR INDER SINGH
c/o Steven Kim
Villa 6 26/34 Sapium Road
Benowa 4218

Presently in India on Business:



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

please address correspondence to:
c/o S. Dutt
13 Babur Place
New Delhi India
or Phone : 9891779441



Signed:
Nara Avalon v.n. Singhderewa
10 County Ct.
Parkwood, QLD. Australia 4214
0401232338

Father:

cc:  Senator Kay Patterson
02 6277 7560
senator.kcpatterson@aph.gov.au

cc: Hon Peter Beattie
07 322 44 500
Brisbane.Central@parliament.qld.gov.au

witnesses are included in the emails included herein:

these people are aware for the kidnapping of my child NARA



ARREST WARRANT REQUEST SOUTHPORT POLICE, QUEENSLAND

**Petitions Unit**
**TCB/OHCHR**

# <u>Friday, January 13, 2006</u>

**THE EVIDENCE IN THIS CASE IS QUITE CLEAR AS INCLUDED IN EXHIBIT 1 BELOW IN EVIDENCE THAT 10 DEFENDANTS ARE STATE ACTORS.**

**I NEED YOU TO TELL ME THAT THESE 10 DEFENDANTS LISTED IN THE EXHIBIT BELOW ARE NOT "STATE ACTOR"**

**PLEASE IN A COMPELETY NEW EMAIL POST UNDER YOUR LETTERHEAD THAT THE ACTORS LISTED 10 OF THEM ARE NOT STATE ACTORS.**

NOW IN EXHIBIT 2 WHICH IS A SUPREME DECISION PLEASE NOTE THAT THE DEFENDANTS ARE STATE ACTORS ONLY.

## JUGVIR INDER SINGH

PETITONER

## EXHIBIT FOR EVIDENCE BEFORE THE TB-petitions OHCHR" <tb-petitions@ohchr.org

## THE NATIONAL HUMAN RIGHTS COMMISSION

## NEW DELHI INDIA

## IN THE MATTER OF:

CASE NO 17/99/2005-2006

**KARUNA BISHNOI**
**MR ADRONA**
**MRS GROVER**
**MR. KOFI ANAN**
**UNICEF**
**LODHI ESTATE**
**NEW DELHI INDIA**

**DEFENDANT NO 1**

**SENATOR KAY PATTERSON**
**FAMILY ASSISTANCE**
**CANBERRA, AUSTRALIA**

**DEFENDANT NO 2**

**HON PETER BEATTIE**
**PREMIER & MINISTER FOR TRADE QLD. GOVT.**
**LEVEL 15 EXECUTIVE BUILDING, GEORGE ST.**
**BRISBANE, QLD. 4000**

**DEFENDANT NO 3**

**CONSTABLE EDMONDS**
**SOUTHPORT POLICE FORCE**
**96 SCARBROUGH STREET**
**SOUTHPORT, QUEENSLAND 4218**

**DEFENDANT NO 4**

**THE HON JOHN HOWARD MP.**
**PREMIER OF THE COMMONWEALTH OF AUSTRALIA**
**PARLIAMENT HOUSE**
**CANBERRA AUSTRALIA 2600**
**DEFENDANT NO 5**

**HON JUDY SPENCE,MP**
**MEMBER FRO MT GRAVATT**
**MINISTER FOR POLICE AND CORRECTIVE SERVICES**
**24TH FLOOR, STATE LAW BUILDING**
**50 ANN STREET, BRISBANE QLD 4000**

**DEFENDANT NO 6**

**MR. BRIAN PULLEN**
**MR. SHAKER NAMBIA**
**MR. GREWAL**
**AUSTRALIAN HIGH COMMISSION**
**1/50 G SHANTIPATH**
**CHANAKYAPURI**
**NEW DELHI 110 021**

**DEFENDANT NO 7**

**HON. MIKE REYNOLDS, AM,MP**
**MEMBER FOR TOWNSVILLE**
**MINSTER FOR CHILD SAFETY**
**7TH FLOOR 111 GEORGE STREET,**
**BRISBANE, QLD. 4001**

