# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) CASE NO 1:07-CV-01170 | |
| | ) JUDGE BATES | |
| | ) | |
| COMMONWEALTH OF AUSTRALIA et al. | ) | |
| | ) | |
| Defendants | | |

## EMERGENCY MOTION OF THE PLAINTIFF NARA AVALON SINGHDEREWA TO CORRECT CITIZENSHIP TO UNITED STATES CITIZEN

The plaintiff shows she submits to the jurisdiction of the court and the plaintiff is an AMERICAN citizen and NOT as claimed by the motion to dismiss by the defendants as an Australian Citizen.

The plaintiffs made a mistake in its pleadings by affirming the plaintiff Nara Avalon Singhderewa was an Australian when in Fact she is the plaintiff's daughter and is American.

At trial the plaintiff will show that Nara Avalon Singhderewa was granted American Citizenship on September 17 2001 in San Diego California, USA.

At trial also the plaintiff will show that as parent of Nara Singhderewa, claimed by the defendants to be Americans, was born to a non permanent parent present in Australia and that Nara has not lived in Australia for 10 years and that Under the Australian Citizenship

CASE 1:07 cv-01170-JDB    Document 18    Filed on                    Page 2 of 17

Act 2007 the plaintiff does not hold Australian Citizen ship.


                                                    S/

                                        _____

                                        JUGVIR INDER SINGH

                                              FOR PLAINTIFF

                            NARA SINGHDEREWA MINOR CHILD

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | ) | |

**ORDER**

UPON DUE CONSIDERATION of the plaintiffs motion to declare Nara Singhderewa a

citizen of the United States and Resident of California and Memorandum Points

Supporting and any opposition is thereto, herby

ORDERED: PLAINTIFF NARA VON NEUMAN SINGHDEREWA is an American

Citizen.

ORDERED: PLAINTIFF NARA VON NEUMAN SINGHDEREWA is an American

Citizen and a resident of California.

ORDERED: THE Complaint is amended to reflect PLAINTIFF NARA VON NEUMAN

SINGHDEREWA is an American Citizen and a resident of California

ENTERED this _____day of _____2007.

_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.            )
                                     )
          Plaintiffs                 )
                                     )
          V                          ) CASE NO 1:07-CV-01170
                                     ) JUDGE BATES
                                     )
COMMONWEALTH OF AUSTRALIA            )
et al.                               )
          Defendants                 )


**MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF JURISDICTION BASED ON AMERICAN CITIZENSHIP OF PLAINTIFF NARA AVALON VON NEWMAN SINGHDEREWA**


ARGUMENT I

The plaintiffs at trial will show:

1.      1.      Nara Avalon Von Newman Singhderewa was granted citizenship to being American Citizen on September 17 2001 in San Diego, California United States of America.  The plaintiff was granted citizenship in her home in Mission Beach, San Diego, California.

2.      Furthermore, all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States in which they reside. See U.S. Constitution amend XIV.  Thus born children as both persons and citizens as matter of federal law.

3.      The plaintiff Nara Singhderewa it will be broke the plane of the cervical os (upper inside of the birth canal) of on Sarah Newman Singh, the wife of the plaintiff on September 17 2001, in Mission Beach, San Diego, California, USA and entered the birth canal.  It is this point the federal Rights of the personhood of citizenship of plaintiff Nara Singhderewa will attach.  The plaintiff Nara who broke the plane of the birth canal and "touch home plate" is legally safe from destruction.

4.      Then Supreme Court's decisions have afforded constitutional protection to personal decisions relating to marriage, see, e.g., Loving v. Virginia, 388 U.S. 1 , procreation, Skinner v. Oklahoma ex rel Williamson, 316 U.S. 535 , family relationships, Prince v. Massachusetts, 321 U.S. 158 , child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510 , and contraception, Griswold v. Connecticut, 381 U.S. 479 , and have recognized the right of the individual to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child, Eisenstadt v. Baird, 405 U.S. 438, 453 . Roe's central holding properly invoked the reasoning and tradition of these precedents. Pp. 846-853.

