# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

## RESPONSE TO ANSWER FILED BY DEFENDANT UNITED NATIONS

The defendant filed an answer to complaint, which was inadvertently docketed as a dispositive motion. Based on the Rules of the court for a dispositive motion the defendant and plaintiff began negotiations over discovery and all other matter and the defendant has assigned a special team for this negotiation. In the meanwhile the court did notice the plaintiffs that the defendants filed an answer and not dispositive motion and the answer dealt with the issue of Immunity. See EXHIBIT THREE.

The plaintiffs have alleged that the defendants kidnapped the plaintiff Nara Avalon Singh Derewa and having kidnapped, concealed and held hostage, aided and abetted kidnappers and in concert violated both the USA Patriot Act and Racketeer Influenced and Corrupt Organizations Act.

The plaintiffs allege that the defendants operated, maintained and participated in an enterprise in IRAQ and used the funds to kidnap, concealed and held hostage, aided and

abetted kidnappers and in concert violated both the USA Patriot Act and Racketeer

Influenced and Corrupt Organizations Act. See   EXHIBIT THREE, EXHIBIT

TWELVE.

Plaintiffs allege that Defendants operated, maintained and participated in an

enterprise which engaged in a pattern of racketeering activity that injured the business

and property of the Plaintiffs in violation of 18 U.S.C. §1961 *et seq*. (the Racketeer

Influenced and Corrupt Organizations Act, or "RICO").  Through a Commonwealth of

Australia controlled state corporation based in Australia and its United States subsidiary,

the Defendants controlled the entire Australian wheat export market and transacted

legitimate business with one another and others through American banking channels in

New York while also operating a racketeering enterprise aimed at harming the business

of American wheat farmers and the plaintiffs child and his business.  Said Defendants

conspired with each other and with certain foreign entities to operate an enterprise that

engaged in a pattern of racketeering activity which involved repeated violations of 18

U.S.C. §1957(a) (engaging in monetary transactions in criminally derived property

"derived from specified unlawful activity", as defined by 18 U.S.C. §1956), as well as 18

U.S.C. §1956 (which prohibits money laundering and includes violations of the Foreign

Corrupt Practices Act as "specified unlawful activity" under both §1956 and 1957)—

specifically, by committing the predicate RICO violations of receiving and laundering

money derived from the unlawful bribery of foreign officials in violation of the Foreign

Corrupt Practices Act. Said racketeering activity enabled the Defendants to secure and

maintain exclusive export markets and enjoy income and proximately caused economic

injury to the property and business of the Plaintiffs who were deliberately excluded from

those countries as a direct result of said bribery and the continued concealment of said

bribery as part of the Defendants' continuing pattern of racketeering activity.  This action

seeks a permanent injunction against said unlawful conduct, compensatory and punitive

damages, treble damages and attorneys fees as provided by RICO, and declaratory relief.

See   EXHIBIT ONE.

## JURISDICTION AND VENUE

This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1332 (diversity of citizenship), 28

U.S.C. §1367 (pendant or supplemental jurisdiction), and 18 U.S.C. §1964 (Racketeer

Influenced and Corrupt Organizations Act, hereafter "RICO").

Venue is proper pursuant to 28 U.S.C. §1391 and other applicable law.

28. Since 1999, Defendant United Nations with Commonwealth of Australia through

Australian Wheat Board, AUSTRAC (Australian Transaction Reporting Agency) ATO

Australian Tax Organization, ASIO Australian Security and Information Organization

and DFAT Australian Foreign Trade Agency AWB LTD has served as the exclusive

manager and marketer of all Australian bulk wheat exports and has exported to a rogue

state IRAQ under the management of the defendant.  EXHIBIT TWELVE and EXHIBIT

FIFTEEN and EXHIBIT TWENTY THREE.

1.       AWB LTD is a state owned corporate entity which was formed to replace the

Australian Wheat Board, a statutory body of the Australian government which was

responsible for controlling the domestic and export marketing of Australian wheat from

1939 to 1999. See   EXHIBIT ONE.

31. AWB LTD is one of the largest registered future traders in the United States and traded extensively with the Enemy of the United States, the rogue state of Iraq under the guidance of the defendant.  See   EXHIBIT THREE.

2.      32. AWB owns and controls numerous subsidiary companies throughout the world, including a United States subsidiary, AWB USA LTD (hereafter AWB USA).

3.      33. AWB USA was incorporated in the State of Delaware and is headquartered in Portland, Oregon. EXHIBIT SEVEN.

4.      34. As a U.S. company, AWB USA participated in the USDA export credit program.

5.      35. In order to obtain favorable contracts and secure markets for Australian wheat, Defendant AWB LTD (hereafter AWB) has paid bribes and kickbacks to foreign governments, committed fraud, and laundered money.  See   EXHIBIT THREE.

6.      36. In order to exclude American wheat growers from certain markets and to sabotage business opportunities for American growers, Defendant AWB has paid bribes and kickbacks to foreign governments, committed fraud, and laundered money. EXHIBIT SEVEN.

7.      37. At all times relevant herein, Defendants have operated, maintained and participated in an enterprise engaged in racketeering activity which has caused injury to the business and property of the Plaintiffs and Plaintiffs' class and which is described more particularly below.

*BRIBERY OF YEMEN OFFICIALS*

38. In 1999, AWB officials bribed Yemenese government officials in order to secure a contract to export wheat to Yemen.

### BRIBERY OF PAKISTANI OFFICIALS

39. In 2001, AWB LTD officials bribed Pakistani government officials in order to secure a contract to export wheat to Pakistan.

### FRAUDULENT DEBT RECOVERY WITH LAUNDERED FUNDS

40. In 2001, the Australian mining company, BHP Billiton, loaned $8 million for the purchase of wheat to the government of Iraq in order to gain favor with the Hussein regime in BHP's attempt to obtain oil business in Iraq. EXHIBIT SIX, EXHIBIT THIRTEEN.

41. The Iraqi government failed to directly repay the $8 million loan to BHP.

2.     42. BHP Billiton contracted with an Australian oil company, Tigris Petroleum, to recover the $8 million debt.     EXHIBIT SEVEN. EXHIBIT NINE.

3.     43. In 2001, AWB fraudulently inflated the costs of a wheat shipment to Iraq by $8 million dollars to recoup the aforementioned debt under false pretenses.   EXHIBIT THIRTEEN.

4.     44. The invoice for said fraudulently inflated costs was transmitted via wire or mail from AWB in Australia to the United Nations (UN) in New York.   EXHIBIT TWENTY FOUR.

5.     45. In response to the fraudulent AWB invoice, the New York branch of BNP paid AWB an inflated cost for a wheat shipment through a UN escrow account.

6.     46. AWB laundered the excess $8 million fraudulent overpayment to BHP

Billiton as recovery of the aforementioned Iraqi debt.

EXHIBIT THIRTEEN.

## *FRAUDULENT SABOTAGE OF INDONESIAN MARKET*

1.      47. In 2002, Defendant AWB USA entered into a contract with a private Indonesian company to export soybeans to the Indonesian company.

2.      48. Said Indonesian company defaulted on the contract; consequently, through the USDA export credit program, AWB USA applied for and received $14 million in U.S. subsidies. EXHIBIT TEN

3.      49. AWB USA illegally and fraudulently received these subsidies, despite the fact that a substantial portion of the payment price of the wheat deal had in fact been paid by the Indonesian company to AWB.

4.      50. As a result of the problems with the AWB USA/Indonesia soybean deal, the USDA banned US exporters from using the export credit program in deals with any companies from Indonesia.

5.      51. AWB USA, upon the instruction of its parent company AWB, effectively scuttled a substantial portion of the US/Indonesian grain trade.

6.      52. Once the USDA export credit ban on Indonesia was implemented and US competition was significantly lessened, AWB LTD by-passed AWB USA LTD and entered into multiple grain deals directly with Indonesian companies.

## *FRAUDULENT ABUSE OF U.N. OIL-FOR-FOOD PROGRAMME*

1.      53. As a result of the government of Iraq's persistent and continued violations of post-Persian Gulf War U.N. sanctions, the U.N. imposed an embargo against the

government of Iraq.   EXHIBIT SEVEN.

2.        54. In order to lessen the effect of the embargo on the citizens of Iraq, the UN

established the UN Oil-for-Food Programme, which allowed goods and services for

humanitarian purposes to be exchanged with Iraq through the U.N.

3.        55. The UN established the Programme's primary escrow account with BNP

(Banco de Nationale de Paris). See   EXHIBIT ONE.

4.        56. Another escrow account for the Programme was with J.P. Morgan Chase in

New York.

5.        57. On multiple occasions AWB LTD submitted via wire or mail fraudulent

misinformation to the 661 Committee of the Programme in New York, NY in the United

States. See   EXHIBIT ONE.

        58. More specifically said fraudulent misinforming communications included, but

were not limited to, inflated valuations of project wheat shipments to Iraq, knowingly

misleading communications that failed to alert the UN of substantial after-service fees,

knowingly misleading communications that failed to alert the UN of AWB's knowledge

that payment of said after-service fees where going to Iraqi governmental agencies, etc.

EXHIBIT TEN.

        59. The Programme operated from 1997 until the end of the war in Iraq in 2003.

6.        60. AWB LTD was the single largest provider of humanitarian goods to Iraq

under the Programme, selling a total of 6.8 million tons of wheat to Iraq and receiving a

total of $2.3 billion in payments from the United Nations escrow account.  EXHIBIT

FOURTEEN.

7.        61. Payments to AWB resultant from their fraudulent communications to the UN

were made to AWB from the U.S. New York branch of BNP and, upon information and belief, the New York branch of J.P. Morgan Chase bank.

### *BRIBERY OF IRAQI OFFICIALS DISGUISED AS COSTS AND FEES*

1.  62. From 1997 until July 1999 AWB's contracts with the Iraqi Grain Board required shipment of its wheat only up to the point of entry to Iraq, the port of Umm Qasr. EXHIBIT TEN.

2.  63. In July 1999 AWB and the Iraqi Grain Board agreed to a new contractual term requiring AWB to assume the cost of inland transportation to points within Iraq from the port of Umm Qasr. EXHIBIT FOURTEEN

3.  64. The inland transportation provisions became standard in all AWB contracts for the remainder of the Programme.

4.  65. Alia is a Jordanian based company that was purportedly responsible for transportation of wheat that was shipped by AWB to Iraq. EXHIBIT TWENTY

    .66. Forty-nine (49%) ownership of Alia was controlled by the Trade Ministry of Iraq.

    .67. The Jordanian principles of Alia had no transportation experience.

5.  68. Iraqi governmental employees performed all duties relevant to Iraq inland transportation of AWB wheat shipments.

    .69. From late 1999 to mid-2000, transport costs ranged between $10.80 and $12 per metric ton (pmt).

    .70. In 2000, the costs increased to between $14 and $15 pmt.

6.  71. From 2001 until the spring of 2003 the transportation costs spiraled to between $45 and $56 pmt.

7.    72. These transport fees were in fact bribes from AWB to the Iraqi government and/or government officials in return for which AWB maintained a virtual monopoly of the Iraq wheat import business.    EXHIBIT TEN.

### *OBSTRUCTION OF JUSTICE*

73. At all times relevant herein, numerous United Nations, Commonwealth of Australia

and  AWB officials were aware that AWB was paying bribes to Iraqi government

agencies and/or officials.  EXHIBIT SIXTEEN.

1. 74. Due to the overwhelming number of allegations of violations of the UN Oil-

for-Food Programme the U.N. designated an independent evaluation of the entire

program, "The Independent Inquiry Committee into the United Nations Oil-for-Food

Programme" (hereinafter referred to at times and "The Volker Report"), the results of

which were released on October 27, 2005.   EXHIBIT TEN.

2. 75. The Volker Report showed that AWB was the most egregious abuser of all

participants in the entire Programme, constituting 14% of all kick-backs paid to the Iraqi

government through the Programme.

3. 76. The Volker Report uncovered numerous documents that suggested that AWB

LTD official knew that the transportation fees and after-service fees paid were in fact

going to the Iraqi government.

4. 77. As a result of the Volker Report, in mid-January 2006 the Australian

Government designated former Australian judge from the New South Wales Court of

Appeals Judge Terence Cole to conduct an independent investigation into AWB and their

role in the UN Oil-for-Food scandal (hereinafter referred to at times as the "Cole

Commission").

5. 78. During this inquiry a number of AWB officials were put under oath and

compelled to testify about AWB's role in the scandal.

6. 79. A number of these AWB officials and other conspirators conspired to and

attempted to obstruct justice by attempting to cover-up AWB's role in the scandal. Said obstruction was implemented via the commission of perjury and other efforts to obfuscate the truth. EXHIBIT SEVEN.

7.    80. During testimony before the Cole Commission, Andrew Lindberg, the former CEO and managing director of AWB LTD, admitted that AWB payments to Alia were indeed being forwarded to agents of Saddam Hussein's regime in the Iraqi government.

## THEORIES OF RECOVERY

### COUNT I – VIOLATION OF 18 U.S.C. 1962(a)

107. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

108. Defendants AWB and AWB USA, United Nations together with the individual Defendants, violated § 1962(a) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968,
this provides as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

109. Defendants AWB and AWB USA and United Nations together with the individual Defendants, continuously and on numerous occasions engaged in a pattern of racketeering activity which included predicate acts of engaging in monetary transactions in criminally derived property "derived from specified unlawful activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices and financial instruments to conceal the true nature of proceeds derived from bribery in violation of 18 U.S.C. §1956.

110. The aforementioned pattern of racketeering activity furthered the Defendants' conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and enabled the Defendants to continue to surreptitiously pay such bribes with the intention of securing an exclusive countries, which would exclude American citizens' plaintiffs and US NATIONAL and cause direct economic injury to the Plaintiffs. EXHIBIT SEVENTEEN.

111. The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO. The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity. The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States.

112. Defendant, United Nations, Commonwealth of Australia, AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. worked together oftentimes on a repeated and continuous basis to engage in the illegal

racketeering activity.  The predicate acts described above include bribery of foreign officials, engaging in monetary transactions with funds derived from bribery, and the laundering of bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs. EXHIBIT EIGHTEEN.

113. Defendants were and continue to be associated with and employed by the Enterprise.  EXHIBIT SEVEN.

114. Defendants directed that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

115. The Enterprise and the participating Defendants have in fact engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

116. The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities described above. The Enterprise and the co-conspirators designed and implemented the United Nations, AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales that would not have been received through the Enterprise's legitimate conduct of business.  EXHIBIT SEVENTEEN.

Plaintiffs have all been injured in their business or property, as required by 18 U.S.C. § 1964(c).  The impact caused by Defendants' pattern and practice of criminal conduct, if not remedied by the Court, will continue to harm the named Plaintiffs.

