## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.              )

                                       )

            Plaintiffs                 )

                                       )

                V                      )          CASE NO 1:07-CV-01170

                                       )          JUDGE John D BATES

                                       )

COMMONWEALTH OF AUSTRALIA              )

                    et al.             )

                Defendants             )


**MOTION TO SET ASIDE, VACATE JUDGMENT ORDERED NOVEMBER 26TH 2007 PURSUANT TO RULE 60 AND ITS SUB CHAPTERS AND REHEAR CASE.**

The plaintiffs seek relief from the court to aside the Judgment Ordered by Judge John D. Bates on the 26th November based on Rule 60 (1) mistake, inadvertence, surprise, or excusable neglect; and Rule 60 (3) fraud (whether previously called intrinsic or extrinsic),misrepresentation, or misconduct by an opposing party; and Rule 60(6) any other reason that justifies relief.

Mistake:

1. Plaintiff claim mistake where Rule LCvR 16.3 and Rule 26 (f) violations by the defendants were malicious and or a mistake as there was a Duty to confer.

   a. The defendants were properly served

      i. Although the docket reflects service of process upon all defendants India and the United Nations, see Order dated 26th November 2007.

2. The defendants replied see ORDER, with motion applications in violation of LCvR 16.3 and Rule 26 (f).

   a. and the U.N. returned the papers, rightly asserting its privileges and immunities. *See Notice [Dkt. No. 6]; Keeney v. U.S., 218 F.2d 843, 845 (D.C. Cir. 1954) (quoting International Organizations Immunities Act, § 7(b), 59 Stat. 672, 22 U.S.C.A. § 288d(b) (granting immunity from suit to "[r]epresentatives* of foreign governments in or to international organizations" as to the performance of official duties).

3. The motions entertained by the court contained claims by the defendants that the allegations against them were in accordance with 22 U.S.C.A. § 288d(b) (granting immunity from suit to "[r]epresentatives of foreign governments in or to international organizations" as to the performance of official duties).

4. That the claim of the defendants as to the performance of official duties is a fraud. Fraud, whether intrinsic or extrinsic, misrepresentation, or other misconduct of an adverse party are express grounds for relief by motion under subdivision (b). that relief from a judgment obtained by extrinsic fraud could be secured by motion within a "reasonable time," which might be after the time stated in the rule had run. *Fiske v*

*Buder, CCA 8th, 1942, 125 F2d 841; see also inferentially Bucy v Nevada Construction Co. CCA 9th, 1942, 125 F2d 213.See Moore and Rogers, Federal Relief from Civil Judgments, 1946, 55 Yale L J 623, 653--659; 3 Moore's Federal Practice, 1938, 3267 et seq.* And the rule expressly does not limit the power of the court, when fraud has been perpetrated upon it, to give relief under the saving clause. As an illustration of this situation, see *Hazel-Atlas Glass Co. v Hartford Empire Co. 1944, 322 US 238, 88 L Ed 1250, 64 S Ct 997.*

S/° _____

JUGVIR INDER SINGH

PRO SE

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.            )
                                     )
            Plaintiffs               )
                                     )
            V                        )        CASE NO 1:07-CV-01170
                                     )        JUDGE John D BATES
                                     )
COMMONWEALTH OF AUSTRALIA            )
            et al.                   )
            Defendants               )

### ORDER

UPON DUE CONSIDERATION OF THE Plaintiff's motion to set aside, vacate and

rehear the matter based on Rule 60 (1) mistake, inadvertence, surprise, or excusable

neglect; and Rule 60 (3) fraud (whether previously called intrinsic or extrinsic),

misrepresentation, or misconduct by an opposing party; and Rule 60(6) any other reason

that justifies relief and the Memorandum of Points and Authorities thereof and the

opposition thereto it is hereby:

ORDERED, that the aforesaid motion be and is hereby GRANTED; and it is further

ORDERED that this matter be set for trial of the facts after Discovery is completed

ENTERED this day_____ of _____ 2008.

_____
UNITED STATES DISTRICT JUDGE
John D. Bates

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.    )
                               )
        Plaintiffs         )
                               )
         V            )        CASE NO 1:07-CV-01170
                               )        JUDGE John D BATES
                               )
COMMONWEALTH OF AUSTRALIA  )
             et al.      )
             Defendants  )

## MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF TO SET ASIDE JUDGMENT AND REHEAR AND RESET FOR TRIAL

MISCONDUCT AND MISREPRESENTATION ELEMENTS:

It is at the very core of actions "to the performance of official duties" that these defendants misrepresent with misconduct before the court and state:

1. Inalienable Rights guaranteed the plaintiffs are not part of the performance of official duties.

2. Defendants DON'T have any responsibility in protecting violations of Universal Declaration of Human Rights.

3. Protection from The Declaration of Basic Principles of Justice for Victims of Crime and Power is not their duties.

4. Protection from the Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment, .as the defendants are actually performing this torture on plaintiffs as part of an official duty.

5. International Convention on the protection of the Rights of all migrant workers and members of their families are purposefully disallowed as defendants are performing an official duty of keeping separated a migrant father from his minor daughter.

6. United Nations Rules for the Protection of the Juveniles Deprived of Liberty as claimed, as a colluded result of official defendant's action, without a court order, are an official duty of depriving a minor of liberty. This is a fraud.

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms. is the declared official duty of the defendants. but not to promote or protect the plaintiffs.

8.      International Covenant on Civil and Political Rights is the very core of to the performance of official duties the defendants misrepresent with misconduct official duties.

9. Child Right Conventions the official performance and duties is stated in EXHIBIT 1 under this convention below as published in the law.

   1. The States Parties to the present Convention, considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world which is official duty of the defendants. The defendants have fraudulently misrepresented that the official duty is to cause separation and take possession of the child and hold her hostage after aiding and abetting in the kidnap. see ORDER.

2.  Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom. It is NOT the official duty of the defendants to conspire and collude and to fail to preserve the dignity that promotes better standards of life and larger freedoms of the plaintiffs and it is a fraud upon the court.

3.  Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Then misrepresenting on the court that violation of this Right upon the plaintiffs family is part of the official duties only adds to the collusion and conspiracy allegations already made to the court.

4.  Recalling that, in the Universal Declaration of Human Rights, the United Nations has proclaimed that childhood is entitled to special care and assistance and Nara is in her childhood and protected and entitled to by this special care and assistance and the defendants conspired to deny Nara the special care and assistance. The defendants state that this child will not be protected and was never promised this protection and this is a fraud.

5.  Convinced that the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance so that it can fully assume its responsibilities within the community, Being that this is the official duty of the defendants.

6.  Bearing in mind that the need to extend particular care to the child has been stated in the Geneva Declaration of the Rights of the Child of 1924 and in the Declaration of the Rights of the Child adopted by the General Assembly on 20 November 1959 and recognized in the Universal Declaration of Human Rights, in the International Covenant on Civil and Political Rights (in particular in articles 23 and 24), in the International Covenant on Economic, Social and Cultural Rights (in particular in article 10) and in the statutes and relevant instruments of specialized agencies and international organizations concerned with the welfare of children is the stated official duty of the defendants.

7.  Bearing in mind that, as indicated in the Declaration of the Rights of the Child, "the child, by reason of his physical and mental immaturity, needs special safeguards and care, including appropriate legal protection, before as well as after birth",

8.  Article 8 States Parties undertake to respect the right of the child to preserve his or her identity, including nationality, name and family relations as recognized by law without unlawful interference.  See ORDER defendant has unlawfully interfered with plaintiff the father of Nara.

9.  Where a child is illegally deprived of some or all of the elements of his or her identity, States Parties shall provide appropriate assistance and protection, with a view to re-establishing speedily his or her identity See ORDER. Nara remains concealed and Plaintiff has no idea what identity NARA retains any longer and the state has interfered and has failed to respond to every and all requests about his child Nara and has violated the respect for identity claiming official duty.

10. Article 9 States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when competent authorities subject to judicial review determine, in accordance with applicable law and procedures, that such separation is necessary for the best interests of the child. Such determination may be necessary in a particular case such as one involving abuse or neglect of the child by the parents, or one where the parents are living separately and a decision must be made as to the child's place of residence. Plaintiff has alleged that NARA was separated from him against her and his will and that Plaintiff was coerced by the use of Australian immigration laws to accept the removal of NARA without any judicial review and in violation of all Australian and Queensland laws and, the state parties have ensured that Plaintiff the father remains separated from NARA against his will and thereby he remains separated as a result of official duty.

11. In any proceedings pursuant to paragraph 1 of the present article, all interested parties shall be given an opportunity to participate in the proceedings and

make their views known.    SEE ORDER denying the plaintiff's child the opportunity to participate.

12. States Parties shall respect the right of the child who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis, except if it is contrary to the child's best interests. Where such separation results from any action initiated by a State Party, such as the detention, imprisonment, exile, deportation or death (including death arising from any cause while the person is in the custody of the State) of one or both parents or of the child, that State Party shall, upon request, provide the parents, the child or, if appropriate, another member of the family with the essential information concerning the whereabouts of the absent member(s) of the family unless the provision of the information would be detrimental to the well-being of the child. States Parties shall further ensure that the submission of such a request shall of itself entail no adverse consequences for the person(s) concerned. States Parties shows no respect to NARA or PLAINTIFF, who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis. Plaintiff has alleged that NARA remains kidnapped in Australia and yet Australia has shown no interest in regaining the NARA child for the plaintiff and has taken no action and never has affirmed that they have told NARA where the father Plaintiff is located at the moment. as a part of official duties.

13. Article 10 In accordance with the obligation of States Parties under article 9, paragraph 1, and applications by a child or his or her parents to enter or leave

a State Party for the purpose of family reunification shall be dealt with by States Parties in a positive, humane and expeditious manner. States Parties shall further ensure that the submission of such a request shall entail no adverse consequences for the applicants and for the members of their family. Defendants has dealt with plaintiff's request for reunification in an inhumane, negative and delayed opposing manner causing huge negative consequences on the Singh family. Defendant's continued actions in this urgent time continue to tear apart the SINGH family limb from limb hour by hour and day by day. Defendant has found every method to deny reunification of the SINGH family.

14. A child whose parents reside in different States shall have the right to maintain on a regular basis, save in exceptional circumstances personal relations and direct contacts with both parents. Towards that end and in accordance with the obligation of States Parties under article 9, paragraph 1, States Parties shall respect the right of the child and his or her parents to leave any country, including their own, and to enter their own country. The right to leave any country shall be subject only to such restrictions as are prescribed by law and which are necessary to protect the national security, public order (order public), public health or morals or the rights and freedoms of others and are consistent with the other rights recognized in the present Convention.

15. Article 12 States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in

accordance with the age and maturity of the child. NARA is capable of forming her views and although tender in age knows how to talk to her father and has consistently talked to her father and can recognize her father's voice and she has been denied access to her father and although the Australian State has bee notified of this violation they have continued to aid and abet this gross violation of the Child's right. NARA has had no views to express to her father. as an official duty of the defendants as admitted.

16. For this purpose, the child shall in particular be provided the opportunity to be heard in any judicial and administrative proceedings affecting the child, either directly, or through a representative or an appropriate body, in a manner consistent with the procedural rules of national law.

17. Article 13 The child shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of the child's choice. Nara has been deprived her freedom of expression and her father has not heard her expressions in the environment deprivations and mental torture of her present situation.Nara has not been free to receive and impart information to her father and the phone is constantly removed from her presence and although the entire family uses the internet to pass NARA photographs and other conversations around the world NARAS information and her growth in never transmitted to her father.Nara has been concealed from her father.

18. Article 14 States Parties shall respect the right of the child to freedom of thought, conscience and religion. See ORDER

    a. He also accuses defendants of torturing him and his daughter, presumably by keeping them apart. *See id.* at 3, 6, 33, 22-26.

    b. As alleged in the complaint, on April 3, 2005, plaintiff "lodged" police reports "electronically from India" with Australian authorities, claiming child abduction and kidnapping of his then-three-year-old daughter. Compl. ¶ 38. When plaintiff tried "to get help to return to Australia in an Emergency [,] [he] was instructed that he will never see his child again. . . ." *Id.* ¶ 40. Defendants "then conspired, using emails of passport documents and other documents to change" his daughter's identity and "to remove [her] from Australia to New Zealand." *Id.* ¶ 41.

19. . Article 16 No child shall be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honor and reputation. The complaint has alleged the continuous and arbitrary interference with her privacy, and unlawful attacks on her honor and reputation and home and correspondence and NARA has not been able to talk to her father or see him due to this continuous interference and the plaintiff has approached Australia for help and Australia has failed to help. as an official duty claimed in the ORDER.

20. The child has the right to the protection of the law against such interference or attacks..

21. *Article 20* A child temporarily or permanently deprived of his or her family environment, or in whose own best interests cannot be allowed to remain in that environment, shall be entitled to special protection and assistance provided by the State. Defendant has been advised that NARA has had a major temporary deprivation and Australia has continued to interfere with Plaintiff and Nara and has continued to foster an environment that harms and gravely harms the minor child. Defendants has made no effort to change the environment for either NARA OR PLAINTIFF.

    a. As alleged in the complaint, on April 3, 2005, plaintiff "lodged" police reports "electronically from India" with Australian authorities, claiming child abduction and kidnapping of his then-three-year-old daughter. Compl. ¶ 38. When plaintiff tried "to get help to return to Australia in an Emergency[,] [he] was instructed that he will never see his child again. . . ." *Id.* ¶ 40. Defendants "then conspired, using emails of passport documents and other documents to change" his daughter's identity and "to remove [her] from Australia to New Zealand." *Id.* ¶ 41.

    b. Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id.* ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id.* ¶ 43. Plaintiff also filed a *habeas corpus* petition in

the Supreme Court of India, which "directed [him] to go to Australia. .
. ." *Id.* ¶ 46.

c. Plaintiff filed this action in June 2007, setting forth the following nine
counts: Battery, Assault, Intentional Infliction of Emotional Distress,
Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and
Wanton Misconduct, Loss of Consortium and Solatium, and Punitive
Damages. Compl. at 22-39.

d. Although the docket reflects service of process upon India and the
United Nations, India has not appeared in the case and the U.N.
returned the papers, rightly asserting its privileges and immunities.
*See* Notice [Dkt. No. 6]; *Keeney v. U.S.,* 218 F.2d 843, 845 (D.C. Cir.
1954) (*quoting* International Organizations Immunities Act, § 7(b), 59
Stat. 672, 22 U.S.C.A. § 288d(b) (granting immunity from suit to
"[r]epresentatives of foreign governments in or to international
organizations" as to the performance of official duties). The basis for
granting Australia's motion applies equally to India. Thus, the Court
will dismiss the complaint against the absent defendants pursuant to
Fed. R. Civ. P. 12(h)(3) (requiring dismissal of an action whenever
subject matter jurisdiction is found wanting).

22. Article 37 States Parties shall ensure that:(a) No child shall be subjected to
torture or other cruel, inhuman or degrading treatment or punishment. Neither
capital punishment nor life imprisonment without possibility of release shall
be imposed for offences committed by persons below eighteen years of

age;(b) No child shall be deprived of his or her liberty unlawfully or arbitrarily. The arrest, detention or imprisonment of a child shall be in conformity with the law and shall be used only as a measure of last resort and for the shortest appropriate period of time;(c) Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age. In particular, every child deprived of liberty shall be separated from adults unless it is considered in the child's best interest not to do so and shall have the right to maintain contact with his or her family through correspondence and visits, save in exceptional circumstances;(d) Every child deprived of his or her liberty shall have the right to prompt access to legal and other appropriate assistance, as well as the right to challenge the legality of the deprivation of his or her liberty before a court or other competent, independent and impartial authority, and to a prompt decision on any such action. The claim of torture is absolute and the ORDER states :

> a. He also accuses defendants of torturing him and his daughter, presumably by keeping them apart. *See id.* at 3, 6, 33, 22-26.

