CASE 1:07 cv-01170-JDB    Document 29    Filed on                    Page 1 of 11

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.              )

                                                  )

           Plaintiffs              )

                                                  )

           V              )              CASE NO 1:07-CV-01170

                                                )              JUDGE JOHN D.BATES

                                                  )

COMMONWEALTH OF AUSTRALIA    )

et al.                                    )

                       Defendants

# MOTION RESPONSE TO THE DEFENDANTS OPPOSITION TO VACATE AND OR REOPEN

## ABSTRACT:

The plaintiff's have alleged torture and although Rule 60 (b) does not require a showing of "extraordinary circumstances" the plaintiff will show the court the test is met by continuing to allege :

1. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and,

with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances".

2.  In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances".

3.  The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh and so invokes "extraordinary circumstances".

4.  The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances".

5.  Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

    a.  "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the

position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

6. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances".

7. Defendants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances".

8. Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope

and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances".

9.  The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances".

10. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances".

11. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

    a.  "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.)

      b. A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

      c. Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

12. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism, dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions, and psychotic episodes so invokes "extraordinary circumstances".

13. Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances".

14. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

15. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances".

16. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational, if not necessarily benign - has been irrevocably undermined. Social institutions are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances".

17. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

18. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances".

19. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".

20. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

21. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".

22. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

    a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

23. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other "objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".

24. Spitz makes the following observation:

    a. "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate

with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

25. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961. Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender: Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

   a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

26. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human

environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever.

27. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation.

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

CASE 1:07 cv-01170-JDB    Document 29    Filed on                    Page 11 of 11

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | ) | |

# ORDER

UPON DUE CONSIDERATION of the plaintiffs Response to the defendants motion to oppose rehearing and vactating order  and Memorandum Points Supporting and any opposition is thereto, herby

ORDERED: CASE IS WITHIN THE RULE 60 and subchaptesr and is set for rehearing after discovery and written intrrogataires are completed

ORDERED: CASE IS SET FOR JURY TRIAL.

ENTERED this _____day of _____2007.

_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

**MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF RESPONSE AND IN OPPOSITION TO DEFENDANTS OPPOSITION TO VACATE AND OR REOPEN**

## ARGUMENT ONE:

1. Here, Plaintiffs allege torts that occurred both outside and inside the United States. Plaintiffs concede that the *acts* of *Defendant itself* were all "committed outside the United States." *See* Plaintiffs' Response Brief. "because the wrongful behavior is alleged to have occurred in Australia and perhaps India" SEE ORDER . Moreover, any omissions committed by the defendants itself clearly occurred inside and outside of the United States. Therefore, under FSIA's territorial requirements, the defendant can be held liable for "its own" alleged torts (as opposed to those committed by its

officials or employees), because those alleged torts partly occurred outside of the United States.  SEE ORDER Plaintiff is a resident of Orlando, Florida, proceeding *pro se* and *in forma pauperis*.

2.  Plaintiffs allege that acts and omissions by defendants inside the United States caused personal injuries. Specifically, Plaintiffs allege that Defendant's agents, officials, and employees failed to report known or suspected child abuse, failed to provide adequate care to a minor entrusted to its sovereignty, failed to report plaintiff's child as missing, failed to report the plaintiffs child as held hostage within its sovereignty, have failed to reveal the location of the plaintiffs child, used computers within the sovereign system to change the identity of the plaintiffs child and got CENTERLINK to talk to the plaintiff, deceived the plaintiffs child, a minor that her father is DEAD. These torts – both acts and omissions – alleged to have been committed by the "Defendant's agents, officials, and employees" *in the United States* all certainly occurred within the United States, and thus squarely fall under the tortious activity exception.where the agency CENTERLINK, of the defendants seeks to find the plaintiff in the United States to payout the social security benefits due the family unit.

3. Plaintiffs' claims meet the tortious conduct exception to FSIA's general rule of immunity, the Court must now consider a final issue.  This concerns "the exception within the exception." FSIA will not allow a tort claim, even against officials or employees whose acts and injuries occur in the United States where those officials were exercising their discretionary function.  Called the discretionary function exception, it exempts claims "based upon the exercise or performance or the failure to

exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).

The discretionary function exception of the FSIA is modeled after the corresponding exception in the Federal Tort Claims Act ("FTCA") and is interpreted and applied consistent with FTCA law. *See, e.g., Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018, 1026 (9th Cir. 1987)*.  This exception appears based upon the policy view that foreign states should be immune from the consequences of discretionary acts of employees, even within the scope of their employment.  Courts have found that both the FTCA and FSIA exceptions are intended to preserve immunity "for decisions grounded in social, economic, and political policy." *In re Terrorist Attacks of September 11, 2001*, 349 F.Supp.2d 765, 794 (S.D.N.Y. 2005) (internal citations and quotations omitted).  Consequently, the discretionary function exception preserves immunity for planning-level decisions, as opposed to operational-level decisions.  *Id.* (citations omitted).

4.  Defendant must satisfy two elements to avail itself of FSIA immunity under the discretionary function exception. First, the challenged action must be discretionary; that is, it must involve "an element of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA context, this prong means that if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply.  *Berkovitz*, 486 U.S. at 536. Second, and even if the challenged action did involve an element of judgment or choice, "a court must determine whether that judgment is of the kind the discretionary function

exception was designed to shield." *Id.*; *Gaubert*, 499 U.S. at 322-23. The Supreme Court explained this prong in *Berkovitz* in the following manner: The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. *Berkovitz*, 486 U.S. at 536 (internal citations omitted).

5. To answer the questions posted by the two *Berkovitz* elements, the Court must define Plaintiffs' negligence claims by their constituent elements.  These claims can be distilled into three principal omissions, as laid out in the Complaint: that (1) Defendants failed to *provide safe care* to plaintiff's child entrusted to their care SEE ORDER denying NARA US CITIZEN AND ORDER DENYING preliminary injunctions; that (2) Defendants *failed to warn* plaintiff that his child would be under the care of known or suspected specialists in child separation*;SEE KEVIN RUDD speech Exhbit and Exhibit of Murder* and that (3) Defendants *failed to report* known or suspected child abuse to the appropriate authorities . *See* Complaint and failure to report Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages.  Compl. at 22-39.

6. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional

distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation.

7. The defendants have it is claimed colluded in this pattern of child abuse and murder before and the pattern requirement is now included as EXHIBIT ONE where more than 300 children are murdered by the Defendant, Australia, with the complete knowledge of the defendants India and United Nations.  SEE Complaint

8. Then the defendants themselves admit to the GENOCIDE and systematic removal of families and the Prime Minister Kevin Rudd apology to the Aborigine nation is included as and Exhibit but the collusion between the defendant Australia and united Nations even on this investigation of Genocide and mass trafficking of children has and might never be investigated but the pattern of behavior is causing duress upon the plaintiff as whereabouts of his child being hostage by these sovereigns of protection.


ARGUMENT TWO

9. Liberty finds no refuge in a jurisprudence of doubt from the Due Process Clause of the Fourteenth Amendment. It declares that no State shall "deprive any person of life, liberty, or property, without due process of law." The controlling word in the cases before us is "liberty." Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, since *Mugler v. Kansas*, 123 U.S. 623, 660 -661 (1887), the Clause has been understood to contain a substantive component as well, one "barring certain

government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). As Justice Brandeis (joined by Justice Holmes) observed,

> [d]espite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth [505 U.S. 833, 847] Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. *Whitney v. California*, 274 U.S. 357, 373 (1927) (concurring opinion). [T]he guaranties of due process, though having their roots in Magna Carta's "per legem terrae" and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." *Poe v. Ullman,* 367 U.S. 497, 541 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds) (quoting *Hurtado v. California,* 110 U.S. 516, 532 (1884)).

10. [T]he guaranties of due process, though having their roots in Magna Carta's "per legem terrae" and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." *Poe v. Ullman,* 367 U.S. 497, 541 (1961) and in this case FSIA has given the right to these defendants to do what they want to whoever they want and continue to wave a flag of sovereignty while killing aborigine children and families by the millions, Indonesian children and Iraq children and then the plaintiffs own child in a collusion with the defendant United Nations and with the complete support of the

defaulted defendant India terrorizing ethnic families in Southeast Asia.

11. The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights. We have held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. See, e.g., *Duncan v. Louisiana*, 391 U.S. 145, 147 -148 (1968). It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual against federal interference by the express provisions of the first eight amendments to the Constitution. See *Adamson v. California*, 332 U.S. 46, 68 -92 (1947) (Black, J., dissenting). The United States of America then would become an essential party to the case and a new case will be filed or this judgment will be set aside where sua sponte the judge see the United States is liable.

12. [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment. Poe v. [505 U.S. 833, 849] Ullman, supra, 367 U.S., at 543 (dissenting from dismissal on jurisdictional grounds). Let us examine the behavior of the defendant in light of this liberty and

look at the ORDER itself to understand the depraved nature of this defendant that has

caused "extraordinary circumstances"

Plaintiff then "filed a Human Rights Complaint with the National Human Right

Commission against the State Actors of Australia and others." *Id*. ¶ 42. "[T]he Human

Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

actions[] against the plaintiff. . . ." *Id*. ¶ 43. Plaintiff also filed a *habeas corpus* petition

in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id*. ¶ 46.

Plaintiff filed this action in June 2007, setting forth the following nine counts:

Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil

RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and

Solatium, and Punitive Damages.  Compl. at 22-39.

13. As Justice Harlan observed:

"Due process has not been reduced to any formula; its content cannot be determined by

reference to any code. [505 U.S. 833, 850]   The best that can be said is that, through the

course of this Court's decisions, it has represented the balance which our Nation, built

upon postulates of respect for the liberty of the individual, has struck between that liberty

and the demands of organized society. If the supplying of content to this Constitutional

concept has, of necessity, been a rational process, it certainly has not been one where

judges have felt free to roam where unguided speculation might take them. The balance

of which I speak is the balance struck by this country, having regard to what history

teaches are the traditions from which it developed as well as the traditions from which it

broke. That tradition is a living thing. A decision of this Court which radically departs

from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint." *Poe v. Ullman*, 367 U.S., at 542 (dissenting from dismissal on jurisdictional grounds). *See also Rochin v. California, supra, at 171-172 (Frankfurter, J., writing for the Court) ("To believe that this judicial exercise of judgment could be avoided by freezing `due process of law' at some fixed stage of time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines, and not for judges").*

5. It is conventional constitutional doctrine that, where reasonable people disagree, the government can adopt one position or the other. See, e.g., Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955). That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty. Thus, while some people might disagree about whether or not the flag should be saluted, or disagree about the proposition that it may not be defiled, we have ruled that a State may not compel or enforce one view or the other. See West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624 (1943); Texas v. Johnson, 491 U.S. 397 (1989). Like in this case the defendants can say well father here is your kid on the line talk to her and other reasonable things but the malicious behaviour as patterned in the Genocide murder of children by this defedants causes the extraordinary conditions and environment to seek relief.

6. Once again the plaintiffs allege a fervent view of individual liberty and the force of stare decisis have led the Court to this conclusion. Ante, at 853. Today a majority reaffirms that the Due Process Clause of the Fourteenth Amendment establishes "a

realm of personal liberty which the government may not enter," ante, at 847 - a realm whose outer limits cannot be determined by interpretations of the Constitution that focus only on the specific practices of States at the time the Fourteenth Amendment was adopted. These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the [505 U.S. 833, 924] liberty protected by the Fourteenth Amendment. Ante, at 851 (emphasis added). The matter has become a constitution matter for if the United States is to sponser the defendants in the hostage taking and child removal and kidnap depriving him Due Process Clause of the Fourteenth Amendment establishes "a realm of personal liberty which the government may not enter," and this reason too the motion to vacate will withstand the test.

7. The Court today reaffirms the long recognized rights of privacy and bodily integrity. As early as 1891, the Court held, [n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others. . . . Union Pacific R. Co. v. Botsford, 141 U.S. 250, 251 (1891). Throughout this century, this Court also has held that the fundamental right of privacy protects citizens against governmental intrusion [505 U.S. 833, 927] in such intimate family matters as procreation, childrearing, marriage, and contraceptive choice. See ante, at 847-849. These cases embody the principle that personal decisions that profoundly affect bodily integrity, identity, and destiny should be largely beyond the reach of government. These soverign defedants cannot claim the congress invased their actions in majesty of the constitution and therefore will cause the case to be

transferred to the United States Supreme Court.

ARGUMENT THREE

8. Furthermore, because the Plaintiffs' allege torture, and other major violations of universally recognized standards of international law, the U.S. Government's expression of concern regarding potential "interference with foreign relations" are irrelevant to the proper disposition of these claims, since these abuses are considered so abhorrent that they are not subject to immunity claims under any circumstances, and most especially where Congress has specifically recognized and authorized the legitimacy of these claims and the authority of U.S. Courts to deal with them through passage of the Torture Victim Protection Act of 1991 (TVPA), 28 U.S.C.A. § 1350 Note (2006).   In short, nothing presented in the Suggestion of Immunity and Statement of Interest provides a legitimate or judicially recognized basis for granting the Defendant immunity, or for dismissing this complaint.   Being that the plaintiff is under great duress the motion to vacate might be considered for "any other reason" being that the plaintiffs are a victim of this abhorrent act of torture.

9. The existing sources of law providing diplomatic agents with immunity from legal process in the United States are the Diplomatic Relations Act and the treaty it implements, the Vienna Convention. 22 U.S.C.A. § 254d. These legal standards reflect the evolutionary development of international law regarding immunity of diplomatic agents. Tachiona ex. rel. Tachiona v. Mugabe, 186 F.Supp.2d 383, 387 (S.D.N.Y. 2002). Historically, the customary law of diplomatic immunity, which provided broad immunities to all foreign diplomatic agents, was based on the premise that the receiving state owed an ambassador the same respect due to the foreign

sovereign he represented. See, e.g., Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Countries eventually recognized, however, that granting diplomatic immunity to a foreign agent often deprived their own nationals of their legal rights. Hellenic Lines, Ltd. v. Moore, 345 F.2d 978 (D.C. Cir. 1965). Consequently, the customary law of diplomatic immunity narrowed to include only those immunities needed to properly carry out the diplomat's functions. Id.    This matter was a subject of discovery and will be revealed at trial in the diplomatic VISA applications lodged by the defendants as they perform the services of torture and child seperation and hostage keeping and violation of United States Core Values.

10. "In resolving a motion to dismiss, the Court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of plaintiff." Mukaddam, 111 F.Supp.2d at 461, citing Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). The Court must take as fact, then, that the Defendant's acts of torture as alleged in the Plaintiffs' complaint are true, leaving no room for an argument that foreign sovereign immunity or the act of state doctrine might provide alternative grounds for protecting Defendant from this Court's jurisdiction, because these violations of international law can never be considered lawfully authorized governmental actions subject to immunity. Kadic, 70 F.3d at 250; Siderman de Blake, 965 F.2d at 717.

11. With regard to the "interference with foreign relations" argument that is one of the principal elements of the U.S. Government's Statement of Interest presented to this Court, this argument cannot serve as a basis for dismissal of otherwise valid legal claims, especially where, as in this case, the allegations in the Complaint have been

specifically recognized by act of Congress, and by the U.S. Supreme Court, as a
legally sufficient basis for the Court to exercise its jurisdiction. Alien Tort Claims Act
(ATCA), 28 U.S.C.A. § 1350 (2006); Torture Victim Protection Act (TVPA), 28
U.S.C.A. § 1350 Note; Sosa v. Alvarez-Machain, 542 U.S. 692, 728 (2004). It is
important to note the special nature of the legal claim that serves as the basis for this

12. Just as the principle of foreign sovereign immunity cannot protect a defendant from
claims alleging major violations of universally accepted international human rights
norms, such as the prohibition against torture, the U.S. Government cannot protect a
defendant and the defendant's acts of torture and by making the argument of potential
"foreign policy impact." Presbyterian Church of Sudan v. Talisman Energy, Inc.,
2005 WL 2082846 (S.D.N.Y. 2005). While the Supreme Court has directed courts to
give "serious weight" to the U.S. Government's views on the potential impact a
particular case might have on foreign relations, the Sosa decision reaffirmed the
settled principle that the Executive Branch's assertion of foreign policy concerns,
"would not necessarily preclude adjudication." Sosa, 542 U.S. at 733 n. 21 (2004);
Kadic, 70 F.3d at 250. "Ultimately, it is [the courts'] responsibility to determine
whether a political question is present, rather than to dismiss on that ground simply
because the Executive Branch expresses some hesitancy about the case proceeding."
Sarei v. Rio Tinto, 2006 WL 2242146 at *8 (9th Cir. 2006); See also, Mujica v.
Occidental Petroleum Corp., 2005 WL 1962673, at *24 (C.D. Cal. June 28, 2005),
citing Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1236 (11th Cir. 2004).

13. The U.S. Government's expression of concern that the case will impact its
prerogative to invite foreign officials to come to the United States is not an adequate

basis for dismissal of the case because the case does not "turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature," nor does it "uniquely demand single-voiced statement of the Government's views." Baker v. Carr, 369 U.S. 186, 211 (1962). When international norms are specifically defined in legal terms that are accepted and applied universally, such as the prohibitions against torture and genocide, they do not "defy judicial application." Sosa, 542 U.S. at 733. Congress also has specifically mandated in the TVPA that the judiciary should hear claims for reparations brought by victims of torture and genocide. 28 U.S.C.A. § 1350 Note; Sosa, 542 U.S. at 728. Consequently, ATCA and TVPA claims based on torture and genocide abuses cannot be considered inherently nonjusticiable, even if they touch on political or foreign policy matters. Sarei, at *10, citing Baker, 369 U.S. at 211.  Because the Complaint is entirely consistent with the U.S. Government's position condemning human rights abuses the Plaintiffs are not asking the Court to second guess a political decision made by the executive branch or legislature. While it is true that courts have dismissed complaints in certain circumstances on political question/foreign policy grounds where they deemed a case could adversely affect a political decision that has already been made, that issue is not presented here. Sarei at *9-10, citing Baker, 369 U.S. at 211. The Complaint does not seek reconsideration or reversal of previous political decisions by the executive branch or legislature. See e.g., Alperin v. Vatican Bank, 410 F.3d 532, 562 (9th Cir. 2005); In re South African Apartheid Litigation, 346 F.Supp.2d 538, 554 S.D.N.Y. 2004).

