**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

RECEIVED

MAR 2 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

**MOTION RESPONSE TO THE DEFENDANTS OPPOSITION TO VACATE AND OR REOPEN**

ABSTRACT:

The plaintiff's have alleged torture and although Rule 60 (b) does not require a showing of "extraordinary circumstances" the plaintiff will show the court the test is met by continuing to allege :

1. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and,

with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances".

2. In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances".

3. The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh and so invokes "extraordinary circumstances".

4. The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances".

5. Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

    a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the

position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

6. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances".

7. Defedants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances".

8. Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope

and the search for meaning in the brutal and indifferent and nightmarish universe

of the earth as a torture cell so invokes "extraordinary circumstances".

9.  The abuser becomes the black hole at the center of the victim's surrealistic galaxy,

sucking in the sufferer's universal need for solace. The victim tries to "control" his

tormentor by becoming one with him (introjecting him) and by appealing to the

monster's presumably dormant humanity and empathy so invokes "extraordinary

circumstances".

10. This bonding is especially strong when the torturer and the tortured form a dyad

and "collaborate" in the rituals and acts of torture (for instance, when the victim is

coerced into selecting the torture implements and the types of torment to be

inflicted, or to choose between two evils) such as entering suit after suit and

police report after police report and approaching every conceivable agency in the

world and so invokes "extraordinary circumstances".

11. The psychologist Shirley Spitz offers this powerful overview of the contradictory

nature of torture in a seminar titled "The Psychology of Torture" (1989):

    a.  "Torture is an obscenity in that it joins what is most private with what is

        most public. Torture entails all the isolation and extreme solitude of

        privacy with none of the usual security embodied therein ... Torture entails

        at the same time all the self exposure of the utterly public with none of its

        possibilities for camaraderie or shared experience. (The presence of an all

        powerful other with whom to merge, without the security of the other's

        benign intentions.)

b.  A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

c.  Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

12. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism, dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions, and psychotic episodes so invokes "extraordinary circumstances".

13. Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances".

14. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

15. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances".

16. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational, if not necessarily benign - has been irrevocably undermined. Social institutions are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances".

17. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

18. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances".

19. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".

20. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

21. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".

22. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

    a.  "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

23. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other "objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".

24. Spitz makes the following observation:

    a.  "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate

with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

25. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender: Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

   a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

26. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human

environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever.

27. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation.

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

CASE 1:07 cv-01170-JDB    Document 29    Filed on    Page 11 of 11

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUGVIR INDER SINGH et al. | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| V | ) CASE NO 1:07-CV-01170 |
| | ) JUDGE BATES |
| | ) |
| COMMONWEALTH OF AUSTRALIA | ) |
| et al. | ) |
| Defendants | ) |

### ORDER

UPON DUE CONSIDERATION of the plaintiffs Response to the defendants motion to oppose rehearing and vactating order and Memorandum Points Supporting and any opposition is thereto, herby

ORDERED: CASE IS WITHIN THE RULE 60 and subchaptesr and is set for rehearing after discovery and written introgataires are completed

ORDERED: CASE IS SET FOR JURY TRIAL.

ENTERED this _____ day of _____ 2007.

_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

CASE 1:07 cv-01170-JDB    Document 29    Filed on                  Page 1 of 28

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

## MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF RESPONSE AND IN OPPOSITION TO DEFENDANTS OPPOSITION TO VACATE AND OR REOPEN

### ARGUMENT ONE:

1. Here, Plaintiffs allege torts that occurred both outside and inside the United States. Plaintiffs concede that the *acts* of *Defendant itself* were all "committed outside the United States." *See* Plaintiffs' Response Brief. "because the wrongful behavior is alleged to have occurred in Australia and perhaps India" SEE ORDER . Moreover, any omissions committed by the defendants itself clearly occurred inside and outside of the United States. Therefore, under FSIA's territorial requirements, the defendant can be held liable for "its own" alleged torts (as opposed to those committed by its

officials or employees), because those alleged torts partly occurred outside of the United States.  SEE ORDER Plaintiff is a resident of Orlando, Florida, proceeding *pro se* and *in forma pauperis*.

