# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

RESPONSE TO COURT ORDER AND MOTION FOR RECONSIDERATION TO

REAHEAR AND REOPEN  BEING MANIFEST UNJUSTICE TO THE PLAINTIFFS

The defendants claim that they have a special contract with the United States of America giving rise to aConstitutional tort actions are an avenue through which individuals can directly appeal to the Constitution as a source of right to remedy government-inflicted injury. It was not until the Supreme Court decisions in Monroe v. Pape[10] and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics[11] that individuals began arguing that the Constitution entitled them to damages for wrongful injury.

**As a result, the concept of individual harm is now incorporated into the substance of many constitutional rights. Instead of having a wholly negative effect on the**

scope of constitutional rights, the constitutional tort remedy contributes to a broader process of rights defini-tion where abstract constitutional provisions are translated into terms relevant to individuals' injuries

With the doctrine of qualified immunity, a court can establish a new right without fear that imposing liability for past conduct will impose costs on government officials who did not know that their conduct was wrong. In the future, government officials could theoretically adjust their conduct to avoid damages liability so it does not violate the now clearly established right. Without such an opportunity for government to adjust its conduct, courts might be less willing to declare new rights for fear of imposing retroactive costs that the government did not have the opportunity to avoid. Thus, a limitation on remedies may make courts more willing to expand rights.

Constitutional tort actions courts apply constitutional rather than common law norms in determining the duty that the government official owes to the individual. In some areas, though, the duties may overlap. For example, a police officer's use of excessive force may be actionable not only under the Fourth Amendment but under the state law tort of assault. In fact, plaintiffs often add state tort claims to complaints alleging federal constitutional tort violations.

Moreover, when common law and constitutional duties overlap, there is no distinction in the sort of injury for which the plaintiff is allowed to recover. Even in constitutional tort actions, a plaintiff may only recover damages for common law injuries such as physical harm, emotional distress, humiliation, and monetary loss.[46] Absent such a common law harm, the only distinct injury suffered by a plaintiff in a constitutional tort action is the

abstract harm of a rights violation. But under Supreme Court precedent, the fact that a constitutional right has been violated in itself only entitles the plaintiff to a nominal damage award of one dollar.[47] As the Supreme Court has held, "the abstract value of a constitutional right may not form the basis for § 1983 damages."[48]

Since the ORDER of Nov 26 2007 claims a "official acts" color of law claim by the defedants with the support of the Unites States of America then  § 1983 "opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation."[75] One proponent of the bill noted that the statute was the only way to ensure that constitutional rights had meaning for individual citizens.[76] Section 1983 was a significant move away from a paradigm where individual rights were primarily protected by the state courts. As one of the opponents of the bill protested:

It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. The deprivation may be of the slightest conceivable character, the damages in the estimation of any sensible man may not be five dollars or even five cents; they may be what lawyers call merely nominal damages; and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted as now in the courts of the States.[77]

The Court's broad interpretation of "under color of" law created an avenue by which individuals could argue that the Constitution regulated government officials' acts that caused individual injuries. Plaintiffs were no longer restricted to bringing actions under

state law for the worst forms of misconduct by state officials. After *Monroe v. Pape*, the number of § 1983 cases brought by plaintiffs in federal court exploded.[102] Many of these cases involved police brutality, unlawful arrests, and prisoners' rights claims.[103] As one commentator declared soon after the Supreme Court decided *Monroe v. Pape*: "It thus appears that what is developing is a kind of 'constitutional tort.'"[104]

In a broad sense, it is true that rights are generally established prior to remedies. For example, the Constitution pre-existed the remedies that now enforce it. But in a more particular sense, rights are shaped, defined, and given real meaning through the remedies used to enforce such rights. Because of its role as the supreme law of the land, the Constitution is not characterized by "the prolixity of a legal code,"[122] but instead "unavoidably deals in general language."[123] Thus, the Constitution and Bill of Rights are filled with open-ended phrases such as "probable cause," "cruel and unusual punishments," "unreasonable searches and seizures," "due process," "equal protection," and "just compensation." While the Constitution establishes general ideals, these norms do not have any concrete meaning until they are actually applied and enforced by judges in particular cases. The process of constitutional definition is an important one.

Then the ORDER persists in claiming that the United States has participated and thus constitutional tort remedy is unique because it requires courts to focus on how constitutional provisions apply to injuries suffered by individuals. As a result, it has pushed the courts to understand constitutional provisions as (1) providing rights that protect individuals from certain governmental inflictions of harm; and (2) regulating the discretion of government officials to harm or allow harm to befall individuals.

In most constitutional tort actions, individuals claim that they have been harmed by either government action or the failure of the government to act despite an established obligation to intervene.[138] Individuals bring such actions not just to make a general point about how the world should be ordered but because they have been injured. Damages, provided for in constitutional tort actions, are a natural remedy for such harm. As the Supreme Court has observed, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."[139] The availability of a damage action for constitutional harms gives individuals an incentive to press claims based on constitutional provisions.[140] As one commentator has noted, the constitutional tort action "gave lawyers an incentive to conceive of past, tort-like harms in constitutional terms."[141]

Constitutional tort actions are not only about rights protecting individuals from certain forms of injuries but also about norms that regulate government action. According to the Hohfeldian formulation, in concluding that an individual plaintiff has a legal right, a court determines both that the plaintiff has a right rooted in the law and that a defendant has a correlative duty to the plaintiff to avoid violating that right.[145] Thus, a protective right in a sense imposes a correlative duty on the government.[146] As one commentator observes, "[r]equests for damages relief raise unique issues concerning the link between the plaintiff's injury and the defendant's wrongdoing . . . [that] require the courts to ask, perhaps using language of causation and duty or obligation, whether the defendant is the appropriate source of funds to compensate the plaintiff."[147] Thus, constitutional tort actions have forced courts to determine both whether the Constitution protects

individuals from certain inflictions of harm and whether the Constitution regulates the ways in which the government may harm individuals.

The November 26th 2007 ORDER insists that the Defendants have Right to usurp the plaintiffs property and his future and so raise unique issues concerning the link between the plaintiff's injury and the defendant's wrongdoing . . . [that] require the courts to ask, perhaps using language of causation and duty or obligation, whether the defendant is the appropriate source of funds to compensate the plaintiff."[147] Thus, constitutional tort actions have forced courts to determine both whether the Constitution protects individuals from certain inflictions of harm and whether the Constitution regulates the ways in which the government may harm individuals.

In First English Evangelical Lutheran Church v. County of Los Angeles,[152] the Supreme Court confirmed that the Just Compensation Clause guarantees an individual remedy for economic injury in cases where the government denies the individual all use of his property even when that denial is temporary.[153] This defined the individual's constitutional right in a way that went beyond what state law had offered.

The ORDER of 26th November 2007 insists the United States has created a contract that allows the defendants to remain immunized from kidnapping and hostage taking thus violates The Due Process Clause of the Fourteenth Amendment, which guarantees persons who face deprivations of "life, liberty, or property," the protections of "due process of law,"[194] has been described as "the least specific and most comprehensive protection of liberties."[195] According to one of its broadest formulations, "The touchstone of due process is protection of the individual against arbitrary action of government."[196] The Due Process Clause has both a procedural and substantive

component. The Clause not only guarantees fairness in governmental procedures but also sets forth a substantive norm that prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective."[197] In constitutional tort actions, the courts have applied this general prohibition against the abuse of government power to a variety of contexts where individuals have been injured by government wrongdoing. Primarily, the courts have used substantive due process in the context of constitutional torts to fill gaps in the Constitution's explicit textual protections.[198]

The Supreme Court has described the substantive due process right as prohibiting "the most egregious official conduct,"[199] that is, "conduct that shocks the conscience."[200] These amorphous concepts could conceivably apply to a vast range of government conduct. The perceived danger of applying the right to substantive due process is that there is no principled way of marking off a boundary to the right. In the words of the Supreme Court, "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."[201]

In defining the right to substantive due process, courts have paid careful attention to the facts of each case in order to limit the reach of their decisions.[202] In doing so, they generally weigh the individual's interest in receiving redress for harm against the reality that many government officials will inevitably cause some harm in the course of their work. These are concerns that relate uniquely to the relationship between the government and individual. As the Supreme Court has explained, "[i]n determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to

balance 'the liberty of the individual' and the 'demands of an organized society.'"[203] Because of a society's compelling interest in a government that can operate effectively, the courts have generally limited the substantive due process right to prohibiting the most egregious forms of governmental misconduct.[204] As a result, the right to substantive due process does not mirror the common law, which only regulates the interactions among private parties.[205]

Bering in mind that the defendants claim a special contract with the United States to violate

Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 9 of 12

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14. National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20. Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and

(d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1. 23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2. 24. Violated and derogated the Constitutional Right of the Plaintiffs

3. 25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity" of the defendant and examine how the pattern of conduct of defendant in defying the agreements it claims it has signed. The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom,

Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status,

Yet the defendants continue to defy and thumb its nose at civilized society and claims it has the right to whatever it wants to whoever it wants and it cannot be sued in any court for violation of treaties and the defendant has used its power to avoid prosecution for the genocide of the aborigines, the genocide of families thrown overboard warships and

murdered at sea, prisons full of minor children being held in contracts with little tiny islands, a white apartheid policy, and most recently shipping tons of wheat to a rogue nation, IRAQ, at war with the United States of America, creating massive oil deals with the companies controlled by the sons of Saddam Hussein, see Cole Commission Report and Volcker Report and bribing officials both Jordan, and IRAQ to file reports to the United Nations and United Nations Security Council to create a WORLD war.

At trial the plaintiff will show that Australian Wheat Board is the world largest monopoly and that all its shipments were authorized by the defendant's agents accepting false documents in Australia to fool the world.

As such the Requirements of Rule 59(e) being that a substantive Constitutional Tort issue is present the motion to vacate is reasonable in face of justice.

That giving a DEATH SENTENCE to the plaintifs minor child of American Origin without any DUE PROCESS of law is manifest unjustice.

That GIVING A DEATH SENTENCE to the plaintiff without any Due Process of Law is Manifest injustice.

That claiming United States sponsers the violation of the FIRST, EIGHT, FOURTH constitutional protections by the defedants is not only unimaginable by manifest injustice.


S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 12 of 12

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.       )

                                      )

          Plaintiffs        )

                                        )

          V           )       CASE NO 1:07-CV-01170

                                      )       JUDGE JOHN D.BATES

                                        )

COMMONWEALTH OF AUSTRALIA   )

et al.                                     )

                 Defendants

RESPONSE TO COURT ORDER AND MOTION FOR RECONSIDERATION TO

REAHEAR AND REOPEN AND THE MEMORANDUM OF POINTS AND

AUTHORITIES IN SUPPORT TO A HEIGHTENED REVIEW OF

"EXTRAORDINARY CIRCUMSTANCE" AND MANIFEST UNJUSTICE TO THE

PLAINTIFFS

ABSTRACT :

The ORDER DATED MARCH 31 2008 is based primarily on Firestone vs. Firestone and

does not prevent manifest injustice.  Like in verbatim Firestone matter the ORDER

admits the motion to vacate is based on Fed R. Civ P 60 and erroneously anchors its

decision to deny the motion, on a Rule 59(e) motion "is discretionary" and need not be

granted unless the district court finds that there is an "intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." *National Trust v. Department of State,* 834 F. Supp. 453, 455 (D.D.C

1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama

Historical Ass'n v. Christopher,* 49 F.3d 750 (D.C. Cir. 1995) (quoting *Virgin Atlantic

Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.), *cert. denied* 113

S. Ct. 67 (1992)).   Application of Rule 59(e) plaintiffs states would create

1. United States to be a nessessary and essential party to the case and would make
   the judgment moot.

2. Would make Nara Singhderewa a minor, that has the right to counsel and present
   being represented by the plaintiff a necessary and essential party to the case and
   being that the ORDER Nov 26th 2007 states she is non-party would make the
   judgement moot.

3. As representative and father of the minor the plaintiff represents the minor in a
   pro se and forma paupers capacity and being that this capacity was denied
   automatically creates non party minor the right to representation and makes the
   order null and void. EXHIBIT ONE

In the Firestone family multi year case, a review of the district court's refusal to vacate a

judgment under Federal Rule of Civil Procedure 59(e) for abuse of discretion. *See

Browder v. Director, Ill. Dep't of Corrections,* 434 U.S. 257, 263 n.7 (1978) (discussing

the analogous Rule 60(b)). Leave to amend a complaint under Rule 15(a) "shall be freely

given when justice so requires." FED. R. CIV. P. 15(a); *see Foman v. Davis,* 371 U.S.

178, 182 (1962). Although the grant or denial of leave to amend is committed to a district

court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as "undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment." *Foman,* 371 U.S. at 182.  SEE ORDER DATED 26th Nov 2007 there is no reason given to deny leave to amend the case.

After the district court dismissed the complaint with prejudice, Russell III and Myrna could amend their complaint only by filing, as they properly did, a 59(e) motion to alter or amend a judgment combined with a Rule 15(a) motion requesting leave of court to amend their complaint. *See Confederate Memorial Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C. Cir. 1993) (describing the procedure). Rule 15(a)'s liberal standard for granting leave to amend governs once the court has vacated the judgment. *See* 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1489 at 694 (2d ed. 1990). But to vacate the judgment, Appellants must first satisfy Rule 59(e)'s more stringent standard. *See id.* Therefore, we first determine whether the district court abused its discretion in failing to vacate the original dismissal with prejudice. If it did, we then ask whether the district court abused its discretion in denying Russell III and Myrna leave to file their amended complaint.  See ORDER dated 26th November 2007.

With respect to the first issue, we conclude that the denial of the 59(e) motion was an abuse of discretion because the dismissal of the original complaint *with prejudice* was erroneous. Even assuming that the district court properly dismissed the complaint, neither the determination that Russell III and Myrna's claims were time-barred, nor the determination that their complaint failed to plead fraud with particularity support a dismissal *with prejudice.* As we have repeatedly held, courts should hesitate to dismiss a

complaint on statute of limitations grounds based solely on the face of the complaint. *See, e.g., Richards v. Mileski,* 662 F.2d 65, 73 (D.C. Cir. 1981); *Jones v. Rogers Memorial Hosp.,* 442 F.2d 773, 775 (D.C. Cir. 1971). In *Richards* we made clear that, because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred. *See Richards,* 662 F.2d at 73. A dismissal *with prejudice* is warranted only when a trial court "determines that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " *Jarrell v. United States Postal Serv.,* 753 F.2d 1088, 1091 (D.C. Cir. 1985) (quoting *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962)).

Failure to plead fraud with particularity likewise does not support a dismissal with prejudice. To the contrary, leave to amend is " "almost always' " allowed to cure deficiencies in pleading fraud. *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice,* 9.03 at 9-34 (2d ed. 1986)).

Turning then to the Rule 15(a) issue, we find error in the district court's complete failure to provide reasons for refusing to grant leave to amend. The Supreme Court stated in *Foman* that while the decision to grant or deny leave to amend is within the trial court's discretion, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." 371 U.S. at 182. We too have emphasized that a proper exercise of discretion requires that the district court provide reasons. *See Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1018, 1020 (D.C. Cir.

1981) (reversing district court's denial of leave to amend, and remanding to the district court either to grant plaintiff leave to amend or provide sufficient reasons for its denial).

the District of Columbia's three-year statute of limitations for claims based on fraud, intentional infliction of emotional distress, and interference with judgments. *See* D.C. Code § 12-301(8) (1995). Under District of Columbia law, a tort action accrues "when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C. 1989); *see also Goldman v. Bequai,* 19 F.3d 666, 671-72 (D.C. Cir. 1994). Fraudulent concealment, however, tolls the running of the statute of limitations. In *Larson v. Northrop Corp.,* we held that to prove fraudulent concealment, plaintiffs must " "show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence.' " 21 F.3d 1164, 1172 (D.C. Cir. 1994) (quoting *Foltz v. U.S. News & World Report, Inc.,* 663 F. Supp. 1494, 1537 (D.D.C. 1987), *aff'd,* 865 F.2d 364 (D.C. Cir.), *cert. denied,* 490 U.S. 1108 (1989) (alteration in original)). Generally, fraudulent concealment requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing. *See Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1491 (D.C. Cir. 1989). A failure to disclose by one who has a duty to do so-such as someone standing in a fiduciary or confidential relationship-also can establish fraudulent concealment. *Id.* at 1496. Once a plaintiff shows fraudulent concealment, a defendant wishing to assert "a defense based on the plaintiff's lack of due diligence must show something closer to actual notice than the merest inquiry notice that would be sufficient

to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell,* 866 F.2d at 1491.  SEE ORDER  Nov 26th 2007.

ARGUMENT I

WAIVER OF SOVERIGN IMMUNITY

Plaintiffs argue that the International Covenant on Civil and Political Rights ('ICCPR') read in conjunction with the ATCA constitutes the requisite waiver of sovereign immunity. The United States ratified the ICCPR in 1992. It provides in relevant part:

Each State party to the present Covenant undertakes: (a) to ensure that any person whose rights or freedoms herein recognized are violated shall have an effective {22 F.Supp.2d 353, 365} remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; (b) to ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities.ICCPR Article 2(3) (a-b).

"No one can read the significant Supreme Court cases on sovereign immunity ... without concluding that the field is a **mass of confusion**; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded."

Antonin Scalia (Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice), letter dated May 10 1976 to the Chairman, Subcommittee on Administrative Practice and Procedure, U.S. Senate Judiciary Committee, pertaining to to the ensuing P.L. 94-574, amending the Administrative Procedure Act to waive sovereign immunity

for "relief other than money damages", 5 U.S.C. § 702, Oct. 21 1976 (U.S. Congress 94-2, House Judiciary Committee, H.R. Rep. No. 94-1656, Sept. 22 1976, SuDoc 94-2:H.rp.1656, Serial Set 13134-12), 1976 USCCAN 6121, 6145, *via* 1976 WestLaw 14066, Leg.Hist. (103 kb), **bold-face** added.  The U.S. Supreme Court has admitted its confusion and confessed *(below)* that it made the very same mistake the Judge did in the *Jama* case. Recovering partially from their confusion, the Supreme Court indicated that sovereign immunity pertains to a *remedy* and not to a claim (a 'cause of action'). The ATCA provides no remedy, merely (as the Judge correctly observed) subject-matter jurisdiction.  EXHIBIT TWO

*Ratification of International Covenant on Civil and Political Rights* {10 kb txt, 302 kb pdf} (U.S. Congress 102-2, Senate Executive Report No. 102-23, March 24 1992), **bold-face** added. Senate Resolution (April 2 1992), ratifying the ICCPR treaty {cited above}. The Declarations and Reservations (323 kb) (UNHCR, Geneva) also quote the content of the U.S. Senate resolution.

The ATCA provides the subject matter jurisdiction (international-law tort claims by aliens), as detailed above. The DJA provides the remedy (declaratory judgment), as detailed above. And, the APA provides the waiver of sovereign immunity for a U.S. Court to award that remedy as detailed above.

The APA (which waives sovereign immunity for "relief other than money damages" on any type of claim for which the U.S. Court has jurisdiction) is like the *Tucker Act* (which waives sovereign immunity for relief by money damages on non-tort contract claims, and "taking" claims, for which the U.S. Court has jurisdiction) {463 U.S. 206, 212}:

In *United States v. Testan*, 424 U.S. 392, 398, 400 (1976), and in *United States v. Mitchell*, 445 U.S. at 538, this Court employed language suggesting that the *Tucker Act* does not effect a waiver of sovereign immunity. Such language was not necessary to the decision in either case. *See infra*, at 217-218. Without in any way questioning the result in either case, we conclude that this isolated language should be disregarded. If a claim falls within the terms of the *Tucker Act*, the United States has presumptively consented to suit.

Congress plainly agreed with Judge Cardozo and was *determined* that U.S. Courts should **stop** creating injustice and hatred, should **stop** giving the United States blanket immunity for the wrongdoings of its officials, should **stop** rubber-stamping their actions, should **stop** thereby licensing them to violate the law, and, instead, should **apply their minds** case-by-case to whether some special factor, in that particular case, *justified* immunity. And, the U.S. Department of Justice agreed with Congress, through their spokesman who is now himself a U.S. Supreme Court Justice {1976 USCCAN 6145}:

It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future {1976 USCCAN 6146} be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on **other legal grounds**, such as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to agency discretion; privileged nature of the defendant's conduct; failure

to exhaust administrative remedies; discretionary power to refuse equitable relief; and the 'political question' doctrine."


ARGUMENT II

MANIFEST INJUSTICE

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id*. ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' We are led to see justice as fairness, as the greatest mutual advantage, as the minimax relative concession, as reciprocity, as the terms of a society-wide agreement that cannot reasonably be rejected, as reversibility, as impartiality and the image is embodied in a woman blindfolded holding a balance.  The plaintiff has argued that the manifested injustice already ruled "unjustifiable" and admitted in an order also denies the plaintiff categorical imperative identified justice as universalizability as recognized by International norms already.


In the UNITED STATES DISTRICT COURT WESTERN DISTRICT OF KENTUCKY AT LOUISVILLE CIVIL ACTION NO. 3:04CV-338-H JAMES H. O'BRYAN et. al. PLAINTIFFS V. HOLY SEE DEFENDANT

Plaintiffs allege first that the Holy See violated its international law obligations under the Universal Declaration of Human Rights and the Convention on the Rights of the Child.  Second, Plaintiffs allege that Defendant, "by and through its agents, servants and employees," breached duties owed to Plaintiffs. Those duties included the duty to provide safe care, custody, and control to the minor children entrusted to Roman Catholic; the duty to warn parents of those children that the priests and other clerics to

whom they entrusted their children were known perpetrators of childhood sexual abuse;

and the duty to report known or suspected perpetrators of childhood sexual abuse to the

appropriate authorities. Third, Plaintiffs allege that the Holy See breached fiduciary

duties owed to Plaintiffs, including but not limited the duty to warn parents of children

placed in the care, custody, and control of known perpetrators of childhood sexual abuse

and the duty to report known or suspected perpetrators of child sexual abuse to the

appropriate authorities. Fourth, Plaintiffs allege that Defendant's conduct constitutes an

outrage and infliction of emotional distress.  Fifth and sixth, in claims solely against the

Holy See in its capacity as an incorporated association and head of an international

religious organization, Plaintiffs allege torts of deceit and misrepresentation.  Plaintiffs

also seek a variety of injunctive relief.  EXHIBIT FOUR

No one disputes that the tortious activity exception is restricted to cases in which the

personal injury, death, or damage to or loss of property occurs in the United States.  28

U.S.C. § 1605(a)(5). The actual personal injuries complained of in this suit – the sexual

abuse of Plaintiffs and purported Class Members – meet that requirement.  However, the

analysis does not end here. The Seventh and D.C. Circuits have added the requirement

that the tortious act or omission (in addition to the actual personal injury) must occur in

the United States.  *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379

(7th Cir. 1985); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517,

1524 (D.C. Cir. 1984).[2] The Ninth Circuit has a slightly different rule, holding that "if

plaintiffs allege *at least one entire tort* occurring in the United States, they may claim

under § 1605(a)(5)."  *Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984)

(emphasis added).  The Sixth Circuit has not considered this additional requirement.

EXHBIT FIVE

Subsequently, Chief Justice Rehnquist, speaking for a unanimous Supreme Court, discussed the issue in *Argentine Republic v. Amerada Hess Shipping Corp.*, *supra*. The Court did hold that § 1605(a)(5) is "limited by its terms . . . to those cases in which the damage to or loss of property occurs *in the United States*." *Id.* at 439 (emphasis in original). The Court then concluded that "[b]ecause respondents' *injury* unquestionably occurred well outside [the United States], the exception for noncommercial torts cannot apply." *Id.* at 441 (emphasis added). The Court then discussed the fact that a tort may have had effects in the United States, drawing a distinction between § 1605(a)(5) and § 1605(a)(2), under which a foreign state may be liable for commercial activities "outside the territory of the United States" that have a "direct effect" inside the United States. 28 U.S.C. § 1605(a)(2). It said that "Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States."

*Amerada Hess*, 488 U.S. at 441. EXHIBIT SIX   EXHBIT SEVEN   While the Supreme Court's conclusions are not completely clear, its language suggests a view that both the injury and the tortious act or omission must occur in the United States. This is strong enough language for this Court to adopt the same view. Here, Plaintiffs allege torts that occurred both outside and inside the United States. Plaintiffs concede that the *acts* of *Defendant itself* were all "committed outside the United States." *See* Plaintiffs' Response Brief at 27. Moreover, any omissions committed by the Holy See itself clearly occurred outside of the United States.  , Plaintiffs allege that acts and omissions by agents of the Holy See inside the United States caused personal injuries. Specifically, Plaintiffs allege

CASE 1:07 cv-01170-JDB    Document 31    Filed on                Page 12 of 46

that Defendant's agents, officials, and employees failed to report known or suspected

child abuse, failed to warn parishioners about known or suspected pedophiles in child-

care positions, failed to provide adequate care to children entrusted to its churches and

school, failed to maintain the premises of churches and schools in a reasonably safe

condition, and failed to adequately supervise or control known or suspected sexual

predators. *Id.* at 17. These torts – both acts and omissions – alleged to have been

committed by the "Defendant's agents, officials, and employees" *in the United States* all

certainly occurred within the United States, and thus squarely fall under the tortious

activity exception of FSIA. Having concluded that some of Plaintiffs' claims meet the

tortious conduct exception to FSIA's general rule of immunity, the Court must now

consider a final issue.  This concerns "the exception within the exception." FSIA will not

allow a tort claim, even against officials or employees of the Holy See whose acts and

injuries occur in the United States where those officials were exercising their

discretionary function.  Called the discretionary function exception, it exempts claims

"based upon the exercise or performance or the failure to exercise or perform a

discretionary function regardless of whether the discretion be abused."  28 U.S.C. §

1605(a)(5)(A).   EXHIBIT EIGHT


The discretionary function exception of the FSIA is modeled after the

corresponding exception in the Federal Tort Claims Act ("FTCA") and is interpreted and

applied consistent with FTCA law. *See, e.g., Joseph v. Office of Consulate General of

Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). This exception appears based upon the

policy view that foreign states should be immune from the consequences of discretionary

acts of employees, even within the scope of their employment.  Courts have found that

both the FTCA and FSIA exceptions are intended to preserve immunity "for decisions

grounded in social, economic, and political policy." *In re Terrorist Attacks of September

11, 2001*, 349 F.Supp.2d 765, 794 (S.D.N.Y. 2005) (internal citations and quotations

omitted).  Consequently, the discretionary function exception preserves immunity for

planning-level decisions, as opposed to operational-level decisions.  *Id.* (citations

omitted).

     Defendant must satisfy two elements to avail itself of FSIA immunity under the

discretionary function exception. First, the challenged action must be discretionary; that

is, it must involve "an element of judgment or choice."  *Berkovitz v. United States*, 486

U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA

context, this prong means that if a "federal statute, regulation, or policy specifically

prescribes a course of action for an employee to follow," the discretionary function

exception does not apply.  *Berkovitz*, 486 U.S. at 536. Second, and even if the challenged

action did involve an element of judgment or choice, "a court must determine whether

that judgment is of the kind the discretionary function exception was designed to shield."

*Id.*; *Gaubert*, 499 U.S. at 322-23. The Supreme Court explained this prong in *Berkovitz* in

the following manner: The basis for the discretionary function exception was Congress'

desire to "prevent judicial 'second-guessing' of legislative and administrative decisions

grounded in social, economic, and political policy through the medium of an action in

tort." The exception, properly construed, therefore protects only governmental actions

and decisions based on considerations of public policy. *Berkovitz*, 486 U.S. at 536

(internal citations omitted).

To answer the questions posted by the two *Berkovitz* elements, the Court must define Plaintiffs' negligence claims by their constituent elements.  These claims can be distilled into three principal omissions, as laid out in the Complaint: that (1) Defendants failed to *provide safe care* to children entrusted to their care; that (2) Defendants *failed to warn* parishioners that their children would be under the care of known or suspected pedophiles*; and that (3) Defendants *failed to report* known or suspected child abuse to the appropriate authorities . *See*  EXHIBIT NINE

For the reasons that follow, only the first group of claims meets the discretionary function test and are exempt from suit.

The first claim seems to be essentially a negligent hiring claim: that the Defendant hired persons whom it knew or suspected were child sexual abusers and place them in positions where they could sexually abuse children. Applying the first prong of the *Berkovitz* test, such personnel decisions appear to involve a discretionary activity. Not surprisingly, courts have generally held that negligent hiring decisions are protected by the discretionary function exception. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 332-34 (1991) (holding that claims involving management decisions, including the "negligent selection of directors and officers," were barred by the discretionary function exception); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions relating to hiring . . . usually involve policy judgments of the type Congress intended the discretionary function to shield").  Although Defendant's hiring decisions may have indeed been negligent, the discretionary function exception to the FSIA protects such decisions. Therefore, Plaintiffs' negligence claim based upon the "duty to provide safe

care, custody, and control" of minor children in Catholic schools and churches cannot

proceed.  EXHIBIT NINE

The second negligence claim is that Defendant failed to warn parishioners that

their children would be under the care of known or suspected pedophiles, allegedly

pursuant to a policy promulgated by the Holy See itself.  Under the tests laid out in

*Berkovitz* and *Gaubert*, the decision by the bishops, archbishops, and other clergy not to

warn parishioners would appear to be a decision specifically prescribed by that policy.

Therefore, their decisions do not satisfy the first prong of the *Berkovitz* test, because they

did not involve "an element of judgment or choice." Therefore, the alleged failure of the

Holy See's officials and employees to warn parishioners that their children would be

under the care of known or suspected pedophiles is not a decision protected by the

discretionary function exception.  EXHBIT TEN

Finally, Plaintiffs' claim that Defendant's officials and employees failed to report

known or suspected perpetrators of child sexual abuse to the relevant state and local

authorities.  Like the failure to warn claim, Plaintiffs claim that the Holy See's employees

and officials failed to report child sexual abuse to the appropriate authorities pursuant to a

policy promulgated by the Holy See. Again, as alleged, this decision did not involve an

"an element of judgment or choice" because an established policy required the action.

Thus, liability for such decision is not barred by the discretionary function exception.

John Rawls's "justice as fairness," where a sense of fairness impels all adult members of

society to accept those principles of justice that it would be rational to adopt in an

"original position." In this original position, all initial endowments disappear behind a

"veil of ignorance." If people had no endowments, or had equal ones, or were ignorant of

what they had, it would be pararational for them to agree that inequalities are to be evened out except if they work to the advantage of the least favored among them. This, Rawls's "difference principle," is the product of prudential reason once fairness has led all to ignore any initial advantages they may have.  The plaintiffs have argued manifested injustice applying Rawl's standard of fairness where Fairness as initial equality is an axiom of justice as fairness.  Plaintiffs argue the prevent the manifest injustice of

1.      Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.   EXHIBIT NINE and ORDER OF NOV 26th 2007.

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and

(d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1.      23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2.      24. Violated and derogated the Constitutional Right of the Plaintiffs

3.      25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity"

of the defendant and examine how the pattern of conduct of  defendant in defying the agreements it claims it has signed.   The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Among other "justices as ...," and next only to Rawls's, the most influential is probably Thomas Scanlon's (1982) justice as unrejectability. Brian Barry's (1995) "justice as impartiality" is a synthetic derivative of both, with a preponderance of Scanlon. The three together incorporate most of the currently dominant mainstream theory that, or so I shall argue, treats justice as a matter of social choice rather than, as in the traditional approach, a quality of individual acts.  Common law tort is simply "a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages."[15] More concretely, common law torts typically involve four elements: (1) a common law duty from one individual to others; (2) that is breached through action or inaction; (3) that causes; (4) injury to another individual.[16] Constitutional torts track the same four elements except that the duty originates from the Constitution instead of the common law. Rather than running between two private individuals, a constitutional duty runs between a government official or municipality and the private individual. While the defendant in a common law tort action may happen to be a government official or municipality, the defendant in a constitutional tort action is always a government official.

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 19 of 46

In Rawls, once he has led people into the original position (and some auxiliary assumptions are made), agreement on distributive principles is a matter of mutual advantage; it has instrumental value. In Scanlon's contractualist theory, in sharp contrast to Rawls, agreement need not yield mutual advantage in order to be reached. It may yield it accessorily, but people do not seek it to make themselves better off in the ordinary narrow sense. They seek it because they are motivated by a common desire for agreement that is inherent in morality (Scanlon 1982: 128).

So far, there is nothing implausible or far-fetched in Scanlon's construction. Less extravagantly than Rawls, it does not require harsh and heroic renunciation of initial advantages. It is easier to take it that people wish to live in agreement with each other, on the basis of which they can mutually justify their conduct (ibid.: 117) than that they commit themselves to a distributive rule that deprives the more favored among them of any advantage over the less favored.

In Scanlon, for the agreement to produce unrejectable rules that will be morally wrong to transgress, the agreement must be both informed and unforced (ibid.: 110-11). The information condition can, I believe, be safely accepted, but what about the condition of unforcedness?

Unforcedness, as Scanlon explains it, means not only that no party must be coerced to agree, but that none must be in a "weak bargaining position" enabling others "to insist on better terms" (ibid.: 111). But better than what? Manifestly, there is a hidden norm both for bargaining strength (none must be in a stronger or weaker position than the norm) and for the terms eventually struck in the bargain (they must not be better for some, worse for others). But if such a norm is tacitly pre-set, the desired bargaining solution will be a

disguised initial condition of the theory and not a theorem of it. Though Scanlon, to his credit, refrains from saying so, we may take it that people starting from initially equal endowments would find rules providing for continuing equality unrejectable--they are left with no ground for rejection. Hence, they would find inequality in breach of the agreement unjust. This is plausible, but how interesting is it?

All we know of the common desire for agreement is that all are "moved by it to the same degree" (ibid.: 111). But what degree, how high? Given a very high degree, a variety of widely divergent terms may all be unrejectable. Nothing ensures a determinate solution. This might not matter much if the whole set of possible solutions were just by virtue of being unanimously agreed upon, or if there were independent means of identifying a unique just solution, or at least a just subset within the possible set. Would the test of "reasonableness" provide such a means? Or, what is a different proposition, is it that only reasonable terms are truly unrejectable? But what, then, is the test of reasonableness? How do we recognize it?

I would submit that we are inadvertently moving back and forth between what are, in fact, two theories separated by the idea of reasonableness, which acts as a "cutout." On the near side, there is a theory in which the desire for agreement and initial equality jointly produce a bargaining solution, which is both unrejectable and normatively unique because it must correspond to the tacit norm built into the initial conditions (i.e., that the terms must not be "better for some and worse for others"). On the far side of the cutout, we find a much simpler theory. Among possible bargaining solutions, there is at least one set of terms that is reasonable. Since it is unreasonable to reject that which is reasonable, these terms will be unrejectable by reasonable persons, hence they will be just. There is

no need for a desire for agreement, and it does not matter whether initial endowments were equal or not, for all will agree to their reasonable redistribution.

Justice as impartiality, then, whether obtained via the "original position" or via a special meaning given to reasonableness, entails equality of valuable endowments and the enforcement of that equality over time.

Justice becomes a matter of satisfying a selection criterion or choice rule (e.g., "choose the state of affairs no one can reasonably reject") by which a state of affairs is identified as "just," in the same way as other selection criteria, choice rules, or choice mechanisms identify a state of affairs as socially "chosen" or "preferred." Fairness, unanimity, non-rejection, veto right held by the "dictator" (e.g., the worst-placed individual or group) fit very well into the *modus operandi* of social choice theory.

Torts are recognized in immemorial and near-universal cross-cultural conventions that condemn and sanction murder, maiming, trespass, theft, and other offenses against person and property. They are not problematical for the present purpose. Duties are conventionally recognized moral imperatives, and their breaches are conventionally condemned but typically not sanctioned. Unlike obligations, duties do not have the rights of another person as their logical corollary; but neglect of duty is generally taken to disqualify an act from being just. Duties, too, are largely unproblematical for the theory of justice.

There are at least two (and perhaps more than two) ways of looking at such pairwise agreements. One is to find that the agreement, by virtue of being untainted by force, fraud, or unconscionability, is just, since those concerned jointly chose it, rather than something else. By extension, the distributive consequence of the totality of all such

agreements, past and present, is a just distribution. The other view is that the agreement was just if and only if the values exchanged or promised under it have been justly come by.it

A door was installed by a Congress of a different era — the first Congress, in its first session, in 1789, when the U.S. was not a superpower — and it was long forgotten, until 1980 (*Filartiga*). It's a door built especially for foreigners. And — as it wasn't crafted to deny justice, but to enable justice — it's plain and simple and it's not decorated with exceptions:

"Sec. 1350. — **Alien's action for tort**

The district courts shall have original **jurisdiction** of any civil action by an **alien** for a **tort** only, committed in violation of the **law of nations** or a treaty of the United States."

Under this provision, U.S. Courts can apply their full-range of remedies to any wrongdoing they find: actual damages, punitive damages, injunctions, declaratory judgments.

The U.S. Congress will not permit a foreign nation to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials *(Foreign Sovereign Immunity Act)*. So too U.S. Courts should not permit the United States itself to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials.

"Sec. 702. — **Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking **relief other than money**

**damages** and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a **judgment or decree may be entered against the United States**: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

*A. Use of the Acts in the Human Rights Context*

The United States affords certain domestic rights of action for persons claiming to be victims of human rights abuses, regardless of where they occur. The Alien Tort Claims Act (ATCA) provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[14] The Torture Victim Protection Act (TVPA), recently passed by Congress, provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual."[15]   This subject matter has never been addressed by the court and although a previous ORDER states the claim of torture and court fails to clarify why ATCA is beyond the subject matter jurisdiction of the court.

The ATCA, which traces its origins to the first Judiciary Act of 1789 but lay virtually unused for 200 years, has found new life as a means for aliens to sue in U.S. federal courts for damages from alleged human rights violations occurring around the world.[16]

The ATCA was enacted along with the Judiciary Act of 1789 in part to allow a forum in the United States for bringing pirates of the high seas to justice.[17] Others have viewed the legislative intent behind the ATCA as being rooted in "what the Founders understood to be the nation's duty to propagate and enforce those international law rules that directly regulated individual conduct."[18] In 1975, Judge Henry [*pg 921] Friendly discussed the ATCA and remarked that "[t]his old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act . . . no one seems to know whence it came."[19]

Regardless of the debate about the origins of Judge Friendly's "legal Lohengrin,"[20] plaintiffs have recently relied upon the ATCA as a means of remedying violations of human rights around the world.[21] For example, in *Filartiga v. Pena-Irala*,[22] a Paraguayan citizen sued the Inspector General of Police of Asuncion for kidnapping and torturing to death his son, Joelito Filartiga.[23] The United States Court of Appeals for the Second Circuit upheld the jurisdiction of the United States District Court for the Eastern District of New York under the ATCA, even though both the plaintiff and the defendant were Paraguayan and all of the relevant actions took place in Paraguay.[24] "'[I]nternational law confers fundamental rights upon all people vis-a-vis their own governments,' including the right to be free from torture."[25] In holding that a United States court could hear claims [*pg 922] regarding torts that violated international law, regardless of where they occurred, the district court relied upon the doctrine of transitory torts, which provides that "liability for certain tortious acts follow[s] the tortfeasor, such that he could be subject to suit for th[ose] act[s] in any forum."[26] Now the complaint so completely clear where even the defendants have admitted that the even took place in Australia or even India.  Clever

maneuvering of the FISA does not render the ATCA beyond the jurisdiction of subject matter.

