# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.            )

                                 )

        Plaintiffs            )

                                 )

        V                     )     CASE NO 1:07-CV-01170

                                 )     JUDGE JOHN D.BATES

                                 )

COMMONWEALTH OF AUSTRALIA      )

et al.                               )

        Defendants


RESPONSE TO COURT ORDER AND MOTION FOR RECONSIDERATION TO REAHEAR AND REOPEN AND THE MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT TO A HEIGHTENED REVIEW OF "EXTRAORDINARY CIRCUMSTANCE" AND MANIFEST UNJUSTICE TO THE PLAINTIFFS

ABSTRACT :

The ORDER DATED MARCH 31 2008 is based primarily on Firestone vs. Firestone and does not prevent manifest injustice.  Like in verbatim Firestone matter the ORDER admits the motion to vacate is based on Fed R. Civ P 60 and erroneously anchors its decision to deny the motion, on a Rule 59(e) motion "is discretionary" and need not be granted unless the district court finds that there is an "intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *National Trust v. Department of State,* 834 F. Supp. 453, 455 (D.D.C 1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama Historical Ass'n v. Christopher,* 49 F.3d 750 (D.C. Cir. 1995) (quoting *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.), *cert. denied* 113 S. Ct. 67 (1992)).   Application of Rule 59(e) plaintiffs states would create

1. United States to be a nessessary and essential party to the case and would make the judgment moot.

2. Would make Nara Singhderewa a minor, that has the right to counsel and present being represented by the plaintiff a necessary and essential party to the case and being that the ORDER Nov 26th 2007 states she is non-party would make the judgement moot.

3. As representative and father of the minor the plaintiff represents the minor in a pro se and forma paupers capacity and being that this capacity was denied automatically creates non party minor the right to representation and makes the order null and void. EXHIBIT ONE

In the Firestone family multi year case, a review of the district court's refusal to vacate a judgment under Federal Rule of Civil Procedure 59(e) for abuse of discretion. *See Browder v. Director, Ill. Dep't of Corrections,* 434 U.S. 257, 263 n.7 (1978) (discussing the analogous Rule 60(b)). Leave to amend a complaint under Rule 15(a) "shall be freely given when justice so requires." FED. R. CIV. P. 15(a); *see Foman v. Davis,* 371 U.S. 178, 182 (1962). Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as "undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment." *Foman,* 371 U.S. at 182.  SEE ORDER DATED 26th Nov 2007 there is no reason given to deny leave to amend the case.

After the district court dismissed the complaint with prejudice, Russell III and Myrna could amend their complaint only by filing, as they properly did, a 59(e) motion to alter or amend a judgment combined with a Rule 15(a) motion requesting leave of court to amend their complaint. *See Confederate Memorial Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C. Cir. 1993) (describing the procedure). Rule 15(a)'s liberal standard for granting leave to amend governs once the court has vacated the judgment. *See* 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1489 at 694 (2d ed. 1990). But to vacate the judgment, Appellants must first satisfy Rule 59(e)'s more stringent standard. *See id.* Therefore, we first determine whether the district court abused its discretion in failing to vacate the original dismissal with prejudice. If it did, we then ask whether the district court abused its discretion in denying Russell III and Myrna leave to file their amended complaint.  See ORDER dated 26th November 2007.

With respect to the first issue, we conclude that the denial of the 59(e) motion was an abuse of discretion because the dismissal of the original complaint *with prejudice* was erroneous. Even assuming that the district court properly dismissed the complaint, neither the determination that Russell III and Myrna's claims were time-barred, nor the determination that their complaint failed to plead fraud with particularity support a dismissal *with prejudice.* As we have repeatedly held, courts should hesitate to dismiss a

complaint on statute of limitations grounds based solely on the face of the complaint. *See, e.g., Richards v. Mileski,* 662 F.2d 65, 73 (D.C. Cir. 1981); *Jones v. Rogers Memorial Hosp.,* 442 F.2d 773, 775 (D.C. Cir. 1971). In *Richards* we made clear that, because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred. *See Richards,* 662 F.2d at 73. A dismissal *with prejudice* is warranted only when a trial court "determines that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " *Jarrell v. United States Postal Serv.,* 753 F.2d 1088, 1091 (D.C. Cir. 1985) (quoting *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962)).

Failure to plead fraud with particularity likewise does not support a dismissal with prejudice. To the contrary, leave to amend is " "almost always' " allowed to cure deficiencies in pleading fraud. *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice,* 9.03 at 9-34 (2d ed. 1986)).

Turning then to the Rule 15(a) issue, we find error in the district court's complete failure to provide reasons for refusing to grant leave to amend. The Supreme Court stated in *Foman* that while the decision to grant or deny leave to amend is within the trial court's discretion, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." 371 U.S. at 182. We too have emphasized that a proper exercise of discretion requires that the district court provide reasons. *See Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1018, 1020 (D.C. Cir.

1981) (reversing district court's denial of leave to amend, and remanding to the district court either to grant plaintiff leave to amend or provide sufficient reasons for its denial).

the District of Columbia's three-year statute of limitations for claims based on fraud, intentional infliction of emotional distress, and interference with judgments. *See* D.C. Code § 12-301(8) (1995). Under District of Columbia law, a tort action accrues "when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C. 1989); *see also Goldman v. Bequai,* 19 F.3d 666, 671-72 (D.C. Cir. 1994). Fraudulent concealment, however, tolls the running of the statute of limitations. In *Larson v. Northrop Corp.,* we held that to prove fraudulent concealment, plaintiffs must " "show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence.' " 21 F.3d 1164, 1172 (D.C. Cir. 1994) (quoting *Foltz v. U.S. News & World Report, Inc.,* 663 F. Supp. 1494, 1537 (D.D.C. 1987), *aff'd,* 865 F.2d 364 (D.C. Cir.), *cert. denied,* 490 U.S. 1108 (1989) (alteration in original)). Generally, fraudulent concealment requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing. *See Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1491 (D.C. Cir. 1989). A failure to disclose by one who has a duty to do so-such as someone standing in a fiduciary or confidential relationship-also can establish fraudulent concealment. *Id.* at 1496. Once a plaintiff shows fraudulent concealment, a defendant wishing to assert "a defense based on the plaintiff's lack of due diligence must show something closer to actual notice than the merest inquiry notice that would be sufficient

CASE 1:07 cv-01170-JDB     Document 31     Filed on                    Page 6 of 46

to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell,* 866 F.2d at 1491.  SEE ORDER  Nov 26th 2007.

ARGUMENT I

WAIVER OF SOVERIGN IMMUNITY

Plaintiffs argue that the International Covenant on Civil and Political Rights ('ICCPR') read in conjunction with the ATCA constitutes the requisite waiver of sovereign immunity. The United States ratified the ICCPR in 1992. It provides in relevant part:

Each State party to the present Covenant undertakes: (a) to ensure that any person whose rights or freedoms herein recognized are violated shall have an effective {22 F.Supp.2d 353, 365} remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; (b) to ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities.ICCPR Article 2(3) (a-b).

"No one can read the significant Supreme Court cases on sovereign immunity ... without concluding that the field is a **mass of confusion**; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded."

Antonin Scalia (Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice), letter dated May 10 1976 to the Chairman, Subcommittee on Administrative Practice and Procedure, U.S. Senate Judiciary Committee, pertaining to to the ensuing P.L. 94-574, amending the Administrative Procedure Act to waive sovereign immunity

for "relief other than money damages", 5 U.S.C. § 702, Oct. 21 1976 (U.S. Congress 94-2, House Judiciary Committee, H.R. Rep. No. 94-1656, Sept. 22 1976, SuDoc 94-2:H.rp.1656, Serial Set 13134-12), 1976 USCCAN 6121, 6145, *via* 1976 WestLaw 14066, Leg.Hist. (103 kb), **bold-face** added.  The U.S. Supreme Court has admitted its confusion and confessed *(below)* that it made the very same mistake the Judge did in the *Jama* case. Recovering partially from their confusion, the Supreme Court indicated that sovereign immunity pertains to a *remedy* and not to a claim (a 'cause of action'). The ATCA provides no remedy, merely (as the Judge correctly observed) subject-matter jurisdiction.  EXHIBIT TWO

*Ratification of International Covenant on Civil and Political Rights* {10 kb txt, 302 kb pdf} (U.S. Congress 102-2, Senate Executive Report No. 102-23, March 24 1992), **bold-face** added. Senate Resolution (April 2 1992), ratifying the ICCPR treaty {cited above}. The Declarations and Reservations (323 kb) (UNHCR, Geneva) also quote the content of the U.S. Senate resolution.

The ATCA provides the subject matter jurisdiction (international-law tort claims by aliens), as detailed above. The DJA provides the remedy (declaratory judgment), as detailed above. And, the APA provides the waiver of sovereign immunity for a U.S. Court to award that remedy as detailed above.

The APA (which waives sovereign immunity for "relief other than money damages" on any type of claim for which the U.S. Court has jurisdiction) is like the *Tucker Act* (which waives sovereign immunity for relief by money damages on non-tort contract claims, and "taking" claims, for which the U.S. Court has jurisdiction) {463 U.S. 206, 212}:

In *United States v. Testan*, 424 U.S. 392, 398, 400 (1976), and in *United States v. Mitchell*, 445 U.S. at 538, this Court employed language suggesting that the *Tucker Act* does not effect a waiver of sovereign immunity. Such language was not necessary to the decision in either case. *See infra*, at 217-218. Without in any way questioning the result in either case, we conclude that this isolated language should be disregarded. If a claim falls within the terms of the *Tucker Act*, the United States has presumptively consented to suit.

Congress plainly agreed with Judge Cardozo and was *determined* that U.S. Courts should **stop** creating injustice and hatred, should **stop** giving the United States blanket immunity for the wrongdoings of its officials, should **stop** rubber-stamping their actions, should **stop** thereby licensing them to violate the law, and, instead, should **apply their minds** case-by-case to whether some special factor, in that particular case, *justified* immunity. And, the U.S. Department of Justice agreed with Congress, through their spokesman who is now himself a U.S. Supreme Court Justice {1976 USCCAN 6145}:

It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future {1976 USCCAN 6146} be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on **other legal grounds**, such as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to agency discretion; privileged nature of the defendant's conduct; failure

to exhaust administrative remedies; discretionary power to refuse equitable relief; and the

'political question' doctrine."


ARGUMENT II

MANIFEST INJUSTICE

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human

Right Commission against the State Actors of Australia and others."  *Id*. ¶ 42.  "[T]he

Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

We are led to see justice as fairness, as the greatest mutual advantage, as the minimax

relative concession, as reciprocity, as the terms of a society-wide agreement that cannot

reasonably be rejected, as reversibility, as impartiality and the image is embodied in a

woman blindfolded holding a balance.  The plaintiff has argued that the manifested

injustice already ruled "unjustifiable" and admitted in an order also denies the plaintiff

categorical imperative identified justice as universalizability as recognized by

International norms already.


In the UNITED STATES DISTRICT COURT WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE CIVIL ACTION NO. 3:04CV-338-H JAMES H. O'BRYAN et. al.
PLAINTIFFS V. HOLY SEE DEFENDANT

        Plaintiffs allege first that the Holy See violated its international law obligations

under the Universal Declaration of Human Rights and the Convention on the Rights of

the Child.  Second, Plaintiffs allege that Defendant, "by and through its agents, servants

and employees," breached duties owed to Plaintiffs. Those duties included the duty to

provide safe care, custody, and control to the minor children entrusted to Roman

Catholic; the duty to warn parents of those children that the priests and other clerics to

whom they entrusted their children were known perpetrators of childhood sexual abuse;

and the duty to report known or suspected perpetrators of childhood sexual abuse to the

appropriate authorities. Third, Plaintiffs allege that the Holy See breached fiduciary

duties owed to Plaintiffs, including but not limited the duty to warn parents of children

placed in the care, custody, and control of known perpetrators of childhood sexual abuse

and the duty to report known or suspected perpetrators of child sexual abuse to the

appropriate authorities. Fourth, Plaintiffs allege that Defendant's conduct constitutes an

outrage and infliction of emotional distress.  Fifth and sixth, in claims solely against the

Holy See in its capacity as an incorporated association and head of an international

religious organization, Plaintiffs allege torts of deceit and misrepresentation.  Plaintiffs

also seek a variety of injunctive relief.  EXHIBIT FOUR

No one disputes that the tortious activity exception is restricted to cases in which the

personal injury, death, or damage to or loss of property occurs in the United States.  28

U.S.C. § 1605(a)(5). The actual personal injuries complained of in this suit – the sexual

abuse of Plaintiffs and purported Class Members – meet that requirement.  However, the

analysis does not end here. The Seventh and D.C. Circuits have added the requirement

that the tortious act or omission (in addition to the actual personal injury) must occur in

the United States.  *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379

(7th Cir. 1985); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517,

1524 (D.C. Cir. 1984).[2] The Ninth Circuit has a slightly different rule, holding that "if

plaintiffs allege *at least one entire tort* occurring in the United States, they may claim

under § 1605(a)(5)."  *Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984)

(emphasis added).  The Sixth Circuit has not considered this additional requirement.

EXHBIT FIVE

Subsequently, Chief Justice Rehnquist, speaking for a unanimous Supreme Court, discussed the issue in *Argentine Republic v. Amerada Hess Shipping Corp.*, *supra*. The Court did hold that § 1605(a)(5) is "limited by its terms . . . to those cases in which the damage to or loss of property occurs *in the United States*." *Id.* at 439 (emphasis in original). The Court then concluded that "[b]ecause respondents' *injury* unquestionably occurred well outside [the United States], the exception for noncommercial torts cannot apply." *Id.* at 441 (emphasis added). The Court then discussed the fact that a tort may have had effects in the United States, drawing a distinction between § 1605(a)(5) and § 1605(a)(2), under which a foreign state may be liable for commercial activities "outside the territory of the United States" that have a "direct effect" inside the United States. 28 U.S.C. § 1605(a)(2). It said that "Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States."

*Amerada Hess*, 488 U.S. at 441. EXHIBIT SIX  EXHBIT SEVEN  While the Supreme Court's conclusions are not completely clear, its language suggests a view that both the injury and the tortious act or omission must occur in the United States. This is strong enough language for this Court to adopt the same view. Here, Plaintiffs allege torts that occurred both outside and inside the United States. Plaintiffs concede that the *acts* of *Defendant itself* were all "committed outside the United States." *See* Plaintiffs' Response Brief at 27. Moreover, any omissions committed by the Holy See itself clearly occurred outside of the United States.  , Plaintiffs allege that acts and omissions by agents of the Holy See inside the United States caused personal injuries. Specifically, Plaintiffs allege

that Defendant's agents, officials, and employees failed to report known or suspected

child abuse, failed to warn parishioners about known or suspected pedophiles in child-

care positions, failed to provide adequate care to children entrusted to its churches and

school, failed to maintain the premises of churches and schools in a reasonably safe

condition, and failed to adequately supervise or control known or suspected sexual

predators. *Id.* at 17. These torts – both acts and omissions – alleged to have been

committed by the "Defendant's agents, officials, and employees" *in the United States* all

certainly occurred within the United States, and thus squarely fall under the tortious

activity exception of FSIA. Having concluded that some of Plaintiffs' claims meet the

tortious conduct exception to FSIA's general rule of immunity, the Court must now

consider a final issue.  This concerns "the exception within the exception." FSIA will not

allow a tort claim, even against officials or employees of the Holy See whose acts and

injuries occur in the United States where those officials were exercising their

discretionary function.  Called the discretionary function exception, it exempts claims

"based upon the exercise or performance or the failure to exercise or perform a

discretionary function regardless of whether the discretion be abused."  28 U.S.C. §

1605(a)(5)(A).   EXHIBIT EIGHT



        The discretionary function exception of the FSIA is modeled after the

corresponding exception in the Federal Tort Claims Act ("FTCA") and is interpreted and

applied consistent with FTCA law. *See, e.g., Joseph v. Office of Consulate General of

Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). This exception appears based upon the

policy view that foreign states should be immune from the consequences of discretionary acts of employees, even within the scope of their employment. Courts have found that both the FTCA and FSIA exceptions are intended to preserve immunity "for decisions grounded in social, economic, and political policy." *In re Terrorist Attacks of September 11, 2001*, 349 F.Supp.2d 765, 794 (S.D.N.Y. 2005) (internal citations and quotations omitted). Consequently, the discretionary function exception preserves immunity for planning-level decisions, as opposed to operational-level decisions. *Id.* (citations omitted).

Defendant must satisfy two elements to avail itself of FSIA immunity under the discretionary function exception. First, the challenged action must be discretionary; that is, it must involve "an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA context, this prong means that if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply. *Berkovitz*, 486 U.S. at 536. Second, and even if the challenged action did involve an element of judgment or choice, "a court must determine whether that judgment is of the kind the discretionary function exception was designed to shield." *Id.*; *Gaubert*, 499 U.S. at 322-23. The Supreme Court explained this prong in *Berkovitz* in the following manner: The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. *Berkovitz*, 486 U.S. at 536

(internal citations omitted).

To answer the questions posted by the two *Berkovitz* elements, the Court must define Plaintiffs' negligence claims by their constituent elements. These claims can be distilled into three principal omissions, as laid out in the Complaint: that (1) Defendants failed to *provide safe care* to children entrusted to their care; that (2) Defendants *failed to warn* parishioners that their children would be under the care of known or suspected pedophiles*;* and that (3) Defendants *failed to report* known or suspected child abuse to the appropriate authorities *. See* EXHIBIT NINE

For the reasons that follow, only the first group of claims meets the discretionary function test and are exempt from suit.

The first claim seems to be essentially a negligent hiring claim: that the Defendant hired persons whom it knew or suspected were child sexual abusers and place them in positions where they could sexually abuse children. Applying the first prong of the *Berkovitz* test, such personnel decisions appear to involve a discretionary activity. Not surprisingly, courts have generally held that negligent hiring decisions are protected by the discretionary function exception. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 332-34 (1991) (holding that claims involving management decisions, including the "negligent selection of directors and officers," were barred by the discretionary function exception); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions relating to hiring . . . usually involve policy judgments of the type Congress intended the discretionary function to shield"). Although Defendant's hiring decisions may have indeed been negligent, the discretionary function exception to the FSIA protects such decisions. Therefore, Plaintiffs' negligence claim based upon the "duty to provide safe

care, custody, and control" of minor children in Catholic schools and churches cannot

proceed.   EXHIBIT NINE

The second negligence claim is that Defendant failed to warn parishioners that

their children would be under the care of known or suspected pedophiles, allegedly

pursuant to a policy promulgated by the Holy See itself.  Under the tests laid out in

*Berkovitz* and *Gaubert*, the decision by the bishops, archbishops, and other clergy not to

warn parishioners would appear to be a decision specifically prescribed by that policy.

Therefore, their decisions do not satisfy the first prong of the *Berkovitz* test, because they

did not involve "an element of judgment or choice." Therefore, the alleged failure of the

Holy See's officials and employees to warn parishioners that their children would be

under the care of known or suspected pedophiles is not a decision protected by the

discretionary function exception.  EXHBIT TEN

Finally, Plaintiffs' claim that Defendant's officials and employees failed to report

known or suspected perpetrators of child sexual abuse to the relevant state and local

authorities.  Like the failure to warn claim, Plaintiffs claim that the Holy See's employees

and officials failed to report child sexual abuse to the appropriate authorities pursuant to a

policy promulgated by the Holy See. Again, as alleged, this decision did not involve an

"an element of judgment or choice" because an established policy required the action.

Thus, liability for such decision is not barred by the discretionary function exception.

John Rawls's "justice as fairness," where a sense of fairness impels all adult members of

society to accept those principles of justice that it would be rational to adopt in an

"original position." In this original position, all initial endowments disappear behind a

"veil of ignorance." If people had no endowments, or had equal ones, or were ignorant of

what they had, it would be pararational for them to agree that inequalities are to be evened out except if they work to the advantage of the least favored among them. This, Rawls's "difference principle," is the product of prudential reason once fairness has led all to ignore any initial advantages they may have.   The plaintiffs have argued manifested injustice applying Rawl's standard of fairness where Fairness as initial equality is an axiom of justice as fairness.  Plaintiffs argue the prevent the manifest injustice of

1.      Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.   EXHIBIT NINE and ORDER OF NOV 26th 2007.

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and

(d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1.      23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2.      24. Violated and derogated the Constitutional Right of the Plaintiffs

3.      25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity"

of the defendant and examine how the pattern of conduct of defendant in defying the agreements it claims it has signed. The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Among other "justices as ...," and next only to Rawls's, the most influential is probably Thomas Scanlon's (1982) justice as unrejectability. Brian Barry's (1995) "justice as impartiality" is a synthetic derivative of both, with a preponderance of Scanlon. The three together incorporate most of the currently dominant mainstream theory that, or so I shall argue, treats justice as a matter of social choice rather than, as in the traditional approach, a quality of individual acts. Common law tort is simply "a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages."[15] More concretely, common law torts typically involve four elements: (1) a common law duty from one individual to others; (2) that is breached through action or inaction; (3) that causes; (4) injury to another individual.[16] Constitutional torts track the same four elements except that the duty originates from the Constitution instead of the common law. Rather than running between two private individuals, a constitutional duty runs between a government official or municipality and the private individual. While the defendant in a common law tort action may happen to be a government official or municipality, the defendant in a constitutional tort action is always a government official.

In Rawls, once he has led people into the original position (and some auxiliary assumptions are made), agreement on distributive principles is a matter of mutual advantage; it has instrumental value. In Scanlon's contractualist theory, in sharp contrast to Rawls, agreement need not yield mutual advantage in order to be reached. It may yield it accessorily, but people do not seek it to make themselves better off in the ordinary narrow sense. They seek it because they are motivated by a common desire for agreement that is inherent in morality (Scanlon 1982: 128).

So far, there is nothing implausible or far-fetched in Scanlon's construction. Less extravagantly than Rawls, it does not require harsh and heroic renunciation of initial advantages. It is easier to take it that people wish to live in agreement with each other, on the basis of which they can mutually justify their conduct (ibid.: 117) than that they commit themselves to a distributive rule that deprives the more favored among them of any advantage over the less favored.

In Scanlon, for the agreement to produce unrejectable rules that will be morally wrong to transgress, the agreement must be both informed and unforced (ibid.: 110-11). The information condition can, I believe, be safely accepted, but what about the condition of unforcedness?

Unforcedness, as Scanlon explains it, means not only that no party must be coerced to agree, but that none must be in a "weak bargaining position" enabling others "to insist on better terms" (ibid.: 111). But better than what? Manifestly, there is a hidden norm both for bargaining strength (none must be in a stronger or weaker position than the norm) and for the terms eventually struck in the bargain (they must not be better for some, worse for others). But if such a norm is tacitly pre-set, the desired bargaining solution will be a

disguised initial condition of the theory and not a theorem of it. Though Scanlon, to his credit, refrains from saying so, we may take it that people starting from initially equal endowments would find rules providing for continuing equality unrejectable--they are left with no ground for rejection. Hence, they would find inequality in breach of the agreement unjust. This is plausible, but how interesting is it?

All we know of the common desire for agreement is that all are "moved by it to the same degree" (ibid.: 111). But what degree, how high? Given a very high degree, a variety of widely divergent terms may all be unrejectable. Nothing ensures a determinate solution. This might not matter much if the whole set of possible solutions were just by virtue of being unanimously agreed upon, or if there were independent means of identifying a unique just solution, or at least a just subset within the possible set. Would the test of "reasonableness" provide such a means? Or, what is a different proposition, is it that only reasonable terms are truly unrejectable? But what, then, is the test of reasonableness? How do we recognize it?

I would submit that we are inadvertently moving back and forth between what are, in fact, two theories separated by the idea of reasonableness, which acts as a "cutout." On the near side, there is a theory in which the desire for agreement and initial equality jointly produce a bargaining solution, which is both unrejectable and normatively unique because it must correspond to the tacit norm built into the initial conditions (i.e., that the terms must not be "better for some and worse for others"). On the far side of the cutout, we find a much simpler theory. Among possible bargaining solutions, there is at least one set of terms that is reasonable. Since it is unreasonable to reject that which is reasonable, these terms will be unrejectable by reasonable persons, hence they will be just. There is

no need for a desire for agreement, and it does not matter whether initial endowments were equal or not, for all will agree to their reasonable redistribution.

Justice as impartiality, then, whether obtained via the "original position" or via a special meaning given to reasonableness, entails equality of valuable endowments and the enforcement of that equality over time.

Justice becomes a matter of satisfying a selection criterion or choice rule (e.g., "choose the state of affairs no one can reasonably reject") by which a state of affairs is identified as "just," in the same way as other selection criteria, choice rules, or choice mechanisms identify a state of affairs as socially "chosen" or "preferred." Fairness, unanimity, non-rejection, veto right held by the "dictator" (e.g., the worst-placed individual or group) fit very well into the *modus operandi* of social choice theory.

Torts are recognized in immemorial and near-universal cross-cultural conventions that condemn and sanction murder, maiming, trespass, theft, and other offenses against person and property. They are not problematical for the present purpose. Duties are conventionally recognized moral imperatives, and their breaches are conventionally condemned but typically not sanctioned. Unlike obligations, duties do not have the rights of another person as their logical corollary; but neglect of duty is generally taken to disqualify an act from being just. Duties, too, are largely unproblematical for the theory of justice.

There are at least two (and perhaps more than two) ways of looking at such pairwise agreements. One is to find that the agreement, by virtue of being untainted by force, fraud, or unconscionability, is just, since those concerned jointly chose it, rather than something else. By extension, the distributive consequence of the totality of all such

agreements, past and present, is a just distribution. The other view is that the agreement was just if and only if the values exchanged or promised under it have been justly come by.it

A door was installed by a Congress of a different era — the first Congress, in its first session, in 1789, when the U.S. was not a superpower — and it was long forgotten, until 1980 (*Filartiga*). It's a door built especially for foreigners. And — as it wasn't crafted to deny justice, but to enable justice — it's plain and simple and it's not decorated with exceptions:

"Sec. 1350. — **Alien's action for tort**

The district courts shall have original **jurisdiction** of any civil action by an **alien** for a **tort** only, committed in violation of the **law of nations** or a treaty of the United States."

Under this provision, U.S. Courts can apply their full-range of remedies to any wrongdoing they find: actual damages, punitive damages, injunctions, declaratory judgments.

The U.S. Congress will not permit a foreign nation to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials *(Foreign Sovereign Immunity Act)*. So too U.S. Courts should not permit the United States itself to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials.

"Sec. 702. — **Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking **relief other than money**

**damages** and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a **judgment or decree may be entered against the United States**: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

*A. Use of the Acts in the Human Rights Context*

The United States affords certain domestic rights of action for persons claiming to be victims of human rights abuses, regardless of where they occur. The Alien Tort Claims Act (ATCA) provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[14] The Torture Victim Protection Act (TVPA), recently passed by Congress, provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual."[15]   This subject matter has never been addressed by the court and although a previous ORDER states the claim of torture and court fails to clarify why ATCA is beyond the subject matter jurisdiction of the court.

The ATCA, which traces its origins to the first Judiciary Act of 1789 but lay virtually unused for 200 years, has found new life as a means for aliens to sue in U.S. federal courts for damages from alleged human rights violations occurring around the world.[16]

The ATCA was enacted along with the Judiciary Act of 1789 in part to allow a forum in the United States for bringing pirates of the high seas to justice.[17] Others have viewed the legislative intent behind the ATCA as being rooted in "what the Founders understood to be the nation's duty to propagate and enforce those international law rules that directly regulated individual conduct."[18] In 1975, Judge Henry [*pg 921] Friendly discussed the ATCA and remarked that "[t]his old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act . . . no one seems to know whence it came."[19]

Regardless of the debate about the origins of Judge Friendly's "legal Lohengrin,"[20] plaintiffs have recently relied upon the ATCA as a means of remedying violations of human rights around the world.[21] For example, in *Filartiga v. Pena-Irala*,[22] a Paraguayan citizen sued the Inspector General of Police of Asuncion for kidnapping and torturing to death his son, Joelito Filartiga.[23] The United States Court of Appeals for the Second Circuit upheld the jurisdiction of the United States District Court for the Eastern District of New York under the ATCA, even though both the plaintiff and the defendant were Paraguayan and all of the relevant actions took place in Paraguay.[24] "'[I]nternational law confers fundamental rights upon all people vis-a-vis their own governments,' including the right to be free from torture."[25] In holding that a United States court could hear claims [*pg 922] regarding torts that violated international law, regardless of where they occurred, the district court relied upon the doctrine of transitory torts, which provides that "liability for certain tortious acts follow[s] the tortfeasor, such that he could be subject to suit for th[ose] act[s] in any forum."[26] Now the complaint so completely clear where even the defendants have admitted that the even took place in Australia or even India.  Clever

maneuvering of the FISA does not render the ATCA beyond the jurisdiction of subject matter.

The TVPA apparently endorsed *Filartiga*'s approach to the ATCA.[27] The TVPA was enacted in 1992, and its legislative history indicates its drafters' intent to address official, government-sanctioned torture or extrajudicial killing.[28] The TVPA is inherently linked to the ATCA, and by no means was intended to replace it.[29] Unlike the ATCA, the TVPA is not a jurisdictional statute. Thus, a TVPA plaintiff must establish its jurisdiction via the ATCA, or through some other means such as the general federal question jurisdiction from section 1331.[30]   The court ORDER denying the plaintiff a Preliminary Injunction, his daughter, being unprecedented in the history of the United States where the United States has gone to war in Vietnam and Iran over hostages still whitewashes the subject of ATCA and TVPA subjects within its jurisdiction.

Litigants have recently invoked the ATCA and the TVPA to attempt to vindicate human rights abuses abroad, perhaps most notably in the case of *Kadic v. Karadzic*,[31] the suit against Radovan Karadzic, wartime leader of the self-proclaimed Bosnian-Serb republic, for various atrocities and brutal acts allegedly committed by the Bosnian-Serb military forces.[32] In *Kadic*, a three-judge panel of the U.S. Court of Appeals for the Second Circuit held that the plaintiffs established the necessary federal subject matter jurisdiction under the ATCA and had brought forth allegations that, if proven true, could be remedied by the ATCA and the TVPA: "[The ATCA] appears to provide a remedy for the appellants' allegations of violations and official torture, and the Torture Victim Act also appears to provide a remedy for their allegations of official torture, [thus] their causes of

action are statutorily authorized."[33] The cases against Karadzic went back to trial, resulting in over $5 billion in judgments being entered against him.[34]

Debate remains over the appropriateness of hearing these types of human rights cases in American courts, especially in cases involving foreign parties and acts that took place in foreign lands seeming to have little connection to the United States.[35] In the words [*pg 924] of Karadzic himself in a letter to United States District Judge Peter K. Leisure, who presided over the billion dollar case, "Can you really hope to find truth, or do justice, or protect rights of people in distant nations? . . . Do you really believe that attaching a U.S. dollar sign to human tragedy around the world by empty judgments in uncontested lawsuits is a step toward peace or justice?"[36] However, many view these cases as wholly appropriate, as they often serve as the sole means for exposing human rights violators, have significant deterrent effects, and help the healing process of victims.[37] For example, Judge Leisure stressed that "[i]t's very important that the United States of America rises to the occasion when these things happen, and we not just wait for the United Nations war crimes tribunal."[38]   Then the manifest unjustice to the plantiffs in this case that there infact United States Connection and even then the court has found it necessary to lay aside the fact that the complaint was bought under this act.

A number of barriers can impede litigants proceeding under the ATCA and the TVPA. For example, the Foreign Sovereign Immunities Act of 1976[39] (FSIA) generally bars jurisdiction over foreign sovereigns in United States courts[40] and can pose problems for human rights litigants. However, the FSIA has been construed as having exceptions allowing ATCA and TVPA suits against foreign government officials who act beyond the scope of their power, for example, by committing an act such as torture that a

government [*pg 925] would not publicly endorse.[41] While the case law is by no means

clear cut,[42] the exceptions are allowing victims of alleged human rights abuses their day

in American courts.[43] Other hurdles, such as the Act of State doctrine[44] and the doctrine

of forum non conveniens,[45] can also prevent ATCA and TVPA litigants from having their

cases heard in U.S. courts.[46]   The plaintiff seek clarification from the court why it states

that the manifest unjustice of it partner and signatory can capture and keep concealed for

a lifetime father from a child and it must pass an ORDER that states something to the

effect that the defendants a permitted in the case to torture and sexually abuse perhaps in

the "White House" even and in public a 6 (SIX) year old girl.


## B. Jurisdiction Under the ATCA and the TVPA

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human

Right Commission against the State Actors of Australia and others."  *Id*. ¶ 42.  "[T]he

Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

A striking aspect of the ATCA and the TVPA is that they can be used in a U.S. court in a

case involving a foreign plaintiff, a foreign defendant, and activity that occurred outside

the United States.[47] In [*pg 926] U.S. courts, it is necessary for plaintiffs to establish that

the court has subject matter jurisdiction over the claim, and that it has personal

jurisdiction over the defendant.[48]

To establish subject matter jurisdiction under the ATCA, a plaintiff must demonstrate

that "three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in

violation of the law of nations (i.e., international law)."[49] In fact, the ATCA has been

interpreted as granting federal subject matter jurisdiction and creating a cause of action

when a plaintiff "can establish that the abuses allegedly inflicted upon her constitute violations of international law."[50] "[T]he torturer has become -- like the pirate and slave trader before him -- *hostis humani generis*, an enemy of all mankind."[51] As a result, the United States can claim universal subject matter jurisdiction for certain offenses "significant enough to threaten the interests 'of civilization everywhere.'"[52] The notion of universal [*pg 927] jurisdiction is based on the principle that states can claim jurisdiction "'to define and punish certain offenses recognized by the community of nations as of universal concern,' . . . even where no other recognized basis of jurisdiction is present."[53] Although court in ORDER finds these offences and knows that the foundation of civilized society is a stake if it grants sovereigns the power to steal and hold hostage minors.

The use of this type of universal jurisdiction over violations of human rights is not restricted to the United States.[54] Many other countries have created criminal penalties for human rights violators and war criminals on the basis of treaty obligations, such as the 1948 Genocide Convention.[55] Belgium, Denmark, France, Germany, Israel, Spain, and Switzerland, for example, have done their part domestically to prosecute non-nationals for war crimes and violations of human rights.[56] One needs only to look at the current case against former Chilean head of state Augusto Pinochet to note the worldwide use of universal jurisdiction.[57] While many of these examples of universal jurisdiction apply to criminal prosecutions, other countries have applied these principles in civil cases in the same spirit as the ATCA and the TVPA.[58]

The process of negotiating a Hague jurisdiction and judgments convention is a significant undertaking, and all parties involved should be commended for the steps that have

already been taken.[175] The benefits of a judgments convention have been well documented.[176] One of the potential consequences, apart from possible constitutional conflicts and having to reorganize domestic jurisdictional law,[177] is the effect of the proposed convention on domestic efforts to enforce human rights around the world, via the ATCA, TVPA, and other similar legislation. The foregoing discussion attempted to present some of the possible structures the final convention could take, and the potential consequences these structures could have on ATCA and TVPA actions, and on human rights litigation in other parts of the world.

If anything, the negotiators should be aware that a project such as the proposed convention, in whatever form it eventually takes, could positively or negatively impact ATCA and TVPA litigation. First of all, keeping a human rights provision as it appears in the current draft of the proposed convention should not do anything to adversely affect human rights litigation, but even then there is room for argument that it could help or hurt. Second, if the proposed convention removes its current human rights exception, it could hinder human rights enforcement. On the other hand, the convention could still be beneficial to human rights litigation in this form, since in many ATCA cases one could claim that jurisdiction was based on more than just a tagging basis.[178] Finally, the proposed convention could allow the automatic enforcement and recognition of judgments in human rights cases when jurisdiction is based on an approved white list ground, or when based on an approved ground that would be exorbitant outside of a human rights setting. Furthermore, in many ways independent of the use of a human provision, the proposed convention could make its jurisdiction, enforcement, and

recognition [*pg 952] sections openly discriminatory to noncontracting states in the style of the Brussels and Lugano conventions.

Above all, it is important to remember Judge Robb's comment in *Tel-Oren v. Libyan-Arab Republic*,[179] an ATCA case, that "[i]t is one thing for a student note-writer to urge that courts accept the challenges involved. It is an entirely different matter for a court to be asked to conduct such a [highly-sensitive and political] hearing successfully. The dangers are obvious."[180] The same is true for the negotiators. These potential formats are easier said than done.

In the context of the implementation of the proposed convention's required, permitted, and prohibited lists, it is also worth noting that there will be some variation in the interpretation of whether a case actually falls within one list versus another. Justice Marshall's choice of words in *Kulko v. Superior Court*[181] is all the more relevant: "[F]ew answers will be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'"[182] Furthermore, many are correct to highlight the practical reality of underenforcement of human rights judgments in the courts of the world.[183] Additionally, there are always potential problems with the enforcement of the convention itself, since states often sign on to treaties with the best of intentions, only to breach their terms when push comes to shove.[184] However, "in an [*pg 953] interdependent world, most countries will often have little choice but, sooner or later, to do business with each other."[185] *See* Anne-Marie Burley, *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 AM. J. INT'L L. 461, 461-62 (1989).

The plaintiffs, *See* Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 814 n.23 (D.C. Cir. 1984) (Bork, J., concurring). Another view on the legislative intent behind the ATCA is that of national security: there was concern that refusing access to the courts to aliens could provoke international hostility. *See id.* at 783-84 (Edwards, J., concurring) (quoting Alexander Hamilton's belief that "the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned," for "[t]his is not less essential to the preservation of the public faith, than to the security of the public tranquillity"). *But see id.* at 816, 821 (Bork, J., concurring) (expressing the view that concerns over national security warrant against hearing ATCA cases). As the opinions in *Tel-Oren* demonstrate, there is no real consensus as to what Congress meant to do in enacting the "legal Lohengrin." *See* Jeffrey Rabkin, Note, *Universal Justice: The Role of Federal Courts in International Civil Litigation*, 95 COLUM. L. REV. 2120, 2125-26 (1995) (discussing national security and other views on the legislative intent of the ATCA).

For an extensive list of ATCA cases against nonstate defendants, see Deborah L. Zimic, *Foreign Sovereign Immunity-Exceptions to Foreign Sovereign Immunity-The Foreign Sovereign Immunities Act Does Not Prohibit Invocation of the Alien Tort Claims Act to Exercise Federal Court Jurisdiction over a Foreign Nation's Non-Commercial Tort in Violation of International Law*, 28 VA. J. INT'L L. 221, 223 n.9 (1987). Ironically, one of the few instances before 1980 in which the ATCA (actually, a predecessor to it) was successfully invoked as a ground of jurisdiction was in *Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795) (No. 1607), in which a French citizen sought restitution for slaves taken

from a Spanish ship seized at war. The earlier use of the ATCA to protect a slaveholder's "property" is ironic given the statute's current use to protect human rights.

Sung Teak Kim, Note, *Adjudicating Violations of International Law: Defining the Scope of Jurisdiction Under the Alien Tort Statute*-Trajano v. Marcos, 27 CORNELL INT'L L.J. 387, 392 (1994) (quoting *Filartiga*, 630 F.2d at 885).

The doctrine of transitory torts holds that a person may be liable in courts of any country for an act wherever it is committed. See William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the "Originalists," 19 HASTINGS INT'L & COMP. L. REV. 221, 234 n.95 (1996). Apart from the human rights context, it has been applied to other situations as well. See, e.g., Darnell v. Rupplin, 371 S.E.2d 743, 745 (N.C. Ct. App. 1988) (alienation of affections as a transitory tort), cited in Jennifer E. McDougal, Comment, Legislating Morality: The Actions for Alienation of Affections and Criminal Conversation in North Carolina, 33 WAKE FOREST L. REV. 163, 185 n.155 (1998); Peter Nicolas, Comment, The Use of Preclusion Doctrine, Antisuit Injunctions, and Forum Non Conveniens Dismissals in Transnational Intellectual Property Litigation, 40 VA. J. INT'L L. 331, 354 (1999) (patent infringement as a transitory tort).

*See* SENATE COMM. ON THE JUDICIARY, THE TORTURE VICTIM PROTECTION ACT OF 1991, S. REP. NO. 102-249, at 4 [hereinafter TORTURE VICTIM PROTECTION ACT] (discussing the ATCA and *Filartiga*, and explaining that *Filartiga* "has met with general approval"); *see also* David P. Kunstle, Note, Kadic v. Karadzic: *Do Private Individuals Have Enforceable Rights and Obligations Under the Alien Tort Claims Act?*, 6 DUKE J. COMP. & INT'L L. 319, 343 (1996) ("[A]s indicated

by both the language and the legislative history of the TVPA, congressional reaction to *Filartiga*'s interpretation of the ATCA was anything but hostile.").

*See* TORTURE VICTIM PROTECTION ACT, *supra* note 27, at 3 ("The TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 . . . . Section 1350 has other important uses and should not be replaced.").70 F.3d 232, 237 (2d Cir. 1995) (holding that a district court could hear claims of torture committed against Muslim women allegedly committed by Serbian troops); *see also* Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (allowing a class action by Philippine nationals against a former Philippine president's estate for violations of human rights); *In re* Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493 (9th Cir. 1992) (allowing an action under ATCA by a Philippine citizen against the daughter of the former Philippine president, claiming wrongful death of her Philippine son caused by torture); National Coalition Gov't v. Unocal, Inc., 176 F.R.D. 329 (C.D. Cal. 1997) (denying a motion to dismiss of an oil company sued for violations of ATCA in connection with allegations of forced labor on a pipeline project); Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995) (awarding damages under ATCA and TVPA for violations of international law including summary execution or "disappearance," torture, arbitrary detention, and cruel, inhuman and degrading treatment).*See* Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981) (explaining that a case may be dismissed at the discretion of the trial court on the grounds of forum non conveniens if an alternative forum has jurisdiction to hear the case, and when the chosen location would "'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate

because of considerations affecting the court's own administrative and legal problems'" (quoting Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947))). *Piper* suggests, however, that ATCA cases might not be completely in danger. For example, where a remedy in an alternative forum is "so clearly inadequate or unsatisfactory that it is no remedy at all," an unfavorable change in law between the forums would be relevant. *Id.* at 254. Similarly, "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." *Id.* at 254 n.22. Keeping in mind the statement from the legislative history of the TVPA that "[a] state that practices torture and summary execution is not one that adheres to the rule of law," TORTURE VICTIM

Plaintiffs have a due process right to have their claims heard, and under current Supreme Court doctrine, tag jurisdiction is allowed to satisfy this right. *See* Harold G. Maier, *A Hague Conference Judgments Convention and United States Courts: A Problem and a Possibility*, 61 ALB. L. REV. 1207, 1235-36 (1998) (arguing that reasonable, permissive rules allowing tag jurisdiction would align with the Supreme Court's attitude towards jurisdictional rules).

1.  There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances" and the ORDER does not prevent this manifest injustice

2.  In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice

3.  The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

4.  The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

5.  Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

6. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

7. Defendants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 37 of 46

8. Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice.

9. The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

10. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice.

11. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

12. "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none

of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.) ORDER does not prevent this manifest injustice

    a.  A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally misinterpreted either as confirmation of information or as guilt for 'complicity'.

    b.  Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

13. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism, dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions,

and psychotic episodes so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

14. Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

15. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

16. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

17. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational, if not necessarily benign - has been irrevocably undermined. Social institutions

are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

18. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

19. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations, psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

20. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".  ORDER does not prevent this manifest injustice

21. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of

victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

22. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances". SEE EXHBIT TEN

23. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

   a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

24. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other

"objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

25. Spitz makes the following observation:

    a.   "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

26. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender:

Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

   a.   "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

27. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the victims can't win. Torture is forever.  SEE EXHIBIT TEN THIS IS MANIFEST INJUSTICE.

28. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation and rehear the matter based on manifest injustice.

29. The constitutional tort remedy is unique because it requires courts to focus on how constitutional provisions apply to injuries suffered by individuals. As a result, it has pushed the courts to understand constitutional provisions as (1) providing rights that protect individuals from certain governmental inflictions of harm; and (2) regulating the discretion of government officials to harm or allow harm to befall individuals.

30. Plaintiffs Constitutional tort actions, individuals claim that they have been harmed by either government action or the failure of the government to act despite an established obligation to intervene.[138] Individuals bring such actions not just to make a general point about how the world should be ordered but because they have been injured. Damages, provided for in constitutional tort actions, are a natural remedy for such harm. As the Supreme Court has observed, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."[139] The availability of a damage action for constitutional harms gives individuals an incentive to press claims based on constitutional provisions.[140] As one commentator has noted, the constitutional tort action "gave lawyers an incentive to conceive of past, tort-like harms in constitutional terms."[141]

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 45 of 46

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.      )
                                 )
            Plaintiffs      )
                                 )
            V              ) CASE NO 1:07-CV-01170
                                 )  JUDGE BATES
                                 )
COMMONWEALTH OF AUSTRALIA    )
et al.                                )
            Defendants    )

# ORDER

UPON DUE CONSIDERATION of the plaintiffs Response to the defendants motion to oppose rehearing and vacating order and Memorandum Points Supporting and any opposition is thereto, herby

ORDERED: CASE IS WITHIN THE RULE 60 and subchapters and is set for rehearing. The plaintiff have shown that Nara Singhderewa is a necessary and essential party and has been admitted as a party.

Plaintiffs have shown the United States of America is a necessary and essential party and has been admitted as a party.

In admitting United States and Nara Singhderewa the plaintiffs have been given leave to amend the complaint for constitutional Torts.

The plaintiffs allege and have shown a Constitutional Tort theus comply with Rule 59(e).

CASE 1:07 cv-01170-JDB    Document 31    Filed on                    Page 46 of 46


The plaintiff as per Rule 60 may bring a new case quoting this ORDER in another court.

ORDERED: CASE IS SET FOR JURY TRIAL.

ENTERED this _____day of _____2007.


_____

UNITED STATES DISTRICT JUDGE
JOHN.D. BATES

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

RESPONSE TO COURT ORDER AND MOTION FOR RECONSIDERATION TO

REAHEAR AND REOPEN  BEING MANIFEST UNJUSTICE TO THE PLAINTIFFS

The defendants claim that they have a special contract with the United States of America giving rise to aConstitutional tort actions are an avenue through which individuals can directly appeal to the Constitution as a source of right to remedy government-inflicted injury. It was not until the Supreme Court decisions in Monroe v. Pape[10] and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics[11] that individuals began arguing that the Constitution entitled them to damages for wrongful injury.

**As a result, the concept of individual harm is now incorporated into the substance of many constitutional rights. Instead of having a wholly negative effect on the**

scope of constitutional rights, the constitutional tort remedy contributes to a broader process of rights defini-tion where abstract constitutional provisions are translated into terms relevant to individuals' injuries

**With the doctrine of qualified immunity, a court can establish a new right without fear that imposing liability for past conduct will impose costs on government officials who did not know that their conduct was wrong. In the future, government officials could theoretically adjust their conduct to avoid damages liability so it does not violate the now clearly established right. Without such an opportunity for government to adjust its conduct, courts might be less willing to declare new rights for fear of imposing retroactive costs that the government did not have the opportunity to avoid. Thus, a limitation on remedies may make courts more willing to expand rights.**

Constitutional tort actions courts apply constitutional rather than common law norms in determining the duty that the government official owes to the individual. In some areas, though, the duties may overlap. For example, a police officer's use of excessive force may be actionable not only under the Fourth Amendment but under the state law tort of assault. In fact, plaintiffs often add state tort claims to complaints alleging federal constitutional tort violations.

Moreover, when common law and constitutional duties overlap, there is no distinction in the sort of injury for which the plaintiff is allowed to recover. Even in constitutional tort actions, a plaintiff may only recover damages for common law injuries such as physical harm, emotional distress, humiliation, and monetary loss.[46] Absent such a common law harm, the only distinct injury suffered by a plaintiff in a constitutional tort action is the

abstract harm of a rights violation. But under Supreme Court precedent, the fact that a constitutional right has been violated in itself only entitles the plaintiff to a nominal damage award of one dollar.[47] As the Supreme Court has held, "the abstract value of a constitutional right may not form the basis for § 1983 damages."[48]

Since the ORDER of Nov 26 2007 claims a "official acts" color of law claim by the defedants with the support of the Unites States of America then  § 1983 "opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation."[75] One proponent of the bill noted that the statute was the only way to ensure that constitutional rights had meaning for individual citizens.[76] Section 1983 was a significant move away from a paradigm where individual rights were primarily protected by the state courts. As one of the opponents of the bill protested:

It authorizes any person who is deprived of any right, privilege, or immunity secured to him by the Constitution of the United States, to bring an action against the wrong-doer in the Federal courts, and that without any limit whatsoever as to the amount in controversy. The deprivation may be of the slightest conceivable character, the damages in the estimation of any sensible man may not be five dollars or even five cents; they may be what lawyers call merely nominal damages; and yet by this section jurisdiction of that civil action is given to the Federal courts instead of its being prosecuted as now in the courts of the States.[77]

The Court's broad interpretation of "under color of" law created an avenue by which individuals could argue that the Constitution regulated government officials' acts that caused individual injuries. Plaintiffs were no longer restricted to bringing actions under

state law for the worst forms of misconduct by state officials. After *Monroe v. Pape*, the number of § 1983 cases brought by plaintiffs in federal court exploded.[102] Many of these cases involved police brutality, unlawful arrests, and prisoners' rights claims.[103] As one commentator declared soon after the Supreme Court decided *Monroe v. Pape*: "It thus appears that what is developing is a kind of 'constitutional tort.'"[104]

In a broad sense, it is true that rights are generally established prior to remedies. For example, the Constitution pre-existed the remedies that now enforce it. But in a more particular sense, rights are shaped, defined, and given real meaning through the remedies used to enforce such rights. Because of its role as the supreme law of the land, the Constitution is not characterized by "the prolixity of a legal code,"[122] but instead "unavoidably deals in general language."[123] Thus, the Constitution and Bill of Rights are filled with open-ended phrases such as "probable cause," "cruel and unusual punishments," "unreasonable searches and seizures," "due process," "equal protection," and "just compensation." While the Constitution establishes general ideals, these norms do not have any concrete meaning until they are actually applied and enforced by judges in particular cases. The process of constitutional definition is an important one.

Then the ORDER persists in claiming that the United States has participated and thus constitutional tort remedy is unique because it requires courts to focus on how constitutional provisions apply to injuries suffered by individuals. As a result, it has pushed the courts to understand constitutional provisions as (1) providing rights that protect individuals from certain governmental inflictions of harm; and (2) regulating the discretion of government officials to harm or allow harm to befall individuals.

In most constitutional tort actions, individuals claim that they have been harmed by either government action or the failure of the government to act despite an established obligation to intervene.[138] Individuals bring such actions not just to make a general point about how the world should be ordered but because they have been injured. Damages, provided for in constitutional tort actions, are a natural remedy for such harm. As the Supreme Court has observed, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."[139] The availability of a damage action for constitutional harms gives individuals an incentive to press claims based on constitutional provisions.[140] As one commentator has noted, the constitutional tort action "gave lawyers an incentive to conceive of past, tort-like harms in constitutional terms."[141]

Constitutional tort actions are not only about rights protecting individuals from certain forms of injuries but also about norms that regulate government action. According to the Hohfeldian formulation, in concluding that an individual plaintiff has a legal right, a court determines both that the plaintiff has a right rooted in the law and that a defendant has a correlative duty to the plaintiff to avoid violating that right.[145] Thus, a protective right in a sense imposes a correlative duty on the government.[146] As one commentator observes, "[r]equests for damages relief raise unique issues concerning the link between the plaintiff's injury and the defendant's wrongdoing . . . [that] require the courts to ask, perhaps using language of causation and duty or obligation, whether the defendant is the appropriate source of funds to compensate the plaintiff."[147] Thus, constitutional tort actions have forced courts to determine both whether the Constitution protects

individuals from certain inflictions of harm and whether the Constitution regulates the ways in which the government may harm individuals.

The November 26th 2007 ORDER insists that the Defendants have Right to usurp the plaintiffs property and his future and so raise unique issues concerning the link between the plaintiff's injury and the defendant's wrongdoing . . . [that] require the courts to ask, perhaps using language of causation and duty or obligation, whether the defendant is the appropriate source of funds to compensate the plaintiff."[147] Thus, constitutional tort actions have forced courts to determine both whether the Constitution protects individuals from certain inflictions of harm and whether the Constitution regulates the ways in which the government may harm individuals.

In First English Evangelical Lutheran Church v. County of Los Angeles,[152] the Supreme Court confirmed that the Just Compensation Clause guarantees an individual remedy for economic injury in cases where the government denies the individual all use of his property even when that denial is temporary.[153] This defined the individual's constitutional right in a way that went beyond what state law had offered.

The ORDER of 26th November 2007 insists the United States has created a contract that allows the defendants to remain immunized from kidnapping and hostage taking thus violates The Due Process Clause of the Fourteenth Amendment, which guarantees persons who face deprivations of "life, liberty, or property," the protections of "due process of law,"[194] has been described as "the least specific and most comprehensive protection of liberties."[195] According to one of its broadest formulations, "The touchstone of due process is protection of the individual against arbitrary action of government."[196] The Due Process Clause has both a procedural and substantive

component. The Clause not only guarantees fairness in governmental procedures but also sets forth a substantive norm that prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective."[197] In constitutional tort actions, the courts have applied this general prohibition against the abuse of government power to a variety of contexts where individuals have been injured by government wrongdoing. Primarily, the courts have used substantive due process in the context of constitutional torts to fill gaps in the Constitution's explicit textual protections.[198]

The Supreme Court has described the substantive due process right as prohibiting "the most egregious official conduct,"[199] that is, "conduct that shocks the conscience."[200] These amorphous concepts could conceivably apply to a vast range of government conduct. The perceived danger of applying the right to substantive due process is that there is no principled way of marking off a boundary to the right. In the words of the Supreme Court, "the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."[201]

In defining the right to substantive due process, courts have paid careful attention to the facts of each case in order to limit the reach of their decisions.[202] In doing so, they generally weigh the individual's interest in receiving redress for harm against the reality that many government officials will inevitably cause some harm in the course of their work. These are concerns that relate uniquely to the relationship between the government and individual. As the Supreme Court has explained, "[i]n determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to

balance 'the liberty of the individual' and the 'demands of an organized society.'"[203] Because of a society's compelling interest in a government that can operate effectively, the courts have generally limited the substantive due process right to prohibiting the most egregious forms of governmental misconduct.[204] As a result, the right to substantive due process does not mirror the common law, which only regulates the interactions among private parties.[205]

Bering in mind that the defendants claim a special contract with the United States to violate

Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and

(d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1.      23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2.      24. Violated and derogated the Constitutional Right of the Plaintiffs

3.      25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity" of the defendant and examine how the pattern of conduct of defendant in defying the agreements it claims it has signed. The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom,

Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status,

Yet the defendants continue to defy and thumb its nose at civilized society and claims it has the right to whatever it wants to whoever it wants and it cannot be sued in any court for violation of treaties and the defendant has used its power to avoid prosecution for the genocide of the aborigines, the genocide of families thrown overboard warships and

murdered at sea, prisons full of minor children being held in contracts with little tiny islands, a white apartheid policy, and most recently shipping tons of wheat to a rogue nation, IRAQ, at war with the United States of America, creating massive oil deals with the companies controlled by the sons of Saddam Hussein, see Cole Commission Report and Volcker Report and bribing officials both Jordan, and IRAQ to file reports to the United Nations and United Nations Security Council to create a WORLD war.

At trial the plaintiff will show that Australian Wheat Board is the world largest monopoly and that all its shipments were authorized by the defendant's agents accepting false documents in Australia to fool the world.

As such the Requirements of Rule 59(e) being that a substantive Constitutional Tort issue is present the motion to vacate is reasonable in face of justice.

That giving a DEATH SENTENCE to the plaintifs minor child of American Origin without any DUE PROCESS of law is manifest unjustice.

That GIVING A DEATH SENTENCE to the plaintiff without any Due Process of Law is Manifest injustice.

That claiming United States sponsers the violation of the FIRST, EIGHT, FOURTH constitutional protections by the defedants is not only unimaginable by manifest injustice.

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

*FEDERAL MAGISTRATES*

*COURT OF AUSTRALIA*

*REGISTRY OF QUEENSLAND*

(FAMILY COURT)

COURT FILE NUMBER                BRM2382/2006
CLIENT IDENTIFICATION NUMBER        SIN4675417

**APPLICATION FOR CONTEMPT OF COURT
FOR DIRECT AND INDERECT INTERFERNCE .
FAMILY LAW ACT 1975**

READ WITH RULE 13.01

JUGVIR INDER SINGH
APPLICANT
(FATHER)
VS.
SARAH JANE NEWMAN (SINGH)

RESPONDENT
(MOTHER)

**APPLICATION FOR DIRECT AND INDIRECT CONTEMPT OF COURT
FOR MALICOUS AND PURPOSEFUL INTERFERNCE BY THE
MININSTER OF IMMIGRATION AND INDGENOUS AFFAIRS AND OR
THE COMMONWEALTH OF AUSTRALIA AND ITS AGENTS WITH A
COURT PROCEEDING**

COMES NOW the applicant alleges that the COMMONWEALTH OF AUSTRALIA and
its agents and ministers are in direct and indirect contempt of court pursuant to Rule
13.01 Part 1 Duty of disclosure (Rule 13.01).

1.  The commonwealth has incorporated the ICCPR 23 (1) into the "paramountcy
    principle" and has promoted "the family is the natural and fundamental group unit

of society and is entitled to the protection of society and the state" yet with willful malice, hate and recklessness has informed the applicant and has actively interfered with the family court orders by finding methods and means to block the father and head of the family access to the court. Being in contempt and violating ICCPR 23 (1)

2. Being that Australia provides the highest standard of protection, being the only country in the world to use a "paramountcy principle" in regards to the child the Commonwealth with hate and malice and has continued to violate even the ICESCR which enshrines in (a) 10. " The widest possible protection and assistance be accorded to the family, which is a natural and fundament group unite of society, particularly for its establishment and while it is responsible for its care and education of dependant children'. Instead the Commonwealth with hate and divisive methods has charged the entire government to interfere with this ONE family court and NOT allow the respondent access to the court. The missed the personal appearance of mediation as a result of this contempt.

3. The Commonwealth has by its actions to deny the applicant personal appearance before this court violated (ADRD) (6), (ECHR, (ACHR)(17)(1) and even the (AfCHPR) and plunged the Commonwealth into the DARK ages of LOST GENERATION, aiding and abetting the stealing of children and using its enormous power to change custody to the COMMONWEALTH favors in a Family Court. This conduct is reprehensible and in contempt of Court.

4. The relationship of the applicant Jugvir and Sarah and Nara belongs to the area of family and is protected from "arbitrary or unlawful interference" The applicant's common family always lived in Queensland and excluding the applicant from Queensland constitutes and interference and is contempt of this court.

5. The Commonwealth is FULLY aware that Nara, a minor child is the ISPSO JURE child of the applicant and is colluding with its ministers and agents to deny access of the applicant to the child in contempt of this court.

6. Gross violations of the Commonwealth extend in the financial matters of the family where the Commonwealth through it agents and ministers have made sure that the applicant CANNOT provide for his minor child and the Commonwealth

not only flaunts the jurisdiction of this family court and is contempt of court but the Commonwealth of Australia flaunts the WHOLE WORLD and the decency to a family protections by Constantly torturing this applicant.

7.  This court knows over the years that UN DOCUMENT A/5365 section 19,20,21, and A/5655, sections 68,69 and ICCPR 24 and ACHR 19 all empower this very court in its family decisions and protections of the child.  Yet now the applicant knows that the Commonwealth will tip the scales of justice by interference, bribes and corruption and hate in the favor of its voter and taxpayer and against another destroying the equal protection of the constitution and in contempt of court.

8. Then this application itself is about a minor child who has vanished, being the MOST grave violation of the ECHR 5, (see CRIME COMMISSION AND MISCONDUCT REPORT FOR SOUTHPORT POLICE UNLAWFUL ACTIONS) yet the Commonwealth supports this grave injustice by denying the applicant access to the court and his minor child in contempt of court.

9. This court has application for child abuse and kidnap and hostage taking and has remained in continuous danger and the Commonwealth being fully aware, as is the UNICEF and other child protection agencies has the GALL and "we don't care about the "Child Rights Convention" cavalier attitude and has maliciously and arbitrarily interfered with the proceedings of this court with the Sole intention, to delay and deprive the applicant any access to his family in this life time causing him torture.

10. As a non- party to a case, the Commonwealth of Australia has a duty to protect the fundamental fabric of society. provide to applicant me, full disclosure of all information and documents, which are relevant to an issue in the case. This duty starts with the pre-action procedure before the case starts and continues until the case is finalized. This means that the Commonwealth too must continue to provide information and documents as circumstances change or more documents are created or come into her possession, power or control.

11. This is a democracy with equal access to the court and equal access to the money taken form the taxpayers under the guise of "paramount importance and interest of the child" and is interfering in the process of the court by fraudulent, negligent

and selective distribution of the funds in hateful bias of the applicant and by assuring he will not have personal access to the court. This conduct is in contempt of court.

12. The court will proceed in its decisions to provide an effective decision for NARA and the family with safeguards "paramount" protection with the full knowledge that the Commonwealth has purposefully intervened in violation of ALL CRC laws to change the balance of this case with a criminal mens rea of continued torture to the applicant and a minor child.

13. The Commonwealth by interfering and gross recklessness continuing to interfere has caused in anti "paramountcy principle"

    a. Psychological trauma to overwhelm the applicant and his relationship with his child and family, sense of control, connection and meaning of life.

    b. Caused the applicant to feel helpless and isolated from his family.

    c. They have threatened the sense of family existence.

    d. Have and continue to aid and abet the vanishing of NARA and minor child.

14. The Commonwealth has The complaint alleges that Sarah Newman, with co conspirators has concealed and abducted a minor Child Nara Avalon Von Neuman Singhderewa and at the mediation she was required to fully disclose information provided in the Rule 13.01.

1. The Commonwealth has knowledge and recklessly interfered with the progress in the case as allegation whereas the applicant knows that Nara is with her mother at some undisclosed location.

2. The Commonwealth has knowledge and recklessly interfered with the progress in the case in that this very court was able to call Sarah Newman back during mediation but that the father and husband have no data at all on the location or number of this phone and that Nara is reachable.

3. The Commonwealth has knowledge and recklessly interfered with the progress in this case in so far as the respondent has received service of process and Mediation and orders and arrived at the mediation and admits that the respondent is being concealed by her mother Jane Whalan and Peter Whalan

4. The Commonwealth has knowledge and recklessly interfered with the progress where Peter Whalan has a Child Abuse application for him and he has conspired to change the phone numbers to reach my child and failed to update this information solely to conceal the parties from each other.

5. The Commonwealth has knowledge and recklessly interfered with the progress where an allegation that my Child Nara's name was changed to Simmons or other things and there was a concealing of information on this.

6. **That the** Commonwealth has knowledge and recklessly interfered with the progress and **meets all required Elements**. The elements generally needed to establish indirect contempt are (1) the making of a valid court order, (2) knowledge of the order by respondent, (3) ability of the respondent to render compliance, and (4) willful disobedience of the order.

# RELIEF

**In compliance with Part 6 Penalties for failing to disclose or file an undertaking or filing a false undertaking**

1. If you fail to comply with your duty to disclose, the Court may:

- refuse to allow you to use that information or document as evidence in your case;

- stay or dismiss all or part of your case

- order costs against you;

- fine you or imprison you on being found guilty of contempt of court for not disclosing the document or for breaching your undertaking.

2. The Commonwealth and it agents and deputies has knowledge and recklessly interfered with the progress of this family and must be ordered by WRIT MANDAMUS to provide instant access for the family to the court.

3. That the applicant by Habeas Corpus excisable instantly be required to be present in Family Court on dates already on calendar.

4. That a contempt of Court order be issued to the Commonwealth for the immediate arrest of the deputies interfering with the Court proceeding

5. That this is an urgent application where the child has been concealed for over a year and data must be divulged.

6. That the cumulative effect of past behavior and present direct violation of the Commonwealth to flaunt laws by penalized for the costs of the preparation of the documents and some other costs to impart a message to the society that this behavior and conduct will attract that direction of the court to comply.

7. Any other order that the court finds is necessary for the fairness of justice.

8. That the Commonwealth and some deputies have been a party in this very matter in an International Human Rights Commission and a Supreme Court, both of them having found that the conduct of the Commonwealth was reprehensible and continuing contempt of court will attract criminal penalties INSTANTOR

JUGVIR INDER SINGH

APPLICANT



Search



### F.A.C.T. Information: Parental Alienation
More great information is available through F.A.C.T. See our home page at http://www.fact.on.ca/

---

### Some of the Literature on Parental Alienation

Rather than just reading the PAS material here, there is now an opportunity to provide YOUR input into the adoption of Parental Alienation Syndrome (PAS) into the DSM-V. To read more about this, including a message from Dr. Gardner, please click here. We encourage all of you to write, and encourage others to write, to include PAS in DSM-V.

In this section, we have used to power of hypertext to link the footnote numbers to the footnotes and, where we have the material, to the actual referenced material. It is hoped that this will allow you to follow through the material and get all the information that you are seeking. Please note, references are sometimes made to other files on this system, and sometimes to files on other systems, so you may see other files reloading.

We have also made PDF files for printing if you would like hard copy. The PDF "Portable Document Format" is used by Adobe Acrobat and the program that will let you view and print these files is free and has versions for almost any type of workstation operating system in use. The free program that will allow you to view and print these files, on-line or off, is available from Adobe at http://www.adobe.com/products/acrobat/readstep.html.

We also have included on a separate page a not-too-complete list of PAS and PAS related sites that we have found on the net. There are many more sites with information. Let us know of any more good ones and we will add them.

We also beginning a section on legal cases in Canada and around the world that deals with PAS in the courts. This section is just starting, and is far from exhaustive. You can see them on our PAS legal page.

Let us know what you think of our files, or about any problems, by emailing us at webmaster@fact.on.ca.

Finally, because it is not a journal article, the article on Hostile Aggressive Parenting is located further down the list. You can get to it quickly by clicking here.

*Much of the material posted here was the result of the considerable knowledge, persistence and hard work of Tom in Los Angeles, USA. Thanks Tom!*

**Parents Who Have Successfully Fought Parent Alienation Syndrome** by A. Jayne Major, Ph.D. from her website http://www.livingmedia2000.com/. This article is a **FABULOUS** summary of PAS that is very readable and complete. It is, seemingly, only published on her website that is providing information about her parenting course to potential instructors but, because it was so good I have reformatted it and added it to our collection. (It was so good I was ready to sign up for the course!) This document is also available in PDF format.

**What you do and don't do when as a loving parent you are confronted with a severe case of PAS in your child** by William Kirkendale. Mr. Kirkendale is a father with a child he has not seen for a considerable length of time, and he has put together a list of some of his DO'S and DONTS that many of us have learned too late. Some of his suggestions, especially about approaching the court or accessing the media, are not particularly appropriate in Canada but the underlying fire is right on target. This material has been reformatted from a web page on www.mall4us.com/parentnPAS.htm. Mr. Kirkendale maintans a web site at http://www.familycourts.com/. This document is also available in PDF format.

**Parental Alienation Syndrome: A Review of Critical Issues** by Ian Turkat is available in PDF format from the Journal of the American Academy of Matrimonial Lawyers, Vol. 18-1, 2002, pp.131-176. (which is available on-line).

**Response to Kelly/Johnson Artilce** by Richard A. Gardner from *Speak Out for Children* (a publication of the Children's Rights Council), 17(2):6-10, 2002. This is Gardner's response to the ``Northern California'' group of psychologists to preempt and redefine Parental Alienation (without the Syndrome). This group includes those PhDs who worked with Judith Wallerstein on her work. This is a real threat to the children who have been damaged by the PAS -- the purpose is really to ensure that the abuse of the children can continue pursuant to the ``feminist'' (and not parental) dogma. This document is not yet available in PDF format.

**Does DSM-IV Have Equivalents for the Parental Alienation Syndrome (PAS) Diagnosis?** by Richard A. Gardner (Unpublished Manuscript) Accepted for Publication 2002. This is a very interesting article that outlines the similar, but not the same, disorders actually included in DSM-IV at this point. The article is quite good in explaining the reasons why PAS is indeed a syndrome, and how it is different from other conditions. As a bonus, some of the similar or contributing conditions that impact children, alienators and target parents are outlined -- this is quite important to target parents, and lawyers, involved with an alienating parent. This document is not yet available in PDF format.

**The Role of the Judiciary in the Entrenchment of the Parental Alienation Syndrome (PAS)** by Richard A. Gardner, 2002. This is a <span style="color:red">great</span> article that points out the faults and

contributions of the judiciary in ensuring that alienating parents abuse their children -- all in the mistaken ``best interests'' of someone. This article and the tables referred to within it can be downloaded from Dr. Gardner's website at http://www.rgardner.com/refs/ar11w.html and http://www.rgardner.com/refs/3pastables.html. This document is not yet available in PDF format.

**The Empowerment of Children in the Development of Parental Alienation Syndrome** by Richard A. Gardner from *The American Journal of Forensic Psychology*, 2002, 20(2):5-29. This article deals with the empowerment of children suffering PAS by the alienator, therapists, lawyers and the judiciary as a major component of the syndrome. Without addressing the intrinsic contribution of all these adults, supposedly working in the ``best interests of the child'' can we hope to stop the destruction of these children. This document is not yet available in PDF format.

**Parental Alienation Syndrome vs. Parental Alienation: Which Diagnosis Should Evaluators Use in Child-Custody Disputes?** by Richard A. Gardner from *The American Journal of Family Therapy*, 30(2):93-115, (2002). Gardner clears the air about the debate between the watered-down, wide ranging ``Parental Alienation'' and the collection of symptoms that identify and define the ``Parental Alienation Syndrome''. For those who think that PA has much at all to do with PAS, this is a `must read'. This document is not yet available in PDF format.

**Denial of the Parental Alienation Syndrome Also Harms Women** by Richard A. Gardner from *American Journal of Family Therapy*, 30(3):191-202 (2002). The article discusses impact on children and families by the denial of the condition of PAS. Denial is found by the patient in many medical conditions, but when the practionners deny the disease, there is no hope for the victims. This document is not yet available in PDF format.

**Comments on Carol S. Bruch's Article "Parental Alienation Syndrome and Parental Alienation: Getting it Wrong in Child Custody Cases"** by Richard A. Gardner from *Family Law Quarterly*, 35(3):527-552, 2001. Gardner addresses an article by a "law researcher" in the Family Law Quarterly that really simply rehashes the same tired old "feminist" myths that are trotted out to ensure that the children are not protected from alienation. Bruch's paper is available here in PDF format only. This document is not yet available in PDF format.

**Current Controversies Regarding Parental Alienation Syndrome** by Richard A. Warshak from *American Journal of Forensic Psychology*, Volume 19, No. 3, 2001, p. 29-59. An excellent article about PAS, the current attempt to redefine it to talk only of the "alienated child" and not the abuse, and about some of the strange reasons made up by others about PAS. This is a great companion to Dr. Warshak's booklet "Parental Alienation Syndrome in Court" (see the Book Section of the FACT site, or Dr. Warshak's site directly). This is an important paper to read. This document is not yet available in PDF format.

**Should Courts Order PAS Children to Visit/Reside with the Alienated Parent?** by Richard A. Gardner from *The American Journal of Forensic Psychology*, 2001, 19(3):61-

106. This article is an outline of the futility of not changing access or custody away from an alienating parent. In 100% of the cases that a change in access or custody did occur, the PAS either diminished or disappeared. In 91% of the cases where a change did not occur, the situation did not improve or degenerated even further. "PAS therapy" does not work alone to protect the children, despite the judges wishing it did. Make sure you give this one to your lawyer. This document is also available in PDF format.

**Family Therapy of the Moderate Type of Parental Alienation Syndrome** by Richard A. Gardner from *The American Journal of Family Therapy*. 27:195-212, 1999. This article is a **GREAT** outline of therapy for the moderate case of PAS that deals with the very specific and knitty-gritty things that the courts and the therapists must do if the therapy is to work. This document is also available in PDF format.

**Questioning the Mental Health Expert's Custody Report** by Ira Daniel Turkat, Ph.D. from the *American Journal of Family Law*, Volume 7, 175-179 (1993). This article is not specifically about PAS. However, it is an EXCELLENT article to look at when you are selecting an assessor or an expert in a legal case. I wish selecting an expert was easy - this article does give you some suggestions that are extremely relevant. This document is also available in PDF format.

Dr. Richard A. Gardner, M.D., who initially derived the name Parental Alienation Syndrome put out a flyer (also in PDF format to advertise his book **The Parental Alienation Syndrome: A Guide for Mental Health Professionals and Legal Professionals** (available through his website at http://www.rgardner.com/). The flyer had a number of very interesting and useful attachments that contain some basic information on PAS. The attachments are:

- DEFINITION OF THE PARENTAL ALIENATION SYNDROME (also in PDF format).
- THE PARENTAL ALIENATION SYNDROME IS NOT THE SAME AS PROGRAMMING ("BRAINWASHING") (also in PDF format).
- THE RELATIONSHIP BETWEEN THE PARENTAL ALIENATION SYNDROME AND BONA FIDE ABUSE AND/OR NEGLECT (also in PDF format).
- THE PARENTAL ALIENATION SYNDROME AS A FORM OF CHILD ABUSE (also in PDF format).
- "THE PARENTAL ALIENATION SYNDROME DOES NOT EXIST BECAUSE IT IS NOT IN DSM-IV" (also in PDF format).
- "THE PARENTAL ALIENATION SYNDROME IS NOT A SYNDROME" (also in PDF format).
- "PEOPLE WHO DIAGNOSE PARENTAL ALIENATION SYNDROME ARE SEXIST" (also in PDF format).
- THE PARENTAL ALIENATION SYNDROME AND SEX-ABUSE ACCUSATIONS (also in PDF format).
- THE PARENTAL ALIENATION SYNDROME AND "PARENTAL ALIENATION" (also in PDF format).

- DIFFERENTIAL *DIAGNOSIS* OF THE THREE TYPES OF PARENTAL ALIENATION SYNDROME (also in PDF format).
- DIFFERENTIAL *TREATMENT* OF THE THREE TYPES OF PARENTAL ALIENATION SYNDROME (also in PDF format).

In addition, he has put out another couple of small pieces of information:

- Addendum I—June 1999 which is meant to be some more up-to-date information on PAS than contained in the 2nd edition,
- Addendum—March 2000 which is meant to be some more up-to-date information on PAS than contained in the 2nd edition, and
- an updated Addendum—March 2000 which is meant to be some more up-to-date information on PAS than contained in the 2nd edition and mentions the Rachael Foundation, and
- Misperceptions versus Facts About Richard A. Gardner, M.D. which is another defensive piece as the result of the false accusations against Dr. Gardner made because they don't like his theory (ironic, isn't it?).

**Parental Alienation Syndrome (PAS): Sixteen Years Later** by Richard A. Gardner from *Academy Forum,* 2001, 45(1):10-12. This provides a summary of the issues related to PAS as they have evolved over the last 16 years. This document is not yet available in PDF format.

**Excerpt from Dr. Rybicki's forthcoming book on Expert Witness Testimony & Forensic Psychology** by Daniel J. Rybicki. This looks like it will be a great book. The material covers a lot of material including alienation techniques, susceptable children, the negatives of the diagnosis according to the detractors, and what evaluators should be careful with. A good read. This document is not yet available in PDF format.

**Remarriage as a Trigger of Parental Alienation Syndrome** by Richard A, Warshak from *The American Journal of Family Therapy, 28:229-241, 2000.* While this document attempts to deal with some of the specifics of parental alienation relative to remarriage of divorced or separated parties, there is a wealth of information about PAS in general as well, including some discussion of therapies to deal with PAS. This document is available in PDF format.

**"Parental Alienation"** by Joel R. Brandes from the *New York Law Journal*, March 26, 2000 provides an interesting look at Parental Alination in New York, where it is supposed to be recognised. This document is not yet available in PDF format. This article was available through the author's website at http://www.brandeslaw.com/parental_alienation.htm, but appears to have been moved.

**Articles in Peer-Review Journals on the Parental Alienation Syndrome (PAS)** by Richard A. Gardner, M.D. is a description of the nature of PAS (mostly the material in the list above) and a compilation of citations by the researcher who introduced the term. This is available through a link to his company, **Creative Therapeutics** at http://www.rgardner.

com/. This particular paper as also been captured into a PDF format (January 6, 2001 version).

On the site, Dr. Gardner also has a list of legal citations indicating times that testimony on PAS has been admitted in the courts of various jurisdictions. The site is set up to allow you to order books, including his **The Parental Alienation Syndrome (2nd edition)** directly.

**Rye Hospital Program For Treating Children Affected by Parental Alienation Syndrome (PAS)**, as published on the website "divorcedfather.com", written by Edward M. Stephens, M.D., provides some information on the diagnosis and treatment of Parental Alienation Syndrome. This article was initially available at http://www.divorcedfather.com/ fathers-rights-child-custody/pas-rye.htm, but appears to have been move. The pagehad also been captured, and is available, in PDF format.

**Mediation and Parental Alienation Syndrome: Considerations for an Intervention Model** by Anita Vestal from the *Family and Conciliation Courts Review*, Vol. 37, No. 4, October, 1999, p. 487-503. Excellent, and long, paper on parental alienation and mediation. Parents, lawyers and judges should read this. This article is an updated and peer-reviewed version of the article "Perspectives on Parental Alienation, Child Custody and Dispute Resolution Systems," which won the essay award from the American Bar Association (see below). This document is also available in PDF format.

**Guidelines for Assessing Parental Preference in Child-Custody Disputes** by Richard A. Gardner, MD from the *Journal of Divorce & Remarriage,* 1999, 30(1/2):1-9. This goes through the Michigan child-custody guidelines with Gardner's opinion and PAS comments throughout. This document is aldo available in PDF format.

**Parental Alienation and the Judiciary** by Dr L. F. Lowenstein from the *Medico-Legal JournaN*ol.67 Part 3, 1999, p. 121-123. This is a short piece on the problems of the judiciary in solving PAS, their reluctance to that the necessary action, and the results of their lack of judicial action. This document is not yet available in PDF format.

**Parental Alienation: Not in the best interest of the children** by Douglas Darnall from the *North Dakota Law Review*, Volume 75, 1999, p 323-364. Excellent and long essay on parental alienation and parental alienation syndrome and the places that lawyers and judges need to fit into the process to help the children. Darnall's book, DIVORCE CASUALTIES: PROTECTING YOUR CHILDREN FROM PARENTAL ALIENATION, that is mentioned in the article can be purchased through the FACT book section. This document is also available in PDF format.

**Differentiating between Parental Alienation Syndrome and Bona Fide Abuse-Neglect** by Richard A. Gardner from *The American Journal of Family Therapy*, Volume 27, Number 2, p 97-107 (April-June 1999). Talk about a **HOT** new article! The article looks at the differences in children, but most specifically adults, under a PAS situation with false allegations of abuse or neglect, and the same where there is true abuse-neglect. Truly makes one wonder seriously about the inducers of PAS. This document is also available in

**Parental Alienation Syndrome: How to Detect It and What to Do About It** by J. Michael Bone and Michael R. Walsh as published in *The Florida Bar Journal*, Volume 73, Number 3, March 1999, p. 44-48. This new article is meant for lawyers. It provides a higher level look at PAS, provides the indications that a lawyer or judge can use to tell if PAS is present, and deals with the absolute need of the courts to operate swiftly if PAS is detected. A quote from the article: "Any attempt at alienating children from the other parent should be seen as a direct and willful violation of one of the prime duties of parenthood". This document is also available in PDF format.

**Alienation And Alignment Of Children** by Philip M. Stahl from the *California Psychologist*, March 1999, Vol. 32, No. 3, p 23ff. An outline of PAS, the his idea of the characteristics of the parents and children, and, to some degree, how treatment methods. The article includes a summary of the milder suggestions for treatment of severe PAS -- including allowing the abuse to continue (the court's general answer). This document is also available in PDF format.

**Parental Alienation Syndrome (PAS)** by L. F. Lowenstein as published in *Justice of the Peace*, Vol. 163 No. 3, 16 January 1999, p 47-50. This article is meant as a summary for justices in the UK. It concludes reminding judges that: "Any parent who practises PAS must ultimately be dealt with severely by the court. PAS is a kind of brainwashing which leads to suffering for all concerned, either in the short or long-term. Both parents must be viewed as having the right and the obligation to play a vital role on the care, guidance and love provided for their children." This document is also available in PDF format.

**Parental alienation syndrome: The lost parents' perspective** by Despina Vassiliou. This is her Masters thesis presented at McGill University in Montreal, Quebec, Canada. The thesis is a qualitative study of the alienated parent's perceptions of their experienes with PAS. This document is not yet available PDF format.

**Parental Alienation Syndrome: A Two Step Approach towards a Solution** by L. F. Lowenstein as published in *Contemporary Family Therapy*, Volume 20, Number 4, December, 1998, p. 505-520. This article is from the UK and talks about the advantages to all parties in mediating to prevent PAS, rather than moving straight into the adversarial system. This document is also available in PDF format.

**The Burgess Decision and the Wallerstein Brief** by Richard A. Gardner from *Journal of the American Academy of Psychiatry and the Law*, 26(3):425-431, 1998. This article addresses the problems of unrestricted mobility in cases where a parent is inducing PAS -- and the damage done to the children and non-custodial parent. This document is not yet available in PDF format.

**MMPI-2 Validty Scales and Suspected Parental Alienation Syndrome** as published by Jeffrey C. Siegel and Joseph S. Langford in the *American Journal of Forensic Psychology*,

Volume 16, Number 4, 1998, p. 5-14. An interesting article that looks at tying those who use parental alienation to the responses on the MMPI-2 test (a test often given my assessors to the parents). The material here is of most interest to professionals who administer and read such tests, but it does represent an early stop in identifying problem areas. This article is also available in PDF format.

**Alienation Revisted** as presented by Mr. Paul Lodge, FCOA, at the Third National Family Court Conference October 20-24 in Melbourse, Australia. This article is conference notes that were initially taken in PDF formation from the conference site. The conference material has moved several times so that a good link is not available. This is conference material, so make some allowances for missing points and references that are not used, please. The original PDF document is available here.

**Intervention-guided single case-help and parental alienation syndrome (PAS)** as presented by Dr. Werner G. Leitner at the XXI International School Psychology Colloquium held from 31 July - 4 August 1998 in Riga, Latvia, and published in Published in Identity & Self Esteem: *Interactions of Students, Family, & Society*, eds. S. Sebre, M. Rascevska, S. Miezite, pp. 253-260, Riga: SIA. This article was initially taken from Dr. Leitner's site at http://www.uni-bamberg.de/~ba2gp4/frame.htm, but it appears to have moved. This document is not yet available in PDF format.

**Recommendations for Dealing with Parents Who Induce a Parental Alienation Syndrome in Their Children** as published by Dr. Richard A. Gardner in the *Journal of Divorce & Remarriage*, Volume 28(3/4), 1998, p. 1-21. This well laid-out article gives Gardners's suggested course of treatment for dealing with the various levels of PAS and in handling the inducing parent. This article is also available in PDF format.

**Parental Alienation Syndrome - A Judicial Response?** as published by Dr. Susan Maidment in *Family Law*, May 1998, p. 264-6. This article gives a quick look at some of the success in dealing with PAS in the UK, but the problem with recognition of PAS by the lower courts despite the law that should make it important. Since PAS cases are apparently rarely reported in the reference cases, this becomes a difficult task. This article is also available in PDF format.

**Parental Alienation is Open Heart Surgery: It Needs More than a Band-Aid to Fix It** by Kathleen Niggemyer as published in the *California Western Law Review*, Volume 34, 1998, p 567-589. This article is talks about parental alienation and, while rejecting the work of Gardner and Turkat (although for the wrong reasons, and generally based on the misrepresentations of others) acknowledges that parental alienation exists -- syndrome or not. The author then looks at the U.S. tort (i.e. suing) solutions that are available and indicates that there is not that much that can be done under the "alienation of affection" rules (in Canada the Supreme Court has basically rejected "alienation of affection" as ever being in the law), but indicates that there may be some ability to deal with it under "purposeful infliction of emotional distress." The auther feels that a truckload of therapists (the author is not a therapist) and reporting back to the court annually will make some sort of a difference for how the children deal with severe alienation. This article has also been put

into [PDF format](#):

**[Identifying Cases of Parent Alienation Syndrome--Part I](#)** by Leona M. Kopetski as published in *The Colorado Lawyer*, February 1998, Volume 27, Number 2 p 65-68 (also available in [PDF format](#)), and
**[Identifying Cases of Parent Alienation Syndrome--Part II](#)** by Leona M. Kopetski as published in *The Colorado Lawyer*, February 1998, Volume 27, Number 3 p 61-64 (also available in [PDF format](#))
These articles deal with evidence of PAS that pre-dated Gardners original work and talks about the impact of PAS on children. The final comments on the second part talks about the significance of sexual reproduction, and equivalent psychological nature of this....*"If children are allowed free access to these different people, they do not need a perfect parent. It is not individual parental mistakes that harm the development of children. It is the exclusion of these different people that places them in danger....".*

**[The Emerging Problem of Parental Alienation](#)** by Caroline Willbourne and Lesley-Anne Cull, as published in *Family Law*, December 1997, p. 807-8. This document is meant for lawyers and provides an overview of things to look at that indicate parental alienation (though I doubt that lawyers see the children enough to tell) but also talks about the damage done to the children in leaving them in the residential care of the alienating parent.. This document is also available in [PDF format](#).

**[Management of Visitation Interference](#)** by Ira Daniel Turkat, Ph.D. as published in *The Judges' Journal* (Number 36) of the American Bar Association in the Spring of 1997. This document is meant for judges and is very strong and specific about the types of therapy and the considerations in orders that are required to handle access problems when Parental Alienation Syndrome or Divorce-Related Malicious Mother Syndrome in involved. This document is also available in [PDF format](#).

**[Summary of the Practice Parameters for Child Custody Evaluation](#)** as published on the website of the *American Academy of Child and Adolescent Psychiatry* as approved in 1997 and published in their Journal. Parental alienation is recognised as the serious problem that it is. This particular page as also been captured in [PDF format](#).

**[Perspectives on Parental Alienation, Child Custody and Dispute Resolution Systems](#)** by Anita Vestal was an award winning essay in the *American Bar Association's Section on Dispute Resolution* and used to be able to be found, in a less formatted form at http://www. abanet.org/dispute/comwin.html -- but no more it appears. This paper is also available in [PDF format](#). This is a good summary of PAS meant for lawyers and discusses such things as the problems with mediation and joint custody when PAS is involved.

**[The Spectrum of Parental Alienation Syndrome (Part I)](#)** by Deirdre Conway Rand as published in the *American Journal of Forensic Psychology*, Volume 15, Number 3, 1997. This came from files at [Aktive Fedre](#), a new fathers' group in Norway (with minor cleaning by FACT) and is kept in two pieces due to the size of the HTML file. These files have also been

put into a single file in PDF format.

**The Spectrum of Parental Alienation Syndrome (Part II)** by Deirdre Conway Rand as published in the *American Journal of Forensic Psychology*, Volume 15, Number 4, 1997. This came from Aktive Fedre as well (with minor cleaning by FACT) and is kept in three pieces due to the size of the HTML file. These files have also been put into a single file in PDF format.

These are excellent articles and deal with not only the psychological aspects of PAS, but the legal process and judicial recognition (mostly in the US) of PAS. We would strongly recommend reading them, and then perhaps distributing them to judges, lawyers, social workers, psychologists, journalists, etc. who deal with, or are interested in, the children of divorce.

**Parental Alienation Syndrome: An Age-Old Custody Problem** by Michael R. Walsh and J. Michael Bone from the June 1997 issue of *The Florida Bar Journal* (p. 93-96). This is also available in PDF format. This is an excellent article for officers of the courts and parents in looking at the face of PAS, the problems with dealing with it, and their roles in protecting the children.

**Interference with Parental Rights of Noncustodial Parent as Grounds for Modification of Child Custody** by Edward B. Borris from the *Divorce Litigation*, January, 1997. This is a heavily referenced, to US cases, of the handling of alienation and access denial in the United States. A good start when looking for precedents. This document is not yet avilable in PDF format.

**Relocation as a Strategy to Interfere with the Child-Parent Relationship** by Ira Daniel Turkat, Ph.D. from the *American Journal of Family Law*, Volume 11, 39-41 (1996). This article talks about the unhealthy relocation of children to interfere with parental contact and identifies some of the risk factors associated with this. A good article to look at for casting some question on relocations. This document is available in PDF format.

**Understanding and Collaboratively Treating Parental Alienation Syndrome** by Kenneth H. Waldron, Ph.D. and David E. Joanis, J. D. from the *American Journal of Family Law*, Volume 10, 121-133 (1996). This is an good article and attempts to broaden the discussion of the nature of PAS by examining the alienating parent, the target parent, and the family system, as well as the techniques used in and results of parental alienation. It also discusses the adversarial system, and the roles of the parties if there is truly a concern about protecting the children. -This document is also available in PDF format.

**Children's Alignment with Parents in Highly Conflicted Custody Cases** by Anita K. Lampel discusses the personality characteristics measured for childer who aligned with a parent (the parent "the child felt provided more empathy and understood the child's age-specific concerns"), nonaligned children, and their parents. In the study about equal numbers (actually a bit more) of the children indicated that father was the "preferred parent". This study was published in *Family and Conciliation Courts Review*, Vol. 34, No. 2, April 1996, 229-239. This paper is also available in PDF format.

**A Therapist's View of Parental Alienation Syndrome** by Mary Lund discusses the nature of PAS and the structure of therapy groups that could be used. It was published in *Family and Conciliation Review*, Vol. 33, No. 3, July 1995. This paper is also available in **PDF format**.

**Divorce-Related Malicious Mother Syndrome** by Ira Daniel Turkat as published in the *Journal of Family Violence*, Volume 10, No. 3, 1995, p 253-264. This article takes a look at a condition involving somewhat acting like a very severe PAS inducer, but with no other mental disorder affecting behaviour. It is interesting to read. This document has also been put into a **PDF format**.

**Parental Alienation Syndrome: A 'Hidden' Facet of Custody Disputes** by Lisa A. Cook, who was apparently a law student at the time. This is a award winning paper, the Lieff Award, of the Canadian Bar Association (CBA), a voluntary organisation of lawyers. That particular organisation has been co-opted to represent only feminist and lesbian viewpoints at this point through their LEAF group (Legal Education and Action Fund for Women) with a strong conviction that women should never be accountable. The CBA itself presented its official position that access denial is not a problem, and does not occur in Canada, to the Special Joint Senate/House Committee on Custody and Access. This article takes a look at PAS, and Canadian law, as it was effective at that time. The position of the paper is very much out of sync with the current stance of LEAF and the CBA. I would note that the author concludes:

> Thus, to search for **a** solution to P.A.S. is illusory. P.A.S. is multi-faceted in terms of its onset, development, and outcomes. At this point, awareness of the **existence** of P.A.S. should be given optimum importance. Although this awareness may not encourage an immediate awareness in alienating parents, it may eventually create an atmosphere wherein parents will not feel the need to alienate. Perhaps this will happen when the legalities surrounding divorce become less alienating -- when the truth is not being sacrificed for 'justice" in custody battles. Only then can the parameters of P.A.S. be fully explored., Only then will custody **battles** have a chance of becoming custody **evaluations**.

I would note that Ms. Cook's SIN indicates that she was likely on a student visa at the time, and there is no indication that she is currently practicing law in Canada (at least under that name). Pity. This document has also been put into a **PDF format**.

**Custody and Visitation Interference: Alternative Remedies** by Joy M. Feinberg and Lori S. Loeb as published in the *AML Journal*, Winter 1994, Volume 12, Number 2, p 271-284 (the publication of the American Academy of Matrimonial Lawyers). This article talks about the remedies in the court to the handling of parental alienation syndrome of varying degrees of severity, and to the kidnapping of children. Interestingly, it also talks of the (then) new recouse of tort action (suing for damages in civil court) as another action that can be taken. The article is also available in **PDF format**.

**Child Visitation Interference in Divorce** by Ira Daniel Turkat from *Clinical Psychology Review*, Vol. 14, No. 8, pp. 737-742, 1994. This article sets the structure of the various forms of visitation interference and talks about how the courts and the lack of research have become big problems in contributing to this form of child abuse. The article has also been put into a PDF format.

**The Parental Alienation Syndrome: An Analysis of Sixteen Selected Cases** by John Dunne and Marsha Hedrick. This was published in the *Journal of Divorce and Remarriage*, Vol. 21(3/4), 1994. This article looks at sixteen cases that met Dr. Gardner's criteria for Parental Alienation Syndrome. It shows that traditional interventions in these cases were ineffective, and that the only effective treatment included a change in custody of the alienated child. This material is also available in PDF format.

**The Detrimental Effects on Women of the Gender Egalitarianism of Child-Custody Dispute Resolution Guidelines** by Richard A. Gardner from the *Academy Forum* Volume 38, Number 1,2 p 10-13 (Spring/Summer 1994), the publication of The American Academy of Psychoanalysis. This article discusses the history of custody over the ages and the possible reasons for the high incidence of parental alienation seen now. The article has also been put into a PDF format.

**Parental Alienation Syndrome: A Developmental Analysis of a Vulnerable Population** by Joseph L. Price, Ph.D. and Kerry S. Pioske, RN, MS, ANP. This was published in the *Journal of Psychosocial Nursing*, Vol. 32, No. 11, 1994 p 9-12. This article provides an overview of PAS for nurses and some description of how it fits into psychological framework of the child and the family. This material is also available in PDF format.

**The Parental Alienation Syndrome: A Dangerous Aura of Reliability** by Cheri L. Wood (no apparent qualifications) as published in the *Loyola of Los Angeles Law Review*, Vol. 29, p 1367-1415 (1994). This article is the paper usually brought up as some to supposedly "destroy" the concept of Parental Alienation Syndrome. It is interesting to read, especially in light of the collection of material on this site. It presents the concept that Dr. Gardner is the only person who believes PAS exisits. It states that there are no articles about PAS in peer reviewed publications (take a look at the site, there have been more than 50 such articles since 1988 and a number of them from Gardner himself). It purports that there is no empirical data for PAS, while a number of the articles here ARE emprical studies, and some took place even before Gardner coined the term. Well, it is a PAS paper that should be of interest if arguing in court (especially in the US). This material is not yet available in PDF format.

**When You Suspect the Worst: Bad-faith relocation, fabricated child sexual abuse, and parental alienation** by Carol Holstein Sanders. This was published in the *Family Advocate* in the Winter, 1993 edition. This article looks at alienation in context of the other common conditions associated with alienating parents using children as weapons against the other parent. This article is a simple and general piece (well, it was written for *lawyers*) but amply indicates the tie in on Parental Alienation with many other actions often seen on relationship

breakdowns. This material is also available in PDF format.

**Intractable Access: Is There a Cure?** by Ken Byrne and Lawrie Maloney. This was published in the *Australian Family Lawyer* v. 8(4), 1993, p. 22. This article looks at a particular case of parental alienation syndrome, and the use of supervised transitions in order to overcome the lack of access. This article is also available in PDF format.

**Expanding the Parameters of Parental Alienation Syndrome** by Glenn F. Cartwright as published in the *American Journal of Family Therapy*, 21 (3), 205-215 (1993). This is available through a link to his personal site at McGill University in Montreal, Quebec, Canada. An excellent paper. He seems to have / make use of a site called "P. A. I. N." (Parental Alienation Information Network") at http://www.education.mcgill.ca/pain/ for the disemmination of material. This particular paper as also been put into a PDF format.

**Family Wars: The Alienation of Children, Composite case from actual examples** by Peggy Ward and J. Campbell Harvey was published in the *New Hampshire Bar Journal*, Volume 34, No.1, March 1993. A slightly different version, but with the same title, composed all of Newletter #9 (from 1993) of The Professional Academy of Custody Evaluators (PACE) is available through a link to PACE's Web site at http://www.pace-custody.org/. This is an excellent and comprehensive paper. The PACE version is available in many different formats across the Web. The PACE verson of this paper has been captured in PDF format, and the New Hampshire paper has been printed in PDF format.

**Mediation: Parental Alienation Syndrome** by Mary Lund from the *Family Law News*, the official publication of the State Bar of California Family Law Section, Volume 15, Number 1, in the Spring of 1992. It provides a very brief overview of the issues with lawyers to help them not contribute to the child abuse known as Parental Alienation. This particular paper as also been put in PDF format.

**Le syndrome d'aliénation parentale (Parental Alienation Syndrome)** by Anne-France Goldwater. This is an article that was originally published in *Développements Récents en Droit Familial* 1991, P. 121-145, but that was made available through http://www.goldwaterdube.com/ as a Microsoft Word document. There are some other good papers there. Despite the French title, most of this document is in English. It provides a good summary from a Canadian, and specifically a Quebec, legal viewpoint. The Word version of this particular paper as also been put in PDF format.

**Legal and Psychotherapeutic Approaches to the Three Types of Parental Alienation Syndrome Families** by Richard A. Gardner, M.D.. This article was published in the *Court Review* Volume 28, Number 1, Spring 1991, p. 14-21, the publication of the American Judges Association. This paper describes the three types of PAS and gives some specific pieces of information that judges, at least judges that care, need to know when coming across PAS in the courtroom. You need to read this one. The paper as also been put in PDF format.

**Mental Health Professionals in Child Custody Disputes: Advocates or Impartial Examiners?** by Kenneth Byrne and published in the *Autralian Family Lawyer*, Vol. 6, No. 3, 1991, p.8. This is article looks at the differences in the functioning and conclusions of an advocate and an examiner. This article is not yet available in PDF format.

**Custody Disputes Fueling "Parental Alienation Syndrome** written about Richard A. Gardner, M.D.. This is a news article was published in the *Family Practice News*, Volume 20, Number 24, December 15-31, 1990, p 7. The paper as also been put in **PDF format**.

**Preventing Parentectomy Following Divorce** by Frank S. Williams, M.D.. This article was the keynote address at the Fifth Annual Conference of National Council for Children's Rights held in Washington DC on October 20, 1990. This paper describes problems with the process and motivations for separation of the children from a parent and talks about some of the preventative actions a parent can take. The paper was taken from the Men's Rights Agency site at http://www.ecn.net.au/~mra/page27b.htm and reformated slightly. This site has considerable amounts of interesting data, and can be accessed through the URL http://www.ecn.net.au/~mra/. The paper as also been put in **PDF format**.

**Brainwashing in Custody Cases: The Parental Alienation Syndrome** by Kenneth Byrne, PhD.. This article was published in the *Australian Family Lawyer,* v. 4(3), 1989, p.1ff. This paper gives a general overview of PAS, and provides lawyers with a list of things to be aware of that may indicate that alienation is taking place. The paper as also been put in **PDF format**.

**Judges Interviewing Children in Custody/Visitation Litigation** by Richard A. Gardner, M. D.. This article was published in the *New Jersey Family Lawyer,* Volume VII, Number 2, August/September 1987, p 26ff. This paper describes the problems that judges have in interviewing children affected by PAS directly, and gives some guidance on the approach and questions that a judge who wants to directly interview the children should take into account. The paper as also been put in **PDF format**.

**Post-Divorce Therapy With Highly Conflicted Families** by Anita K. Lampel, Ph.D.. This article was published in *The Independent Practitioner* Volume 6 Number 3, July 1986, p. 22-26, the Bulletin of the Division of Psychologists in Independent Practice, Division 42 of the Americal Psychological Association. This paper describes the success of conventional techniques on mild cases, but indicates that conventional techniques do not work well on severe cases, and that a change in residency has a much greater chance of working. Some of the improvements are discussed. The paper as also been put in **PDF format**.

**Recent Trends in Divorce and Custody Litigation** by Richard A. Gardner, M.D.. This article was published in the *Academy Forum*, Volume 29, Number 2, Summer, 1985, p. 3-7. This paper, in the journal of The American Academy of Psychoanalysis is the original paper that introduced the term "Parental Alienation Syndrome" and started the debate. The paper as also been put in **PDF format**.

**Understanding and effectively dealing with Hostile-Aggressive Parenting (HAP)** [PDF only] is a paper published by Family Conflict Resolution Services. This paper has been of wide-spread interest. HAP as described in a pattern of parenting that encompasses a number of problematic behaviours what would be associated with an alienating parent under PAS who is purposefully seeking to disrupt contact with a parent. The paper seems to be dynamic in its form, and we cannot keep up with some of the changes. The version on this site is currently the May 2004 version. The November 2003 version and February 2003 version are also available.. You may find a more recent version at http://familyconflict. freeyellow.com/General1/RecommendationsHostile-AgressiveParenting.pdf It is interesting in its scope and relatively easy to read.

**A Guide to the Parental Alienation Syndrome** by Stan Hayward. This is the second edition of Stan Hayward's paper. It provides much more specific information and, in particular, some good UK-oriented information (it is interesting to see how things work/don't work there too). Hayward is the Research Officer at Families Need Fathers, which maintains a website at http://www.fnf.org.uk/. Our copy of the paper is more complete than theirs, so this is a locally stored article. This particular paper is not yet available in PDF format.

**A Guide to the Parental Alienation Syndrome** by Stan Hayward. This is available through a link to http://www.coeffic.demon.co.uk/, the UK Men and Father's Rights page. An excellent paper. This particular paper as also been captured in PDF format.

**The Father's Guide: Coping with Parental Alienation** by the Texas Fathers for Equal Rights (T. F. E. R.). This is is a discussion, by fathers, of some of the strategies fathers should consider in re-establishing a relationship with a child who has been alienated but is once again visiting. TFER's seems to have moved, so this page is a copy of the article. This particular paper was captured in PDF format.

Dr. Douglas Darnall, a therapist, expert witness and author in Ohio, has a great collection of information on Parental Alienation - the stages that usually occur before the more serious PAS kicks at his site at **http://www.parentalalienation.com/PASdirectory.htm**. Information on his book is, of course, there too. There is some useful stuff to consider there. If you are interested, Dr. Parnell was the guest at an on-line chat session at Concerned Counselling on February 3, 1998, and that transcript is available here.

**Parental Alienation Syndrome** is an article The Family Court Reform Council of America. This is is a discussion of PAS in general. Their home page can be found at http://www. familycourts.com/. This particular page as also been captured in PDF format.

---

**Some Reported Results of Access Denial and Parental Alienation**

Case 1:07-cv-01179-JDB   Document 32-4   Filed 04/02/2008   Page 16 of 16
Increased suicidal tendencies were found in people who had experienced the loss of the father. Bron, Strack & Rudolph, Univ. of Gottingen, Germany, 1991

Children showed the most behaviour problems if their parents were in a legal conflict and the visitation was not frequent or regular. American Journal of Orthopsychiatry, 1990

British researchers have found adults who suffer parent loss due to separation or divorce have significantly higher risk of developing agoraphobia withpanic attacks and panic disorder. British Journal of Psychiatry, 1989

Scandinavian research has found a significantly higher number of adults who attempted suicide had lost a parent through divorce in childhood. Acta Psychiatrica, Scandinavia, 1990, 1993

Children who were separated from their father for a period of three months or longer and between the ages of 6 months to 5 years old, suffer a higher risk (2.5 to 5 times higher) of hysteria, emotional disorders and conduct disorder than other children. Indian Journal of Psychiatry, 1988

4036
**Visitors since**
**September 10, 2000**

# RIGHTS OF THE UNBORN UNDER INTERNATIONAL LAW

Fleming article continued (from Part 1)

## CONTENTS (Part 2)

The Right to Life of the Unborn and International Law

Denying Personhood Used to Justify Abuse of Human Rights

Conclusion

Notes

Authors

## THE RIGHT TO LIFE OF THE UNBORN AND INTERNATIONAL LAW

Within what limits may a state party provide for legal abortion? To find the answer to this question, full account has to be taken of the provisions of the United Nations Charter, the Universal Declaration of Human Rights 1948 that seeks to amplify Article 55 of the United Nations Charter, and the International Covenant on Civil and Political Rights 1966. Article 55 commits the United Nations to "promote respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion." [46]

The Universal Declaration of Human Rights 1948 is founded upon the notion that there are human values and these values are inherent in the human individual. In the Preamble the Declaration states that "the foundation of freedom, justice and peace in the world" is the "recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family".[47]

As far as the Declaration is concerned there are human values inherent in all members of the human family because of their "inherent dignity". Since "dignity" is about true worth or excellence ["dignus" L. means worthy], and, in the context, human worth, then the claim for the

inherent dignity of human beings is a claim for basic human values. Further, the Preamble links human dignity, human values with human rights that it describes as "inalienable rights", rights of which we may not be deprived and cannot deprive ourselves. I must not be sold into slavery and I am to be restrained from selling myself into slavery.

These human rights which reflect human values must, says the Preamble, "be protected by the rule of law" otherwise humankind may be driven, "as a last resort, to rebellion against tyranny and oppression". This protection of the rule of law is necessary not only for human beings to live together peaceably within the State, but also so that nations may live together in peace.

The Universal Declaration of Human Rights 1948 presents itself to the world as "a common standard of achievement for all peoples and all nations" and as a guide for every structure in society and for every individual in order that the rights identified in the Declaration may have "their universal and effective recognition and observance" secured.

Article 1 of the Declaration asserts certain things about human beings that affect the understanding of the rest of the document. Human beings, it says, "are born free and equal in dignity and rights". This value of equality of human beings, this injunction not to show preference between individuals in the recognition of "the rights and freedoms set forth in this Declaration", is further specified in Article 2. In particular, in the entitlement to the rights and freedoms in the Declaration there is to be no distinction of any kind, "such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

In this way the Declaration excludes discrimination against the elderly and the very young, the physically and mentally disabled and the chronically ill. All have equal claim to the rights and freedoms enunciated in the Declaration.

Article 3 of the Declaration begins the articulation of the human values to be defended in terms of human rights. "Everyone has the right to life, liberty and the security of person." Thus, human life is held to be both inviolable and inalienable. The Declaration does not begin with hard cases or exceptions, but with the general proposition which concerns the value of human life. Noting the order of the rights articulated is also interesting - life first, then freedom [liberty], and then security of person. Unless the State can guarantee the right to life then there are no meaningful rights to freedom or to security of person. The right to life is logically prior to considerations of the quality of the individual's life.

Does this right to life extend to the unborn child? When Article 3 of the Universal Declaration of Human Rights 1948 was being drafted there were several proposals for the provision of an explicit protection for the unborn child. [48] These proposals were certainly debated. In the event, none of the relevant proposals was pushed to a vote and the final text stated only that 'everyone had the right to life . . ." [49]

The fact that the matter was not pushed to a vote does not mean that one can conclude that the rights of the unborn child are not covered by the Universal Declaration of Human Rights 1948. The text clearly states that everyone has the right to life, and that what is meant by everyone is "every member of the human family," [50] that is, all human beings. Here is the nub of the matter. Some of those nations who opposed an understanding of the CRC's Preambular reference to "the child, by reason of his physical and mental immaturity" needing "special safeguards and care, including appropriate legal protection, before as well as after birth," as including abortion did so on the basis of attitudes which violate explicit provisions of the Universal Declaration of Human Rights 1948 and the International Covenant on Civil and Political Rights 1966.

That opposition was on the basis "that an unborn child is not literally a person whose rights could already be protected, and that the main thrust of the Convention was deemed to promulgate the rights and freedoms of every human being after his birth and to the age of 18 years." [51] These are mere assertions of opinion, opinion which is not universally shared in the way that the various human rights instruments are universally agreed, and in fact is opinion which is in conflict with universally agreed human rights instruments.

Michel Meslin, however, has shown that "the concept of person is one of the most difficult concepts to define - even though it is always burdened with hopes and revendications. It is neither a simple fact, nor evident throughout history." [52]

The briefest of surveys of the literature provides ample evidence to support Meslin's contention. Concepts of personhood based upon science and philosophy abound. For some, personhood begins at syngamy. For others it is at fourteen days after fertilisation, twelve weeks, twenty-eight weeks, birth, three months after birth and so on. There is no agreement in science or philosophy about when personhood begins or where it ends or how it should be defined. The only agreement one finds is in the embryological text books, that human life begins at fertilisation. It is the fertilisation of a human egg by a human sperm that produces a member of the human species, the human family. The main results of fertilisation are:

(a) restoration of the diploid number of chromosomes, half from the father and half from the mother. Hence, the zygote contains a new combination of chromosomes, different from both parents; (b) determination of the sex of the new individual. An X-carrying sperm will produce a female (XX) embryo, and a Y-carrying sperm a male (XY) embryo. Hence, the chromosomal sex of the embryo is determined at fertilization; (c) initiation of cleavage. Without fertilization the oocyte usually degenerates 24 hours after ovulation. [53]

Anthony Fisher has assembled other citations from many medical and biological textbooks, all of which underscore the scientific consensus that "the human embryo is a genetically human, discrete and an alive unit, organically single and individual, with a self-contained power to

organise his or her own growth, multiplication and differentiation in a way that ordinarily leads to a human adult." [54]

R. Yanagimachi begins his essay on "Mammalian Fertilization" with the statement: "Fertilization in mammals normally represents the beginning of life for a new individual." [55]

On the basis, then, of this standard text book definition of fertilisation it may reasonably be concluded that the embryo [56] is a "new individual", genetically different from his or her parents, and containing all the necessary genetic information for further development. This embryological understanding of the beginning of human life has been expressed in various formulations. The Senate Select Committee On The Human Embryo Experimentation Bill 1985 [Australia] defined the human embryo:

The Committee, in adopting the usage 'embryo' to describe the fertilised ovum and succeeding stages up to the observation of human form, means to speak of genetically new human life organised as a distinct entity oriented towards further development.

The testimony of C.R. Austin that the "stage which marks the start of a person is a matter of opinion" [58] is matched by Roger Short's contention that the benchmark fourteen days, for which he argued, was nevertheless "a prejudice" and "purely arbitrary". [59]

We conclude that there is no agreed basis for dividing up the human family into persons and nonpersons, but there is an agreement from science that from fertilisation we all share a common humanity, that we are all members of the "human family", to use the words of the Universal Declaration of Human Rights 1948. This latter point has been conceded by strong supporters of the 'pro-choice' position, especially Peter Singer, Michael Tooley and Helga Kuhse. The attempts to disenfranchise some members of the human family from moral consideration has lead to justifications of intolerable abuses of human rights including slavery, genocide, abortion, infanticide, non-voluntary sterilisation, non-voluntary and voluntary euthanasia of other human beings.

In the current climate we need to appreciate that the same fashionable philosophical notions of human personhood used to justify abortion are also being used to justify the killings of children up to three to six months after birth [60] . If the killing of a child after birth is considered to be in violation of our human rights obligations, then the killing of the child before birth on the same philosophical justification must also be considered a violation of that child's right to life.

## DENYING PERSONHOOD USED TO JUSTIFY ABUSE OF HUMAN RIGHTS

The eugenic impulse to kill fetuses and other members of the human family who have disabilities is still in evidence in the late twentieth century [61] and is used together with a utilitarian moral philosophy to deny personhood, and therefore moral consideration, to those classes of human beings who constitute a burden to the community, a burden which it is often unwilling to accept. Abortion can then be advanced to parents who may feel unable to cope with that burden alone and without the support of the wider community.

There is a connection between the self-interest of communities and the line to be drawn between persons and non-persons. That self-interest may be driven by eugenic, economic, social and political factors such that those a society wishes to exclude are deemed to be non-persons. History is replete with examples of this phenomenon. Thus could Chief Justice Taney of the United States Supreme Court exclude Dred Scott (a Negro slave) from personhood, [62] could the Egyptian Pharaohs exclude the Israelites, could Hitler exclude Jews, Gypsies, the 'degenerate' and the asocials from personhood, [63] could the British tolerate the slave trade, and could the European Australians liquidate and repress the Aborigines. The notion that certain classes of persons are non-persons is a not uncommon opinion. The Canada Indian Act 1880 states that "the term person means an individual other than an Indian".

In the Canada Franchise Act 1885, we learn that "[a person] is a male person, including an Indian and excluding a person of Mongolian or Chinese Race." Here is progress; in only five years Indians were upgraded to personhood and Asians are called persons in the very clause denying them personhood. By 1925, Canadian legislation had determined that all races-and women-are persons. Changes in Canada continued. By 1980, the government had recognized the Inuit, or Eskimos, as Indigenous Peoples with entitlement to lands. And the nation had developed a cadre of advocates dedicated to the empowerment of the disadvantaged. [64]

The Universal Declaration of Human Rights 1948, following the United Nations Charter, rejects discrimination against any members of the "human family", and requires the "recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family" (Emphasis added). As far as human personhood is concerned, the Declaration does not allow discrimination on the basis of human personhood. Article 2 asserts firmly that "everyone is entitled to all the rights and freedoms set forth in this declaration, without distinction of any kind . . ." (Emphasis added) and Article 30 commands that "nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein."

Article 6 specifically deals with the matter of the division of human beings into persons and non-persons in these terms:

Everyone has the right to recognition everywhere as a person before the law. [65]

It is true that the practice of abortion is widespread and, in many countries, legal at least in some circumstances. There is, however, a mismatch between the human rights requirements of international law and the practice of individuals and nation states in the same way that there is a mismatch between the rights of women and the practice of individuals and nation states.

If the human rights of the unborn child are to be upheld in law there will need to be with it an acceptance of the obligation to provide the social, economic, and moral support that women need when faced with an unwanted pregnancy. The hard cases need to be seen as hard cases against the background of the inalienable right of the fetus to live (a right that the fetus shares with his or her fellow human beings) and the rights of everyone (in this context especially women) "to a standard of living adequate for the health and well being of himself and of his family . . . and the right to security in the event of unemployment . . . or other lack of livelihood in circumstances beyond his control." And further, Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection. [66]

Article 6(1) of the International Covenant on Civil and Political Rights 1966 guarantees that "every human being has the inherent right to life." The right to life is the only right in the Convenant that is expressly stated to be "inherent" to everyone. The Human Rights Committee [67] has described it as the "the supreme right." [68]

It is also one of the rights which cannot be derogated from, [69] even in a "time of public emergency which threatens the life of the nation." [70] In its General Comment, [71] on Article 6, the Human Rights Committee has:

". . . noted that quite often the information given concerning article 6 has been limited to only one or other aspect of this right. It is a right which should not be interpreted narrowly." [72] And the "expression 'inherent right to life' cannot properly be understood in a restrictive manner, and the protection of this right requires that States adopt positive measures." [73] That international law does envisage human rights protection for the unborn can be seen in the provision dealing with capital punishment in the International Covenant on Civil and Political Rights 1966:

Sentence of death shall not be imposed for crimes committed by persons below eighteen years of age and shall not be carried out on pregnant women. [74]

In this provision, a state may execute a woman only when she is not pregnant. The innocent are not to die along with the guilty. [75] Indeed the travaux préparatoires of the International Covenant on Civil and Political Rights 1966 makes this abundantly clear: The principal reason for providing in paragraph 4 [now Article 6(5)]of the original text that the death sentence should not be carried out on pregnant women was to save the life of an innocent unborn child. [76]

Here is an explicit recognition in international law that human rights enjoyed by every member of the human family includes the unborn. This fundamentally humane principle was reflected in the common law in England and Australia when each country had the death penalty. [77]

Abortion advocates, however, have asserted that when Article 1 of the Universal Declaration of Human Rights 1948 says that "all human beings are born free and equal in dignity and rights", this means that "persons are recognized in international law, as human beings having been born." [78]

This deduction is without merit in the light of the detailed arguments we have already adduced. It cannot, in good faith, reasonably be deduced from Article 1, read in the context of the whole of the document and in the light of the Covenants which have further specified human rights, that unborn human beings are not persons with rights. The natural meaning of the text, in the light of the other references in the relevant provisions of international law, is that human beings without distinction are born free and equal in dignity and rights because as members of the human family they have had that status from the beginning. The interpretation offered by abortion advocates is about as helpful as deducing from a statement that a baby is born human that it was not human before birth.

Lastly, the use of abortion as a means of genocide is raised in the Convention on the Prevention and Punishment of the Crime of Genocide 1948. [79] In Article II the Convention defines the "odious scourge" [80] of genocide to include "killing members of the group" and "imposing measures intended to prevent births within the group." [81]

The latter inclusion explicitly recognises the right to life of the unborn. In the same article genocide is conceived in terms of an intention "to destroy, in whole or in part, a national, ethnical, racial or religious group". The question is, to what extent, if at all, does this apply to the practice of abortion in contemporary society?

Much depends on what should be understood by the term "in whole or in part of a national group". The moral justification most frequently advanced for abortion is that, as a group or category of human beings, the unborn are not persons and accordingly have no right to life to protect. But, as we have already argued, the unborn are part of the human family. And the human family is itself broken down into nation states or groups.

The unborn are, then, a sub-group of a national group. If the unborn, contrary to Article 6 of the Universal Declaration of Human Rights 1948 and Articles 6 and 16 of the International Covenant on Civil and Political Rights 1966, are defined, as a group, as non-persons and therefore beyond moral and legal protection, does the crime of genocide apply to those countries that fail to give protection to that part of the national group?

Even more obviously, "disabled persons" are recognised in international law as a group which forms part of a nation. [82] These persons "have the same civil and political rights as other human beings" [83] and must be "protected against all exploitation, all regulations and all treatment of a discriminatory, abusive or degrading nature." [84] If it is legally permissible to end the life of unborn human beings with disabilities, and medical tests are routinely applied to pregnant women to discover any fetal abnormality, would this not amount to the crime of genocide against the disabled unborn?

The Genocide Convention speaks of "imposing measures intended to prevent births within the group." Does this mean that the Genocide Convention is limited only to cases where abortion is imposed on women? The answer to this question is no. Since the Genocide Convention defines genocide in terms of "killing members of the group", since "measures intended to prevent births" clearly includes induced abortion, and since abortion involves the intentional killing of the unborn, then the Convention's reference to "imposing measures" cannot be interpreted in a way that would limit its application to women who are forcibly aborted. And in any case, the Convention's definition of genocide includes "killing members of the group". This is sufficient by itself to raise serious questions as to whether the practice of abortion is genocide.

What often makes a group vulnerable to genocide is the denial of human rights, precisely what has occurred to the unborn in Australia and in many other countries. The questions that supporters of legal abortion need to address, then, are these: how is it not genocide to define some members of the human family as non-persons, thereby allowing them to be directly and intentionally killed by induced abortion? How is it not genocide to legally prescribe and actively promote the induced abortion of human beings on the grounds of their actual or perceived disability? If it could be shown that homosexuality was genetically influenced, and homosexuality was thought of as a disability, would the routine abortion of homosexuals be considered the crime of genocide against homosexuals?

## CONCLUSION

The member nations of the United Nations are committed to the promotion of "universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion" (85) by way of a pledge. All members pledge themselves to take joint and separate action in cooperation with the Organisation for the achievement of the purposes set forth in Article 55.(86) What we have here is the idea of a consensus gentium, an agreement among the nations, a consent to be bound by certain values expressed as human rights. This doctrine of consent involves the idea that the "basis of obligation of all international law, and not merely of treaties, is the consent of States." (87)

Australia has bound itself to membership of the United Nations, to the United Nations Charter, to the Universal Declaration of Human Rights 1948, the Convention on the Prevention and Punishment of the Crime of Genocide 1948, the International Covenant on Civil and Political Rights 1966, the Convention on the Rights of the Child 1989, and the Declaration of the Rights of the Child 1959. These documents contain strong commitments to the protection of human rights of all without any distinction whatsoever. Discrimination because of age, personhood, status and disability are all examples of unjust discrimination, including when they are applied to unborn children.

There are, of course other important obligations under international law which, as we have already suggested, will influence municipal law in many other areas of the law. However, it is hard to imagine a more neglected area of human rights discussion, from the perspective of international law, than the rights of the unborn. The Commissions have continued this neglect by their conspicuous failure to discuss these issues which they are obliged to discuss. Any domestic cases involving the unborn whether that be abortion, succession, medical negligence or the criminal law must now have regard to our obligations under international law. Put succinctly, there is a case to be heard for the unborn based on Australia's existing human rights obligations and that now is the time to adjust practice to principle rather than continuing to compromise principles to bring "principle" in line with practice.

[Return to the top]

[Return to FIRST PAGE of article]

[Educational Materials on Abortion]

_____

**NOTES**

46 Charter of the United Nations, Article 55(c).

47 In Secretary, Department of Health and Community Services v. J.W.B. and S.M.B. (Marion's case.) (1992) 175 CLR 218

Brennan J. emphasised:

The law will protect equally the dignity of the hale and hearty and the dignity of the weak and lame; of the frail baby and of the frail aged; of the intellectually able and of the intellectually disabled . . . Our law admits of no discrimination against the weak and disadvantaged in their human dignity.

48 Philip Alston, op. cit. n 32, 159.

49 Ibid.

50 Preamble, Universal Declaration of Human Rights 1948, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948).

51 Sharon Detrick. op. cit. n 27, 109.

52 Michel Meslin, "Religious traditions and the Human Person", in Concepts of Person in Religion and Thought, eds. Hans G. Kippenberg, Yme B. Kuiper, and Andy F. Sanders, (Berlin: Mouton de Gruyter, 1990), 67.

53 T.W. Sadler, Langman's Medical Embryology Sixth Edition, (Baltimore: Williams & Wilkins, 1990), 30.

54 Anthony Fisher, IVF The Critical Issues, (Melbourne: Collins Dove, 1989), 133. Fisher refers to W. J. Hamilton and H.W. Mossman, Human Embryology 4th Edition, (Cambridge: Plenum, 1972); L.B. Arey, Developmental Anatomy 7th Edition, (Philadelphia: Saunders, 1975); B. Alberts et al, Molecular Biology of the Cell, (New York: Garland, 1983); K.L. Moore, Before We Are Born, (Philadelphia: Saunders, 1983); L. Nilsson et al, A Child Is Born, (London: Faber & Faber, 1977).

55 R. Yanagimachi, "Mammalian fertilization", The Physiology of Reproduction, eds. E. Knobil, J. Neill et al, (New York: Raven Press, 1988), 135.

56 It is interesting to note that Langman's Medical Embryology Sixth Edition does not use the term "pre-embryo", a term which is meant to refer to the entity up to 14 days. The comparative lawyer Albin Eser has suggested that "the naive (speaking from a normative-theoretical perspective) and rather simplistic efforts to get rid of the basic value problem through terminological 'degradation' of the pre-implantation embryo to the status of 'pre-embryo' or even to simple 'seed' or 'germ' should be abandoned. Rather than prejudicing the value questions involved through conceptual-terminological game-playing it would be better to concentrate on the question that is lastly decisive: To what extent does or should a species-specific human (since originating from human gametes) new entity of life - i.e., at least genetically capable of achieving the full potential of a human being - possess sufficient value to make us unwilling to allow for total freedom of choice with respect to maintaining or destroying this life?" A. Eser, "Experiments with embryos: legal aspects in comparative perspective", UK National Committee of Comparative Law 1987 Colloquium Legal Regulation of Reproductive Medicine (Cambridge) cited in Anthony Fisher, op. cit., 173-174.

57 Human Embryo Experimentation In Australia, Senate Select Committee On The Human

Embryo Experimentation Bill 1986, (Canberra: Australian Government Printing Service, 1986), xiii.

58 C.R. Austin, Human Embryos, (Oxford: Oxford University Press, 1989), 31.

59 Senate Select Committee on the Human Embryo Experimentation Bill 1985, Official Hansard Report, op. cit. n 57, 2161-2162. Professor R.V. Short was Chairman, Working Party on Human Embryo Experimentation, Australian Academy of Science, Canberra, Australian Capital Territory.

60 Michael Tooley, Abortion and Infanticide, (Oxford: Clarendon Press, 1983). Tooley argues that a child becomes a "quasi-person" at around three months after which time it might be thought wrong to kill the baby (see his conclusions, p. 424). Cf Helga Kuhse and Peter Singer, Should the Baby Live?, (Oxford: Oxford University Press, 1985) especially p. 131 where the authors describe Tooley's argument as "basically sound". For a refutation of Tooley see Bernard Williams, Ethics and the Limits of Philosophy, (London: Fontana Press/Collins, 1985), 114-115.

61 It was also prevalent in the early twentieth century. For example, "Eugenics aims to secure better babies." (Margaret Sanger, Medical Journalists Advocate Birth Control, Birth Control Review, Volume II, Number 10 (October 1918), 4) and ". . . we need not more of the fit, but fewer of the unfit . . . Is it not time to protect ourselves and our children and our children's children? The propagation of the degenerate, the imbecile, the feeble minded, should be prevented." (Margaret Sanger, Birth Control, Past, Present and Future, Birth Control Review, Volume V, Number 8 (August 1921), 19.

62 "Prior to the American Civil War and the antislavery amendments, such decisions as Dred Scott v. Sandford relegated slaves to the legal status of nonpersons in spite of clear biological evidence of their humanity." John Warwick Montgomery, "Abortion and the Law: Three Clarifications", in New Perspectives on Human Abortion, eds. Thomas W. Hilgers, Dennis J. Horan, and David Mall, (Frederick, Maryland: University Publications of America, Inc., 1981), 284. Cf. Dred Scott v. Sandford, 19 Howard 393 (1857) and the Slavery Convention 1927, Article 1.

63 See RN Proctor, Racial Hygiene: medicine under the Nazis (Cambridge, MA: Harvard University Press, 1988); also RJ Lifton, The Nazi Doctors: Medical Killing and the Psychology of Genocide (New York, Basic Books, 1986).

64 Hiram Caton and John I. Fleming, "Afterword: An Allegory", in Hiram Caton and John I. Fleming eds., Proceedings of the Bioethics Symposium: Limits on Care of the Ninth World Congress on Intellectual Disability, (Canberra: National Council for Intellectual Disability, 1992), 67-68.

65 Cf The International Covenant on Civil and Political Rights 1966, Article 16.

66 Universal Declaration of Human Right 1948, Article 25.

67 The Human Rights Committee is established under the International Covenant on Civil and Political Rights 1966 to implement the Convenant, see Part IV of the Convenant. Mr Ganji, a former Human Rights Committee member, has provided useful insight to the Committee's approach concerning Article 6. He has observed:

In order to exercise any rights with which the Committee was concerned an individual had to exist, and in order to exist, he must die neither before nor after birth and he must receive a minimum of food, education, health care, housing and clothing. There was undoubtedly an interconnexion between the right to life, the requirements of which were material and the right to exercise all other freedoms. [SR 67 pr. 78. Comments made during consideration of a report by the German Democratic Republic.]

68 GC 7(16), Doc. A/37/40, 94. Also in Doc. C/21/Add. I.

69 International Covenant on Civil and Political Rights 1966, Article 4(2).

70 International Covenant on Civil and Political Rights 1966, Article 4(1).

71 International Covenant on Civil and Political Rights 1966, Article 40(4).

72 Human Rights Committee, General Comment 6, Article 6 (Sixteenth session, 1982), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 6 (1994) §1.

73 Id. at §5.

74 Article 6(5) of the International Covenant on Civil and Political Rights 1966, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171. See also the United Nations Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty 1984, Article 3.

75 Marc J. Bossuyt in the Guide to the "Travaux Préparatoires" of the International Convenant on Civil and Political Rights, (Martinus Nijhoff Publishers, 1987) observes:

Commission on Human Rights, 5th Session (1949), 6th Session (1950), 8th Session (1952) A/2929, Chapt. VI, §10: "It would seem that the intention of paragraph 4 [5] which was inspired by humanitarian considerations and by consideration for the interests of the unborn child, was

that the death sentence, if it concerned a pregnant woman, should not be carried out at all. It was pointed out, however, that the provision, in its present formulation, might be interpreted as applying solely to the period preceding childbirth [E/CN.4/SR.311, p.7 (B)]." Third Committee, 12th Session (1957) A/3764, §118 [actually §117]: "There was some discussion regarding the meaning of paragraph 4 [5] of the draft of the Commission on Human Rights (E/2573, annex I B), which provided that the sentence of death should not be carried out on a pregnant woman. A number of representatives were of the opinion that the clause sought to prevent the carrying out of the sentence of death before the child was born [A/C.3/SR.809, §27 (CHI); A/C.3/SR.810, §2 (B), §7 (IR); A/C.3/SR.812, §32 (RI); A/C.3/SR.814, §42 (CDN)]. However, other (sic) thought that the death sentence should not be carried out at all if it concerned a pregnant woman [A/C.3/SR.810, §14 (PE); A/C.3/SR.811, §24 (SA)]. The normal development of the unborn child might be affected if the mother were to live in constant fear that, after the birth of her child, the death sentence would be carried out."

76 Ibid., §118, A/3764.

77 In R v. Wycherley 173 ER 486 the accused woman had been found guilty of murder and was sentenced to death. When asked whether she had anything to stay the execution she replied: "I am with child now." A jury was empanelled and found that the woman was not pregnant. Nevertheless, the case highlights that the death penalty was stayed pending the resolution of the issue and logically would have been stayed until at least the birth had she been found to be pregnant.

78 International Planned Parenthood Federation, IPPF Charter on Sexual and Reproductive Rights, 12.

79 78 U.N.T.S. 277, the Convention entered into force on 12 January 1951. The Convention was signed by Australia on 11 December 1948 and ratified on 8 July 1949. Australia has approved and repeated the Convention on the Prevention and Punishment of the Crime of Genocide 1948 in the Genocide Convention Act 1949 (Cth.). However, the Act does not implement the Convention into municipal law, see Minister for Immigration and Ethnic Affairs v Teoh (1995) 183 CLR 273 at 286-287, 298, 304, 315 and Krueger v The Commonwealth, unreported, High Court of Australia, 31 July 1997. Compare the comments of Justice Evatt who has argued:

Quite apart from conventions that Australia ratifies, some parts of that international law can, as a matter of common law, apply in Australia without any further action on the part of anyone. I think the recent High Court case of Teoh may have referred obliquely to this, but it could have said more about the fact that under common law, customary rules, and particularly principles of human rights, such as the principle against genocide and so on, are part of customary international law. Naturally as such, they can be overruled by legislation, as any part of the common law can. But we should not think of international law as being an entirely separate

thing from the law of Australia. Some parts of it we would recognise. [Report by the Senate Legal and Constitutional References Committee, Trick or Treaty?, Commonwealth Power to Make and Implement Treaties, November 1995 at §6.6, see also §3.33.]

80 Convention on the Prevention and Punishment of the Crime of Genocide 1948, Preamble.

81 In Thorpe v The Commonwealth [No 3], unreported, High Court of Australia, 12 June 1997, Kirby J. observed "The definition of "genocide" in the [Genocide] Convention is very broad."

82 Declaration on the Rights of Disabled Persons 1975, proclaimed by the General Assembly Resolution 3447 (XXX) of 9 December 1975. The Declaration is attached as Schedule 5 to the Human Rights and Equal Opportunity Commission Act 1986 (Cth.).

83 Declaration on the Rights of Disabled Persons 1975, Article 4.

84 Declaration on the Rights of Disabled Persons 1975, Article 10.

85 United Nations Charter, Article 55(c).

86 United Nations Charter, Article 56.

87 Parry and Grant Encyclopaedic Dictionary of International Law, eds. Professor Clive Parry et al, (New York: Oceana Publications, Inc., 1986), 72.

**AUTHORS**

Dr John I Fleming, BA, ThL (Hons), PhD.

Director

Southern Cross Bioethics Institute

PO Box 206

Plympton, SA 5038

AUSTRALIA

Tel: + 61 8 8297 0022

Fax: + 61 8 8371 1391

Mobile: 0419 819 452

Email: jfleming@bioethics.org.au

Dr. Michael G Hains, LLB (Hons), Ph.D.

Attorney

Research Fellow

Southern Cross Bioethics Institute

Adjunct Lecturer in Law, University of NSW

Visiting Fellow University of Melbourne (1996)

Email: mhains@ozemail.com.au

[Return to top of page]



Priests for Life
PO Box 141172
Staten Island, NY 10314
Tel. 888-PFL-3448, (718) 980-4400
Fax 718-980-6515
Email mail@priestsforlife.org

Subscribe to Fr. Frank's bi-weekly prolife column (free): subscribe@priestsforlife.org

Click Here to See What Abortion Looks Like

Home

Search  || Crisis Pregnancy Help || About Us || Support our Work
Latest News  || Guestbook || About Other Groups

*This site is updated <u>daily</u>!*

Online Hosting by: <u>Catholic Online</u>

Crime and Misconduct Commission

**Street address**
Level 3 Terrica Place, 140 Creek Street (Cnr Adelaide & Creek Streets), Brisbane

**FORMAL COMPLAINT AGAINST PREMIER OF QUEENSLAND**

**Rob Whiddon**
**Chief of Staff**
AND
**Hon  Peter Beattie**
**Premier & Minister for Trade, QLD Government**
**Level 15 Executive Building, George St**
**Brisbane QLD 4000**
**Queensland, Australia**
**Email: Brisbane.Central@parliament.qld.gov.au**

**Dear** Crime and Misconduct Commissioners,

Over the past few months I have asked Hon Peter Beattie and Rob Whiddon and the officers of the Government of Queensland to intervene as my family representatives to prevent a child abuse and child kidnapping and illegal retention situation of holding hostage my minor child Nara Singhderewa.

The office has violated all the principles of humanity and morality in dealing with this issue when the issue could have been resolved at an earlier stage and my child reunified with me. The laws covering this violations may be found in the Consolidated Acts.

Now as a result of the actions of the State I have not seen or talked to my child in over 6 months.  Extensive Exhibits will be included to support this allegation.

I have tried every avenue through the state and some taxpayers and citizens, all persons involved to reach my child Nara a minor in the state have failed.

I have asked help in the form of Supreme Court Direction to be filed by Rob Whiddon in my behalf such a request of Order Nissi and a Habeas

Corpus for the production of my Child in the Supreme Court and I have
received no help.

The response of the Hon Peter Beattie and Rob Whiddon has been
inconsistent with the term PARAMOUNT being used for other children in
the protection of my child and she being denied the protection so
guaranteed.

When asked about the whereabouts of my Child I was told I should ask
someone else.

When asked about the identity fraud of my child then I was told to ask
some else and report it to the police.

After reporting it to the police, I was told to report it to the Police
Minister Judy Spence.

After reporting to Judy Spence, I was told to report it to Mike
Reynolds.

In each case from all the departments of Queensland it was given to me
understand that my child Nara Singh derewa was easily approachable and
was going to kindy in Queensland and was safe and sound in Parkwood 10
County Place in the care of Peter Whalan.

I asked that a court order showing that Peter had been awarded custody
to my child be presented and then no paper was produced.

My child has vanished with aiding and abetting of the Queensland Police
and the actions of the Queensland Premier.

Documents will prove that action requests, emergency action requests,
and serious emergency action request have gone unheeded and no response
was given.

After repeated phone calls minimum response and minimum communications
was given.

The compliant will be evidence minimum communication and effort.  Or
better no communication and effort to loacate my child or to her her
classified as missing.

Also the evidence will show my huge effort and my emails and phone
calls and reports and communications effort to find my kidnapped child.

I will present an Human Rights Order "saying this illegal retention is unlawful and unwarranted". Yet the Premier supports this illegal action with no "paramount" action giving courage and lethality to the aiders and abettors.

Every department of the Queensland has been concertedly irresponsible and has failed to respond to a major crime having consequences of atleast 25 years in jail. Yet the Premier supports the efforts of the kidnappers as "paramount".

Generally, I here below describe the responsibility of PARAMOUNT action.

As such, it was explained that my child Nara is a young human being a very young human being. As a human being children evidently have a certain moral status. There are things that should not be done to them for the simple reason that they are human. At the same time children are different from adult human beings and it seems reasonable to think that there are things children may not do that adults are permitted to do.
In the majority of jurisdictions, for instance, children are not allowed to vote, to marry, to buy alcohol, to have sex, or to engage in paid employment. What makes children a special case for philosophical consideration is this combination of their humanity and their youth, or, more exactly, what is thought to be associated with their youth. One very obvious way in which the question of what children are entitled to do or to be or to have is raised is by asking, Do children have rights? If so, do they have all the rights that adults have and do they have rights that adults do not have? If they do not have rights how do we ensure that they are treated in the morally right way? Most jurisdictions accord children legal rights. Most countries -- though not the United States of America - are also signatories of the United Nations Convention on the Rights of the Child which was first adopted in 1980. The Convention accords to children a wide range of rights including, most centrally, the right to have their 'best interests' be 'a primary consideration' in all actions

```
concerning them (Article 3), the 'inherent right to life'
(Article 6), and the right of a child "who is capable of
forming his or her own views ... to express these views
freely in all matters affecting the child" (Article 12)
(United Nations 1989). However it is normal to distinguish
between 'positive' rights, those that are recognised in
law, and 'moral' rights, those that are recognised by some
moral theory. That children have 'positive' rights does not
then settle the question of whether they do or should have
moral rights. Indeed the idea of children as rights holders
has been subject to different kinds of philosophical
criticism At the same time there has been philosophical
consideration of what kinds of rights children have if they
do have any rights at all. The various debates shed light
on both the nature and value of rights, and on the moral
status of children.
```

Article 1 of the United Nations Convention defines a child as any human being below the age of eighteen years 'unless,' it adds, 'under the law applicable to the child, majority is attained earlier' (United Nations 1989). In what follows this definition will be assumed. Some think it obvious that children do have rights and believe that the only interesting question is whether children possess all and only those rights which adults possess. Others are sceptical believing that given the nature both of rights and of children it is wrong to think of children as right-holders.

Feinberg distinguishes between rights that belong only to adults (A-rights), rights that are common to both adults and children (A-C-rights), and rights that children alone possess (C-rights) (Feinberg 1980). Thus a common position is that the A-rights include, centrally, the liberty rights, and that the A-C-rights include, centrally, the welfare rights. To repeat, liberty rights are rights of choice (how and whether to vote, what to say publicly, whether to practise a religion and which one, which if any association to join, and so on) whereas welfare rights protect important

What might be included in the C-rights? Feinberg distinguishes between two sub-classes of C-rights. There are, first, those rights which children possess in virtue of their condition of childishness. Although Feinberg does not further divide this first sub-class of C-rights this can be done. There are the rights children have to receive those goods they are incapable of securing for themselves, and are incapable of so doing because of their dependence upon adults. These goods might include food and shelter. There are, second, the rights to be protected against harms which befall children because of their childlike vulnerability and whose particular harmfulness is a function of a fact that they befall children. These harms might include abuse and neglect. Finally, there are goods that children should arguably receive just because they are children. The most central, and contentious, example is a child's right to be loved. This is not an A-C-right but it is

arguably a C-right, and indeed is cited by many as a C-right (MacCormick 1976, 305). Various declarations of children's rights include such a right and a respectable case can be made to meet the various objections normally raised against its attribution (Liao 2000).

These C-rights can be termed 'protection' rights since, in general, they seek to provide protection for children. Further they do so because the state or condition of childhood calls forth and requires this protection. We should be careful to distinguish protection from welfare rights. Children, along with adults, have welfare rights but the content of these will differ between children and adults. It will do so because of the particular form that children's needs and circumstances take. Thus grant that both children and adults have a welfare right to health care. In the case of children but not that of adults paediatric care and treatment is appropriate. But that fact is no different in its significance from the fact that amongst different adults the proper form of health care should vary in line with their various disabilities, diseases, and circumstances.

# 6. The Child's Right to Grow Up  (WHERE IS NARA)

The second sub-class of C-rights are those which Feinberg characterises as 'rights-in-trust' and which he thinks can be resumed under the single title of a 'right to an open future'. These are the rights given to the child in the person of the adult she will become. They are the rights whose protection ensures that, as an adult, she will be in a position to exercise her A- and A-C-rights to the maximal or at least to a very significant degree. They keep her future open. Such rights impose limits on the rights of parents, and also impose duties on the part of the state to protect these rights.

A couple of things are worth noting about these rights-in-trust. First, Feinberg refers to these C-rights as 'anticipatory autonomy rights', which might suggest that they are only A-rights-in-trust. But he also speaks, within a page, of rights-in-trust of class C as protecting those future interests a child will have as an adult. This implies that they are also anticipatory welfare rights (Feinberg 1980, 126-7). Hence this sub-class of C-rights ensures that the adult can later exercise both her A-rights (liberty) and her A-C-rights (welfare).

Second, there is the question of how open a child's future should be. Some interpret the demand for an education for an 'open future' as requiring individuals to acquire 'to the greatest possible extent' the capacity to choose between 'the widest possible variety of ways of life' (Arneson and Shapiro 1996, 388). They point out several objections to such a 'maximising' interpretation. It may not be possible to quantify in a determinate fashion the number of options open to a future adult. Furthermore some fulfilling life choices are only available at the expense of denying the child a number of otherwise possible choices. For instance, a child intensively trained to realise his considerable innate musical abilities may be unable to pursue careers that would have been open to him in the absence of such a dedicated education. The following further criticisms can be added. Requiring that a child be brought up to be able eventually to choose between as many options as possible may impose unreasonable burdens on parents. It also seems implausible to think that a child suffers if she is denied one or even several possible insignificant further

options beyond some threshold number of choices. Is it really harmful to a child that she does not learn to play all of the orchestral instruments and is thereby denied the opportunity to pursue a solo career in those she does not?

Feinberg does sometimes talk only of the harms of closing off significant life choices. Yet he does also on occasion employ the language of maximisation. '[Education] should send [the child] out into the adult world with as many open opportunities as possible, thus maximising his chances for self-fulfillment'. (1980, 135; see also 151). However it seems much more plausible to suggest that a child should have enough autonomy to be able to make reasonable life choices. The preconditions of autonomy are both internal (a capacity to think for oneself, to acquire and appreciate relevant information, and a volitional ability to act independently) and external (the provision of a range of feasible and valuable options). In respect of both conditions it is perfectly possible to have a good sense of what counts as adequate autonomy, even if there is no clear bright line marking the point of sufficiency.

Closely related to Feinberg's idea of 'rights-in-trust' is Eekelaar's idea of a child's 'developmental' rights (Eekelaar 1986). These are the rights of a child to develop her potential so that she enters adulthood without disadvantage. Whereas Feinberg attributes the rights to the child's adult-self, the child holding them only in 'anticipatory' form, Eekelaar attributes the rights to the adult's child-self. Arguably this makes no difference since the child and the adult are one and the same person. Although this is a metaphysically contentious claim (Parfit 1984) grant that child and adult are merely distinct temporal stages of a single individual. Child and adult are one and the same person. Whether each temporal stage of the person has the same interest in the child developing into an adult is a further issue which will be considered shortly.

However child and adult do stand in an asymmetrical relationship to one another in a way that does not seem to be true of the different temporal stages of the same adult. After all adult Smith can now exercise her liberty rights in such a fashion that at a later time she is not able to exercise them and her welfare rights, to the same degree as she can now. Smith can, for instance, choose now to enter into a slavery contract or to engage in a dangerous sport that risks death or serious disability. A child, on the other hand, is denied the right to make choices that will fetter the adult exercise of her rights. This is justified by three thoughts. First, a child, unlike an adult, simply lacks the ability to make considered choices and should not have liberty rights. An adult can make unwise choices but is presumed to possess a general capacity which the child lacks to make wise choices. Or at least we think that an adult has a minimal capacity to make choices which the child lacks, even if a particular adult throughout her life makes suboptimal choices. Second, what is done or not done in childhood affects the whole of one's later life and does so in a way that is largely irreversible. Third, a life in which choices can be made is more valuable than one in which they cannot. So the preconditions for the possibility of such a life should be secured. That is just to say that the child must allow for the possibility of becoming its adult self.

However consider the case of a child who will not develop into an adult, say someone who is suffering from a terminal disease that will prevent her living beyond the age of majority. Such a child lacks developmental rights. Or rather she has them but her circumstances do not allow for their protection. However, she does still have welfare and protection rights whose correlate duties can be discharged. The child has an interest in not suffering harm and in enjoying a certain standard of life even if she never lives beyond her childhood.

When, for instance, we provide a child with health care or protect her from abuse we not only thereby serve her immediate interests as a child but we also ensure that she will grow into a mentally and physically healthy adult. At its simplest a child's welfare right not to be killed is a precondition of the very possibility of there being a future adult with any rights at all. Even the education of a child can be represented as not merely of instrumental worth to the future adult but of value to the child here and now. A child has an interest now in learning things and does so independently of what this might later mean for her future adult self. (Coady 1992, 51).

What kind of adult does her childhood self have an interest in developing into? The answer to this question is important not least for indicating appropriate constraints on any parental upbringing. There is a very influential and recognisably liberal view of what sort of adult a child has an interest in developing into. This is an autonomous individual, one able independently to evaluate and to choose as appropriate its own ends. On the liberal view a child is not autonomous but can with the proper upbringing become autonomous. This view is most directly contrasted with a conception of the individual as equipped with a set of values and beliefs, authoritatively acquired during its childhood as a result of its upbringing, and not open to revision, or at least not open to any substantial revision. However an emphasis upon the capacity to revise one's ends may be at the expense of a deeper understanding of autonomy as a capacity rationally to adhere to some ends (Callan 2002).

# Best Interests  (WHERE IS NARA)

If children are not thought to have the A-rights, and, chiefly, do not have the liberty rights to choose for themselves how to conduct their lives, nevertheless they are not morally abandoned to their own devices. In the first place it is a standard principle of child welfare law and policy that the 'best interests' of a child should be promoted. Article 3.1 of the United Nations Convention on the Rights of the Child states that 'In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration' (United Nations 1989).

Second, Article 12.1 of the Convention asserts that, 'States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance with the age and maturity of the child' (United Nations 1989).

Section 8 discusses the right to be heard. This section discusses the best interest principle, henceforward the BIP. The principle has been given different explicit formulations. Indeed it should be noted that the principle's possible definitions vary in at least two important dimensions: what is being given weight, and how much weight it is being given. Thus we may speak of a child's 'best interests' or simply of a child's 'interests' or 'welfare'. The former is the more familiar version of the principle and it is this understanding of the principle that will be discussed. The difficulties with this maximising interpretation will be considered in due course.

As to the weight of the principle the distinct terms 'paramount' and 'primary' have been employed, along with either the definite or indefinite article, to qualify the consideration that should be given to a child's (best) interests. There are therefore at least four possible weightings: (a) the paramount; (b) a paramount; (c) the primary; (d) a primary. A fifth -- that a child's (best) interests should merely be 'a consideration' -- is otiose. Some consideration should obviously be given to a child's interests. The question however is how much. The distinction between 'paramount' and 'primary' may be understood as follows. A consideration that is paramount outranks and trumps all other considerations. It is, in effect, the only consideration determinative of an outcome. A consideration that is 'primary' is a leading consideration, one that is first in rank among several. But although no considerations outrank a primary consideration there may be other considerations of equal, first rank. Furthermore a leading consideration does not trump even if it outranks all other considerations. A primary consideration is not the only consideration determinative of an outcome.

So it should be evident that (a) and (b) are equivalent, and that the real contrast is between a paramount consideration that trumps all others and a primary one that need not. In effect the interesting choice is between (a) and (d). That is one between a child's (best) interests being the only consideration and their being an important but not the sole consideration. Indeed a debate took place as to which of these two versions should be included within the UN Convention on the Rights of the Child with the weaker formulation being eventually adopted (Alston 1994 12). The difficulties with the idea that a child's (best) interests are the only consideration in the determination of any issues will be discussed further in due course.

We can speak either of 'a' child or, more generally, of 'children'. There is a difference between considering how in some matter the child most directly concerned is affected and considering how any policy or action in respect of that one child may also have consequences for other children. Indeed we might consider how any policy or action at all has implications -- even if very indirect and attenuated -- for all children. However, it is plausible to construe a use of 'children' within a formulation of the BIP as requiring us to attend to the impact of a policy, practice, or activity upon those young persons most obviously and directly affected. The BIP's origins are to be found in custody disputes where the law had to make a determination in respect of a couple's children. Even if there were several children the court had to decide in respect of each individual child what was the most appropriate course of action. The provenance of the BIP shows itself in the continued use of the singular term 'child'.

There is a still further question of how we should understand the scope of the best-interests principle. The BIP has operated in at least two important domains (Kopelman 1997a). One is in the medical context when determining which option should be selected for an ill or diseased child. The second is in custody disputes following the separation or divorce of the child's guardians. Here, where there is unresolved argument as to who should now raise the child, the court must decide. However, beyond these two specified domains, the BIP has also been given broader application in respect of all policies and laws affecting children. This is certainly what the UN Convention Article 3.1 appears to require.

There are at least two kinds of difficulty in accepting the BIP (for a summary of various criticisms see Kopelman 1997b). The first of these concerns the import of the principle, the second concerns how we should interpret 'best interests'. Each will be considered in turn. As to its import the BIP is, in the first instance, a maximising maxim. It requires that the best shall be done for a child and not simply that good or enough must be done. One must act 'so as to promote maximally the good' of the child (Buchanan and Brock 1989, 10).

In some contexts where the BIP operates there appears to be a determinate number of options, and perhaps even only a pair of options. This seems to be the case in custody disputes and medical decision-making. Where each divorced parent lays claim to exclusive custody to the child, no other party has any claim, and no compromise is possible, there are only two possibilities. In this context the better option is the best. The same is true when the decision is simply whether or not to pursue or to abstain from a course of medical treatment. By contrast in the area of general policy affecting children there seem to be very many different possibilities. Yet even with custody and medical decisions we can expand the range of possible options. Thus what might be best for the child is not that she is cared for by either of the parents claiming custody, but that she is adopted by someone else entirely. Again, what might be best for the child is not that she receive the medical treatment on offer rather than not do so, though it may well be better that she does. What is best is that she is treated by the most skilled medical personnel within the finest medical facility, with no expense spared, and so on.

But then the obvious criticism of the BIP is that it is unfeasibly demanding of agencies charged with the care of children. Should we really demand that our law and policy makers do the best for children rather than charge them with doing enough for children? We do not, it seems, require parents to promote their children's best interests. Nor should we. Indeed the standard principles of child welfare policy, even when they include a version of the best-interests maxim, do not stipulate that a child's parents shall do more than ensure that the child receives a threshold of care. Beyond that parents are not normally required maximally to promote their child's interests, and indeed they have considerable discretion as to how they raise the child. So the BIP is not best interpreted as a maximising principle. We should do so much for a child; we should not be obliged to do everything that in principle we might do.

A second problem of the import of the BIP is that it does not, as it stands, take account of the interests of others. In the first place I might be able to improve the situation of child A but only at the cost of worsening that of child B. It is natural to think that the interests of all children should be weighed equally. Hence the BIP ought to be read as requiring us impartially to promote the best interests of each and every child. Of course the BIP directs courts, social workers or medical practitioners in some case to promote the interests of a particular child. But this should not be done by treating the interests of any other child who might be affected as having no value or a lesser value than those of the particular child attended to. It would not be reasonable to expect that parents should view the interests of their own children as having the same weight as that of other children. It is reasonable to ask policy makers and care professionals to do so.

In the second place we cannot be required to promote the best interests of a child over and above, and without regard to, the interests of any relevant adult. It might be in the best interests of a child that her guardian give up every waking minute to her care. But no adult should have to sacrifice her own welfare for that of her child. The BIP should thus be interpreted so as to give at least equal consideration to the interests to the well-being of any adults affected by policies and actions promoting the child's welfare.

The second set of difficulties surrounding the BIP concern the interpretation of 'best interests'. One way to understand this phrase is by reference to what a child would choose for herself under specified hypothetical circumstances. We could call this the 'hypothetical choice' interpretation of the BIP. The other way to understand 'best interests' is simply through offering an account of what is, as a matter of fact, best for the child, an account which is distinct from and independent of the child's desires, actual or hypothetical. Let us call this the 'objectivist' interpretation of the BIP. Each interpretation will now be examined in turn.

The 'objectivist' interpretation of the BIP is beset by a number of difficulties. Some urge that what is best for any child is necessarily indeterminate. There certainly is no fact of the matter in this regard for we must attach values to the options and their outcomes in respect of any choice of action towards a child. However it will be said that independently of questions of value we cannot, with certainty, determine what is best for a child. We cannot in practice make complete and accurate assessments of what will be the outcome of each and every policy option that we might adopt in respect of a child (Mnookin 1979). How can we know with certainty whether this child will flourish if raised by this set of parents rather than by some others in an alternative setting? Even where we are seeking to rank the outcomes of the options within a simple custody dispute between mother and father things may prove impossibly difficult. After all, any number of things may happen if the child is in the mother's custody, and the same is true if the child is given to the father. The BIP is indeterminate even where there are only two possible decisions to be made (Elster 1989, 134-139).

This difficulty can be spelled out in the following fashion. Imagine that indeterminacy afflicts each of the four conditions of a full decision procedure (Parker 1994, 29-31). For a decision to be made the possible options must be known, the possible outcomes of each

possible option must be known, the probabilities of each possible outcome occurring must be known, and the value of each outcome must be known. Independently of the uncertainty in respect of the last condition -- value of the outcomes -- there is uncertainty in respect of the other three conditions. This is probably true. However, it is not clear why the problem is one that is especially or uniquely true of policies affecting children. Any political or legal determination is going to face such indeterminacy in the specification of choices and their outcomes.

Of course once we put values back into the equation there is, arguably, clear indeterminacy. Moral pluralists will hold that it is not possible to rank as better or worse different kinds of life. They will say that it is not possible, in principle, to compare the lives of the fearless adventurer, contemplative scholar, and creative artist. Each realises its own distinctive but strictly incommensurable set of human excellences. How then can we say that there is a best life for a child to grow into, rather than a range of equally possible yet incomparable lives?

The pluralist claim is not directed uniquely at the case of children. The value of some at least of the lives of adults, are for the pluralist, strictly incomparable. Grant that the pluralist claim is false and assume that there is for each and every child a uniquely best life that it could be brought to lead. There is a still further difficulty. Even if moral pluralism as a claim about what is of ultimate objective value is set aside, the fact remains that we do happen to disagree in our basic values. Indeed it is a commonplace of contemporary moral and political philosophy that equally sincere, conscientious, and reasonable individuals espouse fundamentally different, and frequently conflicting, views about morality. As a society we may be able to agree about what is a poor, neglectful or abusive upbringing, but we are likely to be in irresolvable disagreement about what is 'good', even what is 'better', parenting (McGough 1995, 375). We just cannot agree what is in a child's best interests. This is important for a further reason. An education or upbringing shapes the values of the emerging adult. Whether the adult's life goes better or worse will depend crucially on how she evaluates her life in the light of these values. Educators and parents in acting for a child's best interest are also making a difference to the kind of adult thereby formed, and, in consequence, to the goodness of the life she will lead.

The fact of extensive disagreement about what is best for children, or for a child, is often set in the context of broader cultural disagreements about morality in general. It is said that the BIP is subverted, or at least rendered deeply problematic, by the existence of these deep and pervasive cultural disagreements (Alston (ed.) 1994). Care is needed. The statement 'what is best for a child is different in different cultures' is ambiguous. In the first place, the phrase 'in different cultures' may be interpreted as meaning something like 'in different circumstances'. Most moral philosophers will acknowledge that a universal moral principle that all are agreed upon can nevertheless have differential application in differently specified circumstances. Here we do not dispute what in general terms is best for a child. But we do recognise that what it is best to do for any individual child will depend on the particular conditions in which that child finds itself.

On the other hand what is meant by statement 'what is best for a child is different in different cultures' may be that there is no general agreement across cultures about what is best for a child. Each culture has its own understanding of what is in a child's best interests. There is a BIP specific to each culture. What culture A thinks is best for any child is best for any child. What culture B thinks is best for any child -- even though it contradicts what culture A thinks best -- is also what is best for any child. Moral relativism, in some form, has its defenders but its attendant problems are well documented.

If the claim 'what is best for a child is different in different cultures' is a report of cultural difference -- what each culture believes to be best for its children -- then it is still consistent with the BIP having a single universal content. What is best for children is the same whatever the culture, and allowing for the variation in application of the same principle to different contexts. It is just that some cultures do not adhere to the BIP in this form. However things are clearly not that simple. It is one thing to acknowledge in principle that there must be a single BIP; it is quite another to find agreement on what that principle is. The discussions surrounding the formulation of international conventions of human rights have been notoriously beset by significant, and culturally based, differences of moral and political outlook. The United Nations Conventions on the Rights of the Child was no different (LeBlanc 1995).

Even within single cultures which share a broad understanding of what is in a child's best interests there will nevertheless be some measure of disagreement. For instance, within Western societies there are continuing disputes about whether it is morally proper to smack a child.

By contrast with an 'objectivist' interpretation of the BIP what is best for a child can be understood in terms of a child's hypothetical choices. Strictly speaking a hypothetical choice interpretation of the BIP amounts to a distinct principle. It is one Buchanan and Brock define as that of the 'substituted judgement' -- 'acting according to what the incompetent individual, if competent, would choose' (Buchanan and Brock 1989, 10). However it is natural to think that what is best for someone is what they themselves would choose if fully informed and deliberating fully rationally. Thus a striking and influential thought in this context is that we choose what is best for the child if we choose for the child as the child would choose for herself if the child were adult. For instance John Rawls thinks the following formulation defines the acceptable paternalism of a guardian's treatment of his child: 'We must choose for others as we have reason to believe they would choose for themselves if they were at the age of reason and deciding rationally' (Rawls 1999, 183). This apparently simple formulation is in fact susceptible of three quite different interpretations, each of which brings with it its own problems. In each case we are seeking to specify the adult person who chooses for the child.

We might first mean that we should choose for this child as the particular adult the child will become would choose. However this does not determine a unique choice for, crucially, the nature of the particular adult that the child will become depends on the choices that are made for it whilst a child. We can conceive of each of the different adult

selves the child might develop into approving, respectively, of the different choices made for its childhood self -- choices which were responsible for the development of these different selves. Let us take a very basic example. Should we allow the child to go off and play football with his peers, or require him to attend his violin lessons? The child who is allowed to play football becomes a well-paid sportsman who, retrospectively, approves of the decision to free him from music lessons which hampered his ability to develop his footballing skills. On the other hand the child who is made to practise his violin progresses to a fulfilling solo career. This adult -- by contrast with the footballer he did not become -- approves of the enforced musical education away from football that allowed him to have such a career.

The second sense we might give to the phrase 'choose for the child as the child would if adult' is by thinking of the situation in which the choice confronts the child, and then choosing as an adult would. The person who chooses for the child is any adult. This will serve well enough for some choices where there is no doubt as to what a rational adult would choose. In classic adult-child paternalistic scenarios we are not unclear or undecided about what we as adults should do. Would a rational adult choose to stick her hand in the fire, walk out into the traffic, eat whatever was placed in front of her? However if the adult is confronted with other sorts of choices the answer is far less clear. Faced with our imagined choice between playing football and a music lesson how would the adult choose? This of course is wholly indeterminate since different adults will presumably choose differently in the same situation. The adult who prefers football to music will choose the former; the adult who prefers music will choose otherwise.

This leads us then to the third possible interpretation. The adult person who chooses for the child is an adult analogue of the child. This is not the child's future adult self, which as we have seen is indeterminate, but this child made into an adult version of itself. That is, we do not imagine this child developing in the future into its particular adult self. Rather we imagine a mature or grown-up version of this child now making choices. This interpretation however will still not work. The adult version of the child is one with such beliefs and desires filtered out. But, in the first place, it is not clear what remains of the child in any choice situation rendered hypothetical in this fashion. For the child just is someone who has these childish beliefs and desires. What is it to be a child if not to think and want as a child does? Second, it is entirely indeterminate what should replace these beliefs and desires.

These varying interpretations of what it is to choose for a child as an adult would, and their attendant difficulties, display the problems of construing the best interests of a child in terms of the hypothetically adult choices the child would make. The problems are in the last analysis due to the following basic fact. In the cases of adults paternalistically choosing for other adults, and where the paternalism is warranted by a temporary failure of reason, we can have a determinate sense of how the adult would have chosen in the absence of the failure. If she had known that the bridge was unsafe she would have chosen not to cross it. If she was not persuaded by the influence of the drug to think she could fly she would not have decided to jump off the tall building. And so on.

However in the case of children we cannot cash out these hypothetical conditionals. We do not know what a child would choose if possessed of adult rational powers of choice because what makes a child a child just is its lack of such powers (its ignorance, inconstant wants, inconsistent beliefs, and limited powers of ratiocination). At the same time we cannot ask how an adult would choose if in the child's situation just because an adult would not be in that situation, or would not be in a child's situation. We must, it seems, choose for a child because a child cannot choose for itself, and we must choose what is best for a child not what some imagined adult version of the child would choose for itself.

# 8. The Right to be Heard  (WHERE IS NARA)

The right to be heard is a valuable right. What makes it valuable is both that there is a point to making one's views known and, further, that making one's views known makes a difference. It matters to me that I can speak out on political questions. It matters also, and probably more, if what I say leads to the changes I favour. Correlatively it is true both that I do not want to be silenced and that I do not want the statement of my views to be ineffectual. As a further general point it is clear that there will always be some issues on which it is more important that I be allowed to speak and that what I say about these issues carries weight in determining outcomes. Those are the issues that matter to me, and the more they matter the more important it is that I have the freedom to speak about them and be heard.

How is it with the child's right to be heard? It will be important for the child to be listened to. But it is also important that the child is heard in the sense that her views are given due consideration and may influence what is done. Note that the child's right to be heard on matters affecting its own interests is a substitute for the liberty right to make one's own choices. The right to be heard is only a right to have the opportunity to influence the person who will otherwise choose for the child. The power to make those choices resides with the adult guardian or representative of the child. All the child retains is the right to try to motivate that adult to choose as the child herself would choose if she was allowed to.

Article 12.1 of the United Nations Convention on the Rights of the Child not only accords the child the right freely to express its views on matters affecting the child. It also, and crucially, gives the child an assurance that these views will be given 'due weight in accordance with the age and maturity of the child'. What might that mean? The celebrated British legal judgement in the Gillick case (Gillick [1986]) provides a useful guide. This judgement has been extensively if not exhaustively discussed, and it has also been highly influential in matters relating to the consent of children to medical treatment.

The Gillick judgement arose from the dissatisfaction of a mother with the failure of her local health authority to withdraw an advisory circular to the area's doctors. This advised doctors that they could counsel and inform young girls under the age of 16 about sexual matters as well as provide them with contraception, and that they could do this without the consent of the child's parents. The mother, Victoria Gillick, went to court to have the

circular declared unlawful. The final judgement by the British House of Lords was that the circular was not unlawful. A key issue, relevant to the present discussion, concerned the proper relationship between the child's right to decide for itself and the parent's right to decide for the child.

In deciding in favour of the health authority one of the Law Lords, Lord Scarman, made a statement crucial to his finding and one that has subsequently been much cited. It is worth reproducing:

The underlying principle of the law ... is that parental right yields to the child's right to make his own decisions when he reaches a sufficient understanding and intelligence to be capable of making up his own mind on the matter requiring decision.

I would hold that as a matter of law the parental right to determine whether or not their minor child below the age of 16 will have medical treatment terminates if and when the child achieves a sufficient understanding and intelligence to enable him to understand fully what is proposed. (Gillick [1986] 186, 188-9)

First, what does it mean for a child to get to a particular point in their development? On what could be called the threshold interpretation once a child has achieved a certain level of competence her views as to what shall happen to her have a determinate weight, either amounting to a liberty right of choice (on a strong version) or (on a weak version) being counted in the balance against her parents' views and the state's judgement of her best interests. On what could be called the proportionality interpretation the child's views progressively increase in weight as she gains a greater competence to choose for herself. They increase up to the acquisition of a full liberty right of choice.

On either the threshold or the proportionality account we need, second, a measure of that ability that marks the threshold or is simply progressively acquired. How much intelligence and understanding, for instance, is sufficient? In the first place this measure must be taken independently of any judgement of what is in the child's best interest. That a child would choose what is taken to be in her best interests is at most evidence that she does have sufficient intelligence and understanding of the relevant issue. Her making such a choice is not a necessary condition of her having the requisite ability. Similarly the making by a child of a poor choice is not conclusive evidence of her general incapacity to choose for herself. Wise adults can occasionally make stupid decisions just as fools sometimes get it right.

In the Gillick judgement Scarman required of the child that she manifest an understanding of the 'nature' of the contraceptive advice offered and 'also have a sufficient maturity to understand what is involved' (Gillick [1986] 189). We can distinguish here a number of possible elements. There is, first, knowledge of certain facts. A child, for instance, knows that a contraceptive acts to prevent conception that might otherwise result from sexual intercourse. Another child, by contrast, could simply be ignorant of or unable to comprehend the facts of reproduction. There is, second, an understanding of what follows for the child from an act or its omission. Thus failure to

use a contraceptive could lead a young person who had sexual intercourse to become pregnant. These two understandings together constitute knowledge of the 'nature' of the act. Finally there is what arguably comes with 'maturity' which is the ability to appreciate the significance both of an act or its omission and of the relevant consequences. It is one thing to know what it is to become pregnant, and another to understand what that means. This latter understanding involves realising that pregnancy brings in its wake physical changes, that any resultant birth leaves a young person with a child to care for, and so on. Scarman even insisted that the child would need to have an appreciation of the 'moral and family' questions involved.

Two interrelated responses can be, and have been, made to this requirement of competence. One is that it should surely be enough that a child understands the nature of the act. After all no more is needed for an adult's consent to be informed. In the law of contract adults need only to know what they are signing up to. They do not need a full appreciation of the contract's significance and of its import for their future lives. The second thing to say is that Gillick competence as specified is very demanding. Indeed there are many adults who in making their choices fail to display the maturity and 'understanding of what is involved' that is dictated as necessary for the child. Why then should a child have to display a competence that many adults lack both in general and in particular cases?

## Summary

One important, indeed central, manner of understanding the moral status of the child is by questioning whether or not children have rights. It is normally thought that according to the 'will' theory of rights children cannot have rights, whereas according to the 'interest' theory they can. It is, however, at least possible on the 'will' theory that children could have rights, albeit ones that are exercised by trustees or representatives.

Child 'liberationists' claim that children have all the rights that adults do. Others deny this, either believing that children have no rights or believing that children have only some of the rights which adults possess. Those who believe children have no rights deny that children are qualified as adults are to have rights. They further argue that the ascription of rights to children manifests a misunderstanding of what children are like and of the nature of family relationships. Those who deny children all or some of the rights possessed by adults nevertheless believe that children, as humans, have a certain moral status that ought to be protected.

Those who say that drawing a line between adults and children in respect of their possession of rights is arbitrary may mean different things. To deny that different capacities are progressively acquired at different ages is implausible. To insist that drawing a line as such is wrong ignores the point of doing so, and recourse to the alternative of a competency test is not appropriate or practicable. On the standard view children have welfare but not liberty rights, whereas adults have both. Adults also have the right that their childhood selves shall grow up to be adults of a certain sort. Children do not have an interest in remaining in childhood.

The best-interest principle should arguably have only limited application. It is not possible unambiguously to interpret the best interests of a child in terms of a hypothetical adult self, and any objective interpretation will be the subject of contested views. A child's right to be heard in matters affecting its interests is a substitute not a complement to the right of choosing for herself, and the Gillick competence which qualifies a child to exercise its rights of decision-making is arguably stringently defined.

Where does the Premier stand?

I need to find and reunify with my child.

This is a child abuse and child rights violation by the Premier sponsered to make disappear my child.

Yours truly,

Jugvir Inder Singh

Father and representatitive to Nara Singhderewa

# Bibliography

## References Cited

- Aiken, W. and LaFollette, H. (eds., 1980, *Whose Child? Parental Rights, Parental Authority and State Power*, Totowa, NJ: Rowman and Littlefield
- Alston, P., Parker, S., and Seymour, J. (eds.), 1992, *Children, Rights and the Law*, Oxford: Oxford University Press
- Alston, P. (ed.), 1994, *The Best Interests of the Child: Reconciling Culture and Human Rights*, Oxford: Clarendon Press
- Archard, D. and Macleod, C. (eds.), 2002, *The Moral and Political Status of Children: New Essays*, Oxford: Oxford University Press
- Arneson, R.J. and Shapiro, I., 1996, 'Democratic Autonomy and Religious Freedom: A Critique of *Wisconsin v. Yoder*', in *Political Order*, Nomos XXXVIII, I. Shapiro and R. Hardin (eds.), New York: New York University Press: 365 - 411.
- Barrie, J.M.,1995, *Peter Pan and Other Plays*, edited with an Introduction by Peter Hollindale, Oxford: Oxford University Press.

- Benatar, D., 1997, 'Why It is Better Never to Come into Existence', *American Philosophical Quarterly*, 34: 345 - 55.
- Brennan, S. and Noggle, R., 1997, 'The Moral Status of Children: Children's Rights, Parents' Rights, and Family Justice', *Social Theory and Practice*, 23: 1-26.
- Brennan, S., 2002, 'Children's Choices or Children's Interests: Which do their Rights Protect?' in *The Moral and Political Status of Children: New Essays*, D. Archard and C. Macleod (eds.),Oxford: Oxford University Press: 53-69
- Brighouse, H., 2002, 'What Rights (if any) do Children Have?' in *The Moral and Political Status of Children: New Essays*, D. Archard and C. Macleod (eds.), Oxford: Oxford University Press: 31-52
- Buchanan, Allen E. and Brock, Dan W., 1998. *Deciding for Others: The Ethics of Surrogate Decision Making*, Cambridge: Cambridge University Press
- Callan, E., 2002, 'Autonomy, Child-Rearing, and Good Lives', in *The Moral and Political Status of Children: New Essays*, D. Archard and C. Macleod (eds.), Oxford: Oxford University Press: 118-141
- Coady, C.A.J., 1992, 'Theory, Rights and Children: A Comment on O'Neill and Campbell', in *Children, Rights and the Law*, P. Alston, S. Parker, and J. Seymour (eds.), Oxford: Oxford University Press: 43-51
- Cohen, H., 1980, *Equal Rights for Children*, Totowa, NJ: Littlefield, Adams, and Co.
- Eekelaar, J., 1986, 'The Emergence of Children's Rights', *Oxford Journal of Legal Studies*, 6: 161 - 182
- Elster, J., 1989, *Solomonic Judgements, Studies in the limitations of rationality*, Cambridge: Cambridge University Press
- Farson, R., 1994, *Birthrights*, London: Collier Macmillan
- Feinberg, J., 1980, 'A Child's Right to an Open Future', in *Whose Child? Parental Rights, Parental Authority and State Power*, W. Aiken and H. LaFollette, H., Totowa, NJ: Littlefield, Adams, and Co.: 124-153
- Gillick v. West Norfolk and Wisbech Area Health Authority [1986] AC 112
- Griffin, J., 2002, 'Do Children Have Rights?' in *The Moral and Political Status of Children: New Essays*, D. Archard and C. Macleod (eds.),Oxford: Oxford University Press: 19-30
- Hart, H,L.A., 1973, 'Bentham on Legal Rights', in *Oxford Essays in Jurisprudence*, 2nd series, A. W. Simpson (ed.) Oxford: Clarendon Press: 171-201
- Holt, J.C., 1975, *Escape from Childhood: The Needs and Rights of Children*, Harmondsworth: Penguin
- Kopelman, L.M., 1997a, 'Children and Bioethics: Uses and Abuses of the Best-Interests Standard', *The Journal of Medicine and Philosophy* 22: 213-17
- Kopelman, L.M., 1997b, 'The Best-Interests Standard as threshold, Ideal, And Standard of Reasonableness', *The Journal of Medicine and Philosophy*, 22: 271-289.
- Kramer, M.H., Simmonds, N.E. and Steiner, H., 1998, *A Debate Over Rights, Philosophical Enquiries*, Oxford: Clarendon Press

- Kramer, M.H., 1998, 'Rights Without Trimmings', in *A Debate Over Rights, Philosophical Enquiries*, M.H. Kramer, N. Simmonds and H. Steiner, Oxford: Clarendon Press(1998): 7 - 111.
- LeBlanc, Lawrence J., 1995, *The Convention on the Rights of the Child. United Nations Lawmaking on Human Rights*, Lincoln: University of Nebraska Press
- Liao, S.M., 2000, *The Right of Children to be Loved,* D.Phil Thesis submitted to the University of Oxford
- MacCormick, N., 1982,'Children's Rights: A Test-Case', in his *Legal Right and Social Democracy*, Oxford: Clarendon Press: 154-166.
- McGough, Lucy S., 1995, 'Children: V Child Custody', in *Encyclopedia of Bioethics*, W.T. Reich, Editor in Chief, Revised edition, New York: Simon and Schuster Macmillan: 371-8.
- Mnookin, Robert H., 1979, 'Foster Care -- In Whose Best Interests?'. In O'Neill, O. and Ruddick, W. (eds.) Having Children: Philosophical and Legal Reflections on Parenthood (Oxford: Oxford University Press): 179-213.
- Nozick, R., 1974, *Anarchy, State, and Utopia*, Oxford: Basil Blackwell
- O'Neill. O., 1988, 'Children's Rights and Children's Lives', *Ethics*, 98: 445-463
- Purdy, L.M., 1992, *In Their Best Interest? The Case Against Equal Rights for Children*, Ithaca and London: Cornell University Press
- Rawls, J., 1999, *A Theory of Justice*, Revised Edition, Oxford: Oxford University Press
- Raz, J., 1984, 'Legal Rights', *Oxford Journal of Legal Studies* 4(1): 1-21
- Sandel, M., 1982, *Liberalism and the Limits of Justice*, Cambridge: Cambridge University Press
- Schoeman, F., 1980, 'Rights of Families: Rights of Parents, and the Moral Basis of the Family', *Ethics*, 91: 6 - 19
- Schrag, F., 1980, 'Children: Their Rights and Needs', in *Whose Child? Parental Rights, Parental Authority and State Power*, W. Aiken and H. LaFollette, H., Totowa, NJ: Littlefield, Adams, and Co.: 237-253
- Steiner, H., 1994, *An Essay on Rights*, Oxford: Blackwell
- Steiner, H., 1998, 'Working Rights', in *A Debate Over Rights, Philosophical Enquiries*, M.H. Kramer, N. Simmonds and H. Steiner, Oxford: Clarendon Press: 235 - 301
- Sumner, L.W., 1987, *The Moral Foundation of Rights*, Oxford: Clarendon Press
- United Nations (1989) *The Convention on the Rights of the Child*, reprinted in *Children, Rights and the Law*, P. Alston, S. Parker and J. Seymour (eds.), Oxford: Oxford University Press: 245-264; and in L. LeBlanc, *The Convention on the Rights of the Child. United Nations Lawmaking on Human Rights*, Lincoln: University of Nebraska Press 293-316

## Other Important Work

- Archard, D., 1993, *Children: Rights and Childhood*, London: Routledge
- Blustein, J., 1982, *Parents and Children: The Ethics of the Family*, Oxford: Oxford University Press

- Kleinig, J., 1976, 'Mill, Children, and Rights', *Educational Philosophy and Theory*, 8(1): 1-16
- O'Neill, O. and Ruddick, W. (eds.), 1979, *Having Children: Philosophical and Legal Reflections on Parenthood*, Oxford: Oxford University Press
- Scarre, G., (ed.), 1989, *Children, Parents, and Politics*, Cambridge: Cambridge University Press
- Turner, S,M. and Matthews, G.B., eds., 1998, *The Philosopher's Child*, Rochester, NY: University of Rochester
- Wald, M., 1979, 'Children's Rights: A Framework for Analysis', *University of California at Davis Law Review* 12(2): 255-282
- Worsfold, V.L., 1974, 'A Philosophical Justification for Children's Rights', *Harvard Educational Review*, 44(1): 142-57
- Wringe, C., 1981, *Children's Rights*, London: Routledge & Kegan Paul

# Other Internet Resources

- Children's Rights, Human Rights Watch web pages
- Children's Rights: An Overview, maintained by the Legal Information Institute (Cornell Law School)
- Convention on the Rights of the Child, at the UNICEF web site

# Related Entries

**The identity of my child Nara Singhderewa has been changed and** fictitious an identity is created has been created.

You have already been informed that under the Consolidated Acts under the Protection of the Human Rights and Equal Opportunity the changing of identity is a violation of the Rights of the Child. Yet you continue to support this action.

Further Six broad categories of offences can be identified as coming under the umbrella of fraud:[17]

1. Bribery
2. Conflict of interest
3. False statements and false claims

- The offences that fall within this category are very relevant in the context of this paper. This category of offences is primarily regulated by the *Crimes Act 1900* (NSW), for example: obtaining money etc by deception (s178BA); obtaining money by false or misleading statements (s178BB); obtaining credit by fraud (s178C); false pretences (s179); and inducing persons into entering certain arrangements through fraudulent statements (s185A).

4. Extortion
5. Fraudulent conversion
6. Embezzlement

**I charge the following:**

**Queensland**

Salient provisions in the QLD *Criminal Code* are -

Stealing - s. 398
Fraud - s. 408C(1)
Misappropriation - s. 408C
False pretences - s. 427(1)
Falsifying records - s. 441(d)
Producing false records - s. 441(e)
Uttering - s. 489

*Financial Transaction Reports Act 1998*

Salient provisions under the Criminal Code are -

Obtaining property by deception - s. 134.1
Obtaining a financial advantage by deception - s. 134.2
General dishonesty - s. 135.1
Obtaining financial advantage - s. 135.2
Conspiracy to defraud - s. 135.4
Forgery - s. 144.1
Using forged document - s. 145.1
Falsification of documents - s. 145.4

Jugvir Inder Singh

CC : The Honourable Phillip Ruddock MP
Attorney-General

Parliament House
CANBERRA  ACT  2600

Tel:      (02) 6277 7300
Fax:      (02) 6273 4102

**Please quote: MCU**



**Sarah James**

**Vision Research and Development
ABN 87 668 271 752**

Dear recipients of this Email !

**DEBUNKING THE GOLD COAST COUNCIL WATER EMPLOYEE CLAIM OF
A PACIFIC OCEAN JUMPING SPERM.**

     **You have received my emails about the violations of the child rights and
seemed to have paid little attention to the child abuse in our community of the Gold
Coast of Australia.**

     **You have received evidence on the change of identity of my child using
manufactured documents presented in Registry and paid no attention to criminal
activity in the Gold Coast.**

     **Some of you may a technical curiosity in this case as it proceeds over the next
17 years as to where and when did Nara's life begin?**

**FIRST THE ALLEGATION THAT I AM NOT THE FATHER BECAUSE THESE
MANUFACTURED DOCUMENT PROVE A FACT OF PETER WHALAN,
GCCW,THAT ACCOMPLICE AARON SIMMONS IS THE FATHER.**

### 1. Current Scientific Views of When Human Life Begins

Current perspectives on when human life begins range from fertilization to
gastrulation to birth and even after. Here is a brief examination of each of the
major perspectives with arguments for and against each of the positions.
Contemporary scientific literature proposes a variety of answers to the
question of when human life begins.

Metabolic View:

The metabolic view takes the stance that a single developmental moment
marking the beginning of human life does not exist. Both the sperm and egg
cells should individually be considered to be units of life in the same respect as

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA



**Vision Research and Development**
**ABN 87 668 271 752**

any other single or multicellular organism. Thus, neither the union of two gametes nor any developmental point thereafter should be designated as the beginning of new life.

Another slightly different though similar position maintains that the argument over when a new human life begins is irrelevant because the development of a child is a smoothly continuous process. Discrete marking points such as the fourteen day dividing line between a zygote and an embryo are entirely artificial constructions of biologists and doctors in order to better categorize development for academic purposes. This position is supported by recent research that has revealed that fertilization itself is not even an instantaneous event, but rather a process that takes 20-22 hours between the time the sperm penetrates the outermost layers of the egg and the formation of a diploid cell (Kuhse 1988).

Genetic View:

The genetic view takes the position that the creation of a genetically unique individual is the moment at which life begins. This event is often described as taking place at fertilization, thus fertilization marks the beginning of human life. During this developmental event, the genes originating from two sources combine to form a single individual with a different and unique set of genes. One of the most popular arguments for fertilization as the beginning of human life is that at fertilization a new combination of genetic material is created for the first time; thus, the zygote is an individual, unique from all others. This zygote, Nara or Indra Willow was physically in San Diego California inside my wife Sarah. I challenge any authority in the world to deny this.



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

Although the opinion that life begins at fertilization is the most popular view among the public, many scientists no longer support this position, as an increasing number of scientific discoveries seem to contradict it. One such discovery in the last twenty years is that research has shown that there is no "moment of fertilization" at all. Scientists now choose to view fertilization as a process that occurs over a period of 12-24 hours. After sperm are released they must remain in the female reproductive tract for seven hours before they are capable of fertilizing the egg. Approximately ten hours are required for the sperm to travel up to the fallopian tube where they find the egg. The meeting of the egg and the sperm itself is not even an instantaneous process, but rather a complex biochemical interaction through which the sperm ultimately reaches the inner portion of the egg. Following fertilization, the chromosomes contained within the sperm and the chromosomes of the egg meet to form a diploid organism, now called a zygote, over a period of 24 hours. (Shannon and Wolter 1990). Thus, even if one were to argue that life begins at fertilization, fertilization is not a moment, but rather a continuous process lasting 12-24 hours, with an additional 24 hours required to complete the formation of a diploid individual.  Understanding this complex process I claim no Australian male citizen, was involved in the formation of a diploid, Nara/Indra situated in San Diego California USA,

The most popular argument against the idea that life begins at the moment of fertilization has been dubbed the "twinning argument." The main point of this argument is that although a zygote is genetically unique from its parents from the moment a diploid organism is formed; it is possible for that zygote to split into two or more zygotes up until 14 or 15 days after fertilization. Even though the chances of twinning are not very great, as long as there is the potential for



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

it to occur the zygote has not completed the process of individuation and is not an ontological individual.

Proponents of this view often propose the following hypothetical situation: Suppose that an egg is fertilized. At that moment a new life begins; the zygote gains a "soul," in the Catholic line of thought, or "personhood" in a secular line of thought. Then suppose that the zygote splits to form twins. Does the soul of the zygote split as well? No, this is impossible. Yet no one would argue that twins share the same "soul" or the same "personhood." Thus, supporters of this view maintain that the quality of "soul" or "personhood" must be conferred after there is no longer any potential for twinning. (Shannon and Wolter 1990) From this point of view Nara gained her soul and her "personhood" in the United States of America and not in Australia.

The argument that human life begins at the moment that chromosomes of the sperm meet the chromosomes of the egg to form a genetically unique individual is also endangered by the twinning argument because genetic uniqueness is not a requirement for an individual human life. "Genetic uniqueness" can be shared by multiple individuals, particularly indentical twins. Thus, this argument continues, the moment at which a unique individual human forms is the not the moment when its genetic code is determined, but rather the moment when the zygote can no longer split into multiple individuals.  The determination that the "NARA" zygote can longer spilt is also in the United States of America and between and Sarah.

In addition to twinning, there are other complexities that further confound the idea of the moment of conception. Just as it possible for a zygote to form two or more individuals before it is implanted in the uterus, it is also possible for it to not continue to develop at all, but rather just become a part of the placenta.

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA

**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

(Shannon and Wolter 1990). It is estimated that more the 50% of the fertilized eggs abort spontaneously and never become children (see Gilbert 2003). Or, if the zygote splits into multiple zygotes, it is also possible for these to recombine before implantation. All of these possibilities are examples of the ways in which the individuation of the zygote is incomplete until it has been implanted in the uterus.

Embryological View:

In contrast to the genetic view, the embryological view states that human life originates not at fertilization but rather at gastrulation. Human embryos are capable of splitting into identical twins as late as 12 days after fertilization resulting in the development of separate individuals with unique personalities and different souls, according to the religious view. Therefore, properties governing individuality are not set until after gastrulation. This view is endorsed by a host of contemporary scientists such as Renfree (1982), C. Grobstein (1988) and McLaren. This view of when life begins has also been adopted as the official position of the British government. The implications of a belief in this view include giving support to controversial forms of contraception including the "morning after" pill and contragestational agents as long as they are administered during the first two weeks of pregnancy. The now NARA had gastrulation in America and not in Australia.

One of the most popular positions among philosophers is the perspective that life begins at the point of gastrulation, that point at which the zygote is an ontological individual and can no longer become two individuals. Gastrulation commences at the beginning of the third week of pregnancy, when the zygote, now known as an embryo is implanted into the uterus of the mother. The cells are now differentiated into three categories that will give rise to the different



**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

types of body tissue. (Shannon and Wolter 1990). After gastrulation the zygote is destined to form no more than one human being.

The philosophers who support this position argue that there exists a difference between a human individual and a human person. A zygote is both human and numerically single and thus a human individual. However, because individuality is not certain until implantation is complete, and because individuality is a necessary condition of personhood, the zygote is not yet a human person. (Ford 1988; Shannon and Wolter 1990; McCormick 1991). Catholic scholars Shannon and Wolter (1990) describe this eloquently saying, "An individual is not an individual, and therefore not a person, until the process of restriction is complete and determination of particular cells has occurred. Then, and only then, it is clear that another individual cannot come from the cells of this embryo."   According to this view NARA became and individual in America and not in Australia.

Some supporters of the fertilization position find fault in this argument by claiming that the potential of twinning is a technicality and not strong enough to support the claim that human life does not begin until gastrulation. Alan Holland puts forth the view that just because a zygote has the possibility to divide into multiple individuals does not mean that it is not an individual before it divides. As an analogy, he presents the case of the worm that is clearly a single individual worm until it is cut into two when it becomes two individual worms. (Holland 1990).

Some would also argue that in the discussion of when human life begins the question of whether a zygote will eventually become one individual or multiple individuals is irrelevant. The key point is that at least one human life may begin as the result of the zygote, and thus human life began at the creation of

**Sarah    James**

**Vision Research and Development**
**ABN  87 668 271 752**

the zygote, fourteen days before gastrulation. NOW FROM THIS POINT OF

VIEW NARA life began in the United States of America and not the

Commonwealth of Australia.


Neurological view:

Although most cultures identify the qualities of humanity as different from

other living organisms, there is also a universal view that all forms of life on

earth are finite. Implicit in the later view is the reality that all life has both a

beginning and an end, usually identified as some form of death. The debate

surrounding the exact moment marking the beginning of a human life

contrasts the certainty and consistency with which the instant of death is

described. Contemporary American (and Japanese) society defines death as

the loss of the pattern produced by a cerebral electroencephalogram (EEG). If

life and death are based upon the same standard of measurement, then the

beginning of human life should be recognized as the time when a fetus

acquires a recognizable EEG pattern. This acquisition occurs approximately 24-

27 weeks after the conception of the fetus and is the basis for the neurological

view of the beginning of human life.


These principles of the neurological view of the beginning of human life are

presented in *The Facts of Life*, a book written by Harold Morowitz and James

Trefil in 1992 concerning the abortion controversy. An electroencephalogram

(EEG) is a simple medical procedure in which electrodes are attached to

different locations on a patient's head and the voltage difference over time is

measured between the two points. The voltage data is plotted against time to

produce "brain waves" with up and down voltage oscillations that are

representative of the organized electrical activity of the brain (Morowitz and

Trefil 1992). Medical professionals use a patient's EEG pattern to identify a



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

broad spectrum of mental states. Although EEGs are often used as a diagnostic tool, the exact mechanism behind how an EEG pattern is linked to an individual's cerebral neuron activity remains a mystery (Morowitz and Trefil 1992).

Despite lacking a precise explanation for the connection between the EEG and neural activity, there is a strong argument that the unique and highly recognizable EEG pattern produced by a mature brain is a defining characteristic of humanity (Morowitz and Trefil 1992). Therefore, the moment that a developing fetus first exhibits an EEG pattern consistent with that of a mature brain is indicative of the beginning of human life. It is from this point and onward during development that the fetus is capable of the type of mental activity associated with humanity (Morowitz and Trefil 1992).

Because the state of modern technology still prohibits EEGs *in utero*, brain activity data for humans at various stages of development has been gathered using premature infants. Observations to date have led to the conclusion that 25 weeks of gestation is required for the formation of synapses needed for recognizable neural activity. At this point in development, the recognizable signals exist only as intermittent bursts that interrupt periods of random activity (Morowitz and Trefil 1992). This conclusion is summarized by Donald Scott who in his book *Understanding the EEG* wrote, "Attempts have been made to record cerebral activity of premature infants and they have succeeded (only) if the gestational age was 25 weeks or more (Morowitz and Trefil 1992)." Such claims, as well as arguments that endorse an opposite argument, are for many the foundation for any dispute over defining the inception of human life. Consequently, the principles of the neurological view are tenets in the debate over another controversial subject: abortion.



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

Champions for a fetus's right to life often claim that the brain of a human fetus begins to show electrical activity at a remarkably early age. A key moment in the history of the abortion debate is the production and release of "The Silent Scream," an influential abortion film that graphically depicts the fetal response to its termination. The video accompanies the abortion of a 12-week-old fetus with the words "Now this little person at twelve weeks is a fully formed absolutely identifiable human being. He has had brain waves for at least six weeks…" (Morowitz and Trefil 1992). Although such arguments appeal to both the emotion by depicting an infant, though still developing, in a moment of pain and crisis and the intellect by presenting a scientific line of reasoning, the position presented by the film conflicts widely accepted developmental theory. For instance, the film contends that a fetus has brain waves after 12 weeks and suggest, even in the title "The Silent Scream," that it reacts to its termination with fear and pain. These contentions contradict scientific evidence that indicates neural connections in the cerebral cortex have yet to develop in a 12-week-old fetus. Lacking these basic neural networks, the developing fetus is incapable of feeling the emotions recognized as fear or pain (Morowitz and Trefil 1992). The film's position is further contrasted by evidence that suggests a 12-week-old fetus is not yet capable to take direct actions in response to a thought. The developing fetus is therefore incapable of recognizing potential danger and unable to either be fearful of it or actively evade it through movement or any other willful activity (Morowitz and Trefil 1992).

In addition to presenting 25 weeks as a critical developmental landmark, other proponents of the neurological view believe that events of the eighth week of human gestation represent the key moments marking the beginning of human life. Contemporary philosophical arguments for designating week 8 as the beginning of human life proceed in accordance with the following format:

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA



**Sarah / James**

**Vision Research and Development**
**ABN 87 668 271 752**

humanness requires rational thought and rational thought requires a brain and a nervous system. Philosophers who present such arguments contest that an embryo is not a human being until it has a rudimentary nervous system. At week 8, the embryo has completed organogenesis, meaning it has simple, undeveloped versions of all the basic organ systems, including the nervous system (Shannon and Wolter 1990) Philosophers who subscribe to this perspective pay close attention to the progressively increasing complexity of the nervous system or the first weeks and months of pregnancy. At week 5 the first neurons begin to appear, at week 6 "the first synapses … can be recognized," and at 7.5 weeks the embryo displays its first reflexes in response to stimulus. (Shannon and Wolter 1990). Thus around week 8 the embryo has a basic three-neuron circuit, the foundation of a nervous system necessary for rational thought. (Shannon and Wolter 1990). According to this point of view my daughter found her personhood in the United States of America and not in Southport Queensland Australia as claimed bt GCCW employee Peter Whalan.

It should come as no surprise that this contemporary philosophical debate also consists of a second argument, which is in direct opposition to the aforementioned position. There are philosophers who believe that the capacity for rational thought is indeed a prerequisite of humanness, but that an 8-week-old embryo does not have the capacity for rational thought. At 8 weeks an embryo displays reflexes that are the result of its budding nervous system, but it does not yet have the structures necessary to engage in true rational activity in contrast to mere reflex motivated movement. (Shannon and Wolter, 1990)

A third developmental landmark presented by proponents of the neurological view occurs at 20 weeks. Some advocates of the philosophy that a prerequisite for humanness is the capacity for rational thought believe that the existence of



## Vision Research and Development
### ABN 87 668 271 752

a primitive nervous system after 8 weeks, with the ability to respond by reflex to stimulation, does not amount to rational thought. The embryological landmark of 20 weeks marks the completion of the development of the thalamus, a region of the brain, which enables the integration of the nervous system. Philosophers who support this view therefore believe that only after 20 weeks of gestation can the embryo be said to have the capacity for rational thought.

The precept at the heart of the neurological view of the beginning of human life is the significant development of neural pathways that are critical for characteristic human brain activity. The formation of these neural connections is often viewed to culminate in the acquisition of humanness, a stage during the third trimester of human gestation when the overwhelming majority of neural pathways in the cerebral cortex are established (Morowitz and Trefil 1992). The contemporary concept of the acquisition of humanness was developed and elaborated during the later half of the twentieth century by theological and biological leaders who emphasized the importance of the cerebral cortex in characterizing humanness. The Jesuit scholar and anthropologist scientist Pierre Teilhard de Chardin presented his belief that the transcendence of humanity was dependant upon the successful maturation of the cerebral cortex. Bernard Haring, a permanent Catholic theologian of the 1970s argued that individuality and the uniqueness of personal characteristics and activities originated from the cerebral cortex. A decade later, the anatomist Paul Glees argued "the (cerebral cortex) represents the signature of a genetically unique person" (Morowitz and Trefil 1992)

The contemporary idea of the acquisition of humanness is based on the contemporary theories of developmental embryology. Cerebral nerve cells



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

accumulate in number and continually differentiate through the end of the second trimester of human pregnancy (Morowitz and Trefil 1992). However, it is not until the seventh month of gestation that a significant number of connections between the newly amassed neurons begin to take form. It is only after the neurons are linked via synapse connections that the fetus is thought to acquire humanness. Just as a pile of unconnected microchips is incapable of functioning and is therefore not called a computer, the unconnected neurons of the pre 24-week fetal brain lack the capacity to function, thus the developing fetus has yet to acquire humanness (Morowitz and Trefil 1992).

Ecological / Technological view:

Advocates of the neurological view contend that human life begins when a developing fetus acquires humanness, a point designated by brain activity that can be described as characteristically human. But if this developing fetus is separated from its mother at an early stage, regardless of the state of neural development, the fetus will be unable to sustain life on its own. The total dependence of the developing fetus for the majority of gestation catalyzed the formation of another view of when human life begins. The ecological/technological view of when human life begins designates this point when an individual can exist separately from the environment in which it was dependent for development (i.e., its mother's womb).

Under most circumstances, the limiting factor for human viability is not the development of neural connections but the maturation of the lungs. However, advances in medical science permit a premature fetus to breathe after only 25 weeks of gestation, a stage in its development prior to the complete formation of functioning lungs (Gilbert 2002). Legislation using the ecological/technological view of when human life begins includes decrees of



**Vision Research and Development**
**ABN 87 668 271 752**

when a fetus can legally be aborted, mandating that after a fetus is determined to be independent its life can no longer be terminated (Gilbert 2002).

### Self-Consciousness: Contemporary Philosophical Stands on When Human Life Begins

There are philosophers, although not very many, who would dare to make the stance that a fetus nor an infant is a human being because it does not possess a consciousness of itself. This of course means that neither a zygote nor an embryo is a person either. Michael Tooley is one of these philosophers who describes his perspective in the article "Abortion and Infanticide." Essentially he argues that abortion and infanticide are really no different, if you support one, then you must support the other. His argument is that in order to claim that an adult has the right to live and an embryo or a fetus does not, one must be able to identify some moment where the moral status of the organism in question changes. There is nothing inherent about birth that it should automatically be hailed as this defining moment. A more justified moment, Tooley argues, is the moment at which the human child gains consciousness. At this moment, not at birth, should the child be considered a full fledged person, entitled to all the rights, particularly the right to life, that human adults are entitled to (Tooley 1999).

The main problem that most people find with this position on when human life begins is that it condones infanticide, arguing that infants do not have the same right to life as adult humans do. Must people reject this view of when life begins, finding it impossible to support a view that logically leads to the conclusion that infanticide is acceptable. Tooley, however, argues that this rejection of his perspective is based on a purely emotional response to the idea of infanticide and not on logic or reasoning.



## Vision Research and Development
### ABN 87 668 271 752

Historically, the question of when human life begins was answered by a progression that was initiated by edicts on abortion which were governed by the popular notions of moral acceptability. These popular notions were decrees put forth by God, delivered to the populous through religious texts. Modern technological innovations of the twentieth century have reversed the order of this progression; contemporary scholars often address the question of when human life begins by first evaluating scientific data. The conclusions reached via the scientific method become the tools used to create popular standards of moral acceptability. These contemporary notions of moral acceptability then provide the framework for the modern abortion debate.

The temporal divergence between the progressions of thought leading to answers of when human life begins reveals a shift in the source of knowledge that is used to answer one of humanity's most puzzling questions. Prior to the twentieth century, God was humanity's source of absolute knowledge. In recent years, however, scholars have terminated the utility of God's omniscience and in its place have raised science and technology as their source of absolute knowledge. This shift is evidence for, perhaps, the most determinant factor of any argument for when human life begins. The reasons governing the variation in both historical and modern views of when life begins is largely due to a variation in moral standards.

However, understanding the basis for societal moral standards appears to be the key to discerning how to approach the question of when human life begins. Science has not been able to give a definitive answer to this question. One opinion is that the acquisition of humanness is a gradual phenomenon, rather than one that occurs at any particular moment. If one does not believe in a "soul," then one need not believe in a moment of ensoulment. The moments of



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

fertilization, gastrulation, neurulation, and birth, are then milestones in the gradual acquisition of what it is to be human. While one may have a particular belief in when the embryo becomes human, it is difficult to justify such a belief solely by science. Nara is became human in San Diego California United States of America and not in the Gold Coast Australia, where she is a minor child citizen of mine and the Gold Coast Council Water Pacific Ocean jumping Sperm is just one more lie.

## Literature Cited

Bonner, G. 1985. Abortion and Early Christian Thought. In: *Abortion and the Sanctity of Human Life* (J.H. Channer, editor), The Paternoster Press, Exeter, pp 93-122


Buss, M. 1967. The Beginning of Human Life as an Ethical Problem. *Journal of Religion* 47: 244-255

Coughlan, Michael J. Essay review: *When Did I Begin? Conception of the Human Individual in History, Philosophy and Science* by Norman M. Ford. Bioethics: Volume 3, Number 4, 1989 (334-341)


DeMarco, D. 1984. The Roman Catholic Church and Abortion: A Historical Perspective—Part *Homoiletic Press & Pastorial Review* July 1984: 59-66

**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

Ford, N. M. "A reply to Michael Coughlan" *Bioethics*: Volume 3, Number 4, 1989. (342-346).

Ford, N. M. 1988. When Did I Begin? Conception of the Human Individual in History. Cambridge University Press, NY.

Gelfand, Scott D. "Marquis: A defense of abortion?" *Bioethics*: Volume 15, number 2, 2001. (135-145).

Gilbert, S. 2002. http://www.devbio.com/preview_article.php?ch=21&id=7 (April 2, 2002)

Grobstein, C. 1988. *Science and the Unborn: Choosing Human Futures*. Basic Books, NY.

Hare, R. M. "When does potentiality count? A comment on Lockwood" (214-225) *Bioethics*: Volume 2, number 3, 1988.

Holland, Alan. "A fortnight of my life is missing: A discussion of the status of the human 'pre-embryo'" *Journal of Applied Philosopohy* 7(1) 1990. (25-37)

Jakobovits, I. 1973. Jewish Views on Abortion. In: *Abortion Society and Law* (D. Walbert and J. Butler editors), The Press of Case Western Reserve University, Cleveland and London, pp. 103-121

Kuhse, Helga. "A report from Australia: When a human life has not yet begun—according to the law." *Bioethics*: Volume 2, Number 4, 1988. (334-342).

Lockwood, Michael. "Warnock versus Powell (and Harradine): When does potentiality count?" *Bioethics*: Volume 2, Number 3, 1988

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA

**Sarah  James**

**Vision Research and Development**
**ABN  87 668 271 752**

Lockwood, Michael. "Hare on Potentiality: A rejoinder" *Bioethics*: Volume 2, Number 4, 1988.

McCormick, R. 1991. Who or what is a pre-embryo? *Kennedy Inst. Bioethics J.* 1: 1-15.

Morowitz, H. J. and Trefil, J. S. 1992. *The Facts of Life: Science and the Abortion Controversy.* Oxford University Press, New York.

O'Donovan, O. 1975. *The Christian and the Unborn Child.* Grove Books, Bramcote

Renfree, M. B. 1982. Implantation and placentation. In Austin, C. R. and Short, R. V. (eds.) *Reproduction in Mammals 2. Embryonic and Fetal Development* (Second edition). Cambridge University Press, Cambridge. pp. 26-69.

Rogerson, J.W. 1985. Using the Bible in the Debate about Aboriton. In: *Abortion and the Sanctity of Human Life* (J.H. Channer, editor), The Paternoster Press, Exeter, pp. 77-92

Shannon, Thomas A. and Wolter, Allan B. "Reflections on the Moral Status of the Pre-Embryo." *Theological Studies.* Volume 51, 1990.

Tooley, M. "Abortion and Infanticide" in *Bioethics: an Anthology* ed. Kuhse, H. and Singer, P. Oxford: Blackwell Publishers, 1999.



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

Tribe, L. 1990. *Abortion The Clash of the Absolutes*. W.W. Norton and

Company, New York.

DID I CONVINCE ANYONE THAT NARA is my daughter born with Sarah in the

San Diego California United States of America?

Yours truly,



Jugvir Inder Singh

CEO of N-Life Inc. owner of Sarah-James.

## Message Receipt:

Your message has been encrypted and sent to Centrelink. We have issued you with a unique Receipt Number that you should use if you have any queries about this contact. Please print this page or make a note of the Receipt Number below to assist in further communication with Centrelink.

Select the **Finish** button to finalise this transaction.

**Your Receipt Number is:   SIMS514279**.

Fri, 23 Dec 2005, 02:15 PM (Canberra, ACT Australia).



# International Child Custody

## A Common Law Judicial Conference

### (September 18 - 21, 2000) Washington DC

### Hague Convention on the Civil Aspects of International Child Abduction Discussion Topic No 3

#### Issues Surrounding Safe Return of the Child (and the Custodial Parent)*

#### by

### The Delegation From The Commonwealth of Australia **

**\*** A revised version of a paper prepared for this Conference. This paper aims to state the law up to 1 September 2000. The authors acknowledge and thank the participants of the Conference for their helpful comments on the original paper. Further comments are welcomed and may be forwarded to Danny. Sandor@familycourt.gov.au.

The Family Court of Australia website includes a page of selected judgments relating to the Convention at http://www.familycourt.gov.au/judge/index/html/ child_abduction.html and links to Australian legislation.

**\*\*** Mr. Stephen Bourke, Mr. Murray Green, Justice Joseph V. Kay & Mr. Danny Sandor.

# INTRODUCTION

Issues surrounding the safe return of the child and abducting parent need to be seen in the changing context of the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"). Article 1 states that the objects of the Convention are:

*"(a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and*

*(b) to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in other contracting States."*

It is clear and beyond argument that the prompt return is to enable the courts of the child's home country to determine the parenting arrangements for the child in accordance with the law of that country. Wrongful removal or retention should not be permitted to deprive the courts of the child's home country from determining such questions.

However, the picture that emerges today is increasingly one of the abducting parent seeking support of family and friends in contrast to a conscious motivation of depriving the court of the opportunity to determine the parenting arrangements for the child. The Family Law Council reported the following data[1]:

| Abducting Parent's Motivation | Percentage |
|---|---|
| Seeking support | 53% |
| Preventing Contact | 28% |
| Following new partner | 5% |

| Fleeing violence | 6% |
|---|---|
| Other | 8% |

In Australia, the law requires the Commonwealth Central Authority and its State and Territory counterparts to do everything necessary or appropriate to protect the welfare of the child on return.[2] At the 1997 Special Commission meeting at the Hague to discuss the operation of the Convention, the meeting adopted a resolution that Article 7(h) imposed an obligation on Central Authorities to protect the welfare of the returning child (see below). The resolution was adopted subject to certain qualifications relating to the powers of Central Authorities under the legal and welfare systems of each country.

This paper examines the topic of safe return under the following headings: -

A. Undertakings, safe harbour orders, mirror orders;

B. Criminal proceedings against the taking parent;

C. Problems relating to enforcement; and

D. Direct judicial communication

## A. Mirror Orders, Safe Harbour Orders & Undertakings

### Introduction

Kay J's first instance Family Court of Australia decision in *McOwan v McOwan*[3] drew attention to the following key determinant of ongoing judicial support of the Convention:

*"Unless contracting States can feel reasonably assured that when children are returned under the Hague Convention, their welfare will be protected, there is a serious risk that the contracting States and Courts will become reluctant to order the return of children."*[4]

It is well established under Australian jurisprudence that Convention applications are not decided according to the principle that the subject child's best interests or welfare is the paramount consideration.[5] In *Murray v Director, Family Services ACT*,[6] the Full Court of the Family Court of Australia[7] said:

*"... the Hague Convention and the Regulations* [implementing the Convention in Australian law] *contemplate that it is in the best interests of the child for issues such as custody and access to be determined in the courts of the country of the child's habitual residence unless the exceptions referred to in regulation 16 are made out.*

*The issue in a Hague Convention application is purely one of form, subject to those exceptions, and the paramountcy principle is accordingly not relevant."*[8]

That view was reiterated in *McCall and McCall; State Central Authority (Applicant); Attorney-General of the Commonwealth (Intervener)*[9] where it was noted that this stance is in accordance with the point of view of those who drafted the Convention.[10]

Although there would seem some variance in how welfare or best interests considerations come into play once an exception has been made out, it is widely accepted in common law jurisdictions that the paramountcy principle does not govern convention applications. This was held early in the life of the Convention by the English Court of Appeal[11] and followed by the 1992 Scottish Inner House decision of *Whitley, Petitioner.*[12] It is also the position adopted by the United States Sixth Circuit Court of Appeals[13] and the New Zealand approach (illustrated by *Adams and Wigfield*,[14] and subsequently the Court of Appeal's decision in *A v Central Authority for New Zealand*[15]). A similar view was confirmed by the Supreme Court of Ireland in *T.M.M. v M.D*,[16] and the Supreme Court of Canada was unanimous on this issue in *Thomson v Thomson.*[17]

Most recently, in *De L v Director General, NSW Department of Community Services*[18] the High Court of Australia considered the Regulations giving domestic effect to the Convention,[19] it being the case that Australia did not transpose the Hague Convention in a "wholesale" manner when legislating to implement it through the *Family Law (Child Abduction Convention) Regulations* ("the Australian

Regulations").[20]

The majority in *De L v Director General, NSW Department of Community Services*[21] said:

"*The Regulations reflect the objects of the Convention to settle issues of jurisdiction between the Contracting States by favouring the forum which has been the habitual residence of the child. The underlying premise is that, once the forum is located in this way, each Contracting state has faith in the domestic law of the other Contracting States to deal in a proper fashion with matters relating to the custody of children under the age of 16. Necessarily, proceedings under the Regulations are to be seen as standing apart from [proceedings relating to the custody, guardianship or welfare of, or access to, a child]. It follows that they are not subject to the paramountcy principle.*"[22]

Even so, where an established defence under the Convention enlivens a discretion not to order return,[23] it follows that the more effective the mechanisms for protection of children until and upon return to the other jurisdiction, the more likely that return will nonetheless be ordered. Greater confidence in the efficacy of protection measures can avert having to find, as Ward LJ did in a different Convention dilemma, that:

"*... the interests of the children in remaining here should not be sacrificed on the altar of comity between nation States.*"[24]

Limits to comity were also canvassed by Doogue J writing for the New Zealand Court of Appeal in *A v Central Authority for New Zealand*:[25]

"*Where the system of law of the country of habitual residence makes the best interests of the child paramount and provides mechanisms by which the best interests of the child can be protected and properly dealt with, it is for the Court of that country and not the country to which the child has been abducted to determine the best interests of the child.*

*... There may well be cases, for example where the laws of the home country may emphasise the best interests of the child are paramount but there are no mechanisms by which that might be achieved, or it may be established that the Courts of that country construe such provisions in a limiting way, or even that the laws of that country do not reflect the principle that the best interests of the child are paramount.*"[26]

The types of order considered in this section of the paper seek to balance

adherence to the policy of the Convention with the prevention of risk of harm to the child to be returned. That balancing takes place within a legal context where there are limits to the nature, reach and enforceability of orders which may be made by the Court contemplating the child's return.[27] In a related vein, The Chief Justice of the Family Court of Australia said in an *extra curial* address:

*"There is a presumption that upon return to the jurisdiction, a competent body will resolve the competing claims over the children. The position was explained by the Full Court in Gsponer v Director General CSV:*

*"There is no reason why this Court should not assume that once the child is so returned, the courts in that country are not appropriately equipped to make suitable arrangements for the child's welfare."*

*Even so, it is no offence to judicial comity to appreciate that Contracting States may have systems which, in practice, differentially facilitate or impede access to such a competent body."*[28]

Central Authorities can play a critical role in facilitating such access with safety and protection. The need for and nature of case-specific orders by courts depends upon what may be routinely expected of Central Authorities. This paper first examines the extent to which there is a common view as to such expectations.

### The Obligations of Central Authorities Towards Returning Children

A proposal on this subject was put forward by Australia with the support of some other contracting States at the March 1997 Special Commission meeting to discuss the operation of the Convention.[29] Some background to impetus for the resolution was recently described by the Principal Legal Officer for the Commonwealth Central Authority for Australia. In a 1999 paper, Ms. Jennifer Degeling said:

*"This issue has been of some concern to the Chief Justice of the Family Court since his involvement in a number of cases where an abducting parent has fled a domestic violence situation or has been left destitute on return to the country of habitual residence. In Cooper v Casey (1995) FLC ¶92-575 Nicholson CJ said that the Convention imposes an obligation on Central Authorities to take responsibility for ensuring the protection of children returned under the Convention. Although a similar approach was taken by the NZ Court of Appeal in [A v Central Authority for New Zealand], the acceptance of such an obligation had not received much support from other countries who were consulted about this issue prior to the 1997 Special Commission meeting at The Hague."*[30]

It appears there was general acceptance at the 1997 Special Commission meeting

that contracting States to the Convention accept that Central Authorities have an obligation under Article 7(h) to protect the welfare of children upon return. How that obligation should translate into practice was, however, the subject of disagreement. Article 7(h) provides:

*"Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.*
*In particular, either directly or through any intermediary, they shall take all appropriate measures—*

*(h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;"*

The 1997 Special Commission report states:

*"Following discussion of Australia's proposal, delegations appeared to accept the following proposals:*

*1 It is essential to the integrity of the Convention to ensure the safety of children on their return to their country of habitual residence, in order to alleviate possible concerns and the reluctance of judges to order the return of children where issues of (alleged) abuse or violence arise.*

*2 An increase in the number of refusals to return, in cases where such issues arise, would not be desirable. Accordingly, a narrow interpretation of Article 13 b of the Convention should be encouraged by strengthening the role of Central Authorities in co-operating to facilitate awareness of government or public resources available to parents and children. In that context, Central Authorities should be prepared and encouraged by their respective States to adopt a flexible approach to their obligations under Article 7 h of the Convention.*

*Conclusions*

*In view of the above proposals, delegations are urged to adopt the following conclusions:*

*1 To the extent permitted by the powers of their Central Authority and by the legal and social welfare systems of their country, Contracting States accept that Central Authorities have an obligation under Article 7 h to ensure appropriate child protection bodies are alerted so they may act to protect the welfare of children upon return until the jurisdiction of the appropriate court has been effectively invoked, in certain cases.*

*2 It is recognised that, in most cases, a consideration of the child's best interests requires that both parents have the opportunity to participate and be heard in custody proceedings. Central Authorities*

*should therefore co-operate to the fullest extent possible to provide information respecting, legal, financial, protection and other resources in the requesting State, and facilitate contact with these bodies in appropriate cases.*

*[3 - The measures which may be taken in fulfilment of the obligation under Article 7 h to take or cause to be taken an action to protect the welfare of children may include, for example:*

*a alerting the appropriate protection agencies or judicial authorities in the requesting State of the return of a child who may be in danger;*

*b advising the requested State, upon request, of the protective measures and services available in the requesting State to secure the safe return of a particular child;*

*[c providing the requested State with a report on the welfare of the child;]*

*d encouraging the use of Article 21 of the Convention to secure the effective exercise of access or visitation rights.]"*[31]

There then follows a *"Note by the Permanent Bureau"*:

*"The delegation of Italy agreed with the suggested changes regarding Conclusion 1. The Italian experts did not object to the wording of Conclusions 2 and 3. They suggested, regarding Conclusion 3, that one item be added, to provide that applications for return, should include, whenever possible, a description of the services or measures available in the requesting State for the protection of the child or the returning parent. The delegation of Austria with respect to Conclusion 2, preferred the wording suggested in Working Document No 20 to that suggested by the Canadian experts. In addition, the Austrian experts wished Conclusion 2 to specify that returning parents should be given assistance even when ex parte custody orders have been issued after the abduction and that such orders should not prejudge the final outcome of the proceedings. The experts also wished that Conclusion 3 c), be deleted and that it be clearly stated, under Conclusion 3 b, that information was only required upon request. The delegation of France, with respect to Conclusions 1 and 2, reminded the meeting that the French Central Authority could not ensure that custody proceedings would be instituted upon return, although it could commit to assist the parent in all possible ways, in particular by contacting other authorities or services. The French experts found Conclusion 3 to be too specific and would prefer it more open ended. Regarding Conclusion 3 c), it was pointed out that the French Central Authority could not provide information beyond the measures taken upon the return, for it lacked the resources needed for a long term follow-up. Other experts expressed similar concerns as those mentioned above, including those regarding Conclusions 3 b) and 3 c). Experts also wished that it be made clear that the purpose of the proposal was to protect the child and not to reward the abducting parent.*

*The square brackets around Conclusion No 3 reflect the doubts of certain experts as to whether this*

*provision should be retained and the internal square brackets around sub-paragraph c reflect particular*

*doubt as to the acceptability of this provision."*[32]

Ms. Degeling's paper said of the 1997 Special Commission meeting result:

*"The acceptance of the resolution was important as abducting parents often raise arguments that they face harm or an intolerable situation (by which they often mean no accommodation, no financial support, no access to legal aid, domestic violence) if they return with children to foreign countries.*

*At the least, this additional responsibility requires the Central Authority for each country to provide information about services relating to social security, legal aid, emergency accommodation, or domestic violence protection which are available in the city or area to which the abducting parent is asked to return with the children.*

*In Australia it is accepted that the obligation also involves, where necessary, a Central Authority in commencing proceedings in the courts to ensure the protection of the welfare of children (eg. to enforce an undertaking by the parent who sought the return of the children to provide accommodation or financial support)."*[33]

The paper reported on pertinent developments in a number of common law jurisdictions.[34] Within this subset of contracting States, it was apparent that the "welfare on return" principle had been put into operation in a variable manner. Mr. David Harris QC, an English barrister, has suggested that the 1997 Special Commission outcome was insufficient:

*"Until the signatories to the Convention are prepared to develop an effective protocol to secure, to the optimum extent practicable, the safety and welfare of returning children, along the lines proposed by the Government of Australia, it is incumbent upon courts hearing Article 13(b) defences to asses the allegations made carefully and fairly, if necessary taking oral evidence to resolve critical factual disputes, and, in accordance with the requirements of Article 13, to refuse to order a return, where the evidence genuinely establishes a sufficient degree of risk."*[35]

This viewpoint does not, however, factor-in the scope for a court to consider whether undertakings, mirror orders and safe harbour orders can address the risks it finds in a particular case. The paper now turns to a comparison of common law jurisdictions.

## Undertakings and Conditions in the Jurisdiction Ordering Return

The English Court of Appeal decision in *Re C (A Minor)(Abduction)*[36] approved the use of undertakings and subsequently, in *Re M (Abduction: Undertakings)*,[37] Butler-Sloss LJ explained the role of undertakings and conditions as an adjunct to ordering return in the following way:

*"It is perhaps helpful to remind those engaged in Hague Convention applications about the position of undertakings or conditions attached to an Art 12 order to return. Such requirements are to make the return of the children easier and to provide for their necessities, such as a roof over the head, adequate maintenance, etc, until, and only until, the court of habitual residence can become seized of the proceedings brought in that jurisdiction...*

*This court must be careful not in any way to usurp or to be thought to usurp the functions of the court of habitual residence. Equally, the requirements made in this country must not be so elaborate that their implementation might become bogged down in protracted hearings and investigations... Undertakings have their place in the arrangements designed to smooth the return of and protect the child for the limited time before the foreign court takes over, but they must not be used by parties to try to clog or fetter, or, in particular, to delay the enforcement of a paramount decision to return the child."*[38]

In *Thomson v Thomson*,[39] La Forest J writing for the majority of the Supreme Court of Canada, said:

*"Given the preamble's statement that "the interests of children are of paramount importance", courts of other jurisdictions have deemed themselves entitled to require undertakings of the requesting party provided that such undertakings are made within the spirit of the Convention: see Re L., supra; C. v. C., supra; P. v. P. (Minors) (Child Abduction), [1992] 1 F.L.R. 155 (Eng. H.C. (Fam. Div.)); and Re A. (A Minor) (Abduction), supra. Through the use of undertakings, the requirement in Article 12 of the Convention that "the authority concerned shall order the return of the child forthwith" can be complied with, the wrongful actions of the removing party are not condoned, the long-term best interests of the child are left for a determination by the court of the child's habitual residence, and any short-term harm to the child is ameliorated."*[40]

The views of Butler-Sloss LJ in *Re C (A Minor)(Abduction)*[41] and also *Re G (A Minor) (Abduction)*[42] were relied upon by the Supreme Court of Ireland in *P v B*[43] wherein the Court endorsed the use and effectiveness of undertakings. Denham J with whom Hamilton CJ and Egan J agreed said:

*"I am satisfied that undertakings may be given by a party to proceedings under the* [Child Abduction and Enforcement of Custody Orders Act 1991] *and accepted by the court. They are entirely consistent with*

*the 1991 Act and the Hague Convention, they are for the welfare of the child during the transition from one jurisdiction to another. Undertakings may be of particular relevance to very young children.*

*Undertakings in this situation are compatible with the Act and international law which have as their objectives the desire to protect children internationally from the harmful effects of their wrongful removal from the country of their habitual residence and the establishment of procedures to ensure their prompt return to the state of their habitual residence, as well as to secure protection for rights of access.*

*Furthermore, undertakings which are for the welfare of the child are in accord with the constitutional protection of the child and its welfare.*

*Undertakings may also protect a parent in their role and in the exercise of their rights under the Constitution. Consequently I am satisfied that undertakings may be accepted in cases under the 1991 Act."*

As to the breadth of the undertakings accepted in the Court below,[44] it was held:

*"... the conditions as to accommodation and maintenance as identified by the learned trial judge are reasonable. However, in addressing the long term education, maintenance of the child, and bi-annual visits by the child to Ireland, the learned trial judge considered matters more appropriately determined in the Spanish courts."*

In the Scottish courts, the question of the circumstances in which undertakings would be ordered was raised in *Whitley, Petitioner*[45]. Their Lordships considered that they did not need to decide the issue because, in the result, they concurred with the view of the Lord Ordinary that no grave risk exception had been made out and *"[n]o question of offering undertakings was in fact raised before us."*[46] The recent first instance case of *D.I. Petitioner*[47] did not clarify the issue as the left-behind father had "*offered certain undertakings*". Lord Abernethy said:

*"... they were not essential for my decision as to whether the terms of Article 13(b) had been met. Nevertheless they were offered and I think it would be appropriate to record them in the Minute of Proceedings in words which appropriately reflect the terms, both express and implied, of what was offered."*[48]

In August 1995 the United States Central Authority (the Department of State) expressed the following opinion:

*"1. While undertakings are not necessary to operation of the Convention, there are good arguments that*

*their use can be consistent with the Convention. Undertakings are most cleanly consistent with the Convention where they facilitate Article 12's objective of ensuring the return of abducted children "forthwith;" minimize the use of non-return orders based on Article 13; and do not undercut the provisions of Articles 16 and 19, which clearly contemplate that return proceedings under the Convention should be jurisdictional and that substantive issues relating to custody, including maintenance, should be left to the court in the child's place of habitual residence.*

*2. As a corollary to the above, undertakings should be limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that that jurisdiction can resolve the custody dispute. Undertakings that do more than this would appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance."[49]*

In the same month, judgment was delivered by United States Court of Appeals, Third Circuit in *Feder v. Evans – Feder*[50]. The Court approved the use of undertakings in the following remarks:

*"We also note that in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon "undertakings" from the petitioning parent. Thomson v. Thomson, 119 D.L.R.4th 253 (Can.Sup. 1994). The district court, on its own initiative, heard testimony about the undertakings Mr. Feder was willing to make in the event that Evan returned to Australia and was not accompanied by Mrs. Feder. Given its denial of Mr. Feder's petition, however, the court did not assess the need for or the adequacy of those undertakings. If on remand the court decides that Evan's return is in order, but determines that Mrs. Feder has shown that an unqualified return order would be detrimental to Evan, the court should investigate the adequacy of the undertakings from Mr. Feder to ensure that Evan does not suffer shortterm harm. See Re O, 2 FLR 349 (U.K.Fam. 1994) (exacting appropriate undertakings is legitimate in Convention cases)."*

In the decision of *Walsh v. Walsh*[51] delivered on 25 July 2000, the United States Court of Appeals for the First Circuit reversed an order for return of the parties children to Ireland. The United States District Court for the State of Massachusetts had ordered return subject to the father's undertakings. The Court of Appeals held that the father would violate the undertakings he had given and that as a consequence the children would remain at grave risk if returned. The Court reviewed the role and limitations of undertakings as follows:

*"A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings. Necessarily, the "grave risk" exception considers, inter alia, where and how a child is to be returned. n13 The undertakings approach allows courts to conduct an evaluation of the placement options and legal safeguards in the country of habitual*

*residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction. Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm. See, e.g., Blondin v. Dubois, 189 F.3d 240, 248 (2d Cir. 1999) (Blondin II); Turner v. Frowein, 253 Conn. 312, 752 A.2d 955 (Conn. 2000); Thomson v. Thomson [1994] 3 S.C.R. 551, 599 (Can.); P. v. B. [1994] 3 I.R. 507, 521 [\*38] (Ir. S. C.). See generally Paul R. Beaumont & Peter E. McEleavy, The Hague Convention on International Child Abduction 156-72 (1999).*

*A good example of this approach is the Second Circuit's recent decision in Blondin II. The district court had denied the father's petition to return the children to France because the mother had established that returning the children to their father's custody would pose a grave risk of harm. See Blondin v. Dubois, 19 F. Supp. 2d 123, 127-29 (S.D.N.Y. 1998) (Blondin I). The Court of Appeals vacated the district court's judgment and remanded the case to allow the [\*39] district court to consider "remedies that would allow the children's safety to be protected [in France] pending a final adjudication of custody." Blondin II, 189 F.3d at 250.*

*Yet, there may be times when there is no way to return a child, even with undertakings, without exposing him or her to grave risk. Thus, on remand in Blondin, the district court found that the "return of [the children] to France, under any arrangement, would present a 'grave risk'" because "removal ... from their presently secure environment would interfere with their recovery from the trauma they suffered in France; ... returning them to France, where they would encounter the uncertainties and pressures of custody proceedings, would cause them psychological harm; and ... [one of the children] objects to being returned to France." Blondin v. Dubois, 78 F. Supp. 2d 283, 294 (S.D.N.Y. 2000) (Blondin III), appeal filed, No. 00-6066 (2d Cir. Jan. 20, 2000) (emphasis added)."*

In the New Zealand Court of Appeal decision *A v Central Authority for New Zealand*,[52] Doogue J said for the Court:

*"Consideration was given in the course of argument as to whether a Court had power to attach conditions to any order made by it. It seems reasonably clear there can be no power to attach conditions to an order under s 12 in the absence of a finding in favour of a defence under s 13. On the other hand, if such a defence has been made out and the Court is concerned solely with the exercise of his discretion under s 13 of the Act, then it may be possible that conditions could be attached, unless the statutory provisions dealing with conditions in the Act, ss 26, 27 and 28 imply no authority for the imposition of other conditions. See H v H (1995) 12 FRNZ 498. Nevertheless, as has already been stressed in this judgment, it is not the role of a New Zealand Court to interfere with the functions and responsibilities of the relevant Central Authorities and the courts of another jurisdiction. It would be an unusual case which might give rise to the consideration of conditions. No finding is made on this issue."[53]*

When Kay J decided *McOwan and McOwan* in December 1993,[54] his Honour doubted whether there was any express provision in the Hague Convention which would enable a court to require the provision of an undertaking before ordering the return of a child. An express domestic basis was purportedly provided in 1995 when the Regulations were amended to include reg 15(1)(c). Sub-section (1) now reads:

*"15 (1) If a court is satisfied that it is desirable to do so, the court may, in relation to an application made under regulation 14:*

*(a) make an order of a kind mentioned in that regulation; and*

*(b) make any other order that the court considers to be appropriate to give effect to the Convention; and*

*(c) include in an order to which paragraph (a) or (b) applies a condition that the court considers to be appropriate to give effect to the Convention."*[55]

In *De L v Director General, NSW Department of Community Services*[56] the majority of the High Court of Australia remarked on the amended form of reg 15(1):

*"... the effect of reg 15(1) is to provide that, in making an order in relation to the return of a child from Australia, the court may include in its order a condition the court considers appropriate to give effect to the Convention.*

*...*

*It is impossible to identify any specific and detailed criteria which govern the exercise of the power whereby the Court may impose such conditions on the removal of the child 'as the Court considers to be appropriate to give effect to the Convention'. Many of the criteria which may be applicable in a particular case are illustrated in the above passages from the Canadian and English decisions. The basic proposition is that, like other discretionary powers given in such terms, the Court has to exercise discretion judicially, having regard to the subject-matter, scope and purpose of the Regulations."*[57]

Prior to *De L v Director General, NSW Department of Community Services*,[58] the Full Court of the Family Court of Australia in *Police Commissioner of South Australia v Temple (No 2)*[59] held that the undertakings to the Court imposed by Murray J on a father seeking the return of a child to England exceeded what was required. There had not been a finding at first instance that the "grave risk" defence was

made out.[60] The Full Court ordered the child's return subject to more limited undertakings to be made to an English court. Strauss J (with whom Baker and Butler JJ agreed) held that

*"... Regulation 15(3) does not enable the Court to place conditions on the return of the child. It merely enables the Court to place conditions on the temporary removal of the child from one place to another before the return of the child is ordered."*[61]

More recently in *Townsend v Director-General, Department of Families, Youth and Community Care*,[62] Warnick J had ordered that two children brought to Australia by their mother be returned to their father in the United States for custody proceedings to take place in that jurisdiction. The mother had failed to make out a grave risk exception to the requirement to order return. On appeal, she contended *inter alia* that the trial Judge erred in requiring the father to make undertakings rather than the Court imposing conditions.[63] The Full Court of the Family Court of Australia held that the determination of whether to require undertakings or impose conditions was a matter of discretion. The Court said:

*"... in our view it was a matter for his Honour to consider which conditions if any he thought it proper to impose, or what undertakings to require, and we are not persuaded that he fell into error. In particular, in the absence of evidence as to United States law and practice on the matter, we see no reason to assume that the undertakings required by his Honour would be less effective in carrying out the intent of the Convention than orders expressed as conditions."*[64]

It thus seems that under Australian and the other common law jurisprudence reviewed above, court-imposed conditions and undertakings must be purposefully related to the Convention's objects of facilitating return of the child. A finding of "grave risk" by the Australian court ordering return is not however necessary, a position that appears to accord with the caselaw in Ireland, Scotland and Canada but not with the more strict approach taken by the New Zealand Court of Appeal; *quaere* the United States.

**Orders and Undertakings in the Jurisdiction to which the Child is Returned**

In *McOwan and McOwan*,[65] Kay J observed :

*"If undertakings are to be given it is important to make sure they can be enforced. There does not appear to be any existing mechanism by which the Court that extracts the undertaking can ensure that it is complied with. There does not appear to be any legal basis upon which the court of the State in which the*

*child has been returned, can require compliance with an undertaking given to another Court."*[66]

Writing *extra curially*, his Honour suggested:

*"One way to avoid this difficulty is for undertakings to be lodged in both the Court hearing the Convention application and a proper Court in the jurisdiction to which the child is to be returned in order to overcome enforcement difficulties. .... In Re S (Child Abduction: Acquiescence) [1998] 2 FLR 893, Sir Stephen Brown P recorded undertakings given by an American father to the English court to not harass the mother and to agree to a de novo custody hearing in California. He ordered that a copy of his reasons for judgment including those undertakings be provided to the Californian court."*[67]

A "mirror" approach in framing orders for return also finds favour with the English Court of Appeal. In *Re RB (Abduction: Children's Objections)*,[68] Thorpe LJ (with whom Butler Sloss LJ agreed) said:

*"Once the primary jurisdiction is established then mirror orders in the other and the effective use of the Convention gives the opportunity for collaborative judicial function."*[69]

*In the Matter of EP (An Infant); P v P,*[70] an unreported judgment of McGuinness J in the High Court of Ireland,[71] illustrates the difficulties that can arise with undertakings where a child is returned pursuant to the Convention. In this case, return was to a civil law jurisdiction, Italy, and her Honour noted of the difficulty associated with undertakings in the instant case that "[i]*t may well be that this also applies to many non common law jurisdictions."*

McGuinness J was there determining an application to return a child brought unlawfully by her mother from Italy to Ireland. In circumstances where she was satisfied that the child and mother *"had an extremely close relationship"*, her Honour was most concerned that an interim custody order granted by an Italian court would separate them *"for an indefinite and lengthy period, and without possibility of appeal"*. McGuinness J was advised at the conclusion of the hearing that the Italian court had varied its interim custody order and granted custody to the mother. Her Honour gave judgment on 12 February 1997 and ordered the return of the child subject to undertakings by both parents to the High Court of Ireland.

After the child's return, the father failed to abide by his undertakings and further, on 4 March 1997, the Italian court removed the child from the custody of both

parents and placed her in an institution, with minimal access to her mother and father. This Order was apparently based on a report from the Social Services.[72] Enquiries from the Irish Central Authority to the Italian Central Authority received in July 1997 and placed before her Honour in further proceedings were said to show that:-

- The Irish High Court Order was brought to the attention of the Italian Court on 23 April, 1997 and the translation of the above Order was forwarded to it on May 5, 1997.
- In order to enforce the obligations of the parties pursuant to the Irish Order, the Italian Court has to recognise the legal enforceability of the Order in Italy. Such recognition (exequatur) must be applied for by legitimately concerned people.
- The Italian procedural law provides for the parties to undertake obligations which are defined in the "Conciliation Report", which is self-executing (Article 185 Code of Civil Procedure).

McGuinness J said of this information:

*"It is not clear from these replies whether the common law concept that a party may give undertakings to the Court and that the failure to abide by such undertakings constitutes a contempt of Court is a normal part of the Italian legal code. It may well be that this also applies to many other non common law jurisdictions. In the instant case an additional complication is that the content of the Order of this Court made on the 12 February, 1997 was not conveyed to the Italian Court until the 23 April, 1997 and even then not translated until the 5 May, 1997. The child E had already been removed from the custody of her mother on the 5 March, 1997. Clearly this Court cannot know the reasons for the lengthy delay in conveying the content of the Order of 12 February, 1997 to the Italian Court and of having it translated. Nor can it know whether any attempt was made by the legal representatives of the mother to have the Order legally enforced in Italy. The answer given by the Central Authority for Italy does not in fact make it clear whether it is the Order itself which may be recognised as enforceable or whether the undertakings as apart from the Order may be recognised as enforceable. Unfortunately it appears to me that the situation is now such that there is no useful further action that this Court can take in the matter."*[73]

Her Honour then considered and concurred with the views expressed by Singer J of the Family Division of the High Court of Justice in *Re O (Child Abduction: Undertakings)* [1994] 2 FLR 349. Singer J had said *inter alia*:

*"In a case where the Court finds, as I have here, that an Article 13(b) grave risk would be established unless alleviated by undertakings offered or required, and honoured or enforced, it is reasonable . . . for this Court to consider whether the undertakings will be adequately enforceable in the requesting State.*

*The best practice where such issues arise would be for general information concerning its available processes of enforcement of undertakings to be requested from the Central Authority of the home State pursuant to the provisions of Article 7(e), and consistent with the relaxation upon the reception of evidence as the foreign law which Article 14 provides. However if as here, sufficient information cannot be derived from that source then it may well be necessary to direct the parties to file expert evidence in the more conventional manner*

*If in relation to any particular Contracting State that process revealed the absence of machinery adequate to give backing to undertakings the observance of which the English Court relied upon to relieve the children of risk of an intolerable situation, then it would be relevant to consider whether the parent proffering the undertakings genuinely intended to honour them."*

Singer J had suggested:

*"... there may be some scope for developing probably on a bi-lateral basis at least to start with, communication and discussion between Central Authorities so that each may have the opportunity of explaining and, it may be, justifying the approach their domestic Courts take to issues which commonly arise in Convention cases. Such an issue may well be these Courts use of undertakings designed to smooth the speedy passage home and to the door of the proper Court of children who should never have been taken from its jurisdiction. By such discussions and the exchange of views and information it may be that comity would be strengthened, and an understanding achieved that neither country wishes to cause any offence to the Courts of the other, nor to seek to interfere with or to influence what that Court then does.*

*Moreover, it may well be that if such opportunity for the exchange of views does assist to promote co-operation, it should be possible in an appropriate case for the Central Authority of the requested State to liaise with its counterpart in the requesting State to put in place measures agreed by the parties or reasonably required as a proper pre-condition of return."*

It will be recalled that in *Police Commissioner of South Australia v Temple (No 2)*[74] the Full Court of the Family Court of Australia required undertakings to be lodged only in the jurisdiction to which the child was being returned. The more recent first instance Family Court of Australia decision by Lindenmayer J in *Director-General Department of Families, Youth and Hobbs*[75] is the only reported illustration of the use of mirror orders by an Australian court in ordering the return of a child under the Convention. The father, who had initiated the Convention proceedings in respect of his daughter, was permitted by his Honour to file an affidavit that contained a range of undertakings as to:-

- The father not instituting or supporting any criminal or civil charges associated with the removal;
- The father withdrawing pending charges;
- The father paying the costs of the child's return airfare;
- The child remaining in the care of the respondent mother, should she accompany the child back to the Republic of South Africa until the High Court of South Africa directs otherwise or alternatively that he would personally accompany the child on the return trip and would care for the child until otherwise directed.
- The father instituting proceedings in respect of the child within 48 hours of return and pending such proceedings, the respective right of the parents to be governed by their prior settlement agreement; and
- The father obtaining and paying for private educational tuition for the child to maintain her current standard.

The father deposed that he consented to those undertakings being incorporated into "mirror orders" to be granted by both the Family Court of Australia and the High Court of South Africa. Lindenmayer J made orders for the return of the child which would become operative *"conditional upon"* the father first filing the undertakings in the South African court and then filing in the Family Court of Australia an affidavit attesting to his having done so.[76] The child was in fact returned, however, as discussed below, such orders did not secure the co-operation of the mother in the process.

The United States Department of State has suggested that:

*"We also should not lose sight of the fact that there may be other ways to accomplish the objectives of proposed undertakings. For example, it might be possible for the parties to propose a consent order to the appropriate U.S. court prior to entry of the return order in the United Kingdom. In this connection, you may be interested to know that the private bar in the United States occasionally seeks to facilitate the return of children abducted from the United States by having the left-behind parent seek entry, by the appropriate U.S. court, of an order addressing interim issues of custody and support. We understand that private lawyers sometimes recommend use of these orders, which they call "safe-harbor" orders, in cases where the foreign court may be reluctant to return a child to the United States unless such issues are addressed in some fashion. Where a Safe-harbor order has been entered in the United States, there may be no reason for a foreign court even to consider entering undertakings as part of a basic return order."[77]*

Notably, particularly in light of *Director-General Department of Families, Youth and Hobbs*,[78] the Department has expressed the view that it:

*"does not support conditioning the issuance of a return order on the acquisition of a safeharbor order*

*from a court in the requesting state."*[79]

## Anticipatory Mirror Orders

In addition to their use as an adjunct to orders for the return of children pursuant to the Convention, mirror orders have featured in reported caselaw as a mechanism for improving the likelihood that children lawfully taken overseas will be returned if there is then a dispute as to return.

In the English Court of Appeal decision of *Re K (Child)*,[80] Thorpe LJ with whom Sir Oliver Poppelwell agreed, referred to their potential utility where the child was taken to a non-Convention location:

*"Although not a signatory to The Hague Convention on the Civil Aspects of International Child Abduction, Bangladesh of course has a fully-developed legal system. But within that legal system, the interpretation of child welfare will inevitably and properly be reflective of the culture, traditions and institutions of the state. It does not follow that if the issue of J's future were to be determined by a court in that state, following a breach of the contact, that the mother's relationship with J or the importance of his rooting within this society would receive the same evaluation as in this legal system. That is not to criticise the system of law in Bangladesh, but simply to notice its necessary difference.*

*Accordingly, it seems to me that to preclude the possibility of competitive litigation within two systems, reflecting different traditions and cultures, it is desirable to confine the risk of competitive litigation by putting in place, wherever possible, whatever buttresses can be devised for the primary adjudication in this jurisdiction. It seems to me that the appearance within the Family Law Reports of the cases of re T and re A whatever may have provoked that appearance, is useful as offering to practitioners a precedent for the sort of mechanisms appropriate where the friendly foreign jurisdiction roots its family justice system in Islamic law.*

*There is obviously in this case the possibility of notarised agreements. There is the possibility of mirror orders."*[81]

Subsequently in *Re P (A Child : Mirror Orders)*,[82] Singer J in the Family Division of the High Court of Justice dealt with a case where a United States court had refused an application pursuant to the Convention to return a child removed by the mother. The Orange County Family Court made an order regulating rights of contact between the child and the father who was living in England and lacking a right of entry into the United States. The order provided that the mother was to bring the child to England each October for one week, so that the father could have contact with the child for 4 hours a day on 5 consecutive days. Those terms were agreed

between the parties and the United States Court expressly stated that it was to be entered as a mirror order in the Family Division. The father's English lawyers were to provide the mother's representatives and the court in the USA with copies of the mirror order made by the English court prior to the arrival of the child in England.

The primary question before Singer J was whether the making of a mirror order was consistent with the Court's powers and jurisdiction given that the child was neither habitually resident in England nor present in England on that date.[83] In the course of finding that he could and should make the order sought, his Honour observed:

*"As it happens, for some years now, more often of course in unreported but not infrequently in reported cases, Family Division judges and judges of the Court of Appeal have advocated in appropriate cases that the parties before them, where contact or a move to live abroad is in contemplation, should provide precisely that form of cordon sanitaire in that foreign jurisdiction which in this case the parties would seek to create here for their child.*

*Thus, England's judges have invited parties to go off and get mirror orders or their non-common law equivalents in Chile, Canada, Denmark, the Sudan, Bangladesh, Egypt and even in Saudi Arabia."*[84]

*"Then there is the category of case, of which this one is typical, where a foreign court is making provision for contact to take place in another jurisdiction, in this case England. In that category of case it is important that there should be the possibility for orders to be made in advance of and against the arrival of the child so that the parties and the foreign court may have confidence that if either of them seeks to take advantage of the presence of the child in the contact jurisdiction, the court there will not lend itself to any such attempt.*

*The classic anxiety is of course that, the child having come for contact with the parent in England for a limited period, the parent in England either attempts to remove the child to a third country and to keep the child there, or refuses at the end of the contact to allow the child to return to his country of residence. Armed with a consent order already made in the English jurisdiction, an English judge would virtually inevitably order return first and investigation of the merits in the residence jurisdiction."*[85]

It is convenient to note here that legislation may provide for the recognition of orders as between certain jurisdictions thereby creating another avenue for mirror orders to be established by registration.[86] In respect of registration in Australia, New Zealand and a number of States in the United States of America is each a *"prescribed overseas jurisdiction"*. No other common law jurisdictions are prescribed. A key limitation with respect to prescribed jurisdictions, however, is that the Australian provisions for registration do not apply to interim or *ex parte*

orders.[87]

Where an overseas child order is registered in an Australian court,[88] it is enforceable until registration is cancelled[89] and *"has the same force and effect as if it were an order made by that court under this Part."*[90]. Registration of an overseas order in Australia avoids the need for compliance with ss69C and 69E of the *Family Law Act* (Cth) 1975,[91] but in any event these sections are broadly framed and s69E (1)(e) would appear to avoid the difficulties seen in *Re P (A Child : Mirror Orders)*.[92]

## Matters for Continuing Attention

A *"cohesive approach by common law jurisdictions"* is seen as desirable in the treatment of Hague Convention matters generally and the enforcement of undertakings in particular.[93] It would seem that among common law jurisdictions, there are differences and points on which there is no express judicial agreement concerning aspects of when and how the discretion available under the Convention is to be exercised in furtherance of achieving the safe return of children. Some of the issues that warrant further consideration are as follows:-

1. How can contracting States to the Convention and common law jurisdictions in particular, best contribute to giving effect to the 1997 resolution? Would fuller, more specific and widely promoted implementation of the 1997 resolution concerning Article 7(h) minimise the need for undertakings, mirror orders or safe harbour orders?

2. Is it sufficient that the 1997 resolution would seem to be accepted as giving rise to a responsibility upon Central Authorities *"to provide information about services relating to social security, legal aid, emergency accommodation, or domestic violence protection"*? Where sworn/affirmed evidence has alleged child or partner abuse as a defence to return, should there not be an automatic obligation upon the Central Authority to where the child is returned to convey that evidence to the appropriate child protection and/or criminal investigation authorities?

3. Difficulties have been observed in seeking to use the mechanisms of undertakings, mirror orders or safe harbour orders in non-common law jurisdictions. How should these be addressed?

4. What approach should be adopted to give effect to Singer J's suggestion in *Re O (Child Abduction: Undertakings)* that *"in the absence of machinery adequate to give backing to undertakings the observance of which the English Court relied upon to relieve the children of risk of an intolerable situation, then it would be relevant to consider whether the parent proffering the undertakings genuinely intended to honour them."*

5. Is it consistent with the Convention for courts to:-

- seek or accept undertakings, mirror orders or safe harbour orders where none of the "grave risk" exceptions are found to be made out; and
- order "conditional return"?

Should different considerations apply where a consent order is proposed?

6. What benefits, if any, are seen in the use of anticipatory mirror orders and reciprocal registration provisions *vis a vis* contracting States to the Convention? To what extent would there be cost savings or expedition of an application to return a child if such an order existed?

## B. Criminal Proceedings Against the Taking Parent

## Introduction

The wrongful removal or retention of a child across international boundaries has both civil and criminal consequences. The civil aspects are well documented. The debate in relation to criminal penalties for parental child abduction is more controversial and in Australia was the subject of a recent report by the Family Law Council.[94]

Under Australian law, parental child abduction is not a criminal offence. However, some activities associated with the wrongful removal or retention may be criminal in nature while other activities may attract a sanction which, while not strictly criminal, may be punitive in nature and can include imprisonment.

## A Survey of the Law in Australia

Section 65Y of the *Family Law Act* 1975 (Cth) provides that where a parenting order is current, a party to the proceedings that resulted in the making of that order must not intentionally or recklessly take or send, or attempt to take or send the child from Australia. The section also extends its reach to other persons who may conspire with the parent to take or send the child from Australia.

Section 65Z is a companion provision which enacts a similar prohibition where there are proceedings pending for the making of a parenting order, rather than completed proceedings as is required under s65Y. Both sections carry a maximum penalty of 3 years imprisonment.

In addition to ss65Y and 65Z, there are obligations placed upon owners and operators of aircraft or vessels (train travel out of Australia not being possible!),

preventing the departure of the aircraft or vessel where it is believed, evidenced by statutory declaration, that the aircraft or vessel may be used to convey the child wrongfully out of Australia.[95] The penalty attached to both these sections is expressed as a monetary penalty being 60 penalty units.[96]

There are 2 exceptions to the prohibition in ss65Y and 65Z as well as the prohibitions placed on owners and operators of aircraft and vessels under ss65ZA and 65ZB. First, where there is consent in writing by the parties to the parenting order that the child may leave Australia, an offence will not be committed. Of course, if the consent was fraudulently obtained, the consent will be void. Secondly, where there is a court order under the *Family Law Act* 1975 (Cth) or under the law of a State or Territory providing that the child may leave Australia, there will be no offence under the relevant section.

## Other Relevant Provisions

Section 112AP of the *Family Law Act* 1975 (Cth) gives to courts exercising jurisdiction under the Family Law Act a general power to punish for contempt of court.[97] The Family Court of Australia has no inherent power to punish for contempt it being a court created by statute.[98] However, the wording of s112AP implies that the general law of contempt applies when courts are exercising jurisdiction under the *Family Law Act* 1975 (Cth).

Where there has been a contravention of a court order, that contravention by itself is not sufficient to ground a successful action for contempt of court. It must be coupled with a finding that the contravention also involved a flagrant challenge to the authority of the court. What constitutes a flagrant challenge to the authority of the court will be determined in the context of the circumstances of the case but it must be a "notorious" or "scandalous" challenge to the court's authority. In general, a breach of a court order in civil proceedings is dealt with under the summary procedures available to the court.[99] The aim of these summary proceedings is to protect and preserve the rights of parties to those proceedings where there has been a failure to observe the terms of a court order. However, where contemptuous behaviour is involved — being the contravention coupled with the a challenge to the authority of the court, the reason for the contempt proceedings is to preserve the authority of the court. In its report on contempt, the Australian Law Reform Commission said:

*"Except in a very few cases, where overt defiance of the court is a pronounced element in the situation, it is not the judge or the court that the law is protecting, but the successful party. Therefore, the Commission recommends that the summary procedure be retained as the normal means of punishing disobedience with an order made in favour of a party to civil proceedings….On the very rare occasions*

*that the conduct of the respondent in contempt proceedings arising out of disobedience amounts to a flagrant challenge to a court's authority it would be appropriate for the relevant court to impose punishment for the disobedience. In such a case the focus of the relevant proceedings shifts from merely upholding the rights of an aggrieved party to upholding the authority of the court.*"[100]

Except in a very few cases, where overt defiance of the court is pronounced, the typical procedure for dealing with the contravention of a court order is pursuant to s112AD. It has been held that the proceedings pursuant to this part of the *Family Law Act* 1975 (Cth) is a self contained code under which the court may impose sanctions. The provisions are *"careful to avoid the language of the criminal law, and should not be regarded as part of the criminal law of the Commonwealth".*[101] Where there has been a contravention, the range of sanctions the Court may impose is as follows:-

- A sentence of imprisonment;
- A fine of not more than $6,000 for a natural person or $30,000 for a corporation;
- A recognisance;
- Sequestration of a person's property;
- Order for delivery of a document; or
- An order to compensate for contact forgone.

The standard of proof for proceedings under this Part is the civil standard, even though it may result in imprisonment. However, the degree of satisfaction that the court may require varies having regard to the gravity of the facts to be proved.[102]

## Report by the Family Law Council on Parental Child Abduction

The Family Law Council released a comprehensive report on the issue of whether parental child abduction should or should not be a criminal offence. The report canvassed the arguments in favour and against criminalisation of parental child abduction. The arguments in favour of criminalisation were as follows:-

- One of the stated aims of making parental child abduction a criminal offence is its deterrent effect. It is said that the incidence of child abduction by parents would reduce if parents acted to remove a child in the knowledge that they may face criminal proceedings;
- There is a degree of uncertainty in the present law in that parents do not fully understand the exact nature of civil proceedings. The enactment of parental child abduction as a criminal offence – being much easier to understand – would be to reduce the uncertainty;

- It is thought that where the nature of civil proceedings are understood, they are seen as being ineffective in obtaining the return of an abducted child. Criminalisation could facilitate the search process and may, as a consequence, attract the priority in police resources and the advanced procedures (eg telephone interception, listening devices) that apply in the investigation of criminal offences. Internationally the assistance of Interpol and overseas police would become available to locate abducted children. Extradition and mutual assistance procedures would also become available;

- The recovery of abducted children is extremely costly to the taxpayer. Any proposal which has a deterrent effect and which reduces costs deserves close consideration;

- There is a combined deterrent and educative effect of criminalisation. It was suggested that the deterrent effect could be **specific**, by deterring an offending parent from doing it again, or **general**, by deterring parents in general from abducting their children; and

- The offence of child abduction is also covered by the general state and territory law on abduction. Criminalisation at the federal level would bring parental child abduction into line with State laws relating to child abduction. However, the fact that a parent is involved and the *Family Law Act* 1975 (Cth) as amended by the *Family Law Reform Act* 1995 (Cth) now enables each parent to exercise powers in relation to his or her child and tends to distinguish parental child abduction from other forms of child abduction.

Some submissions received by Council strongly supported criminalisation of parental child abduction. The National Children's and Youth Law Centre (NCYLC) said in its submission:

*"The NCYLC believes that child abduction is a violation of the rights of the child and for this reason alone, abducting a child from Australia, to Australia and within Australia should be criminalised.*

*For the NCYLC the motives behind criminalisation are a mixture of punishment (for a wrong done against a child) and deterrence. In this way it is hoped that the criminalisation of parental child abduction shows parents, and those aiding parents, that they do not have a property right in a child and that taking advantage of a child's vulnerability will not be tolerated..."*[103]

An important point made in the Family Court of Australia's submission was that if it is decided to criminalise parental child abduction it will be necessary to be quite specific about what will constitute a criminal offence. The Court suggested that in Austria, France and Netherlands the offence appears to be limited to the taking of the child by a person who does not have parental responsibility for the child. In New Zealand the offence is limited to the removal of a child from the country. However, the Council noted that in other countries with legal systems comparable

to Australia, such as the USA, United Kingdom and Canada, the offence does extends to people with parental responsibility.

There are also arguments against the criminalisation of parental child abduction and the report by the Family Law Council set those arguments out in the following way: -

- The existing provisions in the *Family Law Act* 1975 (Cth) are adequate to cope with the problem;
- The effect on the child of a parent being imprisoned is a powerful argument against criminalisation. It was suggested to the Council that jailing of a parent following action by the other parent could destroy the relationship between the child and the parent taking the action which resulted in the jailing. On the other hand, it was also put to the Council that the consequences could also be educative for the child by informing their understanding of right and wrong and of responsible and irresponsible behaviour. It was thought that it would be far more serious for a child to observe patently illegal behaviour of a parent going without penalty. The Council added that if parental child abduction were to be criminalised, penalties other than imprisonment are more likely in most cases and, therefore, this argument may not be as strong as it first appears;
- The abductor, being the child's parent, has a right, or would in any event believe s/he has a right, to the care and/or control of the child and it was argued that stealing your own children is an oxymoron because it is not easy to see how one can you steal your own child;
- The consequences of an offence being "criminal" can be quite severe; for example, apart from the penalties imposed, the person acquires a criminal record and this can also affect his or her employment prospects which may affect future parenting abilities;
- In some circumstances the abductor may consider that s/he is merely correcting a wrong, such as denial of reasonable contact with the child, or is saving the child from a perceived danger, such as child abuse;
- In some cases the parent is fleeing alleged acts or threats of violence, or otherwise escaping an intolerable situation; and
- To make parental child abduction a criminal offence is an undue intrusion by the State into the domain of the family. Council notes, however, that the state has intervened in the family domain in relation to such matters as child abuse and neglect.

In recommending that parental child abduction not be criminalised, the Council was influenced by arguments that parental child abduction is not typically criminal in nature and there was no strong evidence that criminalisation had the deterrent effect it was claimed to have. The Council also felt that alternatives to

criminalisation would have a much greater likelihood of deterring abduction by parents without the negative effects associated with criminalsation.[104]

## C. PROBLEMS RELATING TO THE ENFORCEMENT OF RETURN ORDERS

## Introduction

Problems associated with the actual execution of orders requiring the return of a child to a Convention country largely divide into problems caused by the abducting parent, and those caused by the child. The majority of problems are not surprisingly, associated with the abducting parent. This section of the paper will examine some of the more common problems in physically ensuring the child is put on an aircraft destined for the targeted country. In addition, it considers some of the solutions which have been utilised by the courts of Australia and Central Authorities and legal remedies which are or may be available to ensure the child is returned as ordered.

## Legal Framework

Section 111B of the *Family Law Act* 1975 (Cth) empowers the executive government to promulgate regulations necessary to enable the performance of the obligations of Australia or to obtain for Australia, any advantage or benefit, under the Convention. Australia has implemented into domestic law, the relevant provisions of the Convention (although not in identical terms) by the *Family Law (Child Abduction Convention) Regulations.*

The types of orders for which the Central Authority can apply and those which the Court is empowered to make are set out in reg 14(1) and reg 15(1) respectively and provide as follows:

*"14(1) [Application where child removed to, or retained in, Australia: Form 2] In relation to a child who is removed from a convention country to, or retained in, Australia, the responsible Central Authority may apply to a court in accordance with Form 2 for:*

    a. *an order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention; or*
    b. *an order for the issue of a warrant for the apprehension or detention of the child authorising a person named or described in the warrant, with such assistance as is necessary and reasonable and if necessary and reasonable by force, to:*
        i. *stop, enter and search any vehicle, vessel or aircraft; or*

ii.   *enter and search premises;*
      *if the person reasonably believes that:*

iii.  *the child is in or on the vehicle, vessel, aircraft or premises, as the case may be; and*

iv.   *the entry and search is made in circumstances of such seriousness or urgency as to justify search and entry under the warrant; or*

c.  *an order directing that the child not to be removed from a place specified in the order and that members of the Australian Federal Police are to prevent removal of the child from that place; or*

d.  *an order requiring such arrangements to be made as are necessary for the purpose of placing the child with an appropriate person, institution or other body to secure the welfare of the child pending the determination of an application under regulation 13; or*

e.  *any other order that the responsible Central Authority considers to be appropriate to give effect to the Convention."*


"*15(1) [Orders in relation to reg 14 application] If a court is satisfied that it is desirable to do so, the court may, in relation to an application made under regulation 14:*

a.  *make an order of a kind mentioned in that regulation; and*

b.  *make any other order that the court considers to be appropriate to give effect to the Convention; and*

c.  *(c) include in an order to which paragraph (a) or (b) applies a condition that the court considers to be appropriate to give effect to the Convention."*


Regulation 20 deals specifically with the responsibilities of a Central Authority following the making of a return order and provides as follows:

"*20(1) [Arrangements by Central Authority] Where an order is made under regulation 16,*[105] *the responsible Central Authority shall cause such arrangements as are necessary to be made in accordance with the order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention."*

"*20(2) [No notification that order stayed] If, within 7 days after the making of an order under regulation 16, the responsible Central Authority has not been notified that the order has been stayed in accordance with subrule 1(10) of Order 32 of the Rules of Court, the child shall be returned to the country in which he or she habitually resided immediately before his or her removal or retention."*


It can be seen that the regulations are framed broadly enough to include the Central Authority seeking, in appropriate cases, the making of *"any other order that the Court considers appropriate to give effect to the Convention".*[106] Both the

Preamble and Article 1 of the Convention emphasise that the purpose and objects of the Convention are to secure the prompt return of children wrongfully removed to or retained in any contracting state.[107] Article 7(h) provides:

*"Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.*

*In particular, either directly or through any intermediary, they shall take all appropriate measures –*

*....*

h.  *to provide such administrative arrangements as may be necessary and appropriate to* **secure** *the* **safe** *return of the child." (emphasis added)*


## Taking the Child from the Abducting Parent

The Full Court of the Family Court of Australia highlighted the importance of making appropriate orders to secure the child following an order for return, in the case of *DM v Director-General, Department of Community Services.*[108] The proceedings involved a child of almost 17 months of age who had been brought to Australia by her father on 14 April 1998. Both the mother and father who resided in the Republic of Macedonia had taken steps to immigrate to Australia. However the requesting applicant mother alleged that the parties had separated on 9 March 1998, after which she had the full-time care of the child and the father had access. She alleged that on 12 April 1998 the father told her he was taking the child for a walk but failed to return. The father alleged that he and the mother had not separated when he arrived in Australia with the child.

The father unsuccessfully defended the application at first instance (both initially before a Judicial Registrar, and then on a re-hearing before a Judge of the Family Court of Australia) and lodged an appeal to the Full Court of the Family Court of Australia. At the hearing before the Full Court, the father sought an adjournment based on medical grounds, arguing first he was unwell on the day of the hearing, and secondly that he had had insufficient time to prepare his case. The adjournment was refused and the father announced he felt sick and was unable to present arguments in relation to continuing the appeal.

What then occurred is recorded in the judgment of Nicholson CJ in relation to obtaining a warrant for the placement of the child in the care of the applicant State

Central Authority (who in this case was also the organisation charged with the welfare of children within the State of New South Wales):

*"I have little doubt that what the father was doing, was seeking to avoid the Court dealing with this matter, and putting the matter off as long as possible.When he adopted that course, I asked the responsible authority whether they wished to make an application as to the disposition of the child. Mrs Flohm, for the authority, indicated that, although the authority had hitherto been reluctant to make such an application, she felt that in the circumstances she ought to make it, and the application was made. The basis of the application is undoubtedly a concern that, since the father was, on the departmental case at least, prepared to abduct the child from its mother in the former Yugoslav Republic of Macedonia, that there was a real risk that if he saw these proceedings as running against him, that he may take similar steps in relation to the child in Australia, to either remove the child from its present address and remove it to other parts of Australia, or elsewhere.*

*Speaking for myself, I think that there is a significant risk of this happening. I propose, in view of the father's attitude, as I indicated to him, to continue to deal with the appeal today, and if he is unable to advance any further material before the Court we will take into account the arguments that are contained in the appeal book and in the material that he has already advanced, and we will consider the appeal on that basis. In order, however, to protect the child from the possibility of removal from its present address, it seems to me that the only appropriate and proper course that this court should take is to order that, until further order, an order be made in terms of paragraph two of the application of the Central Authority."*

Kay J, agreeing with the Chief Justice's reasoning, also added:

*"The only thing I add is that in the father's own material he indicates:*

*"I was waiting for 37 years of my life for this baby to be born, and I was not going to give up on her at any cost."*

*I perceive there to be a real risk that any order that we make, if the appeal is dismissed, could be defeated by the actions of the father."*

The case illustrates the necessity for both the Central Authority and the Court to be vigilant in ensuring that if there is a significant risk, based upon the past conduct of the abducting parent, he/she will attempt to hide the child from the Central Authority to defeat the return order, the Court will make orders which will place the child in the care of the Central Authority, or perhaps in appropriate cases a neutral third party to care for the child pending his/her return to the contracting State. It is

significant to note that the Full Court was not deterred in this course by the very young age of the child and that the child had not been placed in the care of the Applicant State Central Authority upon the original filing of the application and the father had not attempted to go into hiding immediately upon becoming aware of the application, but had sought to oppose it in the Courts. Whilst not common, there are examples where a parent having lost an appeal against a return order has gone into hiding.[109]

The above case illustrates what might be regarded as the strongest of enforcement options available to the Central Authority and the Court in ensuring that the child is returned as ordered.

Orders such as that made in *DM v Director-General, Department of Community Services*[110] are comparatively rare. In the majority of cases, injunctions are placed upon the Respondent confining where the Respondent and the child are to reside pending the return of the child; with the Central Authority to put in place appropriate monitoring to ensure the parent and child remain at that location. A position halfway between these two options, although seldom used if at all, would be to require the abducting person and the child to reside with a neutral third party until the child is returned.

## Lack of Co-operation by the Abducting Parent

Most of the problems encountered in enforcing the order for return are related to the abducting parent failing to co-operate with the Central Authority in making arrangements for the safe return of the child, perhaps in the vain hope that the Central Authority's resolve will be weakened toward pursuing a return, or to gain a minor victory by stretching out the period before which the child has to be returned as long as possible. The following may be regarding as typical examples of this kind of problem; where the abducting parent:-

  i.  refuses to hand over documentation necessary to ensure the child can leave Australia and safely re-enter the other contracting State or to sign fresh documentation which may be required for that purpose;
 ii.  refuses to share information about arrangements which he/she is making for the return of the child to the contracting State, often wrongly believing that this is not anybody's business but his/hers;
iii.  insists upon a date for a return some distance from the order for return date relying upon varying reasons normally associated with the convenience of the abducting parent and/or the welfare of the child;
 iv.  disagrees with every conceivable aspect of the mechanics of the return proposed by the Central Authority i.e. matters such as who will pay for the

airline tickets and make the bookings, choice of airline, route to be taken by the airline, etc.

## Some Solutions

Obviously every case is unique, however the following represent examples of ways in which the Central Authorities of Australia have sought to overcome difficulties in enforcement resulting from a lack of co-operation.

## (i) Seeking a Detailed Order for Return

By the time the application has been made and determined, the Central Authority is usually in a good position to assess the likely level of co-operation which will be received from the abducting parent in the event of a return order. Where it can reasonably be expected that the Central Authority will receive no assistance in arranging the return of the child, an order for return can provide a series of subsidiary orders to give effect to the order for return. Such subsidiary orders could include:-

   i. an order that the passports, which routinely are surrendered to the Court pending determination of the application,[111] be collected by the Central Authority, rather than the abducting parent, who will hold the child's passport until the child arrives at the airport to board the necessary flight;

   ii. an order directing that the abducting parent sign specified, or all necessary, documentation to allow the child to safely and lawfully leave the Commonwealth of Australia and re-enter the other contracting State, together with a default provision that in the event the applicant fails or refuses to sign such documentation, the Registrar is appointed to sign that documentation in place of the abducting parent;

   iii. a mandatory injunction requiring the abducting parent to contact the Central Authority on a regular basis pending return i.e. a reporting condition;

   iv. a specific time by which the child must be returned to the contracting country;

   v. a specific liberty to the Central Authority to return to Court to obtain further subsidiary orders in order to assist the Central Authority carry out its obligation to effect the return of the child pursuant to the Convention Regulations, in order to avoid any argument that there is no such power to do so upon the basis that the Court's power is spent and be prepared to return to Court where necessary;

   vi. an order requiring the abducting parent to enter into a form of recognisance or bond, forfeitable in the event that the child is not returned to the contracting State in accordance with the order.

## (ii) Utilising Sanctions for Breach of Orders

The Family Court of Australia, has, by statute, the same power to punish for contempts of its power and authority, as is possessed by the High Court of Australia in respect of contempts of the High Court.[112] There is a further statutory provision empowering Courts exercising jurisdiction under the *Family Law Act* 1975 (Cth)[113] to punish for contempt where it constitutes a contravention of an order made under the *Family Law Act* 1975 (Cth) and involves a flagrant challenge to the authority of the Court (commonly referred to as criminal contempt) or does not constitute a contravention of an order under the *Family Law Act* 1975 (Cth).[114]

In addition, there is a statutory power to impose sanctions where a Court is satisfied a person has, without reasonable excuse, contravened an order made under the *Family Law Act* 1975 (Cth) (commonly referred to as civil contempt).[115] As mentioned earlier in this paper, orders for return in Hague cases are made pursuant to powers to order a return contained in the *Family Law (Child Abduction Convention) Regulations* rather than the *Family Law Act* 1975 (Cth). The term "order under this Act" includes "an order (however described) made by the Court under this Act".[116] In turn, the words "this Act" are defined in the Act[117] to include "the Regulations". Accordingly, it appears that the section is applicable to orders made under the *Family Law (Child Abduction Convention) Regulations*. The Court must be satisfied that the person breaching the order did so without reasonable excuse. When a breach is established, the Court is specifically empowered to make *"such orders or other orders as the Court considers necessary to ensure compliance with the order that was contravened"*.[118]

Where the only order which the Court makes is an order requiring that the child be returned to a contracting state, it may be open to argument whether it could be said that the actions of the abducting parent had "contravened" the order. It would depend upon the nature of the action by the parent and how direct such action is in preventing the child from being returned. In the case of taking the child into hiding, it may be arguable that the direct effect is to stop compliance with the order. It may be open to greater debate if the actions of the abducting parent have the practicable effect of frustrating the order rather than directly contravening it. However, where the subsidiary order supporting the return order specifically requires the abducting parent to do or refrain from doing things necessary to effect the return of the child, then a case of contravention is more easily made out.

## (iii) Negotiations/Counselling

In Australia, many of the designated State Central Authorities are also the agencies

charged with administering the child welfare legislation in force within the various States and Territories which comprise the Commonwealth of Australia. Within those agencies, there resides significant expertise in the areas of child welfare, counselling and working with what could generally be termed, difficult parents. Often, parents who are initially difficult can be persuaded to accept the Court's decision and not work actively to frustrate it after counselling sessions with a social worker and/or a psychologist. Such an approach is often resource intensive. Further, as the agency is the "opposing party", its officers are often not accepted by the abducting parent as an organisation genuinely motivated to assist him/her and the child. The approach can also have its limits from the perspective of the agency, in that officers of the agency can leave themselves open to allegations of having unduly influenced the abducting parent to take or not take critical decisions, such as whether to appeal the decision at first instance.

## Problems of Enforcement Arising from the Actions of the Child

The most common case is where a child has objected to returning, but the Court has ordered the child's return in any event. On some occasions, the Central Authority will receive some warning that there may be difficulties. The warning will come from statements made by the child, relayed through the abducting parent, or made during direct discussions between the Central Authority and the child. In such cases there is an opportunity to utilise counselling and other forms of persuasion to assist the child in accepting the reality of the situation. In the cases of *Director-General, Department of Families Youth and Community Care v. N*[119] and *Director-General Department of Families Youth and Community Care v. McC*[120] (respondents' names abbreviated), Barry J ordered as part of the return order, that the child attend a counselling session with a Family Court of Australia Counsellor so that the child may have explained to her the decision which his Honour had made. The effectiveness of counselling is obviously reduced where the abducting parent remains hostile following the decision.

In cases where the child is hostile to a return, consideration is given to requesting that the requesting applicant travel to Australia for the purpose of reuniting with the child and having that person accompany the child back to the contracting State. Consideration must be given to who will pay the cost of this travel and an appropriate order sought as part of the subsidiary orders at the time the return order is made.

The circumstance which poses the greater difficulty is where, at the very last minute, usually at the airport, the child refuses to board the aeroplane either by standing his or her ground or running away from the airport. The second of these circumstances occurred in the case of *Director-General, Department of Families,*

*Youth and Community Care v. O* (respondent's name abbreviated).[121] That application involved the return of a 13 year old child who had come to Australia for a one month holiday staying with her father and did not return as arranged. Bell J found that the child did not object for the purposes of the Convention. Whilst upset at the outcome, the child was briefly counselled by an officer of the State Central Authority after the decision was handed down. The mother travelled to Australia to accompany the child to the United Kingdom after the decision was handed down. At the airport, the child asked to go to the toilet before entering the customs area to board the return flight and disappeared from the airport and could not be located. The mother, who was travelling with limited funds, reluctantly boarded the return flight alone.

The father brought an application to re-open the Hague Convention proceedings relying upon the child's reaction at the airport as new evidence of her objection to returning. The application was dismissed. The State Central Authority applied for orders that the respondent pay the necessary costs of an officer of the State Central Authority to accompany the child to the United Kingdom, but ultimately accepted the father's decision that he would return with the child and the entry by him into a $2,000.00 recognisance, forfeitable in the event the child was not successfully returned to the United Kingdom.

A difficulty of another kind arises where the actions of the child in refusing to return, come to the attention of the airline and the airline, in the interests of passenger safety or for some other reason, refuses to accept the child on the aircraft. This occurred in an English case of *Re: HB (Abduction: Child Objections)*.[122] The response of the United Kingdom Central Authority was to request the applicant mother to travel to England to accompany the child, which she did not do. The child sought leave to be joined in the proceedings and to personally appeal the decision of the judge at first instance. Ultimately, the appeal was allowed and a finding that the child objected was made with the application remitted to the trial judge to consider whether the residual discretion to order the child's return in any event should be exercised. At the remitted hearing Hale J[123] dismissed the application noting that one of the primary goals of the Convention, being a prompt return, was no longer possible. Noting the strength of the child's objections and in the mother's failure to readily offer assistance in the form of responding to correspondence sent to her by the United Kingdom Central Authority seeking her assistance in resolving the impasse; Her Honour dismissed the application.

In circumstances where the attendance of the requesting applicant parent is insufficient to persuade the child to behave appropriately for a return journey, it is difficult to envisage what practical options are open to a Central Authority to

enforce the order. Generally speaking, it is expected that the presence of the requesting applicant parent could sufficiently quell the child's apprehension so as to ensure incidents which may cause the airline to refuse to carry the child, will not occur. Where the child's behaviour can be linked to the influence of the abducting parent, consideration could be given to seeking an order that the requesting applicant's costs while staying in the requested country be paid by the abducting parent.

Australian State Courts acting in the *parens patriae* jurisdiction have held that the Court has extremely coercive powers in order to act in the best interests of the child, even if the "target" of the Court's orders is the child him or herself. *In the case of Director-General, New South Wales Department of Community Services v Y,*[124] Austin J of the Supreme Court of New South Wales, on the application of the Director-General, ordered that a child, who had previously been made a ward of Court, with an a-typical eating disorder which appeared to be an extreme form of anorexia, be returned to her treating hospital (from which the child had previously escaped) and detained there, by force if necessary, for treatment for her condition in her best interests, against the very strong wishes of the child and her parents. His Honour took into account what he found to be strong and uniform evidence of the medical experts that without the treatment, the child would die. In a later decision,[125] Austin J ordered the parents of a child, not yet born, not to breast feed the child and that the child have special treatment, as the mother was HIV positive.

Commentators on these decisions have remarked that the coercive powers available in the *parens patriae* jurisdiction are far wider than anything under relevant State legislation involving children in the care of the State.[126] The High Court of Australia has held that the Family Court of Australia has a statutory jurisdiction similar to the *parens patriae* jurisdiction.[127] It is now the subject of express legislative enactment.[128] Whilst it is arguable that the Family Court of Australia would share similarly coercive powers in its "welfare jurisdiction" such coercive powers in both the *parens patriae* and statutory welfare jurisdiction are governed by the best interests of the child as the paramount consideration.

Whether a Court would be prepared to make similar coercive orders against the child, usually the subject of the application and not a party to it, upon the foundation that such orders are necessary and appropriate to give effect to the Convention, has yet to be determined and hopefully, never will need to be.

## D. DIRECT JUDICIAL COMMUNICATIONS - THEIR FEASABILITY AND LIMITS

### Introduction

*"The judge, when the case is already pending elsewhere, is required to communicate with his or her counterpart in the other state. However, the judicial communication is a wild card in this otherwise orderly business. Anything might happen, and it is a process usually not controlled or even witnessed by counsel."*[129]


## The United States Experience

American statutes and canons are replete with provisions promoting direct judicial communications.

The US *Uniform Child Custody Jurisdiction Acts* (UCCJA) envisaged and made provision for judges of different jurisdictions communicating with each other in respect of a matter which may be pending in both jurisdictions or which may need to be transferred from one jurisdiction to another. For example, the relevant Illinios State No. 750 ILCS 35 provided as follows:

*"Sec. 7. **Simultaneous Proceedings in Other States**.*

*(a) A court of this State shall not exercise its jurisdiction under this Act if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this Act, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons.*

*(b) Before hearing the petition in a custody proceeding the court shall examine the pleadings and other information supplied by the parties under Section 10 and shall consult the child custody registry established under Section 17 concerning the pendency of proceedings with respect to the child in other states. If the court has reason to believe that proceedings may be pending in another state it shall direct an inquiry to the state court administrator or other appropriate official of the other state.*

*(c) If the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum and that information be exchanged in accordance with Sections 20 through 23 of this Act. If a court of this State has made a custody judgment before being informed of a pending proceeding in a court of another state it shall immediately inform that court of the fact. If the court is informed that a proceeding was commenced in another state after it assumed jurisdiction it shall likewise inform the other court to the end that the issues may be litigated in the most appropriate forum.*

*Sec. 8. **Inconvenient Forum**.*

*(a) A court which has jurisdiction under this Act to make an initial or modification judgment may decline*

*to exercise its jurisdiction any time before making a judgment if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.*

*...*

*(d) **Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court** with a view to assuring that jurisdiction will be exercised by the most appropriate court and that a forum will be available to the parties.*

*Sec. 24. **International Application.***

*The general policies of this Act extend to the international area. ..."*

The successor to the UCCJA, the *Uniform Child Custody Jurisdiction and Enforcement Act* (UCCJEA) makes more extensive provisions for judicial communication. Following are some relevant extracts from the draft Bill, and prefatory notes and comments by the National Conference of Commissioners on Uniform State Laws

*"**SECTION 110. COMMUNICATION BETWEEN COURTS.***

*(a) A court of this State may communicate with a court in another State concerning a proceeding arising under this [Act].*

*(b) Communications between courts that affect the substantive rights of a party must be made in a manner that allows the parties to participate, or allows the parties to present jurisdictional facts and legal arguments to the courts, before a final determination is made as to which forum is appropriate. A record must be made of those communications between courts. The record may consist of notes or transcripts of a court reporter who listened to a conference call between the courts, an electronic recording of a telephone call, a memorandum of other electronic communications between the courts, or a memorandum made by one or more courts after the communication.*

*(c) Communications between courts on schedules, calendars, court records, and other matters that do not affect the substantive rights of the parties may occur without informing the parties. A record need not be made of those communications.*

*Comment*
*This section emphasizes the role of judicial communications under the Act. It contains the authorization for a court to communicate concerning any proceeding arising under this Act. This includes*

communication with foreign tribunals and tribal courts. Communication can occur in many different ways such as by telephonic conference and by on-line or other electronic communication. The Act does not preclude any method of communication and recognizes that there will be increasing use of modern communication techniques.

Language has been added to emphasize the role of the parties in the communication process. If the communication between the courts involves relatively inconsequential concerns such as scheduling, calendars or consultation on other minor matters, the communication can occur without the parties being informed or participating. Included within this type of communication would be matters of cooperation between courts under Section 112.

However, on all matters which could affect the parties' substantive rights, a court must communicate with another court in a manner which allows the parties to participate or to present jurisdictional facts and arguments. In particular this includes communications that are required under Section 204 (Emergency Jurisdiction), Section 206 (Simultaneous Proceedings), Section 207 (Forum Non Conveniens), and Section 305 (Simultaneous Proceedings). In any event, a record of the communication must be made. No particular form of communication is required to inform the parties that a communication between courts is scheduled. An informal communication is sufficient.

The purpose of this section is to regularize the communication process between courts. It preserves the flexibility necessary to accommodate busy judicial schedules while including protection for the parties against unauthorized ex parte communications. A full discussion of the problem can be found in State ex rel. Grape v. Zach, 524 N.W.2d 788 (Neb. 1994).

## SECTION 204. TEMPORARY EMERGENCY JURISDICTION.

(a) A court of this State has temporary emergency jurisdiction if the child is present in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

...

(d) A court of this State that has been asked to make a child-custody determination under this section, upon being informed that a child-custody proceeding has been commenced, or a child-custody determination has been made, by a court of a State having jurisdiction under Sections 201 through 203, shall immediately communicate with the other court. A court of this State that is exercising jurisdiction pursuant to Sections 201 through 203, upon being informed that a child-custody proceeding has been commenced, or a child-custody determination has been made by a court of another State under a statute similar to this section shall immediately communicate with the court of that State. The purpose of the communication is to resolve the emergency and protect the safety of the parties and the child.

Comment

...

*The communication between courts is to be accomplished in accordance with Section 110. The communication under this section affects the substantive rights of the parties and therefore the provisions of that section on participation of parties and making of the record are applicable.*

## SECTION 206. SIMULTANEOUS PROCEEDINGS.

*(a) Except as otherwise provided in Section 204, a court of this State may not exercise its jurisdiction under this [article] if at the time of the commencement of the proceeding a proceeding concerning the custody of the child had been previously commenced in a court of another State having jurisdiction substantially in conformity with this [Act], unless the proceeding is stayed by the court of the other State because a court of this State is a more convenient forum under Section 207.*

*(b) Except as otherwise provided in Section 204, a court of this State, before hearing a child-custody proceeding, shall examine the court documents and other information supplied by the parties pursuant to Section 209. If the court determines that a child-custody proceeding was previously commenced in a court in another State having jurisdiction substantially in accordance with this [Act], the court of this State shall stay its proceeding and communicate with the court of the other State. If the court of the State having jurisdiction substantially in accordance with this [Act] does not determine that the court of this State is a more appropriate forum, the court of this State shall dismiss the proceeding.*

*(3) proceed with the modification under conditions it considers appropriate.*

*…*
*Comment*

*…*

*Under this Act, the simultaneous proceedings problem will arise only when there is no home State and more than one significant connection State. For those cases this section retains the "first in time" rule of the UCCJA. Subsection (b) retains the UCCJA's policy favoring judicial communication. Communication between courts is required when it is determined that a proceeding has been commenced in another State. The communication is governed by Section 110. It is a communication that affects the substantive rights of the parties.*

**SECTION 306. SIMULTANEOUS PROCEEDINGS.** *If a proceeding for enforcement under this [article] has been or is commenced in this State and a court of this State determines that a proceeding to modify the determination has been commenced in another State having jurisdiction to modify the determination under [Article] 2, the enforcing court shall immediately communicate with the modifying court. The proceeding for enforcement continues unless the enforcing court, after consultation with the modifying court, stays or dismisses the proceeding."*

The promotion of judicial communication has not been confined to the family law area. In his paper *Global Economy Demands Judicial Cooperation and Communication*,[130] Sid Brooks discusses its application in the field of cross border bankruptcies.

*"Pending U.S. Legislation in Cross-Border Cases*

*The first initiative involves legislation passed in 1998 in both the U.S. House of Representatives and the U. S. Senate. That legislation promoted—indeed mandated—that United States courts cooperate and communicate with courts of other countries involved in transnational insolvency cases. Also included in the legislation, however, were controversial "consumer" bankruptcy provisions that, coupled with the threat of a presidential veto, doomed passage of the entire bill in conference committee. Nonetheless, the sections involving international judicial cooperation and communication in transnational insolvency cases were approved without dissent.*

*The successor to the 1998 legislation, H.R. 3150, a nascent "Chapter 15" for the U.S. Bankruptcy Code, creates the architecture for administration of United States cross-border insolvency cases. Patterned after the United Nations Committee on International Trade Law's Model Law on Cross-Border Insolvency, which was developed over five years and involved forty-five countries, H.R. 3150 establishes a comprehensive mechanism for courts dealing with cross-border insolvency cases.*

*Central to the legislation are two principles:*

*1. United States courts are directed to "cooperate to the maximum extent possible with foreign courts or foreign representatives."*

*2. United States courts are authorized to communicate with foreign courts and foreign representatives, either directly or indirectly.*

*The mandate to cooperate is subject to and limited by the enacting country's "public policy," and the court's discretion, but it is mandatory nonetheless. This mandate assures that, to the extent possible, collaborative and accommodating strategies must be used by judges in transnational insolvency cases. In the context of the entire structure of the new Chapter 15, that means United States judges may, under certain circumstances, defer to or harmonize their procedures and orders with judges of foreign courts."*

Many US State codes of judicial conduct, of which the Michigan Code is a good example,[131] make specific provision for the manner in which a Judge should approach this area.

**"CANON 3:**

*A Judge Should Perform the Duties of Office Impartially and Diligently*

*The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:*

### A. Adjudicative Responsibilities:

*4. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except as follows:*

  a.  *A judge may allow ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits, provided:*

  *  *the judge reasonably believes that no party or counsel for a party will gain a procedural or tactical advantage as a result of the ex parte communication, and*

  *  *the judge makes provision promptly to notify all other parties and counsel for parties of the substance of the ex parte communication and allows an opportunity to respond.*
● *A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.*
● *A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.*
● *A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.*
● *A judge may initiate or consider any ex parte communications when expressly authorized by law to do so."*

## How Would an Australian Court React?

The difficulty with the operation of "judicial communication provisions" is that the common law, absent clear statutory authority, would seem to prohibit such behaviour.

In *Re JRL; Ex parte CJL*,[132] the High Court of Australia dealt with an application for a writ of prohibition against a judge hearing a custody case. The child, the subject matter of the proceedings, was living with the father. There had been extensive counselling and a counsellor had prepared a report. The counsellor was strongly of the view the child should live with the mother. The father sought an adjournment of the proceedings, and when the counsellor learnt there was a prospect of an adjournment being granted, she sought and was granted an audience in private with the judge, who was apparently very concerned that the child had an anxiety neurosis which would deteriorate if she was allowed to stay with the father. The judge, after speaking with the counsellor, immediately called counsel into her chambers and discussed the counsellor's evidence with them.

The High Court by a majority of 3 to 2 granted the writ of prohibition. The minority stressed the peculiar statutory role of the counsellor and the remedial action taken by the trial Judge to invite the parties' representatives in as soon as it occurred to the Judge that the private conversations should not be allowed to continue. The majority, however, said that there had been a clear breach of the fundamental principle *"that a judge must not hear evidence or receive representations from one side behind the back of the other"*. Gibbs CJ said:

*"the principle which forbids a judge to receive representations in private, is not confined to representations made by a party or the legal adviser or witness of a party. It is equally true that a judge should not, in the absence of the parties or their legal representatives, allow any person to communicate to him or her any views of opinions concerning a case which he or she is hearing, with a view to influencing the conduct of the case. Indeed, any interference with a judge, by private communication or otherwise, for the purpose of influencing his or her decision in a case is a serious contempt of court."*

Mason J in his judgment made it clear that parliament could override the principle that

*"a judge is to try a case on the evidence and arguments presented in open court by the parties or their legal representatives by reference to those matters alone."*

Brennan J said:

*"it would require at least statutory authority to permit a judge to discuss with a counsellor out of court any question of substance relating to an issue in proceedings for custody pending before that judge."*

His Honour went further, however, by saying:

*"that jurisdiction to determine [proceedings for custody] is a matter vested in the Family Court, and it cannot be exercised in the privacy of a judge's chambers. This is incompatible with the intention of the parliament"*

In *McOwan*,[133] the wife took the children to England for a holiday. Within a week of arrival she decided not to return to Australia. The following week the husband commenced proceedings in the Family Court of Australia for sole custody and sought an order for return of the children. The wife's response was to commence some proceedings in England seeking ex parte orders prohibiting the removal of the children from England. The husband then responded with an application in England under the Hague Convention and the wife was ordered to return the children to Australia, which she did on 25 August 1993. Two days after her arrival, the husband filed a Notice of Discontinuance in the Australian proceedings. The wife then applied for legal aid, trying to seek orders to enable her to return to England, but aid was refused.

Apparently at the behest of the maternal grandparents, Johnson J wrote from the Royal Courts of Justice to the Chief Justice of the Family Court of Australia a letter in the following terms:

*"I have now had a rather sad letter from the maternal grandmother and I enclose a copy of her two letters, and my brief acknowledgment, together with copy of my order.*

*I wonder if you could pass this on to someone who might be able to give the matter some attention. These Hague Convention cases do sometimes seem to produce harsh results, but the policy is clear.*

*Obviously I am not suggesting there is anything amiss in the way the matter is being handled in Australia; my intervention is simply as a matter of humanity, and to show that we do care."*

The Chief Justice then summoned the parties and the State Central Authority to court *"for the purpose of enquiring whether proper arrangements have been made*

*for the welfare of the children".*

When the matter came on for hearing the parties sought an adjournment to enable them to further explore the possibility of a reconciliation. The Attorney-General for the Commonwealth of Australia and the State Central Authority were invited to make submissions relating to the procedure that had been adopted to bring the parties to the Court in the absence of an *inter partes* application.

Eventually Kay J was not required to rule upon the submissions as the parties advised the Court they had reconciled. He did, however, publish a judgment setting out the submissions and identifying the issues raised by them. Accordingly to the submissions, as soon as the child was back in Australia the child abduction convention had served its purpose. His Honour concluded that:

*"the provisions of the Hague Convention appear however to limit the role of the Central Authority to securing the safe return of the child, and for making arrangements for organising and securing the effective exercise of rights of access (see Article 7).*

*It would also seem appropriate that the Central Authority should be required to enquiry whether appropriate arrangements are made for the welfare of the child once the child is returned in accordance with the Hague Convention order. Unless contracting states can feel reasonably assured that when children are returned under the Hague Convention, their welfare will be protected, there is a serious risk that contracting States and courts will become reluctant to order the return of children."*

## An English Approach

The high water mark of international judicial collaboration in Hague cases might well be the judgment of Singer J in *Re M and J (Abduction International Judicial Collaboration)*,[134] a judgment delivered in Family Division of the High Court of Justice on 16 August 1999. The case was unusual in that the children were in England with both of their parents and it was the maternal great grandmother who was claiming rights of custody under American law and seeking the return of the children.

Both parents had been involved with drug offences. The father had been deported from the United States, the mother had been in prison in the United States, and the children had been placed in the care of their great-grandmother. After the mother's release from prison, she took the children to England without the grandmother's consent. The case raised significant issues as to what would happen to the mother in the event that she tried to go back to California if the children were sent back there. The mother had been in breach of probation in leaving California. The great

grandmother was prepared to leave the children in the mother's care upon her return to California. The trial Judge was concerned of the effect upon the children if the mother was arrested at the airport. That led the trial Judge, with the permission of the parties, to communicating with a Californian judge. The Californian judge, Ferrari J, advised Singer J that with the assent of the District Attorney he was able there and then to recall and quash the warrant for the mother's arrest and reinstate the mother's probation and to take no further action until issues relating to the children had been resolved. The next day Ferrari J made an order and faxed a copy of it to Singer J.

Singer J then had a telephone conversation with the mother's counsel and counsel for the great-grandmother. It was agreed he should then speak to Gutman J, the supervising judge of the Family Law Department of Los Angeles Superior Court to arrange the swift listing of a hearing to determine what orders might be made in advance of a return so as to regulate the position of the children pending such a hearing. The discussions between Gutman J and Singer J are set out in length in the reported judgment in this case. There then followed an adjourned hearing for ongoing email and fax contact between various judges. Glitches were overcome with continued trans-Atlantic telephone conversations . All in all, Singer J thought it was a very worthwhile exercise.

In his commentary on the case, William M Hilton said:

"The views of Justice Singer, a well respected judge of the English High Court and a judge well versed in The Convention, as to judicial collaboration exemplifies the highest standards of the reach of The Convention.

This is the second known case under The Convention where judicial collaboration has been used, the first being Diab vs Benoit (Canada 1996) Prov. of Quebec, Dist. of Terrebonne No 700-04-001386-967, available on Hilton House Web Site as: http://www.hiltonhouse.com/cases/Diab_cdn.txt

The concept of judicial collaboration should be used whenever there is any concern about the logistics of returning a child to his/her habitual residence.

Judicial collaboration can and should be used when ever there needs to be a seamless movement of children from one contracting state to another.

The High Court's use of E-Mail, telephone contact and FAX are in harmony with Art. 7(h) of The Convention:

". . . to provide such administrative arrangements as may be necessary and appropriate to secure the safe

*return of the child."*


*The proper and effective use of judicial collaboration may also seen by the recent
United States Court of Appeals Case Blondin v Dubois (2nd Cir 1999) --- Fed.
App.3d ---; No.98-2834; 17 Aug 1999, available on Hilton House Web Site."*

## Concluding Thoughts on Judicial Communication

It seems that the key to legitimacy of judicial cooperation, absent clear statutory
authority, has to be the consent of the parties had and obtained. It would therefore
be wise for judicial decision-makers to create a record of all the communications
and to keep the parties informed of the nature of those communications. It would
also be prudent to have the outcome of the communications confirmed in writing,
either via fax or email, and copies provided to all parties affected by them.

In short, providing justice can be seen to be done, judicial cooperation in Hague
cases is to be encouraged.

# END NOTES

[1] Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, January 1998,
p.10.

[2] Regulation 5(1)(c) of the *Family Law (Child Abduction Convention) Regulations*.

[3] (1994) FLC ¶92-451.

[4] (1994) FLC ¶92-451at 80,692.

[5] An important point raised at the Washington Conference by the delegation from the
United Kingdom was that the approach of courts in contracting States to applications for
relocation of a child or "leave to remove a child from the jurisdiction" will impact upon the
tendency for children to be removed illicitly. The most recent Australian authority in this
regard provides guideline guidance to the correct approach to such applications which are
determined according to the paramountcy principle: *A and A : Relocation Approach* [2000]
FamCA 751 sourced from http://www.familycourt.gov.au/html/2000.html applying the
High Court of Australia decision in *AIF v AMS* (1999) FLC ¶92-852.

[6] (1993) FLC ¶92-416.

7 A significant relevant feature of the Australian court system is that while first instance jurisdiction under the *Family Law Act* 1975 (Cth) is widely dispersed, all appeals from such matters, including appeals from decisions under the *Family Law (Child Abduction Convention) Regulations* are heard by the Full Court of the Family Court of Australia (which typically comprises three judges, at least two of whom are members of the Appeal Division of the Court) thereby assisting in the development of a specialist intermediate level appellate level jurisprudence. At present, there are seven judges of the Appeal Division: Nicholson CJ, Ellis, Lindenmayer, Finn, Kay, Holden and Coleman JJ. Appeals from the Full Court of the Family Court of Australia are by special leave or certificate to the highest court of the land, the High Court of Australia.

8 (1993) FLC ¶92-416 at 80,258-9.

9 (1995) FLC ¶92-551.

10 See para. 19 of the Explanatory Report of the Convention (*Actes et documentes de la Quatorzieme session 6 au 25 Octobre 1980, Tome III*); see also A.E. Anton, (1980) "The Hague Convention on International Child Abduction", Vol 30 *International and Comparative Law Quarterly*, at 542. *McCall's* case also rejected an argument that there was an inconsistency between the Convention and the United Nations Convention on the Rights of the Child, thereby endorsing a view which had expressed in *Murray's* case.

11 *C v C* (1989) 1 WLR 654 (CA); also indexed as *Re C (A Minor)(Abduction* [1989] 1 FLR 403.

12 (1998) Fam LR 7 (decision delivered 29 April 1992, Second Division of the Inner House, Court of Session); see *Singh v Singh* (1997) SC 68 concerning welfare considerations once an exception to the policy of return has been made out.

13 *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996); see also PH Pfund "The Hague Convention on International Child Abduction, the International Child Abduction Remedies Act, and the Need for Availability of Counsel for all Petitioners" (1990) XXIV *Family Law Quarterly*, No.1 at p. 39.

14 [1994] NZFLR 132 per Hammond J.

15 [1996] 2 NZLR 517; also indexed as *A v A* [1996] NZFLR 529.

16 [1999] IESC 8 (8th December 1999) at para 31 sourced from http://www.bailii.org/ie/cases/IESC/1999/8.html.

17 (1994) 6 RFL (4th) 290 at 318. See also *W.(V.) v. S. (D.)*, [1996] 2 S.C.R. 108 at paras 76 and 77 sourced from http://www.canlii.org/ca/cas/scc/1996/1996scc48.html.

[18] (1996) FLC ¶92-706.

[19] *Family Law (Child Abduction Convention) Regulations* made pursuant to s111B of the *Family Law Act* 1975 (Cth) with jurisdiction conferred by s 39(5)(d) of the Act; the constitutional validity of the Regulations as they then stood was confirmed by the Full Court of the Family Court of Australia in *McCall and McCall:State Central Authority (Applicant); Attorney-General (Intervener)* (1995) FLC ¶92-551. The present regulations were held to be valid by the High Court of Australia in *DJL v The Central Authority* (2000) FLC ¶93-015 (*Laing v The Central Authority* (1999) FLC ¶92-849 on appeal).

[20] The Australian approach of drafting Regulations led to a range of interpretative difficulties: see the discussion by the Full Court in *Laing v The Central Authority* (1999) FLC 92-849.

[21] (1996) FLC ¶92-706 per Brennan CJ, Dawson, Toohey, Gaudron, McHugh and Gummow JJ.

[22] (1996) FLC ¶92-706 at 83,454-5. See also the discussion by Kirby J at 83,468-9.

[23] Articles 12 and 13 of the Convention set out defences to the obligation to order return:

*"Article 12*

*Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.*

*The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child unless it is demonstrated that the child is now settled in its new environment.*

*Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.*

*"Article 13*

*Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—*

*a the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had*

*consented to or subsequently acquiesced in the removal or retention; or*
*b there is a grave risk that his or her return would expose the child to physical or*
*psychological harm or otherwise place the child in an intolerable situation.*
*The judicial or administrative authority may also refuse to order the return of the child if it*
*finds that the child objects to being returned and has attained an age and degree of*
*maturity at which it is appropriate to take account of its views.*
*In considering the circumstances referred to in this Article, the judicial and administrative*
*authorities shall take into account the information relating to the social background of the*
*child provided by the Central Authority or other competent authority of the child's habitual*
*residence."*

In respect of Article 13b, the "grave risk" defence is usually based on alleged abuse. The High Court of Australia has granted special leave to appeal in a case where a child's disability (autism) is denied by the left-behind parent and said to lead to grave risk of psychological or physical harm or other intolerable situation if the child is returned. Evidence as to whether there is a facility for the treatment of the child would also seem in issue. The Full Court of the Family Court of Australia judgment upholding the trial Judge's decision to order return to Greece is *P v Commonwealth Central Authority* [2000] FamCA 461 sourced from http://www.familycourt.gov.au/judge/2000/html/p_text.html. Special leave to appeal to the High Court of Australia was granted on 24 November 2000 – *D.P. v Commonwealth Central Authority* (D5-00); transcript of the special leave hearing sourced from http://www.hcourt.gov.au.

24 *Re T (Abduction: Children's Objections to Return* [2000] 2 FLR 192 at 220, Sedley and Simon Brown LJJ agreeing.

25 [1996] 2 NZLR 517; also indexed as *A v A* [1996] NZFLR 529.

26 [1996] 2 NZLR 517 at 522-3. See also *P.Q. Petitioner* (27 April 2000, Outer House, Court of Session) sourced from http://www.scotcourts.gov.uk/opinions/PAT1004.html. There, Lady Paton at first instance in the Outer House of the Court of Session found a grave risk defence made out. The case involved allegations of physical and sexual abuse of the children by their father, where the mother had, from the start, brought the allegations to the attention of the authorities and the courts in the abducted-from country (c.f., *Starr v. Starr*, 1999 S.L.T. 335). Lady Paton said (at para 65): "*The facts speak for themselves, and in the rather unusual circumstances of this case, I consider that there is indeed reason to assume that the courts in France might not, for whatever reason, be able or willing to provide adequate protection for G and B (cf. Friedrich cit. sup.) … As was emphasised in Friedrich v Friedrich, cit. sup., the reason for any apparent lack of ability or willingness on the part of a Hague Convention court to provide adequate procedures or remedies is irrelevant. The explanation might be a lacuna in the legal system itself (which is unlikely in view of the highly-developed and sophisticated system existing in France), or it might simply be the personal view or judgement of someone operating within the system, or some other reason. I do not consider that it is necessary for R.S.* [the respondent mother to the application for return] *to establish whether the lack of protection resulted from the court system itself or from the actings or decisions of particular office-bearers within that*

*system or from some other source. Applying the test in Friedrich v Friedrich, ("when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection"), it is unnecessary in my view to identify or to explain the reason for any apparent incapacity or unwillingness to provide adequate protection.".*

27 One important social context is the frequent claim of child abuse and/or domestic violence by abducting mothers: see Miranda Kaye (1999) "The Hague Convention and the Flight From Domestic Violence: How Women and Children are Being Returned By Coach and Four" Vol 13 *International Journal of Law, Policy and the Family* 191.

28 The Honourable Alastair Nicholson *Advancing Children's Rights and Interests : The Need for Better Inter-Governmental Collaboration*, the 1996 Sir Ronald Wilson Lecture, Perth Australia, 13 November 1996, sourced from http://www.familycourt.gov.au/papers/html/nicholson2.html.

29 *Report of the third Special Commission meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html.

30 Jennifer Degeling, *The Welfare of the Child on Return to their Country of Habitual Residence*, Paper presented at the Biennial Conference for State and Commonwealth Central Authorities, Canberra Australia, 27-28 October 1999.

31 *Report of the third Special Commision meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html at page 22.

32 *Report of the third Special Commision meeting to review the operation of the Hague Convention on the Civil Aspects of International Child Abduction (17-21 March 1997)* drawn up by the Permanent Bureau, sourced from http://www.hcch.net/e/conventions/reports28e.html at page 23.

33 Jennifer Degeling *The Welfare of the Child on Return to their Country of Habitual Residence*, Paper presented at the Biennial Conference for State and Commonwealth Central Authorities, Canberra Australia, 27-28 October 1999. In this regard, it should be a weight towards confidence in returning children to Australia that most delegate State and Territory Central Authorities of Australia are the heads of the government departments responsible for child protection and a further two are Commissioners of the Police Service of that State. Contracting States can therefore legitimately expect that all delegate State and Territory Central Authorities should have close and efficient operational working arrangements between child protection and police services, especially the units with

responsibility for the criminal aspects of family violence allegations. Of course, contracting States with otherwise located Central Authorities may have protocols or other systemic mechanisms which have the same benefits.

34 Australia, England and Wales, New Zealand, Canada (New Brunswick, Saskatchewan, Quebec) and United States of America.

35 David Harris QC *Is the Strength of the Hague Convention Being Diluted by the Courts?* Paper presented at the 8th National Family Law Conference, Hobart Australia 24-28 October 1998 at para 5.64.

36 [1989] 1 FLR 403.

37 [1995] 1 FLR 1021.

38 [1995] 1 FLR 1021 at 1024-5.

39 (1994) 6 RFL (4th) 290 at 318.

40 (1994) 6 RFL (4th) 290 at 318 per Lamer C.J. and La Forest, Sopinka, Gonthier, Cory and Iacobucci JJ; the minority of L'Heureux-Dubé J and McLachlin J (as she then was) held that domestic legislation permitting "transitory orders" could also be invoked *"provided, of course, as is the case here, that the purpose of the transitory order not be to hamper the objectives of the Convention and that the return of the child in the proper jurisdiction not be delayed to the point of frustrating the purpose of the Convention*" (emphasis in the original).

41 [1989] 1 FLR 403.

42 [1989] 2 FLR 475.

43 [1995] 1 ILRM 201.

44 The headnote states: *"Budd J ordered that the child should be returned to Spain on the implementation of certain conditions. The conditions were to the effect that the plaintiff should provide accommodation for the defendant and the child, appropriate maintenance for the child until she was 18, and health insurance for the defendant and child. Furthermore, he should provide for the child's education and supply funds to enable the defendant and the child to travel to Ireland twice a year."*

45 (1998) Fam LR 7 (decision delivered 29 April 1992) - the Second Division of the Inner House of the Court of Session.

46 (1998) Fam LR 7 at 11.

47 [1999] ScotCS 114 (1st June, 1999) sourced from http://www.scotcourts.gov.uk/ opinions/P6_4_99.html

48 [1999] ScotCS 114 (1st June, 1999) at para 12 sourced from http://www.scotcourts. gov.uk/opinions/P6_4_99.html

49 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

50 (3rd Cir. 1995) 63 Fed.3d 217 sourced from http://www.hiltonhouse.com. Although there was dissent as to other matters, there would seem to have been no conflict of view in respect of undertakings.

51 Sourced from http://laws.lp.findlaw.com/getcase/1st/case/991747.html.

52 [1996] 2 NZLR 517 (CA); also indexed as *A v A* [1996] NZFLR 529.

53 [1996] 2 NZLR 517 at 524.

54 (1994) FLC ¶92-451.

55 Regulation 14(1) includes *"an order for the return of the child to the country in which he or she habitually resided immediately before his or her removal or retention"*. Regulation 16 sets out how a court must deal with applications under reg 14(1).

56 (1996) FLC ¶92-706.

57 (1996) FLC ¶92-706 at 83,456-7.

58 (1996) FLC ¶92-706.

59 (1993) FLC ¶92-424.

60 *Police Commissioner of South Australia v Temple* (1993) FLC ¶92-365.

61 *Police Commissioner of South Australia v Temple* (1993) FLC ¶92-365 at 80,363.

62 (1999) FLC ¶92-842.

63 The undertakings were as follows:

"PROVIDED *the FATHER files an Undertaking in Form 41A in this Court and, in respect of Undertakings in paragraphs (c), (d), (e) and (f) carries them into effect:*

*a) that he agrees and will agree to a Stay of the Orders, if any, of the courts in the United States of America, relating to the custody of the children and he will not remove, nor support the removal, of the children from the care and control of the MOTHER until the issue of custody is heard and determined by those Courts;*

*(b) that he agrees to co-operate with the MOTHER to ensure that the Courts of the United States of America determine the issue of custody of the children without delay;*

*(c) that he will take all necessary steps to support the MOTHER's applications to Immigration authorities in the United States of America for her and the children to return to and remain in that country as long as necessary to enable the issue of custody of the children to be heard and determined by the Courts of that country.*

*(d) that he will pay to the Australian Central Authority sufficient moneys to pay for airline tickets from Australia to the United States of America for the MOTHER and the children.*

*(e) that he will pay to the Australian Central Authority for the payment to the MOTHER the sum of $US5,000 to cover the initial cost of temporary accommodation for the MOTHER and the children.*

*(f) that he will pay to the Australian Central Authority for payment to the MOTHER the sum of $US5,000 to cover the initial cost of living expenses for 14 days for the MOTHER and the children."* (1999) FLC ¶92-842 at 85,856-7.

64 (1999) FLC ¶92-842 at 85,858.

65 (1994) FLC ¶92-451.

66 (1994) FLC ¶92-451at 80,691.

67 The Honourable Joseph Victor Kay *The Hague Convention – Order or Chaos? An update on a paper first delivered to a Family Law Conference in Adelaide in 1994*, paper presented at New York University U.S.A, September 1999, sourced from http://www.familycourt.gov.au/papers/html/kay.html

68 [1998] 1 FLR 422.

69 [1998] 1 FLR 422 at 427.

70 18 October 1998 sourced from Lexis.

71 Mrs Justice McGuinness is now a Justice of the Supreme Court of Ireland.

72 At a hearing on 10 February 1998 *inter alia* to enforce the father's undertakings, the trial Judge first discovered that on 13 January 1998, the father had been charged in Italy with offences in connection with the sexual abuse of the child.

73 It is understood that this problem would not arise in the Canadian Province of Quebec under its Civil Code: personal communication with The Honourable Justice Jacques Chamberland.

74 (1993) FLC ¶92-424.

75 (2000) FLC ¶93-007.

76 (2000) FLC ¶93-007 at 87,178.

77 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

78 (2000) FLC ¶93-007.

79 August 10 1995 Correspondence from Department of State "Annex B" to *The Hague Convention and the United States of America: Report on Hague Convention Operations*, Lord Chancellor's Child Abduction Unit Central Authority for England and Wales sourced from http://www.hiltonhouse.com.

80 [1999] EWCA 3184 (15th July, 1999) sourced from http://www.bailii.org/ew/cases/EWCA/1999/3184.html.

81 The cases cited therein are: *re T (Staying Contact in Non-Convention Country)* [1999] 1 FLR 262; *re A (Security for Return to Jurisdiction (Note)* [1999] 2 FLR 1.

82 [2000] 1 FLR 435.

83 In respect of proceedings in Australia see ss69C and 69E *Family Law Act* 1975 (Cth).

84 [2000] 1 FLR 435 at 439.

85 [2000] 1 FLR 435 at 441.

86 In respect of Australia see Part VII Division 13 Subdivisions C and D *Family Law Act* 1975 (Cth) and Schedule 1A of the *Family Law Regulations* 1984 made pursuant to Reg 14. The 1996 Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Cooperation in Respect of Parental Responsibility and Measures for the Protection of Children represents a multi-lateral approach. As at 1 August 2000 the Convention was not yet in force and no common law jurisdiction was a signatory: Linda Silberman (2000) "The 1996 Hague Convention on the Protection of Children: Should the United States Join?" Vol 34 *Family Law Quarterly* 239.

87 Sections 70F and 70L *Family Law Act* 1975 (Cth).

88 See Regulation 23 *Family Law Regulations* 1984.

89 Regulation 23(5) *Family Law Regulations* 1984.

90 Section 70G *Family Law Act* 1975 (Cth).

91 Section 69C *Family Law Act* 1975 (Cth) provides:

"1) Sections 65C, 66F, 67F, 67K and 67T and subsection 68T(4) are express provisions dealing with who may institute particular kinds of proceedings in relation to children.

(2)Any other kind of proceedings under this Act in relation to a child may, unless a contrary intention appears, be instituted by:

(a)either or both of the child's parents; or

(b)the child; or

(c)a grandparent of the child; or

(d)any other person concerned with the care, welfare or development of the child."


Section 69E Family Law Act 1975 provides.

"1) Proceedings may be instituted under this Act in relation to a child only if:

(a) the child is present in Australia on the relevant day (as defined in subsection (2)); or

*(b) the child is an Australian citizen, or is ordinarily resident in Australia, on the relevant day; or*

*(c) a parent of the child is an Australian citizen, is ordinarily resident in Australia, or is present in Australia, on the relevant day; or*

*(d) a party to the proceedings is an Australian citizen, is ordinarily resident in Australia, or is present in Australia, on the relevant day; or*

*(e) it would be in accordance with a treaty or arrangement in force between Australia and an overseas jurisdiction, or the common law rules of private international law, for the court to exercise jurisdiction in the proceedings.*

*(2) In this section:*
*relevant day, in relation to proceedings, means:*

*(a) if the application instituting the proceedings is filed in a court—the day on which the application is filed; or*

*(b) in any other case—the day on which the application instituting the proceedings is made."*

[92] [2000] 1 FLR 435.

[93] Paul Ward (1999) "Common Law Undertakings and the Civil Code - The Irish Experience" *Fam Law* 50.

[94] Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, January 1998.

[95] Section 65ZA (for completed proceedings and s65ZB (for pending proceedings) of the *Family Law Act* 1975 (Cth).

[96] Section 4AB of the *Crimes Act 1904* (Cth) provides that the monetary value of a penalty unit is $112.

[97] Section 35 of the Family Law Act 1975 (Cth) provides that the Family Court of Australia has the same powers to punish contempts of its power and authority as is possessed by the High Court Australia but section 35 is made subject to s112AP.

[98] *In the Marriage of Vergis* (1977) 3 Fam LR 11,398, FLC ¶90-275.

[99] Section 112AD of the *Family Law Act* 1975 (Cth).

100 Australian Law Reform Commission, *Contempt*, ALRC 35, 1987.

101 *In the Marriage of Schwartzkopf* (1992) 15 Fam LR 545, FLC ¶92-303.

102 *In the Marriage of Lindsay,* (1995) 19 Fam LR 649.

103 National Children and Youth Law Centre, *Submission to the Family Law Council Inquiry into Parental Child Abduction, Commonwealth of Australia*, 1998, p26.

104 Family Law Council, *Parental Child Abduction*, Commonwealth of Australia, 1998, pp31-32.

105 Should be 15. Regulation 16 is really a "sign post" provision setting out when the Court must not and may make orders for return.

106 Regulation 15(1)(b).

107 See generally Preamble and Article 1(a).

108 [1998] FamCA 1557; (1998) FLC ¶92-831.

109 See *DJL v The Central Authority* (2000) FLC ¶93-015 (*Laing v The Central Authority* (1999) FLC ¶92-849 on appeal to the High Court of Australia).

110 [1998] FamCA 1557; (1998) FLC ¶92-831.

111 As part of the obligations of the Central Authority to secure the whereabouts of the child and take provisional measures (Article 7(b) of the Convention).

112 Section 35 *Family Law Act* 1975 (Cth).

113 Family Court of Australia, Family Court of Western Australia, Federal Magistrates Service.

114 Section 112AP *Family Law Act* 1975 (Cth).

115 Section 112AD *Family Law Act* 1975 (Cth).

116 Section 112AA *Family Law Act* 1975 (Cth)

117 Section 4 *Family Law Act* 1975 (Cth).

118 Section 112AD(4) *Family Law Act* 1975 (Cth).

119 (unreported), Family Court of Australia, 5 December 1997.

120 (unreported), Family Court of Australia, 8 June 1999.

121 (unreported) Family Court of Australia, Bell J 24 March 1999.

122 [1998] 1 FLR 422.

123 Reported as Re: *HB (Abduction: Child Objections) (No. 2)* [1998] 1 FLR 564.

124 [1999] NSWSC 644 sourced from http://www.austlii.edu.au/au/cases/nsw/supreme_ct/1999/644.html.

125 *Re: Baby A* [1999] NSWSC 787 sourced from http://www.austlii.edu.au/au/cases/nsw/supreme_ct/1999/787.html.

126 See article by John Eades, *Law Society Journal* (February 2000) p. 52.

127 *Secretary, Department of Health and Community Services v. JWB and SMB (Marion's Case)* (1992) 175 CLR 218.

128 Section 67ZC *Family Law Act* 1975 (Cth).

129 Richard Crouch, Attorney, discussing the US *Parental Kidnapping Prevention Act* (The PKPA) http://patriot.net/~crouch/flnc/abd.html.

130 *The Colorado Lawyer* March 1999 Vol. 28, No. 3 http://www.cobar.org/tcl/1999/march/judges.htm.

131 *Adopted by the Michigan Supreme Court effective October 1, 1974, incorporating amendments effective through January 18, 1994* http://www.michbar.org/directory/code.html.

132 (1986) 10 Fam LR 917.

133 (1993) 17 Fam LR 377; (1994) FLC ¶92-451.

134 [2000] 1 FLR 803.

Return to Judicial Education on International Parental Child Abduction Information

     

The 'faces' of abducted children span international boundaries

Please contact webmaster@parentinternational.com with questions or comments about this site

**REF: 3415969**

FA SALLY JENNINGS
TCCC=OPERATIONS MONITERING CENTER

**Dear Sally Jennings, 10417**

# RE: CONCERNING THE MANUFACTURING AND TRANSMISSION, USING THE INTERNATIONAL YAHOO BACKBONE; LICENSED TO AUSTRALIA, OF AARON SIMMONS DOCUMENTS ALREADY IN YOUR POSSESSION, TO COMMIT CRIME.

I am bringing to your attention a transmission of agent Terry Baker questioning how I was in possession of commonwealth and state documents of Aaron Simmons.

Based on this admission and my reply I believe you have jurisdiction to prosecute those involved in the transmission of these documents.

I am now in including from the Crimes Act the relevant portions so that you can better understand and have full knowledge through the act itself and jurisdiction over the prosecution of this complaint.

I will also include NSW AND QUEENSLAND state crime overlap if you wish to complete your understanding and information.

**FIRST**

AARON SIMMONS documents were transmitted using the Yahoo Interface.

I have checked with Yahoo in America to see if they gave special permission to Australia to bypass the criminal aspects of the license issued. I will email you the relevant portion in the next email after consulting with Yahoo America Legal and they study the documents and give a formal written opinion.

I am venturing to guess that these documents were transmitted from TWEED HEADS WEST NSW but I am not quite sure until Yahoo America and Attorney General In

America confirm. but the data is transmitted back and forth between NWS into Queensland.

Yahoo America will locate the ISP and heard pen registers and I will send you that data at a later date.
The data from the document and its use is included as a State Federal Interface,

One use of the data document is the illegal transportation of my Child Nara from Queensland into NSW and A police report stands clear in Maclean NSW but not in Pottsville NSW. I have already sent you this.


### 3AA  State offences that have a federal aspect

*Object*

(1A)  The object of this section is to identify State offences that have a federal aspect because:

    (a)  they potentially fall within Commonwealth legislative power because of the elements of the State offence; or

    (b)  they potentially fall within Commonwealth legislative power because of the circumstances in which the State offence was committed (whether or not those circumstances are expressed to be acts or omissions involved in committing the offence); or

    (c)  the Australian Federal Police investigating them is incidental to the Australian Federal Police investigating an offence against a law of the Commonwealth or a Territory.

*State offences that have a federal aspect*

(1)  For the purposes of this Act, a State offence has a ***federal aspect*** if, and only if:

    (a)  both:

      (i)  the State offence is not an ancillary offence; and

      (ii)  assuming that the provision creating the State offence had been enacted by the Parliament of the Commonwealth instead of by the Parliament of the State—the provision would have been a valid law of the Commonwealth; or

    (b)  both:

      (i)  the State offence is an ancillary offence that relates to a particular primary offence; and

      (ii)  assuming that the provision creating the primary offence had been enacted by the Parliament of the Commonwealth instead of by the Parliament of the State—the provision would have been a valid law of the Commonwealth; or

(c)assuming that the Parliament of the Commonwealth had enacted a provision that created an offence penalising the specific acts or omissions involved in committing the State offence—that provision would have been a valid law of the Commonwealth; or

(d) both:

(i) the Australian Federal Police is investigating a matter relating to a relevant criminal activity that relates to an offence against a law of the Commonwealth or a Territory; and

(ii) if the Australian Federal Police is investigating, or were to investigate, a matter relating to a relevant criminal activity that relates to the State offence—that investigation is, or would be, incidental to the investigation mentioned in subparagraph (i).

*Specificity of acts or omissions*

(2)     For the purposes of paragraph (1)(c), the specificity of the acts or omissions involved in committing a State offence is to be determined having regard to the circumstances in which the

offence was committed (whether or not those circumstances are expressed to be elements of the offence).

*State offences covered by paragraph (1)(c)*

(3) A State offence is taken to be covered by paragraph (1)(c) if the conduct constituting the State offence:

(a) affects the interests of:

(i) the Commonwealth; or **Terry Baker Federal Agent was quite adamant on this point and I will use it as evidence.**

(ii) an authority of the Commonwealth; or **Terry Baker Federal Agent was quite adamant on this point and I will use it as evidence.**

(iii) a constitutional corporation; or

(b) was engaged in by a constitutional corporation; or

(c) was engaged in a Commonwealth place; or

(d) involved the use of a postal service or other like service; or

(e) involved an electronic communication; or     **I have already alleged that the documents were very resolution scanned and using my G4 and High Resolution printer taken by Peter Whalan reproduced in Parkwood QLD.**

(f) involved trade or commerce:

(i) between Australia and places outside Australia; or

(ii) among the States; or

(iii) within a Territory, between a State and a Territory or between 2 Territories; or **I have already alleged that the documents were very resolution scanned in NSW then using para (e) delivered onto my family computer held and being used by Peter and Jane Whalan at 10 county court Parkwood , Queensland and using my G4 and High Resolution printer taken by Peter Whalan reproduced in Parkwood QLD.**

(g) involved:

(i) banking (other than State banking not extending beyond the limits of the State concerned); or

      (ii)  insurance (other than State insurance not extending beyond the limits of the State concerned); or

  (h)  relates to a matter outside Australia; or

  (i)  relates to a matter in respect of which an international agreement to which Australia is a party imposes obligations to which effect could be given by the creation of an offence against the domestic laws of the parties to the agreement; or **Your Email advising me that India was not a signatory to the Hague and Australia is and the violations sent to you are child rights violations. A Human Rights Court has already passed a direction that there are gross violations of the child rights. Further a Supreme Court has passed an opinion on the Human Rights that violations are primarily Australian and Australia must find competent court. And the Consolidated Acts which I can also include contains complete acceptance of Australia's position of Child Rights.**

  (j)  relates to a matter that affects the relations between Australia and another country or countries or is otherwise a subject of international concern. **You have received a number of emails confirming violations, and interpretation and international concern over this matter, from USA, India, Switzerland. USA as far NARA's half brothers and sisters are concerned. Switzerland as far as Nara's aunt is concerned, United Nations, India as far as by brother is concerned. And this will not stop until justice is done.**

(3) Subsection (3) does not limit paragraph (1)(c).


*electronic communication* means a communication of information:

  (a)  whether in the form of text; or

  (b)  whether in the form of data; or

  (c)  whether in the form of speech, music or other sounds; or

  (d)  whether in the form of visual images (animated or otherwise); or

  (e)  whether in any other form; or

  (f)  whether in any combination of forms;

by means of guided and/or unguided electromagnetic energy.

***engage in conduct*** has the same meaning as in the *Criminal Code*.


F/A Sally Jennings this letter contains a format about a complaint and if you don't understand or I have not understood this portion of the law properly as it applies to your jurisdiction please let me know.


Yours Sincerely



Jugvir Inder Singh

# CONSTRUCTING CRIMINAL LAW REFORM AND THE MODEL CRIMINAL CODE[*]

Matthew R. Goode

## 1.    Introduction - The Genesis of The New Movement to Australian Codification of the Criminal Law

The constitutional arrangement in Australia is that the general criminal law is a matter for the States and Territories and not for the Commonwealth. This gives rise to some problems, for, of course, the Commonwealth has its own interests to protect and both should and must enact laws, criminal in nature, to deal with them[1]. The *constitutional* problem that this division of powers produces is not profound - so long as the Commonwealth is acting within the scope of its other nominated powers (and the other Constitutional constraints not relevant to this paper), the offence is constitutional. The consequence of that is, however, that there must exist, side by side, a State/Territory criminal law system dealing with traditional crime (rape, robbery, murder, drink driving, queue jumping and the like) and Commonwealth crime (importing drugs, social security fraud, some environmental offences, Commonwealth property and so on).

But this system produces a substantive problem as well as a constitutional one, and the substantive problem is less well appreciated. If there is no criminal law enacted by the Commonwealth Parliament on a particular question that arises upon a prosecution for a Commonwealth offence, the default system provided is that the court, which is exercising Commonwealth jurisdiction, "picks up" and applies the relevant State or Territory law of the place in which the court is sitting[2]. That would be well and good if the States and Territories maintained a modicum of consistency, if not uniformity, in the criminal law or the law of criminal procedure and evidence - but they do not. While, to its credit, the High Court has recently maintained an effort to converge the effect of the criminal laws of the States and Territories[3], it can only go so far, and irreconcilable differences remain. It necessarily follows

---

[*] MR Goode, LLB (Hons) LLM, Managing Solicitor, Attorney-General's Department, South Australia; Adjunct Associate Professor of Law, University of Adelaide. Member of the Model Criminal Code Officers Committee since its inception. The views expressed in this article are personal to the author and cannot be attributed to any other person or organization.

[1] Compare Canada, in which the reverse is true. Still, problems arise with that system too. In Canada, the problem may be somewhat crudely reduced to the question of characterisation - ie whether a provincial (State) law imposing a punishment is a "criminal" law (invalid) or whether it is something else regulatory (valid). Whatever else can be said about the considerable jurisprudence which this fascinating distinction has produced, it can be said that, in the end, considerations of practicality appear to have won the day. See, for example, *Reference Re Firearms Act* [2000] 1 SCR 783.

[2] This result is achieved by ss 79 and 80 of the Commonwealth *Judiciary Act*. A recent interesting example of the process at work is *Sexton* (2000) 116 A Crim R 173. The position is somewhat complicated by s 4 of the Commonwealth *Crimes Act* which provides that "The principles of the common law with respect to criminal liability shall, subject to this Act, apply in relation to offences against this Act". That provision applies only in relation to the *Crimes Act*, and, in any event, raises the question whether there is one Australian common law. It appears that a majority of the High Court now believes that there is but one common law, (*Winfield and Lipohar* (2000) 168 ALR 8) but the question can hardly be regarded as absolutely settled.

[3] See, for example, the efforts that the High Court has taken to try to keep the *Evidence Act* jurisdictions in line with the common law jurisdictions in relation to the "right to silence": *RPS* (2000) 199 CLR 620; *Azzopardi* [2001] HCA 25.

- 2 -

that a Commonwealth prosecution in, for example, Queensland, may well be dictated by legal considerations significantly different from an identical prosecution in, for example, New South Wales. The Commonwealth is entitled to regard that situation as intolerable.

In the recent past, the situation described has become worse from the Commonwealth's point of view because of a steady expansion in Commonwealth legislative power brought about by a centralist succession of High Court judgments[4]. In relation to basic criminal matters, this has, to some extent, been at the expense of State and Territory criminal jurisdiction, but not to any great degree[5]. By and large, it is true to say that "traditional" crime remains a State and Territory responsibility while the Commonwealth has concentrated on newer and more specialised crimes. The major exception to that generalisation is the field of drug offences[6].

While this dichotomy in spheres of influence may have minimised constitutional clashes in claims to *jurisdiction* over criminal matters, the lack of a basic Commonwealth criminal jurisprudence became more problematic as Commonwealth activity in expanding criminalisation increased. A deal of the problem related to a lack of a Commonwealth law about the general principles of criminal responsibility. In 1990, this problem was put quite neatly in the following way:

> "The result is that in many cases the answer to the question what principles of criminal responsibility should be applied in a prosecution for a breach of Commonwealth law will depend on whether the proceedings arose under the *Crimes Act* or under another Commonwealth statute and in the latter case where the court is held. For example a child aged seven can be criminally responsible for an offence against the *Crimes Act* wherever the offence was tried since seven is the age at which criminal responsibility at common law but if the offence charged is a breach of any other Commonwealth statute, a child under the age of eight would not be criminally responsible if the court were held in Victoria or the Australian Capital Territory and a child under the age of ten would not be criminally responsible if the court were held in New South Wales, Queensland, South Australia or the Northern Territory. However, a child aged seven would remain criminally responsible in Western Australia and Tasmania.".[7]

The Commonwealth Government established a body called the "Review of Commonwealth Criminal Law" to deal with this problem (the Gibbs Committee). The Committee consisted of retired Chief Justice of the High Court, Sir Harry Gibbs, the Honourable Mr Justice Ray Watson and distinguished public servant Mr Andrew Menzies. The Committee began in the by now time honoured fashion by issuing Discussion Papers and then a series of Reports[8]. However, while the

---

[4] For a well read Australian lawyer or person interested in political science, this statement is axiomatic. For the interested outsider to this knowledge, reference may be made to any Australian text on the subject.

[5] Of course, the expansion came at the expense of a great deal of *non-criminal* State jurisdiction.

[6] The Commonwealth, by use of its constitutional power over customs, has enacted primary drugs offences in the *Customs Act* 1901, and, by judicial interpretation, established that, since almost all illegal heroin is imported, the *Customs Act* offences apply to heroin offences within Australia. By contrast, cannabis and amphetamine offences (for example) tend to be dealt with by State and Territory legislation.

[7] Review of Commonwealth Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990) [the Gibbs Committee] at para 3.5.

[8] Review of Commonwealth Criminal Law, *Interim Report, Computer Crime* (November, 1988); Review of Commonwealth Criminal Law, *Interim Report, Detention Before Charge* (March, 1989); Review of Commonwealth

- 3 -

composition of the Committee was distinguished, its reports and recommendations did not always align to the needs and aspirations of the States and Territories, and, as doctrine, its proposals were controversial and subject to well reasoned criticism[9]. This was particularly the case in relation to the Committee's recommendations in relation to the general principles of criminal responsibility[10]. It was not entirely clear that the Review Committee intended that the *entire* criminal law of the Commonwealth should be codified, but it carefully and clearly concluded that the general principles of criminal responsibility should be codified[11]. It is, of course, a nice question whether the Commonwealth criminal law could have any (non-codified) common law component beyond the general principles of criminal responsibility and enacted offences and defences - but that is another impossible question for another time.

In September 1990, the Third International Law Congress was held in Hobart. The codification of Commonwealth criminal law and the recommendations of the Gibbs Committee were considered. The general impression left by the Congress was not only support for the codification of Commonwealth criminal law but, far more importantly, a strong questioning of the extent of the diversity between the criminal laws of the States and Territories[12]. Significantly, the then Attorney-General of Queensland gave a paper at that conference in which he said:

> "Why should a person's criminal responsibility, the punishment which a certain offence carries or even, indeed, whether certain conduct amounts to an offence, vary simply by the crossing of State boundaries? In a country as homogenous as Australia, this amounts to at worst lunacy or at best illogicality."[13].

The fact that it was an Attorney-General of Queensland who was speaking of the need for national uniformity of criminal law and whose extended example of the need for uniformity was the age of consent for sexual behaviour is full of ironies, as will be seen below.

---

Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990); Review of Commonwealth Criminal Law, *Fourth Interim Report,* (November, 1990) [administration of justice offences, offences against government, bribery and corruption, search warrants]; Review of Commonwealth Criminal Law, *Fifth Interim Report,* (June, 1991) [arrest, sentencing, forgery, offences relating to the security and defence of the Commonwealth].

[9] See, generally, Colvin, "Unity and Diversity in Australian Criminal Law: A Comment on the Draft Commonwealth Code" (1991) 15 Crim LJ 82.

[10] See Symposium (1991) 15 Crim LJ 79-152, 157-202.

[11] Review of Commonwealth Criminal Law, *Interim Report, Principles of Criminal Responsibility and Other Matters* (July, 1990) at para 3.12: "The Review Committee considers that the most convenient course... is to codify all relevant principles relating to criminal responsibility. This course should achieve uniformity of principle throughout Australia in Commonwealth criminal trials and should make the relevant principles more readily accessible and, it is hoped, more clear and certain. It should be noted that codification does not necessarily in volve radical reform; the Review Committee would not propose to depart widely from existing principles, but would rather propose generally to restate existing principles whilst at the same time to fill gaps, remove obscurities and correct anomalies.".

[12] See Editorial (1991) 15 Crim LJ 79: "... the often disparate State and Territory criminal laws on the same subject-matter created injustice and inequality before the law; that the time was ripe for the criminal laws of the various States and Territories to be uniformly expressed and applied; and that the Review Committee's report was a viable starting point towards achieving this uniformity.".

[13] The speech is reported in *The Bulletin,* 16 October, 1990 at page 111. "Homogeneity" is, of course, a relative concept. Some might disagree with the argument on that ground, but the point for present purposes is that it was made.

- 4 -

In Brisbane, in April 1991, the Society for the Reform of the Criminal Law staged a major conference on the Gibbs Committee proposals[14]. While the Gibbs proposals themselves were the subject of sustained criticism at a substantive level, the final report of that seminar stated:

> "It therefore appeared that there was reason for optimism that the process of consistent codification of the criminal law in Australia could and should proceed. Delegates from both Code and common law jurisdictions were of a like mind that the process of codification was an important matter to be addressed and should be pursued now. It was an idea whose time was at hand and this country had an opportunity, it was felt, to assume a position as a world leader in the process of formulating, in a codified form, a just system of criminal law, responsive to modern needs, expressed in clear terms and capable of being applied uniformly across the country."[15].

The three themes that seem to have emerged at this point were (a) consistency, if not uniformity across Australian criminal jurisdictions; (b) the overall benefits of codification and (c) the consensus on these objectives by both old Code and common law jurisdictions. One of the objectives of this paper is to study what happened to these themes in practice.

Prior to the Brisbane conference, on 28 June, 1990, the Standing Committee of Attorneys-General ("SCAG") placed the question of the development of a national model criminal code for Australian jurisdictions on its agenda. In order to advance the concept, SCAG established a Committee consisting of an officer from each Australian jurisdiction with expertise in criminal law and criminal justice matters. That Committee was originally known as the Criminal Law Officers Committee ("CLOC"), but, in November 1993, the name was changed to the Model Criminal Code Officers Committee ("MCCOC") in order to reflect the principal remit of the Committee directly[16].

The first formal meeting of the Committee took place in May 1991. In July 1992, the Committee released its first paper, a Discussion Draft on the general principles of criminal responsibility, and, after a great deal of public consultation, including 52 written submissions and a lengthy seminar at the Fourth International Criminal Law Congress in Auckland in 1992, delivered a Final Report to SCAG which was released in December 1992. With the exception of the general principles relating to intoxicated defendants[17], the recommendations in that Final Report formed the basis for the Commonwealth *Criminal Code Bill*, 1994, which was passed by the Commonwealth Parliament in March, 1995[18]. In 1994, both the Commonwealth Government and

---

[14] It was that conference which produced the papers referred to in footnote 9.

[15] From the author's own records. I am unaware that the final communiqué was published at any time.

[16] For general background, see Goode, "Codification of the Australian Criminal Law" (1992) 16 Criminal LJ 5.

[17] The Committee recommended that the law be based on the decision of the High Court in *O'Connor* (1980) 54 ALJR 349 but the Standing Committee decided that it preferred the position taken in *Majewski* [1977] AC 443. That decision is not a principal focus of the discussion which follows. The very interesting debate is well-rehearsed in other places. However, the MCCOC proposed solution to the SCAG decision is an unusual one which has not been well debated.

[18] In December 1993, MCCOC released the first of two Discussion Papers on theft, fraud and related offences. The second Discussion Paper, which dealt with blackmail, forgery, bribery and secret commissions, was released in July, 1994. Both of these Discussion Papers have been the subject of a great deal of public comment. A Final Report encompassing the subject matter of both Discussion Papers was released in late 1995.

- 5 -

the State and Territory Premiers' Leaders Forum endorsed the Model Code project as one of national significance.

## 2.    The Establishment and Composition of MCCOC

The idea of MCCOC was not unusual in a sense, but was unusual in another sense. There have, of course, been many other committees consisting of representatives of each jurisdiction reporting back to SCAG. There is nothing unusual in that. But there were two unusual features of this committee. First, it was composed of representatives who were the principal advisors to their Attorneys-General on crime. This was considered to be vital. MCCOC was meant to be, and was, a committee of highly influential advisors who could get things done and who had good access to their respective Ministers. Second, it was unusual in that the subject matter which was its remit was that normally associated with a law reform commission in some form or another[19]. This was not a law reform commission in the now traditional sense of the word[20], neither, for example, in the nature of its composition nor, importantly in practice, in the fact that the MCCOC task was additional to the work that the members of the Committee performed in the ordinary course of their duties. This latter fact should be borne steadily in mind when one considers the MCCOC legacy (whether one considers it to be significant or not and, if so, in what way).

The initial members of CLOC (later, MCCOC,) were:

| | |
|---|---|
| *Chair*: | Dr David Neal (Director, Policy and Research, Victorian Attorney-General's Department) |
| *NSW* | Mr Peter Berman, (Director, Criminal Law Review Division, NSW Attorney-General's Department) |
| *Queensland* | Mr Peter Svensson, (Legal Consultant, Attorney-General's Department) |
| *Western Australia* | Mr Graeme Scott QC (Crown Counsel) |
| *South Australia* | Mr Matthew Goode (Legal Consultant, Attorney-General's Department) |
| *Tasmania* | Mr Nick Perks, (Crown Prosecutor) |
| *Northern Territory* | Mr Len Flanagan, (DPP) |
| *ACT* | Mr John O'Keefe, (Director, Justice Section, Attorney-General's Department) |
| *Commonwealth* | Mr Herman Woltring (Principal Advisor, Criminal Justice, Attorney-General's Department) |
| | assisted by: Mr Andrew Menzies (Consultant) and Ms Alexis Fraser (Adviser) |

There may appear to be too many prosecutors in that list. Certainly, at the time, Peter Berman, Graeme Scott QC, Nick Perks and Len Flanagan were active prosecutors. But David Neal, Peter

---

[19] For example, codification of the criminal law was the task of the UK Law Commission in that jurisdiction and the Law Reform Commission of Canada in that jurisdiction. The American Model Penal Code was the product of the American Law Institute, but that was an anomalous body conforming to American codification tradition at a time before the law reform commission paradigm was established. The law reform commission paradigm seems not to have taken hold in the United States, perhaps because other institutions of a similar kind served it as well.

[20] See, for example, the description of the characteristics of a typical law reform commission by Sackville, in "The Role of Law Reform Agencies in Australia" (1985) 59 ALJ 151.

- 6 -

Svensson, Matthew Goode, John O'Keefe and Herman Woltring were not - and, what is more, none of the latter could have been known for a prosecution bias. In practice, the accusation that MCCOC did not contain any or sufficient defence representation was made only once to my memory[21]. If anything, MCCOC was criticised far more often and vehemently for being too libertarian rather than not being libertarian enough[22].

Dr David Neal continued as Chair until the election of the Kennett Government in Victoria. The newly elected Victorian Attorney-General was not disposed well to MCCOC and Victorian involvement ceased for about 18 months, until, happily, she relented. After Dr Neal departed as Chair, he continued as a Commonwealth consultant on those matters for which he had become responsible, notably dishonesty offences. Thereafter, the Committee was chaired by Mr Rod Howie QC from New South Wales who successively became Judge Howie and then Mr Justice Howie. The representatives of the various jurisdictions on the Committee over time are detailed in a table attached to this paper.

**3.      What The Committee Did and Reactions To It**

From its beginning, MCCOC proceeded in the traditional way, issuing Discussion Papers and Reports, and taking in comments from all over Australia on both. Both Discussion Papers and Reports had to be, and were, approved for release by vote of SCAG Ministers. A list of these documents is attached as an Appendix to this paper. Almost all of the time, the proceedings of the Committee excited little controversy[23], although, of course, there was consistent attention to the product of the Committee by those to whom the project was central, such as police forces, law societies, bar associations, prosecutors and judicial officers. It is a sad but true fact that Australia legal academics (or indeed, academics from any field) had almost no interest in making submissions to the Committee at all[24]. In my opinion, this says a great deal more about the state of academia specialising in criminal law than it does about the work of the Committee[25]. Be that as it may, the work of the Committee excited major controversy among others worthy of note in three distinct areas.

---

[21] The papers associated with submissions in relation to all the Discussion Papers and Final Reports over ten years are too voluminous to hunt down the reference or to be entirely sure that it only happened the once, but I think that to be right. If memory serves, the context was a submission from the Victorian Bar Association in relation to proposals to restrict the defence "right" to subpoena sexual assault counselling records.
[22] Although the initial formal representation contained no women, it will be seen that that state of affairs did not last long. I do not recall that matter being the subject of criticism at any time.
[23] For example, the MCCOC DP and Report on *Offences Against the Administration of Justice* excited no controversy and appears to have gone pretty well unnoticed (except by the UK Law Commission: *Legislating the Criminal Code: Corruption* (Report No 248, 3 March, 1998). It is not an area of law which appears to excite any attention from legislators, academics or those otherwise involved in the criminal law.
[24] The most notable exceptions to this general statement are Professor David Lanham of the University of Melbourne who made significant comments on the work on fatal and non-fatal offences against the person and criminal jurisdiction, and a number of eloquent feminist academics who made significant contributions to the thinking of the Committee on homicide issues.
[25] Some commentary appeared after the event, when it was far too late to affect the work of the Committee at all. See, for example, Bronitt, "Defending Giorgianni - Part Two: New Solutions for Old Problems in Complicity" (1993) 17 Crim LJ 305; Stuart, "Punishing Corporate Criminals With Restraint" (1995) 6 Crim L Bull 219; Woolf, "The Criminal Code Act 1995 (Cth) - Towards a Realist Vision of Corporate Criminal Liability" (1997) 21 Crim LJ 257; McSherry, "Mental Impairment and Criminal Responsibility: Recent Australian Legislative Reforms" (1999) 23 Crim LJ 135.

- 7 -

(a)    *Principles of Criminal Responsibility: The Queensland Supreme Court*

The Committee decided very early in its life that the very first project in a codification exercise must be the foundational general principles of the criminal law. Hence, the Committee began with a Discussion Paper and Final Report on the general principles. That decision turned out to be absolutely correct. The general principles guided the deliberations of the Committee in its work on the specific offences to be included in the Code in ways which were fundamental to the structure and drafting of the recommended provisions of the Code. The most important of these provisions were those which dealt with default fault elements of offences.

This is not the place to explain in great detail why the general principles took the form that they did. In general terms, the fundamental structure of criminal offences was taken directly from two major sources: the monumental and influential work of Professor Glanville Williams in his *Criminal Law: The General Part*[26] and the very fine judgment of Brennan J (as he then was) in the leading High Court decision of *He Kaw Teh*[27]. It might be thought that these were very good sources. However, the decision to use these sources entailed a decision, not taken lightly, that the basic framework of the general principles would be derived from what might loosely be called common law principles rather than Griffith Code principles. There are two general points to be made about that decision.

The first is a note of explanation for those not familiar with the Australian system of criminal law. As a general proposition, as noted above, criminal law is not a Commonwealth matter. Australian criminal jurisdictions fall generally into one of two kinds. The first are the "common law" jurisdictions. In New South Wales, Victoria, the Australian Capital Territory and South Australia, the criminal law is based on English common law as supplemented, usually extensively, by local statute[28]. By contrast, Queensland, Western Australia, Tasmania and the Northern Territory are what might be termed "Griffith Code" jurisdictions, as their criminal law is codified; based on a form of Criminal Code developed by Sir Samuel Griffith for Queensland at the turn of last century. For present purposes, it is not necessary to go beyond that general distinction.

The second note is that, while both statutory amendments to the common criminal law and statutory amendments to the Griffith Code have often proceeded at least down the same path, the basic assumptions of the general principles of criminal responsibility have become very different over the course of a century. While the common law under the influence of a sequence of High Court decisions culminating in *He Kaw Teh*[29] has proceeded down the route of subjective criminal responsibility, the Griffith Code enacted what was at the time thought to be the common law position of objective criminal responsibility and has remained faithful to that position. The result of this may be illustrated by the general illustrative proposition that, in the common law states, the crime of rape requires proof that the accused knew or was recklessly indifferent to the

---

[26] (Second Ed, 1961).
[27] (1985) 157 CLR 523.
[28] Although those statutes may be very old inheritances indeed.
[29] (1985) 157 CLR 523.

- 8 -

consent of the other party[30], whereas in the Griffith Code jurisdictions, the accused may escape only if he or she was reasonably mistaken as to the consent of the other person[31]. This is not the place to enter into the debate about the wisdom of either outcome. That issue has and no doubt will continue to be debated as a matter of principle in other fora. The point for present purposes is that the difference, in general terms, exists.

MCCOC had to decide what model it would pursue or, to put it in the Australian context and in all reality, what model of criminal liability it would recommend for Australian consistency and for a Commonwealth criminal law. It decided on the common law model, based, as noted above, on Glanville Williams and Brennan J. Why?

??    First, the Griffith Code position was based on the law as it was then thought to be (and certainly was[32]). But the common law has moved on and the Griffith Code has not[33]. The major problem with existing Griffith Codes is that they crystallised the development of the idea of criminal fault in 1900 (or thereabouts), and much has changed for the better in the common law since then. In general terms, the concept of voluntariness has appeared, been developed and taken shape, and the ideas of fault and mistake have been rationalised and developed to a significant degree, both in Australia and in common law and Code systems overseas.

??    Second, the argument about basic fault principles is about *default* principles not *legislated* principles. The real question is - what happens when the Parliament does not state what the fault elements are? Parliament can specify what it wants the law to be if only it has the will to do it. If Parliament wants a particular result, for example, in relation to the rape offence - which is statutory in all jurisdictions - it can simply say so. The fact that this is the real question escaped - and has continued to escape - most critics of the Model Code general principles.

??    Third, the Griffith Code scheme of default no fault has and had no real supporters outside the vested interests in those jurisdictions. For example, the Queensland Criminal Justice Commission advanced the quite ludicrous proposition that the MCCOC draft "introduces many concepts and terminology which are foreign to most States"[34]. That is simply not true. It is true that the subjective fault based approach as a *default proposition* is not the law in four jurisdictions, but it is a fact that all four of those jurisdictions employ all of the concepts in the general principles draft at some point in their criminal justice system.

??    Fourth, flowing from that, when the High Court is given a choice between a subjective fault based regime and a Griffith Code regime, it has adopted the former. An outstanding example is *Chew*[35] which concerned the interpretation of the fault elements of an offence in the Companies (WA) Code.

---

[30] The notorious statement of the principle is *Morgan* [1976] AC 182. See also *Sarragozza* [1984] VR 187; *Tolmie* (1995) 84 A Crim R 295.
[31] *Attorney-General's Reference (No 1)* [1979] WAR 45; *Ingram* [1972] Tas SR 250. However, in *McMaster* (1994) 4 NTLR 92, it was held that the NT version of the Code required proof of subjective fault.

[32] Griffith and other codifiers at the time would have been substantially influenced by such decisions as *Tolson* (1889) 23 QBD 168.
[33] This fact may have considerable implications for an argument about whether codification is a good thing or not.
[34] Submission, October 15, 1992.
[35] (1992) 173 CLR 626.

- 9 -

However, the basic scheme of general principles outlined in the Model Criminal Code ("*the CCA*") was attacked publicly by a senior judicial officer as having a "potential for disaster" and as "an unworkable academic nightmare"[36]. Mr Justice Thomas of the Queensland Supreme Court did not understand the scheme of elements of offences, let alone what follows from it:

> "'The problem', the judge said, 'is that the drafters of the Code have been side-tracked into the metaphysics of action. They have attempted to define all kinds of unlawful human conduct and activity by isolating multiple 'physical elements' and 'fault elements'. .... It is necessary that some parts of the code be mentioned before it can be judged whether it is comprehensible and workable. Don't blame me for the headache you get when you try to understand it - the complexity is the code's, not mine.'"[37].

There is a basic answer to this criticism. It is that "physical elements" and "fault elements" are merely plain English phrases for *actus reus* and *mens rea*, which have been staple criminal law fare for centuries. There is extensive law on the need to distinguish between acts and omissions and the liability consequences that flow from that distinction[38], and the difference between elements of offences which are absolute and those which allow for a defence of reasonable mistake. These basic non-understandings are the subject of classes taught in elementary law courses all over the country. The opinion by Thomas J that the *CCA* analysis of physical elements is an "over-ambitious academic"[39] attempt to reduce human conduct and future legislative action to a tortured and unnecessary classification." is mere unreasoned abuse[40]. It will be shown below that the *CCA* did not complicate that which is already complicated and did, to some considerable degree, simplify and clarify such issues.

In a later letter to the journal, Queensland Chief Judge Pat Shanahan "confined himself" to observing that Queensland had done without "mens rea" and "actus reus" for over 90 years and should not begin now[41]. But the plain fact is that, whether or not the terms "*actus reus*" and "*mens rea*" have been used in the Griffith Code, equivalent concepts have been widely employed in a variety of guises.

---

[36]Among other things. See "Model Criminal Code, Judge fears potential for disaster", *Australian Lawyer*, June 1995 at 12-13. The Model Code team replied in *Australian Lawyer*, August, 1995 at 14-15 and there was further correspondence from Queensland in the *Australian Lawyer*, October 1995 at 6-7.
[37]"Model Criminal Code, Judge fears potential for disaster", *Australian Lawyer*, June 1995 at 12.
[38]This despite the fact that the criminal law has observed such a distinction for over 100 years. The distinction can be traced back to the championship of Macaulay in his work on the Indian Codes [*Notes on the Indian Penal Code*, (1837)] and early common law development; an example is *Smith* (1826) 2 C&P 448, 172 ER 203. Little attention has been paid to the distinction in the Griffith Code, but it is there and it is thought that the distinction has some importance generally (see *Evgeniou* (1964) 37 ALJR 508 at 509). That is not to deny that the distinction between act and omission is very slippery indeed. A minor example can be found in *Fagan* [1969] 1 QB 439 and a very serious example can be found in *Bland's* case [1993] 1 All ER 821 (and cases like it).
[39] It might be noted that Thomas J consistently uses the word "academic" as a term of denigration and abuse. This is all too common is Australian legal culture as well as other non-legal areas of knowledge.
[40]In addition to that quoted above, also "unworkable academic nightmare"; "worse than useless"; "incomprehensible law"; "a career of obfuscation"; "a nightmare" (again); and "this horror". This is the same Mr Justice Thomas who, in the course of wise advice to judges on the appropriate standard of dress for their wives and on "punting" advised: "All things in moderation": Thomas, *Judicial Ethics*, (1988) at 43.
[41]*Australian Lawyer*, October 1995 at 7.

- 10 -

One may compare the reaction of Thomas J with that of Murray J, of the Western Australian Supreme Court, who conducted the most thorough modern review of a Griffith Code to that time. His Honour said to the Senate Legal and Constitutional Legislation Committee about the *CCA*:

> "Time moves on and one's ideas change, but I have become involved in the process of the organisation of this bill and it is lovely to see it come forward. ... I think it is a fine document. I heard, just as Her Honour was leaving, what Judge Yeats said about terminology. It is certainly a very valid point of view. It does have some complexity of terminology, but I think what needs to be clear in our minds is that it is a model, and I hope it would provide a model that would be operative not only in relation to Commonwealth law but would provide a model in relation to state law. There are a number of significant areas which seem to me to embody distinct improvements on the law, both the common law and, in some respects, the Griffith codes."[42].

In fact, the Griffith Codes have grappled with versions of these issues over the years. Apart from the "mystical" WA provision (for example) "An act or omission which renders the person doing the act or omission liable to punishment is called an offence."[43], the notable Griffith Code sections are those dealing with mistake and accident. The judicial gloss on those sections of the Codes shows, conclusively, that they heavily involve what Thomas J believes to be "the metaphysics of action".

To take the most simple of examples, the Griffith Codes did not and do not deal with the (for them) entirely novel idea of recklessness. That necessitated a great deal of what may be called, generously, inventive interpretation in *Vallance*, in the course of which Dixon CJ (to whom, one would have thought, the greatest respect should be shown) stated:

> "... an examination of the Code, in an attempt to answer what might have been supposed one of the simplest problems of the criminal law, leaves no doubt that little help can be found in any natural process of legal reason. The difficulty may lie in the use in the introductory part of the Code of wide abstract statements of principle framed rather to satisfy the analytical conscience of an Austinian jurist than to tell a judge at a criminal trial what he ought to do. It may lie in that because it is followed by many chapters defining particular crimes more often than not in terms adopted long before as occasion demanded by a legislature introducing a new crime or crimes into a common law system, and prone to the use of definitions of a somewhat practical or earthy kind. In the Code these abstractions of doctrine are not the generalised deductions from the particular instances that follow: they come ab extra and speak upon the footing that they will restrain the operation of what follows."[44].

His was, in the result, a minority judgment - but nevertheless, though the High Court judges gave a variety of reasons for their decision, they were unanimous in their view that no-one could be guilty of unlawful wounding unless the accused realised the risk of harm[45].

---

[42]Senate Legal and Constitutional Legislation Committee, *Hansard*, 22 November, 1994 at 271.
[43]WA *Criminal Code*, s 2.
[44]*Vallance* (1961) 108 CLR 56 at 58.
[45]See also, for example, *Bennett* [1990] Tas SR 72.

- 11 -

Mr Justice Thomas and Judge Shanahan might, like the Queensland Criminal Justice Commission in its submission to the Model Code Committee, have politely said that "[t]he meaning of the Code provisions relevant to criminal responsibility are now well understood as a consequence of a body of precedent which has been derived from judicial interpretation of the provisions over the period of almost a century.". But even had they done so, they would have been wrong. Anyone who could call the collection of judicial decisions which includes *Van Den Bemd*[46], *Mamote Kulang*[47], *Hubert*[48] and *Jackson and Hodgetts*[49], let alone the floating jurisprudence on the scope and meaning of s 23, can hardly be called well settled or well understood[50].

The only conclusion that can be made to the criticisms advanced by Mr Justice Thomas is the equivalent to that made by Professor JC Smith to Francis Bennion, who criticised the English Law Commission Code as "over-technical, poor on exposition and a sore puzzle from beginning to end". Professor Smith concluded:

> "Mr Bennion concludes by observing that what really matters is whether his objections are of substance. I agree. In my opinion, they are of no substance. None of them goes to any great issue of principle and in my opinion they are irrelevant or wrong."[51].

Precisely so.

   *(b)    Shock, Horror Teen Sex Incest*

In November, 1996, MCCOC published a Discussion Paper on *Sexual Offences Against the Person.* A storm erupted. The Committee was aware that the topic of sexual offences was bound to generate controversy.   The subject of sexual offences makes many people irritable. Furthermore, in this particular area, the Committee took the view that the history and current state of debate about sexual offences was such that it was absolutely necessary to consider evidentiary and procedural provisions peculiar to charges of sexual offences as well as in the context of consideration of the offences and defences applicable to the area. In addition, SCAG made it clear that it wanted MCCOC to make recommendations about the law as it related to the compelled production of sexual assault counselling notes, which had become a cause celebre at the time, particularly in New South Wales.

It should first be made clear what recommendations did and did not cause the backlash described. Of course the standard issues invited the usual differences of opinion. Those standard issues included whether to retain separate offences of what is commonly called rape and indecent

[46](1994) 179 CLR 137 (HC), (1992) 70 A Crim R 489 (QCCA).
[47](1964) 111 CLR 62.
[48](1993) 67 A Crim R 181.
[49](1989) 44 A Crim R 320.
[50]See, generally, Goode and Leader-Elliott, "Criminal Law" in Baxt and Moore (ed), *An Annual Survey of Australian Law* 1994 at 161-170.
[51]Smith, "The Law Commission's Criminal Law Bill: A Good Start for the Criminal Code" (1995) 16 Statute LR 105 at 108 replying to Bennion, "The Law Commission's Criminal Law Bill: No Way to Draft a Code" (1994) 15 Statute LR 108.

- 12 -

assault or whether to merge them into degrees of sexual assault; whether and to what extent an honest but unreasonable belief in consent would negate criminal liability; the extent to which the complainant's sexual history could be the subject of cross-examination; and the requirements (if any) of corroboration. There were unheralded difficult issues too. Current law commonly does not pay sufficient attention to the balance between allowing people with impaired capacity to consent to have an appropriate sexual relationship (on the one hand) and protecting them from exploitation (on the other hand). The Committee carefully considered these issues and was quite prepared to deal with the genuinely held, if sometimes forcefully opposing views (from a number of sides) about these issues. The Committee was also quite prepared to consult on and take into account the views of those who would, for example, ban access to an alleged victim's counselling records on the one hand and those who thought that any change from the current rules would prejudice the right of the accused to a fair trial on the other hand. The Committee was well aware that certain fringe groups still hold the view that what used to be called "sodomy" should be made a criminal offence, despite the fact that homosexual relations between consenting adults are legal in every Australian jurisdiction.

But the Committee was unprepared for the storm which broke over its collective heads based upon complete and, often, wilful misunderstanding and misrepresentation of the Committee's proposals. The most important example of this was the recommendations about the age of consent. Essentially, the Committee recommended a two tiered age of consent. The first was a "*no defence age*", below which any sexual contact at all would have no defence whatsoever. The Committee suggested that this age should be 10. The second was '*true age of consent*'. This was suggested to be set at 16. Between the ages of 10 and 16, the Committee proposed a number of limited defences: (a) marriage or reasonable belief that there was a marriage; (b) the accused and the victim were not more than 2 years different in age (the sexual experimentation defence); and (c) reasonable belief that the victim was of or above the age of consent.

The Committee received literally thousands of letters on this subject. Almost all of them completely failed to understand the proposals as a result of a campaign of misinformation persistently and wilfully promulgated by an organization calling itself the Australian Christian Coalition. This body conducted an organised campaign, mainly, it seems, in Queensland, on the basis that what the Committee was recommending was the lowering of the age of consent to 10. This was, of course, plainly not true. As opposed to this massive chorus of often highly abusive disapproval[52] based on a false premise, many informed religious organizations and organizations who work with young people supported the Committee's recommendations. These included the Social Issues Committee of the Anglican Diocese of Sydney[53], the Baptist Churches of NSW, the Uniting Church (National Secretary for Social Justice), the Presbyterian Church of Tasmania[54], SA Police, the National Children and Youth Law Centre and the Federation of Community Legal Centres. More simply, a number of submissions revealed that the correspondents were completely unaware of the age of consent in their own jurisdictions, which had sometimes been in place for many years.

---

[52] One submission received stated: "My initial response was that it must have been put together by a panel of paedophiles".
[53] Although that Committee would have preferred the true age of consent to be 18 rather than 16.
[54] Although the Church would have preferred that the "no defence age" to start at 14.

- 13 -

The other proposal which touched some very raw nerves (and prejudices) was the proposal that the criminal offence of incest between consenting adults should be abolished. Again, this proposal was greeted with persistent and wilful misinformation and abuse. This time, it was put about that the Committee was recommending abolition of the law which criminalizes sexual contact between adults and related *children*. That was, of course, simply and completely untrue. The Committee had recommended a sound suite of severe offences dealing with the victimisation of children. The Committee *was* proposing that consenting sexual behaviour between two adults within the prohibited degrees of consanguinity should not be a criminal offence.

Many of those who did understand the proposal still opposed it. Almost all opposition was based either on some peculiar idea of genetics and/or the idea that the criminal law should reflect sexual practices thought to be distasteful or contrary to particular religious conviction by the enactment of a serious criminal offence. The Discussion Paper had dealt quite properly with these objections in advance, but that made no difference to most of these people.

Such was the clamour that groups such as the Australian Christian Coalition had set up, most particularly in Queensland, the then Queensland Attorney-General, Mr Denver Beanland, took the extraordinary step of placing a large public advertisement in the newspapers condemning MCCOC and disassociating himself from its Discussion Paper. Further, in a letter to the editor of "*The Australian*", the Attorney-General declared he would have no part of the Model Criminal Code[55], and, in so doing, repeated the entirely false interpretation of the MCCOC recommendation about the age of consent. He expressed the opinion that anyone who wanted to codify the criminal law should adopt the Queensland Code which had been serving people well for a century. His press release was stronger. It said that "It is an outrage our Federal taxes are being spent on this rubbish.". He moved in SCAG to end the work of the Committee entirely. Happily, that move was not supported, but it signalled an effective end to Queensland participation in the Committee. At no point, of course, did Mr Beanland concern himself with the substantive merits of the policy debate[56].

The reader should not fail to direct the absolutely massive irony in this situation. It was the then Queensland Attorney-General who gave the political impetus to the process that began MCCOC by pointing to what he regarded as the indefensible results of having different rules for the age of consent across Australia. It was another Queensland Attorney-General who, because of the issue of age of consent (in large part) not only tried to stop the work of the Committee but also gave public voice to the great many who would not agree to the reduction of the age of consent in their jurisdiction or who, having heard what it was, simply did not believe it.

All of this placed the Committee is an impossible position. Most respondents thought that there should be a uniform age of consent and, if one took plain numbers, a great many thought that it should be as high as 18. However, in general terms, most Australian jurisdictions have an age of

---

[55] "*The Australian*", 29/4/97 p 8.

[56] It should not be thought that other, less eminent politicians did not repeat this infamous line. In debate on the New South Wales *Crimes Legislation Amendment (Child Sexual Offences) Bill*, the Hon Franca Arena repeated the same calumny (*Hansard*, 28 October, 1998 at p 58). However, in this instance, a properly briefed Attorney-General set the record straight (*Hansard*, 19 November, 1998, pp 66-67).

- 14 -

consent of 16 and those that do not, have an age of 17. For the Committee to move to recommend that the age be raised would be to deprive people of an existing right to have consensual sexual intercourse or sexual touching for absolutely no defensible reason whatsoever. Not only would the right be gone, but such conduct would be the subject of very serious criminal sanctions.

Furthermore, it seemed clear that those who were opposed to the age of consent being set at 16 (as recommended by the Committee) were in large part motivated by prejudice against homosexuality. There is nothing surprising about this, either in conservative community feeling and discourse nor, indeed, in the law. At the time, homosexual sex was entirely illegal in Tasmania, and there were discriminatory provisions involving a raised age of consent (18-21) in Western Australia[57], New South Wales, the Northern Territory and, (of course) Queensland. The Committee was determined not to resile from its view that the age of consent had no rational connection with sexual orientation. There is simply no reason to discriminate. If the general age of consent was 16, and the principle was that there were no rational grounds for discrimination on the basis of sexual orientation, the basis for MCCOC's recommendations is clear. Since that reasoning proved unacceptable, MCCOC was left with no choice but to say, in its Final Report, that it could find no rational basis to depart from the principles that it had formulated, but that, since the general age of consent was quite clearly revealed as a political issue, it could not recommend a fixed age. Instead, it chose to stick by the principles that it had recommended.

The same result was unhappily true for the recommendation about incest. There could be no doubt that thousands of submissions were adamantly opposed to the abolition of the offence, despite the fact that offences against children were comprehensively dealt with by other offences. Few or no submissions were in favour[58]. However, the only argument against the recommendation of the Committee for abolition which might have made any sense in the slightest was the argument that adults who have sexually abused children in the past continue the sexual relationship after the child has passed the age of consent. The idea was that "consent" was vitiated by the compulsion inherent in the previous relationship and the abuse of trust and relative position of power involved. I cannot see the strength of this argument. If there is evidence of sexual abuse in the past, charge and prove it. If there is not, then there is no value in the generalisation. No scientific evidence of any kind was produced in support of this generalisation. Further, sexual offences should be framed (and were recommended by MCCOC) in such a way that abuses of power and position were dealt with in their proper context: that is, for example, the definition of consent, the recommendations concerning persistent sexual abuse of a child and so on. If there was something wrong with these provisions, the Committee was happy to address the problems, and in fact did so with revised recommendations about a raised age of consent in relation to abuse of position of trust by persons in authority.

However, MCCOC was effectively intimidated by the response on incest. It must be remembered that MCCOC was a body representative of and reporting to SCAG, itself a political body of Ministers. If MCCOC so defied the concerted campaign, not only of ignorant interest groups and

---

[57] It appears that the new WA Government is committed to lowering the homosexual age of consent in that State from 21 to 16, the same age as heterosexual consent.
[58] I confess that with the lapse in time, I cannot recall if any were in favour. If there were any, they were small in number.

- 15 -

individuals in their thousands, but also influential politicians and the media prepared to believe them, it would place, if not its existence, then quite possibly its thorough and extensive work on the major part of the structure of sexual offences at severe risk. No Attorney-General can be expected to authorise even the release of recommendations which he or she knows will bring calumny heaped upon his or her head - nor should an Attorney be expected to. So the Committee was compelled to change its mind by the forces of darkness and ignorance. It recommended an offence of incest. But it gave the traditionalists and the moralists exactly what they had asked for - a traditional offence of incest. The recommended offence would criminalise consensual sexual penetration between adults who are parents, sons, daughters, siblings, grandparents and grandchildren (related by birth and not marriage or adoption)[59]. This, of course, caused great angst among those members of the public who wanted to see an expanded incest offence to cover just about every family form or quasi-family form possible. In this form, of course, the offence of incest could well cover the a very large part of the field of child sexual abuse and to that extent render the general offences redundant. Such a result would indeed see the tail wagging the dog.

The same themes can be seen here again. Parochialism loomed large, particularly in Queensland. The (Griffith) Queensland Code was presented (exclusively by Queenslanders) as the best the world had to offer, despite the overwhelming evidence to the contrary and the lack of sustainable substantive argument to support the proposition. And, obviously, populist politics which pander to the lowest common denominator in public discourse prevail. No matter what you say, the louder you shout, the better off you are. Never argue with a person who has a loud hailer.

---

[59] MCCOC, Chapter 5, *Sexual Offences Against the Person: Report* (May 1999) at 187ff, s 5.2.34.

A:\GOODE.DOC

- 16 -

**4.    *Some Thoughts About The Law Reform Process - Thinking It Through***

   *(a)    The MCCOC Objectives and Observations About National Consistency*

It is necessary to be clear about what the Model Code is and what it is not. It is *not* an attempt to force a uniform scheme on any Australian jurisdiction. It is also most definitely *not* an attempt by the Commonwealth to take over the criminal law powers of the States and Territories. It *is* an attempt by a group of experts, with considerable input from widespread community consultation, to put in the public arena a set of best practice basic criminal law provisions in the form of a criminal code which can serve as a model for all Australian jurisdictions to pick up and use in whole or in part when they want to do so. The aim is, in short, voluntary consistency not compulsory uniformity, with the agenda and its results being transparent, owned by all jurisdictions and not just being driven by one. Clearly, of course, the Commonwealth had a greater stake in the codification exercise because it lacked its own enacted criminal law which has led to the great inconvenience outlined at the beginning of this paper. But there are advantages to be had by the established State and Territory jurisdictions as well.

This observation leads me to make some comment on the objectives of national consistency in general. While it is clear that the goal is national consistency in serious criminal offences, none of this should be taken to mean that I think that *everything* should be nationally based, uniform and/or consistent. I do mean to say that it makes no sense at all to have, as we do in this country, a variety of different ages at which consent to sexual intercourse may be given. It is nonsense to say that a person who has consensual sexual intercourse with a 17 year old is guilty of a major crime in one State and no crime at all in another. Equally, I think it to be inescapably wrong for the issue of euthanasia, which is really about the law of homicide, to be decided on a State/Territory rather than a national basis. But I do not think that applies to all criminal justice issues.

For example, there is no reason, in my view, why there should be a national regime about the existence and location of brothels. That is quite clearly a matter on which local communities, probably more local than State and Territory communities, may differ on a rational basis (even if there is often little rational about the debate). Similarly, I think that while the commercial *trade* in illicit recreational drugs should be a national matter, I see no reason why local communities should not determine what policy they want to have on recreational drug *use*. The only question is how local that decision should be.

But what *principles* guide the decision about what should be the subject of national policy and what local and, if local, how local should it be? I am not aware of any work that has been done on this subject. My own view is that the answer depends, not on pre-determined or fixed canons of right and wrong across the policy spectrum, but upon at least three considerations.

The first is a characterisation and identification of the precise nature of the policy issue involved. The second is a public interest analysis of the base of local power appropriate to its resolution. The third is an assessment of the effectiveness and representative quality of the instruments of governance of the locality concerned. I do not pretend that these principles provide *an answer*. I

- 17 -

see no evidence that there is one answer. I do think that it is necessary in the conduct of public affairs to pay careful and sensitive attention to the nature of a given decision and the way in which it affects communities of interest in which the decision has impact.

> (b)    The Significance Of The Record

There is precedent for just such a national consistency codification exercise within a federation. In 1962, the American Law Institute published what it called the Model Penal Code (Proposed Official Draft)[60]. It was, like the MCCOC project, an attempt to provide a model for the consistent codification of the criminal law but, of course, across the United States[61]. It had no Government backing. There were no grandiose claims for implementation strategies and no instant gratification for the years of hard work that had gone into the project. When it came time to celebrate the 25th anniversary of the 1962 draft, however, it was estimated that the Model Penal Code had had a significant influence in the development of the criminal law in at least 37 of the American States[62].

Although, in accordance with what has been said above, Australian progress may be hoped to be more rapid, the record of implementation shown below reveals the beginnings of voluntary consistency based on a public model at successful work. But it would be completely unrealistic to expect that, given a number of factors ranging from the drafting idiosyncrasies of Parliamentary Counsel through to the political gyrations of parties contesting for election victory by law and order auctions, for there to be complete certainty and consistency in any jurisdictional criminal agenda. The MCCOC project should not, for those reasons and by comparison with the experience of other jurisdictions, be seen wholly in terms of its immediate implementation record, although that has been quite good. In an enterprise of this kind, one must take the longer view. The experience of the 1990s has not been good for projects of this kind. The Canadian Government abolished the Law Reform Commission of Canada, which had done an enormous amount of work on a new Criminal Code to replace their current one based on a model developed by Sir James Stephen implemented in the 1890s. The UK Law Commission still exists, but it's reports notoriously languish unimplemented[63], despite repeated calls for action by the legal profession and the judiciary[64]. A similar dismal history even beyond the 1990s has been documented in the United States, despite the influence of the Model Penal Code[65].

One might also usefully compare the record of MCCOC with the recent record of that supposed paragon of jurisdictions, Queensland[66]. Despite the apparent reverence in which the Griffith

---

[60] There were "Tentative Drafts" (which we would call Discussion Papers) at least as early as 1955. An "Official Draft" was released in 1985, but it was the 1962 version which proved to be influential.

[61] See, generally, Wechsler, "The Challenge of a Model Penal Code" (1952) 65 Harvard LR 1097; Schwartz, "The Model Penal Code: An Invitation to Law Reform" (1963) 49 ABAJ 447; Packer, "The Model Penal Code And Beyond" (1963) 63 Columbia LR 594; Wechsler, "Codification of the Criminal Law in the United States: The Model Penal Code" (1968) 68 Columbia LR 1425.

[62] See Symposium (1988) 19 Rutgers LJ Number 3.

[63] The latest in a long series is Law Com 218, *Legislating the Criminal Code: Offences Against The Person and General Principles* (1993) Cmnd 2370.

[64] See, for example, the strong remarks of Lord Ackner in *Savage* [1992] 1 AC 699 at 752.

[65] See Robinson, "Are Criminal Codes Irrelevant?" (1994) 68 So Cal LR 159.

[66] The following account is taken from Kift, "Contemporary Comment" (2001) 25 Crim LJ 28.

- 18 -

Code was held, in the 1990s the same modifying movement was felt in Queensland and in April, 1990, a Criminal Code Review Committee chaired by Mr R O'Regan QC was set up to investigate and draft a new one. This Committee reported in 1992. It therefore ran parallel to the MCCOC General Principles review, but neither touched the other in any way. The O'Regan review was scarcely fundamental. It was in large part a tidying up and modernising exercise which did not examine the foundational structure of the Griffith Code in any meaningful way. Not one of the O'Regan recommendations were enacted. Instead, a completely new a comparatively radical redraft of the entire Criminal Code was produced from the blue in 1994 and enacted as the *Criminal Code*, 1995. I do not intend to go into this in any detail, for two reasons. First, it was accompanied by little analytical explanation and again, a salient point is that it paid no attention to the MCCOC project. Second, it failed to come into operation. The Goss Government, which had enacted it, was defeated at a by-election , lost power, and the new Government scrapped it and announced a new (and third) review. By this time, Mr Beanland was Attorney-General. A new Working Group was set up, which, of course, paid no attention to the MCCOC exercise, and it produced what became the *Criminal Law Amendment Act*, 1997. This was hardly radical stuff. Among other things, it defined "woman" as "including any female", referred to "principle offenders", predictably retained an offence of sodomy punishable by 14 years to life and made other miscellaneous and tidying up amendments[67]. Three superficial but supposedly major reviews of a *Criminal Code* defended as perfect by the judiciary and at least one involved Attorney-General produced what can only be described as a mouse.

  (c)   *Remarks About Law Reform*

I have no doubt at all that the serious criminal offences should be as consistent as possible throughout Australia. I also have no doubt at all that this objective will be difficult to achieve and, if achieved, will take time. The Model Criminal Code is a first big step to providing uniform justice for all Australians. But experience teaches that there are major and serious institutional obstacles to the achievement of nationally consistent legislation, whatever the law reform model used to try for it, even in an area in which all players are agreed on the principles involved. As Duggan has pointed out[68], politicians, bureaucrats, ministerial advisers, drafters of legislation, the public and, where relevant, the consumers or industry all can pose major stumbling blocks, sometimes derived from the promotion of self-interest, to the achievement of the principled result.

  (d)   *Remarks About The Process*

The MCCOC process was and is, in many respects, unique. It did not resemble the traditional law reform agency in any of its guises. That fact was a product of its genesis, but it took on a life of its own because of the dedication and hard work of all of its real participants. Frankly, so far as I am concerned, no praise is too high for those who participated. In its latter stages, MCCOC worked weekends to accommodate the possible participation of full time judicial officers, practicing lawyers and public officials who had full time case loads to cope with so that, in all

---

[67] See, in general, Kift, "How Not To Amend A Criminal Code" (1995) 22 Alt LJ 215.
[68] See the careful analysis of experience in consumer protection laws contained in Duggan, "Some Reflections on Consumer Protection and the Law Reform Process" (1991) 17 Monash ULR 252 at 279ff.

- 19 -

cases, weekend breaks did not exist for those working at that meeting. A great deal of this was completely extra work. They did it anyway. They believed in it and, I think, still do.

There are some, no doubt, who will find the MCCOC process flawed when compared to the traditional "new principle" law reform agencies, such as the highly professional Australian Law Reform Commission and the newly established Victorian Law Reform Commission. It is, of course, absolutely true that MCCOC *appeared* to be much more of an "insiders' club" in its composition and decision-making. But I use the word "appeared" advisedly. True it is that MCCOC was an officials group with no representation from "outside interests" on it. True it is that MCCOC was not "independent" in the sense that, in reporting to SCAG, it was conscious of the fact that its recommendations had to be politically acceptable. The risks of running too close to the wind have been illustrated above. Other examples could be given.

But I would argue that such a view is misconceived. In terms of legal representation, members of the Committee had worked not only in government, but also as prosecutors, defenders, academics and judges. MCCOC adopted the time honoured method of consulting with the community and interest groups by issuing a Discussion Paper before a Final Report. In the case of Sexual Offences, MCCOC conducted public hearings or seminars across the country facilitated by the Commonwealth Office of the Status of Women. And in terms of politics, much has been accurately said about the waste of time and effort involved in law reform bodies' work gathering dust or being substantially modified, because it is, for one thing, politically unacceptable. MCCOC had the advantage of the insider's view on such matters. It also, incidentally, had the very strong advantage of working with professional and dedicated Parliamentary Counsel. Thinking through the idea when trying to get it drafted is a salutary discipline. The same is true for the reader or consumer of the document. Parliamentary Counsel are also not shy about giving instructors the benefit of their views on the policy they are being asked to implement. I should say that no praise is too high for the Parliamentary Counsel with whom the Committee worked.

In the end, MCCOC must be judged by its results. A summary of implementation to date is attached to this paper. I have already remarked that the process of change in the non-Commonwealth jurisdictions must be expected to be incremental. Perhaps we should have another look at what has happened in a decade.

*July, 2001*

## ATTACHMENT 1 - REPRESENTATION

| | NSW | Victoria | SA | WA | Qld | ACT | NT[?] | Tas | C/W | Other[?] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | Mr P Berman, Ms J Orchiston | **Dr D Neal (Chair),** Mr S Bailey | Mr M Goode | Mr G Scott QC | Mr P Svensson | Mr J O'Keefe | Mr R Minahan, Mr L Flanagan QC | Mr N Perks | Mr H Woltring | Mr A Menzies[*], Ms A Fraser |
| 1992 | Mr P Berman, Ms J Orchiston | **Dr D Neal (Chair),** Mr S Bailey | Mr M Goode | Mr G Scott QC (Mr Justice Scott) | Mr P Svensson | Ms D Merryfull, Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | Mr A Menzies, Ms A Fraser |

---

[?] Representation from the Northern Territory was a constant *practical* problem throughout the latter part of the life of the Committee. This was in part due to the tyranny of distance. Public service rules restrict the places in which meetings can be held and it is hard for Territorians to get to those places without taking more time than others. While Mr Flanagan QC was able to attend most meetings, none of his successors played any significant role in the deliberations of the Committee.

[?] Generally, after the first two years it worked out by consensus that the chair of the Committee did not formally represent any particular jurisdiction. The Chair did not, therefore, vote. Therefore, the reader will find the Chair in this column. The purposes for which various people are listed will be detailed separately.

[*] Mr Menzies was a member of the original Gibbs Committee and continued as a consultant to the Commonwealth on CLOC and MCCOC. He was vitally interested in the offences relating to the administration of justice which, although they exc ited little popular attention and controversy, he dealt with in his customary thoughtful and detailed way.

| 1993 | Ms J Orchiston | None[?] | Mr M Goode | Mr M Muller, Mr R Cock | Mr P Svensson | Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | **Dr D Neal, (Chair),** Mr A Menzies, Ms A Fraser |
|------|------|------|------|------|------|------|------|------|------|------|
| 1994 | Ms M Latham | None | Mr M Goode | Mr R Cock, Ms L Jenkins | Mr G Hannigan | Mr J O'Keefe | Mr L Flanagan QC | Mr N Perks | Mr H Woltring | **Mr R Howie QC (Chair),** Mr G McDonald, Ms A Goldman, Dr D Neal, Mr A Menzies, Ms P Supomo[?] |
| 1995 | Ms M Latham | Ms A Cannon | Mr M Goode | Ms L Jenkins | Mr G Hannigan | Ms D Merryfull | Mr L Flanagan QC | Mr N Perks | Mr G McDonald | **Mr R Howie QC (Chair),** Dr D Neal, Ms A Goldman, Mr A Menzies, Ms P Supomo, Ms K O'Rourke, Ms A Will |
| 1996 | Ms M Latham | Ms A Cannon | Mr M Goode | Ms L Jenkins | Mr G Hannigan, Mr D Groth | Ms C Stuart | Mr J Karczewski | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr D Neal, Mr A Menzies, Ms P Supomo, Ms A Will |

[?] As noted elsewhere, for 18 months the then newly elected Liberal Government in Victoria decided not to participate in MCCOC.

[?] Ms Supomo was a consultant provided to the Committee by NSW for the purpose of researching and writing the papers on sexual offences against the person.

| 1997 | Ms M Latham | Ms A Cannon, Mr G Byrne | Mr M Goode | Ms L Jenkins | Mr P Byrne | Ms K Greenland | Mr J Karczewski | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr D Neal, Dr C Howard QC[?] , Mr R Button, Mr A Menzies, Mr I Leader-Elliott[?] , Ms A Will, Ms K O'Rourke, Ms K Merrifield |
|------|------|------|------|------|------|------|------|------|------|------|
| 1998 | Ms M Latham (Judge M Latham) | Mr G Byrne | Mr M Goode | Ms L Jenkins | None[?] | Ms K Greenland | Ms E Kelly, Ms Z Marcham, Mr P Jamieson | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Dr C Howard QC, Mr R Button, Mr I Leader-Elliott, Mr C Pruiti[?] , Mr B Bannerman, Mr A Kristjanson |

---

[?]  Dr Howard is an eminent criminal law academic who was nominated by the Victorian Attorney-General to advise the Committee.

[?]  Mr Leader-Elliott is an eminent academic who was employed by the Commonwealth as a consultant, and who contributed very substantially to the development and writing of the MCCOC work on Criminal Damage and Serious Drug Offences.

[?]  After late 1997, Queensland ceased to provide any representative on the Committee. The reasons for that decision sufficiently appear in the discussion above.

[?]  Mr Pruiti was at the time an officer attached to the Western Australian Crown, whose services were contributed by WA for the development and writing of the MCCOC work on homicide.

| 1999 | Judge M Latham | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland | Ms E Kelly | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Mr I Leader-Elliott |
|------|------|------|------|------|------|------|------|------|------|------|
| 2000 | Mr A Haesler | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland | Ms E Kelly | Mr N Perks | Mr G McDonald | **Judge R Howie (Chair),** Mr I Leader-Elliott, Judge M Latham |
| 2001 | Ms C Loukas | Mr G Byrne | Mr M Goode | Ms L Jenkins | None | Ms K Greenland, Ms A Casimar | Ms E Kelly | Mr N Perks | Mr G McDonald | **Mr Justice R Howie (Chair),** Mr I Leader-Elliott, Judge M Latham, Mr A Haesler |

## ATTACHMENT 2 - PAPERS AND REPORTS[69]

| NAME OF PAPER | CONTENTS | RELEASE |
|---|---|---|
| Chapter 2, Discussion Paper, *General Principles of Criminal Responsibility* | Elements of offences, fault, defences, extensions of criminal responsibility, corporate criminal responsibility, burden of proof | July, 1992<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 2, Final Report, *General Principles of Criminal Responsibility* | As above | December, 1992<br><br>*(Principal Author: Mr Matthew Goode)* |
| **Report on the Abolition of the Year and a Day Rule In Homicide** | Recommending the abolition of the rule that a homicide may not be attributed to an accused if the death occurred more than a year and a day after the act. | 1992 |
| Chapter 3, Discussion Paper, *Theft, Fraud and Related Offences - Part 1* | Theft, fraud, receiving, robbery, burglary | December, 1993<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 3, Discussion Paper, *Blackmail, Forgery, Bribery and Secret Commissions* | Blackmail, forgery, bribery and secret commissions | July, 1994<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 3, Final Report, *Theft, Fraud, Bribery and Related Offences* | Theft, fraud, receiving, robbery, burglary, blackmail, forgery, bribery and secret commissions | December, 1995<br><br>*(Principal Author: Dr David Neal)* |
| **Model Provisions on Mental Impairment** | Detailed draft legislation dealing with all facets of the mentally ill person who commits what would be a crime but for their mental impairment | 1995-1996 |

---

[69] The items listed as official MCCOC publications were published in publicly available material and distributed in book form. The items in bold face were "non Code" projects given to the Committee by SCAG and reported to SCAG as draft legislation with a commentary. After some small time, the MCCOC papers and reports were made available on-line at <http://law.gov.au/publications/Model_Criminal_Code/index.htm>.

- 26 -

| Model Provisions on Forensic Procedures | Detailed draft legislation dealing with police powers to collect forensic samples and the establishment and maintenance of a national DNA data base. | 1995-1996 |
|---|---|---|
| Chapter 3, Discussion Paper, *Conspiracy to Defraud* | Conspiracy to defraud | June, 1996<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 5, Discussion Paper, *Non-Fatal Offences Against the Person* | Causing harm, threats, stalking, endangerment, traps, causing a serious disease, unlawful confinement, kidnapping, child abduction, female genital mutilation, abortion, defences | August, 1996<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Discussion Paper, *Sexual Offences Against the Person* | Sexual acts committed without consent, sexual offences committed against or with children, sexual acts with or against mentally impaired people, provisions relating to evidence and procedure in sexual offences | November, 1996<br><br>*(Principal Authors: Ms Prita Supomo ; Mr Richard Button)* |
| Chapter 6, Discussion Paper, *Serious Drug Offences* | Serious drug offences including trafficking, manufacturing, cultivation, offences involving children, property derived from serious drug offences | June, 1997<br><br>*(Principal Author: Mr Ian Leader-Elliott)* |
| Chapter 3, Final Report, *Conspiracy to Defraud* | Conspiracy to defraud | May, 1997<br><br>*(Principal Author: Dr David Neal)* |
| Chapter 7, Discussion Paper, *Offences Against the Administration of Justice* | Perjury, Protection of witnesses, Perversion of justice and related offences | July, 1997<br><br>*(Principal Author: Mr Andrew Menzies)* |
| Chapter 8, Discussion Paper, *Public Order Offences: Contamination of Goods* | Specific offences dealing with product contamination of threats to do so with a view to causing public alarm | July, 1997<br><br>*(Principal Author: Mr Greg Byrne)* |
| Chapter 8, Final Report, | Specific offences dealing | March 1998 |

- 27 -

| | | |
|---|---|---|
| *Public Order Offences: Contamination of Goods* | with product contamination of threats to do so with a view to causing public alarm | *(Principal Author: Mr Greg Byrne)* |
| Chapter 9, Discussion Paper, *Offences Against Humanity: Slavery* | Offences dealing with slavery, servitude and sexual slavery | April 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Discussion Paper, *Fatal Offences Against The Person* | Murder, manslaughter, causing death by dangerous driving and defences specific to these offences | June, 1998<br><br>*(Principal Authors: Ms Lindy Jenkins, Mr Colin Pruiti)* |
| Chapter 7, Final Report, *Administration of Justice Offences* | Perjury, Protection of witnesses, Perversion of justice and related offences | July, 1998<br><br>*(Principal Author: Mr Andrew Menzies)* |
| Chapter 5, Final Report, *Non-Fatal Offences Against the Person* | Causing harm, threats, stalking, endangerment, traps, causing a serious disease, unlawful confinement, kidnapping, child abduction, female genital mutilation, abortion, defences | September 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 6, Final Report, *Serious Drug Offences* | Serious drug offences including trafficking, manufacturing, cultivation, offences involving children, property derived from serious drug offences | October, 1998<br><br>*(Principal Author: Mr Ian Leader-Elliott)* |
| Chapter 9, Final Report, *Offences Against Humanity: Slavery* | Offences dealing with slavery, servitude and sexual slavery | November 1998<br><br>*(Principal Author: Mr Matthew Goode)* |
| Chapter 5, Final Report, *Sexual Offences Against the Person* | Sexual acts committed without consent, sexual offences committed against or with children, sexual acts with or against mentally impaired people, provisions relating to evidence and procedure in sexual offences. | May, 1999<br><br>*(Principal Authors: Ms Prita Supomo ; Mr Richard Button)* |
| **Model Forensic Procedures Bill and the Proposed DNA Database** | Further report on the requirements for a principled legislative regime for the collection, storage and use of | May, 1999<br><br>*(Principal Author: Mr Geoff McDonald)* |

- 28 -

| | DNA material with a particular view to the implementation of the Commonwealth CrimTrac system. | |
|---|---|---|
| Chapter 4, Discussion Paper, *Damage and Computer Offences and Amendment to Chapter 2: Jurisdiction* | General offences dealing with criminal damage including arson, bushfire, sabotage and general damage offences; and innovative computer damage offences; and model provision relating to criminal jurisdiction in general | January 2000<br><br>*(Principal Authors: Mr Ian Leader-Elliott (damage and computer); Mr Matthew Goode (jurisdiction))* |
| **Final Draft: Model Forensic Procedures Bill and the Proposed National DNA Database** | Further report on the requirements for a principled legislative regime for the collection, storage and use of DNA material with a particular view to the implementation of the Commonwealth CrimTrac system. | February 2000<br><br>*(Principal Author: Mr Geoff McDonald)* |
| Chapter 4, Final Report, *Damage and Computer Offences and Amendment to Chapter 2: Jurisdiction* | General offences dealing with criminal damage including arson, bushfire sabotage and general damage offences; and innovative computer damage offences; and model provision relating to criminal jurisdiction in general | January 2001<br><br>*(Principal Authors: Mr Ian Leader-Elliott (damage and computer); Mr Matthew Goode (jurisdiction))* |

- 29 -

## ATTACHMENT 3 - CURRENT IMPLEMENTATION RECORD[70]

| REPORT | IMPLEMENTATION |
|---|---|
| Chapter 2: General Principles of Criminal Responsibility | (Commonwealth) *Criminal Code Act*, 1995 (SA) *Criminal Law Consolidation (Self Defence) Amendment Act*, 1997 |
| Chapter 2: Criminal Jurisdiction | (NSW) *Crimes Legislation Amendment Act*, 2000 |
| Chapter 3: Theft, Fraud and Related Offences[71] | (Commonwealth) *Criminal Code Amendment (Theft, Fraud , Bribery and Related Offences) Act*, 2000 (SA) *Criminal Law Consolidation (Offences of Dishonesty) Amendment Bill*, 2001 |
| Chapter 4: Criminal Damage and Computer Offences | (NSW) *Crimes Amendment (Computer Offences) Bill*, 2001 (Commonwealth) *Cybercrime Bill*, 2001 |
| Chapter 5: Non-Fatal Offences Against the Person[72] | (NSW) *Crimes (Female Genital Mutilation) Amendment Act*, 1994; (ACT) *Crimes (Amendment) Act (No 3)*, 1995 (NT) *Criminal Code Amendment Act (No 2)*, 1995 (SA) *Statutes Amendment (Female Genital Mutilation and Child Protection) Amendment Act*, 1995 (Vic) *Crimes (Female Genital Mutilation) Act*, 1996 (Qld) *Criminal Law Amendment Act*, 2000 |
| Chapter 5: Sexual Offences Against the Person | (Vic) *Evidence (Confidential Communications) Act*, 1998 (SA) *Evidence (Confidential Communications) Act*, 1999 (NSW) *Criminal Procedure Amendment (Sexual Assault Communications Privilege) Act*, 1999 |
| Chapter 5: Fatal Offences Against the Person | Not Yet Complete |

[70] I have tried to capture all relevant legislation, but may not have succeeded. If not, my apologies to that extent. I would be grateful to be corrected so that a better record can be established.

[71] It may be noted that the recommendations of the Committee reflect what is, largely, already the law in Victoria and the ACT.

[72] The Committee's recommendations in relation to female genital mutilation are the only subject from that report which has been taken up at this stage. The Committee's recommendations on the subject of stalking ran parallel to and reflected legislative action that had already begun.

- 30 -

| Chapter 6: Serious Drug Offences | The recommendation that PIEDs (Performance and Image Enhancing Drugs) (sometimes know as anabolic steroids) be subject to major criminal sanctions has been implemented in every jurisdiction except SA. |
| --- | --- |
| Chapter 7: Offences Against The Administration of Justice | None |
| Chapter 8: Public Order Offences: Contamination of Goods | (NSW) *Crimes (Contamination of Goods) Amendment Act*, 1997<br>(Qld) *Justice and Other Legislation (Miscellaneous Provisions) Act*, 1997<br>(Vic) *Crimes Amendment Act*, 1998<br>(SA) *Criminal Law Consolidation (Contamination of Goods) Amendment Act*, 1999<br>(Tas) *Criminal Code Amendment (Contamination of Goods) Act*, 1999 |
| Chapter 9: Offences Against Humanity: Slavery | (Commonwealth) *Criminal Code Amendment (Slavery and Sexual Servitude) Act*, 1999<br>(SA) *Criminal Law Consolidation (Sexual Servitude) Amendment Act*, 2000 |
| Model Provisions For Mentally Impaired Accused | (SA) *Criminal Law Consolidation (Mental Impairment) Amendment Act,* 1995<br>(Vic) *Crimes (Mental Impairment and Unfitness to be Tried) Act*, 1997<br>(ACT) *Crimes (Amendment) Act*, 1994, *Crimes (Amendment) Act*, 1999[73] |
| Model Provisions for Forensic Procedures[74] | (Vic) *Crimes (Amendment) Act*, 1997<br>(SA) *Criminal Law (Forensic Procedures) Act*, 1998<br>(Commonwealth) *Crimes Amendment (Forensic Procedures) Act*, 1998 |
| Model Provisions for the DNA Database | (Commonwealth) *Crimes (Forensic Procedures) Act*, 2000<br>(NSW) *Crimes (Forensic Procedures) Act*, 2000<br>(ACT) *Crimes (Forensic Procedures) Act*, 2000<br>(Tas) *Forensic Procedures Act*, 2000<br>(SA) *Criminal Law (Forensic Procedures) (Miscellaneous) Amendment* Bill, 2001 |

[73] The ACT legislation differs from the Model Provisions in a number of respects, most notably in the involvement of the Mental Health Tribunal.
[74] It may be noted that Queensland and the Northern Territory enacted legislation in this area. Both legislative schemes depart from the Model Provisions in very significant respects.

- 31 -

| Abolition of the Year and a Day Rule | (NSW) *Criminal (Injuries) Amendment Act*, 1991 |
| | (SA) *Criminal Law Consolidation (Year and a Day) Amendment Act,* 1991 |
| | (Vic) *Crimes (Year and a Day Rule) Act*, 1991 |
| | (Qld) *Penalties and Sentences Act*, 1992 |
| | (WA) *Criminal Law Amendment Act*, 1991 |
| | (Tas) *Criminal Code Amendment (Year and a Day Repeal) Act*, 1993 |
| | (ACT) *Crimes (Amendment) Act*, 1995 |

# Parental Child Abduction
# is Child Abuse

## by Nancy Faulkner, Ph.D

Presented to the
**United Nations Convention on Child Rights**
in Special Session, June 9, 1999,
on behalf of P.A.R.E.N.T.
and victims of parental child abduction.

© Nancy Faulkner 1999

**Peer Reviews following this Report**
[next page]

French translation:
L'enlèvement parental d'un enfant est un viol
de sa personnalité; translated by
Dr. Lorenz Buswell, Genève, October 2000.
[NOTE: Author not responsible for translation accuracy.]

.

## PAGE ONE [this page]

**Parental Child Abduction is Child Abuse**

Introduction
Risk Factors
Impact of Parental Child Abduction

- Reactive Attachment Disorder
- Learned Helplessness
- Fear and Phobias
- Stress and Generalized Anxiety Disorder
- Guilt
- Acute Stress Disorder and
  Posttraumatic Stress Disorder
- Parental Alienation and the Overburdened

Child
- Separation Anxiety and Fear of Abandonment
- Grief

What has been reported about abducted children?
Conclusion from Clawar & Rivlin


**PAGE TWO**  [next page]

- Peer Reviews:
  Parental Child Abduction is Child Abuse
- Update Aug 2000: Law Review of PAS
- Additional Resources
- Update Oct 2000: Loss of Parent and PTSD
- Full Text French Translation
- References

## Introduction

"Because of the harmful effects on children, parental kidnapping has been characterized as a form of child abuse" reports Patricia Hoff, Legal Director for the Parental Abduction Training and Dissemination Project, American Bar Association on Children and the Law. Hoff explains:

> "Abducted children suffer emotionally and sometimes physically at the hands of abductor-parents. Many children are told the other parent is dead or no longer loves them. Uprooted from family and friends, abducted children often are given new names by their abductor-parents and instructed not to reveal their real names or where they lived before." (Hoff, 1997)

As an early leader in the relatively new field of parental child abduction issues, Dr. Dorothy Huntington wrote an article published in 1982, Parental Kidnapping: A New Form of Child Abuse. Huntington contends that from the point of view of the child, "child stealing is child abuse." According to Huntington, "in child stealing the children are used as both objects and weapons in the struggle between the parents which leads to the brutalization of

the children psychologically, specifically destroying their sense of trust in the world around them." Because of the events surrounding parental child abduction, Huntington emphasizes that "we must reconceptualize child stealing as child abuse of the most flagrant sort" (Huntington, 1982, p. 7).

There is an unfortunate and evident paucity of literature on parental child abduction. Just during the past two decades, Huntington (1982), Greif and Hegar (1993), and others have begun addressing concerns for children kidnapped by their parent abductors. With growing concerns for abducted children, some experts have coined terms like "Parental Alienation" to describe the potential negative impact on child victims. Regardless of the specific terms designed to illustrate the effects of parental child abduction, there is general consensus that the children are the resultant casualties.

TOP of PAGE ~ END of PAGE

## Risk Factors

Post-divorce parental child stealing has been on the increase since the mid-1970s, paralleling the rising divorce rate and the escalating litigation over child custody (Huntington, 1986). According to Hoff (1997), "The term 'parental kidnapping' encompasses the taking, retention or concealment of a child by a parent, other family member, or their agent, in derogation of the custody rights, including visitation rights, of another parent or family member."

The abductor parent may move from one state to another, beginning a new round of investigation into the abuse with each move, impeding intervention by child protective services (Jones, Lund & Sullivan, 1996). Or, the abductor may flee to another country, completely shutting down any hopes of involvement by child protective services in the country of origin. The most pervasive scenario is that the abducting parent goes into hiding, or moves beyond the jurisdiction of governing law.

"These kidnappings are very cleverly plotted and planned and often involve the assistance of family members. The target parent has no forwarding

address or telephone numbers." (Clawar & Rivlin, p. 115)

Huntington and others believe that inherent in the act of kidnapping and concealment are negative consequences for the child victims. It is Huntington's contention that one of the most concerning factors is that the parent has fled and "is out of reach of law and child protection agencies." To escape discovery the abductor parent is hiding out, -- "so who knows what is happening with child!" (Huntington, 1982).

The abducted child is without the safeguards normally provided by child law. This leaves the child completely vulnerable to the dictates of the abductor parent, who, as evidenced in the following research by Johnson and Girdner, may not have the child's best interests in mind, or may be functioning with severe impediments.

A study entitled Prevention of Parent or Family Abduction through Early Identification of Risk Factors was conducted by Dr. Janet Johnston (Judith Wallerstein Center for the Family in Transition) and Dr. Linda Girdner (ABA Center on Children and the Law). The researchers detailed six risk parent profiles for abduction:

1. Have threatened to abduct or abducted previously;
2. Are suspicious and distrustful due to a belief abuse has occurred;
3. Are paranoid-delusional;
4. Are sociopathic;
5. Have strong ties to another country; and
6. Feel disenfranchised from the legal system.

These findings by Johnston and Girdner pose a bleak prognosis for children held at the hands of such inept parents.

According to Rand, an abducting parent views the child's needs as secondary to the parental agenda which is to provoke, agitate, control, attack or psychologically torture the other parent. "It should come as no surprise, then, that post-divorce parental abduction is considered a serious form of child abuse" (Rand, 1997).

It is generally accepted that children are emotionally impacted by divorce. Children of troubled abductor parents bear an even greater burden. "The needs of the troubled parent override the developmental needs of the child, with the result that the child becomes psychologically depleted and their own emotional and social progress is crippled" (Rand, 1997). Since the problem of parental child abduction is known to occur in divided parents rather than in united and intact families, the inordinate emotional burdens compound abduction trauma. Rand reports that although Wallerstein is familiar with Parental Alienation Syndrome, Wallerstein and Blakeslee (1989) prefer the term "overburdened child" to describe this problem.

In custody disputes and abductions, the extended support systems of the parents can become part of the dispute scenario, -- leading to a type of "tribal warfare" (Johnston & Campbell, 1988). Believing primarily one side of the abduction story, -- family, friends, and professionals may lose their objectivity. As a result, protective concerns expressed by the abandoned parent may be viewed as undue criticism, interference, and histrionics. Thus, the abandoned parent may be ineffectual in relieving the trauma imposed on an innocent child by the parental abduction.

Generally the abductor does not even speak of the abandoned parent and waits patiently for time to erase probing questions, like "When can we see mom (dad) again?". "These children become hostages ... it remains beyond their comprehension that a parent who really cares and loves them cannot discover their whereabouts" (Clawar & Rivlin, p. 115).

TOP of PAGE ~ END of PAGE

## Impact of Parental Child Abduction

Children who have been psychologically violated and maltreated through the act of abduction, are more likely to exhibit a variety of psychological and social handicaps. These handicaps make them vulnerable to detrimental outside influences (Rand, 1997). Huntington (1982) lists some of the deleterious effects of parental child abduction on the child victim:

1. Depression;
2. Loss of community;
3. Loss of stability, security, and trust;
4. Excessive fearfulness, even of ordinary occurrences;
5. Loneliness;
6. Anger;
7. Helplessness;
8. Disruption in identity formation; and
9. Fear of abandonment.

Many of these untoward effects can be subsumed under the problems relevant to Reactive Attachment Disorder, the diagnostic categories in the following section, and the sections on fear, of abandonment, learned helplessness, and guilt, that follow.

TOP of PAGE ~ END of PAGE

## Reactive Attachment Disorder.

Attachment is the deep and enduring connection established between a child and caregiver in the first few years of life. It profoundly influences every component of the human condition, -- mind, body, emotions, relationships, and values. Children lacking secure attachments with caregivers often become angry, oppositional, antisocial, and may grow up to be parents who are incapable of establishing this crucial foundation with their own children (Levy & Orlans, 1999).

Children who lack permanence in their lives often develop a "one-day-at-a-time" perspective of life, which effects appropriate development of the cognitive-behavioral chain -- thoughts, feelings, actions, choices, and outcomes. "They think, 'I've been moved so many times, I'll just be moved again. So why should I care?'" (ACE, 1999).

Stringer (1999) and other experts on attachment disorder concur that the highest risk occurs during the first few years of life. This disorder is classified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) as Reactive Attachment Disorder. According to Stringer, common causes of attachment problems are:

1. Sudden or traumatic separation from primary caretaker (through death, illness hospitalization of caretaker, or removal of child);
2. Physical, emotional, or sexual abuse;
3. Neglect (of physical or emotional needs);
4. Frequent moves and/or placements;
5. Inconsistent or inadequate care at home or in day care (care must include holding, talking, nurturing, as well as meeting basic physical needs); and
6. Chronic depression of primary caretaker.

It is evident that these causality factors would place at high risk children who are subjected to similar conditions in the circumstances of parental kidnapping.

Attachment is the reciprocal process of emotional connection. This fundamental and necessary developmental process influences a child's physical, cognitive, and psychological development. It becomes the basis for development of basic trust or mistrust, and shapes how the child will relate to the world, how the child will learn, and how the child will form relationships throughout life. "If this process is disrupted, the child may not develop the secure base necessary to support all future healthy development" (Stringer, 1999).

Stringer (1999), Van Bloem (1999), The Attachment Center (ACE, 1999), and criteria in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV, 1994) identify a significant and troubling list of behaviors associated with problematic attachment:

1. Unable to engage in satisfying reciprocal relationships;
2. Superficially engaging, charming (not genuine);
3. Lack of eye contact;
4. Indiscriminately affectionate with strangers;
5. Lack of ability to give and receive affection on parents' terms (not cuddly);
6. Inappropriately demanding and clingy;
7. Poor peer relationships;

8. Low self esteem;
9. Affectionate with strangers or attempts to leave with strangers;
10. Refuses, resists, or is uncomfortable with affection on parental terms;
11. Incessant chatter or nonsense questions;
12. Hyperactive, over-active, or attention deficit;
13. Poor, underdeveloped, or no conscience;
14. Hoarding, gorging, eating abnormalities, or hiding food;
15. Intense control battles;
16. Significant learning problems or lags;
17. Fire setting, fire play, or fascination with fire;
18. Daily lying or lying in the face of the obvious;
19. Fascination with weapons, blood, or gore;
20. Destructive to self or others; and
21. Cruelty to animals, siblings, or others.

This unsettling list of disturbances and other constellations of behaviors exhibited by abducted children comprises criteria from various childhood disorder categories of the Diagnostic and Statistical Manual of Mental Disorders that might lead one to rule out the following diagnoses:

1. Reactive Attachment Disorder of Infancy or Early Childhood;
2. Separation Anxiety Disorder;
3. Overanxious Disorder of Childhood;
4. Attention-Deficit/Hyperactivity Disorder;
5. Conduct Disorder;
6. Disruptive Behavior Disorder;
7. Oppositional Defiant Disorder;
8. Eating Disorders;
9. Learning Disorder NOS;
10. Regression and Elimination Disorders: Encopresis and Enuresis; and
11. Post Traumatic Stress Syndrome.

As a relatively new diagnosis to the Diagnostic and Statistical Manual of Mental Disorders, Reactive Attachment Disorder (RAD), also known as Attachment Disorder (AD), is often misunderstood, and relatively unknown (ACE, 1999). Although the official DSM-IV diagnosis may be overlooked by some professionals, the

phenomenon of attachment disorder was observed 50 years ago by Rene Spitz in the well known monkey studies. Spitz reported that infant monkeys may actually die if they are not played with, talked to, held, stroked, and tended. Some species of young monkeys die when abandoned. Even a brief separation of infant monkeys from their mothers is seen two years later, causing the infants to be more timid, clingy, and relate poorly to others.

Humans are social animals. If abandoned as an infant or young child, we may first protest by screaming, then quietly withdraw; finally, we become detached and apathetic. Abandoned, we may joylessly play some with others, but there is no emotional involvement (Tucker-Ladd, 1960).

The DSM-IV (1994) defines Reactive Attachment Disorder (RAD) as markedly disturbed and developmentally inappropriate social relatedness in most contexts, beginning before age five. According to Van Bloem (1999), inexperienced professionals often misdiagnose Reactive Attachment Disorder (RAD) as Oppositional Defiant Disorder, Attention Deficit Disorder, Depression, Autism, Post-Traumatic Stress Disorder, Bipolar Disorder, or Attention-Deficit/Hyperactivity Disorder. Other experts in RAD estimate that this disorder has been misdiagnosed as Bi-Polar Disorder or Attention Deficit Disorder in 40 to 70 percent of the cases (ACE, 1999).

Bloem (1999) suggests that Reactive Attachment Disorder is often accompanied by other diagnosis listed above, but that Attachment Disorder most often needs to be the primary diagnosis and the focus of early intervention. Some professionals may mildly disagree with Bloem's preferred diagnostic perspective; however, most would agree that the resultant trauma to a child, -- who in a moment was stolen away from his or her entire world of familiarity, -- is emotionally, developmentally, and psychologically devastating.

Van Bloem (1999) reports that for a child "it is not possible to develop true self-esteem and find peace without resolving differences and emotional pain due to stressed or damaged emotional ties to parents and

family." According to Van Bloem, attachment helps the child to:

1. Attain full intellectual potential;
2. Sort out perceptions;
3. Think logically;
4. Develop a conscience;
5. Become self-reliant;
6. Cope with stress and frustration;
7. Handle fear and worry;
8. Develop future relationships; and
9. Reduce jealousy (Van Bloem, 1999).

The words "attachment" and "bonding" are used interchangeably. These bonding impaired individuals typically fail to develop a conscience and do not learn how to trust. With Attachment Disorder, individuals have difficulty forming intimate lasting relationships (ACE, 1999). Children with attachment disturbance often project an image of self-sufficiency and charm, while masking inner feelings of insecurity and self hate. Unfortunately, such children do not respond well to traditional parenting or therapy, since both rely on the child's ability to form relationships (Stringer, 1999).

Adult survivors of abuse may experience long term or chronic lifetime symptoms resulting from childhood trauma. For example, a person who has been physically abused might suffer from depression or anxiety. A victim of childhood sexual abuse might exhibit symptoms of Posttraumatic Stress, or other disorders as evidenced in the DSM-IV criteria of adult mental health disorders, such as:

1. Agoraphobia
2. Posttraumatic Stress Disorder
3. Dissociative Identity Disorder
4. Dysthymic Disorder
5. Substance Abuse or Dependency
6. Generalized Anxiety Disorder
7. Major Depressive Disorder
8. Panic Attacks or Panic Disorder
9. Borderline Personality Disorder

All too often, children suffering from Reactive

Attachment Disorder go untreated and become adults without conscience (Antisocial Personality Disorder) and without concern for anyone but themselves. "Parental dreams are lost, and they grow up uncaring and without social conscience" (ACE, 1999).

TOP of PAGE ~ END of PAGE

## **Learned Helplessness.**

The concept of learned helplessness is based on the highly respected work of Seligman in 1975, when he observed this helpless condition among animals that were unable to alter their environment. Seligman subjected dogs to random shocks at variable intervals that were completely unrelated to their volitional behaviors. Nothing the dogs could do would protect them from being shocked. Under this experimental treatment, the dogs became passive and refused to leave their cages, even though the cage doors were eventually left open as the shock treatments continued.

"The key to the learned helplessness model is punishment that is totally unrelated to the victim's behavior, that is, the victim does not have to do anything wrong to be punished" (Lalli, 1997). As a consequence, the victim places him or herself under a virtual house arrest without informed judgment that includes facts of the situation. In the situation of parental abduction, the child victim often does not know why he or she has been abducted, has no control over the situation, and even though there may be very strong feelings of anger, frustration and confusion, -- the totality of helplessness may result in a yielding to the circumstances. This yielding and superficial appearance of resolution to the circumstance may be the result of complete devastation, lack of control, and total helplessness, -- rather than acceptance.

TOP of PAGE ~ END of PAGE

## **Fear and Phobias.**

Most phobias are groundless and excessive, such as fears of crowds, small spaces, addressing large groups, and heights. These fears of harmless situations may be associated with fantasies of horrible consequences, like

the fear of public speaking. Thus, frightening and irrational thoughts of what might happen become paired with the real situation, which in turn produces a fear reaction. For example, at night a child has fantasies of demons lurking under the bed and in the closet. The stronger the fantasies, the worse the fear when the lights are turned off. Soon, the fears will occur prior to bedtime, from anticipation of being in the dark.

"Likewise, most of us have at least a mild fear of the dark. Relatively few people have been attacked in the dark, no one by ghosts or monsters. Yet, at age 3 or 4 (as soon as our imagination develops enough) we begin fantasizing scary creatures lurking in the dark. Our own fantasies create our fear of the dark." (Tucker-Ladd, 1960)

Children who are abducted have been stripped of almost everything familiar - toys, personal possessions, playmates, relatives, teachers, the neighborhood, playgrounds, favorite shopping and eating places, -- daily routine -- and a parent. Suddenly snatched from all that is familiar and deposited without adequate preparation into a completely new environment, -- fear of the unknown, future events, emotional safety, and physical safety can run rampant and become irrational. The real threat becomes even more exaggerated and capacities to deal with the threat seem completely inadequate. "This is horrible, out of my control, and I can't deal with it." Overwhelmed with the stress of new stimuli and unable to make sense of the situation may lead the child to excessive anxiety and fears, which in turn may develop into chronic anxiety, stress reactions, depression, paranoia and/or other complications discussed in the following sections.

TOP of PAGE ~ END of PAGE

## Stress and Generalized Anxiety Disorder.

One of the leaders in theories of anxiety, Hans Selye spent a life-time studying stress and postulated that almost any change is a stressor, since there is a resultant demand to deal with a new situation. If normal daily stressors are increased to unusual and traumatic events, like child abduction, the short and long term impact may significantly impair development and functioning, --

even into adulthood.

There are three stages in General Adaptation Syndrome (GAS). In the alarm stage, physiological changes occur, -- the heart beats faster, respiration increases and becomes more labored, senses become at least temporarily more alert, perspiration occurs, -- all preparing the body to flee or attack. The body responds with panic, a reaction to the fight or flight dilemma. Under continued stress, the second stage begins, -- resistance. The body becomes weary and attempts to adjust and adapt to the stress. Despite efforts to adapt, the autonomic system is still working overtime.

If the stress is extended (days, weeks, and months), resistance is further depleted and exhaustion occurs. Energy to continue stress adaptation is depleted. The body gives up, with some resultant damage potentially occurring, -- particularly to the heart, kidneys, and stomach. Commonly, psychosomatic disorders occur. These somatic disorders are psychologically mediated physical difficulties, like lethargy, pain, hypertension, headaches, abdominal and gastric distress, and sleep disorders. Feelings of hopelessness and a state of confusion generally accompany the physical symptoms and decision-making deteriorates under intense or prolonged stress.

Extensive replicated research findings have demonstrated these psychosomatic and physiologically damaging consequences may also occur as a result of extended stress from circumstances of childhood trauma. The potential for harmful effects of divorce on children has been widely substantiated. Stress has been documented to alter the brain, cardiovascular systems, immune systems, and hormonal system. For example, it has been discovered that female adult survivors of childhood sexual abuse have a smaller hippocampus than non-abused women. Stress symptoms that are evident as an adult may be due to occurrences from many years prior, e.g., the long term effects of divorce, such as a fear of intimacy, may occur much later in life, -- 10 or 15 years later.

In children, extended stress may result in regression of behaviors, like age inappropriate thumbsucking,

excessive clingyness, unexplained crying, bedwetting, and temper tantrums.

Prolonged and unresolved stress may also manifest in displacement, the redirection of impulses (often anger) from the real threat to an innocent and safer person. Often, the redirection is because the threat is too dangerous to confront. This may be the case in an abducted child who redirects his or her anger from the abductor to another person, possibly the abandoned parent for not rescuing and restoring life to the way it had been. Another form of displacement is internal. Instead of displacing hostility to another person, it is turned inward, against oneself. This is not uncommon in depression and suicide.

Extended stress and frustration to resolve the conflict, in an effort to relieve the anxiety, may result in reaction formation, -- denial and reversal of feelings. Love becomes hate, or hate becomes love. For example, with a problem between a parent and child, the child may express the anger through exaggeration of affection. In this situation, the child may superficially appear to be closely bonded with the parent who is contributing to the stress; if asked, the child will attest to a strong and loving parent-child relationship.

Yet another stress reaction is identification, -- the process of attempting to bond with the person responsible for the stressors and becoming like the abuser to diminish the conflictual anxiety. As an example, some sexual assault victims have been known to identify strongly with offenders, even to the point of developing intimate relationships with incarcerated abusers. In these situations, the victim may emulate and become more and more like the abuser. Identification with and emulation of the offender is particularly true in cases of child sexual assault victims who become adult offenders. In parental child abductions, some children have been known to identify with the abducting parent, to the point of completely rejecting and blaming the abandoned parent, despite evidence absent blame.

Stress also generally interferes with performance, resulting in inhibited learning, poor decision-making, and resulting in restricted development. Intense and

prolonged stress, especially in childhood, may create an overreaction to stress, -- even years later. Intense reactions to stress and resultant failures become a self perpetuating cycle, creating more stress and more failure. Continued failure breeds the feelings of helplessness and hopelessness, which circles back to learned helplessness and giving up.

Generalized Anxiety Disorder is more intense than the normal anxiety generally experienced day to day. It's chronic and exaggerated worry and tension, even though time has passed, the circumstance has changed, and there seems to be nothing evident that will continue to provoke anxiety. Having this disorder means anticipating disaster and experiencing excessive concerns about health, money, family, or work. The problems generalize to other situations in life, become self-sustaining, and the original stressors are then difficult to identify.

People suffering from Generalized Anxiety Disorder cannot seem to control or manage their concerns, even though they may realize their anxiety is more intense than the situation warrants. They seem unable to relax, often have trouble falling or staying asleep, with worries that are accompanied by physical symptoms, like twitching, muscle tension, headaches, irritability, sweating, or hot flashes. There may be feelings of being lightheaded, out of breath, nauseated or an urgency to urinate; or, there may be an almost constant feeling of having a lump in the throat. There may be a heightened startle response, lethargy, or difficulty concentrating. If severe, manifestations of Generalized Anxiety Disorder can be very debilitating, making it difficult to carry out even the most ordinary daily activities (DSM-IV, 1994).

TOP of PAGE ~ END of PAGE

## Guilt.

It is difficult for some to understand the guilt felt by a victim, particularly when the victim is a child. Survivors of childhood sexual abuse continue to remind us that they felt guilt -- guilt that they may have in some way brought on the abuse, guilt for feeling some sensate pleasure, guilt for destruction of the family constellation when the abuse was discovered, and guilt for legal consequences to the offender.

Literature on divorce is deplete with references to children feeling that they had somehow brought about difficulties between their parents and were responsible for the culminating division of the family. The guilt of abducted children is not dissimilar.

> "These children are extremely guilty when they return and are very fearful of the reaction of the other parent. They do not know who to believe, the are bewildered and very fearful. Many children have a sense that the stealing was their fault and that it could have been avoided. They feel to blame for both the stealing and for the divorce. Many of the older children feel very guilty about not having tried to contact the parent victim. These children feel it is not possible to have a relationship with both parents, and they are town between them. It is not uncommon to see total confusion when they are returned, particularly with a sense of being returned to a stranger."
> (Huntington, 1982, p. 8)

TOP of PAGE ~ END of PAGE

## Acute Stress Disorder and Posttraumatic Stress Disorder.

The diagnoses of Acute Stress Disorder and Posttraumatic Stress Disorder are commonly applied by professionals to victims of abuse situations, such as sexual abuse and child abduction, when the presenting symptoms and applicable conditions apply. According to the criteria of the Diagnostic and Statistical Manual of Mental Disorders (1994), a person suffering from Acute Stress Disorder has been exposed to a traumatic event in which both of the following were present:

1. The person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others;
2. The person's response involved intense fear, helplessness, or horror.

Either while experiencing or after experiencing the distressing event, the individual has three (or more) of the following dissociative symptoms:

1. A subjective sense of numbing, detachment, or absence of emotional responsiveness;
2. A reduction in awareness of his or her surroundings (e.g., "being in a daze");
3. Derealization;
4. Depersonalization;
5. Dissociative amnesia (i.e., inability to recall an important aspect of the trauma).

Like many reactive effects and symptoms discussed in the sections above, this diagnostic category also includes marked symptoms of anxiety or increased arousal (e.g., difficulty sleeping, irritability, poor concentration, hypervigilance, exaggerated startle response, motor restlessness). A victim of abuse may meet the criteria for this diagnosis when the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning; or, when the disturbance impairs the individual's ability to pursue some necessary task, such as obtaining necessary assistance or mobilizing personal resources by telling family members about the traumatic experience.

TOP of PAGE ~ END of PAGE

**Parental Alienation and the Overburdened Child.**

"Physical kidnapping situations leave children extremely susceptible to indoctrination against a target parent. Often the operating strategy is to frighten the child into believing that the only way to exist is to escape some ambiguous harm that is to be inflicted upon the parent, child or both of them by

the target parent" (Clawar & Rivlin, p. 115).

In <u>Children Held Hostage: Dealing With Programmed and Brainwashed Children</u>, Clawar and Rivlin detail signs of abduction victim "maladjustment that go beyond the impact of separation and divorce" (p. 129). The authors delineate these parental child abduction consequences as "specifically related to the effects of brainwashing and programming." Clawar and Rivlin list 25 resultant manifestations, including anger, loss of self-confidence and self-esteem, development of fears and phobias, depression, sleep disorders, and eating disorders.

"Brainwashing" and "programming" are terms used more and more frequently by experts of parental child abduction. These term may initially offend or alienate the reader who is not familiar with Parental Alienation and abduction dynamics. "Brainwashing" and "programming" -- or changing a child's belief systems, -- may be intentional, or, it may be the unintentional process of a parent imposing their belief systems on the child through an extended period of inadvertent repetition.

According to Garbarino et al. (1986), psychological maltreatment can be viewed as a pattern of adult behavior which is psychologically destructive to the child, sabotaging the child's appropriate normal development of self and social competence. To assist with a framework for understanding brainwashing and parental alienation concepts, five types of psychological maltreatment identified by Garbarino et al. were adapted by Rand (1997) to apply to the Parental Alienation Syndrome (PAS):

1. Rejecting - The child's legitimate need for a relationship with both parents is rejected. The child has reason to fear rejection and abandonment by the alienating parent if positive feelings are expressed about the other parent and the people and activities associated with that parent.
2. Terrorizing - The child is bullied or verbally

assaulted into being terrified of the target parent. The child is psychologically brutalized into fearing contact with the target parent and retribution by the alienating parent for any positive feelings the child might have for the other parent. Psychological abuse of this type may be accompanied by physical abuse.

3. Ignoring - The parent is emotionally unavailable to the child, leading to feelings of neglect and abandonment. Divorced parents may selectively withhold love and attention from the child, a subtler form of rejecting which shapes the child's behavior.

4. Isolating - The parent isolates the child from normal opportunities for social relations. In PAS, the child is prevented from participating in normal social interactions with the target parent and relatives and friends on that side of the family. In severe PAS, social isolation of the child sometimes extends beyond the target parent to any social contacts which might foster autonomy and independence.

5. Corrupting - The child is missocialized and reinforced by the alienating parent for lying, manipulation, aggression toward others or behavior which is self destructive. In PAS with false allegations of abuse, the child is also corrupted by repeated involvement in discussions of deviant sexuality regarding the target parent or other family and friends associated with that parent. In some cases of severe PAS, the alienating parent trains the child to be an agent of aggression against the target parent, with the child actively participating in deceits and manipulations for the purpose of harassing and persecuting the target parent.

TOP of PAGE ~ END of PAGE

## Separation Anxiety and Fear of Abandonment.

Separation Anxiety and fear of abandonment is noteworthy enough that it deserves mention separate from fear and learned helplessness. While manifestations

of this problem may also meet the criteria for
Overanxious Disorder of Childhood, in this instance
features are more specific to having been removed from
and seemingly abandoned by a parent. As mentioned
above, the child may have no way of knowing what
attempts the abandoned parent may be making for
rescue, may believe to have been deserted by that parent,
and may have been convinced by the abducting parent
that the abandoned parent is deceased or no longer cares
about the child.

According to the DSM-IV (1994), Separation Anxiety is
manifested by developmentally inappropriate and
excessive anxiety concerning separation from home or
from those to whom the individual is attached, as
evidenced by three (or more) of the following:

1. Recurrent excessive distress when separation
   from home or major attachment figures occurs
   or is anticipated;
2. Persistent and excessive worry about losing, or
   about possible harm befalling, major attachment
   figures;
3. Persistent and excessive worry that an untoward
   event will lead to separation from a major
   attachment figure (e.g., getting lost or being
   kidnapped);
4. Persistent reluctance or refusal to go to school
   or elsewhere because of fear of separation;
5. Persistently and excessively fearful or reluctant
   to be alone or without major attachment figures
   at home or without significant adults in other
   settings;
6. Persistent reluctance or refusal to go to sleep
   without being near a near a major attachment
   figure or to sleep away from home;
7. Repeated nightmares involving the theme of
   separation;
8. Repeated complaints of physical symptoms
   (such as headaches, stomachaches, nausea, or
   vomiting) when separation from major
   attachment figures occurs or is anticipated.

The duration of the disturbance is at least 4 weeks. The
onset is before age 18 years. The disturbance causes

clinically significant distress or impairment in social, academic (occupational), or other important areas of functioning (DSM-IV, 1994).

Even children who have not suffered the trauma of abduction may experience Separation Anxiety and fear of abandonment. The death of a parent, family member, or friend's parent, as well as extended absences of one parent and other factors normally expected in life may contribute to separation anxiety. That being the case, one can only imagine the degree of Separation Anxiety experienced by a child who believes to have been abandoned by a parent as a consequence of parental abduction circumstances.

TOP of PAGE ~ END of PAGE

## Grief.

Siegelman (1983), an expert on grief, contends that change is upsetting because we are leaving a part of ourselves behind. Any change involves loss of the known and relinquishing of a reality that has contributed to understanding and consistency. Elizabeth Kubler-Ross, a well respected authority on grief, suggests that the second most intense life stress, second to death, is divorce or loss of a love relationship. "Love relationship" in this sense applies to all familial and close relationships, e.g., husband-wife, parent-child, siblings, etc.

Not only does an abducted child experience the physical distancing and loss of a parent, the child may also be lead to believe the parent is deceased. Parent abductors are frequently known to invent stories about the abandoned parent to silence the frightened child's questioning. With the death of a parent, generally comes loss of attachment, history, and roots. According to Ross, a sudden, unexpected loss is usually harder to accept than an anticipated loss for which we have had time to prepare, as is the case for a kidnapped child.

Loss and grief experts also agree that the loss of a person on whom we are dependent is difficult to handle, especially if that dependency left us without a life of our own and incompetent to care for ourselves -- like that of an abducted child kidnapped from a parent on whom he

or she was dependent. Also, the assistance from personal support systems -- family and friends -- is an important factor in recovering from a loss. Support for such losses are likely to be especially weak when one lives away from family or has few friends, such as the grief-stricken child who was removed from their own support and reality. An abducted child has lost most, if not all support systems.

So, added to the abducted child's long laundry list of challenges, problems, stressors, and confusions, -- is grief. Grief for the absent parent, for a life that no longer exists, for friends and loved ones, and for the certainty and comfort of life as it was.

TOP of PAGE ~ END of PAGE

## **What has been reported about abducted children?**

According to Greif (1999) in his personal lecture notes on "The Impact of Parental Abduction on Children," the following have been experienced by "children on the run," whether they remain within their country of origin or are taken across international borders:

1. Physical, sexual, and emotional abuse (the range being from 6% with Finkelhor, to higher with others);
2. Neglect in terms of care, feeding, and psychological nurturing;
3. Specific training in how to be secretive in relation to hiding a sense of self, hiding accomplishments, distrusting authorities, etc.;
4. Being lied to about the searching parent, including being told the searching parent has abandoned the child, doesn't love the child, or the searching parent is dead;
5. Being moved constantly and denied contact for any significant time with any one other than the abductor - this may include being cut-off from contact with siblings, teachers, friends, grandparents, and other relatives;
6. In addition, and on a more complex level, an abducted child is exposed to a dynamic situation where the child may take on an

inappropriate, more adult-like role. In one scenario, the child may become the protector or caretaker of the abductor, if the abductor appears in need of emotional reassurance. In another scenario, the child over-identifies with the abductor in an "us against them" mentality where distrust of authority is the norm. One possible result of either dynamic is that the located child remains with the abductor!

Confirming the discussions above about the impact of child abduction, Greif adds that according to the literature, upon recovery the child may experience:

1. Concerns about safety and reabduction;
2. Guilt and shame;
3. Confusion about his or her identity if there has been a name change;
4. Loyalty conflicts between the searching parent and the abductor with whom the child may have identified;
5. Specific problems like depression, anxiety, anomie, bedwetting, thumb-sucking; and
6. Psychological regression, withdrawal, PTSD-like symptoms, and extreme fright.

TOP of PAGE ~ END of PAGE

## Conclusion

"As adults, many victims of bitter custody battles who had been permanently removed from a target parent, whisked away to a new town and given a new identity, still long to be reunited with the lost parent. The loss cannot be undone. Childhood cannot be recaptured. Gone forever is that sense of history, intimacy, lost input of values and morals, self-awareness through knowing one's beginnings, love, contact with extended family, and much more. Virtually no child possesses the ability to protect him- or herself against such an undignified and total loss" (Clawar & Rivlin, p. 105).

TOP of PAGE ~ END of PAGE

## Continue to Page Two

## Go to Peer Reviews

**Recommend this page to a friend**.

www.prevent-abuse-now.com/unreport2.htm

**Parental Child Abduction is Child Abuse**
by Nancy Faulkner, Ph.D

**PAGE TWO**

**Recommend this page to a friend**.

## PAGE TWO  [this page]

- Peer Reviews for:
  Parental Child Abduction is Child Abuse

- Additional Resources
- Update Aug 2000:  Law Review of PAS
- Update Oct 2000:  Loss of Parent & PTSD
- Full Text French Translation of:
  Parental Child Abduction is Child Abuse
- References for:
  Parental Child Abduction is Child Abuse

## PAGE ONE  [previous page]

**Parental Child Abduction is Child Abuse**

Introduction
Risk Factors
Impact of Parental Child Abduction

- Reactive Attachment Disorder
- Learned Helplessness
- Fear and Phobias
- Stress and Generalized Anxiety Disorder
- Guilt
- Acute Stress Disorder and
  Posttraumatic Stress Disorder
- Parental Alienation and the Overburdened
  Child
- Separation Anxiety and Fear of Abandonment
- Grief

What has been reported about abducted children?
Conclusion from Clawar & Rivlin

# PEER REVIEWS
for
## Parental Child Abduction is Child Abuse
by Nancy Faulkner, PhD (1999)

### Peer Review #1

**Reviewer:  C. William Brett, Ph.D.,
                President, Windmoor Healthcare Inc.**

   During his thirty year health services career, Dr. Brett has served as a direct services clinician, adjunct professor and doctoral level clinical supervisor, director of community mental health, senior vice president for a national behavioral healthcare corporation, consultant for behavioral healthcare facilities and programs nationwide, and is currently owner and president of a behavioral healthcare corporation.

**Review:**

   I have been in the mental health field for thirty years, both as a clinician and as a manager. During this time I have seen countless issues and serious problems resulting from child abduction, as well as parental conflict related to custody. I have to say, in my professional opinion, Dr.

Faulkner's paper is the first research paper that puts it all in perspective from the research standpoint, as well as information useful to clinical application.

Dr. Faulkner presents this issue in a very logical format, with data and experience that supports her conclusions. The resulting problems from child abduction are at best complex and they are manifested in so many different forms that it has been difficult to capture the issues in a manner that makes logical and clinical sense; however, Dr. Faulkner appears to have accomplished this in this paper. A feat, I might add, that has eluded many researchers.

In conclusion, it is my opinion that this paper, *Parental Child Abduction is Child Abuse*, is the most comprehensive, well presented, and practical look at child abuse resulting from parental abduction that has been presented to date. This is a must read for anyone in this particular field and more importantly, the judiciary who handle these problems daily.


**Peer Review #2**

**Reviewer:   Jan Alan Eglen, Ph.D., ABPP,**
**               President, Associated Psychologists.**
Dr. Eglen, licensed psychologist and Diplomate in Counseling Psychology, has provided healthcare services for more than twenty years. Included in his spectra of services are direct patient care, evaluations, testing and consultation, -- with specialties in neuropsychology, biofeedback, critical incident stress debriefing, EMDR, behavioral medicine, sex counseling, stress management, anger control, depression, and anxiety -- for children, adolescents, teens, adults, and geriatrics. Dr. Eglen has additionally assessed and evaluated more than 1,000 abused children.
**Review:**
This article by Dr. Nancy Faulkner is a serious, scholarly, and systematic analysis of the conditions surrounding parental abduction. She is thorough in describing the precipitant environment, likely abductor personality type, rationale (more aptly defined as ir-rationale), and premeditated sadism (intentional behavior for the purpose of hurting the significant other) for this heinous act. The literal translation of the term "abduction" is "the state or condition of leading away".

There is no question that the only conclusion at which one can arrive is that abduction in any form is abuse and just because it is a parent doing the "leading away", it is no less a terribly abusive act.

Dr. Faulkner is able to initially focus on the act itself, clearly defining the pathology, separating the actual steps involved in carrying off a kidnapping from the emotions involved. Said another way, she is able to guide the reader to an understanding of both the process (abduction) and the content (abuse) as an attempt at mind control and purposely hurtful and hatefilled behavior in its worst form.

If one were to critique the argument of whether parental abduction is abuse, using the sterile language of statistics as a metaphor, the act meets face, criterion, and reference validity as well as reliability. The language describing the act is offensive (abduction, abuse). The pathology of the abductor, hurt to the other parent and abductee rarely changes. The behaviors of both the abductor and the abductee are able to be reasonably described with certainty both at the near and far terms. The literature, to this reviewer's knowledge, has never surveyed an abduction case with a happy ending unless the abductee was being removed from a previously abusive situation. In that case the term abduction is not appropriate and "rescue" is.

Dr. Faulkner puts the issue squarely before us. You cannot get someone to follow you by walking towards them. An abductor always walks toward the abductee and forcibly makes he/she go with them. Abduction is really a "forcible leading away". If the abductee were a willing party they would follow and not need to be led. That never happens and Dr. Faulkner's powerful treatise sets the standard for defining parental abduction as an abusive behavior. The child is a pawn in a terrible event of trying to hurt the other person. It is an event of paranoid thinking on the part of the abductor run wild.

Dr. Nancy Faulkner is a world stage advocate of children's rights. She has taken on a difficult subject, one that is an abhorrence to most individuals to even hear about let alone discuss logically and civilly. She has accomplished that task so professionally and completely as not to inflame the reader into a lynch mob mentality, yet makes the issue and answer to the question posed as demandingly affirmative.

**Peer Review #3**

**Reviewer:  Mary Ann Johnson, MD,**
- Diplomate, American Board of Psychiatry & Neurology in Psychiatry;
- Diplomate, American Board of Adolescent Psychiatry;
- Member, Board of Directors: Safeguarding Our Children - United Mothers.

**Review:**

I have spent more than forty years in clinical practice of psychiatry and have seen the impact of child abuse in its myriad forms. Dr. Faulkner has contributed significantly to our understanding of the impact and consequences of child abuse, with special emphasis on the growing problem of parental abduction. *Parental Child Abduction is Child Abuse* is a comprehensive summary of the literature and an in-depth review of all the risk factors the victims of parental abduction face.

I am especially impressed by Dr. Faulkner's exposition of the role of parental alienation and the ways it can distort psychological development. I feel this research paper should be read by all of us who work with victims of parental abduction, or work to prevent children becoming victims of parental abduction. *Parental Child Abduction is Child Abuse* demonstrates how the impact of this particular form of child abuse has pervasive and long lasting deleterious effects on its victims -- not just children, but also parents who become victims.

**Peer Review #4**

**Reviewer:  Robin Shamsaie, Ph.D., HSPP**

Dr. Shamsaie is a doctoral level school psychologist with independent practice licensure endorsement as a Health Service Provider in Psychology from the state of Indiana. Dr. Shamsaie provides psychological and educational services to children, adolescents and families in private practice, as well as within a residential treatment facility in Terre Haute, Indiana.

**Review:**

I found Dr. Faulkner's documentation of the potentially negative and harmful effects of parental child abduction to be clearly and succinctly articulated. As she notes, there is limited research available to document the developmental impact of parental child abduction on the physical, psychological and emotional health of children. There is increasingly vast scientific literature available, which provides greater understanding of childhood psychological disorders. Her suggestion that these children are at increased risk for developing a variety of mental health disorders was soundly argued. Although I have not personally worked with a child in such a circumstance, it seems fair to say that the parent abductors may be less inclined to seek services for the symptoms their children may experience.

Dr. Faulkner has clearly outlined many potential symptoms that these children may exhibit, similar to other trauma victims. I encourage Dr. Faulkner to consider how our schools can assist in identifying these children and assisting them in obtaining services, as well as adding to our understanding of the consequences of parental child abduction.

I applaud Dr. Faulkner's ongoing dedication to heighten awareness of child abuse.

**NOTE:** It is particularly noteworthy to mention that in post-review discussions with Dr. Shamsaie, she addressed the issue of victims who ultimately identify and align with their abusers. This phenomenon is an excellent topic and might possibly be addressed in a follow-up report.

**BACK to PAGE ONE**
**Parental Child Abuse is Child Abuse**

TOP of PAGE ~ END of PAGE

**Update: August, 2000**

**Law Review of Parental Alienation Syndrome**

One Voice Justice for Children Advocacy, August 6, 2000:

A New York county court refused to allow a sex abuse defendant to present evidence of **Parental Alienation Syndrome (PAS)** where the defendant failed to establish general acceptance of PAS by mental health experts. New York v. Fortin, 706N.Y.2d611 (N.Y. County Ct. 2000).

Michael Fortin was charged with sex crimes against his wife's 13-year-old niece. He moved to introduce testimony about PAS. The prosecution requested and was granted a hearing on the admissibility of such testimony pursuant to Frye v. United States, 293F.1013 (D. C Cir. 1923). Defense psychiatrist Richard Gardner, one of the first persons to write about and discuss PAS, testified that PAS typically arises when one parent programs a child in a campaign of denigration of the other parent, although PAS may also occur when other family members are involved. Under cross-examination, Gardner admitted that he previously had written that psychodynamic psychiatry is the most speculative of all alleged sciences and that the concept of scientific proof is less important in that field than in other sciences, particularly with respect to persons charged with committing sexual abuse.

The court found the proffered evidence inadmissible, holding that Fortin failed to establish that the scientific community has arrived at a general acceptance of PAS given the lack of a clear consensus by psychologists of the existence of this syndrome. In New York v. Wesley, 611 N.Y.S.2d97 (N.Y. Ct.App.1994), the chief justice stated that a court shall not take pioneering risks in accepting new scientific techniques "because premature admission both prejudices litigants and short-circuits debate necessary to determine the accuracy of a technique."

Source: MPDLR (Mental & Physical Disability Law Reporter) 24:3, May/June 2000

**NOTE:**  Posting this brief law review of PAS as published in the MPDLR is neither a condemnation nor endorsement by this website, only a comment on the status as related to court applications.

**Also see** ~ Another Prespective of Parental Alienation ~

discussion of PA (parental alienation) and PAS, by Douglas Darnall, PhD, (1997). In this review of parental alienation, Dr. Darnall makes an excellent point that is worth noting: "Alienation is a process, not a person."

TOP of PAGE ~ END of PAGE

**Update: October, 2000**

**Posttraumatic Stress May be Higher
in Children Who Lose Parents**
Parentally bereaved children and adolescents appear to experience more posttraumatic stress disorder (PTSD) symptoms than do children who have survived tornadoes, researchers report in the September issue of the Journal of the American Academy of Child and Adolescent Psychiatry.
More at -- Medscape.

TOP of PAGE ~ END of PAGE

**Additional Resources**

**Parental Alienation Website** by Douglas Darnall, PhD.
**Directory of PA Resources** by Douglas Darnall, PhD.

**PARENT** ~ **P**arents **A**dvocating for **R**eturn through **E**ducation by **N**etworking **T**ogether is an international advocacy organization working with parents and agencies world wide to bring about greater awareness and understanding concerning international child abduction and to seek measures leading to the prevention and remedy of this growing global problem.

**Run, Mommy, Run**
by Talia Carner, Women's Enews commentator.
"When I was 7 years old, my father kidnapped me and kept me hidden for two years. (He did not molest me, but his occasional beatings were particularly harsh.) He deposited me with a foster family and visited every week or two. He neither wanted me nor loved me, but I was an excellent pawn in his divorce battle over money and property matters. When my mother found me in school a year after my disappearance, my father showed up within an hour after being alerted by the principal's phone call. I

was whisked away to another family. The trauma of being snatched away from my mother never left me. It marked my identity well into adulthood."

TOP of PAGE ~ END of PAGE

**French translation, November, 2000**
Link here for full text French translation, compliments of the "Swiss Movement Against the Kidnapping of Children."
[NOTE: Author not responsible for translation accuracy.]

**BACK to PAGE ONE**
**Parental Child Abduction is Child Abuse**

TOP of PAGE ~ END of PAGE

**References for**
**Parental Child Abduction is Child Abuse**

Attachment Center - At Evergreen (ACE). What is attachment disorder?, May 99.

Clawar SS, Rivlin BV: Children held hostage: Dealing with programmed and brainwashed children. ABA Section of Family Law, ISBN No. 0-89707-628-1.

Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition (DSM-IV). American Psychiatric Association, Washington DC, 1994.

Garbarino J, Guttmann E, Seeley JW: The psychologically battered child: Strategies for identification, assessment, and intervention. San Francisco, Josey-Bass Publishers, 1986.

Greif GL, Hegar, R: When parents kidnap, New York: Free Press, 1993.

Greif GL: The Impact of Parental Abduction on Children. Personal communication and public speaking notes provided by GL Greif, May 27, 1999.

Hoff PM: Parental kidnapping: Prevention and remedies.
Parental Abduction Training and Dissemination Project,
American Bar Association Center on Children and the
Law, 1997.

Huntington, DS: Parental kidnapping: A new form of
child abuse, 1982.

Huntington DS: The forgotten figures in divorce, in
Divorce and Fatherhood: The struggle for parental
identity. Edited by Jacobs JW, Washington DC,
American Psychiatric Association Press, 1986.

Johnston JR, Campbell LE: Impasses of divorce: The
dynamics and resolution of family conflict. New York,
The Free Press, 1988

Jones M, Lund M, Sullivan M: Dealing with parental
alienation in high conflict custody cases. Presented at the
conference of the Association of Family and Conciliation
Courts, San Antonio, TX, 1996.

Lalli, AN: Arguments For Human Research Subject
Protection Without Waivers or Exceptions, Sept 97.

Levy TM, Orlans, M: Attachment, trauma, and healing:
Understanding and treating attachment disorder in
children and families. Child Welfare League of America,
1999.

Rand DC: The spectrum of the parental alienation
syndrome. American Journal of Forensic Psychology,
15-3, 1997.

Stringer K: What is attachment? ToddlerTime, May 99.

Tucker-Ladd, CE: Psychological Self Help. University of
Iowa, 1960.

Van Bloem LL: Attachment oriented individual and
family therapy. Attachment Home Page, Feb 99.

Wallerstein JS, Blakeslee S: Second chances. New York,
Ticknor & Fields, 1989.

Wallerstein JS, Kelly JB: Surviving the breakup: How

children and parents cope with divorce. New York, Basic
Books, 1980.

**Go to Peer Reviews.**

**BACK to PAGE ONE**
**Parental Child Abduction is Child Abuse**

"About the Author"

"Parental Child Abduction is Child Abuse"
proprietary to Nancy Faulkner, PhD, © 1999-2003.
Not to be copied or reprinted, in whole or in part,
without the express written consent of the author.

**Recommend this page to a friend.**

**Sarah**  **James**

### Vision Research and Development
### ABN 87 668 271 752

Thursday, December 22, 2005

Dear Fellow Australians,

**CHILD ABUSE ACCUSATIONS AND OPINIONS FROM HUMAN RIGHTS AND SUPREME COURTS IN MY FAVOR.**



At this time of holiday season I don't want to burden you with an article by Dorothy S. Huntington, PhD validating my opinion on the continuous torture and child abuse that now, is becoming intolerable to both Nara my minor daughter and me her father being perpetrated under the FULL sponsorship of the Australian PEOPLE against its own minor citizen and me!!!

Dr. Huntington goes on to say that the damaging impact of child snatching on both children and parents has just begun to come to our attention. Despite the widespread public and professional interest in child stealing, there has been to date only one systematic research study (Agopian, 1979) on the topic, with only two other projects currently underway. One of these projects is being carried out at the Center for the Family in Transition and it is from this project.

Although no court papers have been filed by me or my wife it has been suggested by Australians that a, a parent could "legally" kidnap a child by taking the child out of the state where he or she did not have custody to another state and obtain a favorable custody

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA



**Vision Research and Development**
**ABN 87 668 271 752**

ruling. This practice, called "forum shopping" or "court shopping", was possible because of the state's failure to give full faith and credit to prior decrees; unwillingness to practice the "clean hands" doctrine; inclination to favor the local petitioner; and adherence to the parens patriae doctrine, which states that the court must be primarily concerned with the child's best interest (although this in itself has never been explicated properly in child stealing cases).

In America, then where Nara was conceived in an attempt to avoid jurisdictional competition, the National Conference of Commissioners on Uniform State-Laws drafted the Uniform Child Custody Jurisdiction Act in 1968. To date, forty-eight states have adopted the Act, which provides uniform guidelines for determining the proper forum for a custody hearing. The federal Kidnapping Prevention Act (28 USC 1738A), which requires nationwide adherence to UCCJA, was then signed into law in 1980 . The Federal Act has three basic provisions: 1) it requires all states to honor the child custody decisions of other states; 2) it authorizes use of the Parent Locater Service; and 3) it authorizes the FBI through the fugitive Felon Act to track parents suspected of abducting their children.  I have a request o this nature with the AG Ruddock and others but with an alarming result of cover-up.

There remain numerous unsolved problems with the federal legislation, among them the fact that a child snatched prior to a custody decree is not protected by the UCCJA, and that the perpetrator must initiate a custody proceeding in another forum in order for the UCCJA to be invoked. For these reasons and others (Bodenheimer, 1978, Shutter, 1981), the new legislation, while a step in the right direction, does not significantly alleviate the problem of child stealing.
What we do know is that the consequences of child stealing are profound. The parent who loses the child has to deal with a precipitous loss beyond the feelings related to the marital breakup or divorce itself. The child who is kidnapped must cope with the shock of the kidnapping, the sudden loss of a parent and social circle, and an abrupt adaptation to a new environment. The child also often has to deal with lies that the snatching parent tells about the other parent, for example, "Mommy doesn't love you anymore", or, "Your father is dead".

It is now generally agreed that the frequency of parental child stealing is increasing (Agopian, l981) United States Senate, 1979), and while there is every indication that this is true, again there is no strong evidence for this fact (Gelles, 1980). Most commentators ascribe the increase to the rapidly rising divorce rate (Agopian, 1981, Fisk, 1977; United States Senate, 1979). Another factor cited is the advent of no-fault divorce, which has encouraged spouses to shift the arena of their hostilities from divorce to custody proceedings (Bodenheimer, 1975). Another contributor is the greater interest of fathers in seeking custody of their children as sex role definitions change to include active parenting by fathers. Also implicated is the proliferation of alternative family life styles,

**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

such as dual career/dual residence marriages which makes kidnapping logistically possible (Gelles, 1980).

**Child stealing, from the point of view of the child, is child abuse.** In child stealing, the children are used as both objects and weapons in the struggle between the parents which leads to the brutalization of the children psychologically, specifically destroying their sense of trust in the world around them. This is one basic definition of child abuse. **Child stealing is turning up the seamier side of child physical abuse and sexual abuse where there is every evidence that the care given to the children in many cases once they have been stolen clearly fits within the definition of maltreatment and abuse.** In situations not involving parental kidnapping, child abuse charges are brought when it is found that the child's diet is inadequate, where schooling is only intermittent if at all, where the surroundings are extremely deprived and where the children are constantly terrified.

Nonetheless, when all of this is true within the circumstance of child stealing, we have not conceptualized child stealing as child abuse.

In America, a sensible Act which Australia has incorporated into its Family Law ,According to the Federal Child Abuse Prevention and Treatment Act of 1974, child maltreatment is defined as **"the physical or mental injury, sexual abuse, negligent treatment, or maltreatment of a child under the age of eighteen by a person who is responsible for the child's welfare under circumstances which indicate that the child's health or welfare is harmed or threatened thereby" (Public Law 93-247,** 93rd Congress, Senate 1191, 1974). Certainly, most of our child stealing cases would fit this definition. Child maltreatment is a multi-faceted phenomenon, Acts of commission (for example, physical abuse) and/or acts of omission (for example, emotional neglect) may be categorized as follows (Halperin, 1979):

**1) physical abuse: infliction of physical injury, to the child;**

**2) sexual abuse: subjection of a child to sexually stimulating acts by an adult;**

**3) physical neglect: failure to provide a child with a nurturing home environment that supplies the basic necessities of life (for example, food, clothing, shelter, supervision, and protection from harm);**

**4) medical neglect: failure of a caretaker to provide medical treatment in cases of suspected or diagnosed physical ailments except for religious reasons);**

**5) emotional abuse: speech and actions by a caretaker that thwart the health personal and social development of a child;**

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA

**Sarah** **James**

Vision Research and Development
ABN 87 668 271 752

6) emotional neglect: failure of a caretaker to show concern
for a child or his/her activities;
7) educational neglect: failure of a caretaker to ensure
that a child is provided with the opportunity to learn;
8) abandonment: failure of a caretaker to make provisions
for the continued sustenance of the child;
9) multiple maltreatment: a severe and complex combination
of several types of abuse and/or neglect.
Every one of these elements is present in most cases of child
stealing. Child stealing should thus not be characterized as a
domestic problem, but as serious child abuse. We must visualize
the harm that is done to both the parents and the child and must
become sensitized to the fact that stolen children frequently
become gypsies, leading a nomadic lifestyle, deprived of stable
schooling and of many of the basic necessities of life. In domestic
relations courts we talk about the best interests of the child but
that element seems not to be considered in child stealing cases.

I have accused the Howard Government in the World Human Rights Case involving
NARA my child of exactly this abuse.

The court opinion and the Supreme Court Opinion is not going to go away!!! I shall
use it and I am using it to gather WORLD consensus.

We also do not know the differential impact on a child of an active abduction versus
passive restraint, such as not returning a child after a vacation. We also do not know the
differential psychological impact of an active abduction involving a traumatic snatch
versus a non-traumatic removal by someone well known and beloved to the child, nor do
we know the differential impact of a traumatic "re-snatch" versus a relatively calm return
to the custodial parent. A kidnapping within the context of the previously warm
relationship with the parent perpetrator may have a totally different psychological impact
over time compared with a child stealing within the context of a previously absent or
negative relationship with the parent perpetrator. One must look also at the past and
current relationships with the parent victim to understand whether this has meaning for
the long-term impacts of child stealing.

What do we know now about the impact of the child stealing?
on the child victims?

1) The loss they suffer at the time of the snatch is not just the loss of the parent victim but
the loss of their whole community: home, school, friends, pets, their familiar
environment, etc. There is often severe depression, resulting from the loss of the custodial

362, 15 Albert Avenue
Broadbeach, Qld. 4218  AUSTRALIA



**Vision Research and Development**
**ABN 87 668 271 752**

parent, friends and familiar surroundings. If they return, the children must then suffer a second loss-- that of the absconding parent who may be forbidden by the frightened custodial parent to ever see the child again, or the loss of the new community to which they had adjusted.  The children become "emotional dishrags" because the perpetrator tells the child that the parent victim doesn't want them anymore, doesn't love them anymore, that the parent victim is dead, or may be getting married and doesn't want them around. The older children (ages 8 or 9) are pressured more heavily by the perpetrator to form a negative image of the parent victim, probably to assure that the child will not attempt to contact the parent victim. The older children also suffer more guilt about not trying to contact the parent victim and therefore the experience seems more difficult for these older children than for the children under the age of five.  The issue of trust is a major one--stolen children are taught to be fearful of police, to be fearful of returning home, because they might be put up for adoption, or locked away forever if the police find them.  The children are usually not well cared for; they move frequently from town to town; food and shelter are inconsistent and unpredictable, schooling is inconsistent and erratic. Middle class children frequently plunge into poverty and instability; they live lives of deprivation and neglect and that in itself is traumatic for the children. They frequently live out of vans, living like vagabonds, being hungry and dirty. Neglect and malnutrition are common.  Physical and sexual abuse are not uncommon. District Attorney Robert Hutchins 6 believes that there is evidence now that stolen children may be put into child slavery rings, pornography rings, or put-up for adoption on the black market. Agopian (1982) suspects that a large portion of stolen children who remain missing are unloaded by the absconding parent and end up in foster homes and institutions.

2) The act of parental kidnapping exacerbates many of the problems the child is suffering as a consequence of the marital separation and the divorce itself (loss of stability, security, and trust) (Haller, 1982). These symptoms are seen in child victims after their return: excessive fearfulness, even of ordinary occurrences; fear of going outside the house; being despondent, lonely and mistrustful of other people and therefore not being able to get close to them and alleviating the loneliness; anger at either or both the parents; a sense of helplessness since they are unable to control what happens to them in their environment; night terrors and nightmares. Children may cease growing emotionally as well as socially and academically, perhaps with regression in the younger children. There may be an inability to trust adults, and severe disruption in all adult relationships (Terr, 1982).  There is disruption in identity formation (Watson, 1975). A child whose life is unstable and unpredictable cannot develop a stable and integrated personality structure. Anger at the custodial parent for not  protecting him from being stolen, or anger at rescuing him from the absconding parent if the "snatch" occurred much earlier, is frequently a result (Edwards, 1981).  Children become withdrawn, silent, reclusive, fearful of being stolen again, fearful of leaving the house, fearful of being alone, and lack trust in their parents. There is a realization that they have been used as weapons in the battles between the parents and the parents thus become suspect. 7 The children develop



**Sarah** **James**
### Vision Research and Development
### ABN 87 668 271 752

severe phobias, particularly fears of being snatched again and suffering another sudden loss (Terr, 1982). Those children who suffer repeated counter-snatchings are the most fearful of all. There is a constant fear about a re-snatch, particularly if the return is via a snatch; there is restricted activity, and fear over a long period of time which is fed into by the fear of the parent victim after the return. Many children fear being killed, and dream of being killed. The children have difficulty in leaving home to do normal developmental things, like going to overnight camp, for fear that they will never see their parent again. They sometimes fear riding in cars, even with adults they know, because of their fear of being kidnapped. Many lose trust in any adult, and have difficulty in forming new attachments such as making new friends. In school they are unable to concentrate, since frightening fantasies intrude on their cognitive processes. They are also frequently found to be lying and stealing. These children develop a sense of being an "odd-ball", that something very shameful has happened to them. For the young children, there may be regression in toilet training, speech, rebelliousness and clinging.Regardless of age, these children seem to be filled with anger about what their parents have done to them, about the use the parents have made of them in their struggles with each other. Very sadly, there is often anger at the parent victim for not allowing the parent perpetrator to have visitation, originally, or after the stealing. The strain of not being able to talk about the perpetrator after the return is very great. These children worry about their future: if they marry and have children, would their spouses steal the children? 3) Attachments to perpetrators may be very strong, just as they are in hostage and abuse situations. There frequently is anger at the parent victim about not being able to see the perpetrator anymore. This is a particularly important issue since many of the children develop very strong attachments to the perpetrators and do not wish to be returned. This is also an issue for the judges in the awarding of custody to the perpetrator, at times an extremely difficult decision. 8There may be a desperate need to keep a good image of the perpetrator as part of an idealization of the parent; an eagerness to forgive the perpetrator that goes directly opposite to what the parent victim wishes.
Children carry with them their introjects--the physical removal from a parent does not necessarily change their identifications. The identifications with the parent perpetrator are extremely important and remain with the child; one frequently has the situation of negative identification in which the child is returned and the custodial parent begins to see the child act like the parent perpetrator used to act, and becomes even more,negative toward that child. Disorders of attachment are most frequently seen, and have the most disastrous future connotations. Attachments to adults are shattered by the lack of trust these children experience. The capacity to form significant human relationships may be seen in Winnicott's (1963) terms as the capacity for concern. This capacity arises as the result of a transaction between a child and a parent who has the ability to give spontaneously the feeling of concern and understanding of the needs of the child (Huntington, 1982). These children have experienced just the opposite--a parent who does not care--and their future relationships are compromised. They sometimes hunger in an indiscriminate way for adult relationships outside



**Vision Research and Development**
**ABN 87 668 271 752**

their family.

4) Guilt is an important issue also for the returned children. There may be a strong bonding between the abducted child and the perpetrator--seeing their fathers in particular as a hero; the child and the father collude in the appearance of being outlaws on the run. The child has idolized the father and his ability to flee the law and to exist outside convention. These children are extremely guilty when they return and are very fearful of the reaction of the other parent. They do not know who to believe, they are bewildered and very fearful. They frequently don't want to leave when they are picked up for the return. These children are caught up in loyalty conflicts about revealing information about the parent who stole them, believing that that would be a betrayal. Steve Lawrence from the Lipsett Organization says that the children at the time of the return frequently think that they are being arrested for possessing stolen toys. They are afraid their mothers are going to give them hell for not calling them after being away for so many months. He also believes the children initially take total responsibility for the child stealing, are very fearful about the parent victim's problems because of what the parent perpetrator has told them and what they need to watch out for.

Many children have a sense that the stealing was their fault and that it could have been avoided. They feel to blame for both the stealing and for the divorce. Many of the older children feel very guilty about not having tried to contact the parent victim. Many have the sense they have done something wrong, particularly about the stories the perpetrators tell. And also very importantly, being told they will be put in Juvenile Hall or a foster home before they are returned.

5) Many of the children have a belief their victim parents do not wane them to task about the experience—that there is something very wrong and therefore they feel guilty. They are also guilty about missing the perpetrator and guilty about missing the perpetrator and guilty about the amount of money the parent has spent to get them back, guilty about not having tried to call the parent victim. There frequently is a maintenance of an identification with the perpetrator, and this causes many problems within the family. There is anxiety over the visitation with the parent perpetrator after the stealing. There is much continued visiting in some cases. These children feel it is not possible to have a relationship with both parents, and they are torn between them. It is not uncommon to see total confusion when they are returned, particularly with a sense of being returned to a stranger. The reunion is very happy for the parent victim, but the child may be frightened and may not know or remember the custodial parent. Steve Lawrence feels the children have a need for help in figuring out how to relate to the parent who stole them because they eventually end up having contact with the child stealer again. The relationships are never again the way they ought to be, either with the perpetrator or the victim.

Children sometimes feel that the perpetrator should pay the kids and the parent victim for the hardships that they experienced, yet there is a great sadness about needing a father, if the father is the perpetrator, and not being able to have one. There is also anger at



**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

Judges for imposing sentences on the parent perpetrator, and anger at judges for not imposing sentences on the perpetrator. Guilt is always with these children. Being placed in protective custody, in a dependency unit or a foster home compounds their idea they have done something wrong.6) Lowell Streicker, the director of the freedom Counseling Center in Burlingame, brings up the issue of a special group of child stealing victims whose parents are involved in a religious organization, possibly a cult. When these marriages break up the custodial parent moves away with the child and the non-custodial parent steals the child back into the cult and the child is exposed to sexual and physical abuse as part of the cult's idiosyncratic practices, and also exposed because of the high degree of pathology in the parent perpetrator. Relatives will also get involved in child stealing --the child is awarded to relatives and one or both parents snatch the child back, with the natural parents taking the child with them into the cult and grandparents will hire someone to go to the cult and steal the child, because they are afraid of the damage occurring to the child (this is very frequent). One parent may also perceive the other as being the enemy of the true faith and that parent conceives that the eternal salvation of the child depends on "rescuing" the child from the parent who is not in the religious group. Frequently, the cult orders the child stealing parent to steal the child, and the perpetrator is responding to pressure from that group. The return of the child is complicated by the child's experience in the cult group. These children appear to be confused, disoriented, and in addition, seem to have internalized some sense of the parent perpetrator's paranoid fantasies about the evil doings of the outside society.

7) In the future, the children feel distrustful of people, have a hard time falling in love, hard time letting go, and feel very vulnerable for many years. One must look always at the very long term effects (one of our interviewed victims had been stolen twenty-five years before, and she said, "I have a feeling like I was lost in time and space", because she moved so much and went to so many different schools. She still does not feel normal).

BIBLIOGRAPHY
Agopian, M. W. Characteristics of parental child stealing offenses. Presented at the annual meeting of the Pacific Sociological Association, San Francisco, 1980a.
Agopian, M. W. Patterns in parental child stealing, Ph.D, dissertation, Los Angeles, USC, l980b.
Agopian, M. W. Problems in the prosecution of parental child stealing offenses. Presented at the annual meeting of the Western Society of Criminology, Newport Beach, California, l98Oc.
Agopian, M. W. Parental Child Stealing. Lexington, Mass.: Lexington Books, D. C. Heath, 1981.
Back, S. M. Areas for Future Research on Parental Kidnapping. Denver Research Institute, Social Systems Research and Evaluation

**Sarah** **James**

**Vision Research and Development**
**ABN 87 668 271 752**

Division, Univ. of Denver, Denver, Colorado, February 1982.

Bodenheimer, B. M. Progress under the Uniform Child Custody Jurisdiction Act and remaining problems: Punitive decrees, joint custody, and excessive modifications. California Law Review, 1977, 65, 978-1014.

Bodenheimer, B. M. Reply of the United States to the questionnaire and report to the Permanent Bureau at the Conference. In mimeo, 1979.

Coombs, R. M. Interstate child custody: Jurisdiction, recognition, and enforcement. Minnesota Law Review, 1982, 66 (5), 711-864.

Dexter, L. A note on selective inattention in social science. Social Problems, 1958, 6 (Fall), 176-182.

Page 19 of 22

1/24/2001 http://www.hiltonhouse.com/articles/Child_abuse_huntington.txt

Duckworth, M. Child-snatchers break hearts, not laws. Sunday Chronicle Herald, Augusta, Georgia, February 20, 1977.

Edwards, P. When parents kidnap their own children. U. S. News and World Report, March 30, 1981, 66 (12), 66-67.

Elliott, C. C. Child Snatching: An exploratory study of an emergent social problem. Prospectus submitted to School of Social Work, Florida State Univ., 1980.

Fisk, M. Child-snatching. Trial, 1977, 13 (10), 18-19.

Fisk, M. Child-snatching. Trial, 1978, 14, IB-20.

Geiss, G. Forward, In M. W. Agopian. Parental Child Stealing. D. C. Heath: Lexington, Mass., 1981.

Gelles, R. J. Research issues in the study of parental kidnapping. Paper prepared for the National Institute of Justice. July 1980.

Geiles, R. J. Parental child snatching. Study prepared for Louis Harris and Associates. In mimeo, December 1982.

Gill, J. E. Stolen Children. New York: Seaview Books, 1981.

Haas, A. D. Parents as kidnappers. Woman's Work, 1977 (July/August).

Haller, L. H. On being kidnapped. In Conference Materials, First National Conference on Interstate Child Custody and Parental Kidnapping Cases, sponsored by the Child Custody Project and the Family Law Section of the American Bar Association, September 10-Il, 19e2, Washington, D. C.

Halperin, S. Helping Maltreated Children: School and Community Involvement. St. Louis: C. V. Mosby, 1979.

Hoff, P. M. Interstate and International Child Custody Disputes:

**Sarah James**

**Vision Research and Development**
**ABN 87 668 271 752**

A Collection of Materials. Washington, D. C.: Child Custody
Project. American Bar Association, 1982.

Hoff, P. M.; J. Schulman: A. E. Volenik, and J. E. O'Daniel.
Interstate Child Custody Disputes and Parental Kidnapping:
Policy, Practice and Law. Washington, D.C. Joint project of the
Child Custody Project, American Bar Association and the National
Center for Women and Family Law, Inc.; National Center for Youth
Law, 1982.

Huntington, D. S. Attachment loss and divorce: A reconsideration
of the concepts. In L. Messinger (Ed.). Therapy with Remarriage
Families. Rockville, Maryland: Aspen Systems Corp., 1982, 17-29.

Katz, S. N. et al. Legal issues in parental kidnapping. Paper
presented at the National Institute of Justice Conference on
Parental Kidnapping, Washington, D. C., 1980.

Lewis, K. On reducing the child snatching syndrome. Children
Today, 1978, 7 (6), 19-35.

Page 20 of 22

1/24/2001 http://www.hiltonhouse.com/articles/Child_abuse_huntington.txt

Schetky, D. H. and L. Haller. Child psychiatry and law. J. Amer.
Acad. Child Psychiat., 1983, 22 (3), 279-285.

Senior, N.; T. Gladstone and B. Nurcombe. Child snatching: A case
report. J. Amer. Acad. Child Psychiat., 1982, 21 (6), 579-583.

Shutter, S. G. Parental Kidnapping Prevention Act - Panacea or
Toothless Tiger? 55 Florida Bar Journal 479 (June 1981) 481.

Terr, L. Psychic trauma in children: Observations following the
Chowchilla school bus kidnapping. Amer. J. Psychiat., 1981, 138,
14-19.

Terr, L. Psychiatric work with children who have been victims of
parental kidnapping. Paper presented at the annual meeting of the
Association of Family and Conciliation Courts, San Francisco,
May, 1982.

Terr, L. Child snatching: A new epidemic of an ancient malady. J.
Pediatrics, 1983, 103 (1), 151-156.

Tunley, R. "I'II never give up." Reader's Digest, 1980, 17, 90-
94.

United States Senate. Hearings before the subcommittee on child
and human development of the Committee on Labor and Human
Resources. United States Senate, 96th Congress, First Session, on
Examination of the problem of "child snatching." Washington, D.
C.: U. S. Government Printing Office, 1979.

Wallop, M. Children of divorce and separation. Trial. 1979, 15,
34-37.

**Sarah James**

Vision Research and Development
ABN 87 668 271 752

Watson, M. The children of Armageddon: Problems of child custody
following divorce. 21 Syracuse Law Review, 55, 64, 1969.
Winnicott, D. W. The development of the capacity for concern
(1963). In Winnicott, The Maturational Processes and the
Facilitating Environment. New York: International Universities
Press, 1965.

FOOT NOTES

1 Dr. Huntington is Director of Research and Evaluation, Center
for the Family in Transition, Corte Madera, California, and
is Project Director of the Child Stealing Project. This work
is supported by the James Irvine Foundation and the Morris
Stulsaft Foundation.

2 WMH Comment: Note the assumption that it is the father who
kidnaps the child.

3 WMH Note: Literally "parent of the county," refers traditionally
to the role of state as sovereign and guardian of persons under
legal disability. Parens patriae originates form the English
common law where the King had a royal prerogative to act as a
guardian to persons with legal disabilities such as infants, idiots
and lunatics. In the United States, the parens patriae function
belongs with the states.

4 WMH Note: As of 21 Jan 1991 all states have enacted some form or
another of the UCCJA. It is not in effect in Guam, Puerto Rico,
and the Virgin Islands. The PKPA, 28 USC 1738A is, however,
effective in these places.

5 WMH Note: 28 Dec 1980, the Feast of the Holy Innocents

6 WMH Note: This observation should be taken with some caution.

7 WMH Note: It is the editor's belief that parents come in
"matched pairs". Is this the child's way of saying the same
thing?

8 WMH Note: This is an example of "Public Policy" in favor or
eliminating kidnapping and the "Best Interests" of the
particular child. The editor's opinion is that Public Policy
should govern as to to otherwise rewards the kidnapper and
encourages others to do the same.

9 WMH Note: This, like it or not, may well happen. Often a
child is picked up by the authorities and held in custody
pending a court hearing. While the usual pattern is to pick up
the child early in the morning and then go directly to court,
it has happened, say when a flight is delayed, that court is
carried over for a day or two. During this time the child is
placed in the children's shelter.



**Vision Research and Development**
**ABN 87 668 271 752**

I shall continue my opinion and use experts in the field to state that Australia and the Gold Coast City Council and those named in the Suit before the Australian Human Rights and Equal Opportunity Commission are continuing to collude and conspire to keep me separated from my child and thus intentionally harm and abuse my minor child. I shall pursue every court in the WORLD to stop the aiding and abetting of this CHILD ABUSE and dear readers you are aware and NO ignorant argument will be accepted.

So dear Australians at this holiday season get me to my CHILD ON TIME!!!!!!

Yours truly,

Jugvir Inder Singh

362, 15 Albert Avenue
Broadbeach, Qld. 4218 AUSTRALIA