**DEFENDANT NO 8**

**CENTRELIN**
**GOVERNMENT OF AUSTRALIA**
**SOUTHPORT**
**QLD. AUSTRALIA**

**DEFENDANT NO 9**

**PHILLIP UDDOCK**
**ATTORNEY GENERAL**
**COMMONWEALTH OF AUSTRALIA**
**ROBERT GURAN OFFICES, NATIONAL CIRCUIT**
**BARTON ACT.  2600**

**DEFENDANT NO 10**

**GOLD CITY COUNCIL**
**GOLD COAST MC**
**QUEENSLAND 9729**

**DEFENDANT NO 11.**

**EXHIBIT 2:**

# IN THE SUPREME COURT OF INDIA
# CIVIL ORIGINAL JURISDICTION

### WRIT PETITION  (CIVIL)  447 OF 2005

**IN THE MATTER OF :**

JUGVIR INDER SINGH

PETITIONOR

VS.

MINISTRY OF EXTERNAL AFFAIRS
THROUGH NATWAR SINGH

AND

COMMONWEALTH OF AUSTRALIA
(RESPONDENTS ON PAGE 26)

RESPONDENTS

**SENATOR KAY PATTERSON**
**FAMILY ASSISTANCE**
**CANBERRA, AUSTRALIA**


**HON PETER BEATTIE**
**PREMIER & MINISTER FOR TRADE QLD. GOVT.**
**LEVEL 15 EXECUTIVE BUILDING, GEORGE ST.**
**BRISBANE, QLD. 4000**


**CONSTABLE EDMONDS**
**SOUTHPORT POLICE FORCE**
**96 SCARBROUGH STREET**
**SOUTHPORT, QUEENSLAND 4218**

**THE HON JOHN HOWARD MP.**
**PREMIER OF THE COMMONWEALTH OF AUSTRALIA**
**PARLIAMENT HOUSE**
**CANBERRA AUSTRALIA 2600**


**HON JUDY SPENCE,MP**
**MEMBER FRO MT GRAVATT**
**MINISTER FOR POLICE AND CORRECTIVE SERVICES**
**24TH FLOOR, STATE LAW BUILDING**
**50 ANN STREET, BRISBANE QLD 4000**


**MR. BRIAN PULLEN**
**MR. SHAKER NAMBIA**
**MR. GREWAL**
**AUSTRALIAN HIGH COMMISSION**
**1/50 G SHANTIPATH**
**CHANAKYAPURI**
**NEW DELHI 110 021**


**HON. MIKE REYNOLDS, AM,MP**
**MEMBER FOR TOWNSVILLE**
**MINSTER FOR CHILD SAFETY**
**7TH FLOOR 111 GEORGE STREET,**
**BRISBANE, QLD. 4001**


**CENTRELIN**
**GOVERNMENT OF AUSTRALIA**
**SOUTHPORT**
**QLD. AUSTRALIA**


**PHILLIP RUDDOCK**
**ATTORNEY GENERAL**
**COMMONWEALTH OF AUSTRALIA**
**ROBERT GURAN OFFICES, NATIONAL CIRCUIT**
**BARTON ACT.  2600**