5.      Liberty finds no refuge in a jurisprudence of doubt.  from the Due Process Clause of the Fourteenth Amendment. It declares that no State shall "deprive any person of life, liberty, or property, without due process of law." The controlling word in the cases before us is "liberty." Although a literal reading of the Clause might suggest that it governs only

the procedures by which a State may deprive persons of liberty, for at least 105 years, since Mugler v. Kansas, 123 U.S. 623, 660 -661 (1887), the Clause has been understood to contain a substantive component as well, one "barring certain government actions regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 331 (1986). As Justice Brandeis (joined by Justice Holmes) observed, [d]espite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth [505 U.S. 833, 847] Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. Whitney v. California, 274 U.S. 357, 373 (1927) (concurring opinion). [T]he guaranties of due process, though having their roots in Magna Carta's "per legem terrae" and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." Poe v. Ullman, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds) (quoting Hurtado v. California, 110 U.S. 516, 532 (1884)).

6.    The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights. We have held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. See, e.g., Duncan v. Louisiana, 391 U.S. 145, 147 -148 (1968). It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual against federal interference by the express provisions of the first eight amendments to the

Constitution. See Adamson v. California, 332 U.S. 46, 68 -92 (1947) (Black, J.,

dissenting). But of course this Court has never accepted that view.

7.      [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be

found in or limited by the precise terms of the specific guarantees elsewhere provided in

the Constitution. This "liberty" is not a series of isolated points pricked out in terms of

the taking of property; the freedom of speech, press, and religion; the right to keep and

bear arms; the freedom from unreasonable searches and seizures; and so on. It is a

rational continuum which, broadly speaking, includes a freedom from all substantial

arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a

reasonable and sensitive judgment must, that certain interests require particularly careful

scrutiny of the state needs asserted to justify their abridgment. Poe v. [505 U.S. 833, 849]

Ullman, supra, 367 U.S., at 543 (dissenting from dismissal on jurisdictional grounds).

8.      As Justice Harlan observed:

"Due process has not been reduced to any formula; its content cannot be determined by

reference to any code. [505 U.S. 833, 850]   The best that can be said is that, through the

course of this Court's decisions, it has represented the balance which our Nation, built

upon postulates of respect for the liberty of the individual, has struck between that liberty

and the demands of organized society. If the supplying of content to this Constitutional

concept has, of necessity, been a rational process, it certainly has not been one where

judges have felt free to roam where unguided speculation might take them. The balance

of which I speak is the balance struck by this country, having regard to what history

teaches are the traditions from which it developed as well as the traditions from which it

broke. That tradition is a living thing. A decision of this Court which radically departs

from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint." Poe v. Ullman, *367 U.S., at 542* (dissenting from dismissal on jurisdictional grounds). *See also Rochin v. California, supra, at 171-172 (Frankfurter, J., writing for the Court) ("To believe that this judicial exercise of judgment could be avoided by freezing `due process of law' at some fixed stage of time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines, and not for judges").*

9.  It is conventional constitutional doctrine that, where reasonable people disagree, the government can adopt one position or the other. See, e.g., Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955). That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty. Thus, while some people might disagree about whether or not the flag should be saluted, or disagree about the proposition that it may not be defiled, we have ruled that a State may not compel or enforce one view or the other. See West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624 (1943); Texas v. Johnson, 491 U.S. 397 (1989).

10. Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. Carey v. Population Services International, 431 U.S., at 685 . Our cases recognize the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. Eisenstadt v. Baird, supra, 405 U.S., at 453 (emphasis in

original). Our precedents "have respected the private realm of family life which the state cannot enter." Prince v. Massachusetts, 321 U.S. 158, 166 (1944). These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State. [505 U.S. 833, 852]

11. Then it is claimed the plaintiff was protected by the interest of the State of California in the protection of potential life. The Roe Court recognized the State's "important and legitimate interest in protecting the potentiality of human life." Roe, supra, at 162. The weight to be given this state interest, not the strength of the woman's interest, was the difficult question faced in Roe. We do not need to say whether each of us, had we been Members of the Court when the valuation of the state interest came before it as an original matter, would have concluded, as the Roe Court did, that its weight is insufficient to justify a ban on abortions prior to viability even when it is subject to certain exceptions. The matter is not before us in the first instance, and, coming as it does after nearly 20 years of litigation in Roe's wake we are satisfied that the immediate question is not the soundness of Roe's resolution of the issue, but the precedential force that must be accorded to its holding. And we have concluded that the essential holding of Roe should be reaffirmed.

12. Then if we choose to rely upon Roe, as against the later cases. [505 U.S. 833, 872]  Roe established a trimester framework to govern abortion regulations. Under this

elaborate but rigid construct, almost no regulation at all is permitted during the first trimester of pregnancy; regulations designed to protect the woman's health, but not to further the State's interest in potential life, are permitted during the second trimester; and, during the third trimester, when the fetus is viable, prohibitions are permitted provided the life or health of the mother is not at stake. Roe, supra, at 163-166. Most of our cases since Roe have involved the application of rules derived from the trimester framework. See, e.g., Thornburgh v. American College of Obstetricians and Gynecologists, supra; Akron I, supra.   The point is that the plaintiff has established rights in California since September 17 2001 till April 2002 when the plaintiff left for Australia.

13. Then the plaintiffs will claim that in California to be sure, the physician's First Amendment rights not to speak are implicated, see Wooley v. Maynard, 430 U.S. 705 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State cf. Whalen v. Roe, 429 U.S. 589, 603 (1977) and it will be shown that the plaintiff was healthy and Nara, plaintiff  was healthy in California.

9.        Recognize that a husband has a deep and proper concern and interest . . . in his wife's pregnancy and in the growth and development of the fetus she is carrying. Danforth, supra, at 69. With regard to the children he has fathered and raised, the Court has recognized his "cognizable and substantial" interest in their custody. Stanley v. Illinois, 405 U.S. 645, 651 -652 (1972); see also Quilloin v. Walcott, 434 U.S. 246 (1978); Caban v. Mohammed, 441 U.S. 380 (1979); Lehr v. Robertson, 463 U.S. 248 (1983). If this case concerned a State's ability to require the mother to notify the father before taking some action with respect to a living [505 U.S. 833, 896]  child raised by both,

therefore, it would be reasonable to conclude, as a general matter, that the father's interest in the welfare of the child and the mother's interest are equal.

10.    Then in California and in San Diego Couty in California where the plaintiffs were resident before birth, however, the issue takes on a very different cast. It is an inescapable biological fact that state regulation with respect to the child a woman is carrying will have a far greater impact on the mother's liberty than on the father's. The effect of state regulation on a woman's protected liberty is doubly deserving of scrutiny in such a case, as the State has touched not only upon the private sphere of the family, but upon the very bodily integrity of the pregnant woman. Cf. Cruzan v. Director, Mo. Dept. of Health, 497 U.S., at 281 . The Court has held that, when the wife and the husband disagree on this decision, the view of only one of the two marriage partners can prevail. Inasmuch as it is the woman who physically bears the child and who is the more directly and immediately affected by the pregnancy, as between the two, the balance weighs in her favor. Danforth, supra, at 71. This conclusion rests upon the basic nature of marriage and the nature of our Constitution: [T]he marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals, each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. Eisenstadt v. Baird, 405 U.S., at 453 (emphasis in original). The Constitution protects individuals, men and women alike, from unjustified state interference, even when that interference is enacted into law for the benefit of their spouses.

11.    Our Constitution is a covenant running from the first generation of Americans to us, and then to future generations. It is a coherent succession. Each generation must learn anew that the Constitution's written terms embody ideas and aspirations that must survive more ages than one. We accept our responsibility not to retreat from interpreting the full meaning of the covenant in light of all of our precedents. We invoke it once again to define the freedom guaranteed by the Constitution's own promise, the promise of liberty.