118. The Enterprise's victims include all persons and/or concerns that have suffered direct economic and non-economic damages from the AWB Unfair Competition Conspiracy.

119. As a direct and proximate result of the AWB Unfair Competition

Conspirators' actions as aforesaid, individually named Plaintiffs been damaged in an amount to be determined at trial.

### COUNT II – VIOLATION OF 18 U.S.C. 1962(c)

120. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

121. Defendants, United Nations, Commonwealth of Australia AWB and AWB USA, together with the individual Defendants, violated §1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which provides as follows:  EXHIBIT EIGHTEEN.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. EXHIBIT TWENTY THREE.

122. Defendants, United Nations, Commonwealth of Australia, AWB and AWB USA continuously and on numerous occasions engaged in a pattern of racketeering activity which included predicate acts of engaging in monetary transactions in criminally derived property "derived from specified unlawful activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices and financial instruments to conceal the true nature of proceeds derived from bribery in violation of 18 U.S.C. §1956. EXHIBIT SEVEN.

123. The aforementioned pattern of racketeering activity furthered the

Defendants' conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and enabled the Defendants to continue to surreptitiously pay such bribes with the intention of securing an exclusive control over the plaintiff, which would exclude American Citizens and US Nationals and cause direct economic injury to the Plaintiffs.  EXHIBIT EIGHTEEN.

124. The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO.  The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity. The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States. EXHIBIT TWENTYTHREE.

125. Defendant, United Nations, Commonwealth of Australia, AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. worked together oftentimes on a repeated and continuous basis to engage in the illegal racketeering activity.  The predicate acts described above include bribery of foreign officials, engaging in monetary transactions with funds derived from bribery, and the laundering of bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs and Plaintiffs' class.

126. Defendants were and continue to be associated with and employed by the Enterprise. EXHIBIT TWENTYTHREE.

127. Defendants directed that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

128. The Enterprise and the participating Defendants have in fact engaged in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

129. The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities described above. The Enterprise and the co-conspirators designed and implemented the AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales that would not have been received through the Enterprise's legitimate conduct of business.

Plaintiffs have all been injured in their business or property, as required by 18 U.S.C. § 1964(c). The impact caused by Defendants' pattern and practice of criminal conduct, if not remedied by the Court, will continue to harm the named Plaintiffs and putative RICO Class Members.

131. The Enterprise's victims include all persons and/or concerns that have suffered direct economic and non-economic damages from the AWB Unfair Competition Conspiracy.

132. As a direct and proximate result of the AWB Unfair Competition Conspirators' actions as aforesaid, individually named Plaintiffs and the putative RICO Class have been damaged in an amount to be determined at trial.

### COUNT III – VIOLATION OF 18 U.S.C. 1962(d)

133. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

134. Defendants, United Nations, Commonwealth of Australia AWB and AWB USA, together with the individual Defendants, violate §1962(d) of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which provides as follows:

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

135. Defendants, United Nations, Commonwealth of Australia, AWB and AWB USA continuously and on numerous occasions conspired to engage in a pattern of racketeering activity which included predicate acts of engaging in monetary transactions in criminally derived property "derived from specified unlawful activity" in violation of 18 U.S.C. §1957(a), and money laundering thru falsified invoices and financial instruments to conceal the true nature of proceeds derived from bribery in violation of 18 U.S.C. §1956. 136. The aforementioned conspiracy to engage in a pattern of racketeering activity furthered the Defendants' conspiracy to bribe Iraqi officials in violation of the Foreign Corrupt Practices Act and enabled the Defendants to continue to conspire to surreptitiously pay such bribes with the intention of securing an exclusive market which would exclude American growers and cause direct economic injury to the Plaintiffs and Plaintiffs' class.

137. The combined business efforts of the Defendants constitute an ongoing Enterprise as that term is defined by RICO. The Enterprise is an ongoing organization that continues to function as a unit and engage in activity separate and apart from the criminal and illegal activity. The Enterprise operated, and continues to operate, legitimate business, which includes business in the United States.   EXHIBIT SEVEN.

138. Defendant, United Nations, Commonwealth of Australia AWB, AWB USA and the Individual Defendants together with the co-conspiring Alia representative, Iraqi

government representatives, BHP Billiton representatives, Yemenis government representative, Pakistani government representatives, Indonesian private citizens, etc. conspired to worked together oftentimes on a repeated and continuous basis to engage in the illegal racketeering activity. The predicate acts described above include conspiracy to bribe foreign officials, conspiracy to engage in monetary transactions with funds derived from bribery, and conspiracy to launder bribery proceeds in order to further and continue the goal of the Enterprise to exclude and harm the Plaintiffs and Plaintiffs' class.

139. Defendants were and continue to be associated with and employed by the Enterprise.

140. Defendants conspired to direct that employees employed by the Enterprise engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

141. The Enterprise and the participating Defendants have in fact conspired to engage in a pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5).

142. The Enterprise has earned billions of dollars in exchange for participating with co-conspiring government and private company officials in the racketeering activities described above. The Enterprise and the co-conspirators designed and implemented the AWB Unfair Competition Conspiracy in order to receive billions of dollars in wheat sales that would not have been received through the Enterprise's legitimate conduct of business.   EXHIBIT EIGHT.

Plaintiff have all been injured in their business or property, as required by 18 U.S.C. § 1964(c).  The impact caused by Defendants' conspiracy to engage in a pattern

and practice of criminal conduct, if not remedied by the Court, will continue to harm the named Plaintiffs Members.  EXHIBIT EIGHT.

144. The Enterprise's victims include all persons and/or concerns that have suffered direct economic and non-economic damages from the AWB Unfair Competition Conspiracy.

145. As a direct and proximate result of the AWB Unfair Competition Conspirators' actions as aforesaid, individually named Plaintiffs have been damaged in an amount to be determined at trial.

### *COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS OPPORTUNITY AND ECONOMIC RELATIONSHIP AND FAMILY RELATIONSHIP*

146. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

147. Defendants intentional illegal actions wrongfully and tortiously interfered with Plaintiffs' family life, business opportunities and economic relationships, including but not limited to their opportunity to export technology and patents and earn income as a result, and to increase their stature and presence in specific export markets. As a direct and proximate result of said actions, Plaintiffs have been damaged in an amount to be determined at trial.

### *CONSPIRACY TO EXCLUDE PLAINTIFFS FROM CERTAIN MARKETS and COUNTRIES*

1.      82. Defendants knew or should have known that United States domestic and international law governing the conduct of AWB and its subsidiaries in engaging in the business of grain exporting prohibits them from engaging in bribery, wire and mail fraud, financial institution fraud, money laundering, obstruction of justice, violations of the Foreign Corrupt Practices Act, and other forms of racketeering activity. SEE EXHIBIT TWENTYONE.

2.      83. Upon information and belief, certain AWB officials, employees and/or agents of Defendants intentionally and knowingly conspired to utilize illegal tactics such as wire fraud, bank fraud, bribery, money laundering and tortious interference with business opportunity in order to gain an unfair competitive advantage in certain wheat markets including, but not limited to, Iraq, Pakistan, Yemen and Indonesia.

.84. Said Defendants, AWB officials, employees and/or agents, Alia officials, Alia employees and/or agent, Iraqi government agencies, Iraqi government officials and/or agents,

.Yemenese government agencies, Yemenese government employees and/or agents, Pakistani government agencies and Pakistani government employees and/or agents who conspired to engage in wire fraud, bank fraud, bribery, money laundering and tortious interference with business opportunity in order to position AWB to have an unfair competitive advantage against AWB competitors are hereinafter referred to as "conspirators" or "co-conspirators," or as subsumed within the term "AWB Unfair Advantage Conspirators" defined below.   EXHIBIT TWENTY TWO.

3.       85. AWB Unfair Advantage Conspirators that knowingly participated in AWB's illegal efforts to corner specific wheat markets were intent on ensuring that their methods to effect the same were not hampered by efforts to comply with the mandates of United States domestic and international laws.

4.       86. AWB Unfair Advantage Conspirators formed an ongoing criminal enterprise designed to implement tactics known to violate international laws and U.S. domestic laws in order to affect an unfair competitive advantage for AWB in specific international wheat markets to the detriment of Plaintiffs (hereinafter "AWB Unfair Advantage Conspiracy").

5.       87. This criminal enterprise was premised on the fact that AWB Unfair Advantage Conspirators knew and intended for AWB to realize monetary benefits from affecting an unfair competitive advantage for AWB in specific international wheat markets.

6.      88. The AWB Unfair Advantage Conspiracy began in or around 1996 and is ongoing.

.89. Certain Defendants, AWB officials and senior management had relationships that assisted in the formation, implementation and continuation of the  AWB Unfair Advantage Conspiracy. Upon information and belief that these relationships were formed and fostered by meetings, telephonic discussions, in-person discussions, e-mail .communications, facsimile communications, wiring communication,  and other communications that occurred in, among other places, Oregon and New York.

EXHIBIT TWENTY FOUR.

7.      90. The corporate Defendant formed and implanted the AWB Unfair Advantage Conspiracy in order to make money selling wheat to specific international wheat markets and in order to gain a competitive advantage in said specific markets.

8.      91. The individual Defendant formed and implemented the AWB Unfair Advantage Conspiracy in order to obtain personal financial rewards and/or financial rewards for their employers.

9.      92. The AWB Unfair Advantage Conspiracy was successful in achieving its unlawful ends. With assistance from certain conspiring individuals and/or organizations, Defendant were able to reap handsome monetary rewards in exchange for participating in the AWB Unfair Advantage Conspiracy which includes, but is not limited to, acts of bribery, wire or mail fraud, financial institution fraud,  money-laundering, obstruction of justice, and violations of the Foreign Corrupt Practices Act to the economic detriment of Plaintiffs.

10.      93. During the period of 1996 to the present, upon information and belief,

Defendant AWB earned millions of dollars in revenue from the AWB Unfair Advantage Conspiracy. These fruits of the AWB Unfair Advantage Conspiracy have been invested in the ongoing operations of Defendants AWB and AWB USA.

11.     94. Upon information and belief, each individual Defendant, through their participation in the AWB Unfair Advantage Conspiracy, earned far more money per contract, per annum or per hour than they could otherwise have earned, absent the AWB Unfair Advantage Conspiracy.

        95. Upon information and belief, the corporate Defendants also benefited

        financially by forming the AWB Unfair Advantage Conspiracy because their co-conspirators used their influence to ensure that the corporate Defendants were awarded contracts or modifications in existing contracts devoid of fair competition that would have existed, absent the AWB Unfair Advantage Conspiracy.

1.     96. Numerous acts of racketeering activity have been committed by the conspirators (and others acting at their direction) in their implementation of the AWB Unfair Advantage Conspiracy, including but not limited to financial institution fraud, wire or mail fraud, bribery, money laundering, and violations of the Foreign Corrupt Practices Act.

2.     97. As part of the aforementioned Conspiracy, the Defendants committed repeated violations of 18 U.S.C. §1957(a) (engaging in monetary transactions in criminally derived property "derived from specified unlawful activity", as defined by 18 U.S.C. §1956), as well as 18 U.S.C. §1956 (which prohibits money laundering and includes violations of the Foreign Corrupt Practices Act as "specified unlawful activity" under both §1956 and 1957)— specifically, by committing RICO predicate acts of receiving

and laundering money derived from the unlawful bribery of foreign officials in violation

of the Foreign Corrupt Practices Act which were intended to cause economic harm to the

Plaintiffs and Plaintiffs' putative class.

3.        98. Upon information and belief, the AWB Unfair Competition Conspiracy

effectively deprived the Plaintiffs and Plaintiffs' class of any meaningful opportunity to

export wheat to Iraq via the U.N. Oil-for-Food Programme.


## COUNT V – VIOLATION OF 50 U.S.C. 1702)

## PATRIOT ACT VIOLATIONS


SEC. 106. PRESIDENTIAL AUTHORITY.

Section 203 of the International Emergency Powers Act (50 U.S.C. 1702) -

(1) in subsection (a)(1)--

(C) when the United States is engaged in armed hostilities or has been attacked by a

foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of

the United States, of any foreign person, foreign organization, or foreign country that he

determines has planned, authorized, aided, or engaged in such hostilities or attacks

against the United States; and all right, title, and interest in any property so confiscated

shall vest, when, as, and upon the terms directed by the President, in such agency or

person as the President may designate from time to time, and upon such terms and

conditions as the President may prescribe, such interest or property shall be held, used,

administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit

of the United States, and such designated agency or person may perform any and all acts

incident to the accomplishment or furtherance of these purposes.

As such the defendants Commonwealth of Australia, United Nations, Union of India did aid and abet the Rogue state of Iraq while keeping the plaintiff hostage, kidnapped and concealed in Australia.  EXHIBIT TEN.

 COURT OF COMPETENT JURISDICTION- Section 3127(2) of title 18, United States states:

`(A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals having jurisdiction over the offense being investigated.

### COUNT VI– VIOLATION OF 18 U.S.C. Section 3127(3)

The defendants from within the United States and other parts of the world did aid and abet the rogue state of Iraq while keeping the plaintiff, hostage, kidnapped and concealed using  PEN REGISTER- Section 3127(3) of title 18, United States Code,

(A) dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

(3) TRAP AND TRACE DEVICE- Section 3127(4) of title 18, United States Code, is `or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;'; and  `or process'.

EXHIBIT TEN.

SEC. 219. SINGLE-JURISDICTION SEARCH WARRANTS FOR TERRORISM.

CASE 1:07 cv-01170-JDB     Document 19     Filed on                    Page 26 of 47

Rule 41(a) of the Federal Rules of Criminal Procedure `executed' the following: `and (3)

in an investigation of domestic terrorism or international terrorism (as defined in section

2331 of title 18, United States Code), by a Federal magistrate judge in any district in

which activities related to the terrorism may have occurred, for a search of property or for

a person within or outside the district'.


S/

_____

JUGVIR INDER SINGH

FOR PLAINTIFF

NARA SINGHDEREWA MINOR CHILD


_____

JUGVIR INDER SINGH

For All Plaintiffs

CASE 1:07 cv-01170-JDB    Document 19    Filed on                        Page 27 of 47

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| | ) | |
| Defendants | ) | |

# ORDER

ENTERED this _____day of _____2007.


_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

CASE 1:07 cv-01170-JDB    Document 19    Filed on                    Page 28 of 47

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | ) | |

**MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF  REPONSE TO THE ANWSER OF THE DEFEDANTS UNITED NATIONS AND JURISDICTION BASED ON VIOLATIONS OF THE PATRIOT ACT AND RICO.**

ARGUMENT I

The plaintiffs at trial will show:

1. The defendants, United Nations, Commonwealth of Australia and Union of India did violate the Patriot Act Provision of the United States, and all other Acts so included in the complaint and is subject to the jurisdiction of the court and within the purview of FSIA. EXHIBIT SIXTEEN.