23. Article 39 States Parties shall take all appropriate measures to promote physical and psychological recovery and social reintegration of a child victim of: any form of neglect, exploitation, or abuse; torture or any other form of cruel, inhuman or degrading treatment or punishment; or armed conflicts. Such recovery and reintegration shall take place in an environment which fosters the health, self-respect and dignity of the child.

24. Article 41 Nothing in the present Convention shall affect any provisions which are more conducive to the realization of the rights of the child and which may be contained in:(a) The law of a State party; or (b) International law in force for that State. NOW THIS IS THE "OFFICIAL DUTY" and performance of the representative as claimed in the order.

25. Violation of the Torture Victim Prevention Act {TVPA], 1991 Act being termed as an official act immune from prosecution is a fraud upon the court. Torture is NOT an official act.

26. Violation of the Federal Kidnapping Act of 1932. of an American resident's child is covered by the Patriot Act and is NOT an official ACT as claimed by the defendants.

27. The Uniform Child Custody Jurisdiction Act is a law in the United States and violations of this law by the defendants is not what the defendants were trained in University to perform. Like go to America as an Australian and steal American Children "under Official Acts" and traffic them to Australia. No this is a fraud

28. Parental Kidnap Prevention Act as applicable,

29. National Center of missing and Exploited Children Assistance Act,

30. Civil Aspects of Hague International Child Abduction is not the plaintiffs law it is an International and the defendants in collusion for the purpose sexual predation have kidnapped the minor from the plaintiff and keep her concealed.

31. . National Child Search Assistance Act,

32. . International Parental Kidnapping Crime Act is actually a crime where the defendants admit to kidnapping but claim they are immune from the actions of hostage taking an American Residents child and keeping her concealed in Australia see ORDER

33. Under 28 U.S.C. § 1605(a)(5), a foreign state is not immune from a lawsuit in which money damages are sought . . . for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment. § 1605(a)(5). Australia rightly asserts that this exception is inapplicable because the wrongful behavior is alleged to have occurred in Australia and perhaps India.

   a. Plaintiff is a resident of Orlando, Florida, proceeding *pro se* and *in forma pauperis* and the act of removing his liberty and causing his personal injury is an American tortuous act within the scope of office.

34. . Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law where the defendants admit to Child Abuse of an American Residents child "never knowing if he will see each other in this life".

35. Violated and derogated Title 18 Chapter 213 §3283. See ORDER

   a. As alleged in the complaint, on April 3, 2005, plaintiff "lodged" police reports "electronically from India" with Australian authorities, claiming child abduction and kidnapping of his then-three-year-old daughter. Compl. ¶ 38. When plaintiff tried "to get help to return to Australia in an Emergency[,] [he] was instructed that he will never see

his child again. . . ." *Id.* ¶ 40. Defendants "then conspired, using emails of passport documents and other documents to change" his daughter's identity and "to remove [her] from Australia to New Zealand." *Id.* ¶ 41. Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id.* ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id.* ¶ 43. Plaintiff also filed a *habeas corpus* petition in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id.* ¶ 46. Plaintiff filed this action in June 2007, setting forth the following nine counts: Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages. Compl. at 22-39.

36. Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault as an official duty is a fraud claimed under Alien Tort Claims.

37. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

38. . Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and

39. RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud),

§1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

40. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

41. Violated and derogated the Constitutional Right of the Plaintiffs

42. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America. The plaintiffs challenge the defendants to replicate this type of behavior and gain immunity under the scope of their jobs. Like for example an affidavit from the immunity seeker stating their primary purpose to come to the United States is Violate and Derogate the Civil Liberties of Americans. This is fraud upon the court as every one of these defendant applicants who work in the United States even on diplomatic missions, take an oath as part of their official duties that they will not violate American Laws. The defendants have violated 25 core values of the laws of the United States yet claim immunity under the guise of "official act"

43. The defendant has derogated and violated, recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovereignty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

44. DECEPTION It includes outright deception, and sometimes almost "accidental" misrepresentation. In some circumstances fraud includes failure to disclose or to tell the whole truth. Sometimes the law makes people like officers and directors and those who assist in furthering the fraud liable even if they did not know about the fraud. Now fraud has come to be defined by courts generally to require an intentional misrepresentation that was properly relied upon by the plaintiff and caused the plaintiff damages. State law is influenced by the Restatement of Law published by nationally renowned legal scholars. Sometimes the states follow the Restatement position completely and sometimes they chose a state-specific variation. The Restatement (Second) of Torts (1965) organizes the topic under Misrepresentation in four divisions: 1) Fraudulent Misrepresentation (Deceit); 2) Concealment and Non Disclosure;    3)    Negligent    Misrepresentation;    and    4)    Innocent Misrepresentation. This represents a progression of mental culpability from intentional or knowing, then active concealment, then negligently misrepresenting and finally harming some through an unknowing falsehood. However limiting our discussion to the mental state, the Restatement defines fraud as:§ 526 <u>Conditions Under Which Misrepresentation Is Fraudulent (Scienter)</u> A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.The 9 elements of Florida fraud are: 1) A representation; 2) Its falsity; 3) Its

materiality; 4) The speaker's knowledge of the representation's falsity or ignorance of its truth; 5) Intent that the representation be acted on in a manner reasonably contemplated; 6) The hearer's ignorance of the falsity of the representation; 7) The hearer's reliance on its truth; 8) The hearer's right to rely on the representation; and 9) Damage caused by the representation. *Musgrave v. Lucas*, 193 Or 401, 410, 238 P2d 780 (1951); *Webb v Clark*, 274 Or 387, 391, 546 P2d 1078 (1976).District of Columbia also has identified 9 almost identical elements of the cause of action for fraud. To sustain a finding of common law fraud, the trial court in most cases must make findings of fact as to each of the nine elements of fraud. Howell v. Kraft, 10 Wash. App. 266, 517 P.2d 203 (1973). Those elements generally are: (1) a representation of an existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the person to whom it is made, (6) ignorance of its falsity on the part of the person to whom it is made, (7) the latter's reliance on the truth of the representation, (8) his right to rely upon it, and (9) his consequent damage. *See* Turner v. Enders, 15 Wash .App. 875, 878, 552 P.2d 694 (1976).

## CONCLUSION

45. Defendants represents, the violations alleged in the complaint are part of its official acts and within the scope of the defendant's job description and thus make them immune as sovereign and diplomats.  See ORDER

As alleged in the complaint, on April 3, 2005, plaintiff "lodged" police reports "electronically from India" with Australian authorities, claiming child abduction and

kidnapping of his then-three-year-old daughter. Compl. ¶ 38. When plaintiff tried "to get help to return to Australia in an Emergency[,] [he] was instructed that he will never see his child again. . . ." *Id.* ¶ 40. Defendants "then conspired, using emails of passport documents and other documents to change" his daughter's identity and "to remove [her] from Australia to New Zealand." *Id.* ¶ 41.

Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id.* ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id.* ¶ 43. Plaintiff also filed a *habeas corpus* petition in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id.* ¶ 46.

Plaintiff filed this action in June 2007, setting forth the following nine counts: Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages. Compl. at 22-39.

46. Its falsity; The defendants know that they have attacked the United States by attacking the resident of the United States and his property and family SEE ORDER

> a. Plaintiff is a resident of Orlando, Florida,

> b. USA PATRIOT SEC. 106. PRESIDENTIAL AUTHORITY. `by any person, or with respect to any property, subject to the jurisdiction of the United States;';

> c. USA PATRIOT SEC. 106. `(A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in

whole or in part in the United States; and the defendants took money

in Los Angles California from the plaintiff in and about April 2001.

46. USA PATRIOT SEC. 320. PROCEEDS OF FOREIGN CRIMES where the

defendants being served in the United States sold to the ENEMY OF THE

UNTED STATES, IRAQ (see EXHIBITS IN FSIA OPPOSITION) and

according to the SEC`(iii) would be punishable under the laws of the United

States by imprisonment for a term exceeding 1 year, if the act or activity

constituting the offense had occurred within the jurisdiction of the United

States.'.

47. Defendants Violate Patriot Act SEC. 329. CRIMINAL PENALTIES. Any

person who is an official or employee of any department, agency, bureau,

office, commission, or other entity of the Federal Government, and any other

person who is acting for or on behalf of any such entity, who, directly or

indirectly, in connection with the administration of this title, corruptly

demands, seeks, receives, accepts, or agrees to receive or accept anything of

value personally or for any other person or entity in return for-- (2) being

influenced to commit or aid in the committing, or to collude in, or allow, any

fraud, or make opportunity for the commission of any fraud, on the United

States; such as Plaintiff, resident of Orlando, Florida, taxpayer with American

Citizen Children fraudulently taking hostage and kidnapping United States

interest Property.

48. USA PATRIOT ACT SEC. 411. DEFINITIONS RELATING TO

TERRORISM. ENGAGE IN TERRORIST ACTIVITY DEFINED- As used

in this chapter, the term 'engage in terrorist activity' means, in an individual

capacity or as a member of an organization—'(VI) to commit an act that the

actor knows, or reasonably should know, affords material support, including a

safe house, transportation, communications, funds, transfer of funds or other

material financial benefit, false documentation or identification, weapons

(including chemical, biological, or radiological weapons), explosives, or

training-- (aa) for the commission of a terrorist activity;

49. SEC. 808. DEFINITION OF FEDERAL CRIME OF TERRORISM Section

2332b of title 18, United States Code 956(a)(1) (relating to conspiracy to

murder, kidnap, or maim persons abroad),

d.   alleged in the complaint, on April 3, 2005, plaintiff "lodged" police

reports "electronically from India" with Australian authorities,

claiming child abduction and kidnapping of his then-three-year-old

daughter. Compl. ¶ 38. When plaintiff tried "to get help to return to

Australia in an Emergency[,] [he] was instructed that he will never see

his child again. . . ." *Id*. ¶ 40. Defendants "then conspired, using

emails of passport documents and other documents to change" his

daughter's identity and "to remove [her] from Australia to New

Zealand." *Id*. ¶ 41. Plaintiff then "filed a Human Rights Complaint

with the National Human Right Commission against the State Actors

of Australia and others." *Id*. ¶ 42. "[T]he Human Rights Direction . . .

observed that the defendant's action[s] were 'unjustifiable' actions[]

against the plaintiff. . . ." *Id*. ¶ 43. Plaintiff also filed a *habeas corpus*

petition in the Supreme Court of India, which "directed [him] to go to
Australia. . . ." *Id.* ¶ 46. Plaintiff filed this action in June 2007, setting
forth the following nine counts: Battery, Assault, Intentional Infliction
of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and
Abetting, Willful and Wanton Misconduct, Loss of Consortium and
Solatium, and Punitive Damages. Compl. at 22-39.

e. 1203 (relating to hostage taking),

f. 2332 (relating to certain homicides and other violence against United
States nationals occurring outside of the United States),

50. The defendants provided  SUPPORT TO TERRORISTS- Section 2339A(a) of
title 18, United States Code

g. `(c) CONSPIRACY- A person who conspires to commit an offense
under this section shall be subject to the same penalties (other than the
penalty of death) as the penalties prescribed for the offense, the
commission of which was the object of the conspiracy.'. The Volcker
report is complete with allegations that the defendants provided
material support to IRAQ. Further the defendants provided material
support to IRAQ a designated TERRORIST ORGANZATION and
took the income from the activity to conceal and take hostage the
plaintiff's daughter. See exhibit 2

51. SEC. 813. INCLUSION OF ACTS OF TERRORISM AS RACKETEERING
ACTIVITY Section 1961(1) of title 18 the defendants in providing support to
IRAQ see EXHIBIT 2 Volcker Commission Report and Cole Commission

Report admits  FSIA opposition 13 at 3.

52. 3) Its materiality;  The defendants knew of AWB AUSTRALIAN WHEAT
    BOARD IRAQ documents span a period of years from about 2002 to 2006.
    Over that period, AWB was involved in a number of investigations
    concerning its sales of wheat to Iraq under the United Nations' Oil-For-Food
    Programme ('OFF Programme').  AWB was exposed to investigations by the
    Permanent Investigations Committee of United States Senate ('PSI'), the
    Independent Inquiry Committee of the United Nations ('IIC') and ultimately
    the Commission but fraudulently represents to the Court that it was not
    dealing with aiding and abetting with IRAQ , a state sponsor of Terrorism and
    thereby deriving any tax benefits or any benefits part of which went into
    concealing American Property in America and Australia of the plaintiffs.

53. These investigations focused on AWB's payment of inland transportation
    fees, totalling approximately US$222 million, to a Jordanian company called
    Alia for Transportation and General Trade Co ('Alia'). In its final report, the
    IIC concluded that Alia was a front company for the Iraqi regime headed by
    Saddam Hussein and that Alia channelled these payments to Iraq in
    contravention of the United Nations' sanctions while the world was told these
    trucks were carrying weapons of mass destruction.

54. Iraq has been a major export market for Australian wheat for many years.
    Prior to 1999, the overseas marketing and export of wheat from Australia was
    controlled by the Australian Wheat Board ('Board'), which was a
    Commonwealth statutory authority.

55. TORTURE : Defendants claim they are torturing the plaintiffs under "official act" and violate the federal criminal prohibition against torture codified at 18 U.S.C. §§ 2340-2340A and supersedes in its entirety the August 1, 2002 opinion of this Office entitled Standards of Conduct under 18 U.S.C. §§ 2340-2340A. That statute prohibits conduct "specifically intended to inflict severe physical or mental pain or suffering." The statute also prohibits certain conduct specifically intended to cause "severe physical suffering" distinct from "severe physical pain." Torture is abhorrent both to American law and values and to international norms. This universal repudiation of torture is reflected in our criminal law, for example, 18 U.S.C. §§ 2340-2340A; international agreements, exemplified by the United Nations Convention Against Torture (the "CAT") (1); customary international law (2); centuries of Anglo-American law (3); and the longstanding policy of the United States.

56. Then the defendants in the Motion to Dismiss admits that the plaintiff Nara Avalon Singhderewa is under the defendants control and in Australia and the plaintiffs Motion for Preliminary Injunction for control of the plaintiff was denied and Section 2340A provides that "[w]hoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years, or both, and if death results to any person from conduct prohibited by this subsection, shall be punished by death or imprisoned for any term of years or for life."[9] Section 2340(1) defines "torture" as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions)

upon another person within his custody or physical control."[10]. Now it is admitted in the ORDER that for a prolonged time from April 3rd 2005 to present

    a. He also accuses defendants of torturing him and his daughter, presumably by keeping them apart. *See id.* at 3, 6, 33, 22-26.