14. The Court should exercise its legislated authority to decide this case because it is brought under the ATCA and TVPA for claims of torture that both Congress and the Supreme Court have recognized as actionable in U.S. courts. Congress has expressly tasked the judiciary with providing the legal means for victims of the most serious human rights abuses to obtain damages in U.S. courts by adopting the ATCA and TVPA. Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.1984). "[I]n implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations". Id. at 797 (Edwards, J., concurring). "The department to whom this has been constitutionally committed is none other than our own--the Judiciary." Kadic, 70 F.3d at 249; see also, Restatement (Third) of Foreign Relations Law § 111(2) (1987) (cases arising under international law are within the judicial authority of the United States). This mandate is particularly clear, as the U.S. Supreme Court recognized in Sosa, given the language and the Congressional mandate of the TVPA, where Congress specifically reaffirmed the availability of damage awards to torture victims through legal actions of this type. 542 U.S. at 728, citing H.R. Rep. No. 102-367, pt. 1, p. 3 (1991). Given this mandate from the legislature, upheld by the Supreme Court very recently in Sosa, this Court has jurisdiction to move forward with the Plaintiffs' case and would violate explicit Congressional and Supreme Court standards if it fails to do so. arising under international law are within the judicial authority of the United States). This mandate is particularly clear, as the U.S. Supreme Court recognized in Sosa, given the language and the Congressional mandate of the TVPA, where Congress specifically reaffirmed the availability of damage awards to torture victims

through legal actions of this type. 542 U.S. at 728, citing H.R. Rep. No. 102-367, pt. 1, p. 3 (1991). Given this mandate from the legislature, upheld by the Supreme Court very recently in Sosa, this Court has jurisdiction to move forward with the Plaintiffs' case and would violate explicit Congressional and Supreme Court standards if it fails to do so.

15. Then in the case of defendant India Jackson v. Beech, 636 F.2d 831, 835 (D.C. Cir. 1980) ("Once a defendant fails to file a responsive answer, he is in default"). Diplomatic presentations of immunity defenses to courts through the U.S. Department of State, while they were commonplace prior to the passage of the FSIA, are no longer considered the appropriate means for registering such claims with the courts. Even the most well-established immunity claims such as head of state immunity are now generally treated as affirmative defenses that must be directly presented to the court by the Defendant official or affected foreign government themselves in order for them to be considered. Failure to present even a valid claim in this way is treated as a waiver of rights. Since the Defendant's claims have been waived through his failure to affirmatively assert any defenses to this Court, the Plaintiffs' motion for a default judgment should be reinstated and granted, consistent with the Federal Rules of Civil Procedure, which provide for default judgments in precisely these types of cases. Mwani v. Bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005), citing Jackson, 636 F.2d at 836. As noted in Mwani, the need to provide a default claim when a foreign defendant does not respond to a lawsuit is particularly compelling when no other forum is available for the plaintiffs to bring their claims, as is the case here. Id. at 7, 13-14.   INDIA, defendant is in default and the ORDER is erroneous.

ARGUMENT THREE

16. It is alleged, and publically proven by Senate of the United States of America, Volcker Report and Cole Commission that the defendants were providing material support to a STATE sponsored terrorist IRAQ was aided and abetted by the defendants SEE EXHIBIT THREE to FOURTEEN  In *Flatow v. Islamic Republic of Iran* Judge Lamberth held that the routine provision of financial assistance to a terrorist group in support of its activities constitutes "providing material support or resources" for a terrorist act within the meaning of the statute.[119] *Eisenfeld v. Islamic Republic of Iran* concluded that the defendants acted as a conduit and provided funds within the meaning of 28 U.S.C. ? 1605(a)(7), which, in turn, caused the deaths of Matthew Eisenfeld and Sara Duker.[128] Upon concluding that the elements of the Act had been proven by the plaintiffs, the court awarded compensatory damages totaling $27,161,002 and punitive damages in the amount of $300 million.[129]   How can the court overlook this material support evidence of the defendants to IRAQ when it has been established and matter of discovery that the defendants were dealing with the ENEMY of UNITED STATES and constitutes a Rule 60(b) any reason to set aside a order invocation.

17. *The Thomas Sutherland Case* Following a bench trial, as required by 28 U.S.C. ? 1608(e), the court issued a twenty-four page ruling on June 25, 2001, concluding that the Iranian government and the MOIS had supported the terrorist organization that kidnapped Dr. Sutherland[153] and that "Hezbollah, funded by MOIS and Iran, was

responsible for the kidnapping and captivity of Thomas Sutherland."[154] According to
the court, the defendants' conduct constituted acts of "torture" and "hostage taking,"
or the material support for such acts, within the meaning of 28 U.S.C. ? 1605(a)(7).[155]
Therefore, the defendants were not entitled to immunity under the FSIA and were
civilly liable to the Sutherlands for battery, assault, false imprisonment, loss of
consortium, intentional infliction of emotional distress, and loss of solatium.[156] The
plaintiffs were variously awarded more than $53 million in compensatory damages,
as well as $330 million in punitive damages against the MOIS.[157] In setting the
compensatory damage award for Dr. Sutherland, the court stated explicitly that it was
following a "formula which has evolved as a standard in the hostage cases brought
under ? 1605(a)(7) . . . . This formula grants the former hostage roughly $10,000 for
each day of his captivity."[158] To explain its use of such a formula, the court wrote:

18. Any skepticism about the adequacy of this formula must overcome the steep
presumption that Congress has tacitly approved its use . . . . The formula was
developed prior to October 28, 2000. On that day, Congress enacted the Victims of
Trafficking and Violence Protection Act of 2000. The Act obligated the United States
Treasury to pay terrorist victims -- including the hostages described above -- the
amount awarded them at trial, or in other words, about $10,000 per day of captivity.
Congress must be presumed to have [been] aware of the damages formula, and its
failure to amend it in any way amounts to tacit approval of the scheme.[159]

19. State-sponsored terrorist acts deprive innocent civilians of their lives, their liberty,
their property, and other rights and freedoms protected by various regional and
international human rights treaties,[22] including the Universal Declaration of Human

Rights,[23] the International Covenant on Civil and Political Rights,[24] the European Convention for the Protection of Human Rights and Fundamental Freedoms,[25] the American Declaration of the Rights and Duties of Man,[26] and the American Convention on Human Rights.[27] As a result, some courts and commentators have suggested that state-sponsored terrorism might even violate a *jus cogens* norm[28] of customary international [*pg 111] law.[29] This point remains hotly disputed, especially in the United States.[30] Nevertheless, it is notable that in at least ten resolutions of the United Nations General Assembly, states have reaffirmed their "unequivocal condemnation of all acts, methods and practices of terrorism as criminal and unjustifiable, wherever and by whomever committed."[31]

## ARGUMENT FOUR

20. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances". The ORDER is clear to this fact in "the  kidnapping of his five-year-old daughter" and this fact Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others."  *Id*. ¶ 42.  "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id*. ¶ 43. Plaintiff also filed a

*habeas corpus* petition in the Supreme Court of India, which "directed [him] to go
to Australia. . . ." *Id.* ¶ 46.

Plaintiff filed this action in June 2007, setting forth the following nine counts:
Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil
RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and
Solatium, and Punitive Damages.  Compl. at 22-39.

21. In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is
    corporeal agony that compels the sufferer to mutate, his identity to fragment, his
    ideals and principles to crumble. The body becomes an accomplice of the tormentor,
    an uninterruptible channel of communication, a treasonous, poisoned territory so
    invokes "extraordinary circumstances".

22. The plaintiff fosters a humiliating dependency of the abused on the perpetrator.
    Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct
    causes of his degradation and dehumanization. As plaintiff sees it, he is rendered
    bestial not by the defendants as sadistic bullies around him, but by his own flesh and
    so invokes "extraordinary circumstances" being that he is filing pro se for himself and
    child NARA.

23. Then the ORDER can be set aside as the child NARA is an essential party to the case
    and has submitted to the jurisdiction of the court SEE order Denying US citizen and
    ORDER denying preliminary injunction but is denied being a prty to the case as the
    estate of the Singhderewa family.

24. The concept of "body" can easily be extended to "family", or "home". Torture is often
    applied to kin and kith, compatriots, or colleagues. This intends to disrupt the

continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances".

1. Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

    a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

2. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances".

3. Defedants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances".

4. Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances".

5. The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances".

6. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances".

7. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

    a. "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.)

    b. A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

    c. Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

8. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism,

dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions, and psychotic episodes so invokes "extraordinary circumstances".

9.  Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances".

10. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

11. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances".

12. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational,

if not necessarily benign - has been irrevocably undermined. Social institutions are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances".

13. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

14. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances".

15. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".

16. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of

victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

17. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".

18. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

   a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

19. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other

"objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".

20. Spitz makes the following observation:

    a.   "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

21. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender: Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

22. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever.  The death sentence without any cause, upon a father and his child has been sponsored by the United States Sovereign Partners the defendants.