2.    Plaintiffs allege that acts and omissions by defendants inside the United States caused personal injuries. Specifically, Plaintiffs allege that Defendant's agents, officials, and employees failed to report known or suspected child abuse, failed to provide adequate care to a minor entrusted to its sovereignty, failed to report plaintiff's child as missing, failed to report the plaintiffs child as held hostage within its sovereignty, have failed to reveal the location of the plaintiffs child, used computers within the sovereign system to change the identity of the plaintiffs child and got CENTERLINK to talk to the plaintiff, deceived the plaintiffs child, a minor that her father is DEAD. These torts – both acts and omissions – alleged to have been committed by the "Defendant's agents, officials, and employees" *in the United States* all certainly occurred within the United States, and thus squarely fall under the tortious activity exception.where the agency CENTERLINK, of the defendants seeks to find the plaintiff in the United States to payout the social security benefits due the family unit.

3.  Plaintiffs' claims meet the tortious conduct exception to FSIA's general rule of immunity, the Court must now consider a final issue. This concerns "the exception within the exception." FSIA will not allow a tort claim, even against officials or employees whose acts and injuries occur in the United States where those officials were exercising their discretionary function.   Called the discretionary function exception, it exempts claims "based upon the exercise or performance or the failure to

exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).

The discretionary function exception of the FSIA is modeled after the corresponding exception in the Federal Tort Claims Act ("FTCA") and is interpreted and applied consistent with FTCA law. *See, e.g., Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018, 1026 (9th Cir. 1987)*. This exception appears based upon the policy view that foreign states should be immune from the consequences of discretionary acts of employees, even within the scope of their employment. Courts have found that both the FTCA and FSIA exceptions are intended to preserve immunity "for decisions grounded in social, economic, and political policy." *In re Terrorist Attacks of September 11, 2001*, 349 F.Supp.2d 765, 794 (S.D.N.Y. 2005) (internal citations and quotations omitted). Consequently, the discretionary function exception preserves immunity for planning-level decisions, as opposed to operational-level decisions. *Id.* (citations omitted).

4. Defendant must satisfy two elements to avail itself of FSIA immunity under the discretionary function exception. First, the challenged action must be discretionary; that is, it must involve "an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA context, this prong means that if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply. *Berkovitz*, 486 U.S. at 536. Second, and even if the challenged action did involve an element of judgment or choice, "a court must determine whether that judgment is of the kind the discretionary function

exception was designed to shield." *Id.*; *Gaubert*, 499 U.S. at 322-23. The Supreme Court explained this prong in *Berkovitz* in the following manner: The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. *Berkovitz*, 486 U.S. at 536 (internal citations omitted).

5. To answer the questions posted by the two *Berkovitz* elements, the Court must define Plaintiffs' negligence claims by their constituent elements. These claims can be distilled into three principal omissions, as laid out in the Complaint: that (1) Defendants failed to *provide safe care* to plaintiff's child entrusted to their care SEE ORDER denying NARA US CITIZEN AND ORDER DENYING preliminary injunctions; that (2) Defendants *failed to warn* plaintiff that his child would be under the care of known or suspected specialists in child separation;*SEE KEVIN RUDD speech Exhbit and Exhibit of Murder* and that (3) Defendants *failed to report* known or suspected child abuse to the appropriate authorities . *See* Complaint and failure to report Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages. Compl. at 22-39.

6. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional

distress, violations of the customary law of human rights, and claims under the
doctrine of *respondeat superior*. The Court should remain open to reconsidering its
decision that the United States-based sovereigns for purposes of FSIA if further
contrary evidence emerges during the litigation.

7. The defendants have it is claimed colluded in this pattern of child abuse and murder
   before and the pattern requirement is now included as EXHIBIT ONE where more than
   300 children are murdered by the Defendant, Australia, with the complete knowledge
   of the defendants India and United Nations. SEE Complaint

8. Then the defendants themselves admit to the GENOCIDE and systematic removal of
   families and the Prime Minister Kevin Rudd apology to the Aborigine nation is
   included as and Exhibit but the collusion between the defendant Australia and united
   Nations even on this investigation of Genocide and mass trafficking of children has
   and might never be investigated but the pattern of behavior is causing duress upon the
   plaintiff as whereabouts of his child being hostage by these sovereigns of protection.