The TVPA apparently endorsed *Filartiga*'s approach to the ATCA.[27] The TVPA was enacted in 1992, and its legislative history indicates its drafters' intent to address official, government-sanctioned torture or extrajudicial killing.[28] The TVPA is inherently linked to the ATCA, and by no means was intended to replace it.[29] Unlike the ATCA, the TVPA is not a jurisdictional statute. Thus, a TVPA plaintiff must establish its jurisdiction via the ATCA, or through some other means such as the general federal question jurisdiction from section 1331.[30]    The court ORDER denying the plaintiff a Preliminary Injunction, his daughter, being unprecedented in the history of the United States where the United States has gone to war in Vietnam and Iran over hostages still whitewashes the subject of ATCA and TVPA subjects within its jurisdiction.

Litigants have recently invoked the ATCA and the TVPA to attempt to vindicate human rights abuses abroad, perhaps most notably in the case of *Kadic v. Karadzic*,[31] the suit against Radovan Karadzic, wartime leader of the self-proclaimed Bosnian-Serb republic, for various atrocities and brutal acts allegedly committed by the Bosnian-Serb military forces.[32] In *Kadic*, a three-judge panel of the U.S. Court of Appeals for the Second Circuit held that the plaintiffs established the necessary federal subject matter jurisdiction under the ATCA and had brought forth allegations that, if proven true, could be remedied by the ATCA and the TVPA: "[The ATCA] appears to provide a remedy for the appellants' allegations of violations and official torture, and the Torture Victim Act also appears to provide a remedy for their allegations of official torture, [thus] their causes of

action are statutorily authorized."[33] The cases against Karadzic went back to trial, resulting in over $5 billion in judgments being entered against him.[34]

Debate remains over the appropriateness of hearing these types of human rights cases in American courts, especially in cases involving foreign parties and acts that took place in foreign lands seeming to have little connection to the United States.[35] In the words [*pg 924] of Karadzic himself in a letter to United States District Judge Peter K. Leisure, who presided over the billion dollar case, "Can you really hope to find truth, or do justice, or protect rights of people in distant nations? . . . Do you really believe that attaching a U.S. dollar sign to human tragedy around the world by empty judgments in uncontested lawsuits is a step toward peace or justice?"[36] However, many view these cases as wholly appropriate, as they often serve as the sole means for exposing human rights violators, have significant deterrent effects, and help the healing process of victims.[37] For example, Judge Leisure stressed that "[i]t's very important that the United States of America rises to the occasion when these things happen, and we not just wait for the United Nations war crimes tribunal."[38]   Then the manifest unjustice to the plantiffs in this case that there infact United States Connection and even then the court has found it necessary to lay aside the fact that the complaint was bought under this act.

A number of barriers can impede litigants proceeding under the ATCA and the TVPA. For example, the Foreign Sovereign Immunities Act of 1976[39] (FSIA) generally bars jurisdiction over foreign sovereigns in United States courts[40] and can pose problems for human rights litigants. However, the FSIA has been construed as having exceptions allowing ATCA and TVPA suits against foreign government officials who act beyond the scope of their power, for example, by committing an act such as torture that a

government [*pg 925] would not publicly endorse.[41] While the case law is by no means

clear cut,[42] the exceptions are allowing victims of alleged human rights abuses their day

in American courts.[43] Other hurdles, such as the Act of State doctrine[44] and the doctrine

of forum non conveniens,[45] can also prevent ATCA and TVPA litigants from having their

cases heard in U.S. courts.[46]   The plaintiff seek clarification from the court why it states

that the manifest unjustice of it partner and signatory can capture and keep concealed for

a lifetime father from a child and it must pass an ORDER that states something to the

effect that the defendants a permitted in the case to torture and sexually abuse perhaps in

the "White House" even and in public a 6 (SIX) year old girl.


## B. Jurisdiction Under the ATCA and the TVPA

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human

Right Commission against the State Actors of Australia and others."  *Id.* ¶ 42.  "[T]he

Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

A striking aspect of the ATCA and the TVPA is that they can be used in a U.S. court in a

case involving a foreign plaintiff, a foreign defendant, and activity that occurred outside

the United States.[47] In [*pg 926] U.S. courts, it is necessary for plaintiffs to establish that

the court has subject matter jurisdiction over the claim, and that it has personal

jurisdiction over the defendant.[48]


To establish subject matter jurisdiction under the ATCA, a plaintiff must demonstrate

that "three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in

violation of the law of nations (i.e., international law)."[49] In fact, the ATCA has been

interpreted as granting federal subject matter jurisdiction and creating a cause of action

when a plaintiff "can establish that the abuses allegedly inflicted upon her constitute violations of international law."[50] "[T]he torturer has become -- like the pirate and slave trader before him -- *hostis humani generis*, an enemy of all mankind."[51] As a result, the United States can claim universal subject matter jurisdiction for certain offenses "significant enough to threaten the interests 'of civilization everywhere.'"[52] The notion of universal [*pg 927] jurisdiction is based on the principle that states can claim jurisdiction "'to define and punish certain offenses recognized by the community of nations as of universal concern,' . . . even where no other recognized basis of jurisdiction is present."[53] Although court in ORDER finds these offences and knows that the foundation of civilized society is a stake if it grants sovereigns the power to steal and hold hostage minors.

The use of this type of universal jurisdiction over violations of human rights is not restricted to the United States.[54] Many other countries have created criminal penalties for human rights violators and war criminals on the basis of treaty obligations, such as the 1948 Genocide Convention.[55] Belgium, Denmark, France, Germany, Israel, Spain, and Switzerland, for example, have done their part domestically to prosecute non-nationals for war crimes and violations of human rights.[56] One needs only to look at the current case against former Chilean head of state Augusto Pinochet to note the worldwide use of universal jurisdiction.[57] While many of these examples of universal jurisdiction apply to criminal prosecutions, other countries have applied these principles in civil cases in the same spirit as the ATCA and the TVPA.[58]

The process of negotiating a Hague jurisdiction and judgments convention is a significant undertaking, and all parties involved should be commended for the steps that have

already been taken.[175] The benefits of a judgments convention have been well documented.[176] One of the potential consequences, apart from possible constitutional conflicts and having to reorganize domestic jurisdictional law,[177] is the effect of the proposed convention on domestic efforts to enforce human rights around the world, via the ATCA, TVPA, and other similar legislation. The foregoing discussion attempted to present some of the possible structures the final convention could take, and the potential consequences these structures could have on ATCA and TVPA actions, and on human rights litigation in other parts of the world.

If anything, the negotiators should be aware that a project such as the proposed convention, in whatever form it eventually takes, could positively or negatively impact ATCA and TVPA litigation. First of all, keeping a human rights provision as it appears in the current draft of the proposed convention should not do anything to adversely affect human rights litigation, but even then there is room for argument that it could help or hurt. Second, if the proposed convention removes its current human rights exception, it could hinder human rights enforcement. On the other hand, the convention could still be beneficial to human rights litigation in this form, since in many ATCA cases one could claim that jurisdiction was based on more than just a tagging basis.[178] Finally, the proposed convention could allow the automatic enforcement and recognition of judgments in human rights cases when jurisdiction is based on an approved white list ground, or when based on an approved ground that would be exorbitant outside of a human rights setting. Furthermore, in many ways independent of the use of a human provision, the proposed convention could make its jurisdiction, enforcement, and

recognition [*pg 952] sections openly discriminatory to noncontracting states in the style of the Brussels and Lugano conventions.

Above all, it is important to remember Judge Robb's comment in *Tel-Oren v. Libyan-Arab Republic*,[179] an ATCA case, that "[i]t is one thing for a student note-writer to urge that courts accept the challenges involved. It is an entirely different matter for a court to be asked to conduct such a [highly-sensitive and political] hearing successfully. The dangers are obvious."[180] The same is true for the negotiators. These potential formats are easier said than done.

In the context of the implementation of the proposed convention's required, permitted, and prohibited lists, it is also worth noting that there will be some variation in the interpretation of whether a case actually falls within one list versus another. Justice Marshall's choice of words in *Kulko v. Superior Court*[181] is all the more relevant: "[F]ew answers will be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'"[182] Furthermore, many are correct to highlight the practical reality of underenforcement of human rights judgments in the courts of the world.[183] Additionally, there are always potential problems with the enforcement of the convention itself, since states often sign on to treaties with the best of intentions, only to breach their terms when push comes to shove.[184] However, "in an [*pg 953] interdependent world, most countries will often have little choice but, sooner or later, to do business with each other."[185] *See* Anne-Marie Burley, *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 AM. J. INT'L L. 461, 461-62 (1989).

The plaintiffs, *See* Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 814 n.23 (D.C. Cir. 1984) (Bork, J., concurring). Another view on the legislative intent behind the ATCA is that of national security: there was concern that refusing access to the courts to aliens could provoke international hostility. *See id.* at 783-84 (Edwards, J., concurring) (quoting Alexander Hamilton's belief that "the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned," for "[t]his is not less essential to the preservation of the public faith, than to the security of the public tranquillity"). *But see id.* at 816, 821 (Bork, J., concurring) (expressing the view that concerns over national security warrant against hearing ATCA cases). As the opinions in *Tel-Oren* demonstrate, there is no real consensus as to what Congress meant to do in enacting the "legal Lohengrin." *See* Jeffrey Rabkin, Note, *Universal Justice: The Role of Federal Courts in International Civil Litigation*, 95 COLUM. L. REV. 2120, 2125-26 (1995) (discussing national security and other views on the legislative intent of the ATCA).

For an extensive list of ATCA cases against nonstate defendants, see Deborah L. Zimic, *Foreign Sovereign Immunity-Exceptions to Foreign Sovereign Immunity-The Foreign Sovereign Immunities Act Does Not Prohibit Invocation of the Alien Tort Claims Act to Exercise Federal Court Jurisdiction over a Foreign Nation's Non-Commercial Tort in Violation of International Law*, 28 VA. J. INT'L L. 221, 223 n.9 (1987). Ironically, one of the few instances before 1980 in which the ATCA (actually, a predecessor to it) was successfully invoked as a ground of jurisdiction was in *Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795) (No. 1607), in which a French citizen sought restitution for slaves taken

from a Spanish ship seized at war. The earlier use of the ATCA to protect a slaveholder's "property" is ironic given the statute's current use to protect human rights.

Sung Teak Kim, Note, *Adjudicating Violations of International Law: Defining the Scope of Jurisdiction Under the Alien Tort Statute*-Trajano v. Marcos, 27 CORNELL INT'L L.J. 387, 392 (1994) (quoting *Filartiga*, 630 F.2d at 885).

The doctrine of transitory torts holds that a person may be liable in courts of any country for an act wherever it is committed. See William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the "Originalists," 19 HASTINGS INT'L & COMP. L. REV. 221, 234 n.95 (1996). Apart from the human rights context, it has been applied to other situations as well. See, e.g., Darnell v. Rupplin, 371 S.E.2d 743, 745 (N.C. Ct. App. 1988) (alienation of affections as a transitory tort), cited in Jennifer E. McDougal, Comment, Legislating Morality: The Actions for Alienation of Affections and Criminal Conversation in North Carolina, 33 WAKE FOREST L. REV. 163, 185 n.155 (1998); Peter Nicolas, Comment, The Use of Preclusion Doctrine, Antisuit Injunctions, and Forum Non Conveniens Dismissals in Transnational Intellectual Property Litigation, 40 VA. J. INT'L L. 331, 354 (1999) (patent infringement as a transitory tort).

*See* SENATE COMM. ON THE JUDICIARY, THE TORTURE VICTIM PROTECTION ACT OF 1991, S. REP. NO. 102-249, at 4 [hereinafter TORTURE VICTIM PROTECTION ACT] (discussing the ATCA and *Filartiga*, and explaining that *Filartiga* "has met with general approval"); *see also* David P. Kunstle, Note, Kadic v. Karadzic: *Do Private Individuals Have Enforceable Rights and Obligations Under the Alien Tort Claims Act?*, 6 DUKE J. COMP. & INT'L L. 319, 343 (1996) ("[A]s indicated

by both the language and the legislative history of the TVPA, congressional reaction to *Filartiga*'s interpretation of the ATCA was anything but hostile.").

*See* TORTURE VICTIM PROTECTION ACT, *supra* note 27, at 3 ("The TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 . . . . Section 1350 has other important uses and should not be replaced.").70 F.3d 232, 237 (2d Cir. 1995) (holding that a district court could hear claims of torture committed against Muslim women allegedly committed by Serbian troops); *see also* Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (allowing a class action by Philippine nationals against a former Philippine president's estate for violations of human rights); *In re* Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493 (9th Cir. 1992) (allowing an action under ATCA by a Philippine citizen against the daughter of the former Philippine president, claiming wrongful death of her Philippine son caused by torture); National Coalition Gov't v. Unocal, Inc., 176 F.R.D. 329 (C.D. Cal. 1997) (denying a motion to dismiss of an oil company sued for violations of ATCA in connection with allegations of forced labor on a pipeline project); Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995) (awarding damages under ATCA and TVPA for violations of international law including summary execution or "disappearance," torture, arbitrary detention, and cruel, inhuman and degrading treatment).*See* Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981) (explaining that a case may be dismissed at the discretion of the trial court on the grounds of forum non conveniens if an alternative forum has jurisdiction to hear the case, and when the chosen location would "'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate

because of considerations affecting the court's own administrative and legal problems'" (quoting *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524 (1947))). *Piper* suggests, however, that ATCA cases might not be completely in danger. For example, where a remedy in an alternative forum is "so clearly inadequate or unsatisfactory that it is no remedy at all," an unfavorable change in law between the forums would be relevant. *Id.* at 254. Similarly, "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." *Id.* at 254 n.22. Keeping in mind the statement from the legislative history of the TVPA that "[a] state that practices torture and summary execution is not one that adheres to the rule of law," TORTURE VICTIM

Plaintiffs have a due process right to have their claims heard, and under current Supreme Court doctrine, tag jurisdiction is allowed to satisfy this right. *See* Harold G. Maier, *A Hague Conference Judgments Convention and United States Courts: A Problem and a Possibility*, 61 ALB. L. REV. 1207, 1235-36 (1998) (arguing that reasonable, permissive rules allowing tag jurisdiction would align with the Supreme Court's attitude towards jurisdictional rules).

1. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances" and the ORDER does not prevent this manifest injustice

2.  In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice

3.  The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

4.  The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

5.  Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

6. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

7. Defendants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

8.  Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice.

9.  The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

10. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice.

11. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

12. "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none

of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.) ORDER does not prevent this manifest injustice

    a.  A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

    b.  Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

13. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism, dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions,

CASE 1:07 cv-01170-JDB    Document 31    Filed on                Page 39 of 46

and psychotic episodes so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

14. Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

15. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

16. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

17. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational, if not necessarily benign - has been irrevocably undermined. Social institutions

are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

18. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

19. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

20. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".  ORDER does not prevent this manifest injustice

21. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of

victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

22. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".  SEE EXHBIT TEN

23. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

   a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

24. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other

"objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".  ORDER does not prevent this manifest injustice

25. Spitz makes the following observation:

   a.  "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

26. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender:

Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

27. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever.  SEE EXHIBIT TEN THIS IS MANIFEST INJUSTICE.

28. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation and rehear the matter based on manifest injustice.

29. The constitutional tort remedy is unique because it requires courts to focus on how constitutional provisions apply to injuries suffered by individuals. As a result, it has pushed the courts to understand constitutional provisions as (1) providing rights that protect individuals from certain governmental inflictions of harm; and (2) regulating the discretion of government officials to harm or allow harm to befall individuals.

30. Plaintiffs Constitutional tort actions, individuals claim that they have been harmed by either government action or the failure of the government to act despite an established obligation to intervene.[138] Individuals bring such actions not just to make a general point about how the world should be ordered but because they have been injured. Damages, provided for in constitutional tort actions, are a natural remedy for such harm. As the Supreme Court has observed, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."[139] The availability of a damage action for constitutional harms gives individuals an incentive to press claims based on constitutional provisions.[140] As one commentator has noted, the constitutional tort action "gave lawyers an incentive to conceive of past, tort-like harms in constitutional terms."[141]

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUGVIR INDER SINGH et al. | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| V | ) CASE NO 1:07-CV-01170 |
| | )  JUDGE BATES |
| | ) |
| COMMONWEALTH OF AUSTRALIA | ) |
| et al. | ) |
| Defendants | ) |

## ORDER

UPON DUE CONSIDERATION of the plaintiffs Response to the defendants motion to oppose rehearing and vacating order and Memorandum Points Supporting and any opposition is thereto, herby

ORDERED: CASE IS WITHIN THE RULE 60 and subchapters and is set for rehearing. The plaintiff have shown that Nara Singhderewa is a necessary and essential party and has been admitted as a party.

Plaintiffs have shown the United States of America is a necessary and essential party and has been admitted as a party.

In admitting United States and Nara Singhderewa the plaintiffs have been given leave to amend the complaint for constitutional Torts.

The plaintiffs allege and have shown a Constitutional Tort theus comply with Rule 59(e).

The plaintiff as per Rule 60 may bring a new case quoting this ORDER in another court.

ORDERED: CASE IS SET FOR JURY TRIAL.

ENTERED this _____day of _____2007.

_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

**Sarah James**

**Vision Research and Development**
**ABN  87 668 271 752**

Thursday, December 22, 2005

Dear Fellow Australians,

**CHILD ABUSE ACCUSATIONS AND OPINIONS FROM HUMAN RIGHTS AND SUPREME COURTS IN MY FAVOR.**



At this time of holiday season I don't want to burden you with an article by Dorothy S. Huntington, PhD validating my opinion on the continuous torture and child abuse that now, is becoming intolerable to both Nara my minor daughter and me her father being perpetrated under the FULL sponsorship of the Australian PEOPLE against its own minor citizen and me!!!

Dr. Huntington goes on to say that the damaging impact of child snatching on both children and parents has just begun to come to our attention. Despite the widespread public and professional interest in child stealing, there has been to date only one systematic research study (Agopian, 1979) on the topic, with only two other projects currently underway. One of these projects is being carried out at the Center for the Family in Transition and it is from this project.

Although no court papers have been filed by me or my wife it has been suggested by Australians that a, a parent could "legally" kidnap a child by taking the child out of the state where he or she did not have custody to another state and obtain a favorable custody



**Vision Research and Development**
**ABN 87 668 271 752**

ruling. This practice, called "forum shopping" or "court shopping", was possible because of the state's failure to give full faith and credit to prior decrees; unwillingness to practice the "clean hands" doctrine; inclination to favor the local petitioner; and adherence to the parens patriae doctrine, which states that the court must be primarily concerned with the child's best interest (although this in itself has never been explicated properly in child stealing cases).

In America, then where Nara was conceived in an attempt to avoid jurisdictional competition, the National Conference of Commissioners on Uniform State-Laws drafted the Uniform Child Custody Jurisdiction Act in 1968. To date, forty-eight states have adopted the Act, which provides uniform guidelines for determining the proper forum for a custody hearing. The federal Kidnapping Prevention Act (28 USC 1738A), which requires nationwide adherence to UCCJA, was then signed into law in 1980 . The Federal Act has three basic provisions: 1) it requires all states to honor the child custody decisions of other states; 2) it authorizes use of the Parent Locater Service; and 3) it authorizes the FBI through the fugitive Felon Act to track parents suspected of abducting their children.  I have a request o this nature with the AG Ruddock and others but with an alarming result of cover-up.

There remain numerous unsolved problems with the federal legislation, among them the fact that a child snatched prior to a custody decree is not protected by the UCCJA, and that the perpetrator must initiate a custody proceeding in another forum in order for the UCCJA to be invoked. For these reasons and others (Bodenheimer, 1978, Shutter, 1981), the new legislation, while a step in the right direction, does not significantly alleviate the problem of child stealing.
What we do know is that the consequences of child stealing are profound. The parent who loses the child has to deal with a precipitous loss beyond the feelings related to the marital breakup or divorce itself. The child who is kidnapped must cope with the shock of the kidnapping, the sudden loss of a parent and social circle, and an abrupt adaptation to a new environment. The child also often has to deal with lies that the snatching parent tells about the other parent, for example, "Mommy doesn't love you anymore", or, "Your father is dead".

It is now generally agreed that the frequency of parental child stealing is increasing (Agopian, l981) United States Senate, 1979), and while there is every indication that this is true, again there is no strong evidence for this fact (Gelles, 1980). Most commentators ascribe the increase to the rapidly rising divorce rate (Agopian, 1981, Fisk, 1977; United States Senate, 1979). Another factor cited is the advent of no-fault divorce, which has encouraged spouses to shift the arena of their hostilities from divorce to custody proceedings (Bodenheimer, 1975). Another contributor is the greater interest of fathers in seeking custody of their children as sex role definitions change to include active parenting by fathers. Also implicated is the proliferation of alternative family life styles,



**Sarah  James**

**Vision Research and Development**
**ABN  87 668 271 752**

such as dual career/dual residence marriages which makes kidnapping logistically possible (Gelles, 1980).


 **Child stealing, from the point of view of the child, is child abuse.** In child stealing, the children are used as both objects and weapons in the struggle between the parents which leads to the brutalization of the children psychologically, specifically destroying their sense of trust in the world around them. This is one basic definition of child abuse. **Child stealing is turning up the seamier side of child physical abuse and sexual abuse where there is every evidence that the care given to the children in many cases once they have been stolen clearly fits within the definition of maltreatment and abuse.** In situations not involving parental kidnapping, child abuse charges are brought when it is found that the child's diet is inadequate, where schooling is only intermittent if at all, where the surroundings are extremely deprived and where the children are constantly terrified.

Nonetheless, when all of this is true within the circumstance of child stealing, we have not conceptualized child stealing as child abuse.

In America, a sensible Act which Australia has incorporated into its Family Law ,According to the Federal Child Abuse Prevention and Treatment Act of 1974, child maltreatment is defined as **"the physical or mental injury, sexual abuse, negligent treatment, or maltreatment of a child under the age of eighteen by a person who is responsible for the child's welfare under circumstances which indicate that the child's health or welfare is harmed or threatened thereby" (Public Law 93-247,** 93rd Congress, Senate 1191, 1974). Certainly, most of our child stealing cases would fit this definition. Child maltreatment is a multi-faceted phenomenon, Acts of commission (for example, physical abuse) and/or acts of omission (for example, emotional neglect) may be categorized as follows (Halperin, 1979):

**1) physical abuse: infliction of physical injury, to the child;**

**2) sexual abuse: subjection of a child to sexually stimulating acts by an adult;**

**3) physical neglect: failure to provide a child with a nurturing home environment that supplies the basic necessities of life (for example, food, clothing, shelter, supervision, and protection from harm);**

**4) medical neglect: failure of a caretaker to provide medical treatment in cases of suspected or diagnosed physical ailments except for religious reasons);**

**5) emotional abuse: speech and actions by a caretaker that thwart the health personal and social development of a child;**

**Sarah** **James**

**Vision Research and Development**
**ABN  87 668 271 752**

**6) emotional neglect: failure of a caretaker to show concern
for a child or his/her activities;
7) educational neglect: failure of a caretaker to ensure
that a child is provided with the opportunity to learn;
8) abandonment: failure of a caretaker to make provisions
for the continued sustenance of the child;
9) multiple maltreatment: a severe and complex combination
of several types of abuse and/or neglect.
Every one of these elements is present in most cases of child
stealing. Child stealing should thus not be characterized as a
domestic problem, but as serious child abuse. We must visualize
the harm that is done to both the parents and the child and must
become sensitized to the fact that stolen children frequently
become gypsies, leading a nomadic lifestyle, deprived of stable
schooling and of many of the basic necessities of life. In domestic
relations courts we talk about the best interests of the child but
that element seems not to be considered in child stealing cases.**

**I have accused the Howard Government in the World Human Rights Case involving
NARA my child of exactly this abuse.**

**The court opinion and the Supreme Court Opinion is not going to go away!!! I shall
use it and I am using it to gather WORLD consensus.**

We also do not know the differential impact on a child of an active abduction versus
passive restraint, such as not returning a child after a vacation. We also do not know the
differential psychological impact of an active abduction involving a traumatic snatch
versus a non-traumatic removal by someone well known and beloved to the child, nor do
we know the differential impact of a traumatic "re-snatch" versus a relatively calm return
to the custodial parent. A kidnapping within the context of the previously warm
relationship with the parent perpetrator may have a totally different psychological impact
over time compared with a child stealing within the context of a previously absent or
negative relationship with the parent perpetrator. One must look also at the past and
current relationships with the parent victim to understand whether this has meaning for
the long-term impacts of child stealing.

What do we know now about the impact of the child stealing?
on the child victims?

1) The loss they suffer at the time of the snatch is not just the loss of the parent victim but
the loss of their whole community: home, school, friends, pets, their familiar
environment, etc. There is often severe depression, resulting from the loss of the custodial



parent, friends and familiar surroundings. If they return, the children must then suffer a second loss-- that of the absconding parent who may be forbidden by the frightened custodial parent to ever see the child again, or the loss of the new community to which they had adjusted.  The children become "emotional dishrags" because the perpetrator tells the child that the parent victim doesn't want them anymore, doesn't love them anymore, that the parent victim is dead, or may be getting married and doesn't want them around. The older children (ages 8 or 9) are pressured more heavily by the perpetrator to form a negative image of the parent victim, probably to assure that the child will not attempt to contact the parent victim. The older children also suffer more guilt about not trying to contact the parent victim and therefore the experience seems more difficult for these older children than for the children under the age of five.  The issue of trust is a major one--stolen children are taught to be fearful of police, to be fearful of returning home, because they might be put up for adoption, or locked away forever if the police find them.  The children are usually not well cared for; they move frequently from town to town; food and shelter are inconsistent and unpredictable, schooling is inconsistent and erratic. Middle class children frequently plunge into poverty and instability; they live lives of deprivation and neglect and that in itself is traumatic for the children. They frequently live out of vans, living like vagabonds, being hungry and dirty. Neglect and malnutrition are common.  Physical and sexual abuse are not uncommon. District Attorney Robert Hutchins 6 believes that there is evidence now that stolen children may be put into child slavery rings, pornography rings, or put-up for adoption on the black market. Agopian (1982) suspects that a large portion of stolen children who remain missing are unloaded by the absconding parent and end up in foster homes and institutions.

2) The act of parental kidnapping exacerbates many of the problems the child is suffering as a consequence of the marital separation and the divorce itself (loss of stability, security, and trust) (Haller, 1982). These symptoms are seen in child victims after their return: excessive fearfulness, even of ordinary occurrences; fear of going outside the house; being despondent, lonely and mistrustful of other people and therefore not being able to get close to them and alleviating the loneliness; anger at either or both the parents; a sense of helplessness since they are unable to control what happens to them in their environment; night terrors and nightmares. Children may cease growing emotionally as well as socially and academically, perhaps with regression in the younger children. There may be an inability to trust adults, and severe disruption in all adult relationships (Terr, 1982).  There is disruption in identity formation (Watson, 1975). A child whose life is unstable and unpredictable cannot develop a stable and integrated personality structure. Anger at the custodial parent for not  protecting him from being stolen, or anger at rescuing him from the absconding parent if the "snatch" occurred much earlier, is frequently a result (Edwards, 1981).  Children become withdrawn, silent, reclusive, fearful of being stolen again, fearful of leaving the house, fearful of being alone, and lack trust in their parents. There is a realization that they have been used as weapons in the battles between the parents and the parents thus become suspect. 7 The children develop



**Vision Research and Development**
**ABN 87 668 271 752**

severe phobias, particularly fears of being snatched again and suffering another sudden loss (Terr, 1982). Those children who suffer repeated counter-snatchings are the most fearful of all. There is a constant fear about a re-snatch, particularly if the return is via a snatch; there is restricted activity, and fear over a long period of time which is fed into by the fear of the parent victim after the return. Many children fear being killed, and dream of being killed. The children have difficulty in leaving home to do normal developmental things, like going to overnight camp, for fear that they will never see their parent again. They sometimes fear riding in cars, even with adults they know, because of their fear of being kidnapped. Many lose trust in any adult, and have difficulty in forming new attachments such as making new friends. In school they are unable to concentrate, since frightening fantasies intrude on their cognitive processes. They are also frequently found to be lying and stealing. These children develop a sense of being an "odd-ball", that something very shameful has happened to them. For the young children, there may be regression in toilet training, speech, rebelliousness and clinging.Regardless of age, these children seem to be filled with anger about what their parents have done to them, about the use the parents have made of them in their struggles with each other. Very sadly, there is often anger at the parent victim for not allowing the parent perpetrator to have visitation, originally, or after the stealing. The strain of not being able to talk about the perpetrator after the return is very great. These children worry about their future: if they marry and have children, would their spouses steal the children? 3) Attachments to perpetrators may be very strong, just as they are in hostage and abuse situations. There frequently is anger at the parent victim about not being able to see the perpetrator anymore. This is a particularly important issue since many of the children develop very strong attachments to the perpetrators and do not wish to be returned. This is also an issue for the judges in the awarding of custody to the perpetrator, at times an extremely difficult decision. 8There may be a desperate need to keep a good image of the perpetrator as part of an idealization of the parent; an eagerness to forgive the perpetrator that goes directly opposite to what the parent victim wishes.
Children carry with them their introjects--the physical removal from a parent does not necessarily change their identifications. The identifications with the parent perpetrator are extremely important and remain with the child; one frequently has the situation of negative identification in which the child is returned and the custodial parent begins to see the child act like the parent perpetrator used to act, and becomes even more,negative toward that child. Disorders of attachment are most frequently seen, and have the most disastrous future connotations. Attachments to adults are shattered by the lack of trust these children experience. The capacity to form significant human relationships may be seen in Winnicott's (1963) terms as the capacity for concern. This capacity arises as the result of a transaction between a child and a parent who has the ability to give spontaneously the feeling of concern and understanding of the needs of the child (Huntington, 1982). These children have experienced just the opposite--a parent who does not care--and their future relationships are compromised. They sometimes hunger in an indiscriminate way for adult relationships outside



**Sarah James**

**Vision Research and Development**
**ABN  87 668 271 752**

their family.

4) Guilt is an important issue also for the returned children. There may be a strong bonding between the abducted child and the perpetrator--seeing their fathers in particular as a hero; the child and the father collude in the appearance of being outlaws on the run. The child has idolized the father and his ability to flee the law and to exist outside convention. These children are extremely guilty when they return and are very fearful of the reaction of the other parent. They do not know who to believe, they are bewildered and very fearful. They frequently don't want to leave when they are picked up for the return. These children are caught up in loyalty conflicts about revealing information about the parent who stole them,  believing that that would be a betrayal. Steve Lawrence from the Lipsett Organization says that the children at the time of the return frequently think that they are being arrested for possessing stolen toys. They are afraid their mothers are going to give them hell for not calling them after being away for so many months. He also believes the children initially take total responsibility for the child stealing, are very fearful  about the parent victim's problems because of what the parent perpetrator has told them and what they need to watch out for.

Many children have a sense that the stealing was their fault and that it could have been avoided. They feel to blame for both the stealing and for the divorce. Many of the older children feel very guilty about not having tried to contact the parent victim. Many have the sense they have done something wrong, particularly about the stories the perpetrators tell. And also very importantly, being told they will be put in Juvenile Hall or a foster home before they are returned.

5) Many of the children have a belief their victim parents do not wane them to task about the experience—that there is something very wrong and therefore they feel guilty. They are also guilty about missing the perpetrator and guilty about missing the perpetrator and guilty about the amount of money the parent has spent to get them back, guilty about not having tried to call the parent victim. There frequently is a maintenance of an identification with the perpetrator, and this causes many problems within the family. There is anxiety over the visitation with the parent perpetrator after the stealing. There is much continued visiting in some cases. These children feel it is not possible to have a relationship with both parents, and they are torn between them. It is not uncommon to see total confusion when they are returned, particularly with a sense of being returned to a stranger. The reunion is very happy for the parent victim, but the child may be frightened and may not know or remember the custodial parent. Steve Lawrence feels the children have a need for help in figuring out how to relate to the parent who stole them because they eventually end up having contact with the child stealer again. The relationships are never again the way they ought to be, either with the perpetrator or the victim.

Children sometimes feel that the perpetrator should pay the kids and the parent victim for the hardships that they experienced, yet there is a great sadness about needing a father, if the father is the perpetrator, and not being able to have one. There is also anger at



**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

Judges for imposing sentences on the parent perpetrator, and anger at judges for not imposing sentences on the perpetrator. Guilt is always with these children. Being placed in protective custody, in a dependency unit or a foster home compounds their idea they have done something wrong.6) Lowell Streicker, the director of the freedom Counseling Center in Burlingame, brings up the issue of a special group of child stealing victims whose parents are involved in a religious organization, possibly a cult. When these marriages break up the custodial parent moves away with the child and the non-custodial parent steals the child back into the cult and the child is exposed to sexual and physical abuse as part of the cult's idiosyncratic practices, and also exposed because of the high degree of pathology in the parent perpetrator. Relatives will also get involved in child stealing --the child is awarded to relatives and one or both parents snatch the child back, with the natural parents taking the child with them into the cult and grandparents will hire someone to go to the cult and steal the child, because they are afraid of the damage occurring to the child (this is very frequent). One parent may also perceive the other as being the enemy of the true faith and that parent conceives that the eternal salvation of the child depends on "rescuing" the child from the parent who is not in the religious group. Frequently, the cult orders the child stealing parent to steal the child, and the perpetrator is responding to pressure from that group. The return of the child is complicated by the child's experience in the cult group. These children appear to be confused, disoriented, and in addition, seem to have internalized some sense of the parent perpetrator's paranoid fantasies about the evil doings of the outside society.

7) In the future, the children feel distrustful of people, have a hard time falling in love, hard time letting go, and feel very vulnerable for many years. One must look always at the very long term effects (one of our interviewed victims had been stolen twenty-five years before, and she said, "I have a feeling like I was lost in time and space", because she moved so much and went to so many different schools. She still does not feel normal).


BIBLIOGRAPHY

Agopian, M. W. Characteristics of parental child stealing offenses. Presented at the annual meeting of the Pacific Sociological Association, San Francisco, 1980a.
Agopian, M. W. Patterns in parental child stealing, Ph.D, dissertation, Los Angeles, USC, l980b.
Agopian, M. W. Problems in the prosecution of parental child stealing offenses. Presented at the annual meeting of the Western Society of Criminology, Newport Beach, California, l98Oc.
Agopian, M. W. Parental Child Stealing. Lexington, Mass.: Lexington Books, D. C. Heath, 1981.
Back, S. M. Areas for Future Research on Parental Kidnapping. Denver Research Institute, Social Systems Research and Evaluation

**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

Division, Univ. of Denver, Denver, Colorado, February 1982.

Bodenheimer, B. M. Progress under the Uniform Child Custody Jurisdiction Act and remaining problems: Punitive decrees, joint custody, and excessive modifications. California Law Review, 1977, 65, 978-1014.

Bodenheimer, B. M. Reply of the United States to the questionnaire and report to the Permanent Bureau at the Conference. In mimeo, 1979.

Coombs, R. M. Interstate child custody: Jurisdiction, recognition, and enforcement. Minnesota Law Review, 1982, 66 (5), 711-864.

Dexter, L. A note on selective inattention in social science. Social Problems, 1958, 6 (Fall), 176-182.

Page 19 of 22
1/24/2001 http://www.hiltonhouse.com/articles/Child_abuse_huntington.txt

Duckworth, M. Child-snatchers break hearts, not laws. Sunday Chronicle Herald, Augusta, Georgia, February 20, 1977.

Edwards, P. When parents kidnap their own children. U. S. News and World Report, March 30, 1981, 66 (12), 66-67.

Elliott, C. C. Child Snatching: An exploratory study of an emergent social problem. Prospectus submitted to School of Social Work, Florida State Univ., 1980.

Fisk, M. Child-snatching. Trial, 1977, 13 (10), 18-19.

Fisk, M. Child-snatching. Trial, 1978, 14, IB-20.

Geiss, G. Forward, In M. W. Agopian. Parental Child Stealing. D. C. Heath: Lexington, Mass., 1981.

Gelles, R. J. Research issues in the study of parental kidnapping. Paper prepared for the National Institute of Justice. July 1980.

Geiles, R. J. Parental child snatching. Study prepared for Louis Harris and Associates. In mimeo, December 1982.

Gill, J. E. Stolen Children. New York: Seaview Books, 1981.

Haas, A. D. Parents as kidnappers. Woman's Work, 1977 (July/August).

Haller, L. H. On being kidnapped. In Conference Materials, First National Conference on Interstate Child Custody and Parental Kidnapping Cases, sponsored by the Child Custody Project and the Family Law Section of the American Bar Association, September 10-Il, 19e2, Washington, D. C.

Halperin, S. Helping Maltreated Children: School and Community Involvement. St. Louis: C. V. Mosby, 1979.

Hoff, P. M. Interstate and International Child Custody Disputes:

**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

A Collection of Materials. Washington, D. C.: Child Custody
Project. American Bar Association, 1982.

Hoff, P. M.; J. Schulman: A. E. Volenik, and J. E. O'Daniel.
Interstate Child Custody Disputes and Parental Kidnapping:
Policy, Practice and Law. Washington, D.C. Joint project of the
Child Custody Project, American Bar Association and the National
Center for Women and Family Law, Inc.; National Center for Youth
Law, 1982.

Huntington, D. S. Attachment loss and divorce: A reconsideration
of the concepts. In L. Messinger (Ed.). Therapy with Remarriage
Families. Rockville, Maryland: Aspen Systems Corp., 1982, 17-29.

Katz, S. N. et al. Legal issues in parental kidnapping. Paper
presented at the National Institute of Justice Conference on
Parental Kidnapping, Washington, D. C., 1980.

Lewis, K. On reducing the child snatching syndrome. Children
Today, 1978, 7 (6), 19-35.

Page 20 of 22
1/24/2001 http://www.hiltonhouse.com/articles/Child_abuse_huntington.txt

Schetky, D. H. and L. Haller. Child psychiatry and law. J. Amer.
Acad. Child Psychiat., 1983, 22 (3), 279-285.

Senior, N.; T. Gladstone and B. Nurcombe. Child snatching: A case
report. J. Amer. Acad. Child Psychiat., 1982, 21 (6), 579-583.

Shutter, S. G. Parental Kidnapping Prevention Act - Panacea or
Toothless Tiger? 55 Florida Bar Journal 479 (June 1981) 481.

Terr, L. Psychic trauma in children: Observations following the
Chowchilla school bus kidnapping. Amer. J. Psychiat., 1981, 138,
14-19.

Terr, L. Psychiatric work with children who have been victims of
parental kidnapping. Paper presented at the annual meeting of the
Association of Family and Conciliation Courts, San Francisco,
May, 1982.