**DEFENDANT NO 10**

**GOLD CITY COUNCIL**
**GOLD COAST MC**
**QUEENSLAND 9729**


**PLEASE PROVE TO ME THAT ONE OF THESE RESPONDENTS IS A PRIVATE ACTOR.**

**The directions from both courts are available,**

**Child Ri**




**Yours truly,**

# JUGVIR INDER SINGH
PETITONER

|    |    |    | alt | mach |
|----|----|----|----------|------|
| 80 | 80 | 80 | 1922.0 | 0.01 |
| 60 | 60 | 60 | 15000.0 | 0.35 |
| 30 | 30 | 30 | 21000.0 | 0.58 |
| 0 | 0 | 0 | 23000.0 | 0.70 |
| 0 | 0 | 0 | 23235.5 | 0.77 |
| 0 | 0 | 1 | 23588.4 | 0.84 |
| 1 | 1 | 1 | 24122.7 | 0.89 |
| 1 | 1 | 1 | 24853.8 | 0.94 |
| 1 | 1 | 1 | 25776.4 | 0.99 |
| 1 | 1 | 2 | 26882.8 | 1.03 |
| 2 | 2 | 2 | 28162.9 | 1.07 |
| 2 | 2 | 2 | 29604.4 | 1.10 |
| 2 | 2 | 2 | 31186.6 | 1.14 |
| 2 | 2 | 3 | 32880.2 | 1.19 |
| 2 | 2 | 3 | 34663.5 | 1.24 |
| 2 | 2 | 3 | 36530.6 | 1.29 |
| 3 | 3 | 3 | 38482.2 | 1.34 |
| 3 | 3 | 3 | 40519.3 | 1.38 |
| 3 | 3 | 3 | 42644.3 | 1.43 |
| 3 | 3 | 3 | 44859.6 | 1.49 |
| 3 | 3 | 4 | 47168.8 | 1.54 |
| 3 | 3 | 4 | 49574.7 | 1.60 |
| 3 | 3 | 4 | 52081.2 | 1.66 |
| 3 | 3 | 4 | 54692.1 | 1.73 |
| 4 | 4 | 4 | 57411.5 | 1.80 |
| 4 | 4 | 4 | 60243.2 | 1.87 |
| 4 | 4 | 4 | 63192.3 | 1.95 |
| 4 | 4 | 4 | 66263.6 | 2.03 |
| 4 | 4 | 5 | 69463.3 | 2.11 |
| 4 | 4 | 5 | 72797.2 | 2.19 |
| 4 | 4 | 5 | 76271.4 | 2.28 |
| 4 | 4 | 5 | 79891.9 | 2.37 |
| 5 | 5 | 5 | 83664.5 | 2.46 |
| 5 | 5 | 5 | 87595.5 | 2.56 |
| 5 | 5 | 6 | 91691.4 | 2.66 |
| 5 | 5 | 6 | 95958.9 | 2.76 |
| 5 | 5 | 6 | 100404.7 | 2.87 |
| 5 | 5 | 6 | 105035.3 | 2.98 |
| 6 | 6 | 6 | 109857.8 | 3.08 |
| 6 | 6 | 7 | 114878.9 | 3.18 |
| 6 | 6 | 7 | 120106.3 | 3.28 |
| 6 | 6 | 7 | 125547.0 | 3.38 |
| 6 | 6 | 7 | 131207.5 | 3.49 |
| 6 | 6 | 7 | 131207.5 | 3.49 |
| 7 | 7 | 8 | 141331.0 | 3.34 |
| 7 | 7 | 8 | 151179.1 | 3.20 |
| 8 | 8 | 9 | 160755.7 | 3.10 |
| 8 | 8 | 9 | 170063.4 | 3.02 |
| 9 | 9 | 10 | 179103.6 | 2.97 |
| 9 | 9 | 10 | 187877.4 | 2.93 |