12.    The Court is unquestionably correct in concluding that the doctrine of stare decisis has controlling significance in a case of this kind, notwithstanding an individual Justice's concerns about the merits. 1 The central holding of Roe v. Wade, 410 U.S. 113 (1973), has been a "part of our law" for almost two decades. Planned Parenthood of Central Mo. v. Danforth, 428 U.S. 52, 101 (1976) (STEVENS, J., concurring in part and dissenting in part). It was a natural sequel to the protection of individual liberty established in Griswold v. Connecticut, 381 U.S. 479 (1965). See also Carey v. Population Services International, 431 U.S. 678, 687, 702 (1977) (WHITE, J., concurring in part and concurring in result). The societal costs of overruling Roe at this late date would be enormous. Roe is an integral part of a correct understanding of both the concept of liberty and the basic equality of men and women.

13.    Then plaintiffs state that in California the plaintiffs Weighing the State's interest in potential life and the woman's liberty interest, I agree with the joint opinion that the State may "`"expres[s] a preference for normal childbirth,"'" that the State may take steps to ensure that a woman's choice "is thoughtful and informed," and that States are free to enact laws to provide a reasonable framework for a woman to make a decision that has

such profound and lasting meaning.

14.     Once again the plaintiffs allege a fervent view of individual liberty and the force of stare decisis have led the Court to this conclusion. Ante, at 853. Today a majority reaffirms that the Due Process Clause of the Fourteenth Amendment establishes "a realm of personal liberty which the government may not enter," ante, at 847 - a realm whose outer limits cannot be determined by interpretations of the Constitution that focus only on the specific practices of States at the time the Fourteenth Amendment was adopted. See ante, at 848-849. Included within this realm of liberty is "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." Ante, at 851, quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972) (emphasis in original). These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the [505 U.S. 833, 924] liberty protected by the Fourteenth Amendment. Ante, at 851 (emphasis added).

15.

The Court today reaffirms the long recognized rights of privacy and bodily integrity. As early as 1891, the Court held, [n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others. . . . Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251 (1891). Throughout this century, this Court also has held that the fundamental right of privacy protects citizens against governmental intrusion [505 U.S. 833, 927] in such intimate family matters as procreation, childrearing, marriage, and

contraceptive choice. See ante, at 847-849. These cases embody the principle that personal decisions that profoundly affect bodily integrity, identity, and destiny should be largely beyond the reach of government.

16. Then the plaintiffs allege The Court has held that limitations on the right of privacy are permissible only if they survive "strict" constitutional scrutiny - that is, only if the governmental entity imposing the restriction can demonstrate that the limitation is both necessary and narrowly tailored to serve a compelling governmental interest. Griswold v. Connecticut, 381 U.S. 479, 485 (1965). We have applied this principle specifically in the context of abortion regulations. Roe v . Wade, 410 U.S., at 155 . 5

17.  At trial it will be shown that the plaintiff left for Australia in or about April 2002 to attend the International Conference of Refractive Surgeons, as President and CEO of N-Life holding the United States Patent on the correction and that he held a return ticket to the United States of America.

18. At trial the plaintiffs will show that Nara was only delivered in Southport Hospital, Queensland, Australia to one non permanent visitor and the plaintiff Nara has not stayed in Australia for 10 years and per the Australian Citizenship Act 2007 she is not an Australian Citizen.

19. The plaintiffs will state that the matter of leaving and reentering United States for the plaintiffs is a matter of discovery.

20. The plaintiffs will show that a company N-Life Inc. paid for the tickets on the Airlines and for the delivery of the plaintiff Nara.

21. That the plaintiffs had full intention to return to the United States.

22. That due to an "medical emergency" where on fetus had to be aborted the plaintiffs

were unable to return to the United States.