2. TELEMARKETING FRAUD- Section 2325(1) of title 18, United States Code

was violated by the defendants in that it raised money in the United States to protect the Inalienable Rights, Fundamental Rights and Child Rights through it many agencies and failed to provide even a single dollar for the protection the plaintiffs.

3. SEC. 1004. VENUE IN MONEY LAUNDERING CASES Section 1956 of title 18, United States Code,

`(i) VENUE a prosecution for an offense under this section or section 1957 may be brought in--

(A) any district in which the financial or monetary transaction is conducted; or

`(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

`(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

`(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.'.   EXHIBIT TEN.

4. PROTECTION FROM EXTORTION- Section 1030(a)(7) of title 18, United States Code,

5.  SEC. 814. DETERRENCE AND PREVENTION OF CYBERTERRORISM.

    (a)  CLARIFICATION  OF  PROTECTION  OF  PROTECTED

    COMPUTERS- Section 1030(a)(5) of title 18, United States Code.

6.  SEC. 813. INCLUSION OF ACTS OF TERRORISM AS RACKETEERING

    ACTIVIT .Section 1961(1) of title 18, United States Code.  EXHIBIT TEN.

7.  SEC.  809.  NO  STATUTE  OF  LIMITATION  FOR  CERTAIN  TERRORISM

    OFFENSES.

    (a) IN GENERAL- Section 3286 of title 18, United States Code,  read as

    follows:

    (b) MATERIAL SUPPORT TO TERRORISTS- Section 2339A(a) of title

    18, United States Code.  See   EXHIBIT TWO.

    (c) MATERIAL SUPPORT TO DESIGNATED FOREIGN TERRORIST

    ORGANIZATIONS- Section 2339 B(a)(1) of title 18, United States Code.

    EXHIBIT TEN.

8.  SEC. 808. DEFINITION OF FEDERAL CRIME OF TERRORISM.

    Section 2332b of title 18, United States Code, 956(a)(1) (relating to

conspiracy to murder, kidnap, or maim persons abroad), 1203 (relating to hostage

taking), , 2332 (relating to certain homicides and other violence against United

States nationals occurring outside of the United States), 2332b (relating to acts of

terrorism transcending national boundaries), 2339A (relating to providing

material support to terrorists), 2339B (relating to providing material support to

terrorist organizations), or 2340A (relating to torture) of this title;. See   EXHIBIT

ONE.

9.  SEC. 805. MATERIAL SUPPORT FOR TERRORISM.

    (a)  IN GENERAL- Section 2339A of title 18, United States Code,

    See   EXHIBIT ONE.

10. SEC. 365. REPORTS RELATING TO COINS AND CURRENCY RECEIVED IN

    NONFINANCIAL TRADE OR BUSINESS.

    (a)  REPORTS REQUIRED- Subchapter II of chapter 53 of title 31, United

        States Code.  EXHIBIT ELEVEN.

    (b)  (a) COIN AND CURRENCY RECEIPTS OF MORE THAN $10,000-

        Any person—

    (c)  `(1) who is engaged in a trade or business; and  EXHIBIT ELEVEN.

    (d)  (2) who, in the course of such trade or business, receives more than

        $10,000 in coins or currency in 1 transaction (or 2 or more related

        transactions),

shall file a report described in subsection (b) with respect to such transaction (or related

transactions) with the Financial Crimes Enforcement Network at such time and in such

manner as the Secretary may, by regulation, prescribe.

11. SEC. 361. FINANCIAL CRIMES ENFORCEMENT NETWORK.

    (a)  IN GENERAL- Subchapter I of chapter 3 of title 31, United States Code

        subchapter II of chapter 53 of this title (such as reports on cash transactions,

        foreign financial agency transactions and relationships, foreign currency

        transactions, exporting and importing monetary instruments, and suspicious

        activities), chapter 2 of title I of Public Law 91-508, and section 21 of the Federal

        Deposit Insurance Act.  EXHIBIT SIXTEEN.

12. 5318(g) of title 31, United States Code.  SUSPICIOUS ACTIVITY REPORTING
    REQUIREMENTS FOR FUTURES COMMISSION MERCHANTS,
    COMMODITY TRADING ADVISORS, AND COMMODITY POOL
    OPERATORS- The Secretary, in consultation with the Commodity Futures
    Trading Commission, may prescribe regulations requiring futures commission
    merchants, commodity trading advisors, and commodity pool operators registered
    under the Commodity Exchange Act to submit suspicious activity reports under
    section 5318(g) of title 31, United States Code.   EXHIBIT SIXTEEN.

13. SEC. 353. PENALTIES FOR VIOLATIONS OF GEOGRAPHIC TARGETING
    ORDERS AND CERTAIN RECORDKEEPING REQUIREMENTS, AND
    LENGTHENING EFFECTIVE PERIOD OF GEOGRAPHIC TARGETING
    ORDERS.  See   EXHIBIT TWO.

   (a)  CIVIL PENALTY FOR VIOLATION OF TARGETING ORDER- Section
        5321(a)(1) of title 31, United States Code,

   (b)  (c) STRUCTURING TRANSACTIONS TO EVADE TARGETING ORDER
        OR CERTAIN RECORDKEEPING REQUIREMENTS- Section 5324(a) of title
        31, United States Code, See   EXHIBIT TWO.  EXHIBIT EIGHTEEN.

14. SEC. 318. LAUNDERING MONEY THROUGH A FOREIGN BANK Section
    1956(c) of title 18, United States Code, See  EXHIBIT TWO.

15. SEC.  317.  LONG-ARM  JURISDICTION  OVER  FOREIGN  MONEY
    LAUNDERERS. Section 1956(b) of title 18, United States Code,

`(2) JURISDICTION OVER FOREIGN PERSONS- For purposes of adjudicating an

action filed or enforcing a penalty ordered under this section, the district courts shall have

jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found.  EXHIBIT SIXTEEN. EXHIBIT NINETEEN.

`(A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;

`(B) the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or

`(C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.   EXHIBIT TWENTY TWO.

16. . 315. INCLUSION OF FOREIGN CORRUPTION OFFENSES AS MONEY LAUNDERING CRIMES Section 1956(c)(7) of title 18, United States Code, is

`(iv) bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official;

`(v) smuggling or export control violations involving--

`(I) an item controlled on the United States Munitions List established under section 38 of the Arms Export Control Act (22 U.S.C. 2778); or See   EXHIBIT TWO.

`(II) an item controlled under regulations under the Export Administration Regulations (15 C.F.R. Parts 730-774); or

`(vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for

prosecution, if the offender were found within the territory of the United States;'; and

EXHIBIT SIXTEEN.

 (C)section 1030 (relating to computer fraud and abuse),  and

(D) by inserting `any felony violation of the Foreign Agents Registration Act of 1938,'

before `or any felony violation of the Foreign Corrupt Practices Act'.

17. TITLE III--INTERNATIONAL MONEY LAUNDERING ABATEMENT AND ANTI-TERRORIST FINANCING ACT OF 2001 SEC. 301. SHORT TITLE. This title may be cited as the `International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001'.

 (2) money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks;

(3) money launderers subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend;

(4) certain jurisdictions outside of the United States that offer `offshore' banking and related facilities designed to provide anonymity, coupled with weak financial supervisory and enforcement regimes, provide essential tools to disguise ownership and movement of criminal funds, derived from, or used to commit, offenses ranging from narcotics trafficking, terrorism, arms smuggling, and trafficking in human beings, to financial frauds that prey on law-abiding citizens.  EXHIBIT SEVENTEEN.

(5) transactions involving such offshore jurisdictions make it difficult for law enforcement officials and regulators to follow the trail of money earned by criminals, organized international criminal enterprises, and global terrorist organizations;

(6) correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions; See   EXHIBIT TWO. See   EXHIBIT FOUR.

(7) private banking services can be susceptible to manipulation by money launderers, for example corrupt foreign government officials, particularly if those services include the creation of offshore accounts and facilities for large personal funds transfers to channel funds into accounts around the globe;   EXHIBIT TWENTY TWO.

(8) United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that make investigations, prosecutions, and forfeitures more difficult, particularly in cases in which money laundering involves foreign persons, foreign banks, or foreign countries;  EXHIBIT FOUR and EXHIBIT FIVE.

(9) the ability to mount effective counter-measures to international money launderers requires national, as well as bilateral and multilateral action, using tools specially designed for that effort; and See   EXHIBIT TWO.

(10) the Basle Committee on Banking Regulation and Supervisory Practices and the Financial Action Task Force on Money Laundering, of both of which the United States is a member, have each adopted international anti-money laundering principles and recommendations.

Violations of United Nations Security Council Resolutions 661 and 986.

CASE 1:07 cv-01170-JDB    Document 19    Filed on                    Page 36 of 47

Defendants violated, Customs Prohibited Export Regulation 13CA. Customs Prohibited

Import Regulations 4QA. Air Navigation Regulation 119, Foreign Exchange Regulation

39,

On 25 June 2005, in consultation with AWB's legal advisers, Hargreaves prepared a

memorandum for Lindberg to speak to at a board meeting of AWB that was scheduled

for 28 June 2005. The memorandum apprised board members of meetings which AWB

had held with key elements of the Federal Government, including the Australian

Embassy in Washington, and expanded on those meetings as follows:


'Meetings with Federal Government

• Chairman and MD met with

o PM's office – senior Foreign Affairs Advisor

o John Anderson and his chief of staff

o Alexander Downer

o Warren Truss

o Heads and other officials of DFAT and DAFF

• Provided briefing on progress so far with IIC and our deep concern over AWB's

treatment so far and that AWB might become victim of its cooperation

• Alerted them to possibility of adverse [findings] including possibility of finding AWB

has wilfully breached sanctions through the trucking arrangements

• Sought their advice on impact if AWB withdrew from process

• Reassured them that:

o AWB has QC's opinion it has not breached sanctions

CASE 1:07 cv-01170-JDB    Document 19    Filed on                Page 37 of 47

o AWB complied with the guidelines laid down by the relevant authorities

o AWB had no knowledge of any connection between the trucking company and the former regime during the OFF program

o AWB has found no evidence of fraud or corrupt payments etc

• Overall the meetings were very satisfactory for AWB

• While there is concern over damage to reputation of Australia and AWB, the feedback from all parties was:

o AWB should continue to engage in the process

o That Fed Gov't is ready to back AWB but this would be difficult if AWB withdraws from process

o No indication from any individual or any meeting that Fed Gov't was distancing itself from AWB in this process

o Strong support came from Minister Downer who indicated he saw it as his responsibility to defend AWB

o Their view of the facts was that:

• AWB had followed the process

• AWB did what it was instructed to do

• AWB did not know, could not have known of any connection between the trucking company and the former regime.'

76 Later in the memorandum, Hargreaves identified the commercial objectives which AWB was pursuing:

On 4 October 2005, a conversation took place between Lindberg, the Minister for

Foreign Affairs, the Honourable Alexander Downer MP, Brendan Stewart, the chairman

of AWB, and others. A minute of this meeting prepared by the Department states:


'2. Mr Downer said the IIC allegations were worse than he had thought. There was

evidence presented by the IIC in the most recent letter. Mr Downer noted the letter

claimed that Alia was a front company. He enquired what was the role of the Iraqi State

Company for Water Transport (ISCWT). Mr Lindberg replied it was the port authority,

which had responsibility for discharging goods from ships. Alia was not a front company

and had provided transportation services. The AWB had been unaware of any

wrongdoing and had used its services in good faith. Mr Downer said AWB needed to

provide evidence. Mr Lindberg said AWB had been seeking additional information from

the IIC about the claims, before providing a written response to the 26 September letter.

The so-called evidence did not support the facts. AWB had provided explanations to the

IIC which had been ignored. AWB could demonstrate that it had paid no kickbacks. Nor

had AWB breached the sanctions regime. This had been confirmed by independent legal

advice both in Australia and overseas (Richard Tracy in Australia and a Cornell

University Professor who had previously participated in drafting the sanctions regime).'


The minute also records that later in the meeting Lindberg reiterated that 'as far as AWB

was aware, no one had been paid off nor any personal gain. AWB had acted in

accordance with the sanctions regime and that this had been supported by legal advice.'

82 AWB objected to the admissibility of the Department's minute on the ground that the statements contained in it were hearsay. There is, in my view, no substance in this objection. The document constitutes a business record which is admissible under s 69 of the Evidence Act. The definition of 'business' in clause 1(1) of Part 2 of the Schedule to the Evidence Act includes an activity engaged in or carried on by the Crown in any of its capacities. The document was tendered by the Commonwealth as evidence of the fact that the statements it records were made by Lindberg. The minute was prepared by Marc Innes-Brown, the head of the Department's Iraq Task Force, who was present at the meeting. The representation in the minute that Lindberg made the statements attributed to him was therefore made by a person who had personal knowledge of what statements were made by Lindberg. Lindberg was questioned about the minute at the Commission and did not dispute its accuracy in any respect.

'Project Rose – AWB Limited Board Briefing – 28 July 2004'. The document includes a page headed 'Initial Legal Advice' which is otherwise blank, presumably on the ground that it is still the subject of a claim for legal professional privilege. It also includes a page relating to Alia which states:


'Alia for Transportation and General Trade Company

• A Jordanian company based in Amman, Jordan

• Owned 51% by the Al-Khawam family based in Iraq

• Chairman is Mr Hussain Al-Khawam

• Directly reporting to him is the General Manager, Mr Othman Al-Absi (AWB's most frequent contact)

• Apparently 49% owned by the Iraqi Ministry of Transport

• The company was formed in 1995 as a joint venture with the Iraqi Ministry of Transport

• Al-Khawam's clan is prominent in southern Iraq and in Jordan. His father led a

rebellion against the British mandate in Iraq in 1920 and against a British-backed

government in 1935.'


The document concludes with a statement that AWB's strategy includes the full

engagement of Australian Government support.


102 The evidence in this Court also includes a handwritten note dated 10 March 2005 of

a joint meeting of directors of AWB and AWBI.

Scales and Cooper signed the authorization for the sum of US$7,087,202.24 to be paid

out of AWBI's account to Tigris on 6 December 2004. Scales' evidence to the

Commission was that:


'I authorised the payment because the recommendation from senior counsel was to do so,

and I believe there was a period of time where there was some – I don't know –

confusion, certainly in my mind, as to whether it was a debt recovery or for services

rendered, because of the half million to one million tonnes issue, and I was assured

during that process that, you know, it was fine to authorise payment.'