57. The Senate attached the following understanding to its resolution of advice and consent to ratification of the CAT:

    b. The United States understands that, in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering.

    c. S. Exec. Rep. No. 101-30, at 36 (1990). This understanding was deposited with the U.S. instrument of ratification, see 1830 U.N.T.S. 320 (Oct. 21, 1994), and thus defines the scope of the United States' obligations under the treaty. See Relevance of Senate Ratification History to Treaty Interpretation, 11 Op. O.L.C. 28, 32-33 (1987). The criminal prohibition against torture that Congress codified in 18 U.S.C. §§ 2340-2340A generally tracks the prohibition in the CAT, subject to the U.S. understanding and although the defendants admit to the violation of CAT claim they have an official duty and this is a fraud.

    d. Drawing distinctions among gradations of pain (for example, severe, mild, moderate, substantial, extreme, intense, excruciating, or agonizing) is obviously not an easy task, especially given the lack of any precise, objective scientific criteria for measuring pain.[18] We are, however, aided in this task by judicial

interpretations of the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350
note (2000). The TVPA, also enacted to implement the CAT, provides a civil
remedy to victims of torture. The TVPA defines "torture" to include:

> any act, directed against an individual in the offender's
> custody or physical control, by which *severe pain or*
> *suffering* (other than pain or suffering arising only from or
> inherent in, or incidental to, lawful sanctions), *whether*
> *physical or mental,*

58. Section 2340 defines "severe mental pain or suffering" to mean:the
prolonged mental harm caused by or resulting from-

> a.  the intentional infliction or threatened infliction of severe
> physical pain or suffering;.  Another question is whether
> the requirement of "prolonged mental harm" caused by or
> resulting from one of the enumerated predicate acts is a
> separate requirement, or whether such "prolonged mental
> harm" is to be presumed any time one of the predicate acts
> occurs. Although it is possible to read the statute's
> reference to "the prolonged mental harm caused by or
> resulting from" the predicate acts as creating a statutory
> presumption that each of the predicate acts always causes
> prolonged mental harm, we do not believe that was
> Congress's intent. As noted, this language closely tracks the
> understanding that the Senate adopted when it gave its

advice and consent to ratification of the CAT: in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering and that mental pain or suffering refers to prolonged mental harm caused by or resulting from (1) the intentional infliction or threatened infliction of severe physical pain or suffering; S. Exec. Rep. No. 101-30, at 36. We do not believe that simply by adding the word "the" before "prolonged harm," Congress intended a material change in the definition of mental pain or suffering as articulated in the Senate's understanding to the CAT. The legislative history, moreover, confirms that sections 2340-2340A were intended to fulfill--but not go beyond--the United States' obligations under the CAT: "This section provides the necessary legislation to implement the [CAT]. . . . The definition of torture emanates directly from article 1 of the [CAT]. The definition for 'severe mental pain and suffering' incorporates the [above mentioned] understanding." S. Rep. No. 103-107, at 58-59 (1993). This understanding, embodied in the statute, was meant to define the obligation undertaken by the United States. Given this understanding, the legislative history, and the fact that section 2340(2) defines "severe mental pain or suffering"

carefully in language very similar to the understanding, we do not believe that Congress intended the definition to create a presumption that any time one of the predicate acts occurs, prolonged mental harm is deemed to result.

59. Turning to the question of what constitutes "prolonged mental harm caused by or resulting from" a predicate act, we believe that Congress intended this phrase to require mental "harm" that is caused by or that results from a predicate act, and that has some lasting duration. There is little guidance to draw upon in interpreting this phrase. (24) Nevertheless, our interpretation is consistent with the ordinary meaning of the statutory terms. First, the use of the word "harm"--as opposed to simply repeating "pain or suffering"--suggests some mental damage or injury. Ordinary dictionary definitions of "harm," such as "physical or mental damage: injury," Webster's Third New International Dictionary at 1034 (emphasis added), or "[p]hysical or psychological injury or damage," American Heritage Dictionary of the English Language at 825 (emphasis added), support this interpretation. Second, to "prolong" means to "lengthen in time" or to "extend in duration," or to "draw out," Webster's Third New International Dictionary at 1815, further suggesting that to be "prolonged," the mental damage must extend for some period of time. This damage need not be permanent, but it must continue for a "prolonged" period of time. (25) Finally, under

section 2340(2), the "prolonged mental harm" must be "caused by" or "resulting from" one of the enumerated predicate acts. (26) 198 F. Supp. 2d at 1346 (emphasis added; first ellipsis in original). In reaching its conclusion, the court noted that the plaintiffs were continuing to suffer serious mental harm even ten years after the events in question: One plaintiff "suffers from anxiety, flashbacks, and nightmares and has difficulty sleeping. [He] continues to suffer thinking about what happened to him during this ordeal and has been unable to work as a result of the continuing effects of the torture he endured." Id. at 1334. Another plaintiff "suffers from anxiety, sleeps very little, and has frequent nightmares. . . . [He] has found it impossible to return to work." Id. at 1336. A third plaintiff "has frequent nightmares. He has had to use medication to help him sleep. His experience has made him feel depressed and reclusive, and he has not been able to work since he escaped from this ordeal." Id. at 1337-38. And the fourth plaintiff "has flashbacks and nightmares, suffers from nervousness, angers easily, and has difficulty trusting people. These effects directly impact and interfere with his ability to work." Id. at 1340. In each case, these mental effects were continuing years after the infliction of the predicate acts. In Sackie v. Ashcroft, 270 F. Supp. 2d 596 (E.D. Pa. 2003), the individual had been kidnapped and "forcibly recruited" as a child soldier at the age of 14, and over the next three to four years had been forced to take

narcotics and threatened with imminent death. Id. at 597-98, 601-02. The court concluded that the resulting mental harm, which continued over this three-to-four-year period, qualified as "prolonged mental harm." Id. at 602. Conversely, in Villeda Aldana v. Fresh Del Monte Produce, Inc., 305 F. Supp. 2d 1285 (S.D. Fla. 2003), the court rejected a claim under the TVPA brought by individuals who had been held at gunpoint overnight and repeatedly threatened with death. While recognizing that the plaintiffs had experienced an "ordeal," the court concluded that they had failed to show that their experience caused lasting damage, noting that "there is simply no allegation that Plaintiffs have suffered any prolonged mental harm or physical injury as a result of their alleged intimidation." Id. at 1294 95.

60. The meaning of "specifically intended."

    a. It is well recognized that the term "specific intent" is ambiguous and that the courts do not use it consistently. See 1 Wayne R. LaFave, Substantive Criminal Law § 5.2(e), at 355 & n.79 (2d ed. 2003). "Specific intent" is most commonly understood, however, "to designate a special mental element which is required above and beyond any mental state required with respect to the actus reus of the crime." Id. at 354; see also Carter v. United States, 530 U.S. 255, 268 (2000) (explaining that general intent, as

opposed to specific intent, requires "that the defendant possessed knowledge [only] with respect to the actus reus of the crime"). As one respected treatise explains:

61. In contrast, cases such as United States v. Neiswender, 590 F.2d 1269 (4th Cir. 1979), suggest that to prove specific intent it is enough that the defendant simply have "knowledge or notice" that his act "would have likely resulted in" the proscribed outcome. Id. at 1273. "Notice," the court held, "is provided by the reasonable foreseeability of the natural and probable consequences of one's acts." Id. We do not believe it is useful to try to define the precise meaning of "specific intent" in section 2340. (27) In light of the President's directive that the United States not engage in torture, it would not be appropriate to rely on parsing the specific intent element of the statute to approve as lawful conduct that might otherwise amount to torture. Some observations, however, are appropriate. It is clear that the specific intent element of section 2340 would be met if a defendant performed an act and "consciously desire[d]" that act to inflict severe physical or mental pain or suffering. 1 LaFave, Substantive Criminal Law § 5.2(a), at 341. Conversely, if an individual acted in good faith, and only after reasonable investigation establishing that his conduct would not inflict severe physical or mental pain or suffering, it appears unlikely that he would have the specific intent necessary to violate sections

2340-2340A. Such an individual could be said neither consciously to desire the proscribed result, see, e.g., Bailey, 444 U.S. at 405, nor to have "knowledge or notice" that his act "would likely have resulted in" the proscribed outcome, Neiswender, 590 F.2d at 1273.

62. Two final points on the issue of specific intent: First, specific intent must be distinguished from motive. There is no exception under the statute permitting torture to be used for a "good reason." Thus, a defendant's motive (to protect national security, for example) is not relevant to the question whether he has acted with the requisite specific intent under the statute. See Cheek v. United States, 498 U.S. 192, 200-01 (1991). Second, specific intent to take a given action can be found even if the defendant will take the action only conditionally. Cf., e.g., Holloway v. United States, 526 U.S. 1, 11 (1999) ("[A] defendant may not negate a proscribed intent by requiring the victim to comply with a condition the defendant has no right to impose."). See also id. at 10-11 & nn. 9-12; Model Penal Code § 2.02(6). Thus, for example, the fact that a victim might have avoided being tortured by cooperating with the perpetrator would not make permissible actions otherwise constituting torture under the statute. Presumably that has frequently been the case with torture, but that fact does not make the practice of torture any less abhorrent or unlawful. (28)  Now the defendant in the motion to dismiss has admitted the plaintiff Nara being five years old is Child of the

plaintiff Jugvir inder Singh and has admitted that Nara is in defendants control and the plaintiff is also under the control of the defendants as they have the entire power of reunification and denial and separation of the two father afrom the child then 18 U.S.C. § 2340A (2000).10. Section 2340 provides in full:

    a. As used in this chapter—

        i. "torture" means an act committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;See, e.g., European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 3, 213 U.N.T.S. 221 (Nov. 4, 1950) ("European Convention") ("No one shall be subjected to torture or to inhuman or degrading treatment or punishment."); Evans, Getting to Grips with Torture, 51 Int'l & Comp. L.Q. at 370 Section 3(b)(2) of the TVPA defines "mental pain or suffering" similarly to the way that section 2340(2) defines "severe mental pain or suffering."The phrase "prolonged mental harm" does not appear in the relevant medical literature or elsewhere in the

United    States    Code.    The    August    2002
Memorandum    concluded    that    to    constitute
"prolonged mental harm," there must be "significant
psychological harm of significant duration, e.g.,
lasting for months or even years." Id. at 1; see also
id. at 7. Although we believe that the mental harm
must be of some lasting duration to be "prolonged,"
to the extent that that formulation was intended to
suggest that the mental harm would have to last for
at least "months or even years,"  SEE ORDER

a.  He also accuses defendants of torturing him and his daughter,
presumably by keeping them apart. *See id.* at 3, 6, 33, 22-26.

b.  As alleged in the complaint, on April 3, 2005, plaintiff "lodged"
police reports "electronically from India" with Australian
authorities, claiming child abduction and kidnapping of his then-
three-year-old daughter. Compl. ¶ 38. When plaintiff tried "to get
help to return to Australia in an Emergency[,] [he] was instructed
that he will never see his child again. . . ." *Id.* ¶ 40. Defendants
"then conspired, using emails of passport documents and other
documents to change" his daughter's identity and "to remove [her]
from Australia to New Zealand." *Id.* ¶ 41.

    c.  Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id.* ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id.* ¶ 43. Plaintiff also filed a *habeas corpus* petition in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id.* ¶ 46.

    d.  Plaintiff filed this action in June 2007, setting forth the following nine counts: Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages. Compl. at 22-39.

63. The speaker's knowledge of the representation's falsity or ignorance of its truth; as admitted in the ORDER, under color law and under official acts the defendants caused Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and other violations but claim they are immune from prosecution as sovereigns and diplomats.

64. It is false for the defendants to believe that United States in creating FSIA abandoned The First Amendment, which Professor Tribe terms "the Constitution's most majestic guarantee,"[2] provides: Congress

shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. CONST. AMEND. I. and as such the plaintiff demands to talk to his child in his arms and assemble peaceably in his residence or have the additional charge of the constitutional questions violated under due color of official authority challenged.

65. This Supreme Court has repeatedly observed that there are derivative and corollary rights that are essential to effectuate the purposes of the First Amendment, or which are inherent in the rights expressly enumerated in the Amendment. For example, in *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965), Justice Brennan, in his concurring opinion explained:

It is true that the First Amendment contains no specific guarantee of access to publications. However, the protection of the Bill of Rights goes beyond the specific guarantees to protect from congressional abridgement those equally fundamental personal rights necessary to make the express guarantees fully meaningful.

Likewise, in *Globe* this Court observed that "[t]he First Amendment is...broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights." *Globe,* 457 U.S. at 604. Thus, in 1982, this Court recognized a

"right to receive information and ideas," locating the right as "an inherent corollary of the right of free speech and press" guaranteed by the First Amendment. *Board of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).    The plaintiffs allege it is false to conclude that FSIA was superior to the First Amendment right of the plaintiff to "receive and information and ideas about his very own child.

66. Freedom of thought, while not expressly guaranteed by the First Amendment, is one of those fundamental rights necessary to make the express guarantees meaningful. As Justice Benjamin Cardozo extolled, "freedom of thought...is the matrix, the indispensable condition, of nearly every other form of freedom. With rare aberrations a pervasive recognition of that truth can be traced in our history, political and legal." *Palko v. Connecticut,* 302 U.S. 319, 326-27 (1937).

As this Court noted as recently as 2002, "[t]he right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coalition* 533 U.S. 234 (2002). "The guarantee of free expression," notes Professor Tribe, "is inextricably linked to the protection and preservation of open and unfettered mental activity... ." L. Tribe, *supra,* § 15-7, at 1322 (2nd ed. 1988).[3] Repeatedly, this Court has recognized that freedom of thought is one of the most elementary and important rights inherent in the First Amendment.

67. Now contrast this Guarantee with the directions of the ORDER which states that some FSIA is far superior to the Constitutionally protected right of a father to speak to his own child and for and a child to speak to her father and that it is forbidden under the color of law and official acts of a father to think about his child and the

child to think about his father.

> a.  More sensitively In *West Virginia State Board of Education v. Barnette*,
> 319 U.S. 624 (1943), this Court, in an 8-1 decision, invalidated a school
> requirement that compelled a flag salute on the ground that it was an
> unconstitutional invasion of "the sphere of intellect and spirit which it is
> the purpose of the First Amendment to our Constitution to reserve from
> official control." *Id*. at 642. The First Amendment, declared this Court,
> gives a constitutional preference for "individual freedom of mind" over
> "officially disciplined uniformity for which history indicates a
> disappointing and disastrous end." The ORDER creates a scence for the
> UNITED STATES that diplomat and a sovereign may be hired brought in
> to work in USA to control the "the sphere of intellect and spirit of
> American" and grant immunity from prosecution which an atrocity to the
> Constitutional Gurantees.

68. Professor Emerson makes the same point. Situating freedom of thought as the
    foundation of the First Amendment, he explains:

Forming or holding a belief occurs prior to expression. But it is the first stage in the
processes of expression, and it tends to progress into expression. Hence safeguarding
the right to form and hold beliefs is essential in maintaining a system of freedom of
expression. Freedom of belief, therefore, must be held included within the protection
of the First Amendment. Thomas Emerson, THE SYSTEM OF FREEDOM OF
EXPRESSION 21-22 (1970).   The defedants believe in another falsity claiming they
have the right to control under official the process of the plaintiffs expression and

freedom of belief and that so of a minor child.

69. *Id.* at 637. At the center of our American freedom, is the "freedom to be intellectually and spiritually diverse." *Id.* at 641. "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds," this Court explained, "only at the price of occasional eccentricity and abnormal attitudes." *Id.* at 641-42.

This principle, that freedom of thought is central to the First Amendment and protected thereby, has guided other important decisions of this Court. In *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court invalidated a New Hampshire statute that required all noncommercial vehicle license plates to bear the state motto "Live Free or Die," finding the requirement inconsistent with "the right of freedom of thought protected by the First Amendment." *Id.* at 714.

In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), this Court invalidated a statute forcing public school teachers to contribute money to a union that advanced partisan political views. This Court characterized the case as one concerning "freedom of belief" and emphasized "freedom of belief is no incidental or secondary aspect of the First Amendment's protections... [A]t the heart of the First Amendment," noted this Court, "is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.* at 234

The Government's Forcible and Direct Aiding and Abetting a Sovereign partner the defendants to kidnap, hold hostage, conceal from the father a minor child of  Mental Processes Violates the First Amendment  The defendants is claiming that is has an

international agreement with the United States government where it is seeking to directly modify the fundamental relation of a father with his minor child and while holding her captive and separated from the father has the power to control the thoughts and thought processes by forcibly administering separations policies designed to manipulate the chemistry of the plaintiffs brain and thereby change the way they thinks. The forcible administration separation policies is not an effort to control the plaintiff's behavior, with merely an incidental effect on his thinking. It is an effort aimed *directly* at changing his *mind* and *mental processes* by forcibly manipulating his brain chemistry. As such, this Court should recognize it as a serious affront to the First Amendment's protection of freedom of thought.