S/

_____

JUGVIR INDER SINGH

EXHIBIT 1

International Criminal Court

COURT IN THE HAGUE

1  Survivor  Sondos Ismail  Sondous Ismael Ibrahim  Iraqi  F  26

2  Victim  Zahra  daughter of Sondos Ismail  Iraqi  F  6

3  Victim  Fatima  daughter of Sondos Ismail  Iraqi  F  7

4  Victim  Eman  daughter of Sondos Ismail  Iraqi  F  8

5  Victim  Khadija Ismail    Iraqi  F  0

6  Survivor  Faris Kadhem    Iraqi  M  34

7  Victim  Leyla  wife of Faris Kadhem  Iraqi  F  0

8  Victim  Zahra  daughter of Faris Kadhem  Iraqi  F  7

9  Montaha Sam Adam  Muntaha Adim  Iraqi  F  53

10  Al Saadi Sharmookh  Radeed Sabah Sharkoukh  Iraqi  M  19

11  Victim  Zainalabaden Aluomer    Iraqi  M  0

12  Victim    wife of Zainalabaden Aluomer  Iraqi  F  0

13  Victim    mother of Zainalabaden Aluomer  Iraqi  F  0

14  Survivor  Sadiq Raza  Sadeq Al-Abodie  Iraqi  M  25

15  Survivor  Kauthar Sadiq  daughter of Sadiq Raza  Iraqi  F  2

16  Victim  Sana  wife of Sadiq Raza  Iraqi  F  0

17  Survivor  Zaynab Alrimahi  Zaineb Al-Ramahi  Iraqi  F  12

18  Victim  Souad Alrimahi  mother of Zaynab Alrimahi  Iraqi  F  32

19  Victim  Ahsan Alrimahi  Ehsan Al-Ramahi  Iraqi  M  42

20  Victim  Mahmoud Alrimahi  Mohammed Al-Ramahi  Iraqi  M  6

21  Victim  Moustafa Alrimahi  Mostafa Al-Ramahi  Iraqi  M  4

22  Victim  Fatima Alrimahi  Fatma Al-Ramahi  Iraqi  F  14

23  Victim  Roukaya Alrimahi  Rokaia Al-Ramahi  Iraqi  F  7

24  Victim  Zaynab Sobie  wife of Ali-Mehdi Sobie  Iraqi  F  31

25  Victim  Donya Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  14

26  Victim  Marva Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  12

27  Victim  Hajaran Sobie  daughter of Ali-Mehdi Sobie  Iraqi  F  10

28  Survivor  Bahram Khan  Bahram Tor  Afghani  M  45

29  Victim  Kaber Khan  brother of Bahram Khan  Afghani  M  0

30  Victim  Mohammed Khan  brother of Bahram Khan  Afghani  M  0

31  Victim  Sohki Khan  brother of Bahram Khan  Afghani  M  0

32  Victim  Salman Khan  brother of Bahram Khan  Afghani  M  0

33  Survivor  Rokaya Satar  Roukayya Sattar  Iraqi  F  22

34  Victim  Raad Al-Saiegh  husband of Rokaya Satar  Iraqi  M  26

35  Victim  Kauthar Raad  daughter of Rokaya Satar  Iraqi  F  4

36  Victim  Alya Raad  daughter of Rokaya Satar  Iraqi  F  2

37  Survivor  Najah Muhsin  Najah Zubaidy / Mrs. Elzoueni  Iraqi  F  26

38  Victim  Najla Muhsin  Najla Zubaidy  Iraqi  F  20

39  Survivor  Zeina Muhsin  Zeina Zubaidy  Iraqi  F  18

40  Victim  Haydar Muhsin  Haydar Zubaidy  Iraqi  M  22

41  Victim  Karrar  son of Najah Muhsin  Iraqi  M  1

42  Survivor  Falah Al-Musawi  Hassan Jassem / Falah Hassan  Iraqi  M  31

43  Victim  Kaltom Al-Battat  wife of Falah Al-Musawi  Iraqi  F  25

44  Victim  Fatima Falah  daughter of Falah Al-Musawi  Iraqi  F  5

45  Victim  Batoul Falah  daughter of Falah Al-Musawi  Iraqi  F  2

46  Victim  Ali Falah  son of Falah Al-Musawi  Iraqi  M  1

47  Survivor  Fawzi Qasim  Fawziqasim  Iraqi  M  37

48  Victim   wife of Fawzi Qasim  Iraqi  F  30

49  Survivor  Amar Fawzi Khasim  son of Fawzi Qasim  Iraqi  M  12

50  Victim  Ayat Fawzi  daughter of Fawzi Qasim  Iraqi  F  8

51  Victim  Noor Fawzi  daughter of Fawzi Qasim  Iraqi  F  6

52  Victim  Fatima Fawzi  daughter of Fawzi Qasim  Iraqi  F  1

53  Survivor  Hadar Ata Essa Qeiaswand  Haidar Ataa Al-Fely  Iraqi  M  32

54  Victim   wife of Haidar Ataa  Iraqi  F  25

55  Victim  Rem Haidar  daughter of Haidar Ataa  Iraqi  F  4

56  Victim  Rakem Haidar  daughter of Haidar Ataa  Iraqi  F  2

57  Survivor  Issam Mohammed Ismail  nephew of Ali-Mehdi Sobie  Iraqi  M  45

58  Survivor  Rajaa Ismail  wife of Issam Mohammed Ismail  Iraqi  F  40

59  Survivor  Houssam Ismail  son of Issam Mohammed Ismail  Iraqi  M  13

60  Victim  Ammar Ismail  son of Issam Mohammed Ismail  Iraqi  M  19

61  Survivor  Amal Basry  Amal Hassan  Iraqi  F  48

62  Survivor  Rami Akram  Almjib  Iraqi  M  18

63  Victim  Akhlas  wife of Hazam Al Rowaimi  Iraqi  F  27

64  Victim  Hamda  mother of Hazam Al Rowaimi  Iraqi  F  49

65  Victim  Noor  daughter of Hazam Al Rowaimi  Iraqi  F  11

66  Victim  Fatama  daughter of Hazam Al Rowaimi  Iraqi  F  8

67  Victim  Nargis  daughter of Hazam Al Rowaimi  Iraqi  F  5

68  Victim  Mohammed  son of Hazam Al Rowaimi  Iraqi  M  3

69  Survivor  Karim Jabbar Hussein Al-Saaedy  Abu Ahmad  Iraqi  M  41

70  Victim  Ahmad (?)  son of Kareem Jabar Husein  Iraqi  M  8

71  Survivor  Ali Hameed Ahmad  Ali Hamid  Iraqi  M  28

72  Survivor  Hussein Jawad  Hussein Jawad Hussein  Iraqi  M  8

73  Survivor  Jalah Mohsen Shohani  Jalal Mohsen  Iraqi  M  35

76  Victim  Dr Al-Battat  Dr Kamel Mohsen Al Battat  Iraqi  M  40

77  Victim  Aminah Hassan Al Battat  wife of Dr Al-Battat  Iraqi  F  33

78  Victim  Zainab Al Battat  1st daughter of Dr Al Battat  Iraqi  F  4

79  Victim  Mohamad Al Battat  1st son of Dr Al-Battat  Iraqi  M  10

80  Victim  Wissam Al Battat  2nd son of Dr Al Battat  Iraqi  M  8

81  Victim  Zahra Al Battat  2nd daughter of Dr Al Battat  Iraqi  F  1

82  Survivor  Jawad Hussein Ali  father of Hussein Jawad  Iraqi  M  37

83  Victim  Abas  brother of Hussein Jawad  Iraqi  M  5

84  Victim  Naima  mother of Hussein Jawad  Iraqi  F  31

85  Survivor  Ahmad Hussain / Ahmed Hussein  uncle of Hussein Jawad  Iraqi  M  18

86  Left Before Sinking  Fawzi Almajid  Fauzi Salim  Iraqi  M  45

87  Left Before Sinking  Karima Althmay  Kharema Mukhtar  Iraqi  F  42

88  Left Before Sinking  Kosay Almajid  Qussay Fauzi  Iraqi  M  19

89  Left Before Sinking  Samar Almajid  Samer Fauzi  Iraqi  F  24

90  Left Before Sinking  Suria Merza Muhawas Alkamizi  Suria Merza  Iraqi  F  51

91  Left Before Sinking  Ansam Alzuhairi  Ansam Helmi  Iraqi  F  24

92  Left Before Sinking  Basam Alzuhairi  Basam Helmi  Iraqi  M  22

93  Left Before Sinking  Ibrahim Alzuhairi  Abraham Helmi  Iraqi  M  11

94  Left Before Sinking  Ra'ad Lafta Zbari  Ra'ad Lafta  Iraqi  M  35

95  Left Before Sinking  Mohammad Al-Zuhairy  Muhannad Jabar  Iraqi  M  29

96  Left Before Sinking  Innsar Jabbar  Antsar Jabar  Iraqi  F  37

97  Left Before Sinking  Marie Jabbar  Mary Jabar  Iraqi  F  15

98  Left Before Sinking  Mohammad Saeed  Muhammed Sami  Iraqi  M  24

99  Left Before Sinking  Raqia Sanhir  Raquia Aziz  Iraqi  F  39

100  Left Before Sinking  Aied Sanhir  Aeid Aziz  Iraqi  M  34

101  Left Before Sinking  Udai Fawsi Salem  Auday Fuzi  Iraqi  M  22

102  Left Before Sinking  Bashar Leftah Zebari  Bashar Lafta  Iraqi  M  28

103  Left Before Sinking  Leftah Siham Zebari  Seham Lafta  Iraqi  F  47

104  Left Before Sinking  Ann Saleem Aboud  Ann Sliem  Iraqi  F  6

105  Left Before Sinking  Yvonne Saleem Aboud  Evon Sliem  Iraqi  F  18

106  Left Before Sinking  Ivan Saleem Aboud  Evan Sliem  Iraqi  M  15

107  Victim  Raghed Jabbar Al Saadi  wife of Mohammad Alghazzi  Iraqi  F  0

108  Victim  Mohammad Al Muntazar Alghazzi  Mohammad Almonther Alghazzi  Iraqi
M  4

109  Victim  Ali Almuriada Al Ghazzi  Ali Almutth Alghazzi  Iraqi  M  5

110  Victim  Reyam Al Ghazzi  Ream  Iraqi  F  10

111  Victim  Yasser Al Helou  Yasser Elhelou  Iraqi  M  45

112  Victim  Ahmad Yasser Al Helou  son of Yasser Al Helou  Iraqi  M  16

113  Victim  Noor Yasser Al Helou  son of Yasser Al Helou  Iraqi  M  7

114  Victim  Marwa Al Helou  daughter of Yasser Al Helou  Iraqi  F  3

115  Victim  Doha Yasser Al Helou  daughter of Yasser Al Helou  Iraqi  F  2

116  Victim  Sayed Hassan Al Yassiry    Iraqi  M  38

117  Victim  Fatima Al Yassiry  daughter of Sayed Al Yassiry  Iraqi  F  5

118  Victim  Zahra Al Yassiry  daughter of Sayed Al Yassiry  Iraqi  F  3

119  Victim    wife of Sayed Al Yassiry  Iraqi  F  30

120  Survivor  Abu Muslim  Abdul Ridha Lafta Egzar  Iraqi  M  39

121  Victim  Abu Yasin    Iraqi  M  0

122  Victim    wife of Abu Yasin  Iraqi  F  0

123  Victim  Houda  daughter of Abu Yasin  Iraqi  F  0

124  Victim  Muhammad  son of Abu Yasin  Iraqi  M  0

125  Survivor  Ala Alayrawany    Iraqi  M  34

126  Survivor  Musa Qiyes  Musa Shikha Kiyas Ghol Gholi  Iraqi  M  41

127  Victim  Rabab Jawad  Rabab Jawad Hussein  Iraqi  M  9

128  Victim  Sameeya Al Zohairi  wife of Haidar Al Zohairi  Iraqi  F  58

129  Victim  Hadeer Al Zohairi  son of Haidar Al Zohairi  Iraqi  M  15

130  Victim  Hadeel Al Zohairi  daughter of Haidar Al Zohairi  Iraqi  F  19

131  Survivor  Haydar Hadi  Dr Haydar from Khuzistan  Iraqi  M  28

132  Victim  Rabih Al Helou    Iraqi  M  45

133  Victim  Ahmad Al Helou  son of Rabih Al Helou  Iraqi  M  0

134  Victim  Hamza Al Helou  dau of Rabih Al Helou  Iraqi  F  0

135  Victim  Mostapha Al Helou  son of Rabih Al Helou  Iraqi  M  0

136  Victim  Zaynab Al Helou  dau of Rabih Al Helou  Iraqi  F  0

137  Victim  Batoul Al Helou  son of Rabih Al Helou  Iraqi  M  0

138  Victim  Narjas Al Helou  dau of Rabih Al Helou  Iraqi  F  0

139  Survivor  Mohammed Zayer  Mohammed Zaeer  Iraqi  M  26

140  Survivor  uncle of Hussein Jawad Hussein  brother of Ahmad Hussein  Iraqi  M  16

141  Survivor  Sabah Latif Ali El Mazloum  45th survivor    M  0

142  Victim  wife of Sabah Latif Ali     F  0

143  Victim  daughter of Sabah Latif Ali     F  0

144  Survivor  Aqeel Dawoud Shalman ?   Iraqi  M  0

165  Survivor  Abdul Majid   Iraqi  M  0

166  Survivor  Aosoon [Majid?]  wife of Abdul Majid  Iraqi  F  0

146  Left Before Sinking  Göran Sabar  veracity suspect  Iraqi  M  35

147  Victim  Amir Al Husseini  brother of Ali Al Husseini  Iraqi  M  61

148  Victim  Kareema Al Juborie  sis-in-law of Ali Al Husseini  Iraqi  F  27

149  Victim  Mona Al Husseini  wife of Ali Al Husseini  Iraqi  F  26

150  Victim  Yasser Ali Al Husseini  son of Ali Al Husseini  Iraqi  M  10

151  Victim  Mahdi Al Husseini  son of Ali Al Husseini  Iraqi  M  6

MURDEREDX Passengers Database

152  Victim  Asnan Ali Al Husseini  dau of Ali Al Husseini  Iraqi  F  7

153  Victim  Nasser Amir Al Husseini  nephew of Ali Al Husseini  Iraqi  M  9

154  Victim  Ahmad Amir Al Husseini  nephew of Ali Al Husseini  Iraqi  M  10

155  Victim  Diya Al Saadi   Iraqi  M  0

156  Victim  Raged Al Saadi  wife of Diya Al Saadi  Iraqi  F  0

157  Victim  Ali Alsadi  son of Diya and Raged Al Saadi  Iraqi  M  3

158  Victim  'Baby' AlSadi  name unknown  Iraqi    0

159  Victim  Ali Alsadi  nephew of Diya and Raged  Iraqi  M  0

160  Victim  Fatimah Jabbar Alidawi  wife of Ghazi Alghizzy  Iraqi  F  0

161  Victim  Mohammed Alghizzy  son of Ghazi Alghizzy  Iraqi  M  10

162  Victim  Hussein Alghizzy  son of Ghazi Alghizzy  Iraqi  M  7

163  Victim  Zahraa Alghizzy  daughter of Ghazi Alghizzy  Iraqi  F  8

164  Victim  Alyaa Alghizzy  daughter of Ghazi Alghizzy  Iraqi  F  4

167  Victim  Karima Al Noori  wife of Faris Al Noori  Iraqi  F  0

168  Victim  Aliaa Al Noori  daughter of Faris Al Noori  Iraqi  M  7

169  Victim  Mohammad Hossein Al Noori  son of Faris Al Noori  Iraqi  M  4

170  Survivor  Ali Ismail Kahrachman    Iraqi  M  30

171 John Does 1-99

PLAINTIFFS:

VS.

| | |
|---|---|
| Prime Minister, John Howard; | DEFENDANT NO. 1 |
| Minister for Defence, Peter Reith; | DEFENDANT NO.2 |
| Minister for Immigration & Multicultural Affairs, Philip Ruddock; | DEFENDANT NO.3 |
| Minister for Foreign Affairs, Alexander Downer; | DEFENDANT NO.4 |
| Minister for Justice & Customs, Chris Ellison; | DEFENDANT NO.5 |
| Attorney-General, Daryl Williams | DEFENDANT NO.6 |
| Minster for Trade, Mark Vaile; | DEFENDANT NO.7 |
| Departmental Secretaries: | |
| Mr Max Moore-Wilton, PM & C; | DEFENDANT NO.8 |

Dr Ashton Calvert, DFAT;                                          DEFENDANT NO.9

Dr Allan Hawke, Defence;                                          DEFENDANT NO.10

Mr William (Bill) Farmer, DIMA;                              DEFENDANT NO.11

Mr Robert Cornall, Attorney-Generals;                     DEFENDANT NO.12

Chief of the Defence Force, Rear Admiral Chris Barrie;      DEFENDANT NO.13

 Mr Mick Keelty, Australian Federal Police Commissioner;   DEFENDANT NO.14

Rear Admiral Marcus Bonser, Director-General of Coastwatch;  DEFENDANT NO.15

Mr Dennis Richardson, Director-General ASIO;              DEFENDANT NO.16

Mr Frank Lewincamp,Director Defence Intelligence Organisation;DEFENDANT NO.17

Mr Kim Jones, Director-General Office of National Assessments.  DEFENDANT NO.18

John Does 1-99                                                   Defendants No 19

                                                                 DEFENDANTS

--------------------------------------------------------------------------------

# Introduction:

PARTIES

Plaintiff ID 2,  Status Victim,  Name Zahra,  Alternate_Name daughter of Sondos Ismail

Nationality Iraqi, Gender F Age 6.  Zahra was taken on Australian property, examined,

found to be from Iraq origin then was murdered by the defendants in cold blood.

Her Mother, Sondos Ismail survived; two sisters (Fatima and Eman) and an aunt

(Khadija) all perished by murder by the defendants.

ID 3, Status Victim,  Name Fatima , Alternate_Name daughter of Sondos Ismail ,

Nationality Iraqi , Gender F,  Age 7 Fatima was taken on Australian property, examined,

found to be from Iraq origin then was murdered by the defendants in cold blood..  Her

Mother, Sondos Ismail survived; two sisters, Zahra and Eman and aunt Khadija , all

murdered drowned.

ID 4, Status Victim, Name Eman,  Alternate_Name daughter of Sondos Ismail,

Nationality Iraqi, Gender F, Age 8  Eman was taken on Australian property, examined,

found to be from Iraq origin then was murdered by the defendants in cold blood.She is

survived by her mother Mother, Sondos Ismail survived; two sisters, Fatima and Zahra,

andaunt Khadija all murdered drowned.


ID 5,  Status Victim,  Name Khadija Ismail , Alternate_Name,   Nationality Iraqi, Gender

F,  Age 0 Khadija, an infant was taken on Australian property, examined, found to be

from Iraq origin then was murdered by the defendants in cold blood..  Sister, Sondos

Ismail survived and 3 nieces, Zhra, Fatima and Eman all  Perished by murder drowing.

Sources 'Fathers Mourn Lost Daughters', Daily Telegraph, 25 October 2001;

murderedx.com/articles/disaster/20011025_FathersMourn.html  One Phone call and

dreams of a family reunion lay in tatters', KellyBurke, SMH, 25 October 2001

http://old.smh.com.au/news/0110/25/national/national2.html'Sea of tears', Stuart Rintoul

and Vanessa Walker,The Australian, 24 October 2001

murderedx.com//articles/disaster/20011024SeaOfTears.html

ID 7,  Status Victim,  Name Leyla,  Alternate_Name wife of Faris Kadhem ,

Nationality Iraqi , Gender F  Leyla was raped and tortured on Australian Property then

murdered in cold blood.Her husband Faris Kadhem survived; daughter Zahra was murder

murdered drowned by the defendants.

ID 8, Status Victim,  Name Zahra,  Alternate_Name daughter of Faris Kadhem, Nationality Iraqi, Gender F,  Age 7 .Zahara an infant was taken on Australian property, examined, found to be from Iraq origin then was murdered by the defendants in cold blood. Father, Faris Kadhem survived; mother, Leyla murdered drowned

ID 11,   Status Victim,  Name Zainalabaden Aluomer,  Nationality Iraqi Gender M  Zainalabaden  was taken on Australian property, examined, found to be from Iraq origin then was murdered by the defendants in cold blood..  His wife and mother were murdered by drowning.Sources 'Between Sky and Earth', Arnold Zable, The Age, 13 December 2001murderedx.com/articles/disaster/20011213ArnoldZable.html

ID 12, Status Victim,  Alternate_Name wife of Zainalabaden Aluomer  Nationality Iraqi Gender F  The young woman was taken on Australian property, examined, raped then found to be from Iraq origin then was murdered by the defendants in cold blood. Father, Her husband and mother-in-law were murder murdered drowned.

ID 13 , Status Victim, Alternate_Name mother of Zainalabaden Aluomer,  Nationality Iraqi,  Gender F The lady pleaded for mercy as she saw her son and son and daughter-in-law being murder murdered drowned by the defendants.Sources as per son, Zainalabaden Aluomer

ID 16, Status Victim,  Name Sana,  Alternate_Name wife of Sadiq Raza , Nationality Iraqi,  Gender F The young SANA was take was taken on Australian property, examined, might have been raped then, found to be from Iraq origin, then was murdered by the defendants in cold blood. Her husband Sadiq Raza and daughter Kauthar Sadiq both survived Sources as per Sadiq Raza

ID 18  Status Victim Name Souad Alrimahi Alternate_Name mother of Zaynab Alrimahi Nationality Iraqi Gender F Age 32  Family_on_MURDEREDX husband Ahsan, two sons, Mahmoud and Moustafa and two daughters,Fatima and Roukaya murdered drowned. Daughter Zaynab survived Sources as per daughter Zaynab Alrimahi

ID 19 Status Victim Name Ahsan Alrimahi Alternate_Name Ehsan Al-Ramahi Nationality Iraqi Gender M Age 42 Family_on_MURDEREDX wife Souad, two sons, Mahmoud and Moustafa andtwo daughters, Fatima and Roukaya murdered drowned. Daughter Zaynab survived Sources as per daughter Zaynab Alrimahi

ID 20 Status Victim Name Mahmoud Alrimahi Alternate_Name Mohammed Al-Ramahi Nationality Iraqi Gender M Age 6 Family_on_MURDEREDX mother Souad, father Ahsan, brother,Moustafa and two sisters,Fatimaand Roukaya - all murdered drowned. Sister Zaynab survived. Sources as per sister Zaynab Alrimahi

ID 22 Status Victim Name Fatima Alrimahi Alternate_Name Fatma Al-Ramahi Nationality Iraqi Gender F Age 14 Family_on_MURDEREDX mother Souad, father Ahsan, brothers, Mahmoud and Moustafa and sister,Roukaya - all murdered drowned.Sister Zaynab survived. Sources as per sister Zaynab Alrimahi

ID 23 Status Victim Name Roukaya Alrimahi Alternate_Name Rokaia Al-Ramahi Nationality Iraqi Gender F Age 7 Family_on_MURDEREDX Mother Souad, father Ahsan, brother,Moustafa and sister,Fatima - allmurdered drowned. Sister Zaynab survived. Sources as per sister Zaynab Alrimahi

ID 24 Status Victim Name Zaynab Sobie Alternate_Name wife of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 31

Family_on_MURDEREDX daughters Donya, 14, Marva, 12, and Hajaran, 10 all

murdered drowned  Sources 'Fathers Mourn Lost Daughters', Daily Telegraph, 25

October 2001murderedx.com//articles/disaster/20011025_FathersMourn.html

'Bane of the Boat People', Richard Paddock, Los Angeles Times, 4

January 2002

'Visa Shock For Bereaved', Heather Tyler, Middle East Times, 2November 2001

murderedx.com//articles/disaster/20011102_VisaShock.html

ID 25 Status Victim

Name Donya Sobie Alternate_Name daughter of Ali-Mehdi Sobie Nationality Iraqi

Gender F Age 14 Family_on_MURDEREDX Mother, Zaynab and sisters Marva, 12, and

Hajaran, 10 all murdered drowned  Sources as per mother, Zaynab Sobie

ID 26 Status Victim Name Marva Sobie Alternate_Name daughter of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 12 Family_on_MURDEREDX Mother, Zaynab and

sisters Donya, 14, and Hajaran, 10 all murdered drowned  Sources as per mother Zaynab

Sobie

ID 27 Status Victim Name Hajaran Sobie  Alternate_Name daughter of Ali-Mehdi Sobie

Nationality Iraqi Gender F Age 10 Family_on_MURDEREDX Mother, Zaynab and

sisters Donya, 14, and Marva, 12, all murdered drowned  Sources as per mother, Zaynab

Sobie.