## ARGUMENT TWO

9. Liberty finds no refuge in a jurisprudence of doubt from the Due Process Clause of
   the Fourteenth Amendment. It declares that no State shall "deprive any person of life,
   liberty, or property, without due process of law." The controlling word in the cases
   before us is "liberty." Although a literal reading of the Clause might suggest that it
   governs only the procedures by which a State may deprive persons of liberty, for at
   least 105 years, since *Mugler v. Kansas*, 123 U.S. 623, 660 -661 (1887), the Clause
   has been understood to contain a substantive component as well, one "barring certain

government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). As Justice Brandeis (joined by Justice Holmes) observed,

> [d]espite arguments to the contrary which had seemed to me persuasive, it is settled that the due process clause of the Fourteenth [505 U.S. 833, 847] Amendment applies to matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States. *Whitney v. California*, 274 U.S. 357, 373 (1927) (concurring opinion). [T]he guaranties of due process, though having their roots in Magna Carta's "per legem terrae" and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." *Poe v. Ullman*, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds) (quoting *Hurtado v. California*, 110 U.S. 516, 532 (1884)).

10. [T]he guaranties of due process, though having their roots in Magna Carta's "per legem terrae" and considered as procedural safeguards "against executive usurpation and tyranny," have in this country "become bulwarks also against arbitrary legislation." *Poe v. Ullman*, 367 U.S. 497, 541 (1961) and in this case FSIA has given the right to these defendants to do what they want to whoever they want and continue to wave a flag of sovereignty while killing aborigine children and families by the millions, Indonesian children and Iraq children and then the plaintiffs own child in a collusion with the defendant United Nations and with the complete support of the

defaulted defendant India terrorizing ethnic families in Southeast Asia.

11. The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights. We have held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. See, e.g., *Duncan v. Louisiana*, 391 U.S. 145, 147 -148 (1968). It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual against federal interference by the express provisions of the first eight amendments to the Constitution. See *Adamson v. California*, 332 U.S. 46, 68 -92 (1947) (Black, J., dissenting). The United States of America then would become an essential party to the case and a new case will be filed or this judgment will be set aside where sua sponte the judge see the United States is liable.

12. [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment. Poe v. [505 U.S. 833. 849] Ullman, supra, 367 U.S., at 543 (dissenting from dismissal on jurisdictional grounds). Let us examine the behavior of the defendant in light of this liberty and

look at the ORDER itself to understand the depraved nature of this defendant that has

caused "extraordinary circumstances"

Plaintiff then "filed a Human Rights Complaint with the National Human Right

Commission against the State Actors of Australia and others." *Id*. ¶ 42. "[T]he Human

Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

actions[] against the plaintiff. . . ." *Id*. ¶ 43. Plaintiff also filed a *habeas corpus* petition

in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id*. ¶ 46.

Plaintiff filed this action in June 2007, setting forth the following nine counts:

Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil

RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and

Solatium, and Punitive Damages. Compl. at 22-39.

13. As Justice Harlan observed:

"Due process has not been reduced to any formula; its content cannot be determined by

reference to any code. [505 U.S. 833, 850] The best that can be said is that, through the

course of this Court's decisions, it has represented the balance which our Nation, built

upon postulates of respect for the liberty of the individual, has struck between that liberty

and the demands of organized society. If the supplying of content to this Constitutional

concept has, of necessity, been a rational process, it certainly has not been one where

judges have felt free to roam where unguided speculation might take them. The balance

of which I speak is the balance struck by this country, having regard to what history

teaches are the traditions from which it developed as well as the traditions from which it

broke. That tradition is a living thing. A decision of this Court which radically departs

from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint." *Poe v. Ullman, 367 U.S., at 542* (dissenting from dismissal on jurisdictional grounds). *See also Rochin v. California, supra, at 171-172 (Frankfurter, J., writing for the Court) ("To believe that this judicial exercise of judgment could be avoided by freezing `due process of law' at some fixed stage of time or thought is to suggest that the most important aspect of constitutional adjudication is a function for inanimate machines, and not for judges").*

5. It is conventional constitutional doctrine that, where reasonable people disagree, the government can adopt one position or the other. See, e.g., Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955). That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty. Thus, while some people might disagree about whether or not the flag should be saluted, or disagree about the proposition that it may not be defiled, we have ruled that a State may not compel or enforce one view or the other. See West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624 (1943); Texas v. Johnson, 491 U.S. 397 (1989). Like in this case the defendants can say well father here is your kid on the line talk to her and other reasonable things but the malicious behaviour as patterned in the Genocide murder of children by this defedants causes the extraordinary conditions and environment to seek relief.