Terr, L. Child snatching: A new epidemic of an ancient malady. J.
Pediatrics, 1983, 103 (1), 151-156.

Tunley, R. "I'll never give up." Reader's Digest, 1980, 17, 90-
94.

United States Senate. Hearings before the subcommittee on child
and human development of the Committee on Labor and Human
Resources. United States Senate, 96th Congress, First Session, on
Examination of the problem of "child snatching." Washington, D.
C.: U. S. Government Printing Office, 1979.

Wallop, M. Children of divorce and separation. Trial. 1979, 15,
34-37.

Sarah James

**Vision Research and Development**
**ABN 87 668 271 752**

Watson, M. The children of Armageddon: Problems of child custody following divorce. 21 Syracuse Law Review, 55, 64, 1969.

Winnicott, D. W. The development of the capacity for concern (1963). In Winnicott, The Maturational Processes and the Facilitating Environment. New York: International Universities Press, 1965.

FOOT NOTES

1 Dr. Huntington is Director of Research and Evaluation, Center for the Family in Transition, Corte Madera, California, and is Project Director of the Child Stealing Project. This work is supported by the James Irvine Foundation and the Morris Stulsaft Foundation.

2 WMH Comment: Note the assumption that it is the father who kidnaps the child.

3 WMH Note: Literally "parent of the county," refers traditionally to the role of state as sovereign and guardian of persons under legal disability. Parens patriae originates form the English common law where the King had a royal prerogative to act as a guardian to persons with legal disabilities such as infants, idiots and lunatics. In the United States, the parens patriae function belongs with the states.

4 WMH Note: As of 21 Jan 1991 all states have enacted some form or another of the UCCJA. It is not in effect in Guam, Puerto Rico, and the Virgin Islands. The PKPA, 28 USC 1738A is, however, effective in these places.

5 WMH Note: 28 Dec 1980, the Feast of the Holy Innocents

6 WMH Note: This observation should be taken with some caution.

7 WMH Note: It is the editor's belief that parents come in "matched pairs". Is this the child's way of saying the same thing?

8 WMH Note: This is an example of "Public Policy" in favor or eliminating kidnapping and the "Best Interests" of the particular child. The editor's opinion is that Public Policy should govern as to to otherwise rewards the kidnapper and encourages others to do the same.

9 WMH Note: This, like it or not, may well happen. Often a child is picked up by the authorities and held in custody pending a court hearing. While the usual pattern is to pick up the child early in the morning and then go directly to court, it has happened, say when a flight is delayed, that court is carried over for a day or two. During this time the child is placed in the children's shelter.



**Vision Research and Development**
**ABN  87 668 271 752**

I shall continue my opinion and use experts in the field to state that Australia and the Gold Coast City  Council and those named in the Suit before the Australian Human Rights and Equal Opportunity Commission are continuing to collude and conspire to keep me separated from my child and thus intentionally harm and abuse my minor child. I shall pursue every court in the WORLD to stop the aiding and abetting of this CHILD ABUSE and dear readers you are aware and NO ignorant argument will be accepted.

So dear Australians at this holiday season get me to my CHILD ON TIME!!!!!!

Yours truly,

Jugvir Inder Singh

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA

# Parental Child Abduction
# is Child Abuse

**by Nancy Faulkner, Ph.D**

Presented to the
**United Nations Convention on Child Rights**
in Special Session, June 9, 1999,
on behalf of P.A.R.E.N.T.
and victims of parental child abduction.

© Nancy Faulkner 1999

**Peer Reviews following this Report**
[next page]

French translation:
L'enlèvement parental d'un enfant est un viol
de sa personnalité; translated by
Dr. Lorenz Buswell, Genève, October 2000.
[NOTE: Author not responsible for translation accuracy.]

.

## PAGE ONE  [this page]

**Parental Child Abduction is Child Abuse**

Introduction
Risk Factors
Impact of Parental Child Abduction

- Reactive Attachment Disorder
- Learned Helplessness
- Fear and Phobias
- Stress and Generalized Anxiety Disorder
- Guilt
- Acute Stress Disorder and
  Posttraumatic Stress Disorder
- Parental Alienation and the Overburdened

Child
- Separation Anxiety and Fear of Abandonment
- Grief

What has been reported about abducted children?
Conclusion from Clawar & Rivlin


**PAGE TWO** [next page]

- Peer Reviews:
  Parental Child Abduction is Child Abuse
- Update Aug 2000: Law Review of PAS
- Additional Resources
- Update Oct 2000: Loss of Parent and PTSD
- Full Text French Translation
- References

## Introduction

"Because of the harmful effects on children, parental kidnapping has been characterized as a form of child abuse" reports Patricia Hoff, Legal Director for the Parental Abduction Training and Dissemination Project, American Bar Association on Children and the Law. Hoff explains:

> "Abducted children suffer emotionally and sometimes physically at the hands of abductor-parents. Many children are told the other parent is dead or no longer loves them. Uprooted from family and friends, abducted children often are given new names by their abductor-parents and instructed not to reveal their real names or where they lived before." (Hoff, 1997)

As an early leader in the relatively new field of parental child abduction issues, Dr. Dorothy Huntington wrote an article published in 1982, Parental Kidnapping: A New Form of Child Abuse. Huntington contends that from the point of view of the child, "child stealing is child abuse." According to Huntington, "in child stealing the children are used as both objects and weapons in the struggle between the parents which leads to the brutalization of

the children psychologically, specifically destroying their sense of trust in the world around them." Because of the events surrounding parental child abduction, Huntington emphasizes that "we must reconceptualize child stealing as child abuse of the most flagrant sort" (Huntington, 1982, p. 7).

There is an unfortunate and evident paucity of literature on parental child abduction. Just during the past two decades, Huntington (1982), Greif and Hegar (1993), and others have begun addressing concerns for children kidnapped by their parent abductors. With growing concerns for abducted children, some experts have coined terms like "Parental Alienation" to describe the potential negative impact on child victims. Regardless of the specific terms designed to illustrate the effects of parental child abduction, there is general consensus that the children are the resultant casualties.

TOP of PAGE ~ END of PAGE

## Risk Factors

Post-divorce parental child stealing has been on the increase since the mid-1970s, paralleling the rising divorce rate and the escalating litigation over child custody (Huntington, 1986). According to Hoff (1997), "The term 'parental kidnapping' encompasses the taking, retention or concealment of a child by a parent, other family member, or their agent, in derogation of the custody rights, including visitation rights, of another parent or family member."

The abductor parent may move from one state to another, beginning a new round of investigation into the abuse with each move, impeding intervention by child protective services (Jones, Lund & Sullivan, 1996). Or, the abductor may flee to another country, completely shutting down any hopes of involvement by child protective services in the country of origin. The most pervasive scenario is that the abducting parent goes into hiding, or moves beyond the jurisdiction of governing law.

"These kidnappings are very cleverly plotted and planned and often involve the assistance of family members. The target parent has no forwarding

address or telephone numbers." (Clawar & Rivlin, p. 115)

Huntington and others believe that inherent in the act of kidnapping and concealment are negative consequences for the child victims. It is Huntington's contention that one of the most concerning factors is that the parent has fled and "is out of reach of law and child protection agencies." To escape discovery the abductor parent is hiding out, -- "so who knows what is happening with child!" (Huntington, 1982).

The abducted child is without the safeguards normally provided by child law. This leaves the child completely vulnerable to the dictates of the abductor parent, who, as evidenced in the following research by Johnson and Girdner, may not have the child's best interests in mind, or may be functioning with severe impediments.

A study entitled <u>Prevention of Parent or Family Abduction through Early Identification of Risk Factors</u> was conducted by Dr. Janet Johnston (Judith Wallerstein Center for the Family in Transition) and Dr. Linda Girdner (ABA Center on Children and the Law). The researchers detailed six risk parent profiles for abduction:

1. Have threatened to abduct or abducted previously;
2. Are suspicious and distrustful due to a belief abuse has occurred;
3. Are paranoid-delusional;
4. Are sociopathic;
5. Have strong ties to another country; and
6. Feel disenfranchised from the legal system.

These findings by Johnston and Girdner pose a bleak prognosis for children held at the hands of such inept parents.

According to Rand, an abducting parent views the child's needs as secondary to the parental agenda which is to provoke, agitate, control, attack or psychologically torture the other parent. "It should come as no surprise, then, that post-divorce parental abduction is considered a serious form of child abuse" (Rand, 1997).

It is generally accepted that children are emotionally impacted by divorce. Children of troubled abductor parents bear an even greater burden. "The needs of the troubled parent override the developmental needs of the child, with the result that the child becomes psychologically depleted and their own emotional and social progress is crippled" (Rand, 1997). Since the problem of parental child abduction is known to occur in divided parents rather than in united and intact families, the inordinate emotional burdens compound abduction trauma. Rand reports that although Wallerstein is familiar with Parental Alienation Syndrome, Wallerstein and Blakeslee (1989) prefer the term "overburdened child" to describe this problem.

In custody disputes and abductions, the extended support systems of the parents can become part of the dispute scenario, -- leading to a type of "tribal warfare" (Johnston & Campbell, 1988). Believing primarily one side of the abduction story, -- family, friends, and professionals may lose their objectivity. As a result, protective concerns expressed by the abandoned parent may be viewed as undue criticism, interference, and histrionics. Thus, the abandoned parent may be ineffectual in relieving the trauma imposed on an innocent child by the parental abduction.

Generally the abductor does not even speak of the abandoned parent and waits patiently for time to erase probing questions, like "When can we see mom (dad) again?". "These children become hostages ... it remains beyond their comprehension that a parent who really cares and loves them cannot discover their whereabouts" (Clawar & Rivlin, p. 115).

TOP of PAGE ~ END of PAGE

## Impact of Parental Child Abduction

Children who have been psychologically violated and maltreated through the act of abduction, are more likely to exhibit a variety of psychological and social handicaps. These handicaps make them vulnerable to detrimental outside influences (Rand, 1997). Huntington (1982) lists some of the deleterious effects of parental child abduction on the child victim:

1. Depression;
2. Loss of community;
3. Loss of stability, security, and trust;
4. Excessive fearfulness, even of ordinary occurrences;
5. Loneliness;
6. Anger;
7. Helplessness;
8. Disruption in identity formation; and
9. Fear of abandonment.

Many of these untoward effects can be subsumed under the problems relevant to Reactive Attachment Disorder, the diagnostic categories in the following section, and the sections on fear, of abandonment, learned helplessness, and guilt, that follow.

TOP of PAGE ~ END of PAGE

## **Reactive Attachment Disorder.**

Attachment is the deep and enduring connection established between a child and caregiver in the first few years of life. It profoundly influences every component of the human condition, -- mind, body, emotions, relationships, and values. Children lacking secure attachments with caregivers often become angry, oppositional, antisocial, and may grow up to be parents who are incapable of establishing this crucial foundation with their own children (Levy & Orlans, 1999).

Children who lack permanence in their lives often develop a "one-day-at-a-time" perspective of life, which effects appropriate development of the cognitive-behavioral chain -- thoughts, feelings, actions, choices, and outcomes. "They think, 'I've been moved so many times, I'll just be moved again. So why should I care?'" (ACE, 1999).

Stringer (1999) and other experts on attachment disorder concur that the highest risk occurs during the first few years of life. This disorder is classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) as Reactive Attachment Disorder. According to Stringer, common causes of attachment problems are:

1. Sudden or traumatic separation from primary caretaker (through death, illness hospitalization of caretaker, or removal of child);
2. Physical, emotional, or sexual abuse;
3. Neglect (of physical or emotional needs);
4. Frequent moves and/or placements;
5. Inconsistent or inadequate care at home or in day care (care must include holding, talking, nurturing, as well as meeting basic physical needs); and
6. Chronic depression of primary caretaker.

It is evident that these causality factors would place at high risk children who are subjected to similar conditions in the circumstances of parental kidnapping.

Attachment is the reciprocal process of emotional connection. This fundamental and necessary developmental process influences a child's physical, cognitive, and psychological development. It becomes the basis for development of basic trust or mistrust, and shapes how the child will relate to the world, how the child will learn, and how the child will form relationships throughout life. "If this process is disrupted, the child may not develop the secure base necessary to support all future healthy development" (Stringer, 1999).

Stringer (1999), Van Bloem (1999), The Attachment Center (ACE, 1999), and criteria in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV, 1994) identify a significant and troubling list of behaviors associated with problematic attachment:

1. Unable to engage in satisfying reciprocal relationships;
2. Superficially engaging, charming (not genuine);
3. Lack of eye contact;
4. Indiscriminately affectionate with strangers;
5. Lack of ability to give and receive affection on parents' terms (not cuddly);
6. Inappropriately demanding and clingy;
7. Poor peer relationships;

8. Low self esteem;
9. Affectionate with strangers or attempts to leave with strangers;
10. Refuses, resists, or is uncomfortable with affection on parental terms;
11. Incessant chatter or nonsense questions;
12. Hyperactive, over-active, or attention deficit;
13. Poor, underdeveloped, or no conscience;
14. Hoarding, gorging, eating abnormalities, or hiding food;
15. Intense control battles;
16. Significant learning problems or lags;
17. Fire setting, fire play, or fascination with fire;
18. Daily lying or lying in the face of the obvious;
19. Fascination with weapons, blood, or gore;
20. Destructive to self or others; and
21. Cruelty to animals, siblings, or others.

This unsettling list of disturbances and other constellations of behaviors exhibited by abducted children comprises criteria from various childhood disorder categories of the Diagnostic and Statistical Manual of Mental Disorders that might lead one to rule out the following diagnoses:

1. Reactive Attachment Disorder of Infancy or Early Childhood;
2. Separation Anxiety Disorder;
3. Overanxious Disorder of Childhood;
4. Attention-Deficit/Hyperactivity Disorder;
5. Conduct Disorder;
6. Disruptive Behavior Disorder;
7. Oppositional Defiant Disorder;
8. Eating Disorders;
9. Learning Disorder NOS;
10. Regression and Elimination Disorders: Encopresis and Enuresis; and
11. Post Traumatic Stress Syndrome.

As a relatively new diagnosis to the Diagnostic and Statistical Manual of Mental Disorders, Reactive Attachment Disorder (RAD), also known as Attachment Disorder (AD), is often misunderstood, and relatively unknown (ACE, 1999). Although the official DSM-IV diagnosis may be overlooked by some professionals, the

phenomenon of attachment disorder was observed 50 years ago by Rene Spitz in the well known monkey studies. Spitz reported that infant monkeys may actually die if they are not played with, talked to, held, stroked, and tended. Some species of young monkeys die when abandoned. Even a brief separation of infant monkeys from their mothers is seen two years later, causing the infants to be more timid, clingy, and relate poorly to others.

Humans are social animals. If abandoned as an infant or young child, we may first protest by screaming, then quietly withdraw; finally, we become detached and apathetic. Abandoned, we may joylessly play some with others, but there is no emotional involvement (Tucker-Ladd, 1960).

The DSM-IV (1994) defines Reactive Attachment Disorder (RAD) as markedly disturbed and developmentally inappropriate social relatedness in most contexts, beginning before age five. According to Van Bloem (1999), inexperienced professionals often misdiagnose Reactive Attachment Disorder (RAD) as Oppositional Defiant Disorder, Attention Deficit Disorder, Depression, Autism, Post-Traumatic Stress Disorder, Bipolar Disorder, or Attention-Deficit/Hyperactivity Disorder. Other experts in RAD estimate that this disorder has been misdiagnosed as Bi-Polar Disorder or Attention Deficit Disorder in 40 to 70 percent of the cases (ACE, 1999).

Bloem (1999) suggests that Reactive Attachment Disorder is often accompanied by other diagnosis listed above, but that Attachment Disorder most often needs to be the primary diagnosis and the focus of early intervention. Some professionals may mildly disagree with Bloem's preferred diagnostic perspective; however, most would agree that the resultant trauma to a child, -- who in a moment was stolen away from his or her entire world of familiarity, -- is emotionally, developmentally, and psychologically devastating.

Van Bloem (1999) reports that for a child "it is not possible to develop true self-esteem and find peace without resolving differences and emotional pain due to stressed or damaged emotional ties to parents and

family." According to Van Bloem, attachment helps the child to:

1.   Attain full intellectual potential;
2.   Sort out perceptions;
3.   Think logically;
4.   Develop a conscience;
5.   Become self-reliant;
6.   Cope with stress and frustration;
7.   Handle fear and worry;
8.   Develop future relationships; and
9.   Reduce jealousy (Van Bloem, 1999).

The words "attachment" and "bonding" are used interchangeably. These bonding impaired individuals typically fail to develop a conscience and do not learn how to trust. With Attachment Disorder, individuals have difficulty forming intimate lasting relationships (ACE, 1999). Children with attachment disturbance often project an image of self-sufficiency and charm, while masking inner feelings of insecurity and self hate. Unfortunately, such children do not respond well to traditional parenting or therapy, since both rely on the child's ability to form relationships (Stringer, 1999).

Adult survivors of abuse may experience long term or chronic lifetime symptoms resulting from childhood trauma. For example, a person who has been physically abused might suffer from depression or anxiety. A victim of childhood sexual abuse might exhibit symptoms of Posttraumatic Stress, or other disorders as evidenced in the DSM-IV criteria of adult mental health disorders, such as:

1.   Agoraphobia
2.   Posttraumatic Stress Disorder
3.   Dissociative Identity Disorder
4.   Dysthymic Disorder
5.   Substance Abuse or Dependency
6.   Generalized Anxiety Disorder
7.   Major Depressive Disorder
8.   Panic Attacks or Panic Disorder
9.   Borderline Personality Disorder

All too often, children suffering from Reactive

Attachment Disorder go untreated and become adults without conscience (Antisocial Personality Disorder) and without concern for anyone but themselves. "Parental dreams are lost, and they grow up uncaring and without social conscience" (ACE, 1999).

TOP of PAGE ~ END of PAGE

## Learned Helplessness.

The concept of learned helplessness is based on the highly respected work of Seligman in 1975, when he observed this helpless condition among animals that were unable to alter their environment. Seligman subjected dogs to random shocks at variable intervals that were completely unrelated to their volitional behaviors. Nothing the dogs could do would protect them from being shocked. Under this experimental treatment, the dogs became passive and refused to leave their cages, even though the cage doors were eventually left open as the shock treatments continued.

"The key to the learned helplessness model is punishment that is totally unrelated to the victim's behavior, that is, the victim does not have to do anything wrong to be punished" (Lalli, 1997). As a consequence, the victim places him or herself under a virtual house arrest without informed judgment that includes facts of the situation. In the situation of parental abduction, the child victim often does not know why he or she has been abducted, has no control over the situation, and even though there may be very strong feelings of anger, frustration and confusion, -- the totality of helplessness may result in a yielding to the circumstances. This yielding and superficial appearance of resolution to the circumstance may be the result of complete devastation, lack of control, and total helplessness, -- rather than acceptance.

TOP of PAGE ~ END of PAGE

## Fear and Phobias.

Most phobias are groundless and excessive, such as fears of crowds, small spaces, addressing large groups, and heights. These fears of harmless situations may be associated with fantasies of horrible consequences, like

the fear of public speaking. Thus, frightening and irrational thoughts of what might happen become paired with the real situation, which in turn produces a fear reaction. For example, at night a child has fantasies of demons lurking under the bed and in the closet. The stronger the fantasies, the worse the fear when the lights are turned off. Soon, the fears will occur prior to bedtime, from anticipation of being in the dark.

> "Likewise, most of us have at least a mild fear of the dark. Relatively few people have been attacked in the dark, no one by ghosts or monsters. Yet, at age 3 or 4 (as soon as our imagination develops enough) we begin fantasizing scary creatures lurking in the dark. Our own fantasies create our fear of the dark." (Tucker-Ladd, 1960)

Children who are abducted have been stripped of almost everything familiar - toys, personal possessions, playmates, relatives, teachers, the neighborhood, playgrounds, favorite shopping and eating places, -- daily routine -- and a parent. Suddenly snatched from all that is familiar and deposited without adequate preparation into a completely new environment, -- fear of the unknown, future events, emotional safety, and physical safety can run rampant and become irrational. The real threat becomes even more exaggerated and capacities to deal with the threat seem completely inadequate. "This is horrible, out of my control, and I can't deal with it." Overwhelmed with the stress of new stimuli and unable to make sense of the situation may lead the child to excessive anxiety and fears, which in turn may develop into chronic anxiety, stress reactions, depression, paranoia and/or other complications discussed in the following sections.

TOP of PAGE ~ END of PAGE

## Stress and Generalized Anxiety Disorder.

One of the leaders in theories of anxiety, Hans Selye spent a life-time studying stress and postulated that almost any change is a stressor, since there is a resultant demand to deal with a new situation. If normal daily stressors are increased to unusual and traumatic events, like child abduction, the short and long term impact may significantly impair development and functioning, --

even into adulthood.

There are three stages in General Adaptation Syndrome (GAS). In the alarm stage, physiological changes occur, -- the heart beats faster, respiration increases and becomes more labored, senses become at least temporarily more alert, perspiration occurs, -- all preparing the body to flee or attack. The body responds with panic, a reaction to the fight or flight dilemma. Under continued stress, the second stage begins, -- resistance. The body becomes weary and attempts to adjust and adapt to the stress. Despite efforts to adapt, the autonomic system is still working overtime.

If the stress is extended (days, weeks, and months), resistance is further depleted and exhaustion occurs. Energy to continue stress adaptation is depleted. The body gives up, with some resultant damage potentially occurring, -- particularly to the heart, kidneys, and stomach. Commonly, psychosomatic disorders occur. These somatic disorders are psychologically mediated physical difficulties, like lethargy, pain, hypertension, headaches, abdominal and gastric distress, and sleep disorders. Feelings of hopelessness and a state of confusion generally accompany the physical symptoms and decision-making deteriorates under intense or prolonged stress.

Extensive replicated research findings have demonstrated these psychosomatic and physiologically damaging consequences may also occur as a result of extended stress from circumstances of childhood trauma. The potential for harmful effects of divorce on children has been widely substantiated. Stress has been documented to alter the brain, cardiovascular systems, immune systems, and hormonal system. For example, it has been discovered that female adult survivors of childhood sexual abuse have a smaller hippocampus than non-abused women. Stress symptoms that are evident as an adult may be due to occurrences from many years prior, e.g., the long term effects of divorce, such as a fear of intimacy, may occur much later in life, -- 10 or 15 years later.

In children, extended stress may result in regression of behaviors, like age inappropriate thumbsucking,

excessive clingyness, unexplained crying, bedwetting, and temper tantrums.

Prolonged and unresolved stress may also manifest in displacement, the redirection of impulses (often anger) from the real threat to an innocent and safer person. Often, the redirection is because the threat is too dangerous to confront. This may be the case in an abducted child who redirects his or her anger from the abductor to another person, possibly the abandoned parent for not rescuing and restoring life to the way it had been. Another form of displacement is internal. Instead of displacing hostility to another person, it is turned inward, against oneself. This is not uncommon in depression and suicide.

Extended stress and frustration to resolve the conflict, in an effort to relieve the anxiety, may result in reaction formation, -- denial and reversal of feelings. Love becomes hate, or hate becomes love. For example, with a problem between a parent and child, the child may express the anger through exaggeration of affection. In this situation, the child may superficially appear to be closely bonded with the parent who is contributing to the stress; if asked, the child will attest to a strong and loving parent-child relationship.

Yet another stress reaction is identification, -- the process of attempting to bond with the person responsible for the stressors and becoming like the abuser to diminish the conflictual anxiety. As an example, some sexual assault victims have been known to identify strongly with offenders, even to the point of developing intimate relationships with incarcerated abusers. In these situations, the victim may emulate and become more and more like the abuser. Identification with and emulation of the offender is particularly true in cases of child sexual assault victims who become adult offenders. In parental child abductions, some children have been known to identify with the abducting parent, to the point of completely rejecting and blaming the abandoned parent, despite evidence absent blame.

Stress also generally interferes with performance, resulting in inhibited learning, poor decision-making, and resulting in restricted development. Intense and

prolonged stress, especially in childhood, may create an overreaction to stress, -- even years later. Intense reactions to stress and resultant failures become a self perpetuating cycle, creating more stress and more failure. Continued failure breeds the feelings of helplessness and hopelessness, which circles back to learned helplessness and giving up.

Generalized Anxiety Disorder is more intense than the normal anxiety generally experienced day to day. It's chronic and exaggerated worry and tension, even though time has passed, the circumstance has changed, and there seems to be nothing evident that will continue to provoke anxiety. Having this disorder means anticipating disaster and experiencing excessive concerns about health, money, family, or work. The problems generalize to other situations in life, become self-sustaining, and the original stressors are then difficult to identify.

People suffering from Generalized Anxiety Disorder cannot seem to control or manage their concerns, even though they may realize their anxiety is more intense than the situation warrants. They seem unable to relax, often have trouble falling or staying asleep, with worries that are accompanied by physical symptoms, like twitching, muscle tension, headaches, irritability, sweating, or hot flashes. There may be feelings of being lightheaded, out of breath, nauseated or an urgency to urinate; or, there may be an almost constant feeling of having a lump in the throat. There may be a heightened startle response, lethargy, or difficulty concentrating. If severe, manifestations of Generalized Anxiety Disorder can be very debilitating, making it difficult to carry out even the most ordinary daily activities (DSM-IV, 1994).

TOP of PAGE ~ END of PAGE

**Guilt.**

It is difficult for some to understand the guilt felt by a victim, particularly when the victim is a child. Survivors of childhood sexual abuse continue to remind us that they felt guilt -- guilt that they may have in some way brought on the abuse, guilt for feeling some sensate pleasure, guilt for destruction of the family constellation when the abuse was discovered, and guilt for legal consequences to the offender.

Literature on divorce is deplete with references to children feeling that they had somehow brought about difficulties between their parents and were responsible for the culminating division of the family. The guilt of abducted children is not dissimilar.

> "These children are extremely guilty when they return and are very fearful of the reaction of the other parent. They do not know who to believe, the are bewildered and very fearful. Many children have a sense that the stealing was their fault and that it could have been avoided. They feel to blame for both the stealing and for the divorce. Many of the older children feel very guilty about not having tried to contact the parent victim. These children feel it is not possible to have a relationship with both parents, and they are town between them. It is not uncommon to see total confusion when they are returned, particularly with a sense of being returned to a stranger."
> (Huntington, 1982, p. 8)

TOP of PAGE ~ END of PAGE

## Acute Stress Disorder and Posttraumatic Stress Disorder.

The diagnoses of Acute Stress Disorder and Posttraumatic Stress Disorder are commonly applied by professionals to victims of abuse situations, such as sexual abuse and child abduction, when the presenting symptoms and applicable conditions apply. According to the criteria of the Diagnostic and Statistical Manual of Mental Disorders (1994), a person suffering from Acute Stress Disorder has been exposed to a traumatic event in which both of the following were present:

1. The person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others;
2. The person's response involved intense fear, helplessness, or horror.

Either while experiencing or after experiencing the distressing event, the individual has three (or more) of the following dissociative symptoms:

1. A subjective sense of numbing, detachment, or absence of emotional responsiveness;
2. A reduction in awareness of his or her surroundings (e.g., "being in a daze");
3. Derealization;
4. Depersonalization;
5. Dissociative amnesia (i.e., inability to recall an important aspect of the trauma).

Like many reactive effects and symptoms discussed in the sections above, this diagnostic category also includes marked symptoms of anxiety or increased arousal (e.g., difficulty sleeping, irritability, poor concentration, hypervigilance, exaggerated startle response, motor restlessness). A victim of abuse may meet the criteria for this diagnosis when the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning; or, when the disturbance impairs the individual's ability to pursue some necessary task, such as obtaining necessary assistance or mobilizing personal resources by telling family members about the traumatic experience.

TOP of PAGE ~ END of PAGE

**Parental Alienation and the Overburdened Child.**

"Physical kidnapping situations leave children extremely susceptible to indoctrination against a target parent. Often the operating strategy is to frighten the child into believing that the only way to exist is to escape some ambiguous harm that is to be inflicted upon the parent, child or both of them by

the target parent" (Clawar & Rivlin, p. 115).

In <u>Children Held Hostage: Dealing With Programmed and Brainwashed Children</u>, Clawar and Rivlin detail signs of abduction victim "maladjustment that go beyond the impact of separation and divorce" (p. 129). The authors delineate these parental child abduction consequences as "specifically related to the effects of brainwashing and programming." Clawar and Rivlin list 25 resultant manifestations, including anger, loss of self-confidence and self-esteem, development of fears and phobias, depression, sleep disorders, and eating disorders.

"Brainwashing" and "programming" are terms used more and more frequently by experts of parental child abduction. These term may initially offend or alienate the reader who is not familiar with Parental Alienation and abduction dynamics. "Brainwashing" and "programming" -- or changing a child's belief systems, -- may be intentional, or, it may be the unintentional process of a parent imposing their belief systems on the child through an extended period of inadvertent repetition.

According to Garbarino et al. (1986), psychological maltreatment can be viewed as a pattern of adult behavior which is psychologically destructive to the child, sabotaging the child's appropriate normal development of self and social competence. To assist with a framework for understanding brainwashing and parental alienation concepts, five types of psychological maltreatment identified by Garbarino et al. were adapted by Rand (1997) to apply to the Parental Alienation Syndrome (PAS):

1. Rejecting - The child's legitimate need for a relationship with both parents is rejected. The child has reason to fear rejection and abandonment by the alienating parent if positive feelings are expressed about the other parent and the people and activities associated with that parent.
2. Terrorizing - The child is bullied or verbally

assaulted into being terrified of the target parent. The child is psychologically brutalized into fearing contact with the target parent and retribution by the alienating parent for any positive feelings the child might have for the other parent. Psychological abuse of this type may be accompanied by physical abuse.

3. Ignoring - The parent is emotionally unavailable to the child, leading to feelings of neglect and abandonment. Divorced parents may selectively withhold love and attention from the child, a subtler form of rejecting which shapes the child's behavior.

4. Isolating - The parent isolates the child from normal opportunities for social relations. In PAS, the child is prevented from participating in normal social interactions with the target parent and relatives and friends on that side of the family. In severe PAS, social isolation of the child sometimes extends beyond the target parent to any social contacts which might foster autonomy and independence.

5. Corrupting - The child is missocialized and reinforced by the alienating parent for lying, manipulation, aggression toward others or behavior which is self destructive. In PAS with false allegations of abuse, the child is also corrupted by repeated involvement in discussions of deviant sexuality regarding the target parent or other family and friends associated with that parent. In some cases of severe PAS, the alienating parent trains the child to be an agent of aggression against the target parent, with the child actively participating in deceits and manipulations for the purpose of harassing and persecuting the target parent.

TOP of PAGE ~ END of PAGE

## **Separation Anxiety and Fear of Abandonment.**

Separation Anxiety and fear of abandonment is noteworthy enough that it deserves mention separate from fear and learned helplessness. While manifestations

of this problem may also meet the criteria for Overanxious Disorder of Childhood, in this instance features are more specific to having been removed from and seemingly abandoned by a parent. As mentioned above, the child may have no way of knowing what attempts the abandoned parent may be making for rescue, may believe to have been deserted by that parent, and may have been convinced by the abducting parent that the abandoned parent is deceased or no longer cares about the child.

According to the DSM-IV (1994), Separation Anxiety is manifested by developmentally inappropriate and excessive anxiety concerning separation from home or from those to whom the individual is attached, as evidenced by three (or more) of the following:

1. Recurrent excessive distress when separation from home or major attachment figures occurs or is anticipated;
2. Persistent and excessive worry about losing, or about possible harm befalling, major attachment figures;
3. Persistent and excessive worry that an untoward event will lead to separation from a major attachment figure (e.g., getting lost or being kidnapped);
4. Persistent reluctance or refusal to go to school or elsewhere because of fear of separation;
5. Persistently and excessively fearful or reluctant to be alone or without major attachment figures at home or without significant adults in other settings;
6. Persistent reluctance or refusal to go to sleep without being near a near a major attachment figure or to sleep away from home;
7. Repeated nightmares involving the theme of separation;
8. Repeated complaints of physical symptoms (such as headaches, stomachaches, nausea, or vomiting) when separation from major attachment figures occurs or is anticipated.

The duration of the disturbance is at least 4 weeks. The onset is before age 18 years. The disturbance causes

clinically significant distress or impairment in social, academic (occupational), or other important areas of functioning (DSM-IV, 1994).

Even children who have not suffered the trauma of abduction may experience Separation Anxiety and fear of abandonment. The death of a parent, family member, or friend's parent, as well as extended absences of one parent and other factors normally expected in life may contribute to separation anxiety. That being the case, one can only imagine the degree of Separation Anxiety experienced by a child who believes to have been abandoned by a parent as a consequence of parental abduction circumstances.

TOP of PAGE ~ END of PAGE

## Grief.

Siegelman (1983), an expert on grief, contends that change is upsetting because we are leaving a part of ourselves behind. Any change involves loss of the known and relinquishing of a reality that has contributed to understanding and consistency. Elizabeth Kubler-Ross, a well respected authority on grief, suggests that the second most intense life stress, second to death, is divorce or loss of a love relationship. "Love relationship" in this sense applies to all familial and close relationships, e.g., husband-wife, parent-child, siblings, etc.

Not only does an abducted child experience the physical distancing and loss of a parent, the child may also be lead to believe the parent is deceased. Parent abductors are frequently known to invent stories about the abandoned parent to silence the frightened child's questioning. With the death of a parent, generally comes loss of attachment, history, and roots. According to Ross, a sudden, unexpected loss is usually harder to accept than an anticipated loss for which we have had time to prepare, as is the case for a kidnapped child.

Loss and grief experts also agree that the loss of a person on whom we are dependent is difficult to handle, especially if that dependency left us without a life of our own and incompetent to care for ourselves -- like that of an abducted child kidnapped from a parent on whom he

or she was dependent. Also, the assistance from personal support systems -- family and friends -- is an important factor in recovering from a loss. Support for such losses are likely to be especially weak when one lives away from family or has few friends, such as the grief-stricken child who was removed from their own support and reality. An abducted child has lost most, if not all support systems.

So, added to the abducted child's long laundry list of challenges, problems, stressors, and confusions, -- is grief. Grief for the absent parent, for a life that no longer exists, for friends and loved ones, and for the certainty and comfort of life as it was.

TOP of PAGE ~ END of PAGE

## **What has been reported about abducted children?**

According to Greif (1999) in his personal lecture notes on "The Impact of Parental Abduction on Children," the following have been experienced by "children on the run," whether they remain within their country of origin or are taken across international borders:

1. Physical, sexual, and emotional abuse (the range being from 6% with Finkelhor, to higher with others);
2. Neglect in terms of care, feeding, and psychological nurturing;
3. Specific training in how to be secretive in relation to hiding a sense of self, hiding accomplishments, distrusting authorities, etc.;
4. Being lied to about the searching parent, including being told the searching parent has abandoned the child, doesn't love the child, or the searching parent is dead;
5. Being moved constantly and denied contact for any significant time with any one other than the abductor - this may include being cut-off from contact with siblings, teachers, friends, grandparents, and other relatives;
6. In addition, and on a more complex level, an abducted child is exposed to a dynamic situation where the child may take on an

inappropriate, more adult-like role. In one scenario, the child may become the protector or caretaker of the abductor, if the abductor appears in need of emotional reassurance. In another scenario, the child over-identifies with the abductor in an "us against them" mentality where distrust of authority is the norm. One possible result of either dynamic is that the located child remains with the abductor!

Confirming the discussions above about the impact of child abduction, Greif adds that according to the literature, upon recovery the child may experience:

1. Concerns about safety and reabduction;
2. Guilt and shame;
3. Confusion about his or her identity if there has been a name change;
4. Loyalty conflicts between the searching parent and the abductor with whom the child may have identified;
5. Specific problems like depression, anxiety, anomie, bedwetting, thumb-sucking; and
6. Psychological regression, withdrawal, PTSD-like symptoms, and extreme fright.

TOP of PAGE ~ END of PAGE

## Conclusion

"As adults, many victims of bitter custody battles who had been permanently removed from a target parent, whisked away to a new town and given a new identity, still long to be reunited with the lost parent. The loss cannot be undone. Childhood cannot be recaptured. Gone forever is that sense of history, intimacy, lost input of values and morals, self-awareness through knowing one's beginnings, love, contact with extended family, and much more. Virtually no child possesses the ability to protect him- or herself against such an undignified and total loss" (Clawar & Rivlin, p. 105).

TOP of PAGE ~ END of PAGE

## Continue to Page Two

## Go to Peer Reviews

**Recommend this page to a friend**.

---

www.prevent-abuse-now.com/unreport2.htm

**Parental Child Abduction is Child Abuse**
by Nancy Faulkner, Ph.D

**PAGE TWO**

**Recommend this page to a friend**.

---

# PAGE TWO  [this page]

- Peer Reviews for:
  Parental Child Abduction is Child Abuse

- Additional Resources
- Update Aug 2000:  Law Review of PAS
- Update Oct 2000:  Loss of Parent & PTSD
- Full Text French Translation of:
  Parental Child Abduction is Child Abuse
- References for:
  Parental Child Abduction is Child Abuse

# PAGE ONE  [previous page]

**Parental Child Abduction is Child Abuse**

Introduction
Risk Factors
Impact of Parental Child Abduction

- Reactive Attachment Disorder
- Learned Helplessness
- Fear and Phobias
- Stress and Generalized Anxiety Disorder
- Guilt
- Acute Stress Disorder and
  Posttraumatic Stress Disorder
- Parental Alienation and the Overburdened
  Child
- Separation Anxiety and Fear of Abandonment
- Grief

What has been reported about abducted children?
Conclusion from Clawar & Rivlin

# PEER  REVIEWS
### for
## Parental Child Abduction is Child Abuse
**by Nancy Faulkner, PhD (1999)**

**Peer Review #1**

**Reviewer:  C. William Brett, Ph.D.,**
           **President, Windmoor Healthcare Inc.**
   During his thirty year health services career, Dr. Brett has served as a direct services clinician, adjunct professor and doctoral level clinical supervisor, director of community mental health, senior vice president for a national behavioral healthcare corporation, consultant for behavioral healthcare facilities and programs nationwide, and is currently owner and president of a behavioral healthcare corporation.
**Review:**
   I have been in the mental health field for thirty years, both as a clinician and as a manager. During this time I have seen countless issues and serious problems resulting from child abduction, as well as parental conflict related to custody. I have to say, in my professional opinion, Dr.

Faulkner's paper is the first research paper that puts it all in perspective from the research standpoint, as well as information useful to clinical application.

Dr. Faulkner presents this issue in a very logical format, with data and experience that supports her conclusions. The resulting problems from child abduction are at best complex and they are manifested in so many different forms that it has been difficult to capture the issues in a manner that makes logical and clinical sense; however, Dr. Faulkner appears to have accomplished this in this paper. A feat, I might add, that has eluded many researchers.

In conclusion, it is my opinion that this paper, *Parental Child Abduction is Child Abuse*, is the most comprehensive, well presented, and practical look at child abuse resulting from parental abduction that has been presented to date. This is a must read for anyone in this particular field and more importantly, the judiciary who handle these problems daily.