| | | | | |
|---|---|---|---|---|
| 9 | 9 | 11 | 196385.8 | 2.89 |
| 10 | 10 | 11 | 204629.2 | 2.84 |
| 10 | 10 | 12 | 212608.2 | 2.79 |
| 11 | 11 | 12 | 220323.1 | 2.75 |
| 11 | 11 | 13 | 227774.3 | 2.69 |
| 11 | 11 | 13 | 234962.1 | 2.64 |
| 12 | 12 | 14 | 241886.7 | 2.58 |
| 12 | 12 | 14 | 248548.2 | 2.51 |
| 13 | 13 | 15 | 254947.0 | 2.44 |
| 13 | 13 | 15 | 261083.1 | 2.37 |
| 13 | 13 | 15 | 266956.8 | 2.30 |
| 14 | 14 | 16 | 272568.1 | 2.23 |
| 14 | 14 | 16 | 277917.3 | 2.15 |
| 15 | 15 | 17 | 283004.5 | 2.09 |
| 15 | 15 | 17 | 287829.8 | 2.00 |
| 15 | 15 | 18 | 292393.3 | 1.91 |
| 16 | 16 | 18 | 296695.1 | 1.82 |
| 16 | 16 | 19 | 300735.4 | 1.73 |
| 17 | 17 | 19 | 304514.3 | 1.64 |
| 17 | 17 | 20 | 308031.8 | 1.55 |
| 17 | 17 | 20 | 311288.0 | 1.47 |
| 18 | 18 | 21 | 314283.0 | 1.39 |
| 18 | 18 | 21 | 317016.9 | 1.31 |
| 19 | 19 | 22 | 319489.7 | 1.23 |
| 19 | 19 | 22 | 321701.6 | 1.16 |
| 20 | 20 | 22 | 323652.5 | 1.09 |
| 20 | 20 | 23 | 325342.6 | 1.03 |
| 20 | 20 | 23 | 326771.7 | 0.98 |
| 21 | 21 | 24 | 327940.1 | 0.93 |
| 21 | 21 | 24 | 328847.7 | 0.89 |
| 22 | 22 | 25 | 329494.5 | 0.86 |
| 22 | 22 | 25 | 329880.6 | 0.84 |
| 22 | 22 | 26 | 330005.9 | 0.84 |
| 22 | 22 | 26 | 330005.9 | 0.84 |
| 23 | 23 | 26 | 329860.4 | 0.84 |
| 23 | 23 | 27 | 329434.3 | 0.86 |
| 24 | 24 | 27 | 328727.7 | 0.90 |
| 24 | 24 | 28 | 327740.3 | 0.94 |
| 24 | 24 | 28 | 326472.4 | 0.99 |
| 25 | 25 | 29 | 324923.8 | 1.05 |
| 25 | 25 | 29 | 323094.4 | 1.11 |
| 26 | 26 | 30 | 320984.3 | 1.19 |
| 26 | 26 | 30 | 318593.4 | 1.26 |
| 27 | 27 | 31 | 315921.6 | 1.34 |
| 27 | 27 | 31 | 312968.9 | 1.42 |
| 27 | 27 | 32 | 309735.1 | 1.51 |
| 28 | 28 | 32 | 306220.2 | 1.60 |
| 28 | 28 | 32 | 302424.2 | 1.69 |
| 29 | 29 | 33 | 298346.9 | 1.78 |
| 29 | 29 | 33 | 293988.2 | 1.87 |
| 30 | 30 | 34 | 289348.1 | 1.97 |