23. The plaintiffs will show at trial that if plaintiff Nara Avalon Singhderewa was delivered on May 28 2002 and the plaintiff Jugvir Inder Singh left for Australia on April 2002 from San Diego, California, after getting permission to travel to Australia, the defendants cannot claim that the plaintiff is an Australian Citizen and had no derived rights from United States of America

24. In conclusion the plaintiff Nara Avalon von Neuman Singhderewa is an American Citizen and the plaintiffs allege all of the counts of the Complaint.


S/' _____

NARA AVALON SINGHDEREWA

Represented by

JUGVIR INDER SINGH

# Historical details for 87 668 271 762

This extract is based on information supplied by businesses to the Registrar of the Australian Business Register. Neither the Registrar nor the Federal Government guarantee that this information is accurate, up to date or complete. You should consider verifying this information from other sources.

ABN: **87 668 271 762**

[View current ABN details](#)

Last modified: **27 Apr 2007**

| ABN status | From | To |
|---|---|---|
| Active | 01 Nov 1999 | (current) |

| Entity names | From | To |
|---|---|---|
| NEWMAN, SARAH JANE | 27 Apr 2004 | (current) |
| NEWMAN, SARAH JANE | 01 Nov 1999 | 27 Apr 2004 |

**Entity type**

[Individual/Sole Trader](#)

| Main business locations | From | To |
|---|---|---|
| QLD 4213 | 27 Apr 2007 | (current) |
| QLD 4214 | 02 Apr 2006 | 27 Apr 2007 |
| QLD 4217 | 27 Apr 2004 | 02 Apr 2006 |
| NSW 2463 | 05 Aug 2000 | 27 Apr 2004 |

| Trading name(s) | From | To |
|---|---|---|
| J.R. DEREWA | 27 Apr 2004 | (current) |
| BIONIC_I.COM | 05 Aug 2000 | 27 Apr 2004 |
| N-LIFE INC. | 05 Aug 2000 | 27 Apr 2004 |
| SARAH-JAMES.COM SARAH KIRKBOND JAMES KIRKBOND | 05 Aug 2000 | 27 Apr 2004 |

| GST status | From | To |
|---|---|---|
| No current or historical GST registrations | | |

Retrieved on: **29 Oct 2007**                    Last updated on: **29 Oct 2007**

# registry of biomedical companies

October 29, 2007          promoting the transfer of scientific know-how between industry and
academia

**Registry of biomedical companies:**

[4] [A] [B] [C] [D] [E] [F] [G] [H] [I] [J] [K] [L] [M] [N] [O] [P] [Q] [R] [S]
[T] [U] [V] [W] [X] [Y] [Z] [^] 1486 active entries

## N-Life Inc.

**PO BOX 98
Darien, 06820
United States of America, Connecticut**

**Phone: 203 323 6284
Fax: 203 323 0269
E-Mail:      n_life_n_life_n_life@yahoo.com**

**Description:**

N-LIFE INC is a biotechnology, nanotechnology, wavefront optics and a
chromorestructuring genomics company. It holds the rights to the correction
of Presbyopia. In 1997 the company acquired the rights and interests
in certain research in chromosomes and mapping from NORTH AMERICAN
GENTICS and in 1998 the company acquired the similar information from ALL
ASIA GENE POOL based in
Delhi India. The company is committed to the rapid deployment of genomics
in a gene therapy. The company is a memeber of University of San Diego
Connect and the NATIONAL AUSTRALIA CLUB.
2001 Company acquired Sarah-James .com n Australia and published the
Complete History and Concepts of Refractive Surgery. It published Zen and
the Art of Seeing.

THIS IS NOT A STATEMENT OF GOOD STANDING
File Number:
2425614        Incorporation Date / Formation Date:
08/10/1994
(mm/dd/yyyy)
Entity Name:
N-LIFE, INC.
Entity Kind:
CORPORATION        Entity Type:
GENERAL
Residency:
DOMESTIC   State:  DE

REGISTERED AGENT INFORMATION


Name:  AMERICAN INCORPORATORS LTD.
Address:        1220 N. MARKET STREET SUITE 808
City:   WILMINGTON        County:        NEW CASTLE
State:  DE    Postal Code:   19801
Phone: (302)421-5752