THE IRON FILINGS CLAIM

210 Communications between a lawyer and client which facilitate a crime or fraud are
not protected by legal professional privilege. This principle is often referred to as the
'fraud exception' to legal professional privilege, but this does not capture its full reach:
Attorney-General (NT) v Kearney (1985) 158 CLR 500 ('Kearney') at 515; Propend at
546; Clements, Dunne & Bell Pty Ltd v Commissioner of Australian Federal Police
(2001) 188 ALR 515 ('Clements') at 521-522 [30].

211 The principle encompasses a wide species of fraud, criminal activity or actions taken
for illegal or improper purposes: see North J's review of the authorities in Clements at
522-526 [35]-[44]. The scope of conduct caught by the principle has been articulated in a
variety of ways, often without particular precision: Propend at 545. Classic formulations
have spoken of communications in furtherance of a 'crime or fraud': R v Cox and Railton
(1884) 14 QBD 153 ('R v Cox') at 165; a 'criminal or unlawful proceeding': Bullivant v
Attorney-General (Vic) [1901] AC 196 ('Bullivant') at 201; 'any unlawful or wicked
act': Annesley v Anglesea (1743) 17 St Tr 1139 at 1229; and 'all forms of fraud and
dishonesty such as fraudulent breach of trust, fraudulent conspiracy, trickery, and sham
contrivances': Crescent Farm (Sidcup) Sports Ltd v Sterling Offices Ltd [1972] Ch 553 at
565. In Kearney, the High Court applied the principle to deny legal professional privilege
to legal advice obtained by the Northern Territory Government which was prima facie a
'deliberate abuse of statutory power' to defeat a land claim under the Aboriginal Land
Rights (Northern Territory) Act 1976 (Cth). In his reasons for judgment, Gibbs CJ (with
whom Mason and Brennan JJ agreed) stated at 515 that 'legal professional privilege will
be denied to a communication which is made for the purpose of frustrating the processes
of the law itself, even though no crime or fraud is contemplated.' Some authorities have

expressed the principle as applicable to prevent a 'fraud on justice' in a broad sense. The concept of a 'fraud on justice' was adopted by Lander J in Gartner v Carter [2004] FCA 258 ('Gartner v Carter') to deny protection to a communication between a lawyer and client for the purpose of the client putting assets beyond the reach of the legitimate claims of secured creditors: at [130] and [139]-[140].

212 The principle extends to 'trickery' and 'shams'. A 'sham' refers to steps which take the form of a legally effective transaction but which the parties intend should not have the apparent, or any, legal consequences: Equuscorp Pty Ltd v Glengallan Investments Pty Ltd (2004) 218 CLR 471; see also Beazley v Steinhardt (1999) 106 A Crim R 21; affirmed on appeal in [1999] FCA 1255 ('Beazley'). The recent case of Australian Securities & Investments Commission v Mercorella (No 3) [2006] FCA 772 provides an example of the denial of legal professional privilege to documents in furtherance of a sham transaction. In that case, creditors of a managed investment scheme claimed privilege over documents relating to securities obtained from the defendant and certain companies in the scheme. The transactions were allegedly entered into so as to advance those creditors' interests over the interests of other creditors to the scheme. Mansfield J found that the communications were prima facie in furtherance of a sham and, as such, were not privileged. After referring to Lander J's decision in Gartner v Carter and Barclays Bank plc v Eustice [1995] 4 All ER 511 ('Barclays Bank'), his Honour stated at [95]:

The iron filings claim refers to a claim by GBI for a rebate of US$2,016,133.00 on account of the fact that earlier shipments of wheat by AWB to GBI had been contaminated by iron filings. Lindberg agreed to pay this sum to GBI in settlement of the

iron filings claim in about October 2002 during the course of a visit to Bagdad. An email dated 7 November 2002 from Chris Whitwell of AWB ('Whitwell') to Lindberg and others reporting on the trip to Iraq in October 2002 stated that the responsible Iraqi Minister had asked for repayment of the iron filings rebate through the 'inland transport mechanism'. The same email referred to the fact that the Iraqi Minister was seeking cabinet approval for repayment of the Tigris debt.

Delegation led by Andrew Lindberg (August 2002) to Baghdad agreed to settle the contamination of the 'Iron Filings' vessels by paying them USD 6 pmt for each vessel total = USD 2,016,133

After being approached by Tigris Petroleum AWB and IGB have agreed to allow the new contract to be the conduit for a repayment of USD 8,375,000 owed to Tigris by IGB for a cargo of wheat shipped in 1996. IGB have agreed to raising the contract price by the debt amount and when payments are made under the Letter of Credit AWB will pay Tigris its debt less AWBs recovery fee.

Plaintiffs claim that fraud and among other activities gave them the means to conceal, kidnap, hold hostage the plaintiff minor from her father plaintiff.

CONCLUSION

As such the defendants have violated the following laws which can not lead them to expectations, that the State department would have recommended immunity as a 'matter of grace and comity' for wrongful taking of the plaintiff's one from the other and their property:

1. Inalienable Rights Guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.

2. Universal Declaration of Human Rights

3. The Declaration of Basic Principles of Justice for Victims of Crime and Power

4. The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5. International Convention on the protection of the Rights of all migrant workers and members of their families

6.  United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7. Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8. International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15.  Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18.  Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19.  Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21.  Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22.  Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and (d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

23.  Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

24.  Violated and derogated the Constitutional Right of the Plaintiffs

25.  Violated and Derogated the Civil Liberties of the plaintiff.

With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

S/' _____

NARA AVALON SINGHDEREWA

      Represented by

JUGVIR INDER SINGH

S/' _____

JUGVIR INDER SINGH

      Pro se.

CASE 1:07 cv-01170-JDB     Document 19     Filed on                     Page 47 of 47

CERTIFICATION ON MAILING

A true copy of the pleading and all attachments were emailed to the Mr. Rarendra Sen, 2107 Massachusetts Avenue, N.W. Washington D.C. USA - 20008 Phone: (202) 939-7000 Fax: (202) 265-4351 and **UNITED NATIONS,** UN Headquarters, **Mr. Nicolas Michel, Under-Secretary-General, The Legal Counsel,** ROOM 3427A, First Avenue at 46th Street, New York, NY 10017 , **Tel (212) 963-1234** ,TEL (212)963-5012 and email provided this Monday, November 12, 2007.

S/' _____

JUGVIR INDER SINGH

Pro se.

# "AUSTWHEAT BILL"

AWB LIMITED
A.C.N. 081 890 459

## BILL OF LADING

Consigned To

THE ORDER MINISTRY OF TRADE GRAIN BOARD
OF IRAQ

B/L No. 1

AWB.0081.0014

**NOT NEGOTIABLE**

or    THEIR    Assigns, he or they paying Freight
for the same as per the below-mentioned "Austwheat 1990" Charterparty, as
amended, all the terms, conditions, clauses and exceptions including
clause 32 (Arbitration) in which Charterparty are herewith incorporated.

Notify Address

MINISTRY OF TRADE GRAIN BOARD OF IRAQ

Vessel

Port(s) of loading
GEELONG

(s) of discharge - direct or via other Ports as per Charterparty
UM-QASER PORT

Shipper's description of goods

AUSTRALIAN HARD WHEAT IN BULK

Grain in bulk of
Forty Eight Thousand Two Hundred Point Zero Zero Zero    MT

being the weight ascertained or accepted by the Silo Authority under the custom of the trade, weight shipped unknown, and to be delivered in the
like apparent good order and condition at the aforesaid port(s) of discharge.

Silo Authority's Weights~    Weight shipped unknown, but said to weigh:    **48200.000 MT**

s Bill of Lading is to have effect subject to the provisions of the Rules contained in Schedule 1 to the Australian Carriage of Goods by Sea Act
91, as applied by that Act, and any subsequent amendment thereto. The Shippers are to be entitled to the benefit of the privileges, rights and
immunities conferred upon the Shipper, and the Shipowners are to be entitled to the benefit of the privileges, rights and immunities conferred upon
the Carrier, by such Act, and the said Schedule 1 thereto, as if the same were herein specifically set out. General Average (if any) shall be settled
according to the York-Antwerp Rules, 1974 as amended 1990.

FREIGHT PREPAID
CLEAN ON BOARD

CHARTERPARTY dated
MELBOURNE 27th July 2000
LC REF:
L/C NO. U720365 ISSUED BY
BNP PARIBAS, NEW YORK AND
MINISTRY OF TRADE/GRAIN BOARD
OF IRAQ, P.O. BOX 329,
BAGHDAD, IRAQ,
REFERENCE NUMBER 2000/72/404
THE OC NO. 700498

SHIPPED at the Port(s) of Loading in apparent good order and
condition on board the Vessel for carriage to the Port(s) of Discharge
specified above

Weight, and quality, unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CLAUSES SEE OVERLEAF

Place and date of Issue
MELBOURNE 23rd September 2000

Number of original Bs/L

FIVE (5)

Signature

BARWIL
A.C.N. 090 740 714
SOUTH MELBOURNE
(INC. (N.S.W.)
CLARENDO

Master/Agent (for or on behalf of the master)
MASTER :
RUBEN R. ERESTAIN

# UNCLASSIFIED
# DECLASSIFIED



DFT.0001.0490

17/1/06

626/34

**Date:** 26/11/02 12:30
**Sender:** Paul Stephens
**To:** Don Cuddihy
**Priority:** Normal
**Subject:** Re:COMMERCIAL-IN-CONFIDENCE:

Don

I spoke to OIP and Treasury who said AWB has one of two options

1. If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2. If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas. Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

I hope this is clear. If not, please let me know.

Paul

_____Reply Separator_____
Subject:    COMMERCIAL-IN-CONFIDENCE:
Author:     Don Cuddihy
Date:       25/11/02 17:36


Paul,

During the dispute over alleged contamination of some AWB Ltd wheat which arrived in Iraq earlier this year, AWB Ltd accepted that some of the cargoes were tainted with iron fillings. It agreed to accept a lower price for the 'tainted' wheat.

In this contect, AWB Ltd has asked me whether there's a mechanism for refunding the money paid by Iraq for the faulty wheat. The only warranty arrangements I am aware of require AWB Ltd to supply replacement wheat, rather than to refund monies paid.

Grateful if you could ask OIP what AWB Ltd's options are in this case.

Regards

Don

AWB.0103.0071



# TIGRIS PETROLEUM

| | |
|---|---|
| Mobile Tel No | +44 7802 267 920 |
| Fax No: | +44 1428 724 523 |

10 May 2001

Charles Stott
International Marketing Manager
AWB Ltd
528 Lonsdale Street
Melbourne 3000
Australia

Dear Charles,

**Iraq: Shipment of Grain by MV Ikan Sepat, January 1996**

I would like to thank you for reporting to me on the discussions which took place this week in Baghdad between the AWB Team and representatives of the Ministry of Trade and the Ministry of Oil.

I understand that Iraq has acknowledged the validity of the Obligation to Tigris, and has requested that Tigris proceed to make a proposal for settlement of the Obligation to the relevant authorities, which  would be transmitted through the good offices of AWB Ltd.

I have discussed the matter with the Board of Tigris and I should be most grateful if you would convey the following proposal to the Ministry of Trade on behalf of Tigris Petroleum.

## 1  Calculation of Interest

The amount owing as at 26th January 2001 (the due date for repayment of the debt) was approximately \$8,050,000.  This includes interest, calculated as agreed at 10% compound per annum from the delivery of the cargo on 26th January 1996.

In consideration for prompt settlement Tigris is prepared to waive its right to compound interest.  A simple interest calculation would reduce the amount owing to Tigris by approximately \$550,000, leaving a net amount outstanding on 26th January of  approximately  \$7,500,000.

Tigris is prepared to agree to the amount of \$7,500,000 effective 26th January 2001.

AWB.0103.0072

**2  Date of Payment**

Tigris is willing to work towards an early settlement of the Obligation.  In consideration of the economic difficulties facing Iraq, Tigris is prepared to agree to deferred payment terms, with simple interest continuing to run at 10% per annum on all unpaid balances.

We are prepared to agree to the following schedule of payments:
* One half of the outstanding obligation, plus interest, on 1st June 2001.
* The remaining one half of the outstanding obligation, plus interest, on 1 December 2001.

**3  Amounts Due**

(a) 1st June 2001

The amount owing to Tigris on 1st June 2001 would be as follows:

| | |
|---|---:|
| 50% of the Outstanding Obligation on 26th January 2001 | $3,750,000 |
| Interest at 10% per annum for 4 months | $  125,000 |
| Total payable on 1st June | $3,875,000 |

(b) 1st December

The amount owing to Tigris on 1st December 2001 would be as follows:

| | |
|---|---:|
| 50% of the Outstanding Obligation on 26th January 2001 | $3,750,000 |
| Interest at 10% per annum for 10 months | $  312,500 |
| Total payable on 1st December | $4,062,000 |

**4  Payment Details**

On confirmation that the counterparties are in agreement with this proposal we shall provide details of the Bank Account into which the funds should be transferred.  The account is a US Dollar account, held with CSFB, Gibraltar.

Could you please convey this proposal with my deepest compliments.  Please also ensure that the parties are aware of my strong personal desire to put this matter behind us, and to allow Tigris to concentrate on our future relationship with the Ministry of Oil, with whom we are currently discussing matters of the utmost importance in relation to the sustainability of Iraq's oil production.

I look forward to hearing from you.

Yours sincerely

**C N Davidson Kelly
President**

From: 61 3 9606 0252     Page: 2/9    Date: 16/08/2004 1:58:02 PM

L30 - 0021

Ale 136

```
Author: Charles Stott at _AWB_CORP_PO
Date:    12/5/95  1:31 PM
Priority: Normal
TO: John Lawrenson
TO: Ron Storey
CC: Peter McKeown
CC: Charles Stott
Subject: BHP/Iraq
```

AWB.0129.0002

---------------------------------- Message Contents ----------------------------------

John/Ron,

Contrary to DFAT's legal advice we have now received UN approval for Iraq transactions to proceed on the basis of; "Cash payment to be received through third parties".

In light of this decision the BHP transaction,structured slightly differently, is now able to proceed. Prescott is expected to provide the green light within the next few days.

Under the old mechanism the IGB was to open a 5 year deferred payment L/C in favour of the AWB. The IGB was to pay cash or deliver oil in substitution for cash if UN restrictions on oil exports were terminated. The AWB was to assign its payment and oil receipt rights to BHP and in return the AWB would receive cash from BHP on bill of lading date.



The new mechanism, which is still to be negotiated with BHP, should simply be COD. BHP will then be left to make its own arrangements with the Iraq's.

As for DFAT, clearly their legal interpretation of UN sanctions was wrong. However, DFAT are certainly not prepared to concede this point. In fact, they claim that it is only because of Australia's excellent standing in the UN that our applications breeze through without close scrutiny.

This position doesn't wash with me.