Sixty years ago this Court opined "[f]freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind." *Jones v. Opelika*, 316 U.S. 584, 618 (1942). Since the advent of powerful antipsychotic drugs in the 1950s (as well as other technologies discussed in Section C2, *infra*), the government now *does have* the capability to "control the inward workings of the mind." The issue to whether plaintiffs rights under the First, Fifth, and Sixth Amendments are violated by allowing the government conspire with a sovereign to administer kidnap, hostage taking and separation policies against his will in order to subject the plaintiff to absolute sovereign control for no reason know to man is a violation of the First Amendment right to freedom of thought, the CCLE observes and other constitutional guarantees (federal and state) including the right to privacy, the rights guaranteed by the Fourth, Fifth, Sixth, Ninth, Tenth and Fourteenth Amendments, as well as International resolutions, laws, and treaties such as the UNIVERSAL DECLARATION OF HUMAN

RIGHTS, adopted by the United Nations General Assembly. *See, e.g.,* William J. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 HARV. L.

Then the plaintiffs claim if "at the heart of the First Amendment is the notion that...in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State" (*Abood,* 431 U.S. at 234-235), then there can be no doubt that the government infringes on the First Amendment when

> b.  The First Amendment protects communication of virtually all kinds, whether in written, verbal, pictorial, or any symbolic form, and whether cognitive or emotive in nature. (2) Communication entails the transmission and reception of whatever is communicated. (3) Transmission and reception necessarily involves mentation on the part of both the person transmitting and the person receiving. (4) It is in fact impossible to distinguish in advance mentation that will be involved in or necessary to transmission and reception from mentation that will not. (5) If communication is to be protected, *all* mentation (regardless of its potential involvement in transmission or reception) must therefore be protected. Michael Shapiro,

70.  The plaintiffs will show that the defendants sovereigns and diplomatic conduct is one that it can do whatever it feels like to whoever it feels like even if it means that no written, verbal, pictorial, or any symbolic form, and whether cognitive or emotive in nature will ever be exchanged between a father and her minor plaintiff child because she is in the defendants control and a such absolutely none has occurred one between the other. The First Amendment protects the communication

of ideas, which itself implies protection of the capacity to produce ideas. Continuing, the Tenth Circuit in *Bee* observed:

"In a society whose 'whole constitutional heritage rebels at the thought of giving government the power to control men's minds,' the governing institutions, and especially the courts, must not only reject direct attempts to exercise forbidden domination over mental processes; they must strictly examine as well oblique intrusions likely to produce, or designed to produce, the same result." L. Tribe, [*supra*] at 899 (1978) (quoting *Stanley,* [*supra*] 394 U.S. 557, 565...). *Bee,* 744 F.2d at 1394.

71. The 20th century imagination is peppered with ruminations on the coercive potential of electronic and chemical technologies. Variations on theme form the basis for countless dystopian novels, most notably NINETEEN EIGHTY-FOUR. ("Don't you see that the whole aim of Newspeak is to narrow the range of thought?Every year fewer and fewer words, and the range of consciousness always a little smaller"). George Orwell, NINETEEN EIGHTY-FOUR 46 (Harcourt, Brace 1949); *see also, id.,* Appendix "The Principles of Newspeak;" A psychoactive drug named "Soma" controls citizens' behavior in the novel BRAVE NEW WORLD. Aldous Huxley, BRAVE NEW WORLD, (Doubleday 1932); In A CLOCKWORK ORANGE, the protagonist, Alex, is conditioned into a docile model citizen through aversion therapy. Anthony Burgess, A CLOCKWORK ORANGE, (W. W. Norton 1963); In THE TERMINAL MAN, a man's violent tendencies are controlled by implanting electrodes into his brain. Michael Crichton, THE TERMINAL MAN, (Knopf 1972); In THIS PERFECT DAY inhabitants are genetically engineered and

drugged daily into a calm state of mind. Ira Levin, THIS PERFECT DAY,
(Random House 1970); In WOMAN ON THE EDGE OF TIME, the heroine is
incarcerated in a mental hospital and subjected to a panoply of forced-drugs and is
subjected to electrode implantation in the brain. Marge Piercy, (Knopf 1976); In
SYNNERS, socket nanotechnology allows imperceptibly small brain implants to
directly interface with a readily available cybernetic information network. Pat
Cadigan, SYNNERS, (Bantam Spectra 1991); In MINDPLAYERS, mind-to-mind
technology works by infusing a chemical bath of sedatives to the brain, then
engaging skull caps connected directly to neurons. For the central character, this
experience has the effect of "producing a change in brain chemistry that felt as
natural as changing your mind" Pat Cadigan, MINDPLAYERS 4, (Bantam Books
1987); *See generally* Kenneth Melvin, Stanley Brodsky and Raymond Fowler, Jr.,
eds. PSY-FI ONE: AN ANTHOLOGY OF PSYCHOLOGY IN SCIENCE
FICTION (1st ed.: Random House, 1977). Federal Agency Views on the Potential
Application of "Brain Fingerprinting." REPORT GAO-02-22, (Oct. 2001.

   To infringe on a fundamental right such as the First Amendment right to freedom of
thought, the government must justify its action by no less a standard than strict scrutiny.
*See N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963) ("The decisions of this Court have
consistently held that only a compelling state interest...can justify limiting First
Amendment freedoms."); *Brandon*, 158 F.3d at 957 ("[T]o forcibly medicate [a non-
dangerous pretrial detainee] the government must satisfy strict scrutiny review and
demonstrate that its proposed approach is narrowly tailored to a compelling interest.").

   To survive strict scrutiny, the governmental interest advanced "must be paramount,

one of vital importance, and the burden is on the government to show the existence of such an interest." *Elrod v. Burns*, 427 U.S. 347, 362 (1976). Here, the sole interest asserted by the state is its "interest in FSIA Act." While this is undeniably a *legitimate* governmental interest, the plaintiffs submits that it is insufficiently *compelling, by itself,* to override a person's First Amendment right to freedom of thought.

As this Court observed nearly 100 years ago:

There is...a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905).

A person's intellect is surely within that protected sphere. The right of a person to liberty, autonomy and privacy over his or her own thought processes is situated at the core of what it means to be a free person. It is essential to the most elementary concepts of human freedom, dignity, and self-expression, and demands this Court's steadfast protection. The right to sovereignty over one's own thought processes is the quintessence of freedom, and is protected by the First Amendment.

S/
_____
JUGVIR INDER SINGH
Pro Se PLAINTIFF

## CERTIFICATION OF SERVICE

A paper copy has been served upon the defendants, Mr. John Prominsky for

Commonwealth of Australia, Union of India, and the to United Nations at **Mr. Nicolas**

**Michel, Under-Secretary-General, The Legal Counsel, United Nations**

**Headquarters, Room No. 3427A, New York, NY 10017 Fax: (+1)(212)963-3386** by

Wire, fax, and mail and email this June Wednesday, March 05, 2008.