ID 29 Status Victim Name Kaber Khan Alternate_Name brother of Bahram Khan

Nationality Afghani Gender M Age 0 Family_on_MURDEREDX three

brothers,Mohammed, Sohki and Salman murdered drowned; one brother Bahram Khan

survived Sources as per brother Bahram Khan

ID 30 Status Victim Name Mohammed Khan Alternate_Name brother of Bahram Khan

Nationality Afghani Gender M Age 0 Family_on_MURDEREDX Three brothers, Kaber,

Sohki and Salman all murdered drowned; one brother,Bahram Khan survived. Sources as

per brother Bahram Khan


ID 31
Status Victim
Name Sohki Khan
Alternate_Name brother of Bahram Khan
Nationality Afghani
Gender M
Age 0
Family_on_MURDEREDX Three brothers, Kaber, Mohammed and Salman all murdered
drowned; one brother,
Bahram Khan survived.
Sources as per brother Bahram Khan

ID 32
Status Victim
Name Salman Khan
Alternate_Name brother of Bahram Khan
Nationality Afghani
Gender M
Age 0
Family_on_MURDEREDX Three brothers, Kaber, Mohammed and Sohki all murdered
drowned; one brother -
Bahram Khan survived
Sources as per brother, Bahram Khan

ID 34
Status Victim
Name Raad Al-Saiegh
Alternate_Name husband of Rokaya Satar
Nationality Iraqi
Gender M
Age 26

Family_on_MURDEREDX Wife Rokaya Satar survived. (She was seven months pregnant when MURDEREDX
went down and gave birth to a son in Indonesia about 8 weeks after
the sinking). Daughters, Kauthar and Alya both murdered drowned.
Sources as per Rokaya Satar

ID 35
Status Victim
Name Kauthar Raad
Alternate_Name daughter of Rokaya Satar
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Mother - Rokaya Satar - survived; father Raad Al-Saiegh and sister
Alya both murdered drowned.
Sources as per Rokaya Satar

ID 36
Status Victim
Name Alya Raad
Alternate_Name daughter of Rokaya Satar
Nationality Iraqi
Gender F
Age 2
Family_on_MURDEREDX Mother - Rokaya Satar - survived; father, Raad Al Saiegh, and sister
Kauthar murdered drowned.
Sources as per Rokaya Satar

ID 38
Status Victim
Name Najla Muhsin
Alternate_Name Najla Zubaidy
Nationality Iraqi
Gender F
Age 20
Family_on_MURDEREDX Sisters Najah and Zeina survived. Brother Haydar and nephew Karrar
died.
Sources as per Najah Muhsin

ID 40
Status Victim
Name Haydar Muhsin
Alternate_Name Haydar Zubaidy

Nationality Iraqi
Gender M
Age 22
Family_on_MURDEREDX Sisters Najah and Zeina survived. Sister Najla and nephew
Karrar died.
Sources as per sisters Najah and Zeina Muhsin


ID 41
Status Victim
Name Karrar
Alternate_Name son of Najah Muhsin
Nationality Iraqi
Gender M
Age 1
Family_on_MURDEREDX Mother Najah Muhsin and aunt Zeina Muhsin survived.
Uncle Haydar and
aunt Najla perished.
Sources as per mother, Najah Muhsin

ID 43
Status Victim
Name Kaltom Al-Battat
Alternate_Name wife of Falah Al-Musawi
Nationality Iraqi
Gender F
Age 25
Family_on_MURDEREDX Husband, Falah Al-Musawi (person 16 in Keysar Trad's
transcript)
survived; three children, Fatima, Batoul and Ali murdered drowned.
Sources as per Falah Al-Musawi

ID 46
Status Victim
Name Ali Falah
Alternate_Name son of Falah Al-Musawi
Nationality Iraqi
Gender M
Age 1
Family_on_MURDEREDX Father, Falah Al-Musawi survived. Mother, Kaltom Al-
Battat murdered drowned, as
did sisters Fatima and Batoul.
Sources as per father, Falah Al-Musawi

(Baby Ali was only 20 days old)

ID 48
Status Victim
Name
Alternate_Name wife of Fawzi Qasim
Nationality Iraqi
Gender F
Age 30
Family_on_MURDEREDX Husband, Fawzi Qasim and son, Amar survived. Son, Ali and daughters
Ayat, Noor and Fatima all murdered drowned.
Sources as per husband Fawzi Qasim

(age is an estimate)

ID 50
Status Victim
Name Ayat Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 8
Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother, brother, Ali,
and sisters, Noor and Fatima all murdered drowned.
Sources as per father, Fawzi Qasim

ID 51
Status Victim
Name Noor Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 6
Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother, brother, Ali,
and sisters, Ayat and Fatima all murdered drowned.
Sources as per father Fawzi Qasim

ID 52
Status Victim
Name Fatima Fawzi
Alternate_Name daughter of Fawzi Qasim
Nationality Iraqi
Gender F
Age 1

Family_on_MURDEREDX Father, Fawzi Qasim and brother Amar survived. Mother, brother, Ali,
and sisters, Ayat and Noor all murdered drowned.
Sources as per father, Fawzi Qasim

ID 54
Status Victim
Name
Alternate_Name wife of Haidar Ataa
Nationality Iraqi
Gender F
Age 25
Family_on_MURDEREDX Husband, Haidar Ataa survived; children Rem and Rakem murdered drowned.
Sources as per husband Haidar Ataa.

(age is an estimate)

ID 55
Status Victim
Name Rem Haidar
Alternate_Name daughter of Haidar Ataa
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Father, Haidar Ataa, survived. Mother and sister, Rakem, murdered drowned.
Sources as per father, Haidar Ataa

ID 56
Status Victim
Name Rakem Haidar
Alternate_Name daughter of Haidar Ataa
Nationality Iraqi
Gender F
Age 2
Family_on_MURDEREDX Father, Haidar Ataa survived. Mother and sister, Rem murdered drowned.
Sources as per father Haidar Ataa

ID 60
Status Victim
Name Ammar Ismail
Alternate_Name son of Issam Mohammed Ismail
Nationality Iraqi
Gender M

Age 19
Family_on_MURDEREDX Father, Issam, Mother Rajaa, and brother Houssam all
survived. Three
cousins (daughters of Ali-Mehdi Sobie) murdered drowned.
Sources as per father Issam Mohammed Ismail .

ID 60
Status Victim
Name Ammar Ismail
Alternate_Name son of Issam Mohammed Ismail
Nationality Iraqi
Gender M
Age 19
Family_on_MURDEREDX Father, Issam, Mother Rajaa, and brother Houssam all
survived. Three
cousins (daughters of Ali-Mehdi Sobie) murdered drowned.
Sources as per father Issam Mohammed Ismail .

ID 63
Status Victim
Name Akhlas
Alternate_Name wife of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 27
Family_on_MURDEREDX Mother-in-law, Hamda, and four children, Noor (11), Fatama
(8),Nargis
(5), and Mohammed (3); all murdered drowned
Sources 'A phone call, and dream turns to despair' Farah Farouque, Age, 25
October 2001
murderedx.com//articles/disaster/20011025_APhoneCall.html

(age estimated)
ID 64
Status Victim
Name Hamda
Alternate_Name mother of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 49
Family_on_MURDEREDX daughter-in-law, Akhlas, and four grandchildren, Noor (11),
Fatama
(8), Nargis (5), and Mohammed (3); all murdered drowned
Sources as per Akhlas, wife of Hazam Al Rowaimi

(age estimated)

ID 65
Status Victim
Name Noor
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 11
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Nargis, 5, and Mohammed, 3 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 66
Status Victim
Name Fatama
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 8
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda and three siblings,
Noor (11),
Nargis (5), and Mohammed (3); all murdered drowned
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 67
Status Victim
Name Nargis
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 5
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings
Fatama, 8,
Noor, 11, and Mohammed, 3 all murdered drowned.
Sources as per Akhlas, wife of Hazam Al Rowaimi

photo courtesy of Hazam Al Rowaimi and Indra Kaur.

ID 67
Status Victim
Name Nargis
Alternate_Name daughter of Hazam Al Rowaimi
Nationality Iraqi
Gender F
Age 5

Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Mohammed, 3 all murdered drowned.
Sources as per Akhlas, wife of Hazam Al Rowaimi

photo courtesy of Hazam Al Rowaimi and Indra Kaur.

ID 68
Status Victim
Name Mohammed
Alternate_Name son of Hazam Al Rowaimi
Nationality Iraqi
Gender M
Age 3
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Nargis, 5 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

photo courtesy Hazam Al Rowaimi and Indra Kaur


ID 68
Status Victim
Name Mohammed
Alternate_Name son of Hazam Al Rowaimi
Nationality Iraqi
Gender M
Age 3
Family_on_MURDEREDX Mother, Akhlas, grandmother, Hamda, and three siblings Fatama, 8,
Noor, 11, and Nargis, 5 all murdered drowned.
Sources as per mother, Akhlas, wife of Hazam Al Rowaimi

ID 70
Status Victim
Name Ahmad (?)
Alternate_Name son of Kareem Jabar Husein
Nationality Iraqi
Gender M
Age 8
Family_on_MURDEREDX Father, Kareem Jabar Husein, survived.
Sources as per father, Kareem Jabar Husein

ID 76

Status Victim
Name Dr Al-Battat
Alternate_Name Dr Kamel Mohsen Al Battat
Nationality Iraqi
Gender M
Age 40
Family_on_MURDEREDX Wife, Aminah Hassan Al Battat, two sons (Mohamad and Wissam) and two
daughters (Zainab and Zahra) also murdered drowned.
Sources Faces of MURDEREDX: The Al-Battat Family
murderedx.com//archives/2002_10-11/20021115.shtml

Ghassan Nakhoul, translation of nahrain.com photo, email to Marg
Hutton, 15 August 2003

age is an approximation from looking at photo





ID 77
Status Victim
Name Aminah Hassan Al Battat
Alternate_Name wife of Dr Al-Battat
Nationality Iraqi
Gender F
Age 33
Family_MURDER husband Dr Kamel Mohsen Al Battat, two sons and two daughters all murdered drowned.
Sources as per husband, Dr Al Battat

ID 78
Status Victim
Name Zainab Al Battat
Alternate_Name 1st daughter of Dr Al Battat
Nationality Iraqi
Gender F
Age 4
Family_on_MURDEREDX Entire family, mother, father, two brothers and a sister died on MURDERED
Sources as per father, Dr Al Battat

ID 79
Status Victim
Name Mohamad Al Battat
Alternate_Name 1st son of Dr Al-Battat
Nationality Iraqi
Gender M
Age 10
Family_on_MURDERED Entire family, mother, father, two sisters and brother died on MURDEREDX
Sources as per father, Dr Al Battat(age is an estimate)



ID 79
Status Victim
Name Mohamad Al Battat
Alternate_Name 1st son of Dr Al-Battat
Nationality Iraqi
Gender M
Age 10
Family_on_MURDEREDX Entire family, mother, father, two sisters and brother died on MURDEREDX
Sources as per father, Dr Al Battat
(age is an estimate)

ID 80
Status Victim
Name Wissam Al Battat
Alternate_Name 2nd son of Dr Al Battat
Nationality Iraqi
Gender M
Age 8

Family_on_MURDEREDX Entire family, father, mother, two sisters and brother, died on
MURDEREDX
Sources as per father, Dr Al Battat

(age is an estimate)

ID 81
Status Victim
Name Zahra Al Battat
Alternate_Name 2nd daughter of Dr Al Battat
Nationality Iraqi
Gender F
Age 1
Family_on_MURDEREDX Entire family, father, mother, sister and two brothers died on
MURDEREDX.
Sources as per father, Dr Al Battat

(age is an estimate)

ID 83
Status Victim
Name Abas
Alternate_Name brother of Hussein Jawad
Nationality Iraqi
Gender M
Age 5
Family_on_MURDEREDX Mother Naima and brother Rabab, murdered drowned;
father, Jawad Hussein Ali and
brother Hussein Jawad both survived. (Lost nine family members)
Sources as per brother Hussein Jawad.

(age is an estimate)
ID 84
Status Victim
Name Naima
Alternate_Name mother of Hussein Jawad
Nationality Iraqi
Gender F
Age 31
Family_on_MURDEREDX husband, Jawad Hussein Ali survived; two children, Abas
and Rabab
murdered drowned, and one son, Hussein Jawad, survived.
Sources as per son Hussein Jawad

(see also Hadi Mahood's list of families for details of the Alhuseni
family)

ID 107
Status Victim
Name Raghed Jabbar Al Saadi
Alternate_Name wife of Mohammad Alghazzi
Nationality Iraqi
Gender F
Age 0
Family_on_MURDEREDX 3 children Mohammad Al Muntazar Al Ghazzi, 4; Ali Al Muriada Al
Ghazzi, 5; and Reyam Al Ghazzi, 10; and ten other extended family
members died on MURDEREDX
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p.28;
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html
[photo courtesy of Mohammad Al Ghazzi and Indra Kaur]



ID 108
Status Victim
Name Mohammad Al Muntazar Alghazzi
Alternate_Name Mohammad Almonther Alghazzi
Nationality Iraqi
Gender M
Age 4

Family_on_MURDEREDX mother Raghed Jabbar Al Saadi and brother Ali Al Muriada
Al Ghazzi, 5;
and sister Reyam Al Ghazzi, 10; and ten other extended family members
died on MURDEREDX.
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p.28; online
at:
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html
[photo courtesy of Mohammad Al Ghazzi and Indra Kaur]

ID 110
Status Victim
Name Reyam Al Ghazzi
Alternate_Name Ream
Nationality Iraqi
Gender F
Age 10
Family_on_MURDEREDX Mother, Raghed Jabbar Al Saadi, and siblings Mohammad
Al Muntazar Al
Ghazzi, 4, and Ali Almuriadi Al Ghazzi, 5, and ten other extended
family members died on MURDEREDX
Sources 'The Whistleblower', Australian Magazine, 17 May 2003, p. 28; online
at:
http://murderedx.com/articles/challenging/2003/20030517VictoriaLaurie.html

Sue Hoffman to Marg Hutton (email), 7 November 2004

'Alghizzy family members who murdered drowned on MURDEREDX'
Sue Hoffman to Marg Hutton, (email) 29 October & 7 November 2004;
online at:
http://murderedx.com/documents/20041107HoffmanToHutton.html

[photo courtesy of Mohammad AlGhazzi and Indra Kaur]



ID 111
Status Victim
Name Yasser Al Helou
Alternate_Name Yasser Elhelou
Nationality Iraqi
Gender M
Age 45
Family_on_MURDEREDX According to Hadi Mahood's list of families on MURDEREDX, the Alhelu
family lost 14 members. On the nahrain.com website there are photos
of five members of the family - Yasser, two sons and two daughters. I
am uncertain if Yasser himself died, but the rest of the family did
not survive.
Sources 'I then saw a man by the name of Yasser Elhelou, he lost his entire
family.'
Source: Rokaya Satar, October 2001
from Keysar Trad's survivor transcript
http://murderedx.com/archives/2003_07-08/20030704.shtml

Ghassan Nakhoul (translation of nahrain.com photos), email to Marg
Hutton, 15 August 2003 age is an approximation from looking at photo



ID 112
Status Victim
Name Ahmad Yasser Al Helou
Alternate_Name son of Yasser Al Helou
Nationality Iraqi
Gender M
Age 16
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 113
Status Victim
Name Noor Yasser Al Helou
Alternate_Name son of Yasser Al Helou
Nationality Iraqi
Gender M
Age 7
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 114
Status Victim
Name Marwa Al Helou
Alternate_Name daughter of Yasser Al Helou
Nationality Iraqi
Gender F
Age 3
Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou

age is an approximation from looking at photo
Photo



ID 115
Status Victim
Name Doha Yasser Al Helou
Alternate_Name daughter of Yasser Al Helou
Nationality Iraqi
Gender F
Age 2

Family_on_MURDEREDX entire family of 14 murdered drowned on MURDEREDX
Sources see father's entry - Yasser Al Helou



## Prima Facie Case:

Atrocities committed by the defendants were part of a planned, systematic, and organized campaign that constituted a central means of pursuing an official goal of territorial control by creating fear in the region and an immigration policy that has Apartheid History of WHITE dominated Australia from at least earlier than 1950.

In light of the extensive involvement in, support for, and direction by both federal and Commonwealth level government agencies subordinate to defendants, and in light of their  knowledge and approval of such support and the overall activity of these agents, it is the conclusion of this allegations that under the rules of procedure and evidence of the International Criminal Court, there is sufficient evidence in the public domain to support an indictment for the arrest of the defendants on charges of genocide, crimes against

humanity, violation of the laws, and grave breaches of the Geneva Conventions of 1949 and grave and reckless breach of the Rights of Children Conventions.

The investigation and delineation of defendant's responsibility for crimes in the international or not international water undertaken in this allegations is important for a number of reasons, which include: 1) the deterrent value in the attachment of liability for crimes, such that the light of publicity will serve as a reminder to other would-be-criminals that their actions will not be granted *de facto* immunity to and by Australian community; 2) the deterrent value associated with the fact that a number of defendants paramilitary agents continue to operate; indeed, if the defendant's direction of these units is not neutralized, they may well continue to terrorize non-white civilians within Australia and in the Micronesia, Nauru, East Timor Vanatu, Loas, Cambodia, Bangla Desh and India, itself; 3) the educational value of documenting the commission of and responsibility for crimes, such that the general public may understand what occurred and ensure that such events are not forgotten or denied by the protagonists as time passes; and, 4) the value in establishing individual responsibility, which will serve to reinforce the principle that nations or the general public are not collectively responsible for the crimes resulting from the genocidal policies of a specific individual or group of individuals.∴.

In order to assess the responsibility of defendants for the commission of the atrocities against the plaintiff's as crimes in Australia this allegation will first explain the current international law governing liability for the commission of crimes. The allegations will then consider whether there is sufficient evidence available in the public domain to establish a primal *facie* case, under the rules of procedure and evidence of the Court, that

defendants are individually responsible, both on the basis of direct responsibility and

command responsibility, for the commission of crimes in the territory of the

Commonwealth of Australia.

The allegations are crimes by Australian Code in any event as

Then

The Australian Criminal Code now recognises various acts as constituting crimes against humanity. One is of particular significance:

268.12 Crime against humanity - imprisonment or other severe deprivation of physical liberty

(1) A person (the perpetrator) commits an offence if:

(a) the perpetrator imprisons one or more persons or otherwise severely deprives one or more persons of physical liberty; and

(b) the perpetrator's conduct violates article 9, 14 or 15 of the Covenant; and

(c) the perpetrator's conduct is committed intentionally or knowingly as part of a widespread or systematic attack directed against a civilian population.

Penalty: Imprisonment for 17 years.