6. Once again the plaintiffs allege a fervent view of individual liberty and the force of stare decisis have led the Court to this conclusion. Ante, at 853. Today a majority reaffirms that the Due Process Clause of the Fourteenth Amendment establishes "a

realm of personal liberty which the government may not enter," ante, at 847 - a realm

whose outer limits cannot be determined by interpretations of the Constitution that

focus only on the specific practices of States at the time the Fourteenth Amendment

was adopted. These matters, involving the most intimate and personal choices a

person may make in a lifetime, choices central to personal dignity and autonomy, are

central to the [505 U.S. 833, 924]  liberty protected by the Fourteenth Amendment. Ante,

at 851 (emphasis added).  The matter has become a constitution matter for if the

United States is to sponser the defendants in the hostage taking and child removal and

kidnap depriving him Due Process Clause of the Fourteenth Amendment establishes

"a realm of personal liberty which the government may not enter," and this reason too

the motion to vacate will withstand the test.

7.  The Court today reaffirms the long recognized rights of privacy and bodily integrity.

As early as 1891, the Court held, [n]o right is held more sacred, or is more carefully

guarded by the common law, than the right of every individual to the possession and

control of his own person, free from all restraint or interference of others. . . . Union

Pacific R. Co. v. Botsford, 141 U.S. 250, 251 (1891). Throughout this century, this

Court also has held that the fundamental right of privacy protects citizens against

governmental intrusion [505 U.S. 833, 927]  in such intimate family matters as

procreation, childrearing, marriage, and contraceptive choice. See ante, at 847-849.

These cases embody the principle that personal decisions that profoundly affect

bodily integrity, identity, and destiny should be largely beyond the reach of

government.  These soverign defedants cannot claim the congress invased their

actions in majesty of the constitution and therefore will cause the case to be

transferred to the United States Supreme Court.

## ARGUMENT THREE

8. Furthermore, because the Plaintiffs' allege torture, and other major violations of universally recognized standards of international law, the U.S. Government's expression of concern regarding potential "interference with foreign relations" are irrelevant to the proper disposition of these claims, since these abuses are considered so abhorrent that they are not subject to immunity claims under any circumstances, and most especially where Congress has specifically recognized and authorized the legitimacy of these claims and the authority of U.S. Courts to deal with them through passage of the Torture Victim Protection Act of 1991 (TVPA), 28 U.S.C.A. § 1350 Note (2006). In short, nothing presented in the Suggestion of Immunity and Statement of Interest provides a legitimate or judicially recognized basis for granting the Defendant immunity, or for dismissing this complaint. Being that the plaintiff is under great duress the motion to vacate might be considered for "any other reason" being that the plaintiffs are a victim of this abhorrent act of torture.

9. The existing sources of law providing diplomatic agents with immunity from legal process in the United States are the Diplomatic Relations Act and the treaty it implements, the Vienna Convention. 22 U.S.C.A. § 254d. These legal standards reflect the evolutionary development of international law regarding immunity of diplomatic agents. Tachiona ex. rel. Tachiona v. Mugabe, 186 F.Supp.2d 383, 387 (S.D.N.Y. 2002). Historically, the customary law of diplomatic immunity, which provided broad immunities to all foreign diplomatic agents, was based on the premise that the receiving state owed an ambassador the same respect due to the foreign

sovereign he represented. See, e.g., Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Countries eventually recognized, however, that granting diplomatic immunity to a foreign agent often deprived their own nationals of their legal rights. Hellenic Lines, Ltd. v. Moore, 345 F.2d 978 (D.C. Cir. 1965). Consequently, the customary law of diplomatic immunity narrowed to include only those immunities needed to properly carry out the diplomat's functions. Id.    This matter was a subject of discovery and will be revealed at trial in the diplomatic VISA applications lodged by the defendants as they perform the services of torture and child seperation and hostage keeping and violation of United States Core Values.