**Peer Review #2**

**Reviewer:  Jan Alan Eglen, Ph.D., ABPP,**
             **President, Associated Psychologists.**

Dr. Eglen, licensed psychologist and Diplomate in Counseling Psychology, has provided healthcare services for more than twenty years. Included in his spectra of services are direct patient care, evaluations, testing and consultation, -- with specialties in neuropsychology, biofeedback, critical incident stress debriefing, EMDR, behavioral medicine, sex counseling, stress management, anger control, depression, and anxiety -- for children, adolescents, teens, adults, and geriatrics. Dr. Eglen has additionally assessed and evaluated more than 1,000 abused children.

**Review:**

This article by Dr. Nancy Faulkner is a serious, scholarly, and systematic analysis of the conditions surrounding parental abduction. She is thorough in describing the precipitant environment, likely abductor personality type, rationale (more aptly defined as ir-rationale), and premeditated sadism (intentional behavior for the purpose of hurting the significant other) for this heinous act. The literal translation of the term "abduction" is "the state or condition of leading away".

There is no question that the only conclusion at which one can arrive is that abduction in any form is abuse and just because it is a parent doing the "leading away", it is no less a terribly abusive act.

Dr. Faulkner is able to initially focus on the act itself, clearly defining the pathology, separating the actual steps involved in carrying off a kidnapping from the emotions involved. Said another way, she is able to guide the reader to an understanding of both the process (abduction) and the content (abuse) as an attempt at mind control and purposely hurtful and hatefilled behavior in its worst form.

If one were to critique the argument of whether parental abduction is abuse, using the sterile language of statistics as a metaphor, the act meets face, criterion, and reference validity as well as reliability. The language describing the act is offensive (abduction, abuse). The pathology of the abductor, hurt to the other parent and abductee rarely changes. The behaviors of both the abductor and the abductee are able to be reasonably described with certainty both at the near and far terms. The literature, to this reviewer's knowledge, has never surveyed an abduction case with a happy ending unless the abductee was being removed from a previously abusive situation. In that case the term abduction is not appropriate and "rescue" is.

Dr. Faulkner puts the issue squarely before us. You cannot get someone to follow you by walking towards them. An abductor always walks toward the abductee and forcibly makes he/she go with them. Abduction is really a "forcible leading away". If the abductee were a willing party they would follow and not need to be led. That never happens and Dr. Faulkner's powerful treatise sets the standard for defining parental abduction as an abusive behavior. The child is a pawn in a terrible event of trying to hurt the other person. It is an event of paranoid thinking on the part of the abductor run wild.

Dr. Nancy Faulkner is a world stage advocate of children's rights. She has taken on a difficult subject, one that is an abhorrence to most individuals to even hear about let alone discuss logically and civily. She has accomplished that task so professionally and completely as not to inflame the reader into a lynch mob mentality, yet makes the issue and answer to the question posed as demandingly affirmative.

## Peer Review #3

**Reviewer: Mary Ann Johnson, MD,**
- Diplomate, American Board of Psychiatry & Neurology in Psychiatry;
- Diplomate, American Board of Adolescent Psychiatry;
- Member, Board of Directors: Safeguarding Our Children - United Mothers.

**Review:**

I have spent more than forty years in clinical practice of psychiatry and have seen the impact of child abuse in its myriad forms. Dr. Faulkner has contributed significantly to our understanding of the impact and consequences of child abuse, with special emphasis on the growing problem of parental abduction. *Parental Child Abduction is Child Abuse* is a comprehensive summary of the literature and an in-depth review of all the risk factors the victims of parental abduction face.

I am especially impressed by Dr. Faulkner's exposition of the role of parental alienation and the ways it can distort psychological development. I feel this research paper should be read by all of us who work with victims of parental abduction, or work to prevent children becoming victims of parental abduction. *Parental Child Abduction is Child Abuse* demonstrates how the impact of this particular form of child abuse has pervasive and long lasting deleterious effects on its victims -- not just children, but also parents who become victims.

## Peer Review #4

**Reviewer: Robin Shamsaie, Ph.D., HSPP**

Dr. Shamsaie is a doctoral level school psychologist with independent practice licensure endorsement as a Health Service Provider in Psychology from the state of Indiana. Dr. Shamsaie provides psychological and educational services to children, adolescents and families in private practice, as well as within a residential treatment facility in Terre Haute, Indiana.

**Review:**

I found Dr. Faulkner's documentation of the potentially negative and harmful effects of parental child abduction to be clearly and succinctly articulated. As she notes, there is limited research available to document the developmental impact of parental child abduction on the physical, psychological and emotional health of children. There is increasingly vast scientific literature available, which provides greater understanding of childhood psychological disorders. Her suggestion that these children are at increased risk for developing a variety of mental health disorders was soundly argued. Although I have not personally worked with a child in such a circumstance, it seems fair to say that the parent abductors may be less inclined to seek services for the symptoms their children may experience.

Dr. Faulkner has clearly outlined many potential symptoms that these children may exhibit, similar to other trauma victims. I encourage Dr. Faulkner to consider how our schools can assist in identifying these children and assisting them in obtaining services, as well as adding to our understanding of the consequences of parental child abduction.

I applaud Dr. Faulkner's ongoing dedication to heighten awareness of child abuse.

**NOTE:**  It is particularly noteworthy to mention that in post-review discussions with Dr. Shamsaie, she addressed the issue of victims who ultimately identify and align with their abusers. This phenomenon is an excellent topic and might possibly be addressed in a follow-up report.

### BACK to PAGE ONE
**Parental Child Abduction is Child Abuse**

TOP of PAGE ~ END of PAGE

**Update: August, 2000**

**Law Review of Parental Alienation Syndrome**

One Voice Justice for Children Advocacy, August 6, 2000:

A New York county court refused to allow a sex abuse defendant to present evidence of **Parental Alienation Syndrome (PAS)** where the defendant failed to establish general acceptance of PAS by mental health experts. New York v. Fortin, 706N.Y.2d611 (N.Y. County Ct. 2000).

Michael Fortin was charged with sex crimes against his wife's 13-year-old niece. He moved to introduce testimony about PAS. The prosecution requested and was granted a hearing on the admissibility of such testimony pursuant to Frye v. United States, 293F.1013 (D. C Cir. 1923). Defense psychiatrist Richard Gardner, one of the first persons to write about and discuss PAS, testified that PAS typically arises when one parent programs a child in a campaign of denigration of the other parent, although PAS may also occur when other family members are involved. Under cross-examination, Gardner admitted that he previously had written that psychodynamic psychiatry is the most speculative of all alleged sciences and that the concept of scientific proof is less important in that field than in other sciences, particularly with respect to persons charged with committing sexual abuse.

The court found the proffered evidence inadmissible, holding that Fortin failed to establish that the scientific community has arrived at a general acceptance of PAS given the lack of a clear consensus by psychologists of the existence of this syndrome. In New York v. Wesley, 611 N.Y.S.2d97 (N.Y. Ct.App.1994), the chief justice stated that a court shall not take pioneering risks in accepting new scientific techniques "because premature admission both prejudices litigants and short-circuits debate necessary to determine the accuracy of a technique."

Source: MPDLR (Mental & Physical Disability Law Reporter) 24:3, May/June 2000

**NOTE:**  Posting this brief law review of PAS as published in the MPDLR is neither a condemnation nor endorsement by this website, only a comment on the status as related to court applications.

**Also see** ~ Another Prespective of Parental Alienation ~

discussion of PA (parental alienation) and PAS, by Douglas Darnall, PhD, (1997). In this review of parental alienation, Dr. Darnall makes an excellent point that is worth noting: "Alienation is a process, not a person."

TOP of PAGE ~ END of PAGE

**Update: October, 2000**

**Posttraumatic Stress May be Higher
in Children Who Lose Parents**
Parentally bereaved children and adolescents appear to experience more posttraumatic stress disorder (PTSD) symptoms than do children who have survived tornadoes, researchers report in the September issue of the Journal of the American Academy of Child and Adolescent Psychiatry.
More at -- Medscape.

TOP of PAGE ~ END of PAGE

**Additional Resources**

**Parental Alienation Website** by Douglas Darnall, PhD.
**Directory of PA Resources** by Douglas Darnall, PhD.

**PARENT** ~ **P**arents **A**dvocating for **R**eturn through **E**ducation by **N**etworking **T**ogether is an international advocacy organization working with parents and agencies world wide to bring about greater awareness and understanding concerning international child abduction and to seek measures leading to the prevention and remedy of this growing global problem.

**Run, Mommy, Run**
by Talia Carner, Women's Enews commentator.
"When I was 7 years old, my father kidnapped me and kept me hidden for two years. (He did not molest me, but his occasional beatings were particularly harsh.) He deposited me with a foster family and visited every week or two. He neither wanted me nor loved me, but I was an excellent pawn in his divorce battle over money and property matters. When my mother found me in school a year after my disappearance, my father showed up within an hour after being alerted by the principal's phone call. I

was whisked away to another family. The trauma of being snatched away from my mother never left me. It marked my identity well into adulthood."

TOP of PAGE ~ END of PAGE

**French translation, November, 2000**
Link here for full text French translation, compliments of the "Swiss Movement Against the Kidnapping of Children."
[NOTE: Author not responsible for translation accuracy.]

**BACK to PAGE ONE**
**Parental Child Abduction is Child Abuse**

TOP of PAGE ~ END of PAGE

**References for**
**Parental Child Abduction is Child Abuse**

Attachment Center - At Evergreen (ACE). What is attachment disorder?, May 99.

Clawar SS, Rivlin BV: Children held hostage: Dealing with programmed and brainwashed children. ABA Section of Family Law, ISBN No. 0-89707-628-1.

Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition (DSM-IV). American Psychiatric Association, Washington DC, 1994.

Garbarino J, Guttmann E, Seeley JW: The psychologically battered child: Strategies for identification, assessment, and intervention. San Francisco, Josey-Bass Publishers, 1986.

Greif GL, Hegar, R: When parents kidnap, New York: Free Press, 1993.

Greif GL: The Impact of Parental Abduction on Children. Personal communication and public speaking notes provided by GL Greif, May 27, 1999.

Hoff PM: Parental kidnapping: Prevention and remedies. Parental Abduction Training and Dissemination Project, American Bar Association Center on Children and the Law, 1997.

Huntington, DS: Parental kidnapping: A new form of child abuse, 1982.

Huntington DS: The forgotten figures in divorce, in Divorce and Fatherhood: The struggle for parental identity. Edited by Jacobs JW, Washington DC, American Psychiatric Association Press, 1986.

Johnston JR, Campbell LE: Impasses of divorce: The dynamics and resolution of family conflict. New York, The Free Press, 1988

Jones M, Lund M, Sullivan M: Dealing with parental alienation in high conflict custody cases. Presented at the conference of the Association of Family and Conciliation Courts, San Antonio, TX, 1996.

Lalli, AN: Arguments For Human Research Subject Protection Without Waivers or Exceptions, Sept 97.

Levy TM, Orlans, M: Attachment, trauma, and healing: Understanding and treating attachment disorder in children and families. Child Welfare League of America, 1999.

Rand DC: The spectrum of the parental alienation syndrome. American Journal of Forensic Psychology, 15-3, 1997.

Stringer K: What is attachment? ToddlerTime, May 99.

Tucker-Ladd, CE: Psychological Self Help. University of Iowa, 1960.

Van Bloem LL: Attachment oriented individual and family therapy. Attachment Home Page, Feb 99.

Wallerstein JS, Blakeslee S: Second chances. New York, Ticknor & Fields, 1989.

Wallerstein JS, Kelly JB: Surviving the breakup: How

children and parents cope with divorce. New York, Basic Books, 1980.

**Go to Peer Reviews**.

**BACK to PAGE ONE**
**Parental Child Abduction is Child Abuse**

"About the Author"

"Parental Child Abduction is Child Abuse"
proprietary to Nancy Faulkner, PhD, © 1999-2003.
Not to be copied or reprinted, in whole or in part,
without the express written consent of the author.

**Recommend this page to a friend**.

# CONSTRUCTING CRIMINAL LAW REFORM AND THE MODEL CRIMINAL CODE[*]

Matthew R. Goode

## 1.    Introduction - The Genesis of The New Movement to Australian Codification of the Criminal Law

The constitutional arrangement in Australia is that the general criminal law is a matter for the States and Territories and not for the Commonwealth. This gives rise to some problems, for, of course, the Commonwealth has its own interests to protect and both should and must enact laws, criminal in nature, to deal with them[1]. The *constitutional* problem that this division of powers produces is not profound - so long as the Commonwealth is acting within the scope of its other nominated powers (and the other Constitutional constraints not relevant to this paper), the offence is constitutional. The consequence of that is, however, that there must exist, side by side, a State/Territory criminal law system dealing with traditional crime (rape, robbery, murder, drink driving, queue jumping and the like) and Commonwealth crime (importing drugs, social security fraud, some environmental offences, Commonwealth property and so on).

But this system produces a substantive problem as well as a constitutional one, and the substantive problem is less well appreciated. If there is no criminal law enacted by the Commonwealth Parliament on a particular question that arises upon a prosecution for a Commonwealth offence, the default system provided is that the court, which is exercising Commonwealth jurisdiction, "picks up" and applies the relevant State or Territory law of the place in which the court is sitting[2]. That would be well and good if the States and Territories maintained a modicum of consistency, if not uniformity, in the criminal law or the law of criminal procedure and evidence - but they do not. While, to its credit, the High Court has recently maintained an effort to converge the effect of the criminal laws of the States and Territories[3], it can only go so far, and irreconcilable differences remain. It necessarily follows

---

[*] MR Goode, LLB (Hons) LLM, Managing Solicitor, Attorney-General's Department, South Australia; Adjunct Associate Professor of Law, University of Adelaide. Member of the Model Criminal Code Officers Committee since its inception. The views expressed in this article are personal to the author and cannot be attributed to any other person or organization.

[1] Compare Canada, in which the reverse is true. Still, problems arise with that system too. In Canada, the problem may be somewhat crudely reduced to the question of characterisation - ie whether a provincial (State) law imposing a punishment is a "criminal" law (invalid) or whether it is something else regulatory (valid). Whatever else can be said about the considerable jurisprudence which this fascinating distinction has produced, it can be said that, in the end, considerations of practicality appear to have won the day. See, for example, *Reference Re Firearms Act* [2000] 1 SCR 783.

[2] This result is achieved by ss 79 and 80 of the Commonwealth *Judiciary Act*. A recent interesting example of the process at work is *Sexton* (2000) 116 A Crim R 173. The position is somewhat complicated by s 4 of the Commonwealth *Crimes Act* which provides that "The principles of the common law with respect to criminal liability shall, subject to this Act, apply in relation to offences against this Act". That provision applies only in relation to the *Crimes Act*, and, in any event, raises the question whether there is one Australian common law. It appears that a majority of the High Court now believes that there is but one common law, (*Winfield and Lipohar* (2000) 168 ALR 8) but the question can hardly be regarded as absolutely settled.

[3] See, for example, the efforts that the High Court has taken to try to keep the *Evidence Act* jurisdictions in line with the common law jurisdictions in relation to the "right to silence": *RPS* (2000) 199 CLR 620; *Azzopardi* [2001] HCA 25.

- 2 -

that a Commonwealth prosecution in, for example, Queensland, may well be dictated by legal considerations significantly different from an identical prosecution in, for example, New South Wales. The Commonwealth is entitled to regard that situation as intolerable.

In the recent past, the situation described has become worse from the Commonwealth's point of view because of a steady expansion in Commonwealth legislative power brought about by a centralist succession of High Court judgments[4]. In relation to basic criminal matters, this has, to some extent, been at the expense of State and Territory criminal jurisdiction, but not to any great degree[5]. By and large, it is true to say that "traditional" crime remains a State and Territory responsibility while the Commonwealth has concentrated on newer and more specialised crimes. The major exception to that generalisation is the field of drug offences[6].

While this dichotomy in spheres of influence may have minimised constitutional clashes in claims to *jurisdiction* over criminal matters, the lack of a basic Commonwealth criminal jurisprudence became more problematic as Commonwealth activity in expanding criminalisation increased. A deal of the problem related to a lack of a Commonwealth law about the general principles of criminal responsibility. In 1990, this problem was put quite neatly in the following way:

> "The result is that in many cases the answer to the question what principles of criminal responsibility should be applied in a prosecution for a breach of Commonwealth law will depend on whether the proceedings arose under the *Crimes Act* or under another Commonwealth statute and in the latter case where the court is held. For example a child aged seven can be criminally responsible for an offence against the *Crimes Act* wherever the offence was tried since seven is the age at which criminal responsibility at common law but if the offence charged is a breach of any other Commonwealth statute, a child under the age of eight would not be criminally responsible if the court were held in Victoria or the Australian Capital Territory and a child under the age of ten would not be criminally responsible if the court were held in New South Wales, Queensland, South Australia or the Northern Territory. However, a child aged seven would remain criminally responsible in Western Australia and Tasmania.".[7]

The Commonwealth Government established a body called the "Review of Commonwealth Criminal Law" to deal with this problem (the Gibbs Committee). The Committee consisted of retired Chief Justice of the High Court, Sir Harry Gibbs, the Honourable Mr Justice Ray Watson and distinguished public servant Mr Andrew Menzies. The Committee began in the by now time honoured fashion by issuing Discussion Papers and then a series of Reports[8]. However, while the

---

[4] For a well read Australian lawyer or person interested in political science, this statement is axiomatic. For the interested outsider to this knowledge, reference may be made to any Australian text on the subject.

[5] Of course, the expansion came at the expense of a great deal of *non-criminal* State jurisdiction.

[6] The Commonwealth, by use of its constitutional power over customs, has enacted primary drugs offences in the *Customs Act* 1901, and, by judicial interpretation, established that, since almost all illegal heroin is imported, the *Customs Act* offences apply to heroin offences within Australia. By contrast, cannabis and amphetamine offences (for example) tend to be dealt with by State and Territory legislation.

[7] Review of Commonwealth Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990) [the Gibbs Committee] at para 3.5.

[8] Review of Commonwealth Criminal Law, *Interim Report, Computer Crime* (November, 1988); Review of Commonwealth Criminal Law, *Interim Report, Detention Before Charge* (March, 1989); Review of Commonwealth

- 3 -

composition of the Committee was distinguished, its reports and recommendations did not always align to the needs and aspirations of the States and Territories, and, as doctrine, its proposals were controversial and subject to well reasoned criticism[9]. This was particularly the case in relation to the Committee's recommendations in relation to the general principles of criminal responsibility[10]. It was not entirely clear that the Review Committee intended that the *entire* criminal law of the Commonwealth should be codified, but it carefully and clearly concluded that the general principles of criminal responsibility should be codified[11]. It is, of course, a nice question whether the Commonwealth criminal law could have any (non-codified) common law component beyond the general principles of criminal responsibility and enacted offences and defences - but that is another impossible question for another time.

In September 1990, the Third International Law Congress was held in Hobart. The codification of Commonwealth criminal law and the recommendations of the Gibbs Committee were considered. The general impression left by the Congress was not only support for the codification of Commonwealth criminal law but, far more importantly, a strong questioning of the extent of the diversity between the criminal laws of the States and Territories[12]. Significantly, the then Attorney-General of Queensland gave a paper at that conference in which he said:

> "Why should a person's criminal responsibility, the punishment which a certain offence carries or even, indeed, whether certain conduct amounts to an offence, vary simply by the crossing of State boundaries? In a country as homogenous as Australia, this amounts to at worst lunacy or at best illogicality."[13].

The fact that it was an Attorney-General of Queensland who was speaking of the need for national uniformity of criminal law and whose extended example of the need for uniformity was the age of consent for sexual behaviour is full of ironies, as will be seen below.

---

Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990); Review of Commonwealth Criminal Law, *Fourth Interim Report,* (November, 1990) [administration of justice offences, offences against government, bribery and corruption, search warrants]; Review of Commonwealth Criminal Law, *Fifth Interim Report,* (June, 1991) [arrest, sentencing, forgery, offences relating to the security and defence of the Commonwealth].

[9] See, generally, Colvin, "Unity and Diversity in Australian Criminal Law: A Comment on the Draft Commonwealth Code" (1991) 15 Crim LJ 82.

[10] See Symposium (1991) 15 Crim LJ 79-152, 157-202.

[11] Review of Commonwealth Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990) at para 3.12: "The Review Committee considers that the most convenient course... is to codify all relevant principles relating to criminal responsibility. This course should achieve uniformity of principle throughout Australia in Commonwealth criminal trials and should make the relevant principles more readily accessible and, it is hoped, more clear and certain. It should be noted that codification does not necessarily involve radical reform; the Review Committee would not propose to depart widely from existing principles, but would rather propose generally to restate existing principles whilst at the same time to fill gaps, remove obscurities and correct anomalies.".

[12] See Editorial (1991) 15 Crim LJ 79: "... the often disparate State and Territory criminal laws on the same subject-matter created injustice and inequality before the law; that the time was ripe for the criminal laws of the various States and Territories to be uniformly expressed and applied; and that the Review Committee's report was a viable starting point towards achieving this uniformity.".

[13] The speech is reported in *The Bulletin,* 16 October, 1990 at page 111. "Homogeneity" is, of course, a relative concept. Some might disagree with the argument on that ground, but the point for present purposes is that it was made.

- 4 -

In Brisbane, in April 1991, the Society for the Reform of the Criminal Law staged a major conference on the Gibbs Committee proposals[14]. While the Gibbs proposals themselves were the subject of sustained criticism at a substantive level, the final report of that seminar stated:

> "It therefore appeared that there was reason for optimism that the process of consistent codification of the criminal law in Australia could and should proceed. Delegates from both Code and common law jurisdictions were of a like mind that the process of codification was an important matter to be addressed and should be pursued now. It was an idea whose time was at hand and this country had an opportunity, it was felt, to assume a position as a world leader in the process of formulating, in a codified form, a just system of criminal law, responsive to modern needs, expressed in clear terms and capable of being applied uniformly across the country."[15].

The three themes that seem to have emerged at this point were (a) consistency, if not uniformity across Australian criminal jurisdictions; (b) the overall benefits of codification and (c) the consensus on these objectives by both old Code and common law jurisdictions. One of the objectives of this paper is to study what happened to these themes in practice.

Prior to the Brisbane conference, on 28 June, 1990, the Standing Committee of Attorneys-General ("SCAG") placed the question of the development of a national model criminal code for Australian jurisdictions on its agenda. In order to advance the concept, SCAG established a Committee consisting of an officer from each Australian jurisdiction with expertise in criminal law and criminal justice matters. That Committee was originally known as the Criminal Law Officers Committee ("CLOC"), but, in November 1993, the name was changed to the Model Criminal Code Officers Committee ("MCCOC") in order to reflect the principal remit of the Committee directly[16].

The first formal meeting of the Committee took place in May 1991. In July 1992, the Committee released its first paper, a Discussion Draft on the general principles of criminal responsibility, and, after a great deal of public consultation, including 52 written submissions and a lengthy seminar at the Fourth International Criminal Law Congress in Auckland in 1992, delivered a Final Report to SCAG which was released in December 1992. With the exception of the general principles relating to intoxicated defendants[17], the recommendations in that Final Report formed the basis for the Commonwealth *Criminal Code Bill*, 1994, which was passed by the Commonwealth Parliament in March, 1995[18]. In 1994, both the Commonwealth Government and

---

[14] It was that conference which produced the papers referred to in footnote 9.

[15] From the author's own records. I am unaware that the final communiqué was published at any time.

[16] For general background, see Goode, "Codification of the Australian Criminal Law" (1992) 16 Criminal LJ 5.

[17] The Committee recommended that the law be based on the decision of the High Court in *O'Connor* (1980) 54 ALJR 349 but the Standing Committee decided that it preferred the position taken in *Majewski* [1977] AC 443. That decision is not a principal focus of the discussion which follows. The very interesting debate is well-rehearsed in other places. However, the MCCOC proposed solution to the SCAG decision is an unusual one which has not been well debated.

[18] In December 1993, MCCOC released the first of two Discussion Papers on theft, fraud and related offences. The second Discussion Paper, which dealt with blackmail, forgery, bribery and secret commissions, was released in July, 1994. Both of these Discussion Papers have been the subject of a great deal of public comment. A Final Report encompassing the subject matter of both Discussion Papers was released in late 1995.

- 5 -

the State and Territory Premiers' Leaders Forum endorsed the Model Code project as one of national significance.

## 2.    The Establishment and Composition of MCCOC

The idea of MCCOC was not unusual in a sense, but was unusual in another sense. There have, of course, been many other committees consisting of representatives of each jurisdiction reporting back to SCAG. There is nothing unusual in that. But there were two unusual features of this committee. First, it was composed of representatives who were the principal advisors to their Attorneys-General on crime. This was considered to be vital. MCCOC was meant to be, and was, a committee of highly influential advisors who could get things done and who had good access to their respective Ministers. Second, it was unusual in that the subject matter which was its remit was that normally associated with a law reform commission in some form or another[19]. This was not a law reform commission in the now traditional sense of the word[20], neither, for example, in the nature of its composition nor, importantly in practice, in the fact that the MCCOC task was additional to the work that the members of the Committee performed in the ordinary course of their duties. This latter fact should be borne steadily in mind when one considers the MCCOC legacy (whether one considers it to be significant or not and, if so, in what way).

The initial members of CLOC (later, MCCOC,) were:

| | |
|---|---|
| *Chair*: | Dr David Neal (Director, Policy and Research, Victorian Attorney-General's Department) |
| *NSW* | Mr Peter Berman, (Director, Criminal Law Review Division, NSW Attorney-General's Department) |
| *Queensland* | Mr Peter Svensson, (Legal Consultant, Attorney-General's Department) |
| *Western Australia* | Mr Graeme Scott QC (Crown Counsel) |
| *South Australia* | Mr Matthew Goode (Legal Consultant, Attorney-General's Department) |
| *Tasmania* | Mr Nick Perks, (Crown Prosecutor) |
| *Northern Territory* | Mr Len Flanagan, (DPP) |
| *ACT* | Mr John O'Keefe, (Director, Justice Section, Attorney-General's Department) |
| *Commonwealth* | Mr Herman Woltring (Principal Advisor, Criminal Justice, Attorney-General's Department) |
| | assisted by: Mr Andrew Menzies (Consultant) and Ms Alexis Fraser (Adviser) |

There may appear to be too many prosecutors in that list. Certainly, at the time, Peter Berman, Graeme Scott QC, Nick Perks and Len Flanagan were active prosecutors. But David Neal, Peter

---

[19] For example, codification of the criminal law was the task of the UK Law Commission in that jurisdiction and the Law Reform Commission of Canada in that jurisdiction. The American Model Penal Code was the product of the American Law Institute, but that was an anomalous body conforming to American codification tradition at a time before the law reform commission paradigm was established. The law reform commission paradigm seems not to have taken hold in the United States, perhaps because other institutions of a similar kind served it as well.

[20] See, for example, the description of the characteristics of a typical law reform commission by Sackville, in "The Role of Law Reform Agencies in Australia" (1985) 59 ALJ 151.

- 6 -

Svensson, Matthew Goode, John O'Keefe and Herman Woltring were not - and, what is more, none of the latter could have been known for a prosecution bias. In practice, the accusation that MCCOC did not contain any or sufficient defence representation was made only once to my memory[21]. If anything, MCCOC was criticised far more often and vehemently for being too libertarian rather than not being libertarian enough[22].

Dr David Neal continued as Chair until the election of the Kennett Government in Victoria. The newly elected Victorian Attorney-General was not disposed well to MCCOC and Victorian involvement ceased for about 18 months, until, happily, she relented. After Dr Neal departed as Chair, he continued as a Commonwealth consultant on those matters for which he had become responsible, notably dishonesty offences. Thereafter, the Committee was chaired by Mr Rod Howie QC from New South Wales who successively became Judge Howie and then Mr Justice Howie. The representatives of the various jurisdictions on the Committee over time are detailed in a table attached to this paper.

**3.      What The Committee Did and Reactions To It**

From its beginning, MCCOC proceeded in the traditional way, issuing Discussion Papers and Reports, and taking in comments from all over Australia on both. Both Discussion Papers and Reports had to be, and were, approved for release by vote of SCAG Ministers. A list of these documents is attached as an Appendix to this paper. Almost all of the time, the proceedings of the Committee excited little controversy[23], although, of course, there was consistent attention to the product of the Committee by those to whom the project was central, such as police forces, law societies, bar associations, prosecutors and judicial officers. It is a sad but true fact that Australia legal academics (or indeed, academics from any field) had almost no interest in making submissions to the Committee at all[24]. In my opinion, this says a great deal more about the state of academia specialising in criminal law than it does about the work of the Committee[25]. Be that as it may, the work of the Committee excited major controversy among others worthy of note in three distinct areas.

---

[21] The papers associated with submissions in relation to all the Discussion Papers and Final Reports over ten years are too voluminous to hunt down the reference or to be entirely sure that it only happened the once, but I think that to be right. If memory serves, the context was a submission from the Victorian Bar Association in relation to proposals to restrict the defence "right" to subpoena sexual assault counselling records.

[22] Although the initial formal representation contained no women, it will be seen that that state of affairs did not last long. I do not recall that matter being the subject of criticism at any time.

[23] For example, the MCCOC DP and Report on *Offences Against the Administration of Justice* excited no controversy and appears to have gone pretty well unnoticed (except by the UK Law Commission: *Legislating the Criminal Code: Corruption* (Report No 248, 3 March, 1998). It is not an area of law which appears to excite any attention from legislators, academics or those otherwise involved in the criminal law.

[24] The most notable exceptions to this general statement are Professor David Lanham of the University of Melbourne who made significant comments on the work on fatal and non-fatal offences against the person and criminal jurisdiction, and a number of eloquent feminist academics who made significant contributions to the thinking of the Committee on homicide issues.

[25] Some commentary appeared after the event, when it was far too late to affect the work of the Committee at all. See, for example, Bronitt, "Defending Giorgianni - Part Two: New Solutions for Old Problems in Complicity" (1993) 17 Crim LJ 305; Stuart, "Punishing Corporate Criminals With Restraint" (1995) 6 Crim L Bull 219; Woolf, "The Criminal Code Act 1995 (Cth) - Towards a Realist Vision of Corporate Criminal Liability" (1997) 21 Crim LJ 257; McSherry, "Mental Impairment and Criminal Responsibility: Recent Australian Legislative Reforms" (1999) 23 Crim LJ 135.

- 7 -

### (a)    Principles of Criminal Responsibility: The Queensland Supreme Court

The Committee decided very early in its life that the very first project in a codification exercise must be the foundational general principles of the criminal law. Hence, the Committee began with a Discussion Paper and Final Report on the general principles. That decision turned out to be absolutely correct. The general principles guided the deliberations of the Committee in its work on the specific offences to be included in the Code in ways which were fundamental to the structure and drafting of the recommended provisions of the Code. The most important of these provisions were those which dealt with default fault elements of offences.

This is not the place to explain in great detail why the general principles took the form that they did. In general terms, the fundamental structure of criminal offences was taken directly from two major sources: the monumental and influential work of Professor Glanville Williams in his *Criminal Law: The General Part*[26] and the very fine judgment of Brennan J (as he then was) in the leading High Court decision of *He Kaw Teh*[27]. It might be thought that these were very good sources. However, the decision to use these sources entailed a decision, not taken lightly, that the basic framework of the general principles would be derived from what might loosely be called common law principles rather than Griffith Code principles. There are two general points to be made about that decision.

The first is a note of explanation for those not familiar with the Australian system of criminal law. As a general proposition, as noted above, criminal law is not a Commonwealth matter. Australian criminal jurisdictions fall generally into one of two kinds. The first are the "common law" jurisdictions. In New South Wales, Victoria, the Australian Capital Territory and South Australia, the criminal law is based on English common law as supplemented, usually extensively, by local statute[28]. By contrast, Queensland, Western Australia, Tasmania and the Northern Territory are what might be termed "Griffith Code" jurisdictions, as their criminal law is codified; based on a form of Criminal Code developed by Sir Samuel Griffith for Queensland at the turn of last century. For present purposes, it is not necessary to go beyond that general distinction.

The second note is that, while both statutory amendments to the common criminal law and statutory amendments to the Griffith Code have often proceeded at least down the same path, the basic assumptions of the general principles of criminal responsibility have become very different over the course of a century. While the common law under the influence of a sequence of High Court decisions culminating in *He Kaw Teh*[29] has proceeded down the route of subjective criminal responsibility, the Griffith Code enacted what was at the time thought to be the common law position of objective criminal responsibility and has remained faithful to that position. The result of this may be illustrated by the general illustrative proposition that, in the common law states, the crime of rape requires proof that the accused knew or was recklessly indifferent to the

---

[26] (Second Ed, 1961).
[27] (1985) 157 CLR 523.
[28] Although those statutes may be very old inheritances indeed.
[29] (1985) 157 CLR 523.

- 8 -

consent of the other party[30], whereas in the Griffith Code jurisdictions, the accused may escape only if he or she was reasonably mistaken as to the consent of the other person[31]. This is not the place to enter into the debate about the wisdom of either outcome. That issue has and no doubt will continue to be debated as a matter of principle in other fora. The point for present purposes is that the difference, in general terms, exists.

MCCOC had to decide what model it would pursue or, to put it in the Australian context and in all reality, what model of criminal liability it would recommend for Australian consistency and for a Commonwealth criminal law. It decided on the common law model, based, as noted above, on Glanville Williams and Brennan J. Why?

??    First, the Griffith Code position was based on the law as it was then thought to be (and certainly was[32]). But the common law has moved on and the Griffith Code has not[33]. The major problem with existing Griffith Codes is that they crystallised the development of the idea of criminal fault in 1900 (or thereabouts), and much has changed for the better in the common law since then. In general terms, the concept of voluntariness has appeared, been developed and taken shape, and the ideas of fault and mistake have been rationalised and developed to a significant degree, both in Australia and in common law and Code systems overseas.

??    Second, the argument about basic fault principles is about *default* principles not *legislated* principles. The real question is - what happens when the Parliament does not state what the fault elements are? Parliament can specify what it wants the law to be if only it has the will to do it. If Parliament wants a particular result, for example, in relation to the rape offence - which is statutory in all jurisdictions - it can simply say so. The fact that this is the real question escaped - and has continued to escape - most critics of the Model Code general principles.

??    Third, the Griffith Code scheme of default no fault has and had no real supporters outside the vested interests in those jurisdictions. For example, the Queensland Criminal Justice Commission advanced the quite ludicrous proposition that the MCCOC draft "introduces many concepts and terminology which are foreign to most States"[34]. That is simply not true. It is true that the subjective fault based approach as a *default proposition* is not the law in four jurisdictions, but it is a fact that all four of those jurisdictions employ all of the concepts in the general principles draft at some point in their criminal justice system.

??    Fourth, flowing from that, when the High Court is given a choice between a subjective fault based regime and a Griffith Code regime, it has adopted the former. An outstanding example is *Chew*[35] which concerned the interpretation of the fault elements of an offence in the Companies (WA) Code.

---

[30] The notorious statement of the principle is *Morgan* [1976] AC 182. See also *Sarragozza* [1984] VR 187; *Tolmie* (1995) 84 A Crim R 295.

[31] *Attorney-General's Reference (No 1)* [1979] WAR 45; *Ingram* [1972] Tas SR 250. However, in *McMaster* (1994) 4 NTLR 92, it was held that the NT version of the Code required proof of subjective fault.

[32] Griffith and other codifiers at the time would have been substantially influenced by such decisions as *Tolson* (1889) 23 QBD 168.

[33] This fact may have considerable implications for an argument about whether codification is a good thing or not.

[34] Submission, October 15, 1992.

[35] (1992) 173 CLR 626.

- 9 -

However, the basic scheme of general principles outlined in the Model Criminal Code ("*the CCA*") was attacked publicly by a senior judicial officer as having a "potential for disaster" and as "an unworkable academic nightmare"[36]. Mr Justice Thomas of the Queensland Supreme Court did not understand the scheme of elements of offences, let alone what follows from it:

> "'The problem', the judge said, 'is that the drafters of the Code have been side-tracked into the metaphysics of action. They have attempted to define all kinds of unlawful human conduct and activity by isolating multiple 'physical elements' and 'fault elements'. .... It is necessary that some parts of the code be mentioned before it can be judged whether it is comprehensible and workable. Don't blame me for the headache you get when you try to understand it - the complexity is the code's, not mine.'"[37].

There is a basic answer to this criticism. It is that "physical elements" and "fault elements" are merely plain English phrases for *actus reus* and *mens rea*, which have been staple criminal law fare for centuries. There is extensive law on the need to distinguish between acts and omissions and the liability consequences that flow from that distinction[38], and the difference between elements of offences which are absolute and those which allow for a defence of reasonable mistake. These basic non-understandings are the subject of classes taught in elementary law courses all over the country. The opinion by Thomas J that the *CCA* analysis of physical elements is an "over-ambitious academic[39] attempt to reduce human conduct and future legislative action to a tortured and unnecessary classification." is mere unreasoned abuse[40]. It will be shown below that the *CCA* did not complicate that which is already complicated and did, to some considerable degree, simplify and clarify such issues.

In a later letter to the journal, Queensland Chief Judge Pat Shanahan "confined himself" to observing that Queensland had done without "mens rea" and "actus reus" for over 90 years and should not begin now[41]. But the plain fact is that, whether or not the terms "*actus reus*" and "*mens rea*" have been used in the Griffith Code, equivalent concepts have been widely employed in a variety of guises.

---

[36]Among other things. See "Model Criminal Code, Judge fears potential for disaster", *Australian Lawyer*, June 1995 at 12-13. The Model Code team replied in *Australian Lawyer*, August, 1995 at 14-15 and there was further correspondence from Queensland in the *Australian Lawyer*, October 1995 at 6-7.

[37]"Model Criminal Code, Judge fears potential for disaster", *Australian Lawyer*, June 1995 at 12.

[38]This despite the fact that the criminal law has observed such a distinction for over 100 years. The distinction can be traced back to the championship of Macaulay in his work on the Indian Codes [*Notes on the Indian Penal Code*, (1837)] and early common law development; an example is *Smith* (1826) 2 C&P 448, 172 ER 203. Little attention has been paid to the distinction in the Griffith Code, but it is there and it is thought that the distinction has some importance generally (see *Evgeniou* (1964) 37 ALJR 508 at 509). That is not to deny that the distinction between act and omission is very slippery indeed. A minor example can be found in *Fagan* [1969] 1 QB 439 and a very serious example can be found in *Bland's* case [1993] 1 All ER 821 (and cases like it).

[39] It might be noted that Thomas J consistently uses the word "academic" as a term of denigration and abuse. This is all too common is Australian legal culture as well as other non-legal areas of knowledge.

[40]In addition to that quoted above, also "unworkable academic nightmare"; "worse than useless"; "incomprehensible law"; "a career of obfuscation"; "a nightmare" (again); and "this horror". This is the same Mr Justice Thomas who, in the course of wise advice to judges on the appropriate standard of dress for their wives and on "punting" advised: "All things in moderation": Thomas, *Judicial Ethics*, (1988) at 43.