| | | | | |
|---|---|---|---|---|
| 30 | 30 | 34 | 284426.4 | 2.06 |
| 30 | 30 | 35 | 279223.1 | 2.14 |
| 31 | 31 | 35 | 273738.1 | 2.21 |
| 31 | 31 | 36 | 267971.4 | 2.29 |
| 32 | 32 | 36 | 261923.0 | 2.36 |
| 32 | 32 | 37 | 255593.2 | 2.43 |
| 33 | 33 | 37 | 248982.0 | 2.51 |
| 33 | 33 | 38 | 242090.0 | 2.57 |
| 33 | 33 | 38 | 234917.6 | 2.64 |
| 34 | 34 | 39 | 227466.0 | 2.69 |
| 34 | 34 | 39 | 219736.7 | 2.74 |
| 35 | 35 | 40 | 211732.0 | 2.79 |
| 35 | 35 | 40 | 203455.3 | 2.84 |
| 36 | 36 | 41 | 194912.0 | 2.88 |
| 36 | 36 | 41 | 186109.6 | 2.92 |
| 36 | 36 | 42 | 177059.4 | 2.95 |
| 37 | 37 | 42 | 167777.7 | 2.99 |
| 37 | 37 | 43 | 158288.9 | 3.05 |
| 38 | 38 | 44 | 148631.1 | 3.14 |
| 38 | 38 | 44 | 138866.2 | 3.22 |
| 39 | 39 | 45 | 129094.1 | 3.28 |
| 40 | 40 | 46 | 119473.8 | 3.30 |
| 40 | 40 | 46 | 119473.8 | 3.30 |
| 40 | 40 | 46 | 116013.6 | 3.29 |
| 40 | 40 | 46 | 112619.4 | 3.28 |
| 40 | 40 | 47 | 109301.1 | 3.26 |
| 41 | 41 | 47 | 106067.4 | 3.24 |
| 41 | 41 | 47 | 102927.4 | 3.20 |
| 41 | 41 | 48 | 99890.1 | 3.16 |
| 42 | 42 | 48 | 96962.5 | 3.12 |
| 42 | 42 | 48 | 94150.3 | 3.08 |
| 42 | 42 | 49 | 91458.2 | 3.04 |
| 43 | 43 | 49 | 88888.9 | 3.01 |
| 43 | 43 | 50 | 86444.0 | 2.97 |
| 44 | 44 | 50 | 84125.4 | 2.94 |
| 44 | 44 | 51 | 81935.0 | 2.91 |
| 45 | 45 | 51 | 79875.0 | 2.88 |
| 45 | 45 | 52 | 77947.3 | 2.84 |
| 45 | 45 | 52 | 76154.3 | 2.81 |
| 46 | 46 | 53 | 74497.7 | 2.78 |
| 46 | 46 | 53 | 72979.4 | 2.75 |
| 47 | 47 | 54 | 71601.2 | 2.72 |
| 47 | 47 | 55 | 70364.4 | 2.68 |
| 48 | 48 | 55 | 69270.0 | 2.65 |
| 48 | 48 | 56 | 68318.3 | 2.61 |
| 49 | 49 | 56 | 67509.5 | 2.57 |
| 49 | 49 | 57 | 66840.7 | 2.53 |
| 50 | 50 | 57 | 66293.2 | 2.50 |
| 50 | 50 | 58 | 65835.1 | 2.48 |
| 51 | 51 | 59 | 65432.3 | 2.45 |
| 51 | 51 | 59 | 65055.3 | 2.43 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 52 | 52 | 60 | 64690.0 | 2.42 | | |
| 52 | 52 | 60 | 64331.5 | 2.40 | | |
| 53 | 53 | 61 | 63976.7 | 2.38 | | |
| 53 | 53 | 61 | 63624.8 | 2.36 | | |
| 54 | 54 | 59 | 63275.8 | 2.34 | | |
| 54 | 54 | 62 | 62929.6 | 2.32 | | |
| 55 | 55 | 63 | 62586.2 | 2.29 | | |
| 55 | 55 | 63 | 62245.7 | 2.24 | | |
| 56 | 56 | 64 | 61907.9 | 2.17 | | |
| 56 | 56 | 65 | 61573.0 | 2.12 | | |
| 57 | 57 | 65 | 61240.8 | 2.03 | | |
| 57 | 57 | 65 | 61240.8 | 2.01 | | |
| 65 | 65 | 75 | 55071.2 | 1.23 | | |
| 70 | 70 | 81 | 51271.4 | 0.86 | 10 | 5 |
| 75 | 70 | 81 | 47243.4 | 0.79 | 10 | 5 |
| 80 | 65 | 75 | 42200.0 | 0.76 | 15 | 5 |
| 85 | 60 | 69 | 39193.6 | 0.74 | 20 | 5 |
| 90 | 55 | 63 | 33673.8 | 0.72 | 25 | 5 |
| 95 | 55 | 63 | 27823.9 | 0.67 | 25 | 5 |
| 100 | 60 | 69 | 21974.0 | 0.55 | 20 | 5 |
| 105 | 65 | 75 | 16897.4 | 0.44 | 15 | 5 |
| 110 | 70 | 81 | 11820.9 | 0.30 | 10 | 5 |
| 115 | 75 | 86 | 6985.1 | 0.17 | 5 | 5 |
| 120 | 80 | 92 | 2149.4 | 0.00 | 0 | 5 |



Apogee - 330k ft

Rocket Burn-Out

Energy Management

Deceleration

Pull-up

Jet Powered Climb

180° Turn

KCSM

ment

ration



KCSM