DFAT throughout this process have postulated over what the UN legislative drafters intent was at the time of establishing the rules and as a result they have applied a far stricter interpretation than the UN. This sanctimonious position is inhibiting our trading relationship with Iraq and has resulted in lost opportunities. DFAT may be motivated by the fact that Evan's is rumored to be seeking the penultimate UN job, or that Australia is currently lobbying for a seat on the security council.

Irrespective of the reasons, I believe the AWB shouldn't miss the opportunity to tactfully feed into the system our concern that trading opportunities with Iraq are being lost because of DFAT's strict interpretation of UN sanctions. I understand that Prescott will raise BHP's concerns with Costello when they meet for lunch next week. However, we should also act given the AWB's entire Iraqi business was at risk.

I believe our reaction should be communicated informally via John and,or Trevor.

Your comment/reaction/suggestions would be appreciated.

Charles

ROS_216C_0020

# The Bank of New York
## Audit Trail Report

Page: 7
Date: 09/12/2000
Time: 17:27:10

| | Item# | Status | Src Currency | Destination | Pay Currency | TRN/System Msg |
|---|---|---|---|---|---|---|
| FT | 7 | Sent | USD | NEW YORK - USD | USD | FTJ0009126703222 |

VAX Transmission Date/Time: 9/12/2000 02:25

A/C:

AWB.0064.0040 _ R

Amount: 576,450.00                     Funds Type: SAME DAY
Value Date: 09/12/2000                 Advise By: MAIL
Your Ref: 49847                        Bene Is Bank: N
Related Ref:                           Charges: OUR

**Beneficiary**                        **Beneficiary's Bank**

ID:                                    ID:  SWIFT          JONBJOAX
ALIA FOR TRANSPORTATION & GEN TRADE    JORDAN NATIONAL BANK PLC
JORDAN                                 HEAD OFFICE/INTERNATIONAL DIVISION
                                       QUEEN MOOR ST-P.O. BOX 3103
                                       AMMAN 11181, JORDAN

**Intermediary**                       **By Order Of**

ID:  SWIFT          AEIBUS33
AMERICAN EXPRESS BANK LTD.
NEW YORK AGENCY
7 WORLD TRADE CENTER, 8FL
NEW YORK, NEW YORK 10048

                                       Description:
**Details Of Payment**                 **Bank To Bank**

Ent By/Dt:     HILERINEJ     App By/Dt:              Ver By/Dt:     ANDREW
09/12/2000 15:20:25                                  09/12/2000 16:59:26

**US DOLLAR PAYMENT REQUEST**                                                                0

| DIVISION REQUESTING PAYMENT | CHARTERING |
|---|---|

AWB.0081.0013 — R

| AMOUNT | US$723,000.00 |
|---|---|

| DATE PAYMENT REQUESTED | 4/10 |
|---|---|

~~29-Sep-00~~

3000

**PAYMENT DETAILS**

| PAYMENT DETAILS - NAME OF VESSEL & B/LADING DATE | 230 Sept 2000 |
|---|---|

| Trucking fee | 48200.00  mt | US$15.00 | US$723,000.00 |
|---|---|---|---|

| Total Remittance | US$723,000.00 | 1118000 |
|---|---|---|

**BANKING DETAILS**

| | CORRESPONDENT BANK (in the USA) | ACCOUNT OF | A/C NUMBER AND NAME OF BENEFICIARY |
|---|---|---|---|
| | American Express Bank N.Y. New York | The Jordan National Bank | Alia for Transportation and General Trade |
| ADDRESS | Account: | P.O.BOX 2103  Amman - Jordan | Ref :Trucking Fee: / AWB |
| SWIFT CODE | aalbus 33 | | |
| ABA No. | | | |

**AUTHORISED SIGNATORIES**



| REQUESTED BY: | AUTHORISED BY: |
|---|---|
| 29-Sep-00  David Cowan | Michael Watson |

U0095

From: Nigel Edmonds-Wilson
Sent: Wednesday, 3 October 2001 3:31:00 PM
To: Annette Bury
Subject: Insurance - equipment to Iraq

Hi Annette,

As part of AWB's existing agreements and contracts with the Grain Board of
Iraq, I am organising some equipment to be supplied to Iraq.

We are now nearing the time when we can look at shipping the equipment, via
the port of Umm Qasr, Iraq.

I need your assistance for two things:

Firstly, we have some equipment in Toowoomba which needs to be insured from
the time it leaves Toowoomba to the time it is delivered onto a vessel
travelling to Umm Qasr. (Toowoomba to Melbourne via road freight, then
temporarily store at either Agrifood or Prograin, until we can put onto a
suitable vessel in either Melbourne, Geelong, Port Adelaide or Port Lincoln).

Secondly, we need to insure the goods for their travel whilst on board the
vessel (some will be containerised and travel as deck cargo, other, smaller
equipment will travel in the Master's care).

Costings of the above equipment are as follows:

Deck Cargo approximately = AUD          (GST excl)
Master's care approximately = AUD          (GST excl)

Please advise me the correct process and contact me if you require any
further info. Your assistance is greatly appreciated.

Regards,

Nigel Edmonds-Wilson
ext 2111

Also please note, we will be shipping some more equipment in the near future
and will require insurance cover then also.

AWB.5064.0315_R

AWB.0129.0161

```
From: Michael Long
Sent: Wednesday, 6 November 2002 11:08:00 AM
To: Executive
Subject: Tigris / BHP / IGB
```

Update re Tigris petroleum / BHP debt


Michael


----- Forwarded by Michael Long/HO/AWB on 06/11/2002 12:09 -----

          Chris Whitwell
          06/11/2002 09:50

                    To: "Norman Davidson-Kelly" <ndk@menaenergy.com>
                    cc: "Chris Whitwell" <cwhitwell@awb.com.au>, "Dominic Hogan"
          <dhogan@awb.com.au>, Michael Long/HO/AWB@AWB
                    Subject: Re: your email

          This document has been read by:      Message:
          Michael Long
Norman

It was good to meet you on our last trip and we briefed Sabah as to the
results of our discussions. briefly they are as follows :

Had a first meeting with Dr Yousif where we put you approximate figures
forward - however we emphasised that any agreement on the final actual
figures had to be reached between Tigris representatives and appropriate
persons in the govt  - we were only facilitating possible repayment.

we took the following approx figures you gave us.

Date  Compound Int: Simple Interest

26th Jan 2001  USD8,050,000 USD7,500,000
26th Jan 2002 USD8,855,000 USD8,000,000
26th Oct 2002 USD9,519,000 USD8,375,000

We suggested the following proposal

1. offsetting vessel claims (iron filings) against Tigris (BHP) debt -
2. Balance of debt to be recovered against new business (load up contract). -
approx USD7.5 million (if using compound)
3. No further vessel claims would be used as offset - but would need to be
redirected through UN account.

Yousif referred the issue to the Minister who we met that evening.

The minister wants to keep the two issues (vessel claims and Tigris debt)
separate. He stated that the simple Interest amount on the Tigris debt had
received approval for repayment and that he felt  through loading up the next
Phase provided this opportunity.

Given that the next phase is due for discussion in Dec it was agreed that it

AWB.0129.0162

was important that Tigris have arranged figures and agreed them prior to
then. Sabah told us of your plans to be there this month.

We discussed with Sabah the possible difficulties in incorporating the entire
debt into one 500 K contract. Suggested some alternate pressure could be
bought to bear on the Govt  by yourselves to increase the tonnage of next
phase to make things easier. he said he would discuss this with you.

I don't have your telephone numbers but happy to discuss further if you wish.
plse call me on my mobile - plse bear in mind UK is 11 hours behind Australia.

regards

Chris Whitwell
Account Manager
Phone: (613) 9209 2044
Fax: (613) 9670 5539
Mobile (61) 419 833 356



        "Norman Davidson-Kelly" <ndk@menaenergy.com>
        01/11/2002 05:57
        Please respond to "Norman Davidson-Kelly"

            To: "Dominic Hogan" <dhogan@awb.com.au>
            cc: "Chris Whitwell" <cwhitwell@awb.com.au>
            Subject: Visit to Baghdad


I understand from Sabah that the trip went reasonably well.  Give me a call
when you get back, and we can catch up.

Mike finds his e-mails to me get bounced back, but maybe you will have better
luck.

N

WST.0012.0110

## Attachment 17

# BLAKE DAWSON WALDRON

### L A W Y E R S

# Consultancy Agreement

**AWB Limited**
**ABN 99 081 890 459**

**and**

**Trevor Flügge and Lyn Flügge**

**as Trustees of the Rockvale Family Trust**

Level 39
101 Collins Street
Melbourne Vic 3000
Telephone: (03) 9679 3000
Fax: (03) 9679 3111      Ref: ABC 03 1313 3157

WST.0012.0111

CONSULTANCY AGREEMENT

## CONTENTS

1.   **INTERPRETATION**                                        1
   1.1   Definitions                                     1
   1.2   Rules for interpreting this document            1

2.   **APPOINTMENT**                                          2
   2.1   Engagement                                      2
   2.2   Specific Retainer                               2
   2.3   General Retainer                                3

3.   **REMUNERATION AND BENEFITS**                             3
   3.1   Remuneration                                    3
   3.2   Terms of Payment                                4
   3.3   Travel                                          4
   3.4   Additional Benefits                             4

4.   **CONFIDENTIAL INFORMATION**                              4

5.   **TERMINATION**                                          4
   5.1   Immediate Termination                           4
   5.2   Termination by Notice                           5
   5.3   Illness of the Consultant                       5
   5.4   No Further Claim                                5
   5.5   Payment in Lieu of Notice                       5
   5.6   Payment of Accrued Benefits                     5
   5.7   Saving of Rights                                5

6.   **NOTICES**                                             5

7.   **GENERAL**                                             6
   7.1   Governing law                                   6
   7.2   Amendment                                       6
   7.3   Waiver of rights                                6
   7.4   Operation of this document                      6
   7.5   Exclusion of contrary legislation               6
   7.6   Inconsistency with other documents              6
   7.7   Counterparts                                    7
   7.8   Attorneys                                       7



WST.0012.0112

## CONSULTANCY AGREEMENT

**DATE**            2002

**PARTIES**

> **AWB Limited**, ABN 99 081 890 459 of Ceres House, 528 Lonsdale Street, Melbourne, Victoria (the "Company"); and
>
> **Trevor Flügge and Lyn Flügge** as Trustees of the Rockvale Family Trust (the "Consultant")

**RECITALS**

A.    Trevor Flügge A.O. ("Mr Flügge") was Chairman of the Company from 1 July 1999 to 14 March 2002, and had previously been Chairman of the Australian Wheat Board and has unique knowledge and experience in wheat marketing and the grains industry.

B.    The Company desires to have the services of Mr Flügge exclusively in relation to markets in which the Company operates.

C.    The Consultant has agreed to make Mr Flügge's services available on the following terms.

**THE PARTIES AGREE AND DECLARE AS FOLLOWS:**

1.    INTERPRETATION

1.1    **Definitions**

In this agreement, unless the context otherwise requires:

"**Board**" means the board of directors of the Company from time to time;

"**Chief Executive**" means the Chief Executive of the Company;

"**Fixed Remuneration**" means the remuneration referred to in clause 3.1(a);

"**Services**" has the meaning given by clause 2.3;

1.2    **Rules for interpreting this document**

Headings are for convenience only, and do not affect interpretation. The following rules apply in interpreting this document, except where the context makes it clear that a rule is not intended to apply.

(a)    A reference to:

(i)    legislation (including subordinate legislation) is to that legislation as amended, re-enacted or replaced, and includes any subordinate legislation issued under it;

WST.0012.0113

(ii)    a document or agreement, or a provision of a document or agreement, is to that document, agreement or provision as amended, supplemented, replaced or novated;

(iii)   a party to this document or to any other document or agreement includes a permitted substitute or a permitted assign of that party;

(iv)    a person includes any type of entity or body of persons, whether or not it is incorporated or has a separate legal identity, and any executor, administrator or successor in law of the person; and

(v)     anything (including a right, obligation or concept) includes each part of it.

(b)    A singular word includes the plural, and vice versa.

(c)    A word which suggests one gender includes the other genders.

(d)    If a word is defined, another part of speech has a corresponding meaning.

(e)    The word "**agreement**" includes an undertaking or other binding arrangement or understanding, whether or not in writing.

(f)    The word "**subsidiary**" and the expression "**related body corporate**" have the same meaning as in the Corporations Act.

## 2.    APPOINTMENT

### 2.1    Engagement

With effect from 1 August 2002 the Consultant is engaged and retained for a period of one year to provide services on a non-continuous basis as required by the Company as a consultant upon the terms and conditions contained in this document (the "Retainer"). The engagement may be renewed or further renewed by agreement in writing for a period specified in the renewal agreement.

### 2.2    Specific Retainer

The Consultant is engaged on an exclusive basis to provide the services of Mr Flügge:

(a)    to be available on request to advise the Company in relation to the general business of the Company and its subsidiaries and specifically:

(i)    the 2004 review of the *Wheat Marketing Act* 1989 and the operation of the Single Desk;

(ii)    international market access and specific international markets and marketing initiatives;

(iii)    grain industry developments in Australia;

(b)    to advise and assist the Company in international business development opportunities; and

WST.0012.0114

(c)    to assist the Company (and in particular the Chief Executive and Managing Director) through his networks to form and develop relationships with overseas government and non-government organisations, trade and industry associations or forums, lobby groups and other contacts in the wheat industry to improve free trade opportunities for the Australian wheat industry.

### 2.3    General Retainer

The Consultant:

(a)    shall procure that Mr Flügge will faithfully and diligently perform the services in clause 2.2 and any related services (the "Services") which are from time to time required by the Chief Executive, the Board or its delegates;

(b)    shall procure that Mr Flügge will at all times comply with all lawful directions given to him for the purpose of performance of Services by the Chief Executive or its delegates and will comply in all respects with all policies, rules and regulations which have been or may in the future be established by the Company for the conduct of its directors and employees to the extent that they are applicable to the performance of the Services;

(c)    shall if required provide the Services not only to the Company but also to AWB (International) Limited or any other related bodies corporate of the Company as the Chief Executive, the Board or its delegates may from time to time reasonably require; and

(d)    shall procure that Mr Flügge will not without the consent of the Chief Executive directly or indirectly engage or be concerned or interested either alone or jointly with or as servant or agent for any other person, firm or corporation in any other trade, business or be interested in any investment in competition with or in conflict with the interests of the Company or any of its related bodies corporate except by way of investment in not more than 0.5% of the securities of any entity if those securities are of a class that are listed on Australian Stock Exchange Limited, or of the securities of an unlisted public company that has more than 1000 members.