JUGVIR INDER SINGH

pro se

Plaintiff

telephones: 5714268522

EXHIBIT 1

International Criminal Court

COURT IN THE HAGUE

1  Survivor  Sondos Ismail  Sondous Ismael Ibrahim  Iraqi  F  26

2  Victim  Zahra  daughter of Sondos Ismail  Iraqi  F  6

3  Victim  Fatima  daughter of Sondos Ismail  Iraqi  F  7

4  Victim  Eman  daughter of Sondos Ismail  Iraqi  F  8

5  Victim  Khadija Ismail    Iraqi  F  0

6  Survivor  Faris Kadhem    Iraqi  M  34

7  Victim  Leyla  wife of Faris Kadhem  Iraqi  F  0

8  Victim  Zahra  daughter of Faris Kadhem  Iraqi  F  7

9  Montaha Sam Adam  Muntaha Adim  Iraqi  F  53

10 Al Saadi Sharmookh  Radeed Sabah Sharkoukh  Iraqi  M  19

11 Victim  Zainalabaden Aluomer    Iraqi  M  0

12 Victim    wife of Zainalabaden Aluomer  Iraqi  F  0

13 Victim    mother of Zainalabaden Aluomer  Iraqi  F  0

14 Survivor  Sadiq Raza  Sadeq Al-Abodie  Iraqi  M  25

15 Survivor  Kauthar Sadiq  daughter of Sadiq Raza  Iraqi  F  2

16 Victim  Sana  wife of Sadiq Raza  Iraqi  F  0

17 Survivor  Zaynab Alrimahi  Zaineb Al-Ramahi  Iraqi  F  12

18 Victim  Souad Alrimahi  mother of Zaynab Alrimahi  Iraqi  F  32

19 Victim  Ahsan Alrimahi  Ehsan Al-Ramahi  Iraqi  M  42

20 Victim  Mahmoud Alrimahi  Mohammed Al-Ramahi  Iraqi  M  6

21  Victim  Moustafa Alrimahi  Mostafa Al-Ramahi  Iraqi  M  4

22  Victim  Fatima Alrimahi  Fatma Al-Ramahi  Iraqi  F  14

23  Victim  Roukaya Alrimahi  Rokaia Al-Ramahi  Iraqi  F  7

24  Victim  Zaynab Sobie  wife of Ali-Mehdi Sobie  Iraqi  F  31

25  Victim  Donya Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  14

26  Victim  Marva Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  12

27  Victim  Hajaran Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  10

28  Survivor  Bahram Khan  Bahram Tor  Afghani  M  45

29  Victim  Kaber Khan  brother of Bahram Khan  Afghani  M  0

30  Victim  Mohammed Khan  brother of Bahram Khan  Afghani  M  0

31  Victim  Sohki Khan  brother of Bahram Khan  Afghani  M  0

32  Victim  Salman Khan  brother of Bahram Khan  Afghani  M  0

33  Survivor  Rokaya Satar  Roukayya Sattar  Iraqi  F  22

34  Victim  Raad Al-Saiegh  husband of Rokaya Satar  Iraqi  M  26

35  Victim  Kauthar Raad  daughter of Rokaya Satar  Iraqi  F  4

36  Victim  Alya Raad  daughter of Rokaya Satar  Iraqi  F  2

37  Survivor  Najah Muhsin  Najah Zubaidy / Mrs. Elzoueni  Iraqi  F  26

38  Victim  Najla Muhsin  Najla Zubaidy  Iraqi  F  20

39  Survivor  Zeina Muhsin  Zeina Zubaidy  Iraqi  F  18

40  Victim  Haydar Muhsin  Haydar Zubaidy  Iraqi  M  22

41  Victim  Karrar  son of Najah Muhsin  Iraqi  M  1

42  Survivor  Falah Al-Musawi  Hassan Jassem / Falah Hassan  Iraqi  M  31

43  Victim  Kaltom Al-Battat  wife of Falah Al-Musawi  Iraqi  F  25

44 Victim  Fatima Falah  daughter of Falah Al-Musawi  Iraqi  F  5

45 Victim  Batoul Falah  daughter of Falah Al-Musawi  Iraqi  F  2

46 Victim  Ali Falah  son of Falah Al-Musawi  Iraqi  M  1

47 Survivor  Fawzi Qasim  Fawziqasim  Iraqi  M  37

48 Victim    wife of Fawzi Qasim  Iraqi  F  30

49 Survivor  Amar Fawzi Khasim  son of Fawzi Qasim  Iraqi  M  12

50 Victim  Ayat Fawzi  daughter of Fawzi Qasim  Iraqi  F  8

51 Victim  Noor Fawzi  daughter of Fawzi Qasim  Iraqi  F  6

52 Victim  Fatima Fawzi  daughter of Fawzi Qasim  Iraqi  F  1

53 Survivor  Hadar Ata Essa Qeiaswand  Haidar Ataa Al-Fely  Iraqi  M  32

54 Victim    wife of Haidar Ataa  Iraqi  F  25

55 Victim  Rem Haidar  daughter of Haidar Ataa  Iraqi  F  4

56 Victim  Rakem Haidar  daughter of Haidar Ataa  Iraqi  F  2

57 Survivor  Issam Mohammed Ismail  nephew of Ali-Mehdi Sobie  Iraqi  M  45

58 Survivor  Rajaa Ismail  wife of Issam Mohammed Ismail  Iraqi  F  40

59 Survivor  Houssam Ismail  son of Issam Mohammed Ismail  Iraqi  M  13

60 Victim  Ammar Ismail  son of Issam Mohammed Ismail  Iraqi  M  19

61 Survivor  Amal Basry  Amal Hassan  Iraqi  F  48

62 Survivor  Rami Akram  Almjib  Iraqi  M  18

63 Victim  Akhlas  wife of Hazam Al Rowaimi  Iraqi  F  27

64 Victim  Hamda  mother of Hazam Al Rowaimi  Iraqi  F  49

65 Victim  Noor  daughter of Hazam Al Rowaimi  Iraqi  F  11

66 Victim  Fatama  daughter of Hazam Al Rowaimi  Iraqi  F  8

67  Victim  Nargis  daughter of Hazam Al Rowaimi  Iraqi  F  5

68  Victim  Mohammed  son of Hazam Al Rowaimi  Iraqi  M  3

69  Survivor  Karim Jabbar Hussein Al-Saaedy  Abu Ahmad  Iraqi  M  41

70  Victim  Ahmad (?)  son of Kareem Jabar Husein  Iraqi  M  8

71  Survivor  Ali Hameed Ahmad  Ali Hamid  Iraqi  M  28

72  Survivor  Hussein Jawad  Hussein Jawad Hussein  Iraqi  M  8

73  Survivor  Jalah Mohsen Shohani  Jalal Mohsen  Iraqi  M  35

76  Victim  Dr Al-Battat  Dr Kamel Mohsen Al Battat  Iraqi  M  40

77  Victim  Aminah Hassan Al Battat  wife of Dr Al-Battat  Iraqi  F  33

78  Victim  Zainab Al Battat  1st daughter of Dr Al Battat  Iraqi  F  4

79  Victim  Mohamad Al Battat  1st son of Dr Al-Battat  Iraqi  M  10

80  Victim  Wissam Al Battat  2nd son of Dr Al Battat  Iraqi  M  8

81  Victim  Zahra Al Battat  2nd daughter of Dr Al Battat  Iraqi  F  1

82  Survivor  Jawad Hussein Ali  father of Hussein Jawad  Iraqi  M  37

83  Victim  Abas  brother of Hussein Jawad  Iraqi  M  5

84  Victim  Naima  mother of Hussein Jawad  Iraqi  F  31

85  Survivor  Ahmad Hussain / Ahmed Hussein  uncle of Hussein Jawad  Iraqi  M  18

86  Left Before Sinking  Fawzi Almajid  Fauzi Salim  Iraqi  M  45

87  Left Before Sinking  Karima Althmay  Kharema Mukhtar  Iraqi  F  42

88  Left Before Sinking  Kosay Almajid  Qussay Fauzi  Iraqi  M  19

89  Left Before Sinking  Samar Almajid  Samer Fauzi  Iraqi  F  24

90  Left Before Sinking  Suria Merza Muhawas Alkamizi  Suria Merza  Iraqi  F  51

91  Left Before Sinking  Ansam Alzuhairi  Ansam Helmi  Iraqi  F  24

92 Left Before Sinking  Basam Alzuhairi  Basam Helmi  Iraqi  M  22

93 Left Before Sinking  Ibrahim Alzuhairi  Abraham Helmi  Iraqi  M  11

94 Left Before Sinking  Ra'ad Lafta Zbari  Ra'ad Lafta  Iraqi  M  35

95 Left Before Sinking  Mohammad Al-Zuhairy  Muhannad Jabar  Iraqi  M  29

96 Left Before Sinking  Innsar Jabbar  Antsar Jabar  Iraqi  F  37

97 Left Before Sinking  Marie Jabbar  Mary Jabar  Iraqi  F  15

98 Left Before Sinking  Mohammad Saeed  Muhammed Sami  Iraqi  M  24

99 Left Before Sinking  Raqia Sanhir  Raquia Aziz  Iraqi  F  39

100 Left Before Sinking  Aied Sanhir  Aeid Aziz  Iraqi  M  34

101 Left Before Sinking  Udai Fawsi Salem  Auday Fuzi  Iraqi  M  22

102 Left Before Sinking  Bashar Leftah Zebari  Bashar Lafta  Iraqi  M  28

103 Left Before Sinking  Leftah Siham Zebari  Seham Lafta  Iraqi  F  47

104 Left Before Sinking  Ann Saleem Aboud  Ann Sliem  Iraqi  F  6

105 Left Before Sinking  Yvonne Saleem Aboud  Evon Sliem  Iraqi  F  18

106 Left Before Sinking  Ivan Saleem Aboud  Evan Sliem  Iraqi  M  15

107 Victim  Raghed Jabbar Al Saadi  wife of Mohammad Alghazzi  Iraqi  F  0

108 Victim  Mohammad Al Muntazar Alghazzi  Mohammad Almonther Alghazzi  Iraqi  M  4

109 Victim  Ali Almuriada Al Ghazzi  Ali Almutth Alghazzi  Iraqi  M  5

110 Victim  Reyam Al Ghazzi  Ream  Iraqi  F  10

111 Victim  Yasser Al Helou  Yasser Elhelou  Iraqi  M  45

112 Victim  Ahmad Yasser Al Helou  son of Yasser Al Helou  Iraqi  M  16

113 Victim  Noor Yasser Al Helou  son of Yasser Al Helou  Iraqi  M  7

114 Victim  Marwa Al Helou  daughter of Yasser Al Helou  Iraqi  F  3

115 Victim  Doha Yasser Al Helou  daughter of Yasser Al Helou  Iraqi  F  2

116 Victim  Sayed Hassan Al Yassiry    Iraqi  M  38

117 Victim  Fatima Al Yassiry  daughter of Sayed Al Yassiry  Iraqi  F  5

118 Victim  Zahra Al Yassiry  daughter of Sayed Al Yassiry  Iraqi  F  3

119 Victim  wife of Sayed Al Yassiry  Iraqi  F  30

120 Survivor  Abu Muslim  Abdul Ridha Lafta Egzar  Iraqi  M  39

121 Victim  Abu Yasin    Iraqi  M  0

122 Victim  wife of Abu Yasin  Iraqi  F  0

123 Victim  Houda  daughter of Abu Yasin  Iraqi  F  0

124 Victim  Muhammad  son of Abu Yasin  Iraqi  M  0

125 Survivor  Ala Alayrawany    Iraqi  M  34

126 Survivor  Musa Qiyes  Musa Shikha Kiyas Ghol Gholi  Iraqi  M  41

127 Victim  Rabab Jawad  Rabab Jawad Hussein  Iraqi  M  9

128 Victim  Sameeya Al Zohairi  wife of Haidar Al Zohairi  Iraqi  F  58

129 Victim  Hadeer Al Zohairi  son of Haidar Al Zohairi  Iraqi  M  15

130 Victim  Hadeel Al Zohairi  daughter of Haidar Al Zohairi  Iraqi  F  19

131 Survivor  Haydar Hadi  Dr Haydar from Khuzistan  Iraqi  M  28

132 Victim  Rabih Al Helou    Iraqi  M  45

133 Victim  Ahmad Al Helou  son of Rabih Al Helou  Iraqi  M  0

134 Victim  Hamza Al Helou  dau of Rabih Al Helou  Iraqi  F  0

135 Victim  Mostapha Al Helou  son of Rabih Al Helou  Iraqi  M  0

136 Victim  Zaynab Al Helou  dau of Rabih Al Helou  Iraqi  F  0

137 Victim  Batoul Al Helou  son of Rabih Al Helou  Iraqi  M  0

138 Victim  Narjas Al Helou  dau of Rabih Al Helou  Iraqi  F  0

139 Survivor  Mohammed Zayer  Mohammed Zaeer  Iraqi  M  26

140 Survivor  uncle of Hussein Jawad Hussein  brother of Ahmad Hussein  Iraqi  M  16

141 Survivor  Sabah Latif Ali El Mazloum  45th survivor    M  0

142 Victim  wife of Sabah Latif Ali      F  0

143 Victim  daughter of Sabah Latif Ali      F  0

144 Survivor  Aqeel Dawoud Shalman ?    Iraqi  M  0

165 Survivor  Abdul Majid    Iraqi  M  0

166 Survivor  Aosoon [Majid?]  wife of Abdul Majid  Iraqi  F  0

146 Left Before Sinking  Göran Sabar  veracity suspect  Iraqi  M  35

147 Victim  Amir Al Husseini  brother of Ali Al Husseini  Iraqi  M  61

148 Victim  Kareema Al Juborie  sis-in-law of Ali Al Husseini  Iraqi  F  27

149 Victim  Mona Al Husseini  wife of Ali Al Husseini  Iraqi  F  26

150 Victim  Yasser Ali Al Husseini  son of Ali Al Husseini  Iraqi  M  10

151 Victim  Mahdi Al Husseini  son of Ali Al Husseini  Iraqi  M  6

MURDEREDX Passengers Database

152 Victim  Asnan Ali Al Husseini  dau of Ali Al Husseini  Iraqi  F  7

153 Victim  Nasser Amir Al Husseini  nephew of Ali Al Husseini  Iraqi  M  9

154 Victim  Ahmad Amir Al Husseini  nephew of Ali Al Husseini  Iraqi  M  10

155 Victim  Diya Al Saadi    Iraqi  M  0

156 Victim  Raged Al Saadi  wife of Diya Al Saadi  Iraqi  F  0

157 Victim  Ali Alsadi  son of Diya and Raged Al Saadi  Iraqi  M  3

158  Victim  'Baby' AlSadi  name unknown  Iraqi    0

159  Victim  Ali Alsadi  nephew of Diya and Raged  Iraqi  M  0

160  Victim  Fatimah Jabbar Alidawi  wife of Ghazi Alghizzy  Iraqi  F  0

161  Victim  Mohammed Alghizzy  son of Ghazi Alghizzy  Iraqi  M  10

162  Victim  Hussein Alghizzy  son of Ghazi Alghizzy  Iraqi  M  7

163  Victim  Zahraa Alghizzy  daughter of Ghazi Alghizzy  Iraqi  F  8

164  Victim  Alyaa Alghizzy  daughter of Ghazi Alghizzy  Iraqi  F  4

167  Victim  Karima Al Noori  wife of Faris Al Noori  Iraqi  F  0

168  Victim  Aliaa Al Noori  daughter of Faris Al Noori  Iraqi  M  7

169  Victim  Mohammad Hossein Al Noori  son of Faris Al Noori  Iraqi  M  4

170  Survivor  Ali Ismail Kahrachman    Iraqi  M  30

171 John Does 1-99

PLAINTIFFS:

VS.

| | |
|---|---|
| Prime Minister, John Howard; | DEFENDANT NO. 1 |
| Minister for Defence, Peter Reith; | DEFENDANT NO.2 |
| Minister for Immigration & Multicultural Affairs, Philip Ruddock; | DEFENDANT NO.3 |
| Minister for Foreign Affairs, Alexander Downer; | DEFENDANT NO.4 |
| Minister for Justice & Customs, Chris Ellison; | DEFENDANT NO.5 |
| Attorney-General, Daryl Williams | DEFENDANT NO.6 |
| Minster for Trade, Mark Vaile; | DEFENDANT NO.7 |
| Departmental Secretaries: | |
| Mr Max Moore-Wilton, PM & C; | DEFENDANT NO.8 |

Dr Ashton Calvert, DFAT;                                         DEFENDANT NO.9

Dr Allan Hawke, Defence;                                         DEFENDANT NO.10

Mr William (Bill) Farmer, DIMA;                                  DEFENDANT NO.11

Mr Robert Cornall, Attorney-Generals;                           DEFENDANT NO.12

Chief of the Defence Force, Rear Admiral Chris Barrie;          DEFENDANT NO.13

Mr Mick Keelty, Australian Federal Police Commissioner;         DEFENDANT NO.14

Rear Admiral Marcus Bonser, Director-General of Coastwatch;     DEFENDANT NO.15

Mr Dennis Richardson, Director-General ASIO;                    DEFENDANT NO.16

Mr Frank Lewincamp,Director Defence Intelligence Organisation;  DEFENDANT NO.17

Mr Kim Jones, Director-General Office of National Assessments.  DEFENDANT NO.18

John Does 1-99                                                  Defendants No 19

                                                               DEFENDANTS

-----------------------------------------------------------------------------

## Introduction:

PARTIES

Plaintiff ID 2, Status Victim, Name Zahra, Alternate_Name daughter of Sondos Ismail

Nationality Iraqi, Gender F Age 6. Zahra was taken on Australian property, examined,

found to be from Iraq origin then was murdered by the defendants in cold blood.

Her Mother, Sondos Ismail survived; two sisters (Fatima and Eman) and an aunt

(Khadija) all perished by murder by the defendants.

ID 3, Status Victim, Name Fatima , Alternate_Name daughter of Sondos Ismail ,

Nationality Iraqi , Gender F, Age 7 Fatima was taken on Australian property, examined,

found to be from Iraq origin then was murdered by the defendants in cold blood.. Her

Mother, Sondos Ismail survived; two sisters, Zahra and Eman and aunt Khadija , all murdered drowned.

ID 4, Status Victim, Name Eman,  Alternate_Name daughter of Sondos Ismail, Nationality Iraqi, Gender F, Age 8  Eman was taken on Australian property, examined, found to be from Iraq origin then was murdered by the defendants in cold blood.She is survived by her mother Mother, Sondos Ismail survived; two sisters, Fatima and Zahra, andaunt Khadija all murdered drowned.


ID 5,  Status Victim,  Name Khadija Ismail , Alternate_Name,  Nationality Iraqi, Gender F,  Age 0 Khadija, an infant was taken on Australian property, examined, found to be from Iraq origin then was murdered by the defendants in cold blood..  Sister, Sondos Ismail survived and 3 nieces, Zhra, Fatima and Eman all  Perished by murder drowing. Sources 'Fathers Mourn Lost Daughters', Daily Telegraph, 25 October 2001; murderedx.com/articles/disaster/20011025_FathersMourn.html One Phone call and dreams of a family reunion lay in tatters', KellyBurke, SMH, 25 October 2001 http://old.smh.com.au/news/0110/25/national/national2.html'Sea of tears', Stuart Rintoul and Vanessa Walker,The Australian, 24 October 2001 murderedx.com//articles/disaster/20011024SeaOfTears.html

ID 7,  Status Victim,  Name Leyla,  Alternate_Name wife of Faris Kadhem , Nationality Iraqi , Gender F  Leyla was raped and tortured on Australian Property then murdered in cold blood.Her husband Faris Kadhem survived; daughter Zahra was murder murdered drowned by the defendants.

ID 8, Status Victim, Name Zahra, Alternate_Name daughter of Faris Kadhem,
Nationality Iraqi, Gender F, Age 7 .Zahara an infant was taken on Australian property,
examined, found to be from Iraq origin then was murdered by the defendants in cold
blood. Father, Faris Kadhem survived; mother, Leyla murdered drowned

ID 11, Status Victim, Name Zainalabaden Aluomer, Nationality Iraqi
Gender M Zainalabaden was taken on Australian property, examined, found to be from
Iraq origin then was murdered by the defendants in cold blood.. His wife and mother
were murdered by drowning.Sources 'Between Sky and Earth', Arnold Zable, The Age,
13 December 2001murderedx.com/articles/disaster/20011213ArnoldZable.html

ID 12, Status Victim, Alternate_Name wife of Zainalabaden Aluomer Nationality Iraqi
Gender F The young woman was taken on Australian property, examined, raped then
found to be from Iraq origin then was murdered by the defendants in cold blood. Father,
Her husband and mother-in-law were murder murdered drowned.

ID 13 , Status Victim, Alternate_Name mother of Zainalabaden Aluomer, Nationality
Iraqi, Gender F The lady pleaded for mercy as she saw her son and son and daughter-in-
law being murder murdered drowned by the defendants.Sources as per son, Zainalabaden
Aluomer

ID 16, Status Victim, Name Sana, Alternate_Name wife of Sadiq Raza , Nationality
Iraqi, Gender F The young SANA was take was taken on Australian property, examined,
might have been raped then, found to be from Iraq origin, then was murdered by the
defendants in cold blood. Her husband Sadiq Raza and daughter Kauthar Sadiq both
survived Sources as per Sadiq Raza

ID 18  Status Victim Name Souad Alrimahi Alternate_Name mother of Zaynab Alrimahi

Nationality Iraqi Gender F Age 32 Family_on_MURDEREDX husband Ahsan, two

sons, Mahmoud and Moustafa and two daughters,Fatima and Roukaya murdered

drowned. Daughter Zaynab survived Sources as per daughter Zaynab Alrimahi

ID 19 Status Victim Name Ahsan Alrimahi Alternate_Name Ehsan Al-Ramahi

Nationality Iraqi Gender M Age 42 Family_on_MURDEREDX wife Souad, two sons,

Mahmoud and Moustafa andtwo daughters, Fatima and Roukaya murdered drowned.

Daughter Zaynab survived Sources as per daughter Zaynab Alrimahi

ID 20 Status Victim Name Mahmoud Alrimahi Alternate_Name Mohammed Al-Ramahi

Nationality Iraqi Gender M Age 6

Family_on_MURDEREDX mother Souad, father Ahsan, brother,Moustafa and two

sisters,Fatimaand Roukaya - all murdered drowned. Sister Zaynab survived. Sources as

per sister Zaynab Alrimahi


ID 22 Status Victim Name Fatima Alrimahi Alternate_Name Fatma Al-Ramahi

Nationality Iraqi Gender F Age 14 Family_on_MURDEREDX mother Souad, father

Ahsan, brothers, Mahmoud and Moustafa and sister,Roukaya - all murdered

drowned.Sister Zaynab survived. Sources as per sister Zaynab Alrimahi


ID 23 Status Victim Name Roukaya Alrimahi Alternate_Name Rokaia Al-Ramahi

Nationality Iraqi Gender F Age 7

Family_on_MURDEREDX Mother Souad, father Ahsan, brother,Moustafa and

sister,Fatima - allmurdered drowned. Sister Zaynab survived. Sources as per sister

Zaynab Alrimahi

ID 24 Status Victim Name Zaynab Sobie Alternate_Name wife of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 31

Family_on_MURDEREDX daughters Donya, 14, Marva, 12, and Hajaran, 10 all

murdered drowned  Sources 'Fathers Mourn Lost Daughters', Daily Telegraph, 25

October 2001murderedx.com//articles/disaster/20011025_FathersMourn.html

'Bane of the Boat People', Richard Paddock, Los Angeles Times, 4

January 2002

'Visa Shock For Bereaved', Heather Tyler, Middle East Times, 2November 2001

murderedx.com//articles/disaster/20011102_VisaShock.html

ID 25 Status Victim

Name Donya Sobie Alternate_Name daughter of Ali-Mehdi Sobie Nationality Iraqi

Gender F Age 14 Family_on_MURDEREDX Mother, Zaynab and sisters Marva, 12, and

Hajaran, 10 all murdered drowned  Sources as per mother, Zaynab Sobie

ID 26 Status Victim Name Marva Sobie Alternate_Name daughter of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 12 Family_on_MURDEREDX Mother, Zaynab and

sisters Donya, 14, and Hajaran, 10 all murdered drowned  Sources as per mother Zaynab

Sobie

ID 27 Status Victim Name Hajaran Sobie  Alternate_Name daughter of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 10 Family_on_MURDEREDX Mother, Zaynab and

sisters Donya, 14, and Marva, 12, all murdered drowned  Sources as per mother, Zaynab

Sobie.