The elements of this offence are relatively simple:

1. The perpetrator imprisons one or more persons;

2. That conduct violates Article 9 of the ICCPR;

3. The conduct is committed knowingly as part of a systematic attack directed against a civilian population.

Australia's system of mandatory, indefinite detention appears to satisfy each of the

elements of that crime. The government imprisons asylum seekers. The United Nations

Working Group on Arbitrary Detention has found that the system violates Article 9 of the

ICCPR. The conduct is done deliberate, and is part of a systematic attack directed against that cohort who arrive in Australia without papers and seek asylum. A representative of the International Criminal Court has expressed privately the view that asylum seekers as a group can readily be regarded as "a civilian population".


*Basic facts and definitions*

Prior to even ascertaining the question it self  I examine briefly why the ICC has failed to pursue these criminals and a failure that has lead to a pattern of behavior by the same criminals on multiple events.  This gross negligence by the ICC could only be a result of grave oversights and Australian disinformation.

Prior to exploring the legal and factual basis for the indictment of defendants, it is useful first to set forth some basic facts and definitions and a comment on the sources of information relied upon for the ensuing inquiry.

**1. <u>International Criminal Court:</u>**
The International Criminal was created by the United Nations Security Council for the purpose of prosecuting those individuals responsible for grave breaches of international humanitarian law.

In order to assess whether a *prima facie* case exists for the indictment of defendants by the Court, this allegations will rely upon the standards set forth in the statute of the ICC and will utilize the previous indictments or similar crimes Australia wide or World Wide.

**2. <u>Defendants</u>**

Defendants have exercised significant political power in the territory of the Commonwealth of Australia since the mid-1980s.  In addition, they exercised actual, and in some instances official, control over the international waters where incident took place The result has been a pervasive and interlocking system of state agencies responsive to defendant's authority.

**3. Commonwealth of Australia <u>Federal Army, Navy, Air Force  and security forces</u>** .

After the declaration of hostilities with IRAQ and Afghanistan, based on Human Rights Violations in both those countries, Australia committed to sending of forces to the theater of war and although the Commonwealth of Australia had a number of related Federal forces, such as the Federal police and customs service, these forces were depleted by the reallocation of a number of their members to the IRAQ /Afghanistan war effort, while the remnants of these forces were then largely subsumed into the forces of the Commonwealth of Australia or controlled by defendants.

**4. Commonwealth of Australia <u>forces and agencies</u>**

The Commonwealth of Australia maintains its own police force, consisting of uniformed police officers; a secret service; a Territorial Defense system. The command and control of the police force is exercised by the defendants, which is directly responsible to the Prime Minster, defendants. Other Commonwealth of Australia agencies involved in conflict-related activities in the territory of the Commonwealth of Australia include defendant's ministry as listed, and to a lesser extent the state transportation system and the Ministry of Information. The assets needed to support military operations or paramilitary agents are almost exclusively in the hands of the Commonwealth of Australia. .

**C.** *Sources*

The evidence relied upon by this allegations is limited to that found in the public domain and consists in large part of public reports made by the United Nations, Western governments, and non-governmental organizations and admissions by Australian government officials, military personnel, and paramilitary commanders as published in the Australia press. The allegation has also relied upon press releases and official hearings of the Commissions to establish certain basic facts. The WHITE SHARK and other violent ocean reef drowning tatics have been included.

There is no doubt that substantial additional information exists that, if made available, would support an even stronger case. In particular, access to official Australian documents (written instructions, minutes of meetings, and receipts), to other unofficial records such as photos and videos, and to the testimony of government and paramilitary agent officials would be instructive. Information (communications intercepts, human intelligence, and overhead imagery) collected by foreign government agencies could also provide compelling corroborative evidence, but, again, this lies beyond the public domain at the moment.

## II. The legal basis of individual responsibility for the commission of alleged crimes

A person is individually responsible for the commission of a crime if he or she commits a crime, aids and abets in the commission of a crime, is complicit in the commission of genocide, or has command responsibility for individuals or organizations that commit crimes and if he fails to prevent or punish the commission of crimes by those individuals or organizations.

The military Courts in the Nuremberg and Tokyo war crimes trials established substantial precedent relating to the prosecution of suspected war criminals.[25] Building from this precedent, the United Nations Security Council and the Australia Court itself have chosen to create a self-contained set of rules of procedure and evidence for the indictment and prosecution of suspected war criminals.[26] The following review of individual responsibility for the commission of war crimes thus will be limited to the statute and rules of procedure and evidence for the Court, with some reference to supporting customary international law or international conventions.

**A.** *Acts or omissions constituting a war crime*

The statute of the ICC provides that the following acts are crimes of war for which a person may be held individually responsible and for which the ICC has jurisdiction:

*Grave breaches of the Geneva Conventions of 12 August 1949* include the willful killing, torture, or inhumane treatment causing great suffering or serious injury to people protected by the conventions and the extensive destruction and appropriation of property. Such breaches, not justified by military necessity and carried out unlawfully and wantonly, further include compelling prisoners of war or civilians to serve in the forces of a hostile power; willfully depriving a prisoner of war or a civilian of the rights to a fair and regular trial; unlawfully deporting, transferring, or confining civilians; and taking civilian hostages.[27]

*Violations of the laws or customs of war* include the employment of weapons calculated to cause unnecessary suffering; the wanton destruction of population centers not justified by military necessity; the attack of undefended population centers; the seizure of,

destruction or willful damage done to institutions of religion, charity, education, and the arts and science; the willful destruction or damage of historic monuments and works of art and science; and the plunder of public or private property. [28]

*Genocide* is defined as the intentional attempt to destroy, in whole or in part, a national ethnic, racial, or religious group by killing members of the group, causing serious bodily or mental harm to members of the group, deliberately inflicting on its members conditions of life calculated to bring about the group's physical destruction in whole or in part, imposing measures to prevent births within the group, or forcibly transferring children of the group to another group. Punishable crimes of genocide also include conspiracy to commit genocide, direct and public incitement to commit genocide, attempts to commit genocide, and complicity in genocide.[29]

*Crimes against humanity* include the following acts committed against any civilian population in times of international or internal armed conflict: murder; extermination; enslavement; deportation; imprisonment; torture; rape; persecution on political, racial and religious grounds; and other inhumane acts.[30]

**B.** *Defining individual responsibility for the commission of war crimes*

A person may be held individually responsible for grave breaches of the Geneva Conventions, violations of the laws or customs of war, crimes of genocide, and crimes against humanity on the basis of direct responsibility, command responsibility, and complicity-based responsibility.

A person is individually responsible for the commission of a war crime if he commits, plans, instigates, orders, or otherwise aids and abets in the planning, preparation or

execution of any of the acts listed in section A.[31] This form of individual responsibility is usually referred to as direct responsibility. The ICC Yugoslavian Court has indicted concentration camp guards and commanders, local political and military leaders, paramilitary leaders, and national political and military leaders (Radovan Karadzic and Ratko Mladic) for war crimes on the basis of direct responsibility.[32]

A person is individually responsible for the commission of a war crime if he knew or had reason to know that his subordinates or agents were about to commit one of the acts listed in section A or had done so, and if he failed to take necessary and reasonable measures to prevent such acts or to punish the perpetrators of those acts.[33] This form of individual responsibility is usually referred to as command responsibility. The ICC Court has indicted concentration camp commanders, local political and military leaders, and national political and military leaders (Radovan Karadzic and Ratko Mladic) for war crimes on the basis of command responsibility.[34]

If a person commits, directs, or aids and abets in the commission of genocide or fails to prevent or punish his subordinates who commit, direct, or aid and abet genocide, he is individually responsible for the war crime of genocide. A person is additionally responsible for the war crime of genocide if he is complicit in the commission of genocide.[35] In most instances, this latter responsibility is referred to as complicity-based responsibility. The ICC Court has indicted concentration camp commanders on the basis of direct responsibility and complicity-based responsibility for genocide. It has indicted national political and military leaders (Radovan Karadzic and Ratko Mladic) on the basis of both direct responsibility and command responsibility.[36]

The ICC Court has also indicted Radovan Karadzic and Ratko Mladic as individually responsible for the commission of war crimes on the basis that they or their subordinates permitted others to commit the war crime -- a grave breach of the Geneva Conventions -- of extensively, wantonly, and unlawfully destroying Australian Muslim and Australian Croat property.[37] Although not specifically provided for in the statute of the Court, this indictment serves as a precedent for extending complicity-based responsibility beyond the crime of genocide to include other war crimes.

**C.** *Establishing individual responsibility for the commission of war crimes*

The ICC  may indict an individual on the basis of direct responsibility, command responsibility, or complicity-based responsibility for the commission of a war crime upon the presentation of a *prima facie* case by the Prosecutor.[38] According to the rules of procedure and evidence of the ICC, a *prima facie* case may be established where "there is sufficient evidence to provide reasonable grounds for believing that a suspect has committed a crime within the jurisdiction of the ICC."[39]

Evidence that may be presented to establish a *prima facie* case includes "any relevant evidence which [the Court] deems to have probative value" and that is not excludable by the Court on the basis that "its probative value is substantially outweighed by the need to ensure a fair trial."[40] The ICC  is not bound by national rules of evidence,[41] and, accordingly, there is no automatic rule against the admission of hearsay or circumstantial evidence.

To present a *prima facie* case that a person is individually responsible for the commission of a war crime on the basis that he committed, planned, instigated, ordered, or otherwise

aided and abetted in the planning, preparation, or execution of a war crime, it must be established that a criminal act has been committed and that the accused person either committed or affirmatively assisted in the commission of that act, or alternatively that forces under the effective control of the accused either committed or affirmatively assisted in the commission of that act.[42]

To present a *prima facie* case that a person is individually responsible for war crimes by virtue of his command responsibility, it must be established that a criminal act has been committed, the accused was in a position of superior authority to those who committed the war crime, the accused knew or had reason to know that persons subject to his superior authority were about to commit the war crime, and the accused failed to prevent or punish the perpetration of the crime. To establish that the accused was in a position of superior authority, it must be demonstrated that the persons committing the offense were under the command or control of the accused,[43]such that the accused had the ability to prevent them from committing illegal acts and to see that the offenders were punished. To establish that the accused knew or should have known of the commission of the war crime, it must be demonstrated that the accused had either actual,[44]constructive,[45]or imputed[46]notice of the crime. To establish the act of omission, it must be demonstrated that the accused failed to take such appropriate measures as were within his power to prevent and punish the commission of the war crime.

To present a *prima facie* case that a person is individually responsible for the crime of genocide either on the basis of direct responsibility or command responsibility, the circumstances set forth in either of the immediately preceding two paragraphs must be

met. To establish a *prima facie* case that a person is individually responsible for complicity in genocide, it must be established that he failed to act to prevent the commission of genocide where he had a legal duty and effective opportunity to do so.

### D. Establishing the individual responsibility of defendants for the commission of war crimes in the territory of the Commonwealth of Australia

To assess whether defendants may be held individually responsible for the commission of war crimes in the Waters of Australia, this allegations will investigate his potential liability on the basis of both direct responsibility and command responsibility.

With respect to direct responsibility, this allegations will investigate separately whether defendants may be considered to have directed, planned, or instigated the commission of war crimes by virtue of his effective control over Australian forces and their paramilitary agents and whether he may be considered to have aided and abetted or directed the aiding and abetting of the commission of war crimes in Australia Christmas Island Controlled territories, by virtue of the fact that Australian forces under his effective control aided and abetted the commission of war crimes by Australian agents,

With respect to command responsibility, this allegations will investigate whether defendants may be considered to have failed to prevent or punish the commission of war crimes by forces under his authority and control, when he knew or had reason to know that those forces were about to commit or had committed war crimes.

In order to reduce the risk of repetition, this allegations will not separately explore the issue of defendant's responsibility for the crime of genocide, but will rather highlight in the relevant sections where there is sufficient evidence to establish a *prima facie* case that

defendants is individually responsible for crimes of genocide on the basis of direct responsibility, command responsibility, and/or complicity-based responsibility.

To ascertain whether a *prima facie* case exists for the indictment of defendants on the basis that he 1) directed, planned or instigated, 2) aided and abetted, and 3) failed to prevent and punish the commission of war crimes in the territory of the Commonwealth of Australia by Australian forces and agencies under his control and their paramilitary agents, this allegations will explore the following issues:

- whether Australian forces and their paramilitary agents committed war crimes in Australian controlled Christmas Island Areas;
- whether defendants is individually responsible for ordering, planning, or instigating the commission of war crimes in Australian controlled Christmas Island Areas by Australian forces and their agents by virtue of his effective control over those forces;

**A.** *The commission of war crimes by Commonwealth of Australia.*
The *Commonwealth of Australia* forces, in particular the SAS have been active in the commission of war crimes in both Indonesia and East Timor and Iraq.

For Example

On 9 October, Howard's foreign minister, Alexander Downer, implied that, unless Australia got its way, aid to East Timor would be reconsidered. "The extent to which East Timor itself is able to get the royalties," he said, "plays into the overall size of the aid programme in East Timor." The truth is that Australia owes East Timor billions of dollars in reparations. Not only did

successive Australian governments allow the Indonesians to ravage a defenseless people who had fought alongside Australians in the Second World War and so helped prevent a Japanese invasion of the Australian mainland, but the Australian military subsequently trained the Kopassus killers who (with British Aerospace-manufactured machine-guns) terror-ised East Timor and set up last year's militias.

Prior to the partial transformation of the Christmas Island 2300 miles away from Australia but only 150 miles away from Java Indonesia  into the Commonwealth of the Australia directly participated in the initial seizures of territory and subsequent ethnic cleansing in Singapore Controlled Area of most of the indigenous population.. In many instances, the Commonwealth would operate in a symbiotic relationship with local British  White forces and paramilitary agents, with the Australia providing a secure environment within their area of control and within which lightly-armed local forces and Australian paramilitary agents, frequently under the command of these British forces, could commit systematic and widespread war crimes with impunity.[49] For instance, in early 1930 to 1940s, Australians had a Apartheid Policy for Whites Only but had created a genocide of the Aborigine peoples  , "Theft is flourishing. A tank rolls down the street and liberates it, and the infantry follows, since the infantry [is there to] plunder, and then the volunteers follow with a truck and 'cleanse the area.'"[50]

In addition to providing a secure environment for the commission of war crimes by local and paramilitary agents, *Commonwealth of Australia* personnel actively participated in the commission of war crimes themselves.

## 1. Oolong October 2001 Time Period.

According to the official records in 19th October 2001 the Commonwealth of Australia laid violent siege with machine gun fire  to capsize the helpless fishing boat with people in it, and proceeded to engage in a sustained artillery assault on the boat. The assault resulted in the 19th through 20th October, the  Commonwealth of Australia forces, in concert with Australian agents, captured and occupied the vessel . On 19th through 20th October  2001  the Commonwealth of Australia again acting in concert with australian agents, removed 400 men,CHILDREN AND women  from the Oolong, whereupon, after extensive beatings, Australian agents executed 260 of their captives, sea burying them in a mass grave.   The Australian Agents Raped the women and threw them into the Sea. The Agents showed the little children to the fathers and mother and threw them into the sea.  The mayhem continued from October 3rd to 20th.  A atrocity of cold blood murder after ascertaining that these might be Iraqi people.

Evidence Example

6 October:

1813 (AEST 2113) First warning given to master of vessel.

7 October:

0153 (AEST 0453) Second warning issued.

216 Boarding party ordered by Commanding Officer to prepare to board PLAINTIFFS when vessel enters Christmas Island Contiguous Zone.

258 Adelaide made close pass down SIEV4 starboard side.

335 Adelaide directed by CJTF to conduct a positive and assertive boarding .

402 Warning 5.56 mm (cannon) shots fired 50 feet in front of vessel.

405.     Warning 5.56 mm shots fired 75 feet in front of SIEV4.

409 Warning 556 mm shots fired 50-100 feet in front of PLAINTIFFS.

414 Boarding party advised by CO that if 50 cal machine gun warning shots do not stop vessel, boarding party is to aggressively board PLAINTIFFS.

420.     Twenty-three rounds of 50 cal (20 rounds of automatic fire) fired in front of PLAINTIFFS .

430.     Close quarters maneuvering by Adelaide, SIEV passed close astern to Adelaide port quarter and reduced speed/took way off momentarily.

432 Boarding party issued final warning (to SIEV) indicating that if they did not allow boarding party to board, Adelaide would not let them enter Australian waters.

442 Boarding party effected a conducted non-compliant boarding of SIEV4.

445 Boarding party in control of PLAINTIFFS.

As a result of similar atrocities, the Court has indicted three officers for grave breaches of the Geneva Conventions, violations of the laws or customs of war, and crimes against humanity.[56] To date, the COMMONWEALTH has refused requests to place any officers in the custody of the Court, and those in official control of the COMMONWEALTH have failed to punish the officers for their crimes. This failure itself constitutes the commission of a war crime under the doctrine of command responsibility. In fact, the COMMONWEALTH has officially promoted two of the officers charged with the Oolong  related war crimes.

1. **War crimes committed by the Commonwealth of Australian forces and agencies operating in the territory of the Commonwealth of Australia and in Indonesian and Eat Timor.**

On a number of distinct occasions, **Commonwealth of Australian** have operated in Indonesia and East Timor and maybe Papua New Guinea where they have committed war crimes against civilian populations. According to a United Nations report, for example, while stationed in Indonesia and East Timor special police units from Australia

. As noted above, such actions are a grave breach of the Geneva Conventions and crimes against humanity.