10. "In resolving a motion to dismiss, the Court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of plaintiff." Mukaddam, 111 F.Supp.2d at 461, citing Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). The Court must take as fact, then, that the Defendant's acts of torture as alleged in the Plaintiffs' complaint are true, leaving no room for an argument that foreign sovereign immunity or the act of state doctrine might provide alternative grounds for protecting Defendant from this Court's jurisdiction, because these violations of international law can never be considered lawfully authorized governmental actions subject to immunity. Kadic, 70 F.3d at 250; Siderman de Blake, 965 F.2d at 717.

11. With regard to the "interference with foreign relations" argument that is one of the principal elements of the U.S. Government's Statement of Interest presented to this Court, this argument cannot serve as a basis for dismissal of otherwise valid legal claims, especially where, as in this case, the allegations in the Complaint have been

specifically recognized by act of Congress, and by the U.S. Supreme Court, as a legally sufficient basis for the Court to exercise its jurisdiction. Alien Tort Claims Act (ATCA), 28 U.S.C.A. § 1350 (2006); Torture Victim Protection Act (TVPA), 28 U.S.C.A. § 1350 Note; Sosa v. Alvarez-Machain, 542 U.S. 692, 728 (2004). It is important to note the special nature of the legal claim that serves as the basis for this

12. Just as the principle of foreign sovereign immunity cannot protect a defendant from claims alleging major violations of universally accepted international human rights norms, such as the prohibition against torture, the U.S. Government cannot protect a defendant and the defendant's acts of torture and by making the argument of potential "foreign policy impact." Presbyterian Church of Sudan v. Talisman Energy, Inc., 2005 WL 2082846 (S.D.N.Y. 2005). While the Supreme Court has directed courts to give "serious weight" to the U.S. Government's views on the potential impact a particular case might have on foreign relations, the Sosa decision reaffirmed the settled principle that the Executive Branch's assertion of foreign policy concerns, "would not necessarily preclude adjudication." Sosa, 542 U.S. at 733 n. 21 (2004); Kadic, 70 F.3d at 250. "Ultimately, it is [the courts'] responsibility to determine whether a political question is present, rather than to dismiss on that ground simply because the Executive Branch expresses some hesitancy about the case proceeding." Sarei v. Rio Tinto, 2006 WL 2242146 at *8 (9th Cir. 2006); See also, Mujica v. Occidental Petroleum Corp., 2005 WL 1962673, at *24 (C.D. Cal. June 28, 2005), citing Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1236 (11th Cir. 2004).

13. The U.S. Government's expression of concern that the case will impact its prerogative to invite foreign officials to come to the United States is not an adequate

basis for dismissal of the case because the case does not "turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature," nor does it "uniquely demand single-voiced statement of the Government's views." Baker v. Carr, 369 U.S. 186, 211 (1962). When international norms are specifically defined in legal terms that are accepted and applied universally, such as the prohibitions against torture and genocide, they do not "defy judicial application." Sosa, 542 U.S. at 733. Congress also has specifically mandated in the TVPA that the judiciary should hear claims for reparations brought by victims of torture and genocide. 28 U.S.C.A. § 1350 Note; Sosa, 542 U.S. at 728. Consequently, ATCA and TVPA claims based on torture and genocide abuses cannot be considered inherently nonjusticiable, even if they touch on political or foreign policy matters. Sarei, at *10, citing Baker, 369 U.S. at 211. Because the Complaint is entirely consistent with the U.S. Government's position condemning human rights abuses the Plaintiffs are not asking the Court to second guess a political decision made by the executive branch or legislature. While it is true that courts have dismissed complaints in certain circumstances on political question/foreign policy grounds where they deemed a case could adversely affect a political decision that has already been made, that issue is not presented here. Sarei at *9-10, citing Baker, 369 U.S. at 211. The Complaint does not seek reconsideration or reversal of previous political decisions by the executive branch or legislature. See e.g., Alperin v. Vatican Bank, 410 F.3d 532, 562 (9th Cir. 2005); In re South African Apartheid Litigation, 346 F.Supp.2d 538, 554 S.D.N.Y. 2004).