[41]*Australian Lawyer*, October 1995 at 7.

- 10 -

One may compare the reaction of Thomas J with that of Murray J, of the Western Australian Supreme Court, who conducted the most thorough modern review of a Griffith Code to that time. His Honour said to the Senate Legal and Constitutional Legislation Committee about the *CCA*:

> "Time moves on and one's ideas change, but I have become involved in the process of the organisation of this bill and it is lovely to see it come forward. ... I think it is a fine document. I heard, just as Her Honour was leaving, what Judge Yeats said about terminology. It is certainly a very valid point of view. It does have some complexity of terminology, but I think what needs to be clear in our minds is that it is a model, and I hope it would provide a model that would be operative not only in relation to Commonwealth law but would provide a model in relation to state law. There are a number of significant areas which seem to me to embody distinct improvements on the law, both the common law and, in some respects, the Griffith codes."[42].

In fact, the Griffith Codes have grappled with versions of these issues over the years. Apart from the "mystical" WA provision (for example) "An act or omission which renders the person doing the act or omission liable to punishment is called an offence."[43], the notable Griffith Code sections are those dealing with mistake and accident. The judicial gloss on those sections of the Codes shows, conclusively, that they heavily involve what Thomas J believes to be "the metaphysics of action".

To take the most simple of examples, the Griffith Codes did not and do not deal with the (for them) entirely novel idea of recklessness. That necessitated a great deal of what may be called, generously, inventive interpretation in *Vallance*, in the course of which Dixon CJ (to whom, one would have thought, the greatest respect should be shown) stated:

> "... an examination of the Code, in an attempt to answer what might have been supposed one of the simplest problems of the criminal law, leaves no doubt that little help can be found in any natural process of legal reason. The difficulty may lie in the use in the introductory part of the Code of wide abstract statements of principle framed rather to satisfy the analytical conscience of an Austinian jurist than to tell a judge at a criminal trial what he ought to do. It may lie in that because it is followed by many chapters defining particular crimes more often than not in terms adopted long before as occasion demanded by a legislature introducing a new crime or crimes into a common law system, and prone to the use of definitions of a somewhat practical or earthy kind. In the Code these abstractions of doctrine are not the generalised deductions from the particular instances that follow: they come ab extra and speak upon the footing that they will restrain the operation of what follows."[44].

His was, in the result, a minority judgment - but nevertheless, though the High Court judges gave a variety of reasons for their decision, they were unanimous in their view that no-one could be guilty of unlawful wounding unless the accused realised the risk of harm[45].

---

[42]Senate Legal and Constitutional Legislation Committee, *Hansard*, 22 November, 1994 at 271.
[43]WA *Criminal Code*, s 2.
[44]*Vallance* (1961) 108 CLR 56 at 58.
[45]See also, for example, *Bennett* [1990] Tas SR 72.

- 11 -

Mr Justice Thomas and Judge Shanahan might, like the Queensland Criminal Justice Commission in its submission to the Model Code Committee, have politely said that "[t]he meaning of the Code provisions relevant to criminal responsibility are now well understood as a consequence of a body of precedent which has been derived from judicial interpretation of the provisions over the period of almost a century.". But even had they done so, they would have been wrong. Anyone who could call the collection of judicial decisions which includes *Van Den Bemd*[46], *Mamote Kulang*[47], *Hubert*[48] and *Jackson and Hodgetts*[49], let alone the floating jurisprudence on the scope and meaning of s 23, can hardly be called well settled or well understood[50].

The only conclusion that can be made to the criticisms advanced by Mr Justice Thomas is the equivalent to that made by Professor JC Smith to Francis Bennion, who criticised the English Law Commission Code as "over-technical, poor on exposition and a sore puzzle from beginning to end". Professor Smith concluded:

> "Mr Bennion concludes by observing that what really matters is whether his objections are of substance. I agree. In my opinion, they are of no substance. None of them goes to any great issue of principle and in my opinion they are irrelevant or wrong."[51].

Precisely so.

(b)    *Shock, Horror Teen Sex Incest*

In November, 1996, MCCOC published a Discussion Paper on *Sexual Offences Against the Person.* A storm erupted. The Committee was aware that the topic of sexual offences was bound to generate controversy.   The subject of sexual offences makes many people irritable. Furthermore, in this particular area, the Committee took the view that the history and current state of debate about sexual offences was such that it was absolutely necessary to consider evidentiary and procedural provisions peculiar to charges of sexual offences as well as in the context of consideration of the offences and defences applicable to the area. In addition, SCAG made it clear that it wanted MCCOC to make recommendations about the law as it related to the compelled production of sexual assault counselling notes, which had become a cause celebre at the time, particularly in New South Wales.

It should first be made clear what recommendations did and did not cause the backlash described. Of course the standard issues invited the usual differences of opinion. Those standard issues included whether to retain separate offences of what is commonly called rape and indecent

---

[46](1994) 179 CLR 137 (HC), (1992) 70 A Crim R 489 (QCCA).
[47](1964) 111 CLR 62.
[48](1993) 67 A Crim R 181.
[49](1989) 44 A Crim R 320.
[50]See, generally, Goode and Leader-Elliott, "Criminal Law" in Baxt and Moore (ed), *An Annual Survey of Australian Law* 1994 at 161-170.
[51]Smith, "The Law Commission's Criminal Law Bill: A Good Start for the Criminal Code" (1995) 16 Statute LR 105 at 108 replying to Bennion, "The Law Commission's Criminal Law Bill: No Way to Draft a Code" (1994) 15 Statute LR 108.

- 12 -

assault or whether to merge them into degrees of sexual assault; whether and to what extent an honest but unreasonable belief in consent would negate criminal liability; the extent to which the complainant's sexual history could be the subject of cross-examination; and the requirements (if any) of corroboration. There were unheralded difficult issues too. Current law commonly does not pay sufficient attention to the balance between allowing people with impaired capacity to consent to have an appropriate sexual relationship (on the one hand) and protecting them from exploitation (on the other hand). The Committee carefully considered these issues and was quite prepared to deal with the genuinely held, if sometimes forcefully opposing views (from a number of sides) about these issues. The Committee was also quite prepared to consult on and take into account the views of those who would, for example, ban access to an alleged victim's counselling records on the one hand and those who thought that any change from the current rules would prejudice the right of the accused to a fair trial on the other hand. The Committee was well aware that certain fringe groups still hold the view that what used to be called "sodomy" should be made a criminal offence, despite the fact that homosexual relations between consenting adults are legal in every Australian jurisdiction.

But the Committee was unprepared for the storm which broke over its collective heads based upon complete and, often, wilful misunderstanding and misrepresentation of the Committee's proposals. The most important example of this was the recommendations about the age of consent. Essentially, the Committee recommended a two tiered age of consent. The first was a "*no defence age*", below which any sexual contact at all would have no defence whatsoever. The Committee suggested that this age should be 10. The second was '*true age of consent*". This was suggested to be set at 16. Between the ages of 10 and 16, the Committee proposed a number of limited defences: (a) marriage or reasonable belief that there was a marriage; (b) the accused and the victim were not more than 2 years different in age (the sexual experimentation defence); and (c) reasonable belief that the victim was of or above the age of consent.

The Committee received literally thousands of letters on this subject. Almost all of them completely failed to understand the proposals as a result of a campaign of misinformation persistently and wilfully promulgated by an organization calling itself the Australian Christian Coalition. This body conducted an organised campaign, mainly, it seems, in Queensland, on the basis that what the Committee was recommending was the lowering of the age of consent to 10. This was, of course, plainly not true. As opposed to this massive chorus of often highly abusive disapproval[52] based on a false premise, many informed religious organizations and organizations who work with young people supported the Committee's recommendations. These included the Social Issues Committee of the Anglican Diocese of Sydney[53], the Baptist Churches of NSW, the Uniting Church (National Secretary for Social Justice), the Presbyterian Church of Tasmania[54], SA Police, the National Children and Youth Law Centre and the Federation of Community Legal Centres. More simply, a number of submissions revealed that the correspondents were completely unaware of the age of consent in their own jurisdictions, which had sometimes been in place for many years.

---

[52] One submission received stated: "My initial response was that it must have been put together by a panel of paedophiles".

[53] Although that Committee would have preferred the true age of consent to be 18 rather than 16.

[54] Although the Church would have preferred that the "no defence age" to start at 14.

- 13 -

The other proposal which touched some very raw nerves (and prejudices) was the proposal that the criminal offence of incest between consenting adults should be abolished. Again, this proposal was greeted with persistent and wilful misinformation and abuse. This time, it was put about that the Committee was recommending abolition of the law which criminalizes sexual contact between adults and related *children*. That was, of course, simply and completely untrue. The Committee had recommended a sound suite of severe offences dealing with the victimisation of children. The Committee *was* proposing that consenting sexual behaviour between two adults within the prohibited degrees of consanguinity should not be a criminal offence.

Many of those who did understand the proposal still opposed it. Almost all opposition was based either on some peculiar idea of genetics and/or the idea that the criminal law should reflect sexual practices thought to be distasteful or contrary to particular religious conviction by the enactment of a serious criminal offence. The Discussion Paper had dealt quite properly with these objections in advance, but that made no difference to most of these people.

Such was the clamour that groups such as the Australian Christian Coalition had set up, most particularly in Queensland, the then Queensland Attorney-General, Mr Denver Beanland, took the extraordinary step of placing a large public advertisement in the newspapers condemning MCCOC and disassociating himself from its Discussion Paper. Further, in a letter to the editor of "*The Australian*", the Attorney-General declared he would have no part of the Model Criminal Code[55], and, in so doing, repeated the entirely false interpretation of the MCCOC recommendation about the age of consent. He expressed the opinion that anyone who wanted to codify the criminal law should adopt the Queensland Code which had been serving people well for a century. His press release was stronger. It said that "It is an outrage our Federal taxes are being spent on this rubbish.". He moved in SCAG to end the work of the Committee entirely. Happily, that move was not supported, but it signalled an effective end to Queensland participation in the Committee. At no point, of course, did Mr Beanland concern himself with the substantive merits of the policy debate[56].

The reader should not fail to direct the absolutely massive irony in this situation. It was the then Queensland Attorney-General who gave the political impetus to the process that began MCCOC by pointing to what he regarded as the indefensible results of having different rules for the age of consent across Australia. It was another Queensland Attorney-General who, because of the issue of age of consent (in large part) not only tried to stop the work of the Committee but also gave public voice to the great many who would not agree to the reduction of the age of consent in their jurisdiction or who, having heard what it was, simply did not believe it.

All of this placed the Committee is an impossible position. Most respondents thought that there should be a uniform age of consent and, if one took plain numbers, a great many thought that it should be as high as 18. However, in general terms, most Australian jurisdictions have an age of

---

[55] "*The Australian*", 29/4/97 p 8.

[56] It should not be thought that other, less eminent politicians did not repeat this infamous line. In debate on the New South Wales *Crimes Legislation Amendment (Child Sexual Offences) Bill*, the Hon Franca Arena repeated the same calumny (*Hansard*, 28 October, 1998 at p 58). However, in this instance, a properly briefed Attorney-General set the record straight (*Hansard*, 19 November, 1998, pp 66-67).

- 14 -

consent of 16 and those that do not, have an age of 17. For the Committee to move to recommend that the age be raised would be to deprive people of an existing right to have consensual sexual intercourse or sexual touching for absolutely no defensible reason whatsoever. Not only would the right be gone, but such conduct would be the subject of very serious criminal sanctions.

Furthermore, it seemed clear that those who were opposed to the age of consent being set at 16 (as recommended by the Committee) were in large part motivated by prejudice against homosexuality. There is nothing surprising about this, either in conservative community feeling and discourse nor, indeed, in the law. At the time, homosexual sex was entirely illegal in Tasmania, and there were discriminatory provisions involving a raised age of consent (18-21) in Western Australia[57], New South Wales, the Northern Territory and, (of course) Queensland. The Committee was determined not to resile from its view that the age of consent had no rational connection with sexual orientation. There is simply no reason to discriminate. If the general age of consent was 16, and the principle was that there were no rational grounds for discrimination on the basis of sexual orientation, the basis for MCCOC's recommendations is clear. Since that reasoning proved unacceptable, MCCOC was left with no choice but to say, in its Final Report, that it could find no rational basis to depart from the principles that it had formulated, but that, since the general age of consent was quite clearly revealed as a political issue, it could not recommend a fixed age. Instead, it chose to stick by the principles that it had recommended.

The same result was unhappily true for the recommendation about incest. There could be no doubt that thousands of submissions were adamantly opposed to the abolition of the offence, despite the fact that offences against children were comprehensively dealt with by other offences. Few or no submissions were in favour[58]. However, the only argument against the recommendation of the Committee for abolition which might have made any sense in the slightest was the argument that adults who have sexually abused children in the past continue the sexual relationship after the child has passed the age of consent. The idea was that "consent" was vitiated by the compulsion inherent in the previous relationship and the abuse of trust and relative position of power involved. I cannot see the strength of this argument. If there is evidence of sexual abuse in the past, charge and prove it. If there is not, then there is no value in the generalisation. No scientific evidence of any kind was produced in support of this generalisation. Further, sexual offences should be framed (and were recommended by MCCOC) in such a way that abuses of power and position were dealt with in their proper context: that is, for example, the definition of consent, the recommendations concerning persistent sexual abuse of a child and so on. If there was something wrong with these provisions, the Committee was happy to address the problems, and in fact did so with revised recommendations about a raised age of consent in relation to abuse of position of trust by persons in authority.

However, MCCOC was effectively intimidated by the response on incest. It must be remembered that MCCOC was a body representative of and reporting to SCAG, itself a political body of Ministers. If MCCOC so defied the concerted campaign, not only of ignorant interest groups and

---

[57] It appears that the new WA Government is committed to lowering the homosexual age of consent in that State from 21 to 16, the same age as heterosexual consent.

[58] I confess that with the lapse in time, I cannot recall if any were in favour. If there were any, they were small in number.

- 15 -

individuals in their thousands, but also influential politicians and the media prepared to believe them, it would place, if not its existence, then quite possibly its thorough and extensive work on the major part of the structure of sexual offences at severe risk. No Attorney-General can be expected to authorise even the release of recommendations which he or she knows will bring calumny heaped upon his or her head - nor should an Attorney be expected to. So the Committee was compelled to change its mind by the forces of darkness and ignorance. It recommended an offence of incest. But it gave the traditionalists and the moralists exactly what they had asked for - a traditional offence of incest. The recommended offence would criminalise consensual sexual penetration between adults who are parents, sons, daughters, siblings, grandparents and grandchildren (related by birth and not marriage or adoption)[59]. This, of course, caused great angst among those members of the public who wanted to see an expanded incest offence to cover just about every family form or quasi-family form possible. In this form, of course, the offence of incest could well cover the a very large part of the field of child sexual abuse and to that extent render the general offences redundant. Such a result would indeed see the tail wagging the dog.

The same themes can be seen here again. Parochialism loomed large, particularly in Queensland. The (Griffith) Queensland Code was presented (exclusively by Queenslanders) as the best the world had to offer, despite the overwhelming evidence to the contrary and the lack of sustainable substantive argument to support the proposition. And, obviously, populist politics which pander to the lowest common denominator in public discourse prevail. No matter what you say, the louder you shout, the better off you are. Never argue with a person who has a loud hailer.

---

[59] MCCOC, Chapter 5, *Sexual Offences Against the Person: Report* (May 1999) at 187ff, s 5.2.34.

- 16 -

**4.      *Some Thoughts About The Law Reform Process - Thinking It Through***

   *(a)      The MCCOC Objectives and Observations About National Consistency*

It is necessary to be clear about what the Model Code is and what it is not. It is *not* an attempt to force a uniform scheme on any Australian jurisdiction. It is also most definitely *not* an attempt by the Commonwealth to take over the criminal law powers of the States and Territories. It *is* an attempt by a group of experts, with considerable input from widespread community consultation, to put in the public arena a set of best practice basic criminal law provisions in the form of a criminal code which can serve as a model for all Australian jurisdictions to pick up and use in whole or in part when they want to do so. The aim is, in short, voluntary consistency not compulsory uniformity, with the agenda and its results being transparent, owned by all jurisdictions and not just being driven by one. Clearly, of course, the Commonwealth had a greater stake in the codification exercise because it lacked its own enacted criminal law which has led to the great inconvenience outlined at the beginning of this paper. But there are advantages to be had by the established State and Territory jurisdictions as well.

This observation leads me to make some comment on the objectives of national consistency in general. While it is clear that the goal is national consistency in serious criminal offences, none of this should be taken to mean that I think that *everything* should be nationally based, uniform and/or consistent. I do mean to say that it makes no sense at all to have, as we do in this country, a variety of different ages at which consent to sexual intercourse may be given. It is nonsense to say that a person who has consensual sexual intercourse with a 17 year old is guilty of a major crime in one State and no crime at all in another. Equally, I think it to be inescapably wrong for the issue of euthanasia, which is really about the law of homicide, to be decided on a State/Territory rather than a national basis. But I do not think that applies to all criminal justice issues.

For example, there is no reason, in my view, why there should be a national regime about the existence and location of brothels. That is quite clearly a matter on which local communities, probably more local than State and Territory communities, may differ on a rational basis (even if there is often little rational about the debate). Similarly, I think that while the commercial *trade* in illicit recreational drugs should be a national matter, I see no reason why local communities should not determine what policy they want to have on recreational drug *use*. The only question is how local that decision should be.

But what *principles* guide the decision about what should be the subject of national policy and what local and, if local, how local should it be? I am not aware of any work that has been done on this subject. My own view is that the answer depends, not on pre-determined or fixed canons of right and wrong across the policy spectrum, but upon at least three considerations.

The first is a characterisation and identification of the precise nature of the policy issue involved. The second is a public interest analysis of the base of local power appropriate to its resolution. The third is an assessment of the effectiveness and representative quality of the instruments of governance of the locality concerned. I do not pretend that these principles provide *an answer*. I

- 17 -

see no evidence that there is one answer. I do think that it is necessary in the conduct of public affairs to pay careful and sensitive attention to the nature of a given decision and the way in which it affects communities of interest in which the decision has impact.

(b)    The Significance Of The Record

There is precedent for just such a national consistency codification exercise within a federation. In 1962, the American Law Institute published what it called the Model Penal Code (Proposed Official Draft)[60]. It was, like the MCCOC project, an attempt to provide a model for the consistent codification of the criminal law but, of course, across the United States[61]. It had no Government backing. There were no grandiose claims for implementation strategies and no instant gratification for the years of hard work that had gone into the project. When it came time to celebrate the 25th anniversary of the 1962 draft, however, it was estimated that the Model Penal Code had had a significant influence in the development of the criminal law in at least 37 of the American States[62].

Although, in accordance with what has been said above, Australian progress may be hoped to be more rapid, the record of implementation shown below reveals the beginnings of voluntary consistency based on a public model at successful work. But it would be completely unrealistic to expect that, given a number of factors ranging from the drafting idiosyncrasies of Parliamentary Counsel through to the political gyrations of parties contesting for election victory by law and order auctions, for there to be complete certainty and consistency in any jurisdictional criminal agenda. The MCCOC project should not, for those reasons and by comparison with the experience of other jurisdictions, be seen wholly in terms of its immediate implementation record, although that has been quite good. In an enterprise of this kind, one must take the longer view. The experience of the 1990s has not been good for projects of this kind. The Canadian Government abolished the Law Reform Commission of Canada, which had done an enormous amount of work on a new Criminal Code to replace their current one based on a model developed by Sir James Stephen implemented in the 1890s. The UK Law Commission still exists, but it's reports notoriously languish unimplemented[63], despite repeated calls for action by the legal profession and the judiciary[64]. A similar dismal history even beyond the 1990s has been documented in the United States, despite the influence of the Model Penal Code[65].

One might also usefully compare the record of MCCOC with the recent record of that supposed paragon of jurisdictions, Queensland[66]. Despite the apparent reverence in which the Griffith

---

[60] There were "Tentative Drafts" (which we would call Discussion Papers) at least as early as 1955. An "Official Draft" was released in 1985, but it was the 1962 version which proved to be influential.

[61] See, generally, Wechsler, "The Challenge of a Model Penal Code" (1952) 65 Harvard LR 1097; Schwartz, "The Model Penal Code: An Invitation to Law Reform" (1963) 49 ABAJ 447; Packer, "The Model Penal Code And Beyond" (1963) 63 Columbia LR 594; Wechsler, "Codification of the Criminal Law in the United States: The Model Penal Code" (1968) 68 Columbia LR 1425.

[62] See Symposium (1988) 19 Rutgers LJ Number 3.

[63] The latest in a long series is Law Com 218, *Legislating the Criminal Code: Offences Against The Person and General Principles* (1993) Cmnd 2370.

[64] See, for example, the strong remarks of Lord Ackner in *Savage* [1992] 1 AC 699 at 752.

[65] See Robinson, "Are Criminal Codes Irrelevant?" (1994) 68 So Cal LR 159.

[66] The following account is taken from Kift, "Contemporary Comment" (2001) 25 Crim LJ 28.

A:\GOODE.DOC

- 18 -

Code was held, in the 1990s the same modifying movement was felt in Queensland and in April, 1990, a Criminal Code Review Committee chaired by Mr R O'Regan QC was set up to investigate and draft a new one. This Committee reported in 1992. It therefore ran parallel to the MCCOC General Principles review, but neither touched the other in any way. The O'Regan review was scarcely fundamental. It was in large part a tidying up and modernising exercise which did not examine the foundational structure of the Griffith Code in any meaningful way. Not one of the O'Regan recommendations were enacted. Instead, a completely new a comparatively radical redraft of the entire Criminal Code was produced from the blue in 1994 and enacted as the *Criminal Code*, 1995. I do not intend to go into this in any detail, for two reasons. First, it was accompanied by little analytical explanation and again, a salient point is that it paid no attention to the MCCOC project. Second, it failed to come into operation. The Goss Government, which had enacted it, was defeated at a by-election , lost power, and the new Government scrapped it and announced a new (and third) review. By this time, Mr Beanland was Attorney-General. A new Working Group was set up, which, of course, paid no attention to the MCCOC exercise, and it produced what became the *Criminal Law Amendment Act*, 1997. This was hardly radical stuff. Among other things, it defined "woman" as "including any female", referred to "principle offenders", predictably retained an offence of sodomy punishable by 14 years to life and made other miscellaneous and tidying up amendments[67]. Three superficial but supposedly major reviews of a *Criminal Code* defended as perfect by the judiciary and at least one involved Attorney-General produced what can only be described as a mouse.

    (c)    *Remarks About Law Reform*

I have no doubt at all that the serious criminal offences should be as consistent as possible throughout Australia. I also have no doubt at all that this objective will be difficult to achieve and, if achieved, will take time. The Model Criminal Code is a first big step to providing uniform justice for all Australians. But experience teaches that there are major and serious institutional obstacles to the achievement of nationally consistent legislation, whatever the law reform model used to try for it, even in an area in which all players are agreed on the principles involved. As Duggan has pointed out[68], politicians, bureaucrats, ministerial advisers, drafters of legislation, the public and, where relevant, the consumers or industry all can pose major stumbling blocks, sometimes derived from the promotion of self-interest, to the achievement of the principled result.

    (d)    *Remarks About The Process*

The MCCOC process was and is, in many respects, unique. It did not resemble the traditional law reform agency in any of its guises. That fact was a product of its genesis, but it took on a life of its own because of the dedication and hard work of all of its real participants. Frankly, so far as I am concerned, no praise is too high for those who participated. In its latter stages, MCCOC worked weekends to accommodate the possible participation of full time judicial officers, practicing lawyers and public officials who had full time case loads to cope with so that, in all

---

[67] See, in general, Kift, "How Not To Amend A Criminal Code" (1995) 22 Alt LJ 215.

[68] See the careful analysis of experience in consumer protection laws contained in Duggan, "Some Reflections on Consumer Protection and the Law Reform Process" (1991) 17 Monash ULR 252 at 279ff.

- 19 -

cases, weekend breaks did not exist for those working at that meeting. A great deal of this was completely extra work. They did it anyway. They believed in it and, I think, still do.

There are some, no doubt, who will find the MCCOC process flawed when compared to the traditional "new principle" law reform agencies, such as the highly professional Australian Law Reform Commission and the newly established Victorian Law Reform Commission. It is, of course, absolutely true that MCCOC *appeared* to be much more of an "insiders' club" in its composition and decision-making. But I use the word "appeared" advisedly. True it is that MCCOC was an officials group with no representation from "outside interests" on it. True it is that MCCOC was not "independent" in the sense that, in reporting to SCAG, it was conscious of the fact that its recommendations had to be politically acceptable. The risks of running too close to the wind have been illustrated above. Other examples could be given.

But I would argue that such a view is misconceived. In terms of legal representation, members of the Committee had worked not only in government, but also as prosecutors, defenders, academics and judges. MCCOC adopted the time honoured method of consulting with the community and interest groups by issuing a Discussion Paper before a Final Report. In the case of Sexual Offences, MCCOC conducted public hearings or seminars across the country facilitated by the Commonwealth Office of the Status of Women. And in terms of politics, much has been accurately said about the waste of time and effort involved in law reform bodies' work gathering dust or being substantially modified, because it is, for one thing, politically unacceptable. MCCOC had the advantage of the insider's view on such matters. It also, incidentally, had the very strong advantage of working with professional and dedicated Parliamentary Counsel. Thinking through the idea when trying to get it drafted is a salutary discipline. The same is true for the reader or consumer of the document. Parliamentary Counsel are also not shy about giving instructors the benefit of their views on the policy they are being asked to implement. I should say that no praise is too high for the Parliamentary Counsel with whom the Committee worked.

In the end, MCCOC must be judged by its results. A summary of implementation to date is attached to this paper. I have already remarked that the process of change in the non-Commonwealth jurisdictions must be expected to be incremental. Perhaps we should have another look at what has happened in a decade.

*July, 2001*

A:\GOODE.DOC

## ATTACHMENT 1 - REPRESENTATION

| | NSW | Victoria | SA | WA | Qld | ACT | NT[?] | Tas | C/W | Other[?] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | Mr P Berman, Ms J Orchiston | **Dr D Neal (Chair),** Mr S Bailey | Mr M Goode | Mr G Scott QC | Mr P Svensson | Mr J O'Keefe | Mr R Minahan, Mr L Flanagan QC | Mr N Perks | Mr H Woltring | Mr A Menzies[*], Ms A Fraser |
| 1992 | Mr P Berman, Ms J Orchiston | **Dr D Neal (Chair),** Mr S Bailey | Mr M Goode | Mr G Scott QC (Mr Justice Scott) | Mr P Svensson | Ms D Merryfull, Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | Mr A Menzies, Ms A Fraser |

---

[?] Representation from the Northern Territory was a constant *practical* problem throughout the latter part of the life of the Committee. This was in part due to the tyranny of distance. Public service rules restrict the places in which meetings can be held and it is hard for Territorians to get to those places without taking more time than others. While Mr Flanagan QC was able to attend most meetings, none of his successors played any significant role in the deliberations of the Committee.

[?] Generally, after the first two years it worked out by consensus that the chair of the Committee did not formally represent any particular jurisdiction. The Chair did not, therefore, vote. Therefore, the reader will find the Chair in this column. The purposes for which various people are listed will be detailed separately.

[*] Mr Menzies was a member of the original Gibbs Committee and continued as a consultant to the Commonwealth on CLOC and MCCOC. He was vitally interested in the offences relating to the administration of justice which, although they excited little popular attention and controversy, he dealt with in his customary thoughtful and detailed way.

| 1993 | Ms J Orchiston | None[?] | Mr M Goode | Mr M Muller, Mr R Cock | Mr P Svensson | Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | **Dr D Neal, (Chair),** Mr A Menzies, Ms A Fraser |
| 1994 | Ms M Latham | None | Mr M Goode | Mr R Cock, Ms L Jenkins | Mr G Hannigan | Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | **Mr R Howie QC (Chair),** Mr G McDonald, Ms A Goldman, Dr D Neal, Mr A Menzies, Ms P Supomo[?] |
| 1995 | Ms M Latham | Ms A Cannon | Mr M Goode | Ms L Jenkins | Mr G Hannigan | Ms D Merryfull | Mr L Flanagan QC | Mr N Perks | Mr G McDonald | **Mr R Howie QC (Chair),** Dr D Neal, Ms A Goldman, Mr A Menzies, Ms P Supomo, Ms K O'Rourke, Ms A Will |
| 1996 | Ms M Latham | Ms A Cannon | Mr M Goode | Ms L Jenkins | Mr G Hannigan, Mr D Groth | Ms C Stuart | Mr J Karczewski | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr D Neal, Mr A Menzies, Ms P Supomo, Ms A Will |

---

[?] As noted elsewhere, for 18 months the then newly elected Liberal Government in Victoria decided not to participate in MCCOC.

[?] Ms Supomo was a consultant provided to the Committee by NSW for the purpose of researching and writing the papers on sexual offences against the person.

| 1997 | Ms M Latham | Ms A Cannon, Mr G Byrne | Mr M Goode | Ms L Jenkins | Mr P Byrne | Ms K Greenland | Mr J Karczewski | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr D Neal, Dr C Howard QC[?] , Mr R Button, Mr A Menzies, Mr I Leader-Elliott[?] , Ms A Will, Ms K O'Rourke, Ms K Merrifield |
|------|------|------|------|------|------|------|------|------|------|------|
| 1998 | Ms M Latham (Judge M Latham) | Mr G Byrne | Mr M Goode | Ms L Jenkins | None[?] | Ms K Greenland | Ms E Kelly, Ms Z Marcham, Mr P Jamieson | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr C Howard QC, Mr R Button, Mr I Leader-Elliott, Mr C Pruiti[?] , Mr B Bannerman, Mr A Kristjanson |

---

[?]  Dr Howard is an eminent criminal law academic who was nominated by the Victorian Attorney-General to advise the Committee.

[?]  Mr Leader-Elliott is an eminent academic who was employed by the Commonwealth as a consultant, and who contributed very substantially to the development and writing of the MCCOC work on Criminal Damage and Serious Drug Offences.

[?]  After late 1997, Queensland ceased to provide any representative on the Committee. The reasons for that decision sufficiently appear in the discussion above.

[?]  Mr Pruiti was at the time an officer attached to the Western Australian Crown, whose services were contributed by WA for the development and writing of the MCCOC work on homicide.

| 1999 | Judge M Latham | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland | Ms E Kelly | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Mr I Leader-Elliott |
|------|----------------|------------|------------|--------------|------|----------------|------------|------------|---------------|-----------------------------------------------|
| 2000 | Mr A Haesler | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland | Ms E Kelly | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Mr I Leader-Elliott, Judge M Latham |
| 2001 | Ms C Loukas | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland, Ms A Casimar | Ms E Kelly | Mr N Perks | Mr G McDonald | **Mr Justice R Howie (Chair),** Mr I Leader-Elliott, Judge M Latham, Mr A Haesler |

## ATTACHMENT 2 - PAPERS AND REPORTS[69]

| NAME OF PAPER | CONTENTS | RELEASE |
|---|---|---|
| Chapter 2, Discussion Paper, *General Principles of Criminal Responsibility* | Elements of offences, fault, defences, extensions of criminal responsibility, corporate criminal responsibility, burden of proof | July, 1992<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 2, Final Report, *General Principles of Criminal Responsibility* | As above | December, 1992<br><br>*(Principal Author: Mr Matthew Goode)* |
| **Report on the Abolition of the Year and a Day Rule In Homicide** | Recommending the abolition of the rule that a homicide may not be attributed to an accused if the death occurred more than a year and a day after the act. | 1992 |
| Chapter 3, Discussion Paper, *Theft, Fraud and Related Offences - Part 1* | Theft, fraud, receiving, robbery, burglary | December, 1993<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 3, Discussion Paper, *Blackmail, Forgery, Bribery and Secret Commissions* | Blackmail, forgery, bribery and secret commissions | July, 1994<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 3, Final Report, *Theft, Fraud, Bribery and Related Offences* | Theft, fraud, receiving, robbery, burglary, blackmail, forgery, bribery and secret commissions | December, 1995<br><br>*(Principal Author: Dr David Neal)* |
| **Model Provisions on Mental Impairment** | Detailed draft legislation dealing with all facets of the mentally ill person who commits what would be a crime but for their mental impairment | 1995-1996 |

---

[69] The items listed as official MCCOC publications were published in publicly available material and distributed in book form. The items in bold face were "non Code" projects given to the Committee by SCAG and reported to SCAG as draft legislation with a commentary. After some small time, the MCCOC papers and reports were made available on-line at <http://law.gov.au/publications/Model_Criminal_Code/index.htm>.

- 26 -

| Model Provisions on Forensic Procedures | Detailed draft legislation dealing with police powers to collect forensic samples and the establishment and maintenance of a national DNA data base. | 1995-1996 |
|---|---|---|
| Chapter 3, Discussion Paper, *Conspiracy to Defraud* | Conspiracy to defraud | June, 1996<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 5, Discussion Paper, *Non-Fatal Offences Against the Person* | Causing harm, threats, stalking, endangerment, traps, causing a serious disease, unlawful confinement, kidnapping, child abduction, female genital mutilation, abortion, defences | August, 1996<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Discussion Paper, *Sexual Offences Against the Person* | Sexual acts committed without consent, sexual offences committed against or with children, sexual acts with or against mentally impaired people, provisions relating to evidence and procedure in sexual offences | November, 1996<br><br>*(Principal Authors: Ms Prita Supomo ; Mr Richard Button)* |
| Chapter 6, Discussion Paper, *Serious Drug Offences* | Serious drug offences including trafficking, manufacturing, cultivation, offences involving children, property derived from serious drug offences | June, 1997<br><br>*(Principal Author: Mr Ian Leader-Elliott)* |
| Chapter 3, Final Report, *Conspiracy to Defraud* | Conspiracy to defraud | May, 1997<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 7, Discussion Paper, *Offences Against the Administration of Justice* | Perjury, Protection of witnesses, Perversion of justice and related offences | July, 1997<br><br>*(Principal Author: Mr Andrew Menzies)* |
| Chapter 8, Discussion Paper, *Public Order Offences: Contamination of Goods* | Specific offences dealing with product contamination of threats to do so with a view to causing public alarm | July, 1997<br><br>*(Principal Author: Mr Greg Byrne)* |
| Chapter 8, Final Report, | Specific offences dealing | March 1998 |

- 27 -

| | | |
|---|---|---|
| *Public Order Offences: Contamination of Goods* | with product contamination of threats to do so with a view to causing public alarm | *(Principal Author: Mr Greg Byrne)* |
| Chapter 9, Discussion Paper, *Offences Against Humanity: Slavery* | Offences dealing with slavery, servitude and sexual slavery | April 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Discussion Paper, *Fatal Offences Against The Person* | Murder, manslaughter, causing death by dangerous driving and defences specific to these offences | June, 1998<br><br>*(Principal Authors: Ms Lindy Jenkins, Mr Colin Pruiti)* |
| Chapter 7, Final Report, *Administration of Justice Offences* | Perjury, Protection of witnesses, Perversion of justice and related offences | July, 1998<br><br>*(Principal Author: Mr Andrew Menzies)* |
| Chapter 5, Final Report, *Non-Fatal Offences Against the Person* | Causing harm, threats, stalking, endangerment, traps, causing a serious disease, unlawful confinement, kidnapping, child abduction, female genital mutilation, abortion, defences | September 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 6, Final Report, *Serious Drug Offences* | Serious drug offences including trafficking, manufacturing, cultivation, offences involving children, property derived from serious drug offences | October, 1998<br><br>*(Principal Author: Mr Ian Leader-Elliott)* |
| Chapter 9, Final Report, *Offences Against Humanity: Slavery* | Offences dealing with slavery, servitude and sexual slavery | November 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Final Report, *Sexual Offences Against the Person* | Sexual acts committed without consent, sexual offences committed against or with children, sexual acts with or against mentally impaired people, provisions relating to evidence and procedure in sexual offences. | May, 1999<br><br>*(Principal Authors: Ms Prita Supomo ; Mr Richard Button)* |
| **Model Forensic Procedures Bill and the Proposed DNA Database** | Further report on the requirements for a principled legislative regime for the collection, storage and use of | May, 1999<br><br>*(Principal Author: Mr Geoff McDonald)* |

- 28 -

| | DNA material with a particular view to the implementation of the Commonwealth CrimTrac system. | |
|---|---|---|
| Chapter 4, Discussion Paper, *Damage and Computer Offences and Amendment to Chapter 2: Jurisdiction* | General offences dealing with criminal damage including arson, bushfire, sabotage and general damage offences; and innovative computer damage offences; and model provision relating to criminal jurisdiction in general | January 2000<br><br>*(Principal Authors: Mr Ian Leader-Elliott (damage and computer); Mr Matthew Goode (jurisdiction))* |
| **Final Draft: Model Forensic Procedures Bill and the Proposed National DNA Database** | Further report on the requirements for a principled legislative regime for the collection, storage and use of DNA material with a particular view to the implementation of the Commonwealth CrimTrac system. | February 2000<br><br>*(Principal Author: Mr Geoff McDonald)* |
| Chapter 4, Final Report, *Damage and Computer Offences and Amendment to Chapter 2: Jurisdiction* | General offences dealing with criminal damage including arson, bushfire sabotage and general damage offences; and innovative computer damage offences; and model provision relating to criminal jurisdiction in general | January 2001<br><br>*(Principal Authors: Mr Ian Leader-Elliott (damage and computer); Mr Matthew Goode (jurisdiction))* |

- 29 -

## ATTACHMENT 3 - CURRENT IMPLEMENTATION RECORD[70]

| REPORT | IMPLEMENTATION |
|---|---|
| Chapter 2: General Principles of Criminal Responsibility | (Commonwealth) *Criminal Code Act*, 1995<br>(SA) *Criminal Law Consolidation (Self Defence) Amendment Act*, 1997 |
| Chapter 2: Criminal Jurisdiction | (NSW) *Crimes Legislation Amendment Act*, 2000 |
| Chapter 3: Theft, Fraud and Related Offences[71] | (Commonwealth) *Criminal Code Amendment (Theft, Fraud , Bribery and Related Offences) Act*, 2000<br>(SA) *Criminal Law Consolidation (Offences of Dishonesty) Amendment Bill*, 2001 |
| Chapter 4: Criminal Damage and Computer Offences | (NSW) *Crimes Amendment (Computer Offences) Bill*, 2001<br>(Commonwealth) *Cybercrime Bill*, 2001 |
| Chapter 5: Non-Fatal Offences Against the Person[72] | (NSW) *Crimes (Female Genital Mutilation) Amendment Act*, 1994;<br>(ACT) *Crimes (Amendment) Act (No 3)*, 1995<br>(NT) *Criminal Code Amendment Act (No 2)*, 1995<br>(SA) *Statutes Amendment (Female Genital Mutilation and Child Protection) Amendment Act*, 1995<br>(Vic) *Crimes (Female Genital Mutilation) Act*, 1996<br>(Qld) *Criminal Law Amendment Act*, 2000 |
| Chapter 5: Sexual Offences Against the Person | (Vic) *Evidence (Confidential Communications) Act*, 1998<br>(SA) *Evidence (Confidential Communications) Act*, 1999<br>(NSW) *Criminal Procedure Amendment (Sexual Assault Communications Privilege) Act*, 1999 |
| Chapter 5: Fatal Offences Against the Person | Not Yet Complete |

---

[70] I have tried to capture all relevant legislation, but may not have succeeded. If not, my apologies to that extent. I would be grateful to be corrected so that a better record can be established.