## 3.    REMUNERATION AND BENEFITS

### 3.1    Remuneration

The remuneration of the Consultant shall comprise:

(a)    an amount of $100,000 payable in equal monthly instalments in consideration of the obligation assumed under paragraph 2.3(d) of this document and his availability to perform the Services; and

(b)    if specifically requested to procure Mr Flügge to undertake a more specific assignment, an amount of $2,500 for each day for each specific assignment for which Mr Flügge provides Services, inclusive of a minimum of 20 days.

WST.0012.0115

3.2    **Terms of Payment**

The Consultant will submit a tax invoice to the Company showing the amount due under paragraph 3.1(a), and any further fees and expenses payable, one week before the end of each month. The Company will endeavour to pay the amount in that invoice, and any other moneys due at the end of each month.

3.3    **Travel**

The Company shall reimburse the Consultant for the costs of travel on Company business required by the Chief Executive.

3.4    **Additional Benefits**

The Consultant shall be entitled to reimbursement of communication and other out of pocket expenses incurred with the authority of the Chief Executive for hospitality and other representation of the Company and for Mr Flügge to be insured at the expense of the Company in connection with performance of the Services in accordance with his status under clause 7.4(a).

4.    CONFIDENTIAL INFORMATION

The Consultant shall not during the term of this agreement or at any time after the termination of the Retainer (except in the proper course of performing Services under this agreement or as may be required by law):

(a)    without the prior consent in writing of the Company disclose to any other person firm or corporation any confidential information relating to the Company or a related or associated body corporate or its or their respective businesses or any trade secrets of which he becomes possessed whilst engaged by the Company; or

(b)    use or attempt to use any such confidential information in any manner which is not in the proper course of the Services and for the benefit of the Company or its related bodies corporate,

and shall use its best endeavours to prevent the disclosure of any such confidential information by third parties. These restrictions shall continue to apply after termination of the Consultant's engagement but shall cease to apply to information or knowledge which has come into the public domain otherwise than by breach of this agreement.

5.    TERMINATION

5.1    **Immediate Termination**

The Retainer may be terminated by the Company forthwith if the Consultant or Mr Flügge personally:

(a)    becomes insolvent or makes an arrangement or composition with creditors; or

(b)    wilfully commits any breach of this agreement or is, in the opinion of the Board or the Chief Executive, guilty of any serious misconduct or dishonesty.



WST.0012.0116

5.2     **Termination by Notice**

The Retainer may be terminated by the Consultant or the Company giving written notice of termination to the other (without having or giving any reason) on 6 months notice.

5.3     **Illness of the Consultant**

If the Consultant is unable to perform the Services due to illness of Mr Flügge or any other cause for:

(a)     a period of four consecutive months, the Company or the Consultant may forthwith terminate the Retainer without notice; or

(b)     a period or periods totalling three months in any one year, the Company may suspend payment of remuneration and provision of benefits in respect of any period in excess of three months during which the Consultant is unable to perform Services.

5.4     **No Further Claim**

If the Retainer is validly terminated under clause 5.1 the Consultant shall have no further claim against the Company for compensation in respect of that termination.

5.5     **Payment in Lieu of Notice**

If notice of termination of the Retainer is given by the Consultant under clause 5.2 the Company may at its option instead of continuing the Retainer for part or all of the period of notice required by that clause terminate the Retainer forthwith and pay to the Consultant an amount equal to the Fixed Remuneration calculated at the rate payable to him at the date of the notice in respect of the remaining period of the Retainer.

5.6     **Payment of Accrued Benefits**

Upon termination of the Retainer for any reason the Consultant shall be entitled to receive from the Company the balance of the Fixed Remuneration and any amount necessary to satisfy the minimum engagement provided by clause 3.1(b).

5.7     **Saving of Rights**

The provisions of this clause 5 shall be without prejudice to any other rights the Company may have in connection with any breach of duty by the Consultant.

6.     **NOTICES**

Any notice given by the Company to the Consultant under this agreement may be signed on behalf of the Company by any director, secretary or authorised officer of the Company (other than the Consultant).

7.    GENERAL

7.1    **Governing law**

This document is governed by the law in force in Victoria.

7.2    **Amendment**

This document can only be amended, supplemented, replaced or novated by another document signed by the parties.

7.3    **Waiver of rights**

A right may only be waived in writing, signed by the party giving the waiver, and:

(a)    no other conduct of a party (including a failure to exercise, or delay in exercising, the right) operates as a waiver of the right or otherwise prevents the exercise of the right;

(b)    a waiver of a right on one or more occasions does not operate as a waiver of that right if it arises again; and

(c)    the exercise of a right does not prevent any further exercise of that right or of any other right.

7.4    **Operation of this document**

(a)    In performing the Services (but not otherwise) Mr Flügge is an officer of the Company with the status of full-time contractor and has duties to the Company accordingly.

(b)    Any right that a person may have under this document is in addition to, and does not replace or limit, any other right that the person may have.

(c)    Any provision of this document which is invalid or unenforceable in any jurisdiction is to be read down for the purposes of that jurisdiction, if possible, so as to be valid and enforceable, and is otherwise capable of being severed to the extent of the invalidity or unenforceability, without affecting the remaining provisions of this document or affecting the validity or enforceability of that provision in any other jurisdiction.

7.5    **Exclusion of contrary legislation**

Any legislation that adversely affects an obligation of a party, or the exercise by a party of a right or remedy, under or relating to this document is excluded to the full extent permitted by law.

7.6    **Inconsistency with other documents**

If this document is inconsistent with any other document or agreement between the parties, this document prevails to the extent of the inconsistency.

WST.0012.0118

7.7 **Counterparts**

This document may be executed in counterparts.

7.8 **Attorneys**

Each person who executes this document on behalf of a party under a power of attorney declares that he or she is not aware of any fact or circumstance that might affect his or her authority to do so under that power of attorney.

**EXECUTED** as an agreement.

**Executed by AWB LIMITED:**

Signature of director

ANDREW LINDBERG
Name of director

Signature of director/secretary

RICHARD FULLER
Name of director/secretary

**SIGNED** by TREVOR FLÜGGE and LYN FLÜGGE as Trustees for the **ROCKVALE FAMILY TRUST** in the presence of:

Signature of party

Signature of party

Signature of witness

Shane Byrne
Name

29.FEB.2000 14:54     SAVAS OIL INT.SRL ROME-ITALY          NR.676   P.1





AWB.0057.0058_2

---

AKARA BLDG - 24 DE CASTRO STREET - WICKHAMS CAY I - ROAD TOWN - TORTOLA - BRITISH V. ISLANDS

---

**TO   :  AWB Limited**
         **Kind attention of Mr. REX LISTER**

**From:  Petr LOSSEV**

**Re.  : Amendments to:   UEB L/C LCIM 2111028 dated 22/02/2000,**
                         **BNP NY L/C Y713867, BUYER REF.NO. 99/52/143,**
                         **UN approval for          MT**
                         **S/AC.25/1999/986/OC.50173/Corr.1/Ext.2**

                         **UEB L/C LCIM 2111028 dated 22/02/2000,**
                         **BNP NY L/C Y713190, BUYER REF.NO. 99/54/70,**
                         **UN approval for          MT**
                         **S/AC.25/1999/986/OC.50071/Corr.1/Ext.1**

**Rome,  29.02.2000**                **Total pages (including cover page) : 6**

Dear Mr. LISTER,

Thank you very much for fax dated 29.02.2000 concerning the requested amendments to both L/Cs covering          MT of wheat under Contract A4907.

We agree with all your requests for amendments and we will instruct our Bank accordingly upon receipt of the extensions for the validity and shipment period from BNP NY (in the enclosed copy of our telex to GBI you will see that we are doing all our best to speed up the matter).

We also enclose 4 pages with extensions of UN approvals for both quantities.

With all our thanks and best regards, we remain,

Very truly yours,

Petr LOSSEV

General Director

---

Via L. Settembrini, 30          Ul. Bolshaya Ordynka,          Rue de la Cité, 3
00195 - Roma - Italia           20/4 building 7                1204 Genève Switzerland
Tel. (06) 361-24-14             109017 Moscow, Russia          Tel. (0041) 22 319 64 04
Fax (06) 361-24-15              Tel. (095) 951 33 26           Fax (0041) 22 319 64 01
Tlx. 622501 - SAVAS I           Fax (095) 961 26 19            Tlx. 413100 ITC CH
                                Tlx. 614919 SAVAS RU

AWB.0157.0499

# Project Rose

## Joint Board Committee

## AWB Limited and

## AWB (International) Limited

## Minutes of the Committee Meeting

## held on 27 April 2005

### *Glen Erin Vineyard Retreat, Rochford Road, Lancefield*

| | | |
|---|---|---|
| **COMMITTEE MEMBERS:** | **Mr Brendan Stewart** | **Chair** |
| | **Mr Robert Barry** | |
| | **Mr Andrew Lindberg** | |
| | **Mr Clinton Starr** | |
| | **Mr Peter Polson** | |
| **OTHER DIRECTORS:** | **Mr Steve Chamarette** | |
| | **Mr Ian Donges** | |
| | **Mr Brendan Fitzgerald** | |
| | **Mr Wayne Gibson** | |
| | **Mr Warrick McClelland** | |
| | **Mr Xavier Martin** | |
| | **Mr Chris Moffet** | |
| | **Mr John Schmoll** | |
| | **Mr John Simpson** | |
| **IN ATTENDANCE:** | **Dr Richard Fuller** | |
| | **Mr Jim Cooper** | |
| | **Mrs Delphine Cassidy** | |
| | **Mr Paul Ingleby** | |
| | **Ms Sarah Scales** | |
| | **Ms Jill Gillingham** | |
| | **Mr Charles Stott** | |
| | **Mr Michael Thomas** | |
| | **Mr Peter Geary** | |
| | **Mr John Maher** | |

## 1. OPENING OF MEETING / DECLARATIONS OF INTEREST

The Chairman declared the meeting open at 4:00pm.

## 2. PROJECT ROSE

The Managing Director briefed the Committee on Project Rose, including the following issues:

- L PP

.........................................    **Date:**
Chairman

AWB.0157.0500

LPP

The Board <u>discussed</u> the Managing Director's Report on Project Rose.

3.      **CLOSE**

The Chairman declared the meeting closed at 4:15pm.

..........................................      **Date:**
**Chairman**

 

AWB.0102.0176

**BHP Petroleum**

13 September, 2000

<u>**To Whom It May Concern**</u>

BHP Petroleum has agreed to restructure its commercial interests in Iraq by transferring to The Tigris Petroleum Corporation Limited, ('Tigris') 57/63 Line Wall Road, Gibraltar (Registered in Gibraltar number 76644) with effect from 1 September 2000 all its right title and interest relating to all Iraqi Assets and Liabilities.

In particular BHP Petroleum has assigned to Tigris all its rights to receive value from the Grain Board of Iraq, or its assignee, in relation to the cargo of grain delivered by the Australian Wheat Board to the Iraq Grain Board in January 1996 on the MV Ikan Sepat, which cargo was financed by BHP Petroleum at a cost of US$ 5 million (US Dollars five million), which rights are hereinafter referred to as 'Grain Board Receivable'.

Tigris is hereby authorised to discuss the Grain Board Receivable with the appropriate parties and to negotiate details and terms of payment as Tigris in its sole discretion shall deem appropriate, without further BHP Petroleum involvement.  Payments made in relation to the Grain Board Receivable should be made as directed by Tigris.

Yours faithfully

**P S Aiken**
President BHP Petroleum

# AWB Limited Memorandum

**To:**  CRRC Committee Members

AWB Legal – Jim Cooper

Mathew Foran – Government Relations

AWB.0129.0116

David Johnson – Manager National Pool

**cc:**  Peter Geary / Dominic Hogan / Chris Whitwell

**From:**  Michael Long

**Date:**  16/9/02

**Subject:**  Iraq debt / BHP / Tigris Petroleum – MV Ikan Sepat Jan. 1996

*6/5/04 Recieved from Terry Archer*

During 1995 /1996 BHP agreed to provide USD 5m worth of Australian wheat to the IGB as a gesture of good faith in view of BHP's desire to enter the Iraqi oil market.

AWB shipped the wheat on board the MV Ikan Sempat in Jan. 1996 and were paid by BHP Petroleum.

IGB have acknowledged the outstanding debt owed to BHP who subsequently assigned their rights to Tigris Petroleum. The current debt including interest stands at some USD 8.8m.

AWB has always acknowledged that it would assist in this debt recovery process. This issue has been raised by AWB personnel with the Minister of Trade, HE Mohamed Medhi Saleh on a few occasions since the debt became due on 26 January 2001. The Minister has always acknowledged this debt.

AWB has agreed to pay to IGB USD 6 per tonne on approximately 300 000mt under Contract Number A1111 / A1112 as settlement for the 'iron filings' quality issues amounting to some USD1.8m. AWB raised the possibility of settlement of this quality claim by AWB paying Tigris as settlement of the Iraqi debt to Tigris. UN Regulations prohibit the direct payment of funds to Iraq whilst Iraq is under UN sanctions.

The IGB has recently invited representatives from AWB and Tigris to visit Baghdad to discuss this issue.

Furthermore, AWB today received a communication from the Iraq Charges de Affaires (attached) quoting the Iraqi Foreign Minister stating **"as regards to the statements by Australian Foreign Minister claiming that Australian owes Iraq USD 500m, this is not true as the amount pending is only around USD8.8m in favour of Australia / Tigris Petroleum Corporation Pty ltd representing value of a quantity of wheat shipped in 1996 plus interest until 30[th] Jan 2002."**

ISM view this statement as extremely important in the context of the recent political noise over Australia's potential involvement in military aggression towards Iraq. It should also be noted that The Hon. Alexander Downer has just addressed the UN over Australia's position with respect to Iraq and has just met with the Iraqi Foreign Minister, HE Naji Sabri.

This statement could well be a phase in Iraq's plan to put more political pressure on the Howard Government. It could bring the AUD 500 m debt owed to the Australian

AWB Limited Memorandum    Case 1:01-cv-01170-JDB    Document 24-11    Filed 11/12/2007    Page 2 of 2

Government into question.  It should be noted that up until now, the Iraqi Trade Minister has always acknowledged this debt to the Australian Government.   Should the Charges de Affaires leak this information to the press, it would have a serious negative impact on the Australian Government, particularly with farm incomes under considerable pressure.