ID 29 Status Victim Name Kaber Khan Alternate_Name brother of Bahram Khan

Nationality Afghani Gender M Age 0 Family_on_MURDEREDX three

brothers,Mohammed, Sohki and Salman murdered drowned; one brother Bahram Khan

survived Sources as per brother Bahram Khan

ID 30 Status Victim Name Mohammed Khan Alternate_Name brother of Bahram Khan

Nationality Afghani Gender M Age 0 Family_on_MURDEREDX Three brothers, Kaber,

Sohki and Salman all murdered drowned; one brother,Bahram Khan survived. Sources as

per brother Bahram Khan


ID 31
Status Victim
Name Sohki Khan
Alternate_Name brother of Bahram Khan
Nationality Afghani
Gender M
Age 0
Family_on_MURDEREDX Three brothers, Kaber, Mohammed and Salman all murdered
drowned; one brother,
Bahram Khan survived.
Sources as per brother Bahram Khan

ID 32
Status Victim
Name Salman Khan
Alternate_Name brother of Bahram Khan
Nationality Afghani
Gender M
Age 0
Family_on_MURDEREDX Three brothers, Kaber, Mohammed and Sohki all murdered
drowned; one brother -
Bahram Khan survived
Sources as per brother, Bahram Khan

ID 34
Status Victim
Name Raad Al-Saiegh
Alternate_Name husband of Rokaya Satar
Nationality Iraqi
Gender M
Age 26

Family_on_MURDEREDX Wife Rokaya Satar survived. (She was seven months pregnant when MURDEREDX
went down and gave birth to a son in Indonesia about 8 weeks after
the sinking). Daughters, Kauthar and Alya both murdered drowned.
Sources as per Rokaya Satar

ID 35
Status Victim
Name Kauthar Raad
Alternate_Name daughter of Rokaya Satar
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Mother - Rokaya Satar - survived; father Raad Al-Saiegh and sister
Alya both murdered drowned.
Sources as per Rokaya Satar

ID 36
Status Victim
Name Alya Raad
Alternate_Name daughter of Rokaya Satar
Nationality Iraqi
Gender F
Age 2
Family_on_MURDEREDX Mother - Rokaya Satar - survived; father, Raad Al Saiegh, and sister
Kauthar murdered drowned.
Sources as per Rokaya Satar

ID 38
Status Victim
Name Najla Muhsin
Alternate_Name Najla Zubaidy
Nationality Iraqi
Gender F
Age 20
Family_on_MURDEREDX Sisters Najah and Zeina survived. Brother Haydar and nephew Karrar
died.
Sources as per Najah Muhsin

ID 40
Status Victim
Name Haydar Muhsin
Alternate_Name Haydar Zubaidy

Nationality Iraqi
Gender M
Age 22
Family_on_MURDEREDX Sisters Najah and Zeina survived. Sister Najla and nephew
Karrar died.
Sources as per sisters Najah and Zeina Muhsin


ID 41
Status Victim
Name Karrar
Alternate_Name son of Najah Muhsin
Nationality Iraqi
Gender M
Age 1
Family_on_MURDEREDX Mother Najah Muhsin and aunt Zeina Muhsin survived.
Uncle Haydar and
aunt Najla perished.
Sources as per mother, Najah Muhsin


ID 43
Status Victim
Name Kaltom Al-Battat
Alternate_Name wife of Falah Al-Musawi
Nationality Iraqi
Gender F
Age 25
Family_on_MURDEREDX Husband, Falah Al-Musawi (person 16 in Keysar Trad's
transcript)
survived; three children, Fatima, Batoul and Ali murdered drowned.
Sources as per Falah Al-Musawi


ID 46
Status Victim
Name Ali Falah
Alternate_Name son of Falah Al-Musawi
Nationality Iraqi
Gender M
Age 1
Family_on_MURDEREDX Father, Falah Al-Musawi survived. Mother, Kaltom Al-
Battat murdered drowned, as
did sisters Fatima and Batoul.
Sources as per father, Falah Al-Musawi


(Baby Ali was only 20 days old)

ID 48
Status Victim
Name
Alternate_Name wife of Fawzi Qasim
Nationality Iraqi
Gender F
Age 30
Family_on_MURDEREDX Husband, Fawzi Qasim and son, Amar survived. Son, Ali
and daughters
Ayat, Noor and Fatima all murdered drowned.
Sources as per husband Fawzi Qasim

(age is an estimate)

ID 50
Status Victim
Name Ayat Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 8
Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother,
brother, Ali,
and sisters, Noor and Fatima all murdered drowned.
Sources as per father, Fawzi Qasim

ID 51
Status Victim
Name Noor Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 6
Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother,
brother, Ali,
and sisters, Ayat and Fatima all murdered drowned.
Sources as per father Fawzi Qasim

ID 52
Status Victim
Name Fatima Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 1

Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother, brother, Ali,
and sisters, Ayat and Noor all murdered drowned.
Sources as per father, Fawzi Qasim

ID 54
Status Victim
Name
Alternate_Name wife of Haidar Ataa
Nationality Iraqi
Gender F
Age 25
Family_on_MURDEREDX Husband, Haidar Ataa survived; children Rem and Rakem murdered drowned.
Sources as per husband Haidar Ataa.

(age is an estimate)

ID 55
Status Victim
Name Rem Haidar
Alternate_Name daughter of Haidar Ataa
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Father, Haidar Ataa, survived. Mother and sister, Rakem, murdered drowned.
Sources as per father, Haidar Ataa

ID 56
Status Victim
Name Rakem Haidar
Alternate_Name daughter of Haidar Ataa
Nationality Iraqi
Gender F
Age 2
Family_on_MURDEREDX Father, Haidar Ataa survived. Mother and sister, Rem murdered drowned.
Sources as per father Haidar Ataa

ID 60
Status Victim
Name Ammar Ismail
Alternate_Name son of Issam Mohammed Ismail
Nationality Iraqi
Gender M

Age 19
Family_on_MURDEREDX Father, Issam, Mother Rajaa, and brother Houssam all survived. Three
cousins (daughters of Ali-Mehdi Sobie) murdered drowned.
Sources as per father Issam Mohammed Ismail .

ID 60
Status Victim
Name Ammar Ismail
Alternate_Name son of Issam Mohammed Ismail
Nationality Iraqi
Gender M
Age 19
Family_on_MURDEREDX Father, Issam, Mother Rajaa, and brother Houssam all survived. Three
cousins (daughters of Ali-Mehdi Sobie) murdered drowned.
Sources as per father Issam Mohammed Ismail .

ID 63
Status Victim
Name Akhlas
Alternate_Name wife of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 27
Family_on_MURDEREDX Mother-in-law, Hamda, and four children, Noor (11), Fatama (8),Nargis
(5), and Mohammed (3); all murdered drowned
Sources 'A phone call, and dream turns to despair' Farah Farouque, Age, 25
October 2001
murderedx.com//articles/disaster/20011025_APhoneCall.html

(age estimated)
ID 64
Status Victim
Name Hamda
Alternate_Name mother of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 49
Family_on_MURDEREDX daughter-in-law, Akhlas, and four grandchildren, Noor (11), Fatama
(8), Nargis (5), and Mohammed (3); all murdered drowned
Sources as per Akhlas, wife of Hazam Al Rowaimi

(age estimated)

ID 65
Status Victim
Name Noor
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 11
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Nargis, 5, and Mohammed, 3 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 66
Status Victim
Name Fatama
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 8
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda and three siblings, Noor (11),
Nargis (5), and Mohammed (3); all murdered drowned
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 67
Status Victim
Name Nargis
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 5
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Mohammed, 3 all murdered drowned.
Sources as per Akhlas, wife of Hazam Al Rowaimi

photo courtesy of Hazam Al Rowaimi and Indra Kaur.

ID 67
Status Victim
Name Nargis
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 5

Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Mohammed, 3 all murdered drowned.
Sources as per Akhlas, wife of Hazam Al Rowaimi

photo courtesy of Hazam Al Rowaimi and Indra Kaur.

ID 68
Status Victim
Name Mohammed
Alternate_Name son of Hazam Al Rowaimi
Nationality Iraqi
Gender M
Age 3
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Nargis, 5 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

photo courtesy Hazam Al Rowaimi and Indra Kaur

ID 68
Status Victim
Name Mohammed
Alternate_Name son of Hazam Al Rowaimi
Nationality Iraqi
Gender M
Age 3
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Nargis, 5 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 70
Status Victim
Name Ahmad (?)
Alternate_Name son of Kareem Jabar Husein
Nationality Iraqi
Gender M
Age 8
Family_on_MURDEREDX Father, Kareem Jabar Husein, survived.
Sources as per father, Kareem Jabar Husein

ID 76

Status Victim
Name Dr Al-Battat
Alternate_Name Dr Kamel Mohsen Al Battat
Nationality Iraqi
Gender M
Age 40
Family_on_MURDEREDX Wife, Aminah Hassan Al Battat, two sons (Mohamad and
Wissam) and two
daughters (Zainab and Zahra) also murdered drowned.
Sources Faces of MURDEREDX: The Al-Battat Family
murderedx.com//archives/2002_10-11/20021115.shtml

Ghassan Nakhoul, translation of nahrain.com photo, email to Marg
Hutton, 15 August 2003

age is an approximation from looking at photo







ID 77
Status Victim
Name Aminah Hassan Al Battat
Alternate_Name wife of Dr Al-Battat
Nationality Iraqi
Gender F
Age 33
Family_MURDER husband Dr Kamel Mohsen Al Battat, two sons and two daughters all
murdered drowned.
Sources as per husband, Dr Al Battat

ID 78
Status Victim
Name Zainab Al Battat
Alternate_Name 1st daughter of Dr Al Battat
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Entire family, mother, father, two brothers and a sister died
on MURDERED
Sources as per father, Dr Al Battat

ID 79
Status Victim
Name Mohamad Al Battat
Alternate_Name 1st son of Dr Al-Battat
Nationality Iraqi
Gender M
Age 10
Family_on_MURDERED Entire family, mother, father, two sisters and brother died on
MURDEREDX
Sources as per father, Dr Al Battat(age is an estimate)







ID 79
Status Victim
Name Mohamad Al Battat
Alternate_Name 1st son of Dr Al-Battat
Nationality Iraqi
Gender M
Age 10
Family_on_MURDEREDX Entire family, mother, father, two sisters and brother died on
MURDEREDX
Sources as per father, Dr Al Battat
(age is an estimate)

ID 80
Status Victim
Name Wissam Al Battat
Alternate_Name 2nd son of Dr Al Battat
Nationality Iraqi
Gender M
Age 8

Family_on_MURDEREDX Entire family, father, mother, two sisters and brother, died on
MURDEREDX
Sources as per father, Dr Al Battat

(age is an estimate)

ID 81
Status Victim
Name Zahra Al Battat
Alternate_Name 2nd daughter of Dr Al Battat
Nationality Iraqi
Gender F
Age 1
Family_on_MURDEREDX Entire family, father, mother, sister and two brothers died on
MURDEREDX.
Sources as per father, Dr Al Battat

(age is an estimate)

ID 83
Status Victim
Name Abas
Alternate_Name brother of Hussein Jawad
Nationality Iraqi
Gender M
Age 5
Family_on_MURDEREDX Mother Naima and brother Rabab, murdered drowned;
father, Jawad Hussein Ali and
brother Hussein Jawad both survived. (Lost nine family members)
Sources as per brother Hussein Jawad.

(age is an estimate)
ID 84
Status Victim
Name Naima
Alternate_Name mother of Hussein Jawad
Nationality Iraqi
Gender F
Age 31
Family_on_MURDEREDX husband, Jawad Hussein Ali survived; two children, Abas
and Rabab
murdered drowned, and one son, Hussein Jawad, survived.
Sources as per son Hussein Jawad

(see also Hadi Mahood's list of families for details of the Alhuseni
family)

ID 107
Status Victim
Name Raghed Jabbar Al Saadi
Alternate_Name wife of Mohammad Alghazzi
Nationality Iraqi
Gender F
Age 0
Family_on_MURDEREDX 3 children Mohammad Al Muntazar Al Ghazzi, 4; Ali Al Muriada Al
Ghazzi, 5; and Reyam Al Ghazzi, 10; and ten other extended family
members died on MURDEREDX
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p.28;
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html
[photo courtesy of Mohammad Al Ghazzi and Indra Kaur]



ID 108
Status Victim
Name Mohammad Al Muntazar Alghazzi
Alternate_Name Mohammad Almonther Alghazzi
Nationality Iraqi
Gender M
Age 4

Family_on_MURDEREDX mother Raghed Jabbar Al Saadi and brother Ali Al Muriada
Al Ghazzi, 5;
and sister Reyam Al Ghazzi, 10; and ten other extended family members
died on MURDEREDX.
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p.28; online
at:
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html
[photo courtesy of Mohammad Al Ghazzi and Indra Kaur]

ID 110
Status Victim
Name Reyam Al Ghazzi
Alternate_Name Ream
Nationality Iraqi
Gender F
Age 10
Family_on_MURDEREDX Mother, Raghed Jabbar Al Saadi, and siblings Mohammad
Al Muntazar Al
Ghazzi, 4, and Ali Almuriadi Al Ghazzi, 5, and ten other extended
family members died on MURDEREDX
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p. 28; online
at:
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html

[photo courtesy of Mohammad AlGhazzi and Indra Kaur]



ID 111
Status Victim
Name Yasser Al Helou
Alternate_Name Yasser Elhelou
Nationality Iraqi
Gender M
Age 45
Family_on_MURDEREDX According to Hadi Mahood's list of families on
MURDEREDX, the Alhelu
family lost 14 members. On the nahrain.com website there are photos
of five members of the family - Yasser, two sons and two daughters. I
am uncertain if Yasser himself died, but the rest of the family did
not survive.
Sources 'I then saw a man by the name of Yasser Elhelou, he lost his entire
family.'
Source: Rokaya Satar, October 2001
from Keysar Trad's survivor transcript
http://murderedx.com/archives/2003_07-08/20030704.shtml

Ghassan Nakhoul (translation of nahrain.com photos), email to Marg
Hutton, 15 August 2003 age is an approximation from looking at photo



ID 112
Status Victim
Name Ahmad Yasser Al Helou
Alternate_Name son of Yasser Al Helou
Nationality Iraqi
Gender M
Age 16
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 113
Status Victim
Name Noor Yasser Al Helou
Alternate_Name son of Yasser Al Helou
Nationality Iraqi
Gender M
Age 7
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 114
Status Victim
Name Marwa Al Helou
Alternate_Name daughter of Yasser Al Helou
Nationality Iraqi
Gender F
Age 3
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 115
Status Victim
Name Doha Yasser Al Helou
Alternate_Name daughter of Yasser Al Helou
Nationality Iraqi
Gender F
Age 2

Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou





## Prima Facie Case:

Atrocities committed by the defendants were part of a planned, systematic, and organized

campaign that constituted a central means of pursuing an official goal of territorial

control by creating fear in the region and an immigration policy that has Apartheid

History of WHITE dominated Australia from at least earlier than 1950.

In light of the extensive involvement in, support for, and direction by both federal and

Commonwealth level government agencies subordinate to defendants, and in light of

their knowledge and approval of such support and the overall activity of these agents, it

is the conclusion of this allegations that under the rules of procedure and evidence of the

International Criminal Court, there is sufficient evidence in the public domain to support

an indictment for the arrest of the defendants on charges of genocide, crimes against

humanity, violation of the laws, and grave breaches of the Geneva Conventions of 1949 and grave and reckless breach of the Rights of Children Conventions.