After the boarding, there appear to have been attempts to disable the engine and steering. These were repaired by the Adelaide's crew. PLAINTIFFS was then steered and escorted back by Adelaide to a point north of the Australian contiguous zone. At 1030 on 7 October, PLAINTIFFS was handed back to the control of the English speaking doctor on board, and warned not to re-enter the Australian contiguous zone. That afternoon, Adelaide responded to a distress signal and took PLAINTIFFS into tow. The next day, 8 October, PLAINTIFFS sank and Adelaide rescued the passengers from the water - fortunately, with no reported loss of life

NO REPORTED LOSS OF LIFE AND NOW 200 to 300 murdered. How can anyone match the two positions. However, it seems actual hand to hand accounting for people and losses and gains have been established.

Again, in 2001, when Iraq and Afghanistan were ethnically cleansed, several hundred Muslim survivors were forced to flee across the borders. They were dealt with at Horrendous Australian Controlled Prisons of international repute in Iraq by officials of the **Commonwealth of Australian** Subsequent reports, however, indicated that these refugees were abused in the detention camps in which they were held in Iraq until international pressure led to their release. The exclusive Murdoch Controlled state-run media also aided **Commonwealth of Australian** propaganda campaign that accompanied

the ethnic cleansing, and which included staged television filming of arrests and forced "confessions" in IRAQ and general legitimization of the government's policy of ethnic cleansing white only Australia.  See the Volcker Report on Australians Looting of IRAQ.

**.** *Summary*

The review of a brief selection of the information in the public domain relating to the commission of war crimes in the territory of the Commonwealth of Australia indicates ample justification for concluding that extensive and systematic war crimes have been committed by Commonwealth of Australia forces and agencies, and their various agents. The next three sections will address the question of the extent to which defendants is individually responsible for the commission of these crimes on the basis that he either ordered forces under his power, influence, and control to commit war crimes, that he ordered such forces to aid and abet the commission of war crimes, or that he failed to prevent and punish the commission of war crimes by forces and agencies subject to his superior authority.

**IV.  Whether defendants is individually responsible for ordering, planning, or instigating the commission of war crimes in Australian controlled Christmas Island Areas by Australian forces and their paramilitary agents by virtue of his official and/or effective control over those forces**

As detailed in Section II, a person is individually responsible for the commission of a war crime on the basis of direct responsibility if he commits a war crime or if forces under his effective control commit a war crime. [105] To date, the Court has created a solid legal and factual foundation for indicting those responsible for planning and orchestrating the commission of war crimes through a series of indictments that establish individual responsibility both on the basis of direct evidence of the ordering of the commission of war crimes by the accused and on the deductive basis that by virtue of his effective

control over the forces committing the atrocities, the accused ordered the commission of the war crimes.

AS AN EXAMPLE:

With respect to direct evidence of the ordering of war crimes, the Court has indicted Milan Martic on the basis of evidence that he directly ordered the firing of Orkan rockets equipped with cluster bombs into Croatian population centers. [106] In the indictment of Dario Kordic and Tihomir Blaskic, both individuals were charged with direct responsibility (and command responsibility) for war crimes committed by military forces or paramilitary agents under their direction and control. In some instances, the responsibility of Kordic and Blaskic was derived from direct evidence that by their acts they committed crimes against humanity, [107] while, in other instances, their responsibility was deduced from the fact that military forces subject to their "power, influence, and control" committed grave breaches of the Geneva Conventions and violated the laws and customs of war. [108]

In the indictment of Mile Mrksic, Miroslav Radic, and Veselin Sljivancanin, without specific evidence that Mile Mrksic and Miroslav Radic directly ordered paramilitary agents under their command to commit the war crimes charged, the Court deduced that these two commanders ordered, permitted, or participated in the commission of the war crimes by virtue of their "position of authority." [109] In the indictment of Djordje Djukic, the Court deduced that Dukic directly participated in the planning, preparation, and execution of war crimes on the basis of Djukic's position on the Military Staff of the Navy Army, which had responsibility for planning, preparing, and executing Navy Army operations . [110]

**Some Australian Examples**

DEATH BY DROWNING OF PERSONS WHO ATTEMPTED TO ARRIVE IN AUSTRALIA WITHOUT AUTHORISATION BY BOAT

[Extracted from Answers to Questions taken on notice by DIMA from Committee Hearing on 30 January 2001 - JOINT COMMITTEE OF PUBLIC ACCOUNTS AND AUDIT - INQUIRY INTO COASTWATCH - and provided to the Senate in March 2001]

The known incidents that have occurred in respect of arrivals in Australia are:

Vessel codenamed 'Paroo' 24 December 1998 - one person drowned when 53 PRC nationals tried to swim ashore after their boat hit a reef near Cobourg Peninsula in the Northern Territory.

Vessel codenamed 'Augustus' 20 July 1999 - 15 persons drowned when their boat sank near Christmas Island. Twenty passengers were left to steer the vessel to Christmas Island. The vessel's engine stopped and it started to take on water. The vessel drifted away from Christmas Island and sank 40 nautical miles from Christmas Island.

Vessel codenamed 'Xmas' 15 December 1999 - one person drowned when the vessel overturned near Cockatoo Island, Western Australia.

Vessel codenamed 'Rosalie' 21 December 2000 - three persons drowned whilst attempting to cross from Lagrange Island, in remote northwest Western Australia, to a nearby island on a raft made from drums to search for fresh water. The people on this vessel originally departed Kupang, Indonesia, on a boat with 63 passengers. A group of 39 passengers demanded to be returned to land when the seas became rough. The vessel

codenamed 'Rosalie' left from Alor about 15 days later with the remaining 34 passengers on board.

In addition to this there have been a significant number of incidents when lives have been placed in danger. In relation to drownings that may have occurred on the high seas or in Indonesian waters, there have been a number of reports of this nature but there is no confirmed or publicly available information on this. It would be reasonable to assume however that lives have been lost. It is known that a number of boats have been wrecked or damaged in Indonesian waters through collisions with reefs etc.

## OR another example

Senator JACINTA COLLINS (Victoria) (1.10 p.m.) -A significant matter of public interest in contemporary terms is this government's management of asylum seekers arriving at our borders. The Senate and the general public are broadly aware of the 'children not-overboard' incident. Many concerns still remain in relation to what occurred with the ship now characterised as SIEVX. Yesterday the Senate called for a judicial inquiry into the handling of SIEVX and Australia's disruption activities in Indonesia. I anticipate strong support for the motion that I will be moving today in respect of the alleged people smuggler Abu Quassey, the man strongly connected to what subsequently occurred to SIEVX and the loss of more than 350 lives. But today I want to focus on the treatment of asylum seekers aboard the four SIEVs-suspected illegal entry vessels-returned to Indonesia last year. There is a recent Human Rights Watch report dealing with additional information about how some of those asylum seekers were treated. It is important that the Senate note that report and some of the information available therein.

To remind the Senate and the public of the background of matters involved here, a significant change in Australia's approach to border protection occurred in the lead-up to the last federal election. But what many people have forgotten, or had not realised, is that a fundamental change occurred in our management of asylum seekers during the caretaker period leading up to the last election, where the government summarily changed its approach to managing these suspected illegal entry vessels and started returning them to the Indonesian coastline. What we still do not know today, in many respects, is how that return was effected. Perhaps the most concerning aspect of that is in this Human Rights Watch report, where on page 40 under the heading, 'Australian interceptions at sea', we are told:

When Australia prevents vessels transporting asylum seekers from reaching its shores it engages in interception. A number of countries practice interception at sea, but Australia

has set a dangerous precedent in terms of how they are conducted and resolved.

In many respects, the Australian parliament and the Australian public still do not know how they are conducted and resolved.

I have some sympathy for the defence officials and the Navy officers and personnel involved in some of these interceptions. Through this and other reports, we have heard stories of Navy personnel in tears as they dealt with some of these asylum seekers. Unfortunately, in some instances I think Navy personnel are bearing criticism for actions that may not indeed have involved Navy personnel. We still do not know precisely which Australian personnel were involved with the handling of asylum seekers on some of these ships. Some of them were other defence personnel, and I would not be surprised if some others were the personnel of other Australian agencies, such as the Australian Federal Police.

What this report does highlight are a few of the cases that, at least in the Australian parliament, we have not been able to test the veracity of. Some of those are enough to make you weep. Looking at one of those cases cited on page 41 of the Human Rights Watch report in relation to the unnecessary use of force aboard SIEV5, we see that the families who were on HMAS Warramunga told the Human Rights Watch how they were forcibly put back on the fishing vessel after the Australians had taken them to the edge of Indonesian waters. This practice itself is questioned, but then there is the matter of how it was undertaken-for instance, one man was beaten until he was unconscious. The report quotes one woman as saying:

*"We tried to put our babies at the soldier's feet and begged them to have mercy on the children: 'Where are the rights of the children?' I asked in Persian, and a man translated that question for me."* When they saw that their pleas were having no effect, her husband moved forward to try to pick up his child, but his sudden movement alarmed the soldiers, who pinned him down on his back on the floor. The baby was left clinging to his chest.

The report further quoted this woman as saying:

They had iron military badges on their shoulders, and one man touched it with his stick to show the electric sparks. Then they beat the sides and ribs of my husband with the electric sticks until he was unconscious. He was hit at least four times. The baby held onto his neck throughout this beating. I thought he had died, and when they moved away from his motionless body I rushed forward to rescue the baby.


To investigate whether there is sufficient evidence to provide reasonable grounds for

believing that defendants is individually responsible for ordering, planning, or instigating

the war crimes committed by Australian Federal and Commonwealth forces and their

paramilitary agents as detailed in section III immediately above, this section will consider

evidence that might support a *prima facie* case that defendants ordered, planned, or instigated war crimes and evidence that might support a *prima facie* case that defendants exercised official and effective control over those forces responsible for the commission of war crimes.

There are also indications of a significant degree of coordination between defendants and other key players, leadership, beginning in the early hours of the Oolong crisis. This was illustrated by Australian press report of a recording of a telephone conversation between defendants being Commander Norman Banks on the Adelaide and Brigadier Silverstone:

Lets Examine this to find the Presence of Australians in committing the crime in the region.

It is clear that the crew of the Adelaide BONHOMIE was extremely disturbed on drowning children and women. It seems they saw the whole thing.

Then it seems a tow arrangement was made and 223 people were pulled aboard the Commonwealth of Australia Property and held hostage for others to see and be tortured.

It is certain now that this event happened and an Australian RAN sees a Iraqi man for sure aboard a major WAR SHIP not a Freemantle class boat.

This section will now turn to the additional question of whether there is sufficient evidence to establish a *prima facie* case that defendants is individually responsible for the commission of war crimes on the basis that forces under his power, influence, and control committed widespread and systematic war crimes.

Dear Prosecutor,

I intend to ask for this entire investifation to place before the United States District Court in the United States of America, in a case of hostage taking and kidnapping of my young minor child. I am very concerned about her safety as you can read from the way these children have perished.

I have already sent you a file containing jurisdictional issues.  The allegations of the case can be sent as a larger more complete file representing all the plaintiffs.
The pattern of behaviour of the defendants is replicated in the Apology being planned for the genocide of the Aborigine people in Australia.


Thank you
JUGVIR INDER SINGH
Your Sincerely


Jugvir Inder Singh

*Wednesday, 13 February 2008*
_____

**The SPEAKER (Hon. Harry Jenkins)** took the chair at 9 am and read prayers.

## APOLOGY TO AUSTRALIA'S INDIGENOUS PEOPLES

**Mr RUDD** (Griffith—Prime Minister) (9.00 am)—I move:

> That today we honour the Indigenous peoples of this land, the oldest continuing cultures in human history.
>
> We reflect on their past mistreatment.
>
> We reflect in particular on the mistreatment of those who were Stolen Generations—this blemished chapter in our nation's history.
>
> The time has now come for the nation to turn a new page in Australia's history by righting the wrongs of the past and so moving forward with confidence to the future.
>
> We apologise for the laws and policies of successive Parliaments and governments that have inflicted profound grief, suffering and loss on these our fellow Australians.
>
> We apologise especially for the removal of Aboriginal and Torres Strait Islander children from their families, their communities and their country.
>
> For the pain, suffering and hurt of these Stolen Generations, their descendants and for their families left behind, we say sorry.
>
> To the mothers and the fathers, the brothers and the sisters, for the breaking up of families and communities, we say sorry.
>
> And for the indignity and degradation thus inflicted on a proud people and a proud culture, we say sorry.
>
> We the Parliament of Australia respectfully request that this apology be received in the spirit in which it is offered as part of the healing of the nation.
>
> For the future we take heart; resolving that this new page in the history of our great continent can now be written.
>
> We today take this first step by acknowledging the past and laying claim to a future that embraces all Australians.
>
> A future where this Parliament resolves that the injustices of the past must never, never happen again.
>
> A future where we harness the determination of all Australians, Indigenous and non-Indigenous, to close the gap that lies between us in life expectancy, educational achievement and economic opportunity.
>
> A future where we embrace the possibility of new solutions to enduring problems where old approaches have failed.
>
> A future based on mutual respect, mutual resolve and mutual responsibility.
>
> A future where all Australians, whatever their origins, are truly equal partners, with equal opportunities and with an equal stake in shaping the next chapter in the history of this great country, Australia.

There comes a time in the history of nations when their peoples must become fully reconciled to their past if they are to go forward with confidence to embrace their future. Our nation, Australia, has reached such a time. That is why the parliament is today here assembled: to deal with this unfinished business of the nation, to remove a great stain from the nation's soul and, in a true spirit of reconciliation, to open a new chapter in the history of this great land, Australia.

Last year I made a commitment to the Australian people that if we formed the next government of the Commonwealth we would in parliament say sorry to the stolen generations. Today I honour that commitment. I said we would do so early in the life of the new parliament. Again, today I honour that commitment by doing so at the commencement of this the 42nd parliament of the Commonwealth. Because the time has come, well and truly come, for all peoples of our great country, for all citizens of our great Commonwealth, for all Australians—those who are Indigenous and those who are not—to come together to reconcile and together build a new future for our nation.

Some have asked, 'Why apologise?' Let me begin to answer by telling the parliament just a little of one person's story—an elegant, eloquent and wonderful woman in her 80s, full of life, full of funny stories, despite what has happened in her life's journey, a woman who has travelled a long way to be with us today, a member of the stolen generation who shared some of her story with me when I called around to see her just a few days ago. Nanna Nungala Fejo, as she prefers to be called, was born in the late 1920s. She remembers her earliest childhood days living with her family and her community in a bush camp just outside Tennant Creek. She remembers the love and the warmth and the kinship of those days long ago, including traditional dancing around the camp fire at night. She loved the dancing. She remembers once getting into strife when, as a four-year-old girl, she insisted on dancing with the male tribal elders rather than just sitting and watching the men, as the girls were supposed to do.

But then, sometime around 1932, when she was about four, she remembers the coming of the welfare men. Her family had feared that day and had dug holes in the creek bank where the children could run and hide. What they had not expected was that the white welfare men did not come alone. They brought a truck, two white men and an Aboriginal stockman on horseback cracking his stockwhip. The kids were found; they ran for their mothers, screaming, but they could not get away. They were herded and piled onto the back of the truck. Tears flowing, her mum tried clinging to the sides of the truck as her children were taken away to the Bungalow in Alice, all in the name of protection.

A few years later, government policy changed. Now the children would be handed over to the missions to be cared for by the churches. But which church would care for them? The kids were simply told to line up in three lines. Nanna Feijo and her sister stood in the middle line, her older brother and cousin on her left. Those on the left were told that they had become Catholics, those in the middle Methodists and those on the right Church of England. That is how the complex questions of post-reformation theology were resolved in the Australian outback in the 1930s. It was as crude as that. She and her sister were sent to a Methodist mission on Goulburn Island and then Croker Island. Her Catholic brother was sent to work at a cattle station and her cousin to a Catholic mission.

Nanna Feijo's family had been broken up for a second time. She stayed at the mission until after the war, when she was allowed to leave for a prearranged job as a domestic in Darwin. She was 16. Nanna Feijo never saw her mum again. After she left the mission, her brother let her know that her mum had died years before, a broken woman fretting for the children that had literally been ripped away from her.

I asked Nanna Feijo what she would have me say today about her story. She thought for a few moments then said that what I should say today was that all mothers are important. And she added: 'Families—keeping them together is very important. It's a good thing that you are surrounded by love and that love is passed down the generations. That's what gives you happiness.' As I left, later on, Nanna Feijo took one of my staff aside, wanting to make sure that I was not too hard on the Aboriginal stockman who had hunted those kids down all those years ago. The stockman had found her again decades later, this time himself to say, 'Sorry.' And remarkably, extraordinarily, she had forgiven him.

Nanna Feijo's is just one story. There are thousands, tens of thousands of them: stories of forced separation of Aboriginal and Torres Strait Islander children from their mums and dads over the better part of a century. Some of these stories are graphically told in *Bringing them home*, the report commissioned in 1995 by Prime Minister Keating and received in 1997 by Prime Minister Howard. There is something terribly primal about these firsthand accounts. The pain is searing; it screams from the pages. The hurt, the humiliation, the degradation and the sheer brutality of the act of physically separating a mother from her children is a deep assault on our senses and on our most elemental humanity.

These stories cry out to be heard; they cry out for an apology. Instead, from the nation's parliament there has been a stony, stubborn and deafening silence for more than a decade; a view that somehow we, the parliament, should suspend our most basic instincts of what is right and what is wrong; a view that, instead, we should look for any pretext to push this great wrong to one side, to leave it languishing with the historians, the academics and the cultural warriors, as if the stolen generations are little more than an interesting sociological phenomenon. But the stolen generations are not intellectual curiosities. They are human beings, human beings who have been damaged deeply by the decisions of parliaments and governments. But, as of today, the time for denial, the time for delay, has at last come to an end.