14. The Court should exercise its legislated authority to decide this case because it is brought under the ATCA and TVPA for claims of torture that both Congress and the Supreme Court have recognized as actionable in U.S. courts. Congress has expressly tasked the judiciary with providing the legal means for victims of the most serious human rights abuses to obtain damages in U.S. courts by adopting the ATCA and TVPA. Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.1984). "[I]n implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations". Id. at 797 (Edwards, J., concurring). "The department to whom this has been constitutionally committed is none other than our own--the Judiciary." Kadic, 70 F.3d at 249; see also, Restatement (Third) of Foreign Relations Law § 111(2) (1987) (cases arising under international law are within the judicial authority of the United States). This mandate is particularly clear, as the U.S. Supreme Court recognized in Sosa, given the language and the Congressional mandate of the TVPA, where Congress specifically reaffirmed the availability of damage awards to torture victims through legal actions of this type. 542 U.S. at 728, citing H.R. Rep. No. 102-367, pt. 1, p. 3 (1991). Given this mandate from the legislature, upheld by the Supreme Court very recently in Sosa, this Court has jurisdiction to move forward with the Plaintiffs' case and would violate explicit Congressional and Supreme Court standards if it fails to do so. arising under international law are within the judicial authority of the United States). This mandate is particularly clear, as the U.S. Supreme Court recognized in Sosa, given the language and the Congressional mandate of the TVPA, where Congress specifically reaffirmed the availability of damage awards to torture victims

through legal actions of this type. 542 U.S. at 728, citing H.R. Rep. No. 102-367, pt.

1, p. 3 (1991). Given this mandate from the legislature, upheld by the Supreme Court

very recently in Sosa, this Court has jurisdiction to move forward with the Plaintiffs'

case and would violate explicit Congressional and Supreme Court standards if it fails

to do so.

15. Then in the case of defendant India Jackson v. Beech, 636 F.2d 831, 835 (D.C. Cir.

1980) ("Once a defendant fails to file a responsive answer, he is in default").

Diplomatic presentations of immunity defenses to courts through the U.S. Department

of State, while they were commonplace prior to the passage of the FSIA, are no

longer considered the appropriate means for registering such claims with the courts.

Even the most well-established immunity claims such as head of state immunity are

now generally treated as affirmative defenses that must be directly presented to the

court by the Defendant official or affected foreign government themselves in order

for them to be considered. Failure to present even a valid claim in this way is treated

as a waiver of rights. Since the Defendant's claims have been waived through his

failure to affirmatively assert any defenses to this Court, the Plaintiffs' motion for a

default judgment should be reinstated and granted, consistent with the Federal Rules

of Civil Procedure, which provide for default judgments in precisely these types of

cases. Mwani v. Bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005), citing Jackson, 636 F.2d

at 836. As noted in Mwani, the need to provide a default claim when a foreign

defendant does not respond to a lawsuit is particularly compelling when no other

forum is available for the plaintiffs to bring their claims, as is the case here. Id. at 7,

13-14.   INDIA, defendant is in default and the ORDER is erroneous.

ARGUMENT THREE

16. It is alleged, and publically proven by Senate of the United States of America, Volcker Report and Cole Commission that the defendants were providing material support to a STATE sponsored terrorist IRAQ was aided and abetted by the defendants SEE EXHIBIT THREE to FOURTEEN In *Flatow v. Islamic Republic of Iran* Judge Lamberth held that the routine provision of financial assistance to a terrorist group in support of its activities constitutes "providing material support or resources" for a terrorist act within the meaning of the statute.[119] *Eisenfeld v. Islamic Republic of Iran* concluded that the defendants acted as a conduit and provided funds within the meaning of 28 U.S.C. ? 1605(a)(7), which, in turn, caused the deaths of Matthew Eisenfeld and Sara Duker.[128] Upon concluding that the elements of the Act had been proven by the plaintiffs, the court awarded compensatory damages totaling $27,161,002 and punitive damages in the amount of $300 million.[129] How can the court overlook this material support evidence of the defendants to IRAQ when it has been established and matter of discovery that the defendants were dealing with the ENEMY of UNITED STATES and constitutes a Rule 60(b) any reason to set aside a order invocation.