[71] It may be noted that the recommendations of the Committee reflect what is, largely, already the law in Victoria and the ACT.

[72] The Committee's recommendations in relation to female genital mutilation are the only subject from that report which has been taken up at this stage. The Committee's recommendations on the subject of stalking ran parallel to and reflected legislative action that had already begun.

- 30 -

| | |
|---|---|
| Chapter 6: Serious Drug Offences | The recommendation that PIEDs (Performance and Image Enhancing Drugs) (sometimes know as anabolic steroids) be subject to major criminal sanctions has been implemented in every jurisdiction except SA. |
| Chapter 7: Offences Against The Administration of Justice | None |
| Chapter 8: Public Order Offences: Contamination of Goods | (NSW) *Crimes (Contamination of Goods) Amendment Act*, 1997<br>(Qld) *Justice and Other Legislation (Miscellaneous Provisions) Act*, 1997<br>(Vic) *Crimes Amendment Act*, 1998<br>(SA) *Criminal Law Consolidation (Contamination of Goods) Amendment Act*, 1999<br>(Tas) *Criminal Code Amendment (Contamination of Goods) Act*, 1999 |
| Chapter 9: Offences Against Humanity: Slavery | (Commonwealth) *Criminal Code Amendment (Slavery and Sexual Servitude) Act*, 1999<br>(SA) *Criminal Law Consolidation (Sexual Servitude) Amendment Act*, 2000 |
| Model Provisions For Mentally Impaired Accused | (SA) *Criminal Law Consolidation (Mental Impairment) Amendment Act,* 1995<br>(Vic) *Crimes (Mental Impairment and Unfitness to be Tried) Act*, 1997<br>(ACT) *Crimes (Amendment) Act*, 1994, *Crimes (Amendment) Act*, 1999[73] |
| Model Provisions for Forensic Procedures[74] | (Vic) *Crimes (Amendment) Act*, 1997<br>(SA) *Criminal Law (Forensic Procedures) Act*, 1998<br>(Commonwealth) *Crimes Amendment (Forensic Procedures) Act*, 1998 |
| Model Provisions for the DNA Database | (Commonwealth) *Crimes (Forensic Procedures) Act*, 2000<br>(NSW) *Crimes (Forensic Procedures) Act*, 2000<br>(ACT) *Crimes (Forensic Procedures) Act*, 2000<br>(Tas) *Forensic Procedures* Act, 2000<br>(SA) *Criminal Law (Forensic Procedures) (Miscellaneous) Amendment* Bill, 2001 |

[73] The ACT legislation differs from the Model Provisions in a number of respects, most notably in the involvement of the Mental Health Tribunal.

[74] It may be noted that Queensland and the Northern Territory enacted legislation in this area. Both legislative schemes depart from the Model Provisions in very significant respects.

- 31 -

| Abolition of the Year and a Day Rule | (NSW) *Criminal (Injuries) Amendment Act*, 1991 |
| | (SA) *Criminal Law Consolidation (Year and a Day) Amendment Act,* 1991 |
| | (Vic) *Crimes (Year and a Day Rule) Act*, 1991 |
| | (Qld) *Penalties and Sentences Act*, 1992 |
| | (WA) *Criminal Law Amendment Act*, 1991 |
| | (Tas) *Criminal Code Amendment (Year and a Day Repeal) Act*, 1993 |
| | (ACT) *Crimes (Amendment) Act*, 1995 |

**REF: 3415969**

FA SALLY JENNINGS
TCCC=OPERATIONS MONITERING CENTER

**Dear Sally Jennings, 10417**

# RE: CONCERNING THE MANUFACTURING AND TRANSMISSION, USING THE INTERNATIONAL YAHOO BACKBONE; LICENSED TO AUSTRALIA, OF AARON SIMMONS DOCUMENTS ALREADY IN YOUR POSSESSION, TO COMMIT CRIME.

I am bringing to your attention a transmission of agent Terry Baker questioning how I was in possession of commonwealth and state documents of Aaron Simmons.

Based on this admission and my reply I believe you have jurisdiction to prosecute those involved in the transmission of these documents.

I am now in including from the Crimes Act the relevant portions so that you can better understand and have full knowledge through the act itself and jurisdiction over the prosecution of this complaint.

I will also include NSW AND QUEENSLAND state crime overlap if you wish to complete your understanding and information.

**FIRST**

AARON SIMMONS documents were transmitted using the Yahoo Interface.

I have checked with Yahoo in America to see if they gave special permission to Australia to bypass the criminal aspects of the license issued.  I will email you the relevant portion in the next email after consulting with Yahoo America Legal and they study the documents and give a formal written opinion.

I am venturing to guess that these documents were transmitted from TWEED HEADS WEST NSW but I am not quite sure until Yahoo America and Attorney General In

America confirm. but the data is transmitted back and forth between NWS into Queensland.

Yahoo America will locate the ISP and heard pen registers and I will send you that data at a later date.
The data from the document and its use is included as a State Federal Interface,

One use of the data document is the illegal transportation of my Child Nara from Queensland into NSW and A police report stands clear in Maclean NSW but not in Pottsville NSW. I have already sent you this.

### 3AA  State offences that have a federal aspect

*Object*

(1A)  The object of this section is to identify State offences that have a federal aspect because:

    (a)  they potentially fall within Commonwealth legislative power because of the elements of the State offence; or

    (b)  they potentially fall within Commonwealth legislative power because of the circumstances in which the State offence was committed (whether or not those circumstances are expressed to be acts or omissions involved in committing the offence); or

    (c)  the Australian Federal Police investigating them is incidental to the Australian Federal Police investigating an offence against a law of the Commonwealth or a Territory.

*State offences that have a federal aspect*

(1)  For the purposes of this Act, a State offence has a ***federal aspect*** if, and only if:

    (a)  both:

        (i)  the State offence is not an ancillary offence; and

        (ii)  assuming that the provision creating the State offence had been enacted by the Parliament of the Commonwealth instead of by the Parliament of the State—the provision would have been a valid law of the Commonwealth; or

    (b)  both:

        (i)  the State offence is an ancillary offence that relates to a particular primary offence; and

        (ii)  assuming that the provision creating the primary offence had been enacted by the Parliament of the Commonwealth instead of by the Parliament of the State—the provision would have been a valid law of the Commonwealth; or

(c)assuming that the Parliament of the Commonwealth had enacted a provision that created an offence penalising the specific acts or omissions involved in committing the State offence—that provision would have been a valid law of the Commonwealth; or

(d) both:

  (i) the Australian Federal Police is investigating a matter relating to a relevant criminal activity that relates to an offence against a law of the Commonwealth or a Territory; and

  (ii) if the Australian Federal Police is investigating, or were to investigate, a matter relating to a relevant criminal activity that relates to the State offence—that investigation is, or would be, incidental to the investigation mentioned in subparagraph (i).

*Specificity of acts or omissions*

(2)    For the purposes of paragraph (1)(c), the specificity of the acts or omissions involved in committing a State offence is to be determined having regard to the circumstances in which the

offence was committed (whether or not those circumstances are expressed to be elements of the offence).

*State offences covered by paragraph (1)(c)*

(3) A State offence is taken to be covered by paragraph (1)(c) if the conduct constituting the State offence:

  (a) affects the interests of:

    (i) the Commonwealth; or **Terry Baker Federal Agent was quite adamant on this point and I will use it as evidence.**

    (ii) an authority of the Commonwealth; or **Terry Baker Federal Agent was quite adamant on this point and I will use it as evidence.**

    (iii) a constitutional corporation; or

  (b) was engaged in by a constitutional corporation; or

  (c) was engaged in a Commonwealth place; or

  (d) involved the use of a postal service or other like service; or

  (e) involved an electronic communication; or    **I have already alleged that the documents were very resolution scanned and using my G4 and High Resolution printer taken by Peter Whalan reproduced in Parkwood QLD.**

  (f) involved trade or commerce:

    (i) between Australia and places outside Australia; or

    (ii) among the States; or

    (iii) within a Territory, between a State and a Territory or between 2 Territories; or **I have already alleged that the documents were very resolution scanned in NSW then using para (e) delivered onto my family computer held and being used by Peter and Jane Whalan at 10 county court Parkwood , Queensland and using my G4 and High Resolution printer taken by Peter Whalan reproduced in Parkwood QLD.**

  (g) involved:

    (i) banking (other than State banking not extending beyond the limits of the State concerned); or

(ii) insurance (other than State insurance not extending beyond the limits of the State concerned); or

(h) relates to a matter outside Australia; or

(i) relates to a matter in respect of which an international agreement to which Australia is a party imposes obligations to which effect could be given by the creation of an offence against the domestic laws of the parties to the agreement; or **Your Email advising me that India was not a signatory to the Hague and Australia is and the violations sent to you are child rights violations. A Human Rights Court has already passed a direction that there are gross violations of the child rights. Further a Supreme Court has passed an opinion on the Human Rights that violations are primarily Australian and Australia must find competent court. And the Consolidated Acts which I can also include contains complete acceptance of Australia's position of Child Rights.**

(j) relates to a matter that affects the relations between Australia and another country or countries or is otherwise a subject of international concern. **You have received a number of emails confirming violations, and interpretation and international concern over this matter, from USA, India, Switzerland. USA as far NARA's half brothers and sisters are concerned. Switzerland as far as Nara's aunt is concerned, United Nations, India as far as by brother is concerned. And this will not stop until justice is done.**

(3) Subsection (3) does not limit paragraph (1)(c).

*electronic communication* means a communication of information:

(a) whether in the form of text; or

(b) whether in the form of data; or

(c) whether in the form of speech, music or other sounds; or

(d) whether in the form of visual images (animated or otherwise); or

(e) whether in any other form; or

(f) whether in any combination of forms;

by means of guided and/or unguided electromagnetic energy.

*engage in conduct* has the same meaning as in the *Criminal Code*.

F/A Sally Jennings this letter contains a format about a complaint and if you don't understand or I have not understood this portion of the law properly as it applies to your jurisdiction please let me know.

Yours Sincerely



Jugvir Inder Singh



# International Child Custody

## A Common Law Judicial Conference

**(September 18 - 21, 2000)**
**Washington DC**

**Hague Convention**
**on the Civil Aspects of International Child Abduction**
**Discussion Topic No 3**

*Issues Surrounding Safe Return of the Child*
*(and the Custodial Parent)\**

**by**

**The Delegation From The Commonwealth of Australia \*\***

**\*** A revised version of a paper prepared for this Conference. This paper aims to state the law up to 1 September 2000. The authors acknowledge and thank the participants of the Conference for their helpful comments on the original paper. Further comments are welcomed and may be forwarded to Danny.Sandor@familycourt.gov.au.

The Family Court of Australia website includes a page of selected judgments relating to the Convention at http://www.familycourt.gov.au/judge/index/html/child_abduction.html and links to Australian legislation.

**\*\*** Mr. Stephen Bourke, Mr. Murray Green, Justice Joseph V. Kay & Mr. Danny Sandor.

# INTRODUCTION

Issues surrounding the safe return of the child and abducting parent need to be seen in the changing context of the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"). Article 1 states that the objects of the Convention are:

*"(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and*

*(b) to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in other contracting States."*

It is clear and beyond argument that the prompt return is to enable the courts of the child's home country to determine the parenting arrangements for the child in accordance with the law of that country. Wrongful removal or retention should not be permitted to deprive the courts of the child's home country from determining such questions.

However, the picture that emerges today is increasingly one of the abducting parent seeking support of family and friends in contrast to a conscious motivation of depriving the court of the opportunity to determine the parenting arrangements for the child. The Family Law Council reported the following data[1]:

| Abducting Parent's Motivation | Percentage |
|---|---|
| Seeking support | 53% |
| Preventing Contact | 28% |
| Following new partner | 5% |

| Fleeing violence | 6% |
|---|---|
| Other | 8% |

In Australia, the law requires the Commonwealth Central Authority and its State and Territory counterparts to do everything necessary or appropriate to protect the welfare of the child on return.[2] At the 1997 Special Commission meeting at the Hague to discuss the operation of the Convention, the meeting adopted a resolution that Article 7(h) imposed an obligation on Central Authorities to protect the welfare of the returning child (see below). The resolution was adopted subject to certain qualifications relating to the powers of Central Authorities under the legal and welfare systems of each country.

This paper examines the topic of safe return under the following headings:-

A. Undertakings, safe harbour orders, mirror orders;

B. Criminal proceedings against the taking parent;

C. Problems relating to enforcement; and

D. Direct judicial communication

## A. Mirror Orders, Safe Harbour Orders & Undertakings

### Introduction

Kay J's first instance Family Court of Australia decision in *McOwan v McOwan*[3] drew attention to the following key determinant of ongoing judicial support of the Convention:

*"Unless contracting States can feel reasonably assured that when children are returned under the Hague Convention, their welfare will be protected, there is a serious risk that the contracting States and Courts will become reluctant to order the return of children."*[4]

It is well established under Australian jurisprudence that Convention applications are not decided according to the principle that the subject child's best interests or welfare is the paramount consideration.[5] In *Murray v Director, Family Services ACT*,[6] the Full Court of the Family Court of Australia[7] said:

*"... the Hague Convention and the Regulations* [implementing the Convention in Australian law] *contemplate that it is in the best interests of the child for issues such as custody and access to be determined in the courts of the country of the child's habitual residence unless the exceptions referred to in regulation 16 are made out.*

*The issue in a Hague Convention application is purely one of form, subject to those exceptions, and the paramountcy principle is accordingly not relevant."[8]*

That view was reiterated in *McCall and McCall; State Central Authority (Applicant); Attorney-General of the Commonwealth (Intervener)[9]* where it was noted that this stance is in accordance with the point of view of those who drafted the Convention.[10]

Although there would seem some variance in how welfare or best interests considerations come into play once an exception has been made out, it is widely accepted in common law jurisdictions that the paramountcy principle does not govern convention applications. This was held early in the life of the Convention by the English Court of Appeal[11] and followed by the 1992 Scottish Inner House decision of *Whitley, Petitioner*.[12] It is also the position adopted by the United States Sixth Circuit Court of Appeals[13] and the New Zealand approach (illustrated by *Adams and Wigfield*,[14] and subsequently the Court of Appeal's decision in *A v Central Authority for New Zealand[15]*). A similar view was confirmed by the Supreme Court of Ireland in *T.M.M. v M.D*,[16] and the Supreme Court of Canada was unanimous on this issue in *Thomson v Thomson*.[17]

Most recently, in *De L v Director General, NSW Department of Community Services[18]* the High Court of Australia considered the Regulations giving domestic effect to the Convention,[19] it being the case that Australia did not transpose the Hague Convention in a "wholesale" manner when legislating to implement it through the *Family Law (Child Abduction Convention) Regulations* ("the Australian

Regulations").[20]

The majority in *De L v Director General, NSW Department of Community Services*[21] said:

*"The Regulations reflect the objects of the Convention to settle issues of jurisdiction between the Contracting States by favouring the forum which has been the habitual residence of the child. The underlying premise is that, once the forum is located in this way, each Contracting state has faith in the domestic law of the other Contracting States to deal in a proper fashion with matters relating to the custody of children under the age of 16. Necessarily, proceedings under the Regulations are to be seen as standing apart from [proceedings relating to the custody, guardianship or welfare of, or access to, a child]. It follows that they are not subject to the paramountcy principle."*[22]

Even so, where an established defence under the Convention enlivens a discretion not to order return,[23] it follows that the more effective the mechanisms for protection of children until and upon return to the other jurisdiction, the more likely that return will nonetheless be ordered. Greater confidence in the efficacy of protection measures can avert having to find, as Ward LJ did in a different Convention dilemma, that:

*"... the interests of the children in remaining here should not be sacrificed on the altar of comity between nation States."*[24]

Limits to comity were also canvassed by Doogue J writing for the New Zealand Court of Appeal in *A v Central Authority for New Zealand*:[25]

*"Where the system of law of the country of habitual residence makes the best interests of the child paramount and provides mechanisms by which the best interests of the child can be protected and properly dealt with, it is for the Court of that country and not the country to which the child has been abducted to determine the best interests of the child.*

*... There may well be cases, for example where the laws of the home country may emphasise the best interests of the child are paramount but there are no mechanisms by which that might be achieved, or it may be established that the Courts of that country construe such provisions in a limiting way, or even that the laws of that country do not reflect the principle that the best interests of the child are paramount."*[26]

The types of order considered in this section of the paper seek to balance

adherence to the policy of the Convention with the prevention of risk of harm to the child to be returned. That balancing takes place within a legal context where there are limits to the nature, reach and enforceability of orders which may be made by the Court contemplating the child's return.[27] In a related vein, The Chief Justice of the Family Court of Australia said in an *extra curial* address:

*"There is a presumption that upon return to the jurisdiction, a competent body will resolve the competing claims over the children. The position was explained by the Full Court in Gsponer v Director General CSV:*

*"There is no reason why this Court should not assume that once the child is so returned, the courts in that country are not appropriately equipped to make suitable arrangements for the child's welfare."*

*Even so, it is no offence to judicial comity to appreciate that Contracting States may have systems which, in practice, differentially facilitate or impede access to such a competent body."*[28]

Central Authorities can play a critical role in facilitating such access with safety and protection. The need for and nature of case-specific orders by courts depends upon what may be routinely expected of Central Authorities. This paper first examines the extent to which there is a common view as to such expectations.

### The Obligations of Central Authorities Towards Returning Children

A proposal on this subject was put forward by Australia with the support of some other contracting States at the March 1997 Special Commission meeting to discuss the operation of the Convention.[29] Some background to impetus for the resolution was recently described by the Principal Legal Officer for the Commonwealth Central Authority for Australia. In a 1999 paper, Ms. Jennifer Degeling said:

*"This issue has been of some concern to the Chief Justice of the Family Court since his involvement in a number of cases where an abducting parent has fled a domestic violence situation or has been left destitute on return to the country of habitual residence. In Cooper v Casey (1995) FLC ¶92-575 Nicholson CJ said that the Convention imposes an obligation on Central Authorities to take responsibility for ensuring the protection of children returned under the Convention. Although a similar approach was taken by the NZ Court of Appeal in [A v Central Authority for New Zealand], the acceptance of such an obligation had not received much support from other countries who were consulted about this issue prior to the 1997 Special Commission meeting at The Hague."*[30]

It appears there was general acceptance at the 1997 Special Commission meeting

that contracting States to the Convention accept that Central Authorities have an obligation under Article 7(h) to protect the welfare of children upon return. How that obligation should translate into practice was, however, the subject of disagreement. Article 7(h) provides:

*"Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.*
*In particular, either directly or through any intermediary, they shall take all appropriate measures—*

*(h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;"*

The 1997 Special Commission report states:

*"Following discussion of Australia's proposal, delegations appeared to accept the following proposals:*

*1 It is essential to the integrity of the Convention to ensure the safety of children on their return to their country of habitual residence, in order to alleviate possible concerns and the reluctance of judges to order the return of children where issues of (alleged) abuse or violence arise.*

*2 An increase in the number of refusals to return, in cases where such issues arise, would not be desirable. Accordingly, a narrow interpretation of Article 13 b of the Convention should be encouraged by strengthening the role of Central Authorities in co-operating to facilitate awareness of government or public resources available to parents and children. In that context, Central Authorities should be prepared and encouraged by their respective States to adopt a flexible approach to their obligations under Article 7 h of the Convention.*

*Conclusions*

*In view of the above proposals, delegations are urged to adopt the following conclusions:*

*1 To the extent permitted by the powers of their Central Authority and by the legal and social welfare systems of their country, Contracting States accept that Central Authorities have an obligation under Article 7 h to ensure appropriate child protection bodies are alerted so they may act to protect the welfare of children upon return until the jurisdiction of the appropriate court has been effectively invoked, in certain cases.*

*2 It is recognised that, in most cases, a consideration of the child's best interests requires that both parents have the opportunity to participate and be heard in custody proceedings. Central Authorities*

*should therefore co-operate to the fullest extent possible to provide information respecting, legal, financial, protection and other resources in the requesting State, and facilitate contact with these bodies in appropriate cases.*

*[3 - The measures which may be taken in fulfilment of the obligation under Article 7 h to take or cause to be taken an action to protect the welfare of children may include, for example:*

*a alerting the appropriate protection agencies or judicial authorities in the requesting State of the return of a child who may be in danger;*

*b advising the requested State, upon request, of the protective measures and services available in the requesting State to secure the safe return of a particular child;*

*[c providing the requested State with a report on the welfare of the child;]*

*d encouraging the use of Article 21 of the Convention to secure the effective exercise of access or visitation rights.]"*[31]

There then follows a *"Note by the Permanent Bureau"*:

*"The delegation of Italy agreed with the suggested changes regarding Conclusion 1. The Italian experts did not object to the wording of Conclusions 2 and 3. They suggested, regarding Conclusion 3, that one item be added, to provide that applications for return, should include, whenever possible, a description of the services or measures available in the requesting State for the protection of the child or the returning parent. The delegation of Austria with respect to Conclusion 2, preferred the wording suggested in Working Document No 20 to that suggested by the Canadian experts. In addition, the Austrian experts wished Conclusion 2 to specify that returning parents should be given assistance even when ex parte custody orders have been issued after the abduction and that such orders should not prejudge the final outcome of the proceedings. The experts also wished that Conclusion 3 c), be deleted and that it be clearly stated, under Conclusion 3 b, that information was only required upon request. The delegation of France, with respect to Conclusions 1 and 2, reminded the meeting that the French Central Authority could not ensure that custody proceedings would be instituted upon return, although it could commit to assist the parent in all possible ways, in particular by contacting other authorities or services. The French experts found Conclusion 3 to be too specific and would prefer it more open ended. Regarding Conclusion 3 c), it was pointed out that the French Central Authority could not provide information beyond the measures taken upon the return, for it lacked the resources needed for a long term follow-up. Other experts expressed similar concerns as those mentioned above, including those regarding Conclusions 3 b) and 3 c). Experts also wished that it be made clear that the purpose of the proposal was to protect the child and not to reward the abducting parent.*

*The square brackets around Conclusion No 3 reflect the doubts of certain experts as to whether this*

*provision should be retained and the internal square brackets around sub-paragraph c reflect particular doubt as to the acceptability of this provision."*[32]

Ms. Degeling's paper said of the 1997 Special Commission meeting result:

*"The acceptance of the resolution was important as abducting parents often raise arguments that they face harm or an intolerable situation (by which they often mean no accommodation, no financial support, no access to legal aid, domestic violence) if they return with children to foreign countries.*

*At the least, this additional responsibility requires the Central Authority for each country to provide information about services relating to social security, legal aid, emergency accommodation, or domestic violence protection which are available in the city or area to which the abducting parent is asked to return with the children.*

*In Australia it is accepted that the obligation also involves, where necessary, a Central Authority in commencing proceedings in the courts to ensure the protection of the welfare of children (eg. to enforce an undertaking by the parent who sought the return of the children to provide accommodation or financial support)."*[33]

The paper reported on pertinent developments in a number of common law jurisdictions.[34] Within this subset of contracting States, it was apparent that the "welfare on return" principle had been put into operation in a variable manner. Mr. David Harris QC, an English barrister, has suggested that the 1997 Special Commission outcome was insufficient:

*"Until the signatories to the Convention are prepared to develop an effective protocol to secure, to the optimum extent practicable, the safety and welfare of returning children, along the lines proposed by the Government of Australia, it is incumbent upon courts hearing Article 13(b) defences to asses the allegations made carefully and fairly, if necessary taking oral evidence to resolve critical factual disputes, and, in accordance with the requirements of Article 13, to refuse to order a return, where the evidence genuinely establishes a sufficient degree of risk."*[35]

This viewpoint does not, however, factor-in the scope for a court to consider whether undertakings, mirror orders and safe harbour orders can address the risks it finds in a particular case. The paper now turns to a comparison of common law jurisdictions.

## Undertakings and Conditions in the Jurisdiction Ordering Return

The English Court of Appeal decision in *Re C (A Minor)(Abduction)*[36] approved the use of undertakings and subsequently, in *Re M (Abduction: Undertakings)*,[37] Butler-Sloss LJ explained the role of undertakings and conditions as an adjunct to ordering return in the following way:

*"It is perhaps helpful to remind those engaged in Hague Convention applications about the position of undertakings or conditions attached to an Art 12 order to return. Such requirements are to make the return of the children easier and to provide for their necessities, such as a roof over the head, adequate maintenance, etc, until, and only until, the court of habitual residence can become seized of the proceedings brought in that jurisdiction...*

*This court must be careful not in any way to usurp or to be thought to usurp the functions of the court of habitual residence. Equally, the requirements made in this country must not be so elaborate that their implementation might become bogged down in protracted hearings and investigations... Undertakings have their place in the arrangements designed to smooth the return of and protect the child for the limited time before the foreign court takes over, but they must not be used by parties to try to clog or fetter, or, in particular, to delay the enforcement of a paramount decision to return the child."*[38]

In *Thomson v Thomson*,[39] La Forest J writing for the majority of the Supreme Court of Canada, said:

*"Given the preamble's statement that "the interests of children are of paramount importance", courts of other jurisdictions have deemed themselves entitled to require undertakings of the requesting party provided that such undertakings are made within the spirit of the Convention: see Re L., supra; C. v. C., supra; P. v. P. (Minors) (Child Abduction), [1992] 1 F.L.R. 155 (Eng. H.C. (Fam. Div.)); and Re A. (A Minor) (Abduction), supra. Through the use of undertakings, the requirement in Article 12 of the Convention that "the authority concerned shall order the return of the child forthwith" can be complied with, the wrongful actions of the removing party are not condoned, the long-term best interests of the child are left for a determination by the court of the child's habitual residence, and any short-term harm to the child is ameliorated."*[40]

The views of Butler-Sloss LJ in *Re C (A Minor)(Abduction)*[41] and also *Re G (A Minor) (Abduction)*[42] were relied upon by the Supreme Court of Ireland in *P v B*[43] wherein the Court endorsed the use and effectiveness of undertakings. Denham J with whom Hamilton CJ and Egan J agreed said:

*"I am satisfied that undertakings may be given by a party to proceedings under the* [Child Abduction and Enforcement of Custody Orders Act 1991] *and accepted by the court. They are entirely consistent with*

*the 1991 Act and the Hague Convention, they are for the welfare of the child during the transition from one jurisdiction to another. Undertakings may be of particular relevance to very young children.*

*Undertakings in this situation are compatible with the Act and international law which have as their objectives the desire to protect children internationally from the harmful effects of their wrongful removal from the country of their habitual residence and the establishment of procedures to ensure their prompt return to the state of their habitual residence, as well as to secure protection for rights of access.*

*Furthermore, undertakings which are for the welfare of the child are in accord with the constitutional protection of the child and its welfare.*

*Undertakings may also protect a parent in their role and in the exercise of their rights under the Constitution. Consequently I am satisfied that undertakings may be accepted in cases under the 1991 Act."*

As to the breadth of the undertakings accepted in the Court below,[44] it was held:

*"... the conditions as to accommodation and maintenance as identified by the learned trial judge are reasonable. However, in addressing the long term education, maintenance of the child, and bi-annual visits by the child to Ireland, the learned trial judge considered matters more appropriately determined in the Spanish courts."*

In the Scottish courts, the question of the circumstances in which undertakings would be ordered was raised in *Whitley, Petitioner*[45]. Their Lordships considered that they did not need to decide the issue because, in the result, they concurred with the view of the Lord Ordinary that no grave risk exception had been made out and *"[n]o question of offering undertakings was in fact raised before us."*[46] The recent first instance case of *D.I. Petitioner*[47] did not clarify the issue as the left-behind father had "*offered certain undertakings*". Lord Abernethy said:

*"... they were not essential for my decision as to whether the terms of Article 13(b) had been met. Nevertheless they were offered and I think it would be appropriate to record them in the Minute of Proceedings in words which appropriately reflect the terms, both express and implied, of what was offered."*[48]

In August 1995 the United States Central Authority (the Department of State) expressed the following opinion:

*"1. While undertakings are not necessary to operation of the Convention, there are good arguments that*

*their use can be consistent with the Convention. Undertakings are most cleanly consistent with the Convention where they facilitate Article 12's objective of ensuring the return of abducted children "forthwith;" minimize the use of non-return orders based on Article 13; and do not undercut the provisions of Articles 16 and 19, which clearly contemplate that return proceedings under the Convention should be jurisdictional and that substantive issues relating to custody, including maintenance, should be left to the court in the child's place of habitual residence.*

*2. As a corollary to the above, undertakings should be limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that that jurisdiction can resolve the custody dispute. Undertakings that do more than this would appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance."*[49]

In the same month, judgment was delivered by United States Court of Appeals, Third Circuit in *Feder v. Evans – Feder*[50]. The Court approved the use of undertakings in the following remarks:

*"We also note that in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon "undertakings" from the petitioning parent. Thomson v. Thomson, 119 D.L.R.4th 253 (Can.Sup. 1994). The district court, on its own initiative, heard testimony about the undertakings Mr. Feder was willing to make in the event that Evan returned to Australia and was not accompanied by Mrs. Feder. Given its denial of Mr. Feder's petition, however, the court did not assess the need for or the adequacy of those undertakings. If on remand the court decides that Evan's return is in order, but determines that Mrs. Feder has shown that an unqualified return order would be detrimental to Evan, the court should investigate the adequacy of the undertakings from Mr. Feder to ensure that Evan does not suffer shortterm harm. See Re O, 2 FLR 349 (U.K.Fam. 1994) (exacting appropriate undertakings is legitimate in Convention cases)."*

In the decision of *Walsh v. Walsh*[51] delivered on 25 July 2000, the United States Court of Appeals for the First Circuit reversed an order for return of the parties children to Ireland. The United States District Court for the State of Massachusetts had ordered return subject to the father's undertakings. The Court of Appeals held that the father would violate the undertakings he had given and that as a consequence the children would remain at grave risk if returned. The Court reviewed the role and limitations of undertakings as follows:

*"A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings. Necessarily, the "grave risk" exception considers, inter alia, where and how a child is to be returned. n13 The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual*

*residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction. Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm. See, e.g., Blondin v. Dubois, 189 F.3d 240, 248 (2d Cir. 1999) (Blondin II); Turner v. Frowein, 253 Conn. 312, 752 A.2d 955 (Conn. 2000); Thomson v. Thomson [1994] 3 S.C.R. 551, 599 (Can.); P. v. B. [1994] 3 I.R. 507, 521 [\*38] (Ir. S. C.). See generally Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 156-72 (1999).*

*A good example of this approach is the Second Circuit's recent decision in Blondin II. The district court had denied the father's petition to return the children to France because the mother had established that returning the children to their father's custody would pose a grave risk of harm. See Blondin v. Dubois, 19 F. Supp. 2d 123, 127-29 (S.D.N.Y. 1998) (Blondin I). The Court of Appeals vacated the district court's judgment and remanded the case to allow the [\*39] district court to consider "remedies that would allow the children's safety to be protected [in France] pending a final adjudication of custody." Blondin II, 189 F.3d at 250.*

*Yet, there may be times when there is no way to return a child, even with undertakings, without exposing him or her to grave risk. Thus, on remand in Blondin, the district court found that the "return of [the children] to France, under any arrangement, would present a 'grave risk'" because "removal ... from their presently secure environment would interfere with their recovery from the trauma they suffered in France; ... returning them to France, where they would encounter the uncertainties and pressures of custody proceedings, would cause them psychological harm; and ... [one of the children] objects to being returned to France." Blondin v. Dubois, 78 F. Supp. 2d 283, 294 (S.D.N.Y. 2000) (Blondin III), appeal filed, No. 00-6066 (2d Cir. Jan. 20, 2000) (emphasis added)."*

In the New Zealand Court of Appeal decision *A v Central Authority for New Zealand*,[52] Doogue J said for the Court:

*"Consideration was given in the course of argument as to whether a Court had power to attach conditions to any order made by it. It seems reasonably clear there can be no power to attach conditions to an order under s 12 in the absence of a finding in favour of a defence under s 13. On the other hand, if such a defence has been made out and the Court is concerned solely with the exercise of his discretion under s 13 of the Act, then it may be possible that conditions could be attached, unless the statutory provisions dealing with conditions in the Act, ss 26, 27 and 28 imply no authority for the imposition of other conditions. See H v H (1995) 12 FRNZ 498. Nevertheless, as has already been stressed in this judgment, it is not the role of a New Zealand Court to interfere with the functions and responsibilities of the relevant Central Authorities and the courts of another jurisdiction. It would be an unusual case which might give rise to the consideration of conditions. No finding is made on this issue."*[53]

When Kay J decided *McOwan and McOwan* in December 1993,[54] his Honour doubted whether there was any express provision in the Hague Convention which would enable a court to require the provision of an undertaking before ordering the return of a child. An express domestic basis was purportedly provided in 1995 when the Regulations were amended to include reg 15(1)(c). Sub-section (1) now reads:

*"15 (1) If a court is satisfied that it is desirable to do so, the court may, in relation to an application made under regulation 14:*

*(a) make an order of a kind mentioned in that regulation; and*

*(b) make any other order that the court considers to be appropriate to give effect to the Convention; and*

*(c) include in an order to which paragraph (a) or (b) applies a condition that the court considers to be appropriate to give effect to the Convention."*[55]

In *De L v Director General, NSW Department of Community Services*[56] the majority of the High Court of Australia remarked on the amended form of reg 15(1):

*"... the effect of reg 15(1) is to provide that, in making an order in relation to the return of a child from Australia, the court may include in its order a condition the court considers appropriate to give effect to the Convention.*

*...*

*It is impossible to identify any specific and detailed criteria which govern the exercise of the power whereby the Court may impose such conditions on the removal of the child 'as the Court considers to be appropriate to give effect to the Convention'. Many of the criteria which may be applicable in a particular case are illustrated in the above passages from the Canadian and English decisions. The basic proposition is that, like other discretionary powers given in such terms, the Court has to exercise discretion judicially, having regard to the subject-matter, scope and purpose of the Regulations."*[57]

Prior to *De L v Director General, NSW Department of Community Services*,[58] the Full Court of the Family Court of Australia in *Police Commissioner of South Australia v Temple (No 2)*[59] held that the undertakings to the Court imposed by Murray J on a father seeking the return of a child to England exceeded what was required. There had not been a finding at first instance that the "grave risk" defence was

made out.[60] The Full Court ordered the child's return subject to more limited undertakings to be made to an English court. Strauss J (with whom Baker and Butler JJ agreed) held that

*"... Regulation 15(3) does not enable the Court to place conditions on the return of the child. It merely enables the Court to place conditions on the temporary removal of the child from one place to another before the return of the child is ordered."*[61]

More recently in *Townsend v Director-General, Department of Families, Youth and Community Care*,[62] Warnick J had ordered that two children brought to Australia by their mother be returned to their father in the United States for custody proceedings to take place in that jurisdiction. The mother had failed to make out a grave risk exception to the requirement to order return. On appeal, she contended *inter alia* that the trial Judge erred in requiring the father to make undertakings rather than the Court imposing conditions.[63] The Full Court of the Family Court of Australia held that the determination of whether to require undertakings or impose conditions was a matter of discretion. The Court said:

*"... in our view it was a matter for his Honour to consider which conditions if any he thought it proper to impose, or what undertakings to require, and we are not persuaded that he fell into error. In particular, in the absence of evidence as to United States law and practice on the matter, we see no reason to assume that the undertakings required by his Honour would be less effective in carrying out the intent of the Convention than orders expressed as conditions."*[64]

It thus seems that under Australian and the other common law jurisprudence reviewed above, court-imposed conditions and undertakings must be purposefully related to the Convention's objects of facilitating return of the child. A finding of "grave risk" by the Australian court ordering return is not however necessary, a position that appears to accord with the caselaw in Ireland, Scotland and Canada but not with the more strict approach taken by the New Zealand Court of Appeal; *quaere* the United States.

## Orders and Undertakings in the Jurisdiction to which the Child is Returned

In *McOwan and McOwan*,[65] Kay J observed :

*"If undertakings are to be given it is important to make sure they can be enforced. There does not appear to be any existing mechanism by which the Court that extracts the undertaking can ensure that it is complied with. There does not appear to be any legal basis upon which the court of the State in which the*

*child has been returned, can require compliance with an undertaking given to another Court."*[66]

Writing *extra curially*, his Honour suggested:

*"One way to avoid this difficulty is for undertakings to be lodged in both the Court hearing the Convention application and a proper Court in the jurisdiction to which the child is to be returned in order to overcome enforcement difficulties. .... In Re S (Child Abduction: Acquiescence) [1998] 2 FLR 893, Sir Stephen Brown P recorded undertakings given by an American father to the English court to not harass the mother and to agree to a de novo custody hearing in California. He ordered that a copy of his reasons for judgment including those undertakings be provided to the Californian court."*[67]

A "mirror" approach in framing orders for return also finds favour with the English Court of Appeal. In *Re RB (Abduction: Children's Objections),*[68] Thorpe LJ (with whom Butler Sloss LJ agreed) said:

*"Once the primary jurisdiction is established then mirror orders in the other and the effective use of the Convention gives the opportunity for collaborative judicial function."*[69]

*In the Matter of EP (An Infant); P v P,*[70] an unreported judgment of McGuinness J in the High Court of Ireland,[71] illustrates the difficulties that can arise with undertakings where a child is returned pursuant to the Convention. In this case, return was to a civil law jurisdiction, Italy, and her Honour noted of the difficulty associated with undertakings in the instant case that *"[i]t may well be that this also applies to many non common law jurisdictions."*

McGuinness J was there determining an application to return a child brought unlawfully by her mother from Italy to Ireland. In circumstances where she was satisfied that the child and mother *"had an extremely close relationship"*, her Honour was most concerned that an interim custody order granted by an Italian court would separate them *"for an indefinite and lengthy period, and without possibility of appeal"*. McGuinness J was advised at the conclusion of the hearing that the Italian court had varied its interim custody order and granted custody to the mother. Her Honour gave judgment on 12 February 1997 and ordered the return of the child subject to undertakings by both parents to the High Court of Ireland.

After the child's return, the father failed to abide by his undertakings and further, on 4 March 1997, the Italian court removed the child from the custody of both

parents and placed her in an institution, with minimal access to her mother and father. This Order was apparently based on a report from the Social Services.[72] Enquiries from the Irish Central Authority to the Italian Central Authority received in July 1997 and placed before her Honour in further proceedings were said to show that: -

- The Irish High Court Order was brought to the attention of the Italian Court on 23 April, 1997 and the translation of the above Order was forwarded to it on May 5, 1997.
- In order to enforce the obligations of the parties pursuant to the Irish Order, the Italian Court has to recognise the legal enforceability of the Order in Italy. Such recognition (exequatur) must be applied for by legitimately concerned people.
- The Italian procedural law provides for the parties to undertake obligations which are defined in the "Conciliation Report", which is self-executing (Article 185 Code of Civil Procedure).