**AWB.0129.0117**

**Actions, Approvals**

1. **ISM request AWB Legal to review the file attached and to advise CRRC if ISM is authorised to negotiate with IGB  / Tigris the settlement of the Iraqi debt to Tigris.  Specifically it would involve AWB I paying monies to Tigris Petroleum subject to all the correct paperwork being received from both IGB and Tigris. <u>Advice to go to CRRC for meeting Thursday 19 Sept 2002.</u>**

2. **ME Desk  / Government Relations to devise the most appropriate strategy for liaising with the Australian Government in relation to the latest advice form Charge de Affaires.  This will need to be done quickly if we are to gain political mileage from it.**

3. **ME Desk to prepare a letter to HE Medhi Saleh from Andrew Lindberg alerting him to our concern over the recent correspondence and seeking his reconfirmation of the Australian debt.**




AWB.0087.0076

Ronly, UK
Fax No: 0011441819510512

From : Michael Watson –
AWB Limited, Melbourne, Fax No (03) 92092303

6th March 2000

Attention: Simone Jordon

Dear Simone,

**Ref: Australian Wheat,  - Ex Australia to Iraq**

I refer to our discussions and thought for good order sake, that I would drop you a line
to re-affirm the points of agreement that were reached

- Ronly or a company to be nominated to assist AWB in facilitating the
  payment of Inland Trucking fees within Iraq, to the nominated trucking
  company
- Trucking Fee to be remitted to the nominated trucking account upon receipt of
  trucking fee from AWB
- Total cargo approx 1.5million metric tons
- Shipment period March- July 00
- Where required, Ronly or a company to be nominated will also arrange to pay
  freight to Owners nominated by AWB, in the execution of AWB shipments to
  Iraq. Such freight to be remitted to Owners, upon receipt from such freight
  from AWB.

It is agreed Ronly or a company to be advised, will provide administration support
and will issue required invoices to AWB upon sailing of each vessel for trucking
and where required freight.

It is understood that Ronly or a company to be nominated will not be responsible
for the payment of either trucking fees or freight unless same received from AWB

It is agreed that AWB will pay a fee of USD 0.20 Per Metric Ton, to Ronly or a
company to advised in the execution of the above contract.

I would ask that you issue me an invoice periodically for shipments effected to
cover the above fee and that such should be kept separate to any trucking or
freight invoices.

AWB LIMITED ACN 081 890 459

Ceres House 528 Lonsdale Street Melbourne Vic 3000  GPO Box 4562 Melbourne Vic 3001 Australia
Telephone 03 9209 2000  Facsimile 03 9670 2782  www.awb.com.au

*The Australian Grains Marketer*

AWB.0087.0077

I trust that the above in line with your understanding of the agreement that we reached. If there are any questions or anything that I have left out, please do not hesitate to let me know.

If you are going to use the services of another company to perform the above, then please let me know, together with their banking details.

I will advise you in due course the banking details of the trucking company as they tend to change the banking details from time to time

I expect that I will place a couple of our existing contracts with Owners via you or the company that will be used. However, I will revert on this point in the near future. As discussed, if this happens, then we will need back to back c/ps on terms, freight rates etc and in order to efficiently manage the contracts, AWB would need a side letter to act as 'managers'

As advised, we can discuss this later.

Thanks again for your assistance in this matter


Sincerely

Michael Watson

AWB.0071.0223

FROM : PLIA FOR TRANS.&TRADE        PHONE NO. : 009626503102        Oct. 27 1999 10:43AM P1



## Alia for Transportation & General Trade

No.  : F/8/294/99
Date : 27/10/1999

To  : Australian Wheat Board
Att. : Mr. Mark Emons

Subject : ( 900 000 Ton Wheat )

Dear Sir,

We would like to introduce to you our company being one of the Jordanian Establishments specialized on the fields of over land and ocean freight transportation moreover, our company is a member of the syndicate of shipping agents in Jordan also we are agents of the state company for Iraqi land Transport and Iraq .

We have informed officially  form Ministry of  Transportation Iraqi    that  your company won a contract to supply Iraq  by (900 000) tons of ( Wheat ) .

And with reference  to our phone call with your Today office, we informed that  you are in charge  in this  matter .  So, please call us in order  to co-ordinate  together and to give you the way of payments .

Thank you for your co-operation and best regards,

**Our Phone :**
*Tel*    : 009626 5690588    *Fax :* 009626 5603102
*Mobil*  ; 00962  79547968    *Alia E-Mail Address*  : alia @ jonet .
**Note :**

*Our Account No .*        : 6/101837/2012/2
*Address Bank*           : TLAA AL AIL – JORDAN  AMMAN
                          B.O BOX 644

Othman  Al  Absi
General  Manager

# Alia for Transportation & General trade Co.
## Amman, Jordan
### "At a Glance"

**March 2005**

**Mr. HUSSAIN K. Al Farhood** – Chairman
**Mr. OTHMAN Al Absi** – General Manager

### KEY MEETING OBJECTIVES:

1. Recognition of ALIA's support for providing discharge and transport services in Iraq in a very challenging environment and their ongoing help organising training groups from the IGB.
2. Appreciation of ALIA's ongoing commitment to improve the discharge operation and the port infrastructure at Umm Qasr and so reduce supply chain costs for AWB.
3. We are looking to finalise details over a transport contract to support the new 2.6 million mt contract when Letter of Credit is received.
4. We are looking to elicit the Chairman's view on the Future of Iraq in regards to the Political, Social and Economic environment and the composition and policies of the new government.
5. We are looking to introduce AWB Chartering to Alia as a possible fee for service opportunity re other origin freight to Iraq and will discuss other possibilities re US Wheat, co-operation in Umm Qasr.

### KEY POINTS

- AWB has been using Alia's services since 1998 and their service
- Chairman is well connected in Iraqi Political Circles and has always proved to be very well informed about key issues inside Baghdad over the last couple of years.
- Alia is in discussion with US Trading Companies (With US government support)  to provide Ocean Freight from the US and Inland transport from Tartous to Iraq

### PERSONAL PROFILE:

The Chairman Mr. Hussain  belongs to the powerful Khawam family in Iraq and also sits on the board of Riyadh Investment Group (diversified holding company for Khawam Family interests) He lives in Amman, Jordan at present.

Directly reporting to the Chairman is the General Manager Mr Othman Al-Absi. Mr. Othman is AWB's most frequent contact and manages the discharge and transport operation at Umm Qasr/other ports.

### COMPANY BACKGROUND

Alia is a diversified transport and logistics company providing inland transport services to AWB and is involved in relaunching Iraqi Airways, truck management, coastal vessels, shipping and agency services

HDD.0014.1161

## USD PAYMENT REQUEST

**AWB.0196.0065** _R_

| | |
|---|---|
| DIVISION REQUESTING PAYMENT | Chartering |
| AMOUNT | -US$125,892.31 |
| DATE PAYMENT TO BE MADE | 25 -26-Sep-00 |
| PAYMENT DETAILS | |
| PAYMENT DETAILS - NAME OF VESSEL & B/LADING DATE | |

*Credit Applied to reduce Pmt. & Reduce Debtors so that actual pmt is low.*

SO    MV    BOR Ronly ✓

MV    Frt

V2/4   120420
US$267,508.94
-US$393,401.25   500530

to    500530    433,500 00.

SO    411820    18 423.75

SO    230120    21 675.00. WITHHELD

| | Total Remittance | -US$125,892.31 | 1118600 |
|---|---|---|---|

### BANKING DETAILS

| CORRESPONDENT BANK (in the USA) | ACCOUNT OF | A/C NUMBER AND NAME OF BENEFICIARY |
|---|---|---|
| Bank of New York | Credit Suisse Geneva | Ronly Holdings Ltd |
| ADDRESS  New York | Case Postale 2153 | Ref: Naree/ AWB |
| | 1211 Geneva 2 | |
| | Switzerland | |

CHIPS U/ID

AUTHORISED SIGNATORIES

| REQUESTED BY: | AUTHORISED BY: | |
|---|---|---|
| 26-Sep-00  David Cowan | Eddie Collis | |

DR    FB 500530    393,401.25

CR    120420    267,508.95

CR    118600    125,892.31

& *Amt owed by Ronly Holdings Ltd in 120420 is reduced via offset.*    EB 10/00    V2/6

WST.0002.0131

ARTHUR ANDERSEN

**Privileged & Confidential**

5 September 2000

Ms Alifia Sachak
Senior Corporate Counsel
AWB Limited
Ceres House
528 Lonsdale Street
MELBOURNE VIC 3000

Arthur Andersen
A Member Firm of Andersen Worldwide SC

360 Elizabeth Street
Melbourne VIC 3000

GPO Box 5151AA
Melbourne VIC 3001

Tel  61 3 9286 8000
Fax 61 3 9286 8100
DX 288 Melbourne

Dear Ms Sachak

Re:     **Investigation of International Business Transactions Conducted by the International
Marketing Group**

Further to our meetings with Mr Tim Goodacre and Mr Charles Stott, this is to confirm our
understanding of the arrangements made with you for Arthur Andersen to provide assistance
in the above matter.

**Our Understanding of Your Needs**

We understand that AWB Limited (AWB) has concerns about the integrity of international
business transactions conducted by the International Marketing Group.  You are seeking
independent assistance in determining the existence of any illegal or unethical behaviour and
any failure of the control systems.  We are mindful of your concerns that any investigation must
be conducted discreetly so as not to alert anyone of your concerns.

**Scope and Approach**

As discussed, for purposes of discretion our inquiries will be conducted covertly under the guise
of and in tandem with an Arthur Andersen, Business Process Review.  This project will give
sufficient cover for us to conduct our investigations.

Our work, to be performed under your direction in conjunction with our Business Process team,
will involve an initial assessment of this matter.  Our general activities are described below.
However, it may also be appropriate that we perform other tasks identified during the course of
this engagement, or to conduct a forensic examination of certain computer systems and
facilities.

The first phase of our work subject to these arrangements will be limited to assessing the nature
and extent of possible fraud, bribery, corruption or misconduct, and any related circumstances.
The requirement for and extent of further work is dependent on the outcomes of this initial
phase.  Any further work will be subject to a separate job arrangement letter.

At the conclusion of this phase we will provide you with an investigation matrix, outlining
further activities and avenues of inquiry that may assist you to fully resolve this matter.  We
will keep you informed on the likely need for further work as the assessment phase progresses
and will not commence any further inquiries until agreement has been reached with you.

WST.0002.0132

Australian Wheat Board
Page 2
5 September 2000

Our experience is that in these matters the success of the inquiries usually hinges on information gathered and avenues of inquiry identified as a result of probing interviews with a variety of people.

Our work, to be performed under your direction will include:

- Conducting inquiries, interviewing staff and third parties;
- Interviewing former staff (only on your direction);
- Analysing the available information in this matter;
- Reviewing personnel files and other avenues of inquiry;
- Conducting an assessment of processes;
- Assessing physical security and access to key documents;
- Assessing the integrity risks relating to identified areas;
- Assessing your exposure to the Commonwealth Criminal Code anti-bribery provisions; and
- Performing other tasks identified during the course of this engagement.

We will discuss these issues with you as the investigation progresses.

At the conclusion of this phase we will provide you with an investigation matrix. We will also outline further activities and avenues of inquiry that may assist you to fully resolve this matter. We will keep you informed on the likely need for further work as the investigation progresses and will not commence any further inquiries until agreement has been reached with you.

We will keep our written product to a minimum with a view to spending the greatest amount of time on site work, interviews and contact with personnel. We will not prepare or otherwise issue a written report unless requested by you to do so. Any work product which we prepare for you is to be used solely to assist you in rendering legal advice to AWB and/or in anticipation of litigation and will not be used for any other purpose or made public without our written permission. If you prepare a report on this matter that refers to our work, you agree to make available to us that report prior to its issuance. You agree that we may read the report and verify the accuracy of references to our work. We will communicate to you any errors; misleading items or significant omissions we identify and work with you to resolve any such matters.

We understand that all communications between our respective firms, as well as any materials or information developed or received by us pursuant to this arrangement, whether oral or written, are protected by applicable legal privileges and, therefore, will be treated by us as confidential. Accordingly, we agree, subject to applicable law or court order, not to disclose any of our communications, or any of the information we receive or develop in the course of our work for you, to any person or entity apart from your firm or such other persons or entities as your firm may designate.

If access to or disclosure of any of the materials in our possession relating to this arrangement is sought by a third party, we will promptly notify you of such action, and co-operate with you concerning our response thereto.

Australian Wheat Board
Page 3
5 September 2000

Notwithstanding anything contained herein to the contrary, if you intend to publish or otherwise reproduce any of Arthur Andersen's work product or to make reference to Arthur Andersen in any document that contains other information, you agree to (i) provide Arthur Andersen with a draft of the document to review, and (ii) obtain Arthur Andersen's written approval for inclusion of Arthur Andersen's name or work product in such document before the document is printed and distributed.

The services to be provided under this letter do not include the giving of testimony or appearances by Arthur Andersen in any legal or arbitration proceedings. Upon your determination that such testimony or appearances are necessary, and if we agree, that work will be the subject of a separate arrangement letter. If, as a result of the services hereunder, we are subpoenaed by a third party or ordered by a court of law to appear as a witness at trial or produce documents in respect of the services performed hereunder, you agree on behalf of AWB to cover and/or reimburse Arthur Andersen for all costs incurred, including but not limited to preparation time, out of pocket expenses, travel time and expenses and other reasonable costs incurred.

From time to time, quality control procedures are performed by firm personnel not assigned to the engagement to assure us that our work meets our professional standards. ~~If you so request in writing~~ we will advise you prior to the application of any of these quality control procedures and determine with you if there are any steps we should take to protect the legal privileges related to communications between us.

We are not aware of any situations which, in our view, constitute actual conflicts of interest and which would impair our ability objectively to provide assistance in the above matter.

We take no responsibility for monitoring for possible conflicts that could arise during the course of the engagement, although we will inform you promptly should any come to our attention. We reserve the right to resign from this engagement at any time if conflicts of interest arise or become known to us that, in our judgement, would impair our ability to perform objectively.

Charges for our work will be based on the level of staff and the time required to complete the assignment, plus out-of-pocket expenses. Our fees and the fee arrangements are quoted in the letter addressed to Mr Tim Goodacre outlining the Business Process Review. ~~We will also charge on the same basis for responding to any subpoenas, enquiries with representatives of the authorities or regulators and any other similar work we are required to perform related to this engagement.~~ Any other work outside the scope of this engagement will be the subject of a separate engagement letter.

The amounts payable under the letter referred to above have been calculated without reference to Goods and Services Tax ("GST"). Arthur Andersen is entitled to and will charge you an amount equal to the amount of any GST applicable to supplies and services made pursuant to this agreement.

We intend to provide AWB with the services of some our most experienced people for this project. Paul MacKellar, Partner, Business Fraud and Investigation Services (BFIS) will lead this engagement. Andrew Tuohy, Manager, and several of our senior consultants will perform the work.