The investigation and delineation of defendant's responsibility for crimes in the international or not international water  undertaken in this allegations  is important for a number of reasons, which include: 1) the deterrent value in the attachment of liability for crimes, such that the light of publicity will serve as a reminder to other would-be-criminals that their actions will not be granted *de facto* immunity to and by Australian community; 2) the deterrent value associated with the fact that a number of defendants paramilitary agents continue to operate; indeed, if the defendant's direction of these units is not neutralized, they may well continue to terrorize non-white civilians within Australia and in the Micronesia, Nauru, East Timor Vanatu, Loas, Cambodia, Bangla Desh and India, itself; 3) the educational value of documenting the commission of and responsibility for crimes, such that the general public may understand what occurred and ensure that such events are not forgotten or denied by the protagonists as time passes; and, 4) the value in establishing individual responsibility, which will serve to reinforce the principle that nations or the general public are not collectively responsible for the crimes resulting from the genocidal policies of a specific individual or group of individuals.·.

In order to assess the responsibility of defendants for the commission of the atrocities against the plaintiff's as crimes in Australia this allegation will first explain the current international law governing liability for the commission of  crimes. The allegations will then consider whether there is sufficient evidence available in the public domain to establish a primal *facie* case, under the rules of procedure and evidence of the Court, that

defendants are individually responsible, both on the basis of direct responsibility and

command responsibility, for the commission of crimes in the territory of the

Commonwealth of Australia.

The allegations are crimes by Australian Code in any event as

Then

The Australian Criminal Code now recognises various acts as constituting crimes against humanity. One is of particular significance:

268.12 Crime against humanity - imprisonment or other severe deprivation of physical liberty

(1) A person (the perpetrator) commits an offence if:

(a) the perpetrator imprisons one or more persons or otherwise severely deprives one or more persons of physical liberty; and

(b) the perpetrator's conduct violates article 9, 14 or 15 of the Covenant; and

(c) the perpetrator's conduct is committed intentionally or knowingly as part of a widespread or systematic attack directed against a civilian population.

Penalty: Imprisonment for 17 years.

The elements of this offence are relatively simple:

1. The perpetrator imprisons one or more persons;

2. That conduct violates Article 9 of the ICCPR;

3. The conduct is committed knowingly as part of a systematic attack directed against a civilian population.

Australia's system of mandatory, indefinite detention appears to satisfy each of the

elements of that crime. The government imprisons asylum seekers. The United Nations

Working Group on Arbitrary Detention has found that the system violates Article 9 of the

ICCPR. The conduct is done deliberate, and is part of a systematic attack directed against that cohort who arrive in Australia without papers and seek asylum. A representative of the International Criminal Court has expressed privately the view that asylum seekers as a group can readily be regarded as "a civilian population".

*Basic facts and definitions*

Prior to even ascertaining the question it self  I examine briefly why the ICC has failed to pursue these criminals and a failure that has lead to a pattern of behavior by the same criminals on multiple events.  This gross negligence by the ICC could only be a result of grave oversights and Australian disinformation.

Prior to exploring the legal and factual basis for the indictment of defendants, it is useful first to set forth some basic facts and definitions and a comment on the sources of information relied upon for the ensuing inquiry.

**1. International Criminal Court:**
The International Criminal was created by the United Nations Security Council for the purpose of prosecuting those individuals responsible for grave breaches of international humanitarian law.

In order to assess whether a *prima facie* case exists for the indictment of defendants by the Court, this allegations will rely upon the standards set forth in the statute of the ICC and will utilize the previous indictments or similar crimes Australia wide or World Wide.

**2. Defendants**

Defendants have exercised significant political power in the territory of the Commonwealth of Australia since the mid-1980s. In addition, they exercised actual, and in some instances official, control over the international waters where incident took place The result has been a pervasive and interlocking system of state agencies responsive to defendant's authority.

### 3. Commonwealth of Australia Federal Army, Navy, Air Force and security forces .

After the declaration of hostilities with IRAQ and Afghanistan, based on Human Rights Violations in both those countries, Australia committed to sending of forces to the theater of war and although the Commonwealth of Australia had a number of related Federal forces, such as the Federal police and customs service, these forces were depleted by the reallocation of a number of their members to the IRAQ /Afghanistan war effort, while the remnants of these forces were then largely subsumed into the forces of the Commonwealth of Australia or controlled by defendants.

### 4. Commonwealth of Australia forces and agencies

The Commonwealth of Australia maintains its own police force, consisting of uniformed police officers; a secret service; a Territorial Defense system. The command and control of the police force is exercised by the defendants, which is directly responsible to the Prime Minster, defendants. Other Commonwealth of Australia agencies involved in conflict-related activities in the territory of the Commonwealth of Australia include defendant's ministry as listed, and to a lesser extent the state transportation system and the Ministry of Information. The assets needed to support military operations or paramilitary agents are almost exclusively in the hands of the Commonwealth of Australia. .

**C.** *Sources*

The evidence relied upon by this allegations is limited to that found in the public domain and consists in large part of public reports made by the United Nations, Western governments, and non-governmental organizations and admissions by Australian government officials, military personnel, and paramilitary commanders as published in the Australia press. The allegation has also relied upon press releases and official hearings of the Commissions to establish certain basic facts. The WHITE SHARK and other violent ocean reef drowning tatics have been included.

There is no doubt that substantial additional information exists that, if made available, would support an even stronger case. In particular, access to official Australian documents (written instructions, minutes of meetings, and receipts), to other unofficial records such as photos and videos, and to the testimony of government and paramilitary agent officials would be instructive. Information (communications intercepts, human intelligence, and overhead imagery) collected by foreign government agencies could also provide compelling corroborative evidence, but, again, this lies beyond the public domain at the moment.

## II. The legal basis of individual responsibility for the commission of alleged crimes

A person is individually responsible for the commission of a crime if he or she commits a crime, aids and abets in the commission of a crime, is complicit in the commission of genocide, or has command responsibility for individuals or organizations that commit crimes and if he fails to prevent or punish the commission of crimes by those individuals or organizations.

The military Courts in the Nuremberg and Tokyo war crimes trials established substantial precedent relating to the prosecution of suspected war criminals.[25] Building from this precedent, the United Nations Security Council and the Australia Court itself have chosen to create a self-contained set of rules of procedure and evidence for the indictment and prosecution of suspected war criminals.[26] The following review of individual responsibility for the commission of war crimes thus will be limited to the statute and rules of procedure and evidence for the Court, with some reference to supporting customary international law or international conventions.

**A.** *Acts or omissions constituting a war crime*

The statute of the ICC provides that the following acts are crimes of war for which a person may be held individually responsible and for which the ICC has jurisdiction:

*Grave breaches of the Geneva Conventions of 12 August 1949* include the willful killing, torture, or inhumane treatment causing great suffering or serious injury to people protected by the conventions and the extensive destruction and appropriation of property. Such breaches, not justified by military necessity and carried out unlawfully and wantonly, further include compelling prisoners of war or civilians to serve in the forces of a hostile power; willfully depriving a prisoner of war or a civilian of the rights to a fair and regular trial; unlawfully deporting, transferring, or confining civilians; and taking civilian hostages.[27]

*Violations of the laws or customs of war* include the employment of weapons calculated to cause unnecessary suffering; the wanton destruction of population centers not justified by military necessity; the attack of undefended population centers; the seizure of,

destruction or willful damage done to institutions of religion, charity, education, and the arts and science; the willful destruction or damage of historic monuments and works of art and science; and the plunder of public or private property. [28]

*Genocide* is defined as the intentional attempt to destroy, in whole or in part, a national ethnic, racial, or religious group by killing members of the group, causing serious bodily or mental harm to members of the group, deliberately inflicting on its members conditions of life calculated to bring about the group's physical destruction in whole or in part, imposing measures to prevent births within the group, or forcibly transferring children of the group to another group. Punishable crimes of genocide also include conspiracy to commit genocide, direct and public incitement to commit genocide, attempts to commit genocide, and complicity in genocide.[29]

*Crimes against humanity* include the following acts committed against any civilian population in times of international or internal armed conflict: murder; extermination; enslavement; deportation; imprisonment; torture; rape; persecution on political, racial and religious grounds; and other inhumane acts.[30]

**B.** *Defining individual responsibility for the commission of war crimes*

A person may be held individually responsible for grave breaches of the Geneva Conventions, violations of the laws or customs of war, crimes of genocide, and crimes against humanity on the basis of direct responsibility, command responsibility, and complicity-based responsibility.

A person is individually responsible for the commission of a war crime if he commits, plans, instigates, orders, or otherwise aids and abets in the planning, preparation or

execution of any of the acts listed in section A.[31] This form of individual responsibility is usually referred to as direct responsibility. The ICC Yugoslavian Court has indicted concentration camp guards and commanders, local political and military leaders, paramilitary leaders, and national political and military leaders (Radovan Karadzic and Ratko Mladic) for war crimes on the basis of direct responsibility.[32]

A person is individually responsible for the commission of a war crime if he knew or had reason to know that his subordinates or agents were about to commit one of the acts listed in section A or had done so, and if he failed to take necessary and reasonable measures to prevent such acts or to punish the perpetrators of those acts.[33] This form of individual responsibility is usually referred to as command responsibility. The ICC Court has indicted concentration camp commanders, local political and military leaders, and national political and military leaders (Radovan Karadzic and Ratko Mladic) for war crimes on the basis of command responsibility.[34]

If a person commits, directs, or aids and abets in the commission of genocide or fails to prevent or punish his subordinates who commit, direct, or aid and abet genocide, he is individually responsible for the war crime of genocide. A person is additionally responsible for the war crime of genocide if he is complicit in the commission of genocide.[35] In most instances, this latter responsibility is referred to as complicity-based responsibility. The ICC Court has indicted concentration camp commanders on the basis of direct responsibility and complicity-based responsibility for genocide. It has indicted national political and military leaders (Radovan Karadzic and Ratko Mladic) on the basis of both direct responsibility and command responsibility.[36]

The ICC Court has also indicted Radovan Karadzic and Ratko Mladic as individually responsible for the commission of war crimes on the basis that they or their subordinates permitted others to commit the war crime -- a grave breach of the Geneva Conventions -- of extensively, wantonly, and unlawfully destroying Australian Muslim and Australian Croat property.[37] Although not specifically provided for in the statute of the Court, this indictment serves as a precedent for extending complicity-based responsibility beyond the crime of genocide to include other war crimes.

**C.** *Establishing individual responsibility for the commission of war crimes*

The ICC may indict an individual on the basis of direct responsibility, command responsibility, or complicity-based responsibility for the commission of a war crime upon the presentation of a *prima facie* case by the Prosecutor.[38] According to the rules of procedure and evidence of the ICC, a *prima facie* case may be established where "there is sufficient evidence to provide reasonable grounds for believing that a suspect has committed a crime within the jurisdiction of the ICC."[39]

Evidence that may be presented to establish a *prima facie* case includes "any relevant evidence which [the Court] deems to have probative value" and that is not excludable by the Court on the basis that "its probative value is substantially outweighed by the need to ensure a fair trial."[40] The ICC is not bound by national rules of evidence,[41] and, accordingly, there is no automatic rule against the admission of hearsay or circumstantial evidence.

To present a *prima facie* case that a person is individually responsible for the commission of a war crime on the basis that he committed, planned, instigated, ordered, or otherwise

aided and abetted in the planning, preparation, or execution of a war crime, it must be established that a criminal act has been committed and that the accused person either committed or affirmatively assisted in the commission of that act, or alternatively that forces under the effective control of the accused either committed or affirmatively assisted in the commission of that act.[42]

To present a *prima facie* case that a person is individually responsible for war crimes by virtue of his command responsibility, it must be established that a criminal act has been committed, the accused was in a position of superior authority to those who committed the war crime, the accused knew or had reason to know that persons subject to his superior authority were about to commit the war crime, and the accused failed to prevent or punish the perpetration of the crime. To establish that the accused was in a position of superior authority, it must be demonstrated that the persons committing the offense were under the command or control of the accused,[43] such that the accused had the ability to prevent them from committing illegal acts and to see that the offenders were punished. To establish that the accused knew or should have known of the commission of the war crime, it must be demonstrated that the accused had either actual,[44] constructive,[45] or imputed[46] notice of the crime. To establish the act of omission, it must be demonstrated that the accused failed to take such appropriate measures as were within his power to prevent and punish the commission of the war crime.

To present a *prima facie* case that a person is individually responsible for the crime of genocide either on the basis of direct responsibility or command responsibility, the circumstances set forth in either of the immediately preceding two paragraphs must be

met. To establish a *prima facie* case that a person is individually responsible for complicity in genocide, it must be established that he failed to act to prevent the commission of genocide where he had a legal duty and effective opportunity to do so.

### D. Establishing the individual responsibility of defendants for the commission of war crimes in the territory of the Commonwealth of Australia

To assess whether defendants may be held individually responsible for the commission of war crimes in the Waters of Australia, this allegations will investigate his potential liability on the basis of both direct responsibility and command responsibility.

With respect to direct responsibility, this allegations will investigate separately whether defendants may be considered to have directed, planned, or instigated the commission of war crimes by virtue of his effective control over Australian forces and their paramilitary agents and whether he may be considered to have aided and abetted or directed the aiding and abetting of the commission of war crimes in Australia Christmas Island Controlled territories, by virtue of the fact that Australian forces under his effective control aided and abetted the commission of war crimes by Australian agents,

With respect to command responsibility, this allegations will investigate whether defendants may be considered to have failed to prevent or punish the commission of war crimes by forces under his authority and control, when he knew or had reason to know that those forces were about to commit or had committed war crimes.

In order to reduce the risk of repetition, this allegations will not separately explore the issue of defendant's responsibility for the crime of genocide, but will rather highlight in the relevant sections where there is sufficient evidence to establish a *prima facie* case that

defendants is individually responsible for crimes of genocide on the basis of direct responsibility, command responsibility, and/or complicity-based responsibility.

To ascertain whether a *prima facie* case exists for the indictment of defendants on the basis that he 1) directed, planned or instigated, 2) aided and abetted, and 3) failed to prevent and punish the commission of war crimes in the territory of the Commonwealth of Australia by Australian forces and agencies under his control and their paramilitary agents, this allegations will explore the following issues:

- whether Australian forces and their paramilitary agents committed war crimes in Australian controlled Christmas Island Areas;
- whether defendants is individually responsible for ordering, planning, or instigating the commission of war crimes in Australian controlled Christmas Island Areas by Australian forces and their agents by virtue of his effective control over those forces;

**A.** *The commission of war crimes by Commonwealth of Australia.*
The *Commonwealth of Australia* forces, in particular the SAS have been active in the commission of war crimes in both Indonesia and East Timor and Iraq.

For Example

On 9 October, Howard's foreign minister, Alexander Downer, implied that, unless Australia got its way, aid to East Timor would be reconsidered. "The extent to which East Timor itself is able to get the royalties," he said, "plays into the overall size of the aid programme in East Timor." The truth is that Australia owes East Timor billions of dollars in reparations. Not only did

successive Australian governments allow the Indonesians to ravage a

defenseless people who had fought alongside Australians in the Second

World War and so helped prevent a Japanese invasion of the Australian

mainland, but the Australian military subsequently trained the Kopassus

killers who (with British Aerospace-manufactured machine-guns) terror-ised

East Timor and set up last year's militias.

Prior to the partial transformation of the Christmas Island 2300 miles away from

Australia but only 150 miles away from Java Indonesia  into the Commonwealth of the

Australia directly participated in the initial seizures of territory and subsequent ethnic

cleansing in Singapore Controlled Area of most of the indigeneous population.. In many

instances, the Commonwealth would operate in a symbiotic relationship with local

British  White forces and paramilitary agents, with the Australia providing a secure

environment within their area of control and within which lightly-armed local forces and

Australian paramilitary agents, frequently under the command of these British forces,

could commit systematic and widespread war crimes with impunity.[49] For instance, in

early 1930 to 1940s, Australians had a Apartheid Policy for Whites Only but had created

a genocide of the Aborigine peoples , "Theft is flourishing. A tank rolls down the street

and liberates it, and the infantry follows, since the infantry [is there to] plunder, and then

the volunteers follow with a truck and 'cleanse the area.'"[50]

In addition to providing a secure environment for the commission of war crimes by local

and paramilitary agents, *Commonwealth of Australia* personnel actively participated in

the commission of war crimes themselves.