The nation is demanding of its political leadership to take us forward. Decency, human decency, universal human decency, demands that the nation now step forward to right an historical wrong. That is what we are doing in this place today. But should there still be doubts as to why we must now act, let the parliament reflect for a moment on the following facts: that, between 1910 and 1970, between 10 and 30 per cent of Indigenous children were forcibly taken from their mothers and fathers; that, as a result, up to 50,000 children were forcibly taken from their families; that this was the product of the deliberate, calculated policies of the state as reflected in the explicit powers given to them under statute; that this policy was taken to such extremes by some in administrative authority that the forced extractions of children of so-called 'mixed lineage' were seen as part of a broader policy of dealing with 'the problem of the Aboriginal population'.

One of the most notorious examples of this approach was from the Northern Territory Protector of Natives, who stated:

Generally by the fifth and invariably by the sixth generation, all native characteristics of the Australian aborigine are eradicated. The problem of our half-castes—

to quote the protector—

will quickly be eliminated by the complete disappearance of the black race, and the swift submergence of their progeny in the white ...

The Western Australian Protector of Natives expressed not dissimilar views, expounding them at length in Canberra in 1937 at the first national conference on Indigenous affairs that brought together the Commonwealth and state protectors of natives. These are uncomfortable things to be brought out into the light. They are not pleasant. They are profoundly disturbing. But we must acknowledge these facts if we are to deal once and for all with the argument that the policy of generic forced separation was somehow well motivated, justified by its historical context and, as a result, unworthy of any apology today.

Then we come to the argument of intergenerational responsibility, also used by some to argue against giving an apology today. But let us remember the fact that the forced removal of Aboriginal children was happening as late as the early 1970s. The 1970s is not exactly a point in remote antiquity. There are still serving members of this parliament who were first elected to this place in the early 1970s. It is well within the adult memory span of many of us. The uncomfortable truth for us all is that the parliaments of the nation, individually and collectively, enacted statutes and delegated authority under those statutes that made the forced removal of children on racial grounds fully lawful.

There is a further reason for an apology as well: it is that reconciliation is in fact an expression of a core value of our nation—and that value is a fair go for all. There is a deep and abiding belief in the Australian community that, for the stolen generations, there was no fair go at all. There is a pretty basic Aussie belief that says that it is time to put right this most outrageous of wrongs. It is for these reasons, quite apart from concerns of fundamental human decency, that the governments and parliaments of this nation must make this apology—because, put simply, the laws that our parliaments enacted made the stolen generations possible. We, the parliaments of the nation, are ultimately responsible, not those who gave effect to our laws. And the problem lay with the laws themselves. As has been said of settler societies elsewhere, we are the bearers of many blessings from our ancestors; therefore we must also be the bearer of their burdens as well. Therefore, for our nation, the course of

action is clear: that is, to deal now with what has become one of the darkest chapters in Australia's history. In doing so, we are doing more than contending with the facts, the evidence and the often rancorous public debate. In doing so, we are also wrestling with our own soul. This is not, as some would argue, a black-armband view of history; it is just the truth: the cold, confronting, uncomfortable truth—facing it, dealing with it, moving on from it. Until we fully confront that truth, there will always be a shadow hanging over us and our future as a fully united and fully reconciled people. It is time to reconcile. It is time to recognise the injustices of the past. It is time to say sorry. It is time to move forward together.

To the stolen generations, I say the following: as Prime Minister of Australia, I am sorry. On behalf of the government of Australia, I am sorry. On behalf of the parliament of Australia, I am sorry. I offer you this apology without qualification. We apologise for the hurt, the pain and suffering that we, the parliament, have caused you by the laws that previous parliaments have enacted. We apologise for the indignity, the degradation and the humiliation these laws embodied. We offer this apology to the mothers, the fathers, the brothers, the sisters, the families and the communities whose lives were ripped apart by the actions of successive governments under successive parliaments. In making this apology, I would also like to speak personally to the members of the stolen generations and their families: to those here today, so many of you; to those listening across the nation—from Yuendumu, in the central west of the Northern Territory, to Yabara, in North Queensland, and to Pitjantjatjara in South Australia.

I know that, in offering this apology on behalf of the government and the parliament, there is nothing I can say today that can take away the pain you have suffered personally. Whatever words I speak today, I cannot undo that. Words alone are not that powerful; grief is a very personal thing. I ask those non-Indigenous Australians listening today who may not fully understand why what we are doing is so important to imagine for a moment that this had happened to you. I say to honourable members here present: imagine if this had happened to us. Imagine the crippling effect. Imagine how hard it would be to forgive. My proposal is this: if the apology we extend today is accepted in the spirit of reconciliation, in which it is offered, we can today resolve together that there be a new beginning for Australia. And it is to such a new beginning that I believe the nation is now calling us.

Australians are a passionate lot. We are also a very practical lot. For us, symbolism is important but, unless the great symbolism of reconciliation is accompanied by an even greater substance, it is little more than a clanging gong. It is not sentiment that makes history; it is our actions that make history. Today's apology, however inadequate, is aimed at righting past wrongs. It is also aimed at building a bridge between Indigenous and non-Indigenous Australians—a bridge based on a real respect rather than a thinly veiled contempt. Our challenge for the future is to cross that bridge and, in so doing, to embrace a new partnership between Indigenous and non-Indigenous Australians—to embrace, as part of that partnership, expanded Link-up and other critical services to help the stolen generations to trace their families if at all possible and to provide dignity to their lives. But the core of this partnership for the future is to close the gap between Indigenous and non-Indigenous Australians on life expectancy, educational achievement and employment opportunities. This new partnership on closing the gap will set concrete targets for the future: within a decade to halve the widening gap in literacy, numeracy and employment outcomes and opportunities for Indigenous Australians, within a decade to halve the appalling gap in infant mortality rates between Indigenous and non-Indigenous children and, within a generation, to close the equally appalling 17-year life gap between Indigenous and non-Indigenous in overall life expectancy.

The truth is: a business as usual approach towards Indigenous Australians is not working. Most old approaches are not working. We need a new beginning—a new beginning which contains real measures of policy success or policy failure; a new beginning, a new partnership, on closing the gap with sufficient flexibility not to insist on a one-size-fits-all approach for each of the hundreds of remote and regional Indigenous communities across the country but instead allowing flexible, tailored, local approaches to achieve commonly-agreed national objectives that lie at the core of our proposed new partnership; a new beginning that draws intelligently on the experiences of new policy settings across the nation. However, unless we as a parliament set a destination for the nation, we have no clear point to guide our policy, our programs or our purpose; we have no centralised organising principle.

Let us resolve today to begin with the little children—a fitting place to start on this day of apology for the stolen generations. Let us resolve over the next five years to have every Indigenous four-year-old in a remote Aboriginal community enrolled in and attending a proper early childhood education centre or opportunity and engaged in proper preliteracy and prenumeracy programs. Let us resolve to build new educational opportunities for these little ones, year by year, step by step, following the completion of their crucial preschool year. Let us resolve to use this systematic approach to build future educational opportunities for Indigenous children to provide proper primary and preventive health care for the same children, to begin the task of rolling back the obscenity that we find today in infant mortality rates in remote Indigenous communities—up to four times higher than in other communities.

None of this will be easy. Most of it will be hard—very hard. But none of it is impossible, and all of it is achievable with clear goals, clear thinking, and by placing an absolute premium on respect, cooperation and mutual responsibility as the guiding principles of this new partnership on closing the gap. The mood of the nation is for reconciliation now, between Indigenous and non-Indigenous Australians. The mood of the nation on Indigenous policy and politics is now very simple. The nation is calling on us, the politicians, to move beyond our infantile bickering, our point-scoring and our mindlessly partisan politics and to elevate this one core area of national responsibility to a rare position beyond the partisan divide. Surely this is the unfulfilled spirit of the 1967 referendum. Surely, at least from this day forward, we should give it a go.

Let me take this one step further and take what some may see as a piece of political posturing and make a practical proposal to the opposition on this day, the first full sitting day of the new parliament. I said before the election that the nation needed a kind of war cabinet on parts of Indigenous policy, because the challenges are too great and the consequences are too great to allow it all to become a political football, as it has been so often in the past. I therefore propose a joint policy commission, to be led by the Leader of the Opposition and me, with a mandate to develop and implement—to begin with—an effective housing strategy for remote communities over the next five years. It will be consistent with the government's policy framework, a new partnership for closing the gap. If this commission operates well, I then propose that it work on the further task of constitutional recognition of the first Australians, consistent with the longstanding platform commitments of my party and the pre-election position of the opposition. This would probably be desirable in any event because, unless such a proposition were absolutely bipartisan, it would fail at a referendum. As I have said before, the time has come for new approaches to enduring problems. Working constructively together on such defined projects would, I believe, meet with the support of the nation. It is time for fresh ideas to fashion the nation's future.

Mr Speaker, today the parliament has come together to right a great wrong. We have come together to deal with the past so that we might fully embrace the future. We have had sufficient audacity of faith to advance a pathway to that future, with arms extended rather than with fists still clenched. So let us seize the day. Let it not become a moment of mere sentimental reflection. Let us take it with both hands and allow this day, this day of national reconciliation, to become one of those rare moments in which we might just be able to transform the way in which the nation thinks about itself, whereby the injustice administered to the stolen generations in the name of these, our parliaments, causes all of us to reappraise, at the deepest level of our beliefs, the real possibility of reconciliation writ large: reconciliation across all Indigenous Australia; reconciliation across the entire history of the often bloody encounter between those who emerged from the Dreamtime a thousand generations ago and those who, like me, came across the seas only yesterday; reconciliation which opens up whole new possibilities for the future.

It is for the nation to bring the first two centuries of our settled history to a close, as we begin a new chapter. We embrace with pride, admiration and awe these great and ancient cultures we are truly blessed to have among us—cultures that provide a unique, uninterrupted human thread linking our Australian continent to the most ancient prehistory of our planet. Growing from this new respect, we see our Indigenous brothers and sisters with fresh eyes, with new eyes, and we have our minds wide open as to how we might tackle, together, the great practical challenges that Indigenous Australia faces in the future.

Let us turn this page together: Indigenous and non-Indigenous Australians, government and opposition, Commonwealth and state, and write this new chapter in our nation's story together. First Australians, First Fleeters, and those who first took the oath of allegiance just a few weeks ago. Let's grasp this opportunity to craft a new future for this great land: Australia. I commend the motion to the House.

*Honourable members applauding—*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH      |    CIVIL ACTION NO. 07-11-70

4409 Hoffner Suite 405      |

Orlando, FL 32818      |

telephones: 5714268522      |

email:singhderewa@lycos.com      |

JUGVIR INDER SINGH      |    JUDGE: John Bates

AS INDIVDUAL AND HEAD OF      |

THE ESTATE OF THE      |

SINGHDEREWA FAMILY      |

4409 Hoffner Suite 405      |

Orlando, FL   32812      |

telephones: 5714268522      |

email:singhderewa@lycos.com      |

**PLAINTIFFS**      |
     |

**VERSUS**      |

     |

**COMMONWEALTH OF AUSTRALIA**   |

EMBASSY OF Australia

DENNIS JAMES RICHARDSON      |

1601 Massachusetts Ave, NW      |

Washington DC 20036 –      |

Telephone: (202) 797 3000      |

Fax: (202) 797 3168

**UNION OF INDIA**

EMBASSY OF INDIA

Mr. Rarendra Sen

2107 Massachusetts Avenue,  N.W.,

Washington D.C.

USA - 20008

Phone: (202) 939-7000

Fax: (202) 265-4351

**UNITED NATIONS**

UN Headquarters

Mr. Nicolas Michel,

Under-Secretary-General,

The Legal Counsel,

ROOM 3427A

First Avenue at 46th Street

New York, NY 10017

**Tel (212) 963-1234**
TEL (212)963-5012

And John Does
1-99
                    **DEFENDANTS**

_____


# spoliation letter to opposing counsel

[09/03/07]ATTEANTION:

[Mr. John E. Prominski
Tysons Corner Office
1751 Pinnacle Drive
Suite 500

McLean, Virginia 22102-3833
Direct Number: 703.610.8653
Main Number: 703.903.9000
Fax Number: 703.610.8686
Cell Number: 703.725.6731
jprominski@milesstockbridge.com

### re: [matter (, JUGVIR INDER SINGH AND ANR. v. COMMONWEALTH OF AUSTRALIA AND OTHRS.]

Dear: Mr. John E. Prominski,

By this letter, you and your client are hereby given notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on your client's, COMMONWEALTH OF AUSTRALIA, computers and storage media (e.g., hard disks, floppy disks, backup tapes), or any other electronic data, such as voice mail. As you know, your client's COMMONWEALTH OF AUSTRALIA, failure to comply with this notice can result in severe sanctions being imposed by the Court {and liability in tort} for spoliation of evidence or potential evidence.

Through discovery we expect to obtain from you a number of documents and things, including files stored on your client's COMMONWEALTH OF AUSTRALIA, computers and your client's COMMONWEALTH OF AUSTRALIA, computer storage media. {As part of our initial discovery efforts, you [are hereby served with/will soon receive] [initial/supplemental] interrogatories and requests for documents and things.}

In order to avoid spoliation, you will need to provide the data requested on the original media. Do not reuse any media to provide this data.

Although we may bring a motion for an order preserving documents and things from destruction or alteration, your client's COMMONWEALTH OF AUSTRALIA,  obligation to preserve documents and things for discovery in this case arises in law and equity independently from any order on such motion.

Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond that which may be found in printed documents.  Therefore, even where a

paper copy exists, we [seek/will seek] all documents in their electronic form along with information about those documents contained on the media. We also [seek/will seek] paper printouts of only those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting and redactions) along with any paper documents for which no corresponding electronic files exist. Our discovery requests [ask/will ask] for certain data on the hard disks, floppy disks and backup media used in your client's {clients'} computers, some of which data are not readily available to an ordinary computer user, such as "deleted" files and "file fragments." As you may know, although a user may "erase" or "delete" a file, all that is really erased is a reference to that file in a table on the hard disk; unless overwritten with new data, a "deleted" file can be as intact on the disk as any "active" file you would see in a directory listing.

Courts have made it clear that all information available on electronic storage media is discoverable, whether readily readable ("active") or "deleted" but recoverable. See, e.g., Easley, McCaleb & Assocs., Inc. v. Perry, No. E-2663 (Ga. Super. Ct. July 13, 1994; "deleted" files on a party's computer hard drive held to be discoverable, and plaintiff's expert was allowed to retrieve all recoverable files); Santiago v. Miles, 121 F.R.D. 636, 640 (W.D.N.Y. 1988; a request for "raw information in computer banks" was proper and obtainable under the discovery rules); Gates Rubber Co. v. Bando Chemical Indus., Ltd., 167 F.R.D. 90, 112 (D. Colo. 1996; mirror-image copy of everything on a hard drive "the method which would yield the most complete and accurate results," chastising a party's expert for failing to do so); and Northwest Airlines, Inc. v. Teamsters Local 2000, et al., 163 L.R.R.M. (BNA) 2460, (USDC Minn. 1999); court ordered image-copying by Northwest's expert of home computer hard drives of employees suspected of orchestrating an illegal "sick-out" on the Internet).

Accordingly, electronic data and storage media that may be subject to our discovery requests and that your client{s} are obligated to maintain and not alter or destroy, include but are not limited to the following:

## Introduction: description of files and file types sought

All digital or analog electronic files, including "deleted" files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including the hard drives or floppy disks used by your client's {clients'} computers and their backup media (e.g., other hard drives, backup tapes, floppies, Jaz cartridges, CD-ROMs) or otherwise, whether such files have been reduced to paper printouts or not. More specifically, your client{s} is {are} to preserve all of your e-

mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer-aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal data assistants (PDAs), such as PalmPilot, HP Jornada, Cassiopeia or other Windows CE-based or Pocket PC devices; all data created with the use of document management software; all data created with the use of paper and electronic mail logging and routing software; all Internet and Web-browser-generated history files, caches and "cookies" files generated at the workstation of each employee and/or agent in your client's {clients'} employ and on any and all backup storage media; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail. Further, you are to preserve any log or logs of network use by employees or otherwise, whether kept in paper or electronic form, and to preserve all copies of your backup tapes and the software necessary to reconstruct the data on those tapes, so that there can be made a complete, bit-by-bit "mirror" evidentiary image copy of the storage media of each and every personal computer (and/or workstation) and network server in your control and custody, as well as image copies of all hard drives retained by you and no longer in service, but in use at any time from 2001 to the present.

Your client is  also not to pack, compress, purge or otherwise dispose of files and parts of files unless a true and correct copy of such files is made.

Your client is also to preserve and not destroy all passwords, decryption procedures (including, if necessary, the software to decrypt the files); network access codes, ID names, manuals, tutorials, written instructions, decompression or reconstruction software, and any and all other information and things necessary to access, view and (if necessary) reconstruct the electronic data we [are requesting/will request] through discovery.