17. *The Thomas Sutherland Case* Following a bench trial, as required by 28 U.S.C. ? 1608(e), the court issued a twenty-four page ruling on June 25, 2001, concluding that the Iranian government and the MOIS had supported the terrorist organization that kidnapped Dr. Sutherland[153] and that "Hezbollah, funded by MOIS and Iran, was

responsible for the kidnapping and captivity of Thomas Sutherland."[154] According to the court, the defendants' conduct constituted acts of "torture" and "hostage taking," or the material support for such acts, within the meaning of 28 U.S.C. ? 1605(a)(7).[155] Therefore, the defendants were not entitled to immunity under the FSIA and were civilly liable to the Sutherlands for battery, assault, false imprisonment, loss of consortium, intentional infliction of emotional distress, and loss of solatium.[156] The plaintiffs were variously awarded more than $53 million in compensatory damages, as well as $330 million in punitive damages against the MOIS.[157] In setting the compensatory damage award for Dr. Sutherland, the court stated explicitly that it was following a "formula which has evolved as a standard in the hostage cases brought under ? 1605(a)(7) . . . . This formula grants the former hostage roughly $10,000 for each day of his captivity."[158] To explain its use of such a formula, the court wrote:

18. Any skepticism about the adequacy of this formula must overcome the steep presumption that Congress has tacitly approved its use . . . . The formula was developed prior to October 28, 2000. On that day, Congress enacted the Victims of Trafficking and Violence Protection Act of 2000. The Act obligated the United States Treasury to pay terrorist victims -- including the hostages described above -- the amount awarded them at trial, or in other words, about $10,000 per day of captivity. Congress must be presumed to have [been] aware of the damages formula, and its failure to amend it in any way amounts to tacit approval of the scheme.[159]

19. State-sponsored terrorist acts deprive innocent civilians of their lives, their liberty, their property, and other rights and freedoms protected by various regional and international human rights treaties,[22] including the Universal Declaration of Human

Rights,[23] the International Covenant on Civil and Political Rights,[24] the European Convention for the Protection of Human Rights and Fundamental Freedoms,[25] the American Declaration of the Rights and Duties of Man,[26] and the American Convention on Human Rights.[27] As a result, some courts and commentators have suggested that state-sponsored terrorism might even violate a *jus cogens* norm[28] of customary international [*pg 111] law.[29] This point remains hotly disputed, especially in the United States.[30] Nevertheless, it is notable that in at least ten resolutions of the United Nations General Assembly, states have reaffirmed their "unequivocal condemnation of all acts, methods and practices of terrorism as criminal and unjustifiable, wherever and by whomever committed."[31]

## ARGUMENT FOUR

20. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances". The ORDER is clear to this fact in "the kidnapping of his five-year-old daughter" and this fact Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id.* ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id.* ¶ 43. Plaintiff also filed a

*habeas corpus* petition in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id.* ¶ 46.

Plaintiff filed this action in June 2007, setting forth the following nine counts: Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages. Compl. at 22-39.

21. In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances".

22. The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As plaintiff sees it, he is rendered bestial not by the defendants as sadistic bullies around him, but by his own flesh and so invokes "extraordinary circumstances" being that he is filing pro se for himself and child NARA.

23. Then the ORDER can be set aside as the child NARA is an essential party to the case and has submitted to the jurisdiction of the court SEE order Denying US citizen and ORDER denying preliminary injunction but is denied being a prty to the case as the estate of the Singhderewa family.

24. The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the

continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances".

1. Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

    a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

2. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances".

3. Defedants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances".

4. Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances".

5. The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances".

6. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances".

CASE 1:07 cv-01170-JDB    Document 29    Filed on                Page 23 of 28

7. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

    a. "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.)

    b. A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

    c. Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

8. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism,

dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions, and psychotic episodes so invokes "extraordinary circumstances".

9.  Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances".

10. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

11. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances".

12. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational,

if not necessarily benign - has been irrevocably undermined. Social institutions are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances".

13. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

14. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances".

15. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".

16. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of

victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

17. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".

18. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

    a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

19. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other

"objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".

20. Spitz makes the following observation:

    a.  "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

21. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender: Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

    a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

22. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever. The death sentence without any cause, upon a father and his child has been sponsored by the United States Sovereign Partners the defendants.

S/

_____

JUGVIR INDER SINGH