McGuinness J said of this information:

*"It is not clear from these replies whether the common law concept that a party may give undertakings to the Court and that the failure to abide by such undertakings constitutes a contempt of Court is a normal part of the Italian legal code. It may well be that this also applies to many other non common law jurisdictions. In the instant case an additional complication is that the content of the Order of this Court made on the 12 February, 1997 was not conveyed to the Italian Court until the 23 April, 1997 and even then not translated until the 5 May, 1997. The child E had already been removed from the custody of her mother on the 5 March, 1997. Clearly this Court cannot know the reasons for the lengthy delay in conveying the content of the Order of 12 February, 1997 to the Italian Court and of having it translated. Nor can it know whether any attempt was made by the legal representatives of the mother to have the Order legally enforced in Italy. The answer given by the Central Authority for Italy does not in fact make it clear whether it is the Order itself which may be recognised as enforceable or whether the undertakings as apart from the Order may be recognised as enforceable. Unfortunately it appears to me that the situation is now such that there is no useful further action that this Court can take in the matter."*[73]

Her Honour then considered and concurred with the views expressed by Singer J of the Family Division of the High Court of Justice in *Re O (Child Abduction: Undertakings)* [1994] 2 FLR 349. Singer J had said *inter alia*:

*"In a case where the Court finds, as I have here, that an Article 13(b) grave risk would be established unless alleviated by undertakings offered or required, and honoured or enforced, it is reasonable . . . for this Court to consider whether the undertakings will be adequately enforceable in the requesting State.*

*The best practice where such issues arise would be for general information concerning its available processes of enforcement of undertakings to be requested from the Central Authority of the home State pursuant to the provisions of Article 7(e), and consistent with the relaxation upon the reception of evidence as the foreign law which Article 14 provides. However if as here, sufficient information cannot be derived from that source then it may well be necessary to direct the parties to file expert evidence in the more conventional manner*

*If in relation to any particular Contracting State that process revealed the absence of machinery adequate to give backing to undertakings the observance of which the English Court relied upon to relieve the children of risk of an intolerable situation, then it would be relevant to consider whether the parent proffering the undertakings genuinely intended to honour them."*

Singer J had suggested:

*"... there may be some scope for developing probably on a bi-lateral basis at least to start with, communication and discussion between Central Authorities so that each may have the opportunity of explaining and, it may be, justifying the approach their domestic Courts take to issues which commonly arise in Convention cases. Such an issue may well be these Courts use of undertakings designed to smooth the speedy passage home and to the door of the proper Court of children who should never have been taken from its jurisdiction. By such discussions and the exchange of views and information it may be that comity would be strengthened, and an understanding achieved that neither country wishes to cause any offence to the Courts of the other, nor to seek to interfere with or to influence what that Court then does.*

*Moreover, it may well be that if such opportunity for the exchange of views does assist to promote co-operation, it should be possible in an appropriate case for the Central Authority of the requested State to liaise with its counterpart in the requesting State to put in place measures agreed by the parties or reasonably required as a proper pre-condition of return."*

It will be recalled that in *Police Commissioner of South Australia v Temple (No 2)*[74] the Full Court of the Family Court of Australia required undertakings to be lodged only in the jurisdiction to which the child was being returned. The more recent first instance Family Court of Australia decision by Lindenmayer J in *Director-General Department of Families, Youth and Hobbs*[75] is the only reported illustration of the use of mirror orders by an Australian court in ordering the return of a child under the Convention. The father, who had initiated the Convention proceedings in respect of his daughter, was permitted by his Honour to file an affidavit that contained a range of undertakings as to:-

- The father not instituting or supporting any criminal or civil charges associated with the removal;
- The father withdrawing pending charges;
- The father paying the costs of the child's return airfare;
- The child remaining in the care of the respondent mother, should she accompany the child back to the Republic of South Africa until the High Court of South Africa directs otherwise or alternatively that he would personally accompany the child on the return trip and would care for the child until otherwise directed.
- The father instituting proceedings in respect of the child within 48 hours of return and pending such proceedings, the respective right of the parents to be governed by their prior settlement agreement; and
- The father obtaining and paying for private educational tuition for the child to maintain her current standard.

The father deposed that he consented to those undertakings being incorporated into "mirror orders" to be granted by both the Family Court of Australia and the High Court of South Africa. Lindenmayer J made orders for the return of the child which would become operative *"conditional upon"* the father first filing the undertakings in the South African court and then filing in the Family Court of Australia an affidavit attesting to his having done so.[76] The child was in fact returned, however, as discussed below, such orders did not secure the co-operation of the mother in the process.

The United States Department of State has suggested that:

*"We also should not lose sight of the fact that there may be other ways to accomplish the objectives of proposed undertakings. For example, it might be possible for the parties to propose a consent order to the appropriate U.S. court prior to entry of the return order in the United Kingdom. In this connection, you may be interested to know that the private bar in the United States occasionally seeks to facilitate the return of children abducted from the United States by having the left-behind parent seek entry, by the appropriate U.S. court, of an order addressing interim issues of custody and support. We understand that private lawyers sometimes recommend use of these orders, which they call "safe-harbor" orders, in cases where the foreign court may be reluctant to return a child to the United States unless such issues are addressed in some fashion. Where a Safe-harbor order has been entered in the United States, there may be no reason for a foreign court even to consider entering undertakings as part of a basic return order."[77]*

Notably, particularly in light of *Director-General Department of Families, Youth and Hobbs*,[78] the Department has expressed the view that it:

*"does not support conditioning the issuance of a return order on the acquisition of a safeharbor order*

*from a court in the requesting state."*[79]

## Anticipatory Mirror Orders

In addition to their use as an adjunct to orders for the return of children pursuant to the Convention, mirror orders have featured in reported caselaw as a mechanism for improving the likelihood that children lawfully taken overseas will be returned if there is then a dispute as to return.

In the English Court of Appeal decision of *Re K (Child)*,[80] Thorpe LJ with whom Sir Oliver Poppelwell agreed, referred to their potential utility where the child was taken to a non-Convention location:

*"Although not a signatory to The Hague Convention on the Civil Aspects of International Child Abduction, Bangladesh of course has a fully-developed legal system. But within that legal system, the interpretation of child welfare will inevitably and properly be reflective of the culture, traditions and institutions of the state. It does not follow that if the issue of J's future were to be determined by a court in that state, following a breach of the contact, that the mother's relationship with J or the importance of his rooting within this society would receive the same evaluation as in this legal system. That is not to criticise the system of law in Bangladesh, but simply to notice its necessary difference.*

*Accordingly, it seems to me that to preclude the possibility of competitive litigation within two systems, reflecting different traditions and cultures, it is desirable to confine the risk of competitive litigation by putting in place, wherever possible, whatever buttresses can be devised for the primary adjudication in this jurisdiction. It seems to me that the appearance within the Family Law Reports of the cases of re T and re A whatever may have provoked that appearance, is useful as offering to practitioners a precedent for the sort of mechanisms appropriate where the friendly foreign jurisdiction roots its family justice system in Islamic law.*

*There is obviously in this case the possibility of notarised agreements. There is the possibility of mirror orders."*[81]

Subsequently in *Re P (A Child : Mirror Orders)*,[82] Singer J in the Family Division of the High Court of Justice dealt with a case where a United States court had refused an application pursuant to the Convention to return a child removed by the mother. The Orange County Family Court made an order regulating rights of contact between the child and the father who was living in England and lacking a right of entry into the United States. The order provided that the mother was to bring the child to England each October for one week, so that the father could have contact with the child for 4 hours a day on 5 consecutive days. Those terms were agreed

between the parties and the United States Court expressly stated that it was to be entered as a mirror order in the Family Division. The father's English lawyers were to provide the mother's representatives and the court in the USA with copies of the mirror order made by the English court prior to the arrival of the child in England.

The primary question before Singer J was whether the making of a mirror order was consistent with the Court's powers and jurisdiction given that the child was neither habitually resident in England nor present in England on that date.[83] In the course of finding that he could and should make the order sought, his Honour observed:

*"As it happens, for some years now, more often of course in unreported but not infrequently in reported cases, Family Division judges and judges of the Court of Appeal have advocated in appropriate cases that the parties before them, where contact or a move to live abroad is in contemplation, should provide precisely that form of cordon sanitaire in that foreign jurisdiction which in this case the parties would seek to create here for their child.*

*Thus, England's judges have invited parties to go off and get mirror orders or their non-common law equivalents in Chile, Canada, Denmark, the Sudan, Bangladesh, Egypt and even in Saudi Arabia."*[84]

*"Then there is the category of case, of which this one is typical, where a foreign court is making provision for contact to take place in another jurisdiction, in this case England. In that category of case it is important that there should be the possibility for orders to be made in advance of and against the arrival of the child so that the parties and the foreign court may have confidence that if either of them seeks to take advantage of the presence of the child in the contact jurisdiction, the court there will not lend itself to any such attempt.*

*The classic anxiety is of course that, the child having come for contact with the parent in England for a limited period, the parent in England either attempts to remove the child to a third country and to keep the child there, or refuses at the end of the contact to allow the child to return to his country of residence. Armed with a consent order already made in the English jurisdiction, an English judge would virtually inevitably order return first and investigation of the merits in the residence jurisdiction."*[85]

It is convenient to note here that legislation may provide for the recognition of orders as between certain jurisdictions thereby creating another avenue for mirror orders to be established by registration.[86] In respect of registration in Australia, New Zealand and a number of States in the United States of America is each a *"prescribed overseas jurisdiction"*. No other common law jurisdictions are prescribed. A key limitation with respect to prescribed jurisdictions, however, is that the Australian provisions for registration do not apply to interim or *ex parte*

orders.[87]

Where an overseas child order is registered in an Australian court,[88] it is enforceable until registration is cancelled[89] and *"has the same force and effect as if it were an order made by that court under this Part."*[90]. Registration of an overseas order in Australia avoids the need for compliance with ss69C and 69E of the *Family Law Act* (Cth) 1975,[91] but in any event these sections are broadly framed and s69E (1)(e) would appear to avoid the difficulties seen in *Re P (A Child : Mirror Orders)*.[92]

## Matters for Continuing Attention

A *"cohesive approach by common law jurisdictions"* is seen as desirable in the treatment of Hague Convention matters generally and the enforcement of undertakings in particular.[93] It would seem that among common law jurisdictions, there are differences and points on which there is no express judicial agreement concerning aspects of when and how the discretion available under the Convention is to be exercised in furtherance of achieving the safe return of children. Some of the issues that warrant further consideration are as follows:-

1. How can contracting States to the Convention and common law jurisdictions in particular, best contribute to giving effect to the 1997 resolution? Would fuller, more specific and widely promoted implementation of the 1997 resolution concerning Article 7(h) minimise the need for undertakings, mirror orders or safe harbour orders?

2. Is it sufficient that the 1997 resolution would seem to be accepted as giving rise to a responsibility upon Central Authorities *"to provide information about services relating to social security, legal aid, emergency accommodation, or domestic violence protection"*? Where sworn/affirmed evidence has alleged child or partner abuse as a defence to return, should there not be an automatic obligation upon the Central Authority to where the child is returned to convey that evidence to the appropriate child protection and/or criminal investigation authorities?

3. Difficulties have been observed in seeking to use the mechanisms of undertakings, mirror orders or safe harbour orders in non-common law jurisdictions. How should these be addressed?

4. What approach should be adopted to give effect to Singer J's suggestion in *Re O (Child Abduction: Undertakings)* that *"in the absence of machinery adequate to give backing to undertakings the observance of which the English Court relied upon to relieve the children of risk of an intolerable situation, then it would be relevant to consider whether the parent proffering the undertakings genuinely intended to honour them."*

5. Is it consistent with the Convention for courts to:-

- seek or accept undertakings, mirror orders or safe harbour orders where none of the "grave risk" exceptions are found to be made out; and
- order "conditional return"?

Should different considerations apply where a consent order is proposed?

6. What benefits, if any, are seen in the use of anticipatory mirror orders and reciprocal registration provisions *vis a vis* contracting States to the Convention? To what extent would there be cost savings or expedition of an application to return a child if such an order existed?

## B. Criminal Proceedings Against the Taking Parent

## Introduction

The wrongful removal or retention of a child across international boundaries has both civil and criminal consequences. The civil aspects are well documented. The debate in relation to criminal penalties for parental child abduction is more controversial and in Australia was the subject of a recent report by the Family Law Council.[94]

Under Australian law, parental child abduction is not a criminal offence. However, some activities associated with the wrongful removal or retention may be criminal in nature while other activities may attract a sanction which, while not strictly criminal, may be punitive in nature and can include imprisonment.

## A Survey of the Law in Australia

Section 65Y of the *Family Law Act* 1975 (Cth) provides that where a parenting order is current, a party to the proceedings that resulted in the making of that order must not intentionally or recklessly take or send, or attempt to take or send the child from Australia. The section also extends its reach to other persons who may conspire with the parent to take or send the child from Australia.

Section 65Z is a companion provision which enacts a similar prohibition where there are proceedings pending for the making of a parenting order, rather than completed proceedings as is required under s65Y. Both sections carry a maximum penalty of 3 years imprisonment.

In addition to ss65Y and 65Z, there are obligations placed upon owners and operators of aircraft or vessels (train travel out of Australia not being possible!),

preventing the departure of the aircraft or vessel where it is believed, evidenced by statutory declaration, that the aircraft or vessel may be used to convey the child wrongfully out of Australia.[95] The penalty attached to both these sections is expressed as a monetary penalty being 60 penalty units.[96]

There are 2 exceptions to the prohibition in ss65Y and 65Z as well as the prohibitions placed on owners and operators of aircraft and vessels under ss65ZA and 65ZB. First, where there is consent in writing by the parties to the parenting order that the child may leave Australia, an offence will not be committed. Of course, if the consent was fraudulently obtained, the consent will be void. Secondly, where there is a court order under the *Family Law Act* 1975 (Cth) or under the law of a State or Territory providing that the child may leave Australia, there will be no offence under the relevant section.

## Other Relevant Provisions

Section 112AP of the *Family Law Act* 1975 (Cth) gives to courts exercising jurisdiction under the Family Law Act a general power to punish for contempt of court.[97] The Family Court of Australia has no inherent power to punish for contempt it being a court created by statute.[98] However, the wording of s112AP implies that the general law of contempt applies when courts are exercising jurisdiction under the *Family Law Act* 1975 (Cth).

Where there has been a contravention of a court order, that contravention by itself is not sufficient to ground a successful action for contempt of court. It must be coupled with a finding that the contravention also involved a flagrant challenge to the authority of the court. What constitutes a flagrant challenge to the authority of the court will be determined in the context of the circumstances of the case but it must be a "notorious" or "scandalous" challenge to the court's authority. In general, a breach of a court order in civil proceedings is dealt with under the summary procedures available to the court.[99] The aim of these summary proceedings is to protect and preserve the rights of parties to those proceedings where there has been a failure to observe the terms of a court order. However, where contemptuous behaviour is involved — being the contravention coupled with the a challenge to the authority of the court, the reason for the contempt proceedings is to preserve the authority of the court. In its report on contempt, the Australian Law Reform Commission said:

*"Except in a very few cases, where overt defiance of the court is a pronounced element in the situation, it is not the judge or the court that the law is protecting, but the successful party. Therefore, the Commission recommends that the summary procedure be retained as the normal means of punishing disobedience with an order made in favour of a party to civil proceedings….On the very rare occasions*

*that the conduct of the respondent in contempt proceedings arising out of disobedience amounts to a flagrant challenge to a court's authority it would be appropriate for the relevant court to impose punishment for the disobedience. In such a case the focus of the relevant proceedings shifts from merely upholding the rights of an aggrieved party to upholding the authority of the court."*[100]

Except in a very few cases, where overt defiance of the court is pronounced, the typical procedure for dealing with the contravention of a court order is pursuant to s112AD. It has been held that the proceedings pursuant to this part of the *Family Law Act* 1975 (Cth) is a self contained code under which the court may impose sanctions. The provisions are *"careful to avoid the language of the criminal law, and should not be regarded as part of the criminal law of the Commonwealth".*[101] Where there has been a contravention, the range of sanctions the Court may impose is as follows:-

- A sentence of imprisonment;
- A fine of not more than $6,000 for a natural person or $30,000 for a corporation;
- A recognisance;
- Sequestration of a person's property;
- Order for delivery of a document; or
- An order to compensate for contact forgone.

The standard of proof for proceedings under this Part is the civil standard, even though it may result in imprisonment. However, the degree of satisfaction that the court may require varies having regard to the gravity of the facts to be proved.[102]

## Report by the Family Law Council on Parental Child Abduction

The Family Law Council released a comprehensive report on the issue of whether parental child abduction should or should not be a criminal offence. The report canvassed the arguments in favour and against criminalisation of parental child abduction. The arguments in favour of criminalisation were as follows:-

- One of the stated aims of making parental child abduction a criminal offence is its deterrent effect. It is said that the incidence of child abduction by parents would reduce if parents acted to remove a child in the knowledge that they may face criminal proceedings;
- There is a degree of uncertainty in the present law in that parents do not fully understand the exact nature of civil proceedings. The enactment of parental child abduction as a criminal offence – being much easier to understand – would be to reduce the uncertainty;

- It is thought that where the nature of civil proceedings are understood, they are seen as being ineffective in obtaining the return of an abducted child. Criminalisation could facilitate the search process and may, as a consequence, attract the priority in police resources and the advanced procedures (eg telephone interception, listening devices) that apply in the investigation of criminal offences. Internationally the assistance of Interpol and overseas police would become available to locate abducted children. Extradition and mutual assistance procedures would also become available;
- The recovery of abducted children is extremely costly to the taxpayer. Any proposal which has a deterrent effect and which reduces costs deserves close consideration;
- There is a combined deterrent and educative effect of criminalisation. It was suggested that the deterrent effect could be **specific**, by deterring an offending parent from doing it again, or **general**, by deterring parents in general from abducting their children; and
- The offence of child abduction is also covered by the general state and territory law on abduction. Criminalisation at the federal level would bring parental child abduction into line with State laws relating to child abduction. However, the fact that a parent is involved and the *Family Law Act* 1975 (Cth) as amended by the *Family Law Reform Act* 1995 (Cth) now enables each parent to exercise powers in relation to his or her child and tends to distinguish parental child abduction from other forms of child abduction.

Some submissions received by Council strongly supported criminalisation of parental child abduction. The National Children's and Youth Law Centre (NCYLC) said in its submission:

*"The NCYLC believes that child abduction is a violation of the rights of the child and for this reason alone, abducting a child from Australia, to Australia and within Australia should be criminalised.*

*For the NCYLC the motives behind criminalisation are a mixture of punishment (for a wrong done against a child) and deterrence. In this way it is hoped that the criminalisation of parental child abduction shows parents, and those aiding parents, that they do not have a property right in a child and that taking advantage of a child's vulnerability will not be tolerated..."*[103]

An important point made in the Family Court of Australia's submission was that if it is decided to criminalise parental child abduction it will be necessary to be quite specific about what will constitute a criminal offence. The Court suggested that in Austria, France and Netherlands the offence appears to be limited to the taking of the child by a person who does not have parental responsibility for the child. In New Zealand the offence is limited to the removal of a child from the country. However, the Council noted that in other countries with legal systems comparable

to Australia, such as the USA, United Kingdom and Canada, the offence does extends to people with parental responsibility.

There are also arguments against the criminalisation of parental child abduction and the report by the Family Law Council set those arguments out in the following way: -

- The existing provisions in the *Family Law Act* 1975 (Cth) are adequate to cope with the problem;
- The effect on the child of a parent being imprisoned is a powerful argument against criminalisation. It was suggested to the Council that jailing of a parent following action by the other parent could destroy the relationship between the child and the parent taking the action which resulted in the jailing. On the other hand, it was also put to the Council that the consequences could also be educative for the child by informing their understanding of right and wrong and of responsible and irresponsible behaviour. It was thought that it would be far more serious for a child to observe patently illegal behaviour of a parent going without penalty. The Council added that if parental child abduction were to be criminalised, penalties other than imprisonment are more likely in most cases and, therefore, this argument may not be as strong as it first appears;
- The abductor, being the child's parent, has a right, or would in any event believe s/he has a right, to the care and/or control of the child and it was argued that stealing your own children is an oxymoron because it is not easy to see how one can you steal your own child;
- The consequences of an offence being "criminal" can be quite severe; for example, apart from the penalties imposed, the person acquires a criminal record and this can also affect his or her employment prospects which may affect future parenting abilities;
- In some circumstances the abductor may consider that s/he is merely correcting a wrong, such as denial of reasonable contact with the child, or is saving the child from a perceived danger, such as child abuse;
- In some cases the parent is fleeing alleged acts or threats of violence, or otherwise escaping an intolerable situation; and
- To make parental child abduction a criminal offence is an undue intrusion by the State into the domain of the family. Council notes, however, that the state has intervened in the family domain in relation to such matters as child abuse and neglect.

In recommending that parental child abduction not be criminalised, the Council was influenced by arguments that parental child abduction is not typically criminal in nature and there was no strong evidence that criminalisation had the deterrent effect it was claimed to have. The Council also felt that alternatives to

criminalisation would have a much greater likelihood of deterring abduction by parents without the negative effects associated with criminalsation.[104]

## C. PROBLEMS RELATING TO THE ENFORCEMENT OF RETURN ORDERS

## Introduction

Problems associated with the actual execution of orders requiring the return of a child to a Convention country largely divide into problems caused by the abducting parent, and those caused by the child. The majority of problems are not surprisingly, associated with the abducting parent. This section of the paper will examine some of the more common problems in physically ensuring the child is put on an aircraft destined for the targeted country. In addition, it considers some of the solutions which have been utilised by the courts of Australia and Central Authorities and legal remedies which are or may be available to ensure the child is returned as ordered.

## Legal Framework

Section 111B of the *Family Law Act* 1975 (Cth) empowers the executive government to promulgate regulations necessary to enable the performance of the obligations of Australia or to obtain for Australia, any advantage or benefit, under the Convention. Australia has implemented into domestic law, the relevant provisions of the Convention (although not in identical terms) by the *Family Law (Child Abduction Convention) Regulations.*

The types of orders for which the Central Authority can apply and those which the Court is empowered to make are set out in reg 14(1) and reg 15(1) respectively and provide as follows:

*"14(1) [Application where child removed to, or retained in, Australia: Form 2] In relation to a child who is removed from a convention country to, or retained in, Australia, the responsible Central Authority may apply to a court in accordance with Form 2 for:*

    a. *an order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention; or*

    b. *an order for the issue of a warrant for the apprehension or detention of the child authorising a person named or described in the warrant, with such assistance as is necessary and reasonable and if necessary and reasonable by force, to:*

        i. *stop, enter and search any vehicle, vessel or aircraft; or*

    ii.   *enter and search premises;*
         *if the person reasonably believes that:*

    iii.   *the child is in or on the vehicle, vessel, aircraft or premises, as the case may be; and*

    iv.   *the entry and search is made in circumstances of such seriousness or urgency as to justify search and entry under the warrant; or*

c.  *an order directing that the child not to be removed from a place specified in the order and that members of the Australian Federal Police are to prevent removal of the child from that place; or*

d.  *an order requiring such arrangements to be made as are necessary for the purpose of placing the child with an appropriate person, institution or other body to secure the welfare of the child pending the determination of an application under regulation 13; or*

e.  *any other order that the responsible Central Authority considers to be appropriate to give effect to the Convention."*

> ***"15(1) [Orders in relation to reg 14 application]*** *If a court is satisfied that it is desirable to do so, the court may, in relation to an application made under regulation 14:*
>
>   a.  *make an order of a kind mentioned in that regulation; and*
>
>   b.  *make any other order that the court considers to be appropriate to give effect to the Convention; and*
>
>   c.  *(c) include in an order to which paragraph (a) or (b) applies a condition that the court considers to be appropriate to give effect to the Convention."*

Regulation 20 deals specifically with the responsibilities of a Central Authority following the making of a return order and provides as follows:

***"20(1) [Arrangements by Central Authority]*** *Where an order is made under regulation 16,*[105] *the responsible Central Authority shall cause such arrangements as are necessary to be made in accordance with the order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention."*

***"20(2) [No notification that order stayed]*** *If, within 7 days after the making of an order under regulation 16, the responsible Central Authority has not been notified that the order has been stayed in accordance with subrule 1(10) of Order 32 of the Rules of Court, the child shall be returned to the country in which he or she habitually resided immediately before his or her removal or retention."*

It can be seen that the regulations are framed broadly enough to include the Central Authority seeking, in appropriate cases, the making of *"any other order that the Court considers appropriate to give effect to the Convention".*[106] Both the

Preamble and Article 1 of the Convention emphasise that the purpose and objects of the Convention are to secure the prompt return of children wrongfully removed to or retained in any contracting state.[107] Article 7(h) provides:

*"Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.*

*In particular, either directly or through any intermediary, they shall take all appropriate measures –*

*....*

    h.  *to provide such administrative arrangements as may be necessary and appropriate to* **secure** *the* **safe** *return of the child." (emphasis added)*

## Taking the Child from the Abducting Parent

The Full Court of the Family Court of Australia highlighted the importance of making appropriate orders to secure the child following an order for return, in the case of *DM v Director-General, Department of Community Services.*[108] The proceedings involved a child of almost 17 months of age who had been brought to Australia by her father on 14 April 1998. Both the mother and father who resided in the Republic of Macedonia had taken steps to immigrate to Australia. However the requesting applicant mother alleged that the parties had separated on 9 March 1998, after which she had the full-time care of the child and the father had access. She alleged that on 12 April 1998 the father told her he was taking the child for a walk but failed to return. The father alleged that he and the mother had not separated when he arrived in Australia with the child.

The father unsuccessfully defended the application at first instance (both initially before a Judicial Registrar, and then on a re-hearing before a Judge of the Family Court of Australia) and lodged an appeal to the Full Court of the Family Court of Australia. At the hearing before the Full Court, the father sought an adjournment based on medical grounds, arguing first he was unwell on the day of the hearing, and secondly that he had had insufficient time to prepare his case. The adjournment was refused and the father announced he felt sick and was unable to present arguments in relation to continuing the appeal.

What then occurred is recorded in the judgment of Nicholson CJ in relation to obtaining a warrant for the placement of the child in the care of the applicant State

Central Authority (who in this case was also the organisation charged with the welfare of children within the State of New South Wales):

*"I have little doubt that what the father was doing, was seeking to avoid the Court dealing with this matter, and putting the matter off as long as possible. When he adopted that course, I asked the responsible authority whether they wished to make an application as to the disposition of the child. Mrs Flohm, for the authority, indicated that, although the authority had hitherto been reluctant to make such an application, she felt that in the circumstances she ought to make it, and the application was made. The basis of the application is undoubtedly a concern that, since the father was, on the departmental case at least, prepared to abduct the child from its mother in the former Yugoslav Republic of Macedonia, that there was a real risk that if he saw these proceedings as running against him, that he may take similar steps in relation to the child in Australia, to either remove the child from its present address and remove it to other parts of Australia, or elsewhere.*

*Speaking for myself, I think that there is a significant risk of this happening. I propose, in view of the father's attitude, as I indicated to him, to continue to deal with the appeal today, and if he is unable to advance any further material before the Court we will take into account the arguments that are contained in the appeal book and in the material that he has already advanced, and we will consider the appeal on that basis. In order, however, to protect the child from the possibility of removal from its present address, it seems to me that the only appropriate and proper course that this court should take is to order that, until further order, an order be made in terms of paragraph two of the application of the Central Authority."*

Kay J, agreeing with the Chief Justice's reasoning, also added:

*"The only thing I add is that in the father's own material he indicates:*

*"I was waiting for 37 years of my life for this baby to be born, and I was not going to give up on her at any cost."*

I perceive there to be a real risk that any order that we make, if the appeal is dismissed, could be defeated by the actions of the father."

The case illustrates the necessity for both the Central Authority and the Court to be vigilant in ensuring that if there is a significant risk, based upon the past conduct of the abducting parent, he/she will attempt to hide the child from the Central Authority to defeat the return order, the Court will make orders which will place the child in the care of the Central Authority, or perhaps in appropriate cases a neutral third party to care for the child pending his/her return to the contracting State. It is

significant to note that the Full Court was not deterred in this course by the very young age of the child and that the child had not been placed in the care of the Applicant State Central Authority upon the original filing of the application and the father had not attempted to go into hiding immediately upon becoming aware of the application, but had sought to oppose it in the Courts. Whilst not common, there are examples where a parent having lost an appeal against a return order has gone into hiding.[109]

The above case illustrates what might be regarded as the strongest of enforcement options available to the Central Authority and the Court in ensuring that the child is returned as ordered.

Orders such as that made in *DM v Director-General, Department of Community Services*[110] are comparatively rare. In the majority of cases, injunctions are placed upon the Respondent confining where the Respondent and the child are to reside pending the return of the child; with the Central Authority to put in place appropriate monitoring to ensure the parent and child remain at that location. A position halfway between these two options, although seldom used if at all, would be to require the abducting person and the child to reside with a neutral third party until the child is returned.

## Lack of Co-operation by the Abducting Parent

Most of the problems encountered in enforcing the order for return are related to the abducting parent failing to co-operate with the Central Authority in making arrangements for the safe return of the child, perhaps in the vain hope that the Central Authority's resolve will be weakened toward pursuing a return, or to gain a minor victory by stretching out the period before which the child has to be returned as long as possible. The following may be regarding as typical examples of this kind of problem; where the abducting parent: -

i.   refuses to hand over documentation necessary to ensure the child can leave Australia and safely re-enter the other contracting State or to sign fresh documentation which may be required for that purpose;
ii.  refuses to share information about arrangements which he/she is making for the return of the child to the contracting State, often wrongly believing that this is not anybody's business but his/hers;
iii. insists upon a date for a return some distance from the order for return date relying upon varying reasons normally associated with the convenience of the abducting parent and/or the welfare of the child;
iv.  disagrees with every conceivable aspect of the mechanics of the return proposed by the Central Authority i.e. matters such as who will pay for the

airline tickets and make the bookings, choice of airline, route to be taken by the airline, etc.

## Some Solutions

Obviously every case is unique, however the following represent examples of ways in which the Central Authorities of Australia have sought to overcome difficulties in enforcement resulting from a lack of co-operation.

### (i) Seeking a Detailed Order for Return

By the time the application has been made and determined, the Central Authority is usually in a good position to assess the likely level of co-operation which will be received from the abducting parent in the event of a return order. Where it can reasonably be expected that the Central Authority will receive no assistance in arranging the return of the child, an order for return can provide a series of subsidiary orders to give effect to the order for return. Such subsidiary orders could include:-

   i.  an order that the passports, which routinely are surrendered to the Court pending determination of the application,[111] be collected by the Central Authority, rather than the abducting parent, who will hold the child's passport until the child arrives at the airport to board the necessary flight;

   ii.  an order directing that the abducting parent sign specified, or all necessary, documentation to allow the child to safely and lawfully leave the Commonwealth of Australia and re-enter the other contracting State, together with a default provision that in the event the applicant fails or refuses to sign such documentation, the Registrar is appointed to sign that documentation in place of the abducting parent;

   iii.  a mandatory injunction requiring the abducting parent to contact the Central Authority on a regular basis pending return i.e. a reporting condition;

   iv.  a specific time by which the child must be returned to the contracting country;

   v.  a specific liberty to the Central Authority to return to Court to obtain further subsidiary orders in order to assist the Central Authority carry out its obligation to effect the return of the child pursuant to the Convention Regulations, in order to avoid any argument that there is no such power to do so upon the basis that the Court's power is spent and be prepared to return to Court where necessary;

   vi.  an order requiring the abducting parent to enter into a form of recognisance or bond, forfeitable in the event that the child is not returned to the contracting State in accordance with the order.

## (ii) Utilising Sanctions for Breach of Orders

The Family Court of Australia, has, by statute, the same power to punish for contempts of its power and authority, as is possessed by the High Court of Australia in respect of contempts of the High Court.[112] There is a further statutory provision empowering Courts exercising jurisdiction under the *Family Law Act* 1975 (Cth)[113] to punish for contempt where it constitutes a contravention of an order made under the *Family Law Act* 1975 (Cth) and involves a flagrant challenge to the authority of the Court (commonly referred to as criminal contempt) or does not constitute a contravention of an order under the *Family Law Act* 1975 (Cth).[114]

In addition, there is a statutory power to impose sanctions where a Court is satisfied a person has, without reasonable excuse, contravened an order made under the *Family Law Act* 1975 (Cth) (commonly referred to as civil contempt).[115] As mentioned earlier in this paper, orders for return in Hague cases are made pursuant to powers to order a return contained in the *Family Law (Child Abduction Convention) Regulations* rather than the *Family Law Act* 1975 (Cth). The term "order under this Act" includes "an order (however described) made by the Court under this Act".[116] In turn, the words "this Act" are defined in the Act[117] to include "the Regulations". Accordingly, it appears that the section is applicable to orders made under the *Family Law (Child Abduction Convention) Regulations*. The Court must be satisfied that the person breaching the order did so without reasonable excuse. When a breach is established, the Court is specifically empowered to make *"such orders or other orders as the Court considers necessary to ensure compliance with the order that was contravened"*.[118]

Where the only order which the Court makes is an order requiring that the child be returned to a contracting state, it may be open to argument whether it could be said that the actions of the abducting parent had "contravened" the order. It would depend upon the nature of the action by the parent and how direct such action is in preventing the child from being returned. In the case of taking the child into hiding, it may be arguable that the direct effect is to stop compliance with the order. It may be open to greater debate if the actions of the abducting parent have the practicable effect of frustrating the order rather than directly contravening it. However, where the subsidiary order supporting the return order specifically requires the abducting parent to do or refrain from doing things necessary to effect the return of the child, then a case of contravention is more easily made out.

## (iii) Negotiations/Counselling

In Australia, many of the designated State Central Authorities are also the agencies

charged with administering the child welfare legislation in force within the various States and Territories which comprise the Commonwealth of Australia. Within those agencies, there resides significant expertise in the areas of child welfare, counselling and working with what could generally be termed, difficult parents. Often, parents who are initially difficult can be persuaded to accept the Court's decision and not work actively to frustrate it after counselling sessions with a social worker and/or a psychologist. Such an approach is often resource intensive. Further, as the agency is the "opposing party", its officers are often not accepted by the abducting parent as an organisation genuinely motivated to assist him/her and the child. The approach can also have its limits from the perspective of the agency, in that officers of the agency can leave themselves open to allegations of having unduly influenced the abducting parent to take or not take critical decisions, such as whether to appeal the decision at first instance.

## Problems of Enforcement Arising from the Actions of the Child

The most common case is where a child has objected to returning, but the Court has ordered the child's return in any event. On some occasions, the Central Authority will receive some warning that there may be difficulties. The warning will come from statements made by the child, relayed through the abducting parent, or made during direct discussions between the Central Authority and the child. In such cases there is an opportunity to utilise counselling and other forms of persuasion to assist the child in accepting the reality of the situation. In the cases of *Director-General, Department of Families Youth and Community Care v. N*[119] and *Director-General Department of Families Youth and Community Care v. McC*[120] (respondents' names abbreviated), Barry J ordered as part of the return order, that the child attend a counselling session with a Family Court of Australia Counsellor so that the child may have explained to her the decision which his Honour had made. The effectiveness of counselling is obviously reduced where the abducting parent remains hostile following the decision.

In cases where the child is hostile to a return, consideration is given to requesting that the requesting applicant travel to Australia for the purpose of reuniting with the child and having that person accompany the child back to the contracting State. Consideration must be given to who will pay the cost of this travel and an appropriate order sought as part of the subsidiary orders at the time the return order is made.

The circumstance which poses the greater difficulty is where, at the very last minute, usually at the airport, the child refuses to board the aeroplane either by standing his or her ground or running away from the airport. The second of these circumstances occurred in the case of *Director-General, Department of Families,*

*Youth and Community Care v. O* (respondent's name abbreviated).[121] That application involved the return of a 13 year old child who had come to Australia for a one month holiday staying with her father and did not return as arranged. Bell J found that the child did not object for the purposes of the Convention. Whilst upset at the outcome, the child was briefly counselled by an officer of the State Central Authority after the decision was handed down. The mother travelled to Australia to accompany the child to the United Kingdom after the decision was handed down. At the airport, the child asked to go to the toilet before entering the customs area to board the return flight and disappeared from the airport and could not be located. The mother, who was travelling with limited funds, reluctantly boarded the return flight alone.

The father brought an application to re-open the Hague Convention proceedings relying upon the child's reaction at the airport as new evidence of her objection to returning. The application was dismissed. The State Central Authority applied for orders that the respondent pay the necessary costs of an officer of the State Central Authority to accompany the child to the United Kingdom, but ultimately accepted the father's decision that he would return with the child and the entry by him into a $2,000.00 recognisance, forfeitable in the event the child was not successfully returned to the United Kingdom.

A difficulty of another kind arises where the actions of the child in refusing to return, come to the attention of the airline and the airline, in the interests of passenger safety or for some other reason, refuses to accept the child on the aircraft. This occurred in an English case of *Re: HB (Abduction: Child Objections)*.[122] The response of the United Kingdom Central Authority was to request the applicant mother to travel to England to accompany the child, which she did not do. The child sought leave to be joined in the proceedings and to personally appeal the decision of the judge at first instance. Ultimately, the appeal was allowed and a finding that the child objected was made with the application remitted to the trial judge to consider whether the residual discretion to order the child's return in any event should be exercised. At the remitted hearing Hale J[123] dismissed the application noting that one of the primary goals of the Convention, being a prompt return, was no longer possible. Noting the strength of the child's objections and in the mother's failure to readily offer assistance in the form of responding to correspondence sent to her by the United Kingdom Central Authority seeking her assistance in resolving the impasse; Her Honour dismissed the application.

In circumstances where the attendance of the requesting applicant parent is insufficient to persuade the child to behave appropriately for a return journey, it is difficult to envisage what practical options are open to a Central Authority to

enforce the order. Generally speaking, it is expected that the presence of the requesting applicant parent could sufficiently quell the child's apprehension so as to ensure incidents which may cause the airline to refuse to carry the child, will not occur. Where the child's behaviour can be linked to the influence of the abducting parent, consideration could be given to seeking an order that the requesting applicant's costs while staying in the requested country be paid by the abducting parent.

Australian State Courts acting in the *parens patriae* jurisdiction have held that the Court has extremely coercive powers in order to act in the best interests of the child, even if the "target" of the Court's orders is the child him or herself. *In the case of Director-General, New South Wales Department of Community Services v Y*,[124] Austin J of the Supreme Court of New South Wales, on the application of the Director-General, ordered that a child, who had previously been made a ward of Court, with an a-typical eating disorder which appeared to be an extreme form of anorexia, be returned to her treating hospital (from which the child had previously escaped) and detained there, by force if necessary, for treatment for her condition in her best interests, against the very strong wishes of the child and her parents. His Honour took into account what he found to be strong and uniform evidence of the medical experts that without the treatment, the child would die. In a later decision,[125] Austin J ordered the parents of a child, not yet born, not to breast feed the child and that the child have special treatment, as the mother was HIV positive.