WST.0002.0134

Australian Wheat Board
Page 4
5 September 2000

Except to the extent finally determined to have resulted from the wilful or reckless misconduct of Arthur Andersen: (i) Arthur Andersen's maximum aggregate liability to you for any reason, including Arthur Andersen's negligence, relating to the services under this letter shall be limited to the fees paid to Arthur Andersen for the portion of the work giving rise to liability; and (ii) You agree on behalf of AWB that AWB will indemnify and hold harmless Arthur Andersen from any claims, liabilities costs and expenses (including defence costs) associated with any third party claim arising from or relating to Arthur Andersen's services under this letter. This provision shall continue to apply after any termination of this arrangement and during any dispute between the parties.

We are pleased to have been asked to serve you in this matter, and you may be assured this assignment will be given our closest attention. Should you wish to discuss this matter further please do not hesitate to contact Paul MacKellar on 9286 8075 or mobile 0418 363074.

To confirm your agreement with the arrangements and the indemnity please sign the enclosed copy of this letter and return it to Paul MacKellar.

Yours faithfully

ARTHUR ANDERSEN

Agreed: .............................................

Dated: ..............................................

Enc.

# Attachment 13

**Trevor Flugge**                    **01-Jun-01 - 30-Jun-01**                    **Calendar**

**Friday, June 1**

| | | |
|---|---|---|
| 09:00 | 09:30 | Gerard to pickup from Pacific International, deliver to airport |
| 10:05 | 12:10 | Melbourne/Brisbane, Qantas flight QF616 |
| | | Arrive Brisbane 12:10pm |
| 13:05 | 15:20 | Brisbane/Cairns Qantas QF616 |
| | | arrives Cairns 3:20pm |
| 17:45 | 20:00 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Saturday, June 2**

| | | |
|---|---|---|
| 13:00 | 14:30 | Informal buffet lunch - Pacific Flavours Brasserie |
| 15:00 | 17:00 | Sightseeing activities |
| 18:00 | 22:30 | Welcome dinner - Great Aussie BBQ - Pool deck 4th floor - dress: |
| | | smart casual (tie not necessary) |
| 19:00 | 20:00 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Sunday, June 3**

| | | |
|---|---|---|
| 06:30 | 10:00 | between 6:30am-10:00am breakfast is served in Pacific Flavours |
| | | Brasserie |
| 07:30 | 07:45 | Depart hotel walk to Marlin jetty |
| 07:45 | 09:15 | Quicksilver cruise boarding at Marlin Jetty for golfers to Port Douglas |
| 09:30 | 10:00 | Transfer to Sheraton Mirage golf club |
| 10:00 | 16:30 | Tee off for AWB/KOFMIA Golf Tournament |
| 16:30 | 17:15 | Depart Sheraton Mirage transfer to jetty for return trip to Cairns |
| 19:00 | 22:45 | Magic Million Celebration Dinner - 2nd floor - The Michaelmas Cay |
| | | Ballroom - Dress: smart casual (tie not necessary) |
| 21:00 | 22:15 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Monday, June 4**

| | | |
|---|---|---|
| - All Day - | | Foundation Day - WA Public Holiday |
| 06:30 | 09:30 | breakfast is served in Pacific Flavours Brassiere |
| 10:35 | 12:55 | Cairns/Ayers Rock, Qantas QF689 |
| | | arrives Ayers Rock 12:55pm |
| 14:15 | 15:50 | Ayers Rock/Perth Qantas QF1923 |
| | | Arrives Perth 3:50pm |

**Tuesday, June 5**

| | | |
|---|---|---|
| 07:00 | 20:00 | Keep free |

**Wednesday, June 6**

| | | |
|---|---|---|
| 07:00 | 19:00 | Keep free |
| 10:00 | 11:30 | Phone hookup re Prospectus |

**Thursday, June 7**

| | | |
|---|---|---|
| 14:15 | 16:30 | 2:15pm - Tour of the CBH Kwinana port terminal facility |
| | | 2:45pm - 4:15pm  Co-operative Bulk Handling Limited - launch of the |
| | | CBH Teacher's Guide - The Granary Museum, CBH Kwinana Grain |
| | | Terminal, Kwinana Beach Road, Rockingham (reception 9237 9601) - |
| 18:00 | 19:30 | Perth - Rabobank Agribusiness speech WA Club, 101 St George's |
| | | Terrace, Perth  (Andre 08 9224 7587) |

**Friday, June 8**

| | | |
|---|---|---|
| 11:00 | 14:00 | Perth - CBH& GPWA meeting, CEO & Chairman of 3 organisations, |



WST.0012.0101

possible merger.  GWPA 14/172 St Georges Terrace, Perth

**Saturday, June 9**

**Sunday, June 10**

| | | |
|---|---|---|
| 16:30 | 22:10 | Perth/KL - Malaysian Airlines MH124 |
| 23:00 | 23:45 | Accommodation: Kuala Lumpur, Shangri La, 11 Jalan Sultan Ismail, Kuala Lumpur.  Phone 603 232 2388, Fax, 603 230 1514 |

**Monday, June 11**

| | | |
|---|---|---|
| - All Day - | | Queens's Birthday Holiday - all states except WA |
| 08:00 | 16:00 | KL |
| 19:00 | 20:00 | Accommodation: Kuala Lumpur, Shangri La, 11 Jalan Sultan Ismail, Kuala Lumpur.  Phone 603 232 2388, Fax, 603 230 1514 |

**Tuesday, June 12**

| | | |
|---|---|---|
| 09:50 | 10:35 | Subang/Penang,  Malaysian Airlines MH1928 |
| 16:40 | 17:55 | Penang/Singapore Eva Airways BR286 |
| 22:45 | 23:45 | Singapore/London  Qantas flight QF9 |
| | | arrive London Wednesday 13 June 5:15am |

**Wednesday, June 13**

| | | |
|---|---|---|
| 05:15 | 06:15 | Arrive London, Heathrow |
| 12:30 | 14:00 | Lunch with BER - venue to be advised |
| 14:30 | 16:30 | IGC Industry round table - Cabot Hall conference room Canary Wharf, London |
| 18:00 | 20:00 | IGC welcome reception, Institute of Directors, 116 Pall Mall, London |
| 19:30 | 21:45 | Dinner with Nidera - venue to be advised |
| 21:45 | 22:15 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Thursday, June 14**

| | | |
|---|---|---|
| 07:30 | 08:30 | Breakfast with GTC |
| 10:00 | 17:45 | IGC conference - Queen Elizabeth II Conference Centre, broad Sanctuary, Westminster, London |
| 19:30 | 22:00 | Dinner with Club Demeter - venue to be advised |
| 22:30 | 23:45 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Friday, June 15**

| | | |
|---|---|---|
| - All Day - | | FYI - Executive meeting 8:00-11:00am |
| 09:30 | 12:30 | Meeting with CWB - Greg Arason, President & CEO; Bill Spafford, Vice President, Sales & Market Development; Jean-Benoit Gauthier, Senior Marketing Manager; Chris Gillen, Marketing Manager; Brian White, Vice President (Acting) Market Analysis |
| 14:00 | 15:00 | Meeting with Ben Gill, President, National Farmers Union, Agriculture House, 164 Shaftesbury Av, London |
| 16:00 | 17:00 | Meeting with Prof Allan Buckwell, Director of Policy, Country Landowners Association, 16 Belgrave Square, London.  Phone 020 7235 0511, Fax 020 7235 4696 |
| 19:00 | 20:00 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Saturday, June 16**

| | | |
|---|---|---|
| 09:00 | 17:15 | London |
| 19:00 | 20:00 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park |



WST.0012.0102



Corner, London. Tel: 44 20 7409 3131
Fax: 44 20 7493 3476

**Sunday, June 17**

| | | |
|---|---|---|
| 09:00 | 14:00 | London |
| 15:35 | 18:10 | London, Heathrow/Geneva British Airways, BA730<br>Departs Heathrow 3:35pm arrives Geneva main terminal 6:10pm |
| 19:00 | 20:00 | Accommodation: Hotel Intercontinental Geneve, 7-9 Chemin du<br>Petit-Saconnex, 1211 Geneva, Switzerland - Tel: 41 22 919 3939<br>Fax: 41 22 919 3838 |

**Monday, June 18**

| | | |
|---|---|---|
| 08:00 | 08:15 | Geneva - Pickup by Embassy driver |
| 08:30 | 10:00 | Briefing session with Dr Geoff Raby, Ambassador & Permanent<br>Representative |
| 13:00 | 14:30 | Lunch hosted by Ambassador Raby |
| 19:00 | 20:00 | Accommodation: Hotel Intercontinental Geneve, 7-9 Chemin du<br>Petit-Saconnex, 1211 Geneva, Switzerland - Tel: 41 22 919 3939 |

**Tuesday, June 19**

| | | |
|---|---|---|
| 11:00 | 12:10 | Geneva/Paris, Air France AF1643, |
| 13:15 | 19:15 | Paris/Amman, Air France AF672 |
| 21:00 | 22:00 | Accommodation, Marriott Amman, Issam Al Ajlouni St, Shmeisani<br>Amman Jordan, Phone 9626 560 7607, Fax 9626 567 0100. |

**Wednesday, June 20**

| | | |
|---|---|---|
| 07:00 | 08:45 | Amman |
| 09:30 | 20:30 | Depart Amman, drive to Baghdad - Grains board to arrange driver |

**Thursday, June 21**

| | | |
|---|---|---|
| 08:00 | 16:30 | Baghdad |

**Friday, June 22**

| | | |
|---|---|---|
| 09:00 | 19:00 | Depart Baghdad, drive to Amman |
| 22:15 | 23:45 | Amman/Cairo, Egyptair MS815 |
| 23:45 | 23:55 | Accommodation, Marriott Cairo Hotel & Casino, Saraya El Gezira<br>Street, Zamalek, Cairo. Phone 202 735 8888, Fax 202 735 6667 |

**Saturday, June 23**

| | | |
|---|---|---|
| 09:00 | 17:15 | FSFM Board meeting, Cairo |
| 19:15 | 23:50 | Cairo/Dubai, Emirates Airlines EK402 |

**Sunday, June 24**

| | | |
|---|---|---|
| 02:45 | 14:10 | Dubai/Singapore, Emirates Airlines EK68 - Arrives Melbourne 0025<br>Monday 25 June |
| 15:20 | 23:45 | Singapore/Melbourne Emirates Airlines EK68, departs Singapore<br>Sunday 24 June, 3:20pm, arrives Melbourne Monday 25 June 12:25am |

**Monday, June 25**

| | | |
|---|---|---|
| 00:25 | 00:30 | Arrive Melbourne 12:25am |
| 00:30 | 01:30 | Gerard to pickup from airport - deliver to Pacific Hotel |
| 10:00 | 14:45 | Australian Wool Services, 369 Royal Parade, Parkville - Markus<br>Ziemer expecting you and will have papers ready |
| 15:00 | 16:00 | Board briefing with Richard Fuller |
| 19:00 | 20:00 | Accommodation: Pacific International, 471 Little Bourke Street,<br>Melbourne. Phone 03 9607 3000, fax 03 9642 3822 |

**Tuesday, June 26**

| | | |
|---|---|---|
| 12:30 | 13:30 | Corporate Risk Committee meeting - including lunch |

5 i

WST.0012.0103

| 13:45 | 15:45 | AWB (International) Limited Board meeting |
| 17:00 | 18:00 | Listing Committee meeting |
| 19:00 | 20:00 | Board dinner - The Australian Club |
| 22:00 | 23:00 | Accommodation: Pacific International, 471 Little Bourke Street, Melbourne.  Phone 03 9607 3000, fax 03 9642 3822 |

**Wednesday, June 27**

| 08:30 | 12:30 | AWB Limited Board Meeting |
|  |  | 12:00md guests arrive - Gordon Dickinson, Brett Paton, UBS Warburg |
| 12:30 | 14:00 | Board Luncheon |
| 17:30 | 18:00 | Gerard to pickup from AWB - deliver to airport |
| 18:35 | 20:35 | Melbourne/Perth QF481 |

**Thursday, June 28**

**Friday, June 29**

| 19:00 | 23:45 | Perth - sleepover |

**Saturday, June 30**

52



AWB.0136.0466



**FACSIMILE**

# AWB
### L I M I T E D

**AWB LIMITED**
ACN 081 890 459

Ceres House
528 Lonsdale Street
Melbourne Vic 3000

GPO Box 4562
Melbourne Vic 3001
Australia

Telephone
03 9209 2000

Facsimile
03 9670 2782

| To | Mr Yousif A. Rahman Director General | From | Mark Emons |
|---|---|---|---|
| Company | Grain Board of Iraq | Direct Fax | +613 9 670 5539 |
| Fax | 0011 9641 414 0860 | Direct Phone | +613 9 209 2035 |
| No. of pages (including front cover) 1 | | Date | 5 April 2000 |
| Subject | AWB Visit to Baghdad | | |

If you have not received all pages please contact the sender.
This facsimile is strictly confidential and intended solely for the named addressee.
If you have received this document in error please notify us immediately and destroy this copy.

Dear Sir,

Due to a change in travel commitments we are having to change our arrival date in Baghdad. With your agreement our intention is now to arrive in Baghdad on the evening of Monday 10th April. We would hope then to meet with your goodselves on the morning of Tuesday 11th. We will then depart Baghdad early on Wednesday morning.

AWB General Manager Mr Edward Laskie will be carrying a personal message for Minister Saleh from our Chairman Mr Flugge which he would like to pass to you.

Our Chairman has asked me to discuss with you while I am in Baghdad the issue of the position of the United Nations on trucking fee and also future phases of the Food for Oil program.

Please could you confirm that these dates are suitable as soon as possible before our departure on Thursday this week.

Best regards

Mark Emons
Regional Manager

*The Australian Grains Marketer*

AWB.0069.0023





**FACSIMILE**

# AWB
## LIMITED

**AWB LIMITED**
ACN 081 890 459

Ceres House
528 Lonsdale Street
Melbourne Vic 3000

GPO Box 4562
Melbourne Vic 3001
Australia

Telephone
.+613 9209 2000

Facsimile
613 9670 5539

| To | Name: | Deborah Watson |
|---|---|---|
|  | Company: | DFAT |
|  | Fax: | 02 6261 2640 |
| From | Name: | Dominic Hogan |
|  | Direct Fax: | +613 9670 5539 |
|  | Direct Telephone: | +613 9209 2035 |
|  | Email | dhogan@awb.com.au |

| No. of pages: | 1 of 2 | Date: | 28th February 2001 |
|---|---|---|---|
| Subject: | AWB / IGB contract – Iraq | | |

If you have not received all pages please contact the sender. This facsimile is strictly confidential and intended solely for the named addressee. If you have received this document in error please notify us immediately and destroy this copy.

Dear Deborah,

As discussed, attached is copy of "Request to Ship Goods to Iraq" with correct DM price.

Best regards,

**Dominic Hogan**
**Regional Manager**
**Middle East**

*The Australian Grains Marketer*