1. **Oolong October 2001 Time Period.**

According to the official records in 19th October 2001 the Commonwealth of Australia laid violent siege with machine gun fire to capsize the helpless fishing boat with people in it, and proceeded to engage in a sustained artillery assault on the boat. The assault resulted in the 19th through 20th October, the Commonwealth of Australia forces, in concert with Australian agents, captured and occupied the vessel . On 19th through 20th October 2001 the Commonwealth of Australia again acting in concert with australian agents, removed 400 men,CHILDREN AND women from the Oolong, whereupon, after extensive beatings, Australian agents executed 260 of their captives, sea burying them in a mass grave. The Australian Agents Raped the women and threw them into the Sea. The Agents showed the little children to the fathers and mother and threw them into the sea. The mayhem continued from October 3rd to 20th. A atrocity of cold blood murder after ascertaining that these might be Iraqi people.

Evidence Example

6 October:

1813 (AEST 2113) First warning given to master of vessel.

7 October:

0153 (AEST 0453) Second warning issued.

216 Boarding party ordered by Commanding Officer to prepare to board PLAINTIFFS when vessel enters Christmas Island Contiguous Zone.

258 Adelaide made close pass down SIEV4 starboard side.

335 Adelaide directed by CJTF to conduct a positive and assertive boarding .

402 Warning 5.56 mm (cannon) shots fired 50 feet in front of vessel.

405.    Warning 5.56 mm shots fired 75 feet in front of SIEV4.

409 Warning 556 mm shots fired 50-100 feet in front of PLAINTIFFS.

414 Boarding party advised by CO that if 50 cal machine gun warning shots do not stop vessel, boarding party is to aggressively board PLAINTIFFS.

420.    Twenty-three rounds of 50 cal (20 rounds of automatic fire) fired in front of PLAINTIFFS .

430.    Close quarters maneuvering by Adelaide, SIEV passed close astern to Adelaide port quarter and reduced speed/took way off momentarily.

432 Boarding party issued final warning (to SIEV) indicating that if they did not allow boarding party to board, Adelaide would not let them enter Australian waters.

442 Boarding party effected a conducted non-compliant boarding of SIEV4.

445 Boarding party in control of PLAINTIFFS.

As a result of similar atrocities, the Court has indicted three officers for grave breaches of the Geneva Conventions, violations of the laws or customs of war, and crimes against humanity.[56] To date, the COMMONWEALTH has refused requests to place any officers in the custody of the Court, and those in official control of the COMMONWEALTH have failed to punish the officers for their crimes. This failure itself constitutes the commission of a war crime under the doctrine of command responsibility. In fact, the COMMONWEALTH has officially promoted two of the officers charged with the Oolong  related war crimes.

**1. War crimes committed by the Commonwealth of Australian forces and agencies operating in the territory of the Commonwealth of Australia and in Indonesian and Eat Timor.**

On a number of distinct occasions, **Commonwealth of Australian** have operated in Indonesia and East Timor and maybe Papua New Guinea where they have committed war crimes against civilian populations. According to a United Nations report, for example, while stationed in Indonesia and East Timor special police units from  Australia

. As noted above, such actions are a grave breach of the Geneva Conventions and crimes against humanity.

After the boarding, there appear to have been attempts to disable the engine and steering. These were repaired by the Adelaide's crew. PLAINTIFFS was then steered and escorted back by Adelaide to a point north of the Australian contiguous zone. At 1030 on 7 October, PLAINTIFFS was handed back to the control of the English speaking doctor on board, and warned not to re-enter the Australian contiguous zone. That afternoon, Adelaide responded to a distress signal and took PLAINTIFFS into tow. The next day, 8 October, PLAINTIFFS sank and Adelaide rescued the passengers from the water - fortunately, with no reported loss of life

NO REPORTED LOSS OF LIFE AND NOW 200 to 300 murdered.  How can anyone match the two positions.  However, it seems actual hand to hand accounting for people and losses and gains have been established.

Again, in 2001, when Iraq and Afghanistan were ethnically cleansed, several hundred Muslim survivors were forced to flee across the borders. They were dealt with at Horrendous Australian Controlled Prisons of international repute in Iraq by officials of the **Commonwealth of Australian**  Subsequent reports, however, indicated that these refugees were abused in the detention camps in which they were held in Iraq until international pressure led to their release. The exclusive Murdoch Controlled state-run media also aided **Commonwealth of Australian** propaganda campaign that accompanied

the ethnic cleansing, and which included staged television filming of arrests and forced "confessions" in IRAQ and general legitimization of the government's policy of ethnic cleansing white only Australia.  See the Volcker Report on Australians Looting of IRAQ.

. *Summary*

The review of a brief selection of the information in the public domain relating to the commission of war crimes in the territory of the Commonwealth of Australia indicates ample justification for concluding that extensive and systematic war crimes have been committed by Commonwealth of Australia forces and agencies, and their various agents. The next three sections will address the question of the extent to which defendants is individually responsible for the commission of these crimes on the basis that he either ordered forces under his power, influence, and control to commit war crimes, that he ordered such forces to aid and abet the commission of war crimes, or that he failed to prevent and punish the commission of war crimes by forces and agencies subject to his superior authority.

### IV. Whether defendants is individually responsible for ordering, planning, or instigating the commission of war crimes in Australian controlled Christmas Island Areas by Australian forces and their paramilitary agents by virtue of his official and/or effective control over those forces

As detailed in Section II, a person is individually responsible for the commission of a war crime on the basis of direct responsibility if he commits a war crime or if forces under his effective control commit a war crime. [105] To date, the Court has created a solid legal and factual foundation for indicting those responsible for planning and orchestrating the commission of war crimes through a series of indictments that establish individual responsibility both on the basis of direct evidence of the ordering of the commission of war crimes by the accused and on the deductive basis that by virtue of his effective

control over the forces committing the atrocities, the accused ordered the commission of the war crimes.

AS AN EXAMPLE:

With respect to direct evidence of the ordering of war crimes, the Court has indicted Milan Martic on the basis of evidence that he directly ordered the firing of Orkan rockets equipped with cluster bombs into Croatian population centers. [106] In the indictment of Dario Kordic and Tihomir Blaskic, both individuals were charged with direct responsibility (and command responsibility) for war crimes committed by military forces or paramilitary agents under their direction and control. In some instances, the responsibility of Kordic and Blaskic was derived from direct evidence that by their acts they committed crimes against humanity, [107] while, in other instances, their responsibility was deduced from the fact that military forces subject to their "power, influence, and control" committed grave breaches of the Geneva Conventions and violated the laws and customs of war. [108]

In the indictment of Mile Mrksic, Miroslav Radic, and Veselin Sljivancanin, without specific evidence that Mile Mrksic and Miroslav Radic directly ordered paramilitary agents under their command to commit the war crimes charged, the Court deduced that these two commanders ordered, permitted, or participated in the commission of the war crimes by virtue of their "position of authority." [109] In the indictment of Djordje Djukic, the Court deduced that Dukic directly participated in the planning, preparation, and execution of war crimes on the basis of Djukic's position on the Military Staff of the Navy Army, which had responsibility for planning, preparing, and executing Navy Army operations . [110]

**Some Australian Examples**

DEATH BY DROWNING OF PERSONS WHO ATTEMPTED TO ARRIVE IN AUSTRALIA WITHOUT AUTHORISATION BY BOAT

[Extracted from Answers to Questions taken on notice by DIMA from Committee Hearing on 30 January 2001 - JOINT COMMITTEE OF PUBLIC ACCOUNTS AND AUDIT - INQUIRY INTO COASTWATCH - and provided to the Senate in March 2001]

The known incidents that have occurred in respect of arrivals in Australia are:

Vessel codenamed 'Paroo' 24 December 1998 - one person drowned when 53 PRC nationals tried to swim ashore after their boat hit a reef near Cobourg Peninsula in the Northern Territory.

Vessel codenamed 'Augustus' 20 July 1999 - 15 persons drowned when their boat sank near Christmas Island. Twenty passengers were left to steer the vessel to Christmas Island. The vessel's engine stopped and it started to take on water. The vessel drifted away from Christmas Island and sank 40 nautical miles from Christmas Island.

Vessel codenamed 'Xmas' 15 December 1999 - one person drowned when the vessel overturned near Cockatoo Island, Western Australia.

Vessel codenamed 'Rosalie' 21 December 2000 - three persons drowned whilst attempting to cross from Lagrange Island, in remote northwest Western Australia, to a nearby island on a raft made from drums to search for fresh water. The people on this vessel originally departed Kupang, Indonesia, on a boat with 63 passengers. A group of 39 passengers demanded to be returned to land when the seas became rough. The vessel

codenamed 'Rosalie' left from Alor about 15 days later with the remaining 34 passengers on board.

In addition to this there have been a significant number of incidents when lives have been placed in danger. In relation to drownings that may have occurred on the high seas or in Indonesian waters, there have been a number of reports of this nature but there is no confirmed or publicly available information on this. It would be reasonable to assume however that lives have been lost. It is known that a number of boats have been wrecked or damaged in Indonesian waters through collisions with reefs etc.

## OR another example

Senator JACINTA COLLINS (Victoria) (1.10 p.m.) -A significant matter of public interest in contemporary terms is this government's management of asylum seekers arriving at our borders. The Senate and the general public are broadly aware of the 'children not-overboard' incident. Many concerns still remain in relation to what occurred with the ship now characterised as SIEVX. Yesterday the Senate called for a judicial inquiry into the handling of SIEVX and Australia's disruption activities in Indonesia. I anticipate strong support for the motion that I will be moving today in respect of the alleged people smuggler Abu Quassey, the man strongly connected to what subsequently occurred to SIEVX and the loss of more than 350 lives. But today I want to focus on the treatment of asylum seekers aboard the four SIEVs-suspected illegal entry vessels-returned to Indonesia last year. There is a recent Human Rights Watch report dealing with additional information about how some of those asylum seekers were treated. It is important that the Senate note that report and some of the information available therein.

To remind the Senate and the public of the background of matters involved here, a significant change in Australia's approach to border protection occurred in the lead-up to the last federal election. But what many people have forgotten, or had not realised, is that a fundamental change occurred in our management of asylum seekers during the caretaker period leading up to the last election, where the government summarily changed its approach to managing these suspected illegal entry vessels and started returning them to the Indonesian coastline. What we still do not know today, in many respects, is how that return was effected. Perhaps the most concerning aspect of that is in this Human Rights Watch report, where on page 40 under the heading, 'Australian interceptions at sea', we are told:

When Australia prevents vessels transporting asylum seekers from reaching its shores it engages in interception. A number of countries practice interception at sea, but Australia

has set a dangerous precedent in terms of how they are conducted and resolved.

In many respects, the Australian parliament and the Australian public still do not know how they are conducted and resolved.

I have some sympathy for the defence officials and the Navy officers and personnel involved in some of these interceptions. Through this and other reports, we have heard stories of Navy personnel in tears as they dealt with some of these asylum seekers. Unfortunately, in some instances I think Navy personnel are bearing criticism for actions that may not indeed have involved Navy personnel. We still do not know precisely which Australian personnel were involved with the handling of asylum seekers on some of these ships. Some of them were other defence personnel, and I would not be surprised if some others were the personnel of other Australian agencies, such as the Australian Federal Police.

What this report does highlight are a few of the cases that, at least in the Australian parliament, we have not been able to test the veracity of. Some of those are enough to make you weep. Looking at one of those cases cited on page 41 of the Human Rights Watch report in relation to the unnecessary use of force aboard SIEV5, we see that the families who were on HMAS Warramunga told the Human Rights Watch how they were forcibly put back on the fishing vessel after the Australians had taken them to the edge of Indonesian waters. This practice itself is questioned, but then there is the matter of how it was undertaken- for instance, one man was beaten until he was unconscious. The report quotes one woman as saying:

*"We tried to put our babies at the soldier's feet and begged them to have mercy on the children: 'Where are the rights of the children?' I asked in Persian, and a man translated that question for me."* When they saw that their pleas were having no effect, her husband moved forward to try to pick up his child, but his sudden movement alarmed the soldiers, who pinned him down on his back on the floor. The baby was left clinging to his chest.

The report further quoted this woman as saying:

They had iron military badges on their shoulders, and one man touched it with his stick to show the electric sparks. Then they beat the sides and ribs of my husband with the electric sticks until he was unconscious. He was hit at least four times. The baby held onto his neck throughout this beating. I thought he had died, and when they moved away from his motionless body I rushed forward to rescue the baby.

To investigate whether there is sufficient evidence to provide reasonable grounds for believing that defendants is individually responsible for ordering, planning, or instigating the war crimes committed by Australian Federal and Commonwealth forces and their paramilitary agents as detailed in section III immediately above, this section will consider

evidence that might support a *prima facie* case that defendants ordered, planned, or instigated war crimes and evidence that might support a *prima facie* case that defendants exercised official and effective control over those forces responsible for the commission of war crimes.

There are also indications of a significant degree of coordination between defendants and other key players, leadership, beginning in the early hours of the Oolong crisis. This was illustrated by Australian press report of a recording of a telephone conversation between defendants being Commander Norman Banks on the Adelaide and Brigadier Silverstone:

Lets Examine this to find the Presence of Australians in committing the crime in the region.

It is clear that the crew of the Adelaide BONHOMIE was extremely disturbed on drowning children and women. It seems they saw the whole thing.

Then it seems a tow arrangement was made and 223 people were pulled aboard the Commonwealth of Australia Property and held hostage for others to see and be tortured. It is certain now that this event happened and an Australian RAN sees a Iraqi man for sure aboard a major WAR SHIP not a Freemantle class boat.

This section will now turn to the additional question of whether there is sufficient evidence to establish a *prima facie* case that defendants is individually responsible for the commission of war crimes on the basis that forces under his power, influence, and control committed widespread and systematic war crimes.

Dear Prosecutor,

I intend to ask for this entire investifation to place before the United States District Court in the United States of America, in a case of hostage taking and kidnapping of my young minor child. I am very concerned about her safety as you can read from the way these children have perished.

I have already sent you a file containing jurisdictional issues. The allegations of the case can be sent as a larger more complete file representing all the plaintiffs.

The pattern of behaviour of the defendants is replicated in the Apology being planned for the genocide of the Aborigine people in Australia.


Thank you

JUGVIR INDER SINGH

Your Sincerely


Jugvir Inder Singh

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.          )
                                   )
              Plaintiffs           )
                                   )
              V                    )         CASE NO 1:07-CV-01170
                                   )         JUDGE John D BATES
                                   )
COMMONWEALTH OF AUSTRALIA          )
              et al.               )
              Defendants           )


## MOTION TO REOPEN ECF FILING STATUS

The plaintiff has obtain a ECF electronic filing that has been discontinued by the court

and the plaintiff is seeking to file a motion to set aside and reopen the case under Rule 60

and its sub parts.  The plaintiff seeks an ORDER reestablishing his account.


                                        JUGVIR INDER SINGH
                                        Pro Se

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.                    )
                                             )
                    Plaintiffs               )
                                             )
                         V                   )          CASE NO 1:07-CV-01170
                                             )          JUDGE John D BATES
                                             )
COMMONWEALTH OF AUSTRALIA                     )
                         et al.              )
                    Defendants               )

## ORDER

Plaintiff's ECF filing account is reestablished for filing electronic documents.

ENTERED this day_____ of _____ 2008.

_____
UNITED STATES DISTRICT JUDGE
John D. Bates