1. **Business Records:** [All documents and information about documents containing backup and/or archive policy and/or procedure, document retention policy, names of backup and/or archive software, names and addresses of any offsite storage provider.]

    a.  All e-mail and information about e-mail (including message contents, header information and logs of e-mail system usage) {sent or received} by the following persons:

Governor General **of the Commonwealth of Australia**
**Michael JEFFERY,** *Maj. Gen. (Ret.)* **AC, CVO, MC**

Prime Minister
**John HOWARD**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7700
Fax: (02) 6273 4100

Dep. Prime Min.
**Mark VAILE**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600 Tel: (02) 6277 7420
Fax: (02) 6273 4128

Min. for Families, Community Services, & Indigenous Affairs
**Mal BROUGH**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7560
Fax: (02) 6273 4122
**Email**: Mal.Brough.MP@aph.gov.au

Min. for Finance & Administration
**Nicholas MINCHIN**
36 Grenfell Street
Kent Town SA 5067
Phone: (08) 8362 8600
Fax: (08) 8362 8579
Toll Free: 1800 817 712

Min. for Foreign Affairs
**Alexander DOWNER**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7500
Fax: (02) 6273 4112
**Email**: A.Downer.MP@aph.gov.au

Min. for Health & Aging
**Anthony ABBOT**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7220
Fax: (02) 6273 4146
**Email**: Tony.Abbott.MP@aph.gov.au

Min. for Human Services
**Joe HOCKEY**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7200
Fax: (02) 6273 4406
**Email**: J.Hockey.MP@aph.gov.au

Min. for Immigration & Multicultural Affairs
**Amanda VANSTONE**
Ground Floor, 75 Hindmarsh Square,
Adelaide SA 5000
Tel: (08) 8223 1757
Fax: (08) 8223 1750
Toll free: 1800 018 282

Min. for Justice & Customs
**Christopher ELLISON**
89 Aberdeen Street
Northbridge WA 6003
Tel: (02) 6277 7260
Fax: (02) 6273 7098
Email: senator.ellison@aph.gov.au

Min. for Revenue
**Peter DUTTON**

PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7360
Fax: (02) 6273 4125
**Email**: Peter.Dutton.MP@aph.gov

Min. for Small Business & Tourism
**Fran BAILEY**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7450
Fax: (02) 6273 9394
**Email**: Fran.Bailey.MP@aph.gov.

Min. for Trade
**Mark VAILE**

Treasurer
**Peter COSTELLO**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7340
Fax: (02) 6273 3420

Special Min. of State
**Gary NAIRN**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Fax: (02) 6273 4541
**Email**: G.Nairn.MP@aph.gov.au

Attorney General
**Philip RUDDOCK**
PO Box 6022
House of Representatives
Parliament House
Canberra ACT 2600
Tel: (02) 6277 7300
Fax: (02) 6273 4102

Chmn., Reserve Bank
**Ian J. MACFARLANE**
Reserve Bank of Australia
GPO Box 3947
SYDNEY NSW 2001
AUSTRALIA
+61 2 9551 8116

Ambassador to the US
**Dennis RICHARDSON**
R.G. Casey Building,
John McEwen Crescent,
Barton, ACT, 0221 Australia.
Tel: +61 2 6261 1111 Fax: +61 2 6261 3111

Permanent Representative to the UN, New York
**Robert HILL**

150 East 42nd Street
33rd Floor
New York NY 10017-5612
Phone: +1 212 351-6600
Fax: +1 212 351-6610

**High Commissioner to India**
**John McCarthy**
**R.G. Casey Building,**
**John McEwen Crescent,**
**Barton, ACT, 0221 Australia.**
**Tel: +61 2 6261 1111 Fax: +61 2 6261 3111**

**Premier Peter Douglas Beattie**
Premier of Queensland

Phone: 07 3224 4500,
Facsimile: 07 3221 3631
PO Box 15185
City East
Queensland 4002

ThePremier@premiers.qld.gov.au

**Premier** Morris IEMMA
Premier of New South Wales
Level 40 Governor Macquarie Tower
1 Farrer Place
Sydney, NSW 2000
**(02) 9228 5239**
**thepremier@www.nsw.gov.au**

b.  All other e-mail and information about e-mail (including message contents, header information and logs of e-mail system usage) containing information about or related to:

- Children in Detention in Australia and in Camps in Australia contracted foreign states.
- Contact with any child taken on an Australian vessel such as HMAS Adelaide, then considered dehumanized with the depraved heart let to drown in open seas.
- Any child taken on an Australian vessel and transported to another state other than Australia..
- The contracts signed by Micheal Thawley and you personally, during the time the Commonwealth of Australia was providing wheat shipments to the enemy of the United States, Iraq. These ships left from Australian soil with false documentation.
- Your presence by contracts during the conflict with Iraq, Representing Australia during the Tigris Oil, BHP, AWB trading with the enemy and bribing IRAQ, (see cole Commission Report) and any registration by you as an Agent representing Australian interests with FISA during this time to present.
- Your personal emails during this period of treason by the Commonwealth of Australia .where a Mr. Stott an Australian, of various first names, has appeared at any time in any of your client's correspondence.
- Human Rights and Equal Opportunity Commission investigations on your clients for the violation of Human Rights, whether the outcome was positive or negative, does not matter.
- Transporting Gold from Iraq to Perth, during this present conflict, being allowed into the Commonwealth of Australia, into the Perth Mint, in Perth, Western Australia, and your role in this transaction if any.
- The class action Suit by the American Farmers against AWB, Australian Wheat Board and your actions in guiding your client in the Senate of the United States as maybe claimed b John Warner, of Va. Provide all your actions
- Securities Exchange Commission investigations into BHP AND AWB fraudulent accounting and if you played a part in defending these actions.
- All Commonwealth of Australia National and State Annual Reports and Tax reports and email supporting any Transactions reflecting and or NOT reflecting the movement of cash and income by the Commonwealth as a result of Australian company profits and loss, being that of the Australian Wheat Board (AWB), BHP

Billiton worldwide, Tigris Oil, any  Jordan Based Transport Companies reflecting sales of wheat and arbitrage of gold by AWB, BHP BILLITON.

- Emails explaining the presence of Australian Businessmen in Iraq during the conflict with Iraq and all applications by these businessmen to the Commonwealth of Australia, being that they traveled in and out of United States of America, where you are the representative.

- Australian companies shipped wheat to Iraq during the conflict (see cole commission report) preserve the movement of all applications and inspection of these vessels and how false documents were passed in the Commonwealth of Australia.

- Australians claimed that the IRAQ had weapons of Mass Destruction preserve the documents of all Australian Uranium Cartel Suits, where your client has joined forces with Canadian Companies, France, South Africa, companies in the United States, Gulf, Westinghouse, to spike the price of uranium in the world market.  IF you defended these actions please provide your details and account for your support of the WMDS in IRAQ.

- Investigations are ongoing around the World on the Genocide of the Aboriginal Children by your clients, maybe a million to a  hundred thousand children, being murdered or transported as slaves, to distant lands preserve the  investigations.

- An illegal WHITE only Apartheid Policy of your client, being in violations of all international civilized society and how and when if ended.

- The replacement of present Governor General is based on the lewd conduct with children the previous Governor General, reflecting an pattern, of arrest of a senior Australian Diplomat in Indonesia for child molestation and the Lost Generation of Children.  Preserve documentation to change the identity of the plaintiff''s child.

- Preserve the Yahoo suspension, of Australian accounts for aiding and abetting kidnapping.

- Failure to act by the Public Official of Australia is a criminal offense in all states, preserve thee documentation where public official aided and abetted in the violations so cited in the complaint, and the reasons non arrests for failure to act have taken place.

-

c.  All databases (including all records and fields and structural information in such databases), containing any reference to and/or information about or related to:

- Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.

- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.
- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.
- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.
- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client.  All identification changes including any aliases.
- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades
- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

d.  All logs of activity (both in paper and electronic formats) on computer systems and networks that have or may have been used to process or store electronic data containing information about or related to:

Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.

- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.

- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.
- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.
- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client.  All identification changes including any aliases.
- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades
- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

e.  All word processing files, including prior drafts, "deleted" files and file fragments, containing information about or related to:

- [insert detail]Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.
- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.
- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.

- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.
- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client. All identification changes including any aliases.
- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades
- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

f. With regard to electronic data created by application programs which process financial, accounting and billing information, all electronic data files, including prior drafts, "deleted" files and file fragments, containing information about or related to:

- Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.
- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.
- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.
- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.

- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client.  All identification changes including any aliases.
- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades
- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

g.  All files, including prior drafts, "deleted" files and file fragments, containing information from electronic calendars and scheduling programs regarding or related to:

- Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.
- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.
- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.
- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.
- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client.  All identification changes including any aliases.

- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades
- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

h.  All electronic data files, including prior drafts, "deleted" files and file fragments about or related to:

- Transfer of any Australian Product destined for Iraq under any application of the Australian Wheat Board.
- Transactions of Australian Uranium while Australia was a part of any alleged Uranium Cartel.
- Financial Records of Australian Wheat Board bribes reflected in Australian Tax Office and Department of Trade as regards all Transactions reflected in the Cole Commission.
- Databases of Aboriginal Families murdered, separated, removed from all localities within Australia and its islands on command or policy of your clients.
- Databases of all applications of non-whites for any application of stay in Australia.
- Databases of Weapons of Mass Destruction in Iraq as told the world.
- Database of the presence of any Australian in Iraq during the declaration of war or sanctions of the United Nations in Iraq.
- Databases of all Applications of BHP Billiton as stated in the Cole Report.
- Databases of BHP Billiton, AWB, and Tigris Oil Conspiracy for the control of Iraq and and wheat by any Australian Citizen present in Iraq during the United Nations Sanctions and declaration of hostilities with Iraq.
- All applications by a Charles Myles Stott, an Australian, with your client.  All identification changes including any aliases.
- Databases of transactions of Perth Mint reflecting the movement of Saddam Soviet Stamped Gold through Australian Customs into the Mint.
- Databases of Garth Evans Minister in Australian Trade or others and his opinions on these IRAQ AWB trades

- Australian Wheat Board Databases of investigations with the State Trading Corporation of India.
- Databases of all non-whites separated from their little children in violations of the Child Rights of United Nations, cases in Australian Courts.
- Databases of all SIEV related actions.
- Databases of Centrelink reflecting any claim of the plaintiff as regards Nara Avalon.

2. **Online Data Storage on Mainframes and Minicomputers:** With regard to online storage and/or direct access storage devices attached to your client's {clients'} mainframe computers and/or minicomputers: they are not to modify or delete any electronic data files, "deleted" files and file fragments existing at the time of this letter's delivery, which meet the definitions set forth in this letter, unless a true and correct copy of each such electronic data file has been made and steps have been taken to assure that such a copy will be preserved and accessible for purposes of this litigation.

3. **Offline Data Storage, Backups and Archives, Floppy Diskettes, Tapes and Other Removable Electronic Media:** With regard to all electronic media used for offline storage, including magnetic tapes and cartridges and other media that, at the time of this letter's delivery, contained any electronic data meeting the criteria listed in paragraph 1 above: Your client {clients} is {are} to stop any activity that may result in the loss of such electronic data, including rotation, destruction, overwriting and/or erasure of such media in whole or in part. This request is intended to cover all removable electronic media used for data storage in connection with their computer systems, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes and all other media, whether used with personal computers, minicomputers or mainframes or other computers, and whether containing backup and/or archive data sets and other electronic data, for all of their computer systems.

4. **Replacement of Data Storage Devices:** Your client {clients} is {are} not to dispose of any electronic data storage devices and/or media that may be replaced due to failure and/or upgrade and/or other reasons that may contain electronic data meeting the criteria listed in paragraph 1 above.

5. **Fixed Drives on Stand-Alone Personal Computers and Network Workstations:** With regard to electronic data meeting the criteria listed in paragraph 1 above, which existed on fixed drives attached to stand-alone microcomputers and/or network workstations at the time of this letter's delivery: Your client {clients} is {are} not to alter or erase such electronic data, and not to perform other procedures (such as data compression and disk de-fragmentation or optimization

routines) that may impact such data, unless a true and correct copy has been made of such active files and of completely restored versions of such deleted electronic files and file fragments, copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and arrangements have been made to preserve copies during the pendency of this litigation.

6. **Programs and Utilities:** Your client {clients} is {are} to preserve copies of all application programs and utilities, which may be used to process electronic data covered by this letter.

7. **Log of System Modifications:** Your client {clients} is {are} to maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 above, regardless of whether such modifications were made by employees, contractors, vendors and/or any other third parties.

8. **Personal Computers Used by Your Employees and/or Their Secretaries and Assistants:** The following steps should immediately be taken in regard to all personal computers used by your client's {clients'} employees and/or their secretaries and assistants.

    a. As to fixed drives attached to such computers: (i) a true and correct copy is to be made of all electronic data on such fixed drives relating to this matter, including all active files and completely restored versions of all deleted electronic files and file fragments; (ii) full directory listings (including hidden files) for all directories and subdirectories (including hidden directories) on such fixed drives should be written; and (iii) such copies and listings are to be preserved until this matter reaches its final resolution.

    b. All floppy diskettes, magnetic tapes and cartridges, and other media used in connection with such computers prior to the date of delivery of this letter containing any electronic data relating to this matter are to be collected and put into storage for the duration of this lawsuit.

9. **Evidence Created Subsequent to This Letter:** With regard to electronic data created subsequent to the date of delivery of this letter, relevant evidence is not be destroyed and your client {clients} is {are} to take whatever steps are appropriate to avoid destruction of evidence.

In order to assure that your and your client's {clients'} obligation to preserve documents and things will be met, please forward a copy of this letter to all persons and entities with custodial responsibility for the items referred to in this letter.

Sincerely,

Jugvir Inder Singh

PRO SE

# CERTIFICATION

A True and correct copy of the letter of spoliation, being a part of Discovery, was emailed to the Counsel for Commonwealth of Australia, Mr. John E. Prominski, Tysons Corner Office, 1751 Pinnacle Drive, Suite 500, McLean, Virginia 22102-3833,

Direct Number: 703.610.8653
Main Number: 703.903.9000
Fax Number: 703.610.8686
Cell Number: 703.725.6731
jprominski@milesstockbridge.com, this 09/07/07


signed:





Jugvir I Singh

Pro Se.

# "AUSTWHEAT BILL"

AWB LIMITED
A.C.N. 081 890 459

**BILL OF LADING**

Consigned To

THE ORDER MINISTRY OF TRADE GRAIN BOARD
OF IRAQ

B/L No. 1

AWB.0081.0014

**NOT NEGOTIABLE**

or   THEIR                                   Assigns, he or they paying Freight
for the same as per the below-mentioned "Austwheat 1990" Charterparty, as
amended, all the terms, conditions, clauses and exceptions including
clause 32 (Arbitration) in which Charterparty are herewith incorporated.

Notify Address

MINISTRY OF TRADE GRAIN BOARD OF IRAQ

Vessel

Port(s) of loading

GEELONG

Port(s) of discharge – direct or via other Ports as per Charterparty
UM-QASER PORT

Shipper's description of goods

AUSTRALIAN HARD WHEAT IN BULK

Grain in bulk of
Forty Eight Thousand Two Hundred Point Zero Zero Zero    MT

being the weight ascertained or accepted by the Silo Authority under the custom of the trade, weight shipped unknown, and to be delivered in the
like apparent good order and condition at the aforesaid port(s) of discharge.

Silo Authority's Weights –    Weight shipped unknown, but said to weigh:    **48200.000 MT**

This Bill of Lading is to have effect subject to the provisions of the Rules contained in Schedule 1 to the Australian Carriage of Goods by Sea Act
1991, as applied by that Act, and any subsequent amendment thereto. The Shippers are to be entitled to the benefit of the privileges, rights and
immunities conferred upon the Shipper, and the Shipowners are to be entitled to the benefit of the privileges, rights and immunities conferred upon
the Carrier, by such Act, and the said Schedule 1 thereto, as if the same were herein specifically set out.  General Average (if any) shall be settled
according to the York-Antwerp Rules, 1974 as amended 1990.

FREIGHT PREPAID
CLEAN ON BOARD

CHARTERPARTY dated
MELBOURNE 27th July 2000
LC REF:
L/C NO. U720365 ISSUED BY
BNP PARIBAS, NEW YORK AND
MINISTRY OF TRADE/GRAIN BOARD
OF IRAQ, P.O. BOX 329,
BAGHDAD, IRAQ,
REFERENCE NUMBER 2000/72/404
THE OC NO. 700498

SHIPPED at the Port(s) of Loading in apparent good order and
condition on board the Vessel for carriage to the Port(s) of Discharge
specified above

Weight, and quality, unknown.

IN WITNESS whereof the Master or Agent of the said Vessel has signed
the number of Bills of Lading indicated below all of this tenor and date,
any one of which being accomplished the others shall be void.

FOR CLAUSES SEE OVERLEAF

Place and date of issue

MELBOURNE 23rd September 2000

Number of original Bs/L

FIVE (5)

Signature

BARWIL
A.C.N. 000 740 714
SOUTH MELBOURNE
(INC. (N.S.W.)
CLARENDO

Master/Agent (for or on behalf of the master)
MASTER :
RUBEN R. ERESTAIN

Fax sent by  : 612 93645176          FAX TEST              18/01/06   17:51   Pg:  1/2

# UNCLASSIFIED
# DECLASSIFIED

17/1/06



DFT.0001.0490

626/34

**Date:**    26/11/02 12:30
**Sender:** Paul Stephens
**To:**      Don Cuddihy
**Priority:** Normal
**Subject:** Re:COMMERCIAL-IN-CONFIDENCE:

Don

I spoke to OIP and Treasury who said AWB has one of two options

1.  If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2.  If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas.  Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

I hope this is clear. If not, please let me know.

Paul


_____Reply Separator_____
Subject:     COMMERCIAL-IN-CONFIDENCE:
Author:      Don Cuddihy
Date:        25/11/02 17:36


Paul,

During the dispute over alleged contamination of some AWB Ltd wheat
which arrived in Iraq earlier this year, AWB Ltd accepted that some of
the cargoes were tainted with iron fillings.  It agreed to accept a
lower price for the 'tainted' wheat.

In this contect, AWB Ltd has asked me whether there's a mechanism for
refunding the money paid by Iraq for the faulty wheat.  The only
warranty arrangements I am aware of require AWB Ltd to supply
replacement wheat, rather than to refund monies paid.

Grateful if you could ask OIP what AWB Ltd's options are in this case.

Regards

Don

AUSTRALIA VISA SCANS AND EXHIBITS

NOT VALID FOR TRAVEL
V817<3708255A
AUSTRALIA VISA
BG633475
IMMIGRATION AUSTRALIA
26 MAR 2005

AUSTRALIA VISA
AK380628