Commentators on these decisions have remarked that the coercive powers available in the *parens patriae* jurisdiction are far wider than anything under relevant State legislation involving children in the care of the State.[126] The High Court of Australia has held that the Family Court of Australia has a statutory jurisdiction similar to the *parens patriae* jurisdiction.[127] It is now the subject of express legislative enactment.[128] Whilst it is arguable that the Family Court of Australia would share similarly coercive powers in its "welfare jurisdiction" such coercive powers in both the *parens patriae* and statutory welfare jurisdiction are governed by the best interests of the child as the paramount consideration.

Whether a Court would be prepared to make similar coercive orders against the child, usually the subject of the application and not a party to it, upon the foundation that such orders are necessary and appropriate to give effect to the Convention, has yet to be determined and hopefully, never will need to be.

## D. DIRECT JUDICIAL COMMUNICATIONS - THEIR FEASABILITY AND LIMITS

### Introduction

*"The judge, when the case is already pending elsewhere, is required to communicate with his or her counterpart in the other state. However, the judicial communication is a wild card in this otherwise orderly business. Anything might happen, and it is a process usually not controlled or even witnessed by counsel."*[129]

## The United States Experience

American statutes and canons are replete with provisions promoting direct judicial communications.

The US *Uniform Child Custody Jurisdiction Acts* (UCCJA) envisaged and made provision for judges of different jurisdictions communicating with each other in respect of a matter which may be pending in both jurisdictions or which may need to be transferred from one jurisdiction to another. For example, the relevant Illinios State No. 750 ILCS 35 provided as follows:

*"Sec. 7.* **Simultaneous Proceedings in Other States***.*

*(a) A court of this State shall not exercise its jurisdiction under this Act if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this Act, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons.*

*(b) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under Section 10 and shall consult the child custody registry established under Section 17 concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state.*

*(c) If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with Sections 20 through 23 of this Act. If a court of this State has made a custody judgment before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the most appropriate forum.*

*Sec. 8.* **Inconvenient Forum.**

*(a) A court which has jurisdiction under this Act to make an initial or modification judgment may decline*

*to exercise its jurisdiction any time before making a judgment if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.*

*…*

*(d) **Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court** with a view to assuring that jurisdiction will be exercised by the most appropriate court and that a forum will be available to the parties.*

*Sec. 24. **International Application.***

*The general policies of this Act extend to the international area. …"*

The successor to the UCCJA, the *Uniform Child Custody Jurisdiction and Enforcement Act* (UCCJEA) makes more extensive provisions for judicial communication. Following are some relevant extracts from the draft Bill, and prefatory notes and comments by the National Conference of Commissioners on Uniform State Laws

*"**SECTION 110. COMMUNICATION BETWEEN COURTS.***

*(a) A court of this State may communicate with a court in another State concerning a proceeding arising under this [Act].*

*(b) Communications between courts that affect the substantive rights of a party must be made in a manner that allows the parties to participate, or allows the parties to present jurisdictional facts and legal arguments to the courts, before a final determination is made as to which forum is appropriate. A record must be made of those communications between courts. The record may consist of notes or transcripts of a court reporter who listened to a conference call between the courts, an electronic recording of a telephone call, a memorandum of other electronic communications between the courts, or a memorandum made by one or more courts after the communication.*

*(c) Communications between courts on schedules, calendars, court records, and other matters that do not affect the substantive rights of the parties may occur without informing the parties. A record need not be made of those communications.*

*Comment*
*This section emphasizes the role of judicial communications under the Act. It contains the authorization for a court to communicate concerning any proceeding arising under this Act. This includes*

communication with foreign tribunals and tribal courts. Communication can occur in many different ways such as by telephonic conference and by on-line or other electronic communication. The Act does not preclude any method of communication and recognizes that there will be increasing use of modern communication techniques.

Language has been added to emphasize the role of the parties in the communication process. If the communication between the courts involves relatively inconsequential concerns such as scheduling, calendars or consultation on other minor matters, the communication can occur without the parties being informed or participating. Included within this type of communication would be matters of cooperation between courts under Section 112.

However, on all matters which could affect the parties' substantive rights, a court must communicate with another court in a manner which allows the parties to participate or to present jurisdictional facts and arguments. In particular this includes communications that are required under Section 204 (Emergency Jurisdiction), Section 206 (Simultaneous Proceedings), Section 207 (Forum Non Conveniens), and Section 305 (Simultaneous Proceedings). In any event, a record of the communication must be made. No particular form of communication is required to inform the parties that a communication between courts is scheduled. An informal communication is sufficient.

The purpose of this section is to regularize the communication process between courts. It preserves the flexibility necessary to accommodate busy judicial schedules while including protection for the parties against unauthorized ex parte communications. A full discussion of the problem can be found in State ex rel. Grape v. Zach, 524 N.W.2d 788 (Neb. 1994).

## SECTION 204. TEMPORARY EMERGENCY JURISDICTION.

(a) A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

...

(d) A court of this State that has been asked to make a child-custody determination under this section, upon being informed that a child-custody proceeding has been commenced, or a child-custody determination has been made, by a court of a State having jurisdiction under Sections 201 through 203, shall immediately communicate with the other court. A court of this State that is exercising jurisdiction pursuant to Sections 201 through 203, upon being informed that a child-custody proceeding has been commenced, or a child-custody determination has been made by a court of another State under a statute similar to this section shall immediately communicate with the court of that State. The purpose of the communication is to resolve the emergency and protect the safety of the parties and the child.

Comment

...

*The communication between courts is to be accomplished in accordance with Section 110. The communication under this section affects the substantive rights of the parties and therefore the provisions of that section on participation of parties and making of the record are applicable.*

## SECTION 206. SIMULTANEOUS PROCEEDINGS.

*(a) Except as otherwise provided in Section 204, a court of this State may not exercise its jurisdiction under this [article] if at the time of the commencement of the proceeding a proceeding concerning the custody of the child had been previously commenced in a court of another State having jurisdiction substantially in conformity with this [Act], unless the proceeding is stayed by the court of the other State because a court of this State is a more convenient forum under Section 207.*

*(b) Except as otherwise provided in Section 204, a court of this State, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to Section 209. If the court determines that a child-custody proceeding was previously commenced in a court in another State having jurisdiction substantially in accordance with this [Act], the court of this State shall stay its proceeding and communicate with the court of the other State. If the court of the State having jurisdiction substantially in accordance with this [Act] does not determine that the court of this State is a more appropriate forum, the court of this State shall dismiss the proceeding.*

*(3) proceed with the modification under conditions it considers appropriate.*

*…*
*Comment*

*…*

*Under this Act, the simultaneous proceedings problem will arise only when there is no home State and more than one significant connection State. For those cases this section retains the "first in time" rule of the UCCJA. Subsection (b) retains the UCCJA's policy favoring judicial communication. Communication between courts is required when it is determined that a proceeding has been commenced in another State. The communication is governed by Section 110. It is a communication that affects the substantive rights of the parties.*

## SECTION 306. SIMULTANEOUS PROCEEDINGS. *If a proceeding for enforcement under this [article] has been or is commenced in this State and a court of this State determines that a proceeding to modify the determination has been commenced in another State having jurisdiction to modify the determination under [Article] 2, the enforcing court shall immediately communicate with the modifying court. The proceeding for enforcement continues unless the enforcing court, after consultation with the modifying court, stays or dismisses the proceeding."*

The promotion of judicial communication has not been confined to the family law area. In his paper *Global Economy Demands Judicial Cooperation and Communication*,[130] Sid Brooks discusses its application in the field of cross border bankruptcies.

*"Pending U.S. Legislation in Cross-Border Cases*

*The first initiative involves legislation passed in 1998 in both the U.S. House of Representatives and the U. S. Senate. That legislation promoted—indeed mandated—that United States courts cooperate and communicate with courts of other countries involved in transnational insolvency cases. Also included in the legislation, however, were controversial "consumer" bankruptcy provisions that, coupled with the threat of a presidential veto, doomed passage of the entire bill in conference committee. Nonetheless, the sections involving international judicial cooperation and communication in transnational insolvency cases were approved without dissent.*

*The successor to the 1998 legislation, H.R. 3150, a nascent "Chapter 15" for the U.S. Bankruptcy Code, creates the architecture for administration of United States cross-border insolvency cases. Patterned after the United Nations Committee on International Trade Law's Model Law on Cross-Border Insolvency, which was developed over five years and involved forty-five countries, H.R. 3150 establishes a comprehensive mechanism for courts dealing with cross-border insolvency cases.*

*Central to the legislation are two principles:*

*1. United States courts are directed to "cooperate to the maximum extent possible with foreign courts or foreign representatives."*

*2. United States courts are authorized to communicate with foreign courts and foreign representatives, either directly or indirectly.*

*The mandate to cooperate is subject to and limited by the enacting country's "public policy," and the court's discretion, but it is mandatory nonetheless. This mandate assures that, to the extent possible, collaborative and accommodating strategies must be used by judges in transnational insolvency cases. In the context of the entire structure of the new Chapter 15, that means United States judges may, under certain circumstances, defer to or harmonize their procedures and orders with judges of foreign courts."*

Many US State codes of judicial conduct, of which the Michigan Code is a good example,[131] make specific provision for the manner in which a Judge should approach this area.

**"CANON 3:**

*A Judge Should Perform the Duties of Office Impartially and Diligently*

*The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:*

**A. Adjudicative Responsibilities:**

*4. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except as follows:*

   a. *A judge may allow ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits, provided:*

* *the judge reasonably believes that no party or counsel for a party will gain a procedural or tactical advantage as a result of the ex parte communication, and*

* *the judge makes provision promptly to notify all other parties and counsel for parties of the substance of the ex parte communication and allows an opportunity to respond.*

● *A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.*

● *A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.*

● *A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.*

● *A judge may initiate or consider any ex parte communications when expressly authorized by law to do so."*

## How Would an Australian Court React?

The difficulty with the operation of "judicial communication provisions" is that the common law, absent clear statutory authority, would seem to prohibit such behaviour.

In *Re JRL; Ex parte CJL*,[132] the High Court of Australia dealt with an application for a writ of prohibition against a judge hearing a custody case. The child, the subject matter of the proceedings, was living with the father. There had been extensive counselling and a counsellor had prepared a report. The counsellor was strongly of the view the child should live with the mother. The father sought an adjournment of the proceedings, and when the counsellor learnt there was a prospect of an adjournment being granted, she sought and was granted an audience in private with the judge, who was apparently very concerned that the child had an anxiety neurosis which would deteriorate if she was allowed to stay with the father. The judge, after speaking with the counsellor, immediately called counsel into her chambers and discussed the counsellor's evidence with them.

The High Court by a majority of 3 to 2 granted the writ of prohibition. The minority stressed the peculiar statutory role of the counsellor and the remedial action taken by the trial Judge to invite the parties' representatives in as soon as it occurred to the Judge that the private conversations should not be allowed to continue. The majority, however, said that there had been a clear breach of the fundamental principle *"that a judge must not hear evidence or receive representations from one side behind the back of the other"*. Gibbs CJ said:

*"the principle which forbids a judge to receive representations in private, is not confined to representations made by a party or the legal adviser or witness of a party. It is equally true that a judge should not, in the absence of the parties or their legal representatives, allow any person to communicate to him or her any views of opinions concerning a case which he or she is hearing, with a view to influencing the conduct of the case. Indeed, any interference with a judge, by private communication or otherwise, for the purpose of influencing his or her decision in a case is a serious contempt of court."*

Mason J in his judgment made it clear that parliament could override the principle that

*"a judge is to try a case on the evidence and arguments presented in open court by the parties or their legal representatives by reference to those matters alone."*

Brennan J said:

*"it would require at least statutory authority to permit a judge to discuss with a counsellor out of court any question of substance relating to an issue in proceedings for custody pending before that judge."*

His Honour went further, however, by saying:

*"that jurisdiction to determine [proceedings for custody] is a matter vested in the Family Court, and it cannot be exercised in the privacy of a judge's chambers. This is incompatible with the intention of the parliament"*

In *McOwan*,[133] the wife took the children to England for a holiday. Within a week of arrival she decided not to return to Australia. The following week the husband commenced proceedings in the Family Court of Australia for sole custody and sought an order for return of the children. The wife's response was to commence some proceedings in England seeking ex parte orders prohibiting the removal of the children from England. The husband then responded with an application in England under the Hague Convention and the wife was ordered to return the children to Australia, which she did on 25 August 1993. Two days after her arrival, the husband filed a Notice of Discontinuance in the Australian proceedings. The wife then applied for legal aid, trying to seek orders to enable her to return to England, but aid was refused.

Apparently at the behest of the maternal grandparents, Johnson J wrote from the Royal Courts of Justice to the Chief Justice of the Family Court of Australia a letter in the following terms:

*"I have now had a rather sad letter from the maternal grandmother and I enclose a copy of her two letters, and my brief acknowledgment, together with copy of my order.*

*I wonder if you could pass this on to someone who might be able to give the matter some attention. These Hague Convention cases do sometimes seem to produce harsh results, but the policy is clear.*

*Obviously I am not suggesting there is anything amiss in the way the matter is being handled in Australia; my intervention is simply as a matter of humanity, and to show that we do care."*

The Chief Justice then summoned the parties and the State Central Authority to court *"for the purpose of enquiring whether proper arrangements have been made*

*for the welfare of the children".*

When the matter came on for hearing the parties sought an adjournment to enable them to further explore the possibility of a reconciliation. The Attorney-General for the Commonwealth of Australia and the State Central Authority were invited to make submissions relating to the procedure that had been adopted to bring the parties to the Court in the absence of an *inter partes* application.

Eventually Kay J was not required to rule upon the submissions as the parties advised the Court they had reconciled. He did, however, publish a judgment setting out the submissions and identifying the issues raised by them. Accordingly to the submissions, as soon as the child was back in Australia the child abduction convention had served its purpose. His Honour concluded that:

*"the provisions of the Hague Convention appear however to limit the role of the Central Authority to securing the safe return of the child, and for making arrangements for organising and securing the effective exercise of rights of access (see Article 7).*

*It would also seem appropriate that the Central Authority should be required to enquiry whether appropriate arrangements are made for the welfare of the child once the child is returned in accordance with the Hague Convention order. Unless contracting states can feel reasonably assured that when children are returned under the Hague Convention, their welfare will be protected, there is a serious risk that contracting States and courts will become reluctant to order the return of children."*

## An English Approach

The high water mark of international judicial collaboration in Hague cases might well be the judgment of Singer J in *Re M and J (Abduction International Judicial Collaboration)*,[134] a judgment delivered in Family Division of the High Court of Justice on 16 August 1999. The case was unusual in that the children were in England with both of their parents and it was the maternal great grandmother who was claiming rights of custody under American law and seeking the return of the children.

Both parents had been involved with drug offences. The father had been deported from the United States, the mother had been in prison in the United States, and the children had been placed in the care of their great-grandmother. After the mother's release from prison, she took the children to England without the grandmother's consent. The case raised significant issues as to what would happen to the mother in the event that she tried to go back to California if the children were sent back there. The mother had been in breach of probation in leaving California. The great

grandmother was prepared to leave the children in the mother's care upon her return to California. The trial Judge was concerned of the effect upon the children if the mother was arrested at the airport. That led the trial Judge, with the permission of the parties, to communicating with a Californian judge. The Californian judge, Ferrari J, advised Singer J that with the assent of the District Attorney he was able there and then to recall and quash the warrant for the mother's arrest and reinstate the mother's probation and to take no further action until issues relating to the children had been resolved. The next day Ferrari J made an order and faxed a copy of it to Singer J.

Singer J then had a telephone conversation with the mother's counsel and counsel for the great-grandmother. It was agreed he should then speak to Gutman J, the supervising judge of the Family Law Department of Los Angeles Superior Court to arrange the swift listing of a hearing to determine what orders might be made in advance of a return so as to regulate the position of the children pending such a hearing. The discussions between Gutman J and Singer J are set out in length in the reported judgment in this case. There then followed an adjourned hearing for ongoing email and fax contact between various judges. Glitches were overcome with continued trans-Atlantic telephone conversations . All in all, Singer J thought it was a very worthwhile exercise.

In his commentary on the case, William M Hilton said:

*"The views of Justice Singer, a well respected judge of the English High Court and a judge well versed in The Convention, as to judicial collaboration exemplifies the highest standards of the reach of The Convention.*

*This is the second known case under The Convention where judicial collaboration has been used, the first being Diab vs Benoit (Canada 1996) Prov. of Quebec, Dist. of Terrebonne No 700-04-001386-967, available on Hilton House Web Site as: http://www.hiltonhouse.com/cases/Diab_cdn.txt*

*The concept of judicial collaboration should be used whenever there is any concern about the logistics of returning a child to his/her habitual residence.*

*Judicial collaboration can and should be used when ever there needs to be a seamless movement of children from one contracting state to another.*

*The High Court's use of E-Mail, telephone contact and FAX are in harmony with Art. 7(h) of The Convention:*

*". . . to provide such administrative arrangements as may be necessary and appropriate to secure the safe*

*return of the child."*

*The proper and effective use of judicial collaboration may also seen by the recent United States Court of Appeals Case Blondin v Dubois (2nd Cir 1999) --- Fed. App.3d ---; No.98-2834; 17 Aug 1999, available on Hilton House Web Site."*

## Concluding Thoughts on Judicial Communication

It seems that the key to legitimacy of judicial cooperation, absent clear statutory authority, has to be the consent of the parties had and obtained. It would therefore be wise for judicial decision-makers to create a record of all the communications and to keep the parties informed of the nature of those communications. It would also be prudent to have the outcome of the communications confirmed in writing, either via fax or email, and copies provided to all parties affected by them.

In short, providing justice can be seen to be done, judicial cooperation in Hague cases is to be encouraged.

## END NOTES

[1] Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, January 1998, p.10.

[2] Regulation 5(1)(c) of the *Family Law (Child Abduction Convention) Regulations*.

[3] (1994) FLC ¶92-451.

[4] (1994) FLC ¶92-451at 80,692.

[5] An important point raised at the Washington Conference by the delegation from the United Kingdom was that the approach of courts in contracting States to applications for relocation of a child or "leave to remove a child from the jurisdiction" will impact upon the tendency for children to be removed illicitly. The most recent Australian authority in this regard provides guideline guidance to the correct approach to such applications which are determined according to the paramountcy principle: *A and A : Relocation Approach* [2000] FamCA 751 sourced from http://www.familycourt.gov.au/html/2000.html applying the High Court of Australia decision in *AIF v AMS* (1999) FLC ¶92-852.

[6] (1993) FLC ¶92-416.

7 A significant relevant feature of the Australian court system is that while first instance jurisdiction under the *Family Law Act* 1975 (Cth) is widely dispersed, all appeals from such matters, including appeals from decisions under the *Family Law (Child Abduction Convention) Regulations* are heard by the Full Court of the Family Court of Australia (which typically comprises three judges, at least two of whom are members of the Appeal Division of the Court) thereby assisting in the development of a specialist intermediate level appellate level jurisprudence. At present, there are seven judges of the Appeal Division: Nicholson CJ, Ellis, Lindenmayer, Finn, Kay, Holden and Coleman JJ. Appeals from the Full Court of the Family Court of Australia are by special leave or certificate to the highest court of the land, the High Court of Australia.

8 (1993) FLC ¶92-416 at 80,258-9.

9 (1995) FLC ¶92-551.

10 See para. 19 of the Explanatory Report of the Convention (*Actes et documentes de la Quatorzieme session 6 au 25 Octobre 1980, Tome III*); see also A.E. Anton, (1980) "The Hague Convention on International Child Abduction", Vol 30 *International and Comparative Law Quarterly*, at 542. *McCall's* case also rejected an argument that there was an inconsistency between the Convention and the United Nations Convention on the Rights of the Child, thereby endorsing a view which had expressed in *Murray's* case.

11 *C v C* (1989) 1 WLR 654 (CA); also indexed as *Re C (A Minor)(Abduction* [1989] 1 FLR 403.

12 (1998) Fam LR 7 (decision delivered 29 April 1992, Second Division of the Inner House, Court of Session); see *Singh v Singh* (1997) SC 68 concerning welfare considerations once an exception to the policy of return has been made out.

13 *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996); see also PH Pfund "The Hague Convention on International Child Abduction, the International Child Abduction Remedies Act, and the Need for Availability of Counsel for all Petitioners" (1990) XXIV *Family Law Quarterly*, No.1 at p. 39.

14 [1994] NZFLR 132 per Hammond J.

15 [1996] 2 NZLR 517; also indexed as *A v A* [1996] NZFLR 529.

16 [1999] IESC 8 (8th December 1999) at para 31 sourced from http://www.bailii.org/ie/cases/IESC/1999/8.html.

17 (1994) 6 RFL (4th) 290 at 318. See also *W.(V.) v. S. (D.)*, [1996] 2 S.C.R. 108 at paras 76 and 77 sourced from http://www.canlii.org/ca/cas/scc/1996/1996scc48.html.

[18] (1996) FLC ¶92-706.

[19] *Family Law (Child Abduction Convention) Regulations* made pursuant to s111B of the *Family Law Act* 1975 (Cth) with jurisdiction conferred by s 39(5)(d) of the Act; the constitutional validity of the Regulations as they then stood was confirmed by the Full Court of the Family Court of Australia in *McCall and McCall: State Central Authority (Applicant); Attorney-General (Intervener)* (1995) FLC ¶92-551. The present regulations were held to be valid by the High Court of Australia in *DJL v The Central Authority* (2000) FLC ¶93-015 (*Laing v The Central Authority* (1999) FLC ¶92-849 on appeal).

[20] The Australian approach of drafting Regulations led to a range of interpretative difficulties: see the discussion by the Full Court in *Laing v The Central Authority* (1999) FLC 92-849.

[21] (1996) FLC ¶92-706 per Brennan CJ, Dawson, Toohey, Gaudron, McHugh and Gummow JJ.

[22] (1996) FLC ¶92-706 at 83,454-5. See also the discussion by Kirby J at 83,468-9.

[23] Articles 12 and 13 of the Convention set out defences to the obligation to order return:

"*Article 12*

*Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.*
*The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child unless it is demonstrated that the child is now settled in its new environment.*
*Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.*

"*Article 13*

*Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—*

*a the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had*

*consented to or subsequently acquiesced in the removal or retention; or*
*b there is a grave risk that his or her return would expose the child to physical or*
*psychological harm or otherwise place the child in an intolerable situation.*
*The judicial or administrative authority may also refuse to order the return of the child if it*
*finds that the child objects to being returned and has attained an age and degree of*
*maturity at which it is appropriate to take account of its views.*
*In considering the circumstances referred to in this Article, the judicial and administrative*
*authorities shall take into account the information relating to the social background of the*
*child provided by the Central Authority or other competent authority of the child's habitual*
*residence."*

In respect of Article 13b, the "grave risk" defence is usually based on alleged abuse. The High Court of Australia has granted special leave to appeal in a case where a child's disability (autism) is denied by the left-behind parent and said to lead to grave risk of psychological or physical harm or other intolerable situation if the child is returned. Evidence as to whether there is a facility for the treatment of the child would also seem in issue. The Full Court of the Family Court of Australia judgment upholding the trial Judge's decision to order return to Greece is *P v Commonwealth Central Authority* [2000] FamCA 461 sourced from http://www.familycourt.gov.au/judge/2000/html/p_text.html. Special leave to appeal to the High Court of Australia was granted on 24 November 2000 – *D.P. v Commonwealth Central Authority* (D5-00); transcript of the special leave hearing sourced from http://www.hcourt.gov.au.

24 *Re T (Abduction: Children's Objections to Return* [2000] 2 FLR 192 at 220, Sedley and Simon Brown LJJ agreeing.

25 [1996] 2 NZLR 517; also indexed as *A v A* [1996] NZFLR 529.

26 [1996] 2 NZLR 517 at 522-3. See also *P.Q. Petitioner* (27 April 2000, Outer House, Court of Session) sourced from http://www.scotcourts.gov.uk/opinions/PAT1004.html. There, Lady Paton at first instance in the Outer House of the Court of Session found a grave risk defence made out. The case involved allegations of physical and sexual abuse of the children by their father, where the mother had, from the start, brought the allegations to the attention of the authorities and the courts in the abducted-from country (c.f., *Starr v. Starr*, 1999 S.L.T. 335). Lady Paton said (at para 65): "*The facts speak for themselves, and in the rather unusual circumstances of this case, I consider that there is indeed reason to assume that the courts in France might not, for whatever reason, be able or willing to provide adequate protection for G and B (cf. Friedrich cit. sup.) … As was emphasised in Friedrich v Friedrich, cit. sup., the reason for any apparent lack of ability or willingness on the part of a Hague Convention court to provide adequate procedures or remedies is irrelevant. The explanation might be a lacuna in the legal system itself (which is unlikely in view of the highly-developed and sophisticated system existing in France), or it might simply be the personal view or judgement of someone operating within the system, or some other reason. I do not consider that it is necessary for R.S.* [the respondent mother to the application for return] *to establish whether the lack of protection resulted from the court system itself or from the actings or decisions of particular office-bearers within that*

*system or from some other source. Applying the test in Friedrich v Friedrich, ("when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection"), it is unnecessary in my view to identify or to explain the reason for any apparent incapacity or unwillingness to provide adequate protection.".*

27 One important social context is the frequent claim of child abuse and/or domestic violence by abducting mothers: see Miranda Kaye (1999) "The Hague Convention and the Flight From Domestic Violence: How Women and Children are Being Returned By Coach and Four" Vol 13 *International Journal of Law, Policy and the Family* 191.

28 The Honourable Alastair Nicholson *Advancing Children's Rights and Interests : The Need for Better Inter-Governmental Collaboration*, the 1996 Sir Ronald Wilson Lecture, Perth Australia, 13 November 1996, sourced from http://www.familycourt.gov.au/papers/html/nicholson2.html.

29 *Report of the third Special Commission meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html.

30 Jennifer Degeling, *The Welfare of the Child on Return to their Country of Habitual Residence*, Paper presented at the Biennial Conference for State and Commonwealth Central Authorities, Canberra Australia, 27-28 October 1999.

31 *Report of the third Special Commision meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html at page 22.

32 *Report of the third Special Commision meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html at page 23.

33 Jennifer Degeling *The Welfare of the Child on Return to their Country of Habitual Residence*, Paper presented at the Biennial Conference for State and Commonwealth Central Authorities, Canberra Australia, 27-28 October 1999. In this regard, it should be a weight towards confidence in returning children to Australia that most delegate State and Territory Central Authorities of Australia are the heads of the government departments responsible for child protection and a further two are Commissioners of the Police Service of that State. Contracting States can therefore legitimately expect that all delegate State and Territory Central Authorities should have close and efficient operational working arrangements between child protection and police services, especially the units with

responsibility for the criminal aspects of family violence allegations. Of course, contracting States with otherwise located Central Authorities may have protocols or other systemic mechanisms which have the same benefits.

34 Australia, England and Wales, New Zealand, Canada (New Brunswick, Saskatchewan, Quebec) and United States of America.

35 David Harris QC *Is the Strength of the Hague Convention Being Diluted by the Courts?* Paper presented at the 8th National Family Law Conference, Hobart Australia 24-28 October 1998 at para 5.64.

36 [1989] 1 FLR 403.

37 [1995] 1 FLR 1021.

38 [1995] 1 FLR 1021 at 1024-5.

39 (1994) 6 RFL (4th) 290 at 318.

40 (1994) 6 RFL (4th) 290 at 318 per Lamer C.J. and La Forest, Sopinka, Gonthier, Cory and Iacobucci JJ; the minority of L'Heureux-Dubé J and McLachlin J (as she then was) held that domestic legislation permitting "transitory orders" could also be invoked *"provided, of course, as is the case here, that the purpose of the transitory order not be to hamper the objectives of the Convention and that the return of the child in the proper jurisdiction not be delayed to the point of frustrating the purpose of the Convention*" (emphasis in the original).

41 [1989] 1 FLR 403.

42 [1989] 2 FLR 475.

43 [1995] 1 ILRM 201.

44 The headnote states: *"Budd J ordered that the child should be returned to Spain on the implementation of certain conditions. The conditions were to the effect that the plaintiff should provide accommodation for the defendant and the child, appropriate maintenance for the child until she was 18, and health insurance for the defendant and child. Furthermore, he should provide for the child's education and supply funds to enable the defendant and the child to travel to Ireland twice a year."*

45 (1998) Fam LR 7 (decision delivered 29 April 1992) - the Second Division of the Inner House of the Court of Session.

46 (1998) Fam LR 7 at 11.

47 [1999] ScotCS 114 (1st June, 1999) sourced from http://www.scotcourts.gov.uk/opinions/P6_4_99.html

48 [1999] ScotCS 114 (1st June, 1999) at para 12 sourced from http://www.scotcourts.gov.uk/opinions/P6_4_99.html

49 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

50 (3rd Cir. 1995) 63 Fed.3d 217 sourced from http://www.hiltonhouse.com. Although there was dissent as to other matters, there would seem to have been no conflict of view in respect of undertakings.

51 Sourced from http://laws.lp.findlaw.com/getcase/1st/case/991747.html.

52 [1996] 2 NZLR 517 (CA); also indexed as *A v A* [1996] NZFLR 529.

53 [1996] 2 NZLR 517 at 524.

54 (1994) FLC ¶92-451.

55 Regulation 14(1) includes *"an order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention"*. Regulation 16 sets out how a court must deal with applications under reg 14(1).

56 (1996) FLC ¶92-706.

57 (1996) FLC ¶92-706 at 83,456-7.

58 (1996) FLC ¶92-706.

59 (1993) FLC ¶92-424.

60 *Police Commissioner of South Australia v Temple* (1993) FLC ¶92-365.

61 *Police Commissioner of South Australia v Temple* (1993) FLC ¶92-365 at 80,363.

62 (1999) FLC ¶92-842.

63 The undertakings were as follows:

"PROVIDED *the FATHER files an Undertaking in Form 41A in this Court and, in respect of Undertakings in paragraphs (c), (d), (e) and (f) carries them into effect:*

*a) that he agrees and will agree to a Stay of the Orders, if any, of the courts in the United States of America, relating to the custody of the children and he will not remove, nor support the removal, of the children from the care and control of the MOTHER until the issue of custody is heard and determined by those Courts;*

*(b) that he agrees to co-operate with the MOTHER to ensure that the Courts of the United States of America determine the issue of custody of the children without delay;*

*(c) that he will take all necessary steps to support the MOTHER's applications to Immigration authorities in the United States of America for her and the children to return to and remain in that country as long as necessary to enable the issue of custody of the children to be heard and determined by the Courts of that country.*

*(d) that he will pay to the Australian Central Authority sufficient moneys to pay for airline tickets from Australia to the United States of America for the MOTHER and the children.*

*(e) that he will pay to the Australian Central Authority for the payment to the MOTHER the sum of $US5,000 to cover the initial cost of temporary accommodation for the MOTHER and the children.*

*(f) that he will pay to the Australian Central Authority for payment to the MOTHER the sum of $US5,000 to cover the initial cost of living expenses for 14 days for the MOTHER and the children."* (1999) FLC ¶92-842 at 85,856-7.

64 (1999) FLC ¶92-842 at 85,858.

65 (1994) FLC ¶92-451.

66 (1994) FLC ¶92-451at 80,691.

67 The Honourable Joseph Victor Kay *The Hague Convention – Order or Chaos? An update on a paper first delivered to a Family Law Conference in Adelaide in 1994*, paper presented at New York University U.S.A, September 1999, sourced from http://www.familycourt.gov.au/papers/html/kay.html

68 [1998] 1 FLR 422.

69 [1998] 1 FLR 422 at 427.

70 18 October 1998 sourced from Lexis.

71 Mrs Justice McGuinness is now a Justice of the Supreme Court of Ireland.

72 At a hearing on 10 February 1998 *inter alia* to enforce the father's undertakings, the trial Judge first discovered that on 13 January 1998, the father had been charged in Italy with offences in connection with the sexual abuse of the child.

73 It is understood that this problem would not arise in the Canadian Province of Quebec under its Civil Code: personal communication with The Honourable Justice Jacques Chamberland.

74 (1993) FLC ¶92-424.

75 (2000) FLC ¶93-007.

76 (2000) FLC ¶93-007 at 87,178.

77 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

78 (2000) FLC ¶93-007.

79 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

80 [1999] EWCA 3184 (15th July, 1999) sourced from http://www.bailii.org/ew/cases/EWCA/1999/3184.html.

81 The cases cited therein are: *re T (Staying Contact in Non-Convention Country)* [1999] 1 FLR 262; *re A (Security for Return to Jurisdiction (Note)* [1999] 2 FLR 1.

82 [2000] 1 FLR 435.

83 In respect of proceedings in Australia see ss69C and 69E *Family Law Act* 1975 (Cth).

84 [2000] 1 FLR 435 at 439.

85 [2000] 1 FLR 435 at 441.

86 In respect of Australia see Part VII Division 13 Subdivisions C and D *Family Law Act* 1975 (Cth) and Schedule 1A of the *Family Law Regulations* 1984 made pursuant to Reg 14. The 1996 Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Cooperation in Respect of Parental Responsibility and Measures for the Protection of Children represents a multi-lateral approach. As at 1 August 2000 the Convention was not yet in force and no common law jurisdiction was a signatory: Linda Silberman (2000) "The 1996 Hague Convention on the Protection of Children: Should the United States Join?" Vol 34 *Family Law Quarterly* 239.

87 Sections 70F and 70L *Family Law Act* 1975 (Cth).

88 See Regulation 23 *Family Law Regulations* 1984.

89 Regulation 23(5) *Family Law Regulations* 1984.

90 Section 70G *Family Law Act* 1975 (Cth).

91 Section 69C *Family Law Act* 1975 (Cth) provides:

"1) Sections 65C, 66F, 67F, 67K and 67T and subsection 68T(4) are express provisions dealing with who may institute particular kinds of proceedings in relation to children.

(2)Any other kind of proceedings under this Act in relation to a child may, unless a contrary intention appears, be instituted by:

(a)either or both of the child's parents; or

(b)the child; or

(c)a grandparent of the child; or

(d)any other person concerned with the care, welfare or development of the child."

Section 69E Family Law Act 1975 provides.

"1) Proceedings may be instituted under this Act in relation to a child only if:

(a) the child is present in Australia on the relevant day (as defined in subsection (2)); or

*(b) the child is an Australian citizen, or is ordinarily resident in Australia, on the relevant day; or*

*(c) a parent of the child is an Australian citizen, is ordinarily resident in Australia, or is present in Australia, on the relevant day; or*

*(d) a party to the proceedings is an Australian citizen, is ordinarily resident in Australia, or is present in Australia, on the relevant day; or*

*(e) it would be in accordance with a treaty or arrangement in force between Australia and an overseas jurisdiction, or the common law rules of private international law, for the court to exercise jurisdiction in the proceedings.*

*(2) In this section:*
*relevant day, in relation to proceedings, means:*

*(a) if the application instituting the proceedings is filed in a court—the day on which the application is filed; or*

*(b) in any other case—the day on which the application instituting the proceedings is made."*

[92] [2000] 1 FLR 435.

[93] Paul Ward (1999) "Common Law Undertakings and the Civil Code - The Irish Experience" *Fam Law* 50.

[94] Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, January 1998.

[95] Section 65ZA (for completed proceedings and s65ZB (for pending proceedings) of the *Family Law Act* 1975 (Cth).

[96] Section 4AB of the *Crimes Act 1904* (Cth) provides that the monetary value of a penalty unit is $112.

[97] Section 35 of the Family Law Act 1975 (Cth) provides that the Family Court of Australia has the same powers to punish contempts of its power and authority as is possessed by the High Court Australia but section 35 is made subject to s112AP.

[98] *In the Marriage of Vergis* (1977) 3 Fam LR 11,398, FLC ¶90-275.

[99] Section 112AD of the *Family Law Act* 1975 (Cth).

100 Australian Law Reform Commission, *Contempt*, ALRC 35, 1987.

101 *In the Marriage of Schwartzkopf* (1992) 15 Fam LR 545, FLC ¶92-303.

102 *In the Marriage of Lindsay,* (1995) 19 Fam LR 649.

103 National Children and Youth Law Centre, *Submission to the Family Law Council Inquiry into Parental Child Abduction, Commonwealth of Australia*, 1998, p26.

104 Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, 1998, pp31-32.

105 Should be 15. Regulation 16 is really a "sign post" provision setting out when the Court must not and may make orders for return.

106 Regulation 15(1)(b).

107 See generally Preamble and Article 1(a).

108 [1998] FamCA 1557; (1998) FLC ¶92-831.

109 See *DJL v The Central Authority* (2000) FLC ¶93-015 (*Laing v The Central Authority* (1999) FLC ¶92-849 on appeal to the High Court of Australia).

110 [1998] FamCA 1557; (1998) FLC ¶92-831.

111 As part of the obligations of the Central Authority to secure the whereabouts of the child and take provisional measures (Article 7(b) of the Convention).

112 Section 35 *Family Law Act* 1975 (Cth).

113 Family Court of Australia, Family Court of Western Australia, Federal Magistrates Service.

114 Section 112AP *Family Law Act* 1975 (Cth).

115 Section 112AD *Family Law Act* 1975 (Cth).

116 Section 112AA *Family Law Act* 1975 (Cth)

117 Section 4 *Family Law Act* 1975 (Cth).

118 Section 112AD(4) *Family Law Act* 1975 (Cth).

119 (unreported), Family Court of Australia, 5 December 1997.

120 (unreported), Family Court of Australia, 8 June 1999.

121 (unreported) Family Court of Australia, Bell J 24 March 1999.

122 [1998] 1 FLR 422.

123 Reported as Re: *HB (Abduction: Child Objections) (No. 2)* [1998] 1 FLR 564.

124 [1999] NSWSC 644 sourced from http://www.austlii.edu.au/au/cases/nsw/ supreme_ct/1999/644.html.

125 *Re: Baby A* [1999] NSWSC 787 sourced from http://www.austlii.edu.au/au/cases/nsw/ supreme_ct/1999/787.html.

126 See article by John Eades, *Law Society Journal* (February 2000) p. 52.

127 *Secretary, Department of Health and Community Services v. JWB and SMB (Marion's Case)* (1992) 175 CLR 218.

128 Section 67ZC *Family Law Act* 1975 (Cth).

129 Richard Crouch, Attorney, discussing the US *Parental Kidnapping Prevention Act* (The PKPA) http://patriot.net/~crouch/flnc/abd.html.

130 *The Colorado Lawyer* March 1999 Vol. 28, No. 3 http://www.cobar.org/tcl/1999/march/ judges.htm.

131 *Adopted by the Michigan Supreme Court effective October 1, 1974, incorporating amendments effective through January 18, 1994* http://www.michbar.org/directory/code. html.

132 (1986) 10 Fam LR 917.

133 (1993) 17 Fam LR 377; (1994) FLC ¶92-451.

134 [2000] 1 FLR 803.

     

The 'faces' of abducted children span international boundaries

Please contact webmaster@parentinternational.com with questions or comments about this site