CASE NUMBER_____

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

JUGVIR INDER SINGH,

Plaintiffs-Appellants,

v.

COMMONWEALTH OF AUSTRALIA et al.,

Defendants-Cross Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA IN 07 CV-1170-(JDB),
JUDGE JOHN D. BATES

BRIEF OF PLAINTIFFS JUGVIR INDER SINGH.

JUGVIR INDER SINGH
PRO SE
4409 HOFFNER, SUITE 405
ORLANDO, FL 32818
(571) 426-8522


Attorney for the Plaintiff


December 1, 2003

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA

USCA_____

TABLE OF CONTENTS

PG
_____

1 BASIS OF THE COURTS SUBJECT MATTER JURISDICTION          2

2. BASIS OF COURTS APPEAL JURISDICTION          4

3, TIMELINESS          6

4. APPEAL FROM FINAL ORDER          6

5. STATEMENT OF ISSUES AT APPEAL          12

6. STATEMENT OF CASE ITS NATURE AND DISPOSITION          16

7. RELEVANT FACTS WITH REFERENCES IN PLEADINGS          20-25

8. SUMMARY OF THE ARGUMENTS          25
   A.  APPELLANTS CONTENTION AND REASONS          25-26
   B.  EACH ISSUE AND STANDARD OF REVIEW          26
   C.  CONCLUSION AND RELIEF          26-27
9. TABLE OF AUTHORITIES          27-30
10. CERTIFICATE OF COMPLIANCE

11. APPENDIX          32

12, Docket          32-39

13. ORDER          41-42

14, RESPONSE          43-88

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA

USCA_____

JUGVIR INDER SINGH
                    Plaintiff/ Appellants

v.

COMMONWEALTH OF AUSTRALIA
UNION OF INDIA
UNITED NATIONS
                    Defendants/Appellees

## 1.  BASIS OF THE COURTS SUBJECT MATTER JURISDICTION

Plaintiffs allege by kidnapping, taking hostage and concealing the minor plaintiff party

Nara Avalon Singhderewa from the plaintiff father Jugvir Inder Singh the defendants

negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as

that breach involved the failure to report and the failure to warn), outrage and emotional

distress, violations of the customary law of human rights, and claims under the doctrine

of *respondeat superior* gives this court jurisdiction

The plaintiff is a National of the United States of America being a resident of Orlando Fl,

USA, a Citizen of India but a non-resident Indian, and with inalienable citizenship rights

of Australia through his minor child, a plaintiff party Nara Singhderewa where these

Rights are guaranteed by the United Nations.  The Foreign Sovereign Immunity Act is

easily overcome in this matter by the four pronged irreducible arguments giving the court

subject matter jurisdiction.

1.  The plaintiff being a US National with property rights, tangible and intangible in

the United States does not waive any of his constitution rights and civil tort rights

and the United States thus represents his interests as inviolable and the alleged acts being inside and outside the US are violations of United States law and international law.  The FSIA is penetrated.

2. The plaintiff being a US NATIONAL has inalienable citizenship Rights and property rights in Australia through his own efforts and his Australian minor Child.  This inalienable right is considered Fundamental and in claiming a FSIA defense the Sovereign is committing a Constitutional and International Fraud upon the American people where in gaining its Sovereign diplomatic mission position in the United States, Australia claims equal protection of all its people as a democratic Country.  Thus the defendant may be representing both plaintiff and Nara as the minor plaintiff is inalienably fundamental joint at the hip to the plaintiff father, and both the plaintiff and the minor have subjected themselves to the jurisdiction of the court in every manner.  The acts as alleged then if perpetrated in the United States or in Australia would be a violation of the law in both nations as well as International Law and the FSIA is not applicable defense in the matter but has been penetrated giving the court subject matter jurisdiction.

3. The defendant United Nations cannot hold the FSIA defense in this matter as it has the duty to intake as input and act in terms of output in violations that are alleged and guarantee the Inalienable Rights and through its membership admitted on the basis of a Charter claiming universal protection of the Fundamental and Inalienable, create the vast protections world wide and it is fraud as claimed, that the official duty of the United Nations and it vast tentacles are presently moving to continue the torture and keep separated the minor child from the father and

close its doors to input and output of the violations so alleged and the FSIA is penetrated. The Charter of United Nations presented to the people of the United States informs the taxpayers that its official acts are as those claimed in the complaint and the CHARTER is completely the opposite.

4. Although the Union of India has defaulted and has not put a FSIA defense it is because the plaintiff is also a Citizen of India and has subjected himself to the jurisdiction of this court. Should the Union of India then propound this defense then the basis of it diplomatic mission is jeopardized much as Australia mission is and the defendant must categorically restate to the congress that it represents only a select group of people in India and that the defendant has no Constitutional government and it is then up to the people of the United States and State Department to reclassify the nation in granting or granting an Embassy on US soil. Until that protocol is complete the Union of India can be said to represent the interests of the plaintiffs and the plaintiff has already subjected themselves to the jurisdiction of this court FSIA is penetrated and the acts meet the exception within FSIA.

Thus in presenting itself to this court the United States, Australia, India claim to the Senate and Congress that they are SOVEREIGNS in each others country and that they represent ALL the people of their respective country in order to gain the position of SOVERIEGN. The UNITED NATIONS represents the people of the WORLD though its treaties. As such the Discovery and Production of Documents from the defendants, which have never been produced, will show that the DOOR is closed to the defendants

for the FSIA argument.  The plaintiffs must have a clear reasoned ORDER that deny him his Constitutional and Civil Remedies in all three Nations.

## 2.  BASIS OF COURTS APPEAL JURISDICTION

1.     "In resolving a motion to dismiss, the Court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of plaintiff." *Mukaddam, 111 F.Supp.2d at 461, citing Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).* The Court must take as fact, then, that the Defendant's acts of torture as alleged in the Plaintiffs' complaint are true, leaving no room for an argument that foreign sovereign immunity or the act of state doctrine might provide alternative grounds for protecting Defendant from this Court's jurisdiction, because these violations of international law can never be considered lawfully authorized governmental actions subject to immunity. *Kadic, 70 F.3d at 250; Siderman de Blake, 965 F.2d at 717.*

2.     Defendants negligent failure to report, a kidnapping, hostage taking and concealment and attempts at identity changes of a minor and  negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*.   SEE DOCUMENT 29 pages 1-11

3.     Just as the principle of foreign sovereign immunity cannot protect a defendant from claims alleging major violations of universally accepted international human rights norms, such as the prohibition against torture, the U.S. Government cannot protect a defendant and the defendant's acts of torture by making the argument of potential "foreign policy impact." *Presbyterian*

*Church of Sudan v. Talisman Energy, Inc., 2005 WL 2082846 (S.D.N.Y. 2005)*. While the Supreme Court has directed courts to give "serious weight" to the U.S. Government's views on the potential impact a particular case might have on foreign relations, the Sosa decision reaffirmed the settled principle that the Executive Branch's assertion of foreign policy concerns, "would not necessarily preclude adjudication." *Sosa, 542 U.S. at 733 n. 21 (2004); Kadic, 70 F.3d at 250*. "Ultimately, it is [the courts'] responsibility to determine whether a political question is present, rather than to dismiss on that ground simply because the Executive Branch expresses some hesitancy about the case proceeding." *Sarei v. Rio Tinto, 2006 WL 2242146 at *8 (9th Cir. 2006); See also, Mujica v. Occidental Petroleum Corp., 2005 WL 1962673, at *24 (C.D. Cal. June 28, 2005), citing Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1236 (11th Cir. 2004).*    In this case it would be cannot be Congress and state that India, Australia and United Nations, being sovereigns over the plaintiffs who claim, constitutional and civil tort violations have come to this court and claim these plaintiffs don't exist one for the other.

4. Then if FSIA can survive the Section 1605(a) the FSIA also provides an exception to foreign sovereign immunity for tortious acts of a foreign state or its agents. The tort exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise encompassed [by the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

The United States affords certain domestic rights of action for persons claiming to be victims of human rights abuses, regardless of where they occur. The Alien Tort Claims Act (ATCA) provides that "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[14] The Torture Victim Protection Act (TVPA), recently passed by Congress, provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual."[15]

4.  Now the defendants have not denied the acts alleged they have claimed immunity as part of their functions  If that be so Defendant must satisfy two elements to avail itself of FSIA immunity under the discretionary function exception. First, the challenged action must be discretionary; that is, it must involve "an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA context, this prong means that if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply.  *Berkovitz*, 486 U.S. at 536. The defendants cannot penetrate the plaintiff's arguments and allegations in this event and actions have liabilities in all defendant nations.

5.  Second, and even if the challenged action did involve an element of judgment or choice, "a court must determine whether that judgment is of the kind the discretionary function  The court ORDER has failed provide any explanation.

6.  Defendant asserts that Plaintiff's claims should be dismissed for lack of standing because Plaintiffs' injuries are not fairly traceable to the conduct of Defendant. At this stage of the litigation, Defendant's assertion is merely a conclusory

statement without legal or factual support. Therefore, standing does not bar Plaintiffs' claims. SEE DOCUMENT 29 pages 1-11

7. The irony is the fact that the plaintiff is suing the Ambassadors that actually represent him, such and the defendant India, Australia, United Nations and United States since the existing sources of law providing diplomatic agents with immunity from legal process in the United States are the *Diplomatic Relations Act* and the treaty it implements, the *Vienna Convention. 22 U.S.C.A. § 254d.* These legal standards reflect the evolutionary development of international law regarding immunity of diplomatic agents. *Tachiona ex. rel. Tachiona v. Mugabe*, *186 F.Supp.2d 383, 387 (S.D.N.Y. 2002).* Historically, the customary law of diplomatic immunity, which provided broad immunities to all foreign diplomatic agents, was based on the premise that the receiving state owed an ambassador the same respect due to the foreign sovereign he represented. See, e.g., *Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812).* Countries eventually recognized, however, that granting diplomatic immunity to a foreign agent often deprived their own nationals of their legal rights. *Hellenic Lines, Ltd. v. Moore, 345 F.2d 978 (D.C. Cir. 1965).* Consequently, the customary law of diplomatic immunity narrowed to include only those immunities needed to properly carry out the diplomat's functions. Id.

8. More broadly when international norms are specifically defined in legal terms that are accepted and applied universally, such as the prohibitions against torture and genocide, they do not "defy judicial application." *Sosa, 542 U.S. at 733.* Congress also has specifically mandated in the TVPA that the judiciary should

hear claims for reparations brought by victims of torture and genocide. 28 U.S.C.A. § 1350 Note; Sosa, 542 U.S. at 728. Consequently, ATCA and TVPA claims based on torture and genocide abuses cannot be considered inherently nonjusticiable, even if they touch on political or foreign policy matters. Sarei, at *10, citing Baker, 369 U.S. at 211.

9. The Court should exercise its legislated authority to decide this case because it is brought under the ATCA and TVPA for claims of torture that both Congress and the Supreme Court have recognized as actionable in U.S. courts. Congress has expressly tasked the judiciary with providing the legal means for victims of the most serious human rights abuses to obtain damages in U.S. courts by adopting the ATCA and TVPA. *Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.1984).* "[I]n implementing section 1350, courts merely carry out the existing view of the legislature that federal courts should entertain certain actions that implicate the law of nations". Id. at 797 (Edwards, J., concurring). "The department to whom this has been constitutionally committed is none other than our own--the Judiciary." Kadic, 70 F.3d at 249; see also, Restatement (Third) of Foreign Relations Law § 111(2) (1987) (cases arising under international law are within the judicial authority of the United States). This mandate is particularly clear, as the U.S. Supreme Court recognized in Sosa, given the language and the Congressional mandate of the TVPA, where Congress specifically reaffirmed the availability of damage awards to torture victims through legal actions of this type. *542 U.S. at 728, citing H.R. Rep. No. 102-367, pt. 1, p. 3 (1991).* Given this mandate from the legislature, upheld by the

Supreme Court very recently in Sosa, this Court has jurisdiction to move forward with the Plaintiffs' case and would violate explicit Congressional and Supreme Court standards if it fails to do so.

10. The court has jurisdiction as there are ERRORS OF LAW, and errors on the face the record being that there no explanation of the illegally expropriated property of the plaintiffs. Let us give credit to the District Court in being able to determine that the Minor Nara Singhderewa is the ipso jure child of plaintiff and the defendants have made no allegations that this is not the case then what is the property illegally expropriated if any?

a. Even if the situation is as SEE DOCKET 17 it is described the plaintiff in American and the Child hostage in Australia then does the ORDER state neither ever had any property one between the other and both lived on the thin air principle advocated by the court? That ORDER is completely without merits. But in the FSIA OPPOSITION at 21 page 23 we have this claim. However the property rights inherent in the plaintiffs is made to vanish by dismissing the estate of SINGHDEREWA family and thus depriving a minor all her future support.

   i. Here the basis of defendants expropriation exception was premised on taking of all the plaintiffs company, computers, software, patents, inheritance, automobiles, credit cards, property, marketing, telephones, internet systems, Australian business in real estate, cattle, Whey Protein, tourism, scram engine and Rocket data, Atlanta Nasa Merit System Protection Board Data, diamond ring configurations, all amounting to more that 100 million dollars of tangible property, because the plaintiff minor child is an Australian. Taking of the plaintiffs saris, Ganesh, Buddha carvings, and other religious and family items including video equipment, eye surgery equipment, hard disks and copyrighted books being only left on the hard disk and irreplaceable concern Refractive Surgery, Adaptive Optics and other material exclusively controlled by the defendants. Being in excess of 1 million United States Dollars.

ii.  However the ORDER is remarkable in so far as value such as this taken illegally expropriated by the defendants leaving the plaintiff to file under conditions of pauper but great value is addressed in the ORDER as not worth the consideration causing manifest injustice.

In the United States, India and Australia a persons intellect is his property and what composes intellect and intellectual property is also the plaintiffs property and the courts arbitrarily dismissing the point is in sharp contrast to as this Court observed nearly 100 years ago:

> There is…a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905).  A person's intellect is surely within that protected sphere. The right of a person to liberty, autonomy and privacy over his or her own thought processes is situated at the core of what it means to be a free person. It is essential to the most elementary concepts of human freedom, dignity, and self-expression, and demands this Court's steadfast protection. The right to sovereignty over one's own thought processes is the quintessence of freedom, and is protected by the First Amendment.

11. Jurisdiction is further granted as Procedural Errors being (a) Dismissing Application for the Change of Citizenship without explanation. (b) Dismissing a defaulted party Union of India who failed to file and motion claiming FSIA.(c) Dismissing indispensible parties.(d) Violations of the meet and confer rules (e)Accepting dispositive motions prior to meet and confer rules although being made aware of this situation.(f) Giving no explanation why the plaintiffs' property rights affected by allegations are not affected in the United States and how taking his property by alleged acts is considered not taking and there is no explanation violating the "taking clause".

3. **TIMELINESS**:  The appeal is timely filed from an MINUTE ORDER denying 32 Plaintiff's Motion to Alter Judgment, for the reasons stated in the Order of March 31, 2008. Plaintiff is advised that any further filings save a notice of appeal may be deemed redundant and ordered stricken from the record. SO ORDERED. Signed by Judge John D. Bates on 4/2/08.(ah) (Entered: 04/02/2008)

4. **FINAL ORDER**: THE MINUTE ORDER denying 32 Plaintiff's Motion to Alter Judgment, for the reasons stated in the Order of March 31, 2008. Plaintiff is advised that any further filings save a notice of appeal may be deemed redundant and ordered stricken from the record. SO ORDERED. Signed by Judge John D. Bates on 4/2/08.(ah) (Entered: 04/02/2008) is a final ORDER directing the plaintiffs to file and appeal. SEE DOCUMENT 29 pages 1-11

5. **STATEMENT OF ISSUES AT APPEAL**

14. The plaintiff's have alleged torture and it is not in any diplomatic policy statement or work permit VISA applications of Australia, India, United Nation in the United States where such acts are termed as "official acts" being permitted as part of their functional performance.  The acts alleged are a violation of United States Law, Australia Law, United Nations Law and International Law.  Defendants negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*  have been dismissed in error.

i.  There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances" and is manifest injustice in all defendant nations and cannot not be an act within the purview claiming an immunity.  The defendants have continued in this pattern of behavior since at least April 3rd 2005, where they have colluded to keep a minor concealed in a hostage and kidnapped manner and have also deprived the plaintiff father and child of his property.

ii.  Although discovery has not been completed the plaintiffs challenge the defendant sovereigns where in a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances" where it is thought of a manifest injustice but the sovereign thinks it is his official duty.to cause corporeal agony The issue should be resolved by an intelligent ORDER answer which should state that it is official duty of the defendants to REPORT the action to enforcement agencies.

iii.  It is quite obvious to the court that the child must see her father and the farther plaintiff must see and be with his child. The plaintiff fosters a humiliating

dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh and so invokes "extraordinary circumstances" and the ORDER continues the cycle of manifest injustice with a cycle of never ending lawsuits.

iv.   The defendants have skilled intelligence agents and interrogating rooms in the diplomatic mission and have subjected the plaintiff's concept of "body" and easily extended it to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances".   Torture against the "family", or "home". has been applied to kin and kith, compatriots, or colleagues is also one core of the claim but an action that is being claimed as an official duty and allowed to stand in the ORDER and should be reversed.

v.   The immunity claims of the defendants official acts in matter maybe described by Beatrice Patsalides where this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

vi.   Is to increase the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position

of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost." This transmorgrification the defendants claim is the "official duty" and can sustain an immunity in the civilized society.  The ORDER lets this behavior stand and it manifest injustice.Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances".  If this the reason why these defendant diplomats are here in the United States with the sponsorship and invitation of the State Department then FSIA is violation of the constitutional rights of the plaintiff.  I think not.  The ORDER must be reversed.

vii.  After nearly three years from at least April 3rd 2005 the Defendants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the

inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances" and the ORDER allows this manifest injustice to stand as an act under the color of law.

viii.  Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances" given the guise that the defendants were invited to the Unites States to perform this act under some diplomatic umbrella and it is manifest injustice and must be reversed.

ix.  After nearly four years now the abuser defendants becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances" but this set of defendant's inhumanity is couched as diplomatic official acts where there a cognitive death sentence without due process and the ORDER cannot stand.

7.  **STATEMENT OF CASE ITS NATURE AND DISPOSITION**

28.  The plaintiffs use the words of Judge John D. Bates to state the case where the ORDER states the Plaintiff is a resident of Orlando, Florida, proceeding *pro se* and *in forma pauperis*. He seeks monetary damages from the

Commonwealth of Australia, the Union of India and the United Nations for allegedly "colluding, conspiring [and] aiding and abetting" in the  kidnapping of his five-year-old daughter in Australia.   Compl. at 3. He also accuses defendants of torturing him and his daughter, presumably by keeping them apart.   *See id*. at 3, 6, 33, 22-26.  Australia moves to dismiss pursuant to Rule 12(b)(1), (b)(6) and (b)(7) of the Federal Rules of Civil Procedure. Because the complaint presents no basis for obtaining jurisdiction under the exceptions to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605, the Court will grant the Rule 12(b)(1) motion and will dismiss the case.[2]  1 The complaint purportedly is brought by plaintiff Jugvir Inder Singh and the "Estate of the Singhderewa Family."   Because only "natural persons" may proceed *pro se* and *in forma pauperis* in federal court, *Rowland v. California Men's Colony*, 506 U.S. 194, 202 (1993), the Court considers the action to be brought solely by Mr. Singh.2

Although the docket reflects service of process upon India and the United Nations, India has not appeared in the case and the U.N. returned the papers, rightly asserting its privileges and immunities.  *See* Notice [Dkt. No. 6]; *Keeney v. U.S.,* 218 F.2d 843, 845 (D.C. Cir. 1954) (*quoting* International Organizations Immunities Act, § 7(b), 59 Stat. 672, 22 U.S.C.A. § 288d(b) (granting immunity from suit to "[r]epresentatives of foreign governments in or to international organizations" as to the performance of official duties).  The basis for granting Australia's motion applies equally to India.   Thus, the Court will dismiss the complaint against the absent defendants pursuant to Fed. R. Civ. P. 12(h)(3) (requiring dismissal of an action whenever subject

matter jurisdiction is found wanting).

29.    As alleged in the complaint, on April 3, 2005, plaintiff "lodged" police reports "electronically from India" with Australian authorities, claiming child abduction and kidnapping of his then-three-year-old daughter.  Compl. ¶ 38.  When plaintiff tried "to get help to return to Australia in an Emergency[,] [he] was instructed that he will never see his child again. . . ." *Id*. ¶ 40.  Defendants "then conspired, using emails of passport documents and other documents to change" his daughter's identity and "to remove [her] from Australia to New Zealand."  *Id*. ¶ 41.

30.    Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others."  *Id*. ¶ 42.  "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' actions[] against the plaintiff. . . ." *Id*. ¶ 43. Plaintiff also filed a *habeas corpus* petition in the Supreme Court of India, which "directed [him] to go to Australia. . . ." *Id*. ¶ 46.

31.    Plaintiff filed this action in June 2007, setting forth the following nine counts: Battery, Assault, Intentional Infliction of Emotional Distress, Civil Conspiracy, Civil RICO, Aiding and Abetting, Willful and Wanton Misconduct, Loss of Consortium and Solatium, and Punitive Damages.  Compl. at 22-39.

32.    The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a United States court. *See* 28 U.S.C. § 1330; *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989). The "interlocking provisions" of that statute, *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1099 (D.C. Cir. 1982), compress subject-matter jurisdiction and personal jurisdiction into a single, two-pronged inquiry: (1) whether service of the foreign state was accomplished properly, and

(2) whether one of the statutory exceptions to sovereign immunity applies. *See* § 1330. As determined below, Australia rightly contends that none of the asserted exceptions applies to the circumstances of this case.

33.    Plaintiff initially invoked the FSIA's non-commercial tort exception, § 1605(a)(5), and its state-sponsored terrorism exception, § 1605(a)(7).  Compl. at 3. In his opposition to the pending motion to dismiss, plaintiff seems also to invoke the commercial activity exception, § 1605(a)(2), the expropriation exception, § 1605(a)(3) and the immovable property exception, § 1605(a)(4).  The latter asserted exceptions merit little discussion.   As indicated by its terms, the commercial activity exception is predicated on the foreign state's performance of commercial activity within the United States or outside of the United States that "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).   The complaint does not concern commercial activity.   The expropriation and immovable property exceptions apply to claims arising from the taking of property, which is not at issue here.

> Under 28 U.S.C. § 1605(a)(5), a foreign state is not immune from a lawsuit
> in which money damages are sought . . . for personal injury or death . . . occurring
> in the United States and caused by the tortious act or omission of that foreign state
> or of any official or employee of that foreign state while acting within the scope
> of his office or employment. § 1605(a)(5).  Australia rightly asserts that this exception is
> inapplicable because the wrongful behavior is alleged to have occurred in Australia and
> perhaps India.

Under 28 U.S.C. § 1605(a)(7), the terrorism exception, a foreign state is not immune from a lawsuit

> in which money damages are sought . . . for personal injury or death that was
> caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking,
> or the provision of material support or resources (as defined in section 2339A of
> title 18) for such an act if such act or provision of material support is engaged in
> by an official, employee, or agent of such foreign state while acting within the
> scope of his or her office, employment, or agency. § 1605(a)(7).  This exception
> applies only if the foreign state was designated as a state sponsor of

terrorism at the time of the act or as a result of the act, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration, and the claimant or the victim was a national of the United States when the act occurred. § 1605(a)(7)(A)-(B).  Australia rightly asserts that it was not designated a state sponsor of terrorism at the time of the alleged acts, *see* 50 U.S.C. App. § 2405(j); 22 U.S.C. § 2371, and plaintiff has not demonstrated that Australia was ever so designated.[3]  The finding by the court in completely unfounded and it ignores four commission Reports and Senate Investigations

8.  RELEVANT FACTS WITH REFERENCES IN PLEADINGS

28.    The plaintiff in the United States was an employee of N-Life Inc. which had offices in Darien Ct., Greenwich, Ct and San Diego California and the company held the exclusive rights to the scope development of the plaintiffs United States Patent 5,803,923 covering the Refractive Surgery Correction of Presbyopia.  Granted September 18 1998 showing the plaintiff to be resident at 45 Phillips Lane.

29.    N-Life Inc paid for the plaintiff to fly to Australia during the International Refractive Symposia in Sydney to establish a subsidiary in Australia and Sarah-James and Sarah-James.com in Villa 5 Sapium Road, Benowa, Queensland Austrlia which was done and complex computer configurations and marketing for the Southeast Asia was established and the plaintiffs will show the Federal Taxes of N-Life filed in the United States to reflect this exactly in the Amount in excess to USD 40 million.  US Federal taxes were filed till the plaintiffs present plight.  THIS PROPERTY HAS BEEN illegally expropriated by the defendants.

30.    In April 2005 two Australian Businessmen, Troy Dann and Kim Steven from whom Sarah- James and N-Life had purchased the rights to manufacture OBX whey proteins travelled to Bangkok to meet an investor for the manufacturing plant and the plaintiff was not satisfied that investors money source was not from prohibited activity and refused the funds offered and travelled to India to complete the litigation on his real estate holding and eye surgery PRESBYOPIA CORRECTION TEAM .

31.    While in transit in a hotel the plaintiff was checking his email and saw cybercrime plans to kidnap his child being hatched in Australia with some strangers passport and travel documents in the Yahoo backbone under the email header of bloodylegends@yahoo.com a white nazi group and then the plaintiff was informed over the phone by a man that his daughter has been taken from home and was kidnapped and held hostage and that if the plaintiff returned to Australia he would be killed.

32.    The plaintiff instantly went for help to the Australian High Commission and was informed that he will never see his daughter again and the travel documents in the passport were made void.

33.    The plaintiff, under great duress filed Human Rights Complaint and Australia was informed that its actions were "unjustifiable" and the defendant used power and corruption to continue changing the identity of the plaintiff's child.  The Human Rights Commission in Australia refused to table the question before the parliament as was requited to and all Police Reports to the Southport Police in Queensland, Surfers Paradise Police in Queensland, Brisbane Police for a possible Suspect in Queensland, McLean Police in NSW and Police Ministers and the Attorney General in Australia in collusion one with other made vanish the reports and refused to answer and refused to take any

action and interfered actively with the hostage taking and kidnap of the plaintiffs minor child.

34.    The plaintiff approached the Supreme Court who in HABEUS CORPUS proceeding directed the plaintiff to appear in Australia and the judgment was sent to Australia with a request and Australia defendant then colluded with the defendant India and United Nations and refused reunification of the father with Child.

35.    Having exhausted all remedy then the plaintiff approached the United Nations and the United Nations refused to answers hundreds upon hundred of phone calls and requests and made vanish some reunification papers.  The United Nations offices in Australia, India, Switzerland and the United States were repeatedly requested to help and they in collusion with the defendants have refused to prosecute knowing the defendant has exhausted his review and refused to take the violators from its membership causing the plaintiffs harm.

36.    The plaintiff lodged a complaint of kidnap and hostage taking in the United States with the Federal Bureau of Investigation through the MOST WANTED program and was requested to continue his efforts through the Australian Federal Police.  The circle cannot be complete.

37.    Now in a meet and confer on the 3rd of April 2008 between the defendants and plaintiff finally the defendants did say "GO TO AUSTRALIA"  The plaintiff requested immediate communication with his plaintiff child and the conference ended with threats of sanctions from the defendant and the child has not been either produced or even heard from and only an "empty statement" of going to a defendants area five times the size of

the United States to search for his minor is not acceptable as a meet and confer unforced reunification per Convention of Child Rights stipulation.

38.    The Australian Federal Police informed the plaintiff that he had to lodge a complaint with Australian Federal Court and get an order of missing child for that court. The plaintiff did lodge a case and the defendants colluded one with the other to sabotage the appearance of the plaintiff before this court in Australia.

34.    Then Also Under the authority of Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs, respectfully requested that the court enter a preliminary injunction pending final resolution of this action enjoining the defendants and their agents, including any person acting in the name of the defendants from exercising any rights whatsoever over Nara Avalon von Neumann Singhderewa a minor, ipso jure child, nearly 6 years old, of plaintiff Jugvir Inder Singh.  An order was directed to the plaintiff to show greater materiality in the issue though the defendants did not oppose the motion.

35.    The plaintiffs show that the matter at hand the decision focuses on the applicability of an exception to immunity under the FSIA for actions seeking rights in illegally expropriated property. Specifically, the FSIA provides for an exception to immunity in cases in which rights in property taken in violation of international law are at issue and the property at stake is owned or operated by an agency or instrumentality of the foreign state that is engaged in a commercial activity in the United States.  It is claimed that the defendants illegally expropriated property the plaintiff's property and the inheritance of the plaintiffs, the commercial property of plaintiffs, the intellectual property of the plaintiffs among other property rights.  The defendants will in the foreseeable future and in the past have conducted commercial activity with the plaintiff

Jugvir Inder Singh and the plaintiff Nara Avalon Singh Derewa, N-Life Inc. where plaintiff is majority stockholder, and Sarah-James, being held in trust for Nara.

36.    The Under the declaration of the Universal Declaration on Human Rights and the Convention on the Rights of the Child creates a private right of action as plaintiffs has exhausted local remedies

### 9.   SUMMARY OF THE ARGUMENTS

Although Under FSIA's burden-shifting structure, once a foreign state has made a prima facie showing of immunity, the plaintiff then bears the burden of coming forward with facts showing that one of the statutory exceptions to immunity applies.  *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994). However, once the *asserted allegations* brings claims within the statutory exceptions to FSIA, the burden then shifts to the party asserting immunity to prove that the exceptions do not apply. *See Siderman v. Republic of Argentina*, 965 F.2d 699, 707-08 (9th Cir. 1992). The ultimate burden of persuasion remains with the foreign sovereign at all times. *See Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989).

A.   APPELLANTS CONTENTION  AND  REASONS   the following claims, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior* being referred to complaint at 14 through 30 from 4page 16.

a.      In the complaint issues from number 49  page 22 in the complaint to Number 133 page 43 a set of reliefs remain completely dismissed without any explanation.

b.      Then the dealings of the defendants with Saddam Hussein's regime a listed terrorist state with tomes of Evidence made public in the United Nations Volcker Report and Cole Commission and Senate and Patak Commission and included as evidence being dismissed as Australia was not listed although it is ADMITTED Australia was aiding and abetting the enemy and a listed state and so were the defendants and they used the money from these transaction to conceal the plaintiffs child.  Terrorism exception has clearly been met.

c.            The thin Air principle of the defendants being that this defendant has no property Rights see complaint at 11 page 6 through 12 dismissed but stated that a portion of it was in the United States Affected and portion was illegally taken by the defendants.

### B.  CONCLUSION AND RELIEF:

 In summary The plaintiffs have endured long term suffering and torture by the defedants who have failed to report negligence claim that Defendants failed to provide safe care of children entrusted to them as Sovereigns Defendant's motion to dismiss as to the failure to report and failure to warn negligence claims and as to all other claims asserted against the defedants this time fall within the FSIA exception.  Therefore, the following claims remain against the defendant : negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*.  The plaintiffs Rights, intangible and Intangible have been affected in the United States.  The defendants are in a suit presently with the Plaintiff in the United States and are presently concluding it business for the return or not return of the plaintiff's assets and should the plaintiff be

united or not united with plaintiff will by law be required to conduct its business as far as the minor is concerned and falls with the FSIA exception.

RELIEF

10. The plaintiff is entitled to a JURY trial in the matter and requests that the matter be set for trial. Document 27 pg 1-29

11. The plaintiff has requested the defendants to Produce the Discovery material to verify any denial they have fraudulently stated to the court in dealing with Saddam Huessien Terrorist Regime and be compelled to answer and produce the documents.

12. The FSIA exception are adequately met and the matter should be set for trial.

13. The Alien Claims Tort have been met and the matter be allowed under that subject matter. Document 27 pg 1-29

14. The Torture Victim Protection Acts have been met so the case my be allwed on this matter.

15. The Convention for Child Rights have been met and the Reunification and Preliminary Injunction for plaintiff Nara be so ORDERED.

16. Adequate reason for denying plaintiffs Nara Singhderewa citizenship in the United States be addressed.

17. A Sua Sponte Writ of Habeus Corpus for the production of the plaintiff Nara Singhderewa be Ordered.

18. The plaintiffs property has been taken illegally and the matter meets with subject matter jurisdiction in FSIA and the plaintiff is affected in the United States.

# TABLE OF AUTHORITIES

**CASES**

Alperin v. Vatican Bank, 410 F.3d 532 (9th Cir. 2005)

Baker v. Carr, 369 U.S. 186 (1962)...............

*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993);

Cabiri v. Assasie-Gyimah, 921 F.Supp. 1189 (S.D.N.Y. 1996)........

Carrera v. Carrera, 174 F.2d 496 (D.C. Cir. 1949)..................................................

Chong Boon Kim v. Kim Yong Shik, Civ. No. 12565 (Cir. Ct. 1st Dir. Haw. 1963)..........

Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980)

*Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989

*Gilson v. Republic of Ireland*, 682 F.2d 1022 (D.C. Cir. 1982).

Hellenic Lines, Ltd. v. Moore, 345 F.2d 978 (D.C. Cir. 1965)..........................................

Hilao v. Marcos, 25 F.3d 1467(9th Cir. 1994)................................................................

In re South African Apartheid Litigation, 346 F.Supp.2d 538 (S.D.N.Y. 2004) ..................

Jackson v. Beech, 636 F.2d 831 (D.C. Cir. 1980)

*Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987)

Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995) ..

Kilroy v. Charles Windsor, Prince of Wales, Civ. No. C-78-291 (N.D. Ohio, 1978)...

Letelier v. Republic of Chile, 488 F.Supp. 665 (D.D.C. 1980) ..........

Mujica v. Occidental Petroleum Corp., 2005 WL 1962673 (C.D. Cal. June 28, 2005)..

Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations,111 F.Supp.2d 457 (S.D.N.Y. 2000).....................

Mwani v. Bin Laden, 417 F.3d 1 (D.C. Cir. 2005).........................

*Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984)

Phoenix Consulting Inc., v. Republic of Angola, 216 F.3d 36 (D.C. Cir. 2000)..............

Presbyterian Church of Sudan v. Talisman Energy, Inc., 2005 WL 2082846(S.D.N.Y. 2005).....

Re Bo Xilai, Bow Street Magistrates (unreported decision), November 8, 2005...

Republic of Austria v. Altmann, 541 U.S. 677 (2004) .............

Sarei v. Rio Tinto, 2006 WL 2242146(9th Cir. 2006)...........

Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch), 1163 L.Ed. 287 (1812)....

Siderman de Blake v. Republic of Argentina, 965 F.2d 677 (9th Cir. 1992)......

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)..

Tachiona ex. rel. Tachiona v. Mugabe, 186 F.Supp.2d 383 (S.D.N.Y. 2002) ..

Tachiona v. Mugabe, 169 F.Supp.2d 259(S.D.N.Y. 2001).

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.1984) ...

Trajano v. Marcos, 978 F.2d 493 (9th Cir. 1992)....

Trost v. Tompkins, 44 A.2d 226 (D.D.C. 1945) ....

U.S. v. Al-Hamdi, 356 F.3d 564 (4th Cir. 2004)....

*United States v. Gaubert*, 499 U.S. 315, 322 (1991

U.S. v. Kostadinov, 734 F.2d 905 (2d Cir. 1984).....

U.S. v. Sissoko, 995 F.Supp. 1469 (S.D. Fla. 1997)........

U.S. v. Tachiona, 386 F.3d 205 (2d Cir. 2004)

Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995)...

**STATUTES, RULES, AND REGULATIONS**

Alien Tort Claims Act, 28 U.S.C.A. § 1350 (2006).....

Diplomatic Relations Act of 1978, 22 U.S.C.A. § 254a (2006)...

Foreign Sovereign Immunities Act of 1976, 28 U.S.C.A. §§ 1602 et seq (2006) .

Torture Victim Protection Act of 1991, 28 U.S.C.A. § 1350 Note (2006)....

**TREATIES AND CONVENTIONS**

Convention on the Privileges and Immunities of the United Nations, Feb. 13, 1946,

21 U.S.T. 1418, T.I.A.S. No. 6900............................

Agreement Between the United Nations and the United States of America Regarding the

Headquarters of the United Nations, June 26-Nov. 21 1947, 61 Stat. 754, 756 .

Vienna Convention on Diplomatic Immunity, April 18, 1961, 23 U.S.T.

3227,U.N.T.S.95, .

Universal Declaration on Human Rights

Convention on the Rights of the Child creates

**OTHER AUTHORITIES**

Restatement (Third) of Foreign Relations Law (1987) § 111(2)..........

Restatement (Third) of Foreign Relations Law(1987) § 464.....

Maureen Fan, Chinese Rights Activist Stands Trial After Police Detain Defense

Team,Wash. Post, August 19, 2006, at A10 ..

Volcker UN OIL FOR FOOD SCAM

Patak OIL FOR FOOD SCAM IN INDIA

COLE COMMISSION AUSTRALIAN WHEAT OIL FOR FOOD SCAM

\S"
_____
JUGVIR INDER SINGH
PRO SE APPELLANT
4409 Hoffner Suite 405, Orlando Fl 32818

DATED: Friday, April 11, 2008

CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

This is to certify, under penalty of perjury, that I have read the applicable Federal Rules

of Civil Procedure and Local Court Rules, and that the attached Appellants Brief and

Statement of Interest of The United Nations, Australia and the Union of India, and all

accompanying documents, comply with the requirements of said Rules, as we understand

them, including Compliance with type-volume Limitations being 30 pages, Typeface

Requirement, and Type Style Requirements. Being a 12 point Times Roman Font and

1. This brief complies with the type-volume limitations of the Fed R. App. P 32(a)
   (7) (B) (iii) of 30 pages and 8076 words.

2. The brief complies with the typeface requirements of the Fed R. App. P 32(a)(5)
   and the typestyle requirements of the Fed R. App. P 32(a)(6) because:

   a. This brief has been prepared in a proportionally spaced typeface using
      Microsoft Word 2003.

   b. This brief complies with the efiling requirements of conversion to PDF
      files from within the compliance.

\S"
_____
JUGVIR INDER SINGH
PRO SE APPELLANT
4409 Hoffner Suite 405, Orland Fl 32818
DATED: Friday, April 11, 2008

APPENDIX

APPEAL, CLOSED, JURY, PROSE-NP, TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:07-cv-01170-JDB

SINGH et al v. COMMONWEALTH OF
AUSTRALIA et al
Assigned to: Judge John D. Bates
Cause: 42:1983 Civil Rights Act

Date Filed: 06/29/2007
Date Terminated: 11/26/2007
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights:
Other
Jurisdiction: Federal Question

**Plaintiff**

**JUGVIR INDER SINGH**
*as individual and head of the*
*Estate of the Singhderewa Family*

represented by **JUGVIR INDER SINGH**
4409 Hoffner
Suite 405
Orlando, FL 32818
5714268522
Email: singhderewa@lycos.com
PRO SE

**JUGVIR INDER SINGH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ESTATE OF THE**
**SINGHDEREWA FAMILY**

V.

**Defendant**

**COMMONWEALTH OF**
**AUSTRALIA**

represented by **John E. Prominski, Jr.**
MILES & STOCKBRIDGE, P.C.
1751 Pinnacle Drive
Suite 500
McLean, VA 22102
(703) 610-8653

Email:
jprominski@milesstockbridge.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNION OF INDIA**

**Defendant**

**UNITED NATIONS**

**Defendant**

**JOHN DOES**
*1-99*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/29/2007 | 1 | COMPLAINT against COMMONWEALTH OF AUSTRALIA, UNION OF INDIA, UNITED NATIONS filed by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY. (Attachments: #  1 Civil Cover Sheet)(lc, ) (Entered: 07/02/2007) |
| 06/29/2007 | 2 | MOTION for Leave to Proceed in forma pauperis by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (lc, ) (Entered: 07/02/2007) |
| 06/29/2007 | | Fiat ORDER granting 2 Motion for Leave to Proceed in forma pauperis. Signed by Judge Henry H. Kennedy on 6/29/2007. (lc, ) (Entered: 07/02/2007) |
| 06/29/2007 | 3 | MOTION For CM/ECF Password by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (lc, ) (Entered: 07/02/2007) |
| 06/29/2007 | | SUMMONS Not Issued as to COMMONWEALTH OF AUSTRALIA, UNION OF INDIA, UNITED NATIONS (lc, ) (Entered: 07/02/2007) |
| 07/06/2007 | | Summons (3) Issued as to COMMONWEALTH OF AUSTRALIA, UNION OF INDIA, UNITED NATIONS. (lc, ) (Entered: 07/06/2007) |

| 07/13/2007 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. COMMONWEALTH OF AUSTRALIA served on 7/10/2007, answer due 7/30/2007 (lc, ) (Entered: 07/16/2007) |
|---|---|---|
| 07/20/2007 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNION OF INDIA served on 7/11/2007, answer due 7/31/2007 (lc, ) (Entered: 07/24/2007) |
| 07/30/2007 | 6 | NOTICE by UNITED NATIONS. Related document: 1 Complaint filed by ESTATE OF THE SINGHDEREWA FAMILY, JUGVIR INDER SINGH. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3)(lc, ) Modified on 9/27/2007 (lc, ). (Entered: 07/31/2007) |
| 08/13/2007 | 7 | NOTICE of Appearance by John E. Prominski, Jr on behalf of COMMONWEALTH OF AUSTRALIA (tg, ) (Entered: 08/15/2007) |
| 08/22/2007 | 8 | ORDER granting 3 Plaintiff's Motion for a CM/ECF password, subject to his completion of training. Signed by Judge John D. Bates on 8/22/07.(ah) (Entered: 08/22/2007) |
| 08/29/2007 | 9 | MOTION for Extension of Time to *File Responsive Pleadings* by COMMONWEALTH OF AUSTRALIA (Attachments: # 1 Text of Proposed Order)(Prominski, John) (Entered: 08/29/2007) |
| 08/29/2007 |  | MINUTE ORDER granting 9 Commonwealth of Australia's Motion for Extension of Time to September 24, 2007, to respond to the complaint. SO ORDERED. Signed by Judge John D. Bates on 8/29/07.(ah) (Entered: 08/29/2007) |
| 09/12/2007 | 10 | MOTION for Extension of Time to by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (SINGH, JUGVIR) Modified on 9/12/2007 (lc, ). (Entered: 09/12/2007) |
| 09/21/2007 | 11 | MOTION to Dismiss *Pursuant to Rules 12(b)(1), 12(b)(6) and 12(b)(7)* by COMMONWEALTH OF AUSTRALIA (Attachments: # 1 Text of Proposed Order)(Prominski, John) (Entered: 09/21/2007) |
| 09/27/2007 | 12 | Order advising plaintiff to respond by October 29, 2007, to Australia's motion to dismiss or the Court will treat the motion as conceded and may dismiss the complaint against the movant. Signed by Judge John D. Bates on 9/27/07. (ah) (Entered: 09/27/2007) |

| 09/27/2007 | | MINUTE ORDER denying as moot 10 Plaintiff's Motion for Extension of Time to respond to the United Nations' Notice that it does not submit to the jurisdiction of this Court, which was improperly docketed as an Answer to the complaint and erroneously viewed by plaintiff as a dispositive motion. SO ORDERED. Signed by Judge John D. Bates on 9/27/07.(ah) (Entered: 09/27/2007) |
|---|---|---|
| 10/14/2007 | 13 | Emergency MOTION for Preliminary Injunction by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (SINGH, JUGVIR) (Entered: 10/14/2007) |
| 10/16/2007 | 14 | ORDER denying 13 Plaintiff's Motion for a Preliminary Injunction. Signed by Judge John D. Bates on 10/16/07.(ah) (Entered: 10/16/2007) |
| 10/27/2007 | 15 | Memorandum in opposition to re 11 MOTION to Dismiss *Pursuant to Rules 12(b)(1), 12(b)(6) and 12(b)(7)* filed by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY. (SINGH, JUGVIR) (Entered: 10/27/2007) |
| 10/27/2007 | 16 | ENTERED IN ERROR..... First MOTION for Hearing by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (SINGH, JUGVIR) Modified on 10/29/2007 (lc, ). (Entered: 10/27/2007) |
| 10/29/2007 | 17 | ENTERED IN ERROR..... Memorandum in opposition to re 16 First MOTION for Hearing filed by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY. (Attachments: # 1 Exhibit inhertance trade secrets# 2 Exhibit Futile Police Reports# 3 Exhibit Futile Attempts at Police Reports# 4 Exhibit Police Report on Suspect and Futile Attempts# 5 Exhibit Futile Attempts with United Nations# 6 Exhibit Example if inherited property)(SINGH, JUGVIR) Modified on 10/29/2007 (lc, ). (Entered: 10/29/2007) |
| 10/29/2007 | 18 | ENTERED IN ERROR.....MOTION to Expedite by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (SINGH, JUGVIR) Modified on 10/29/2007 (lc, ). (Entered: 10/29/2007) |
| 10/29/2007 | | NOTICE OF CORRECTED DOCKET ENTRY: re 17 Memorandum in Opposition, 16 First MOTION for Hearing, 18 MOTION to Expedite were entered in error because the documents attached to the entries are incorrect. (lc, ) (Entered: 10/29/2007) |
| 11/01/2007 | 19 | Emergency MOTION to Amend/Correct *Citizenship* by |

| | | |
|---|---|---|
| | | JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY (Attachments: # 1 # 2 # 3 Exhibit American Citizen Data)(SINGH, JUGVIR) (Entered: 11/01/2007) |
| 11/05/2007 | 20 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's memoranda in Opposition to Defendant Australia's Pending Motion to Dismiss* by COMMONWEALTH OF AUSTRALIA (Attachments: # 1 Text of Proposed Order Order)(Prominski, John) (Entered: 11/05/2007) |
| 11/05/2007 | | MINUTE ORDER granting 20 Defendant Australia's Motion for Extension of Time to File Reply by November 15, 2007. SO ORDERED. Signed by Judge John D. Bates on 11/5/07.(ah) (Entered: 11/05/2007) |
| 11/07/2007 | | Set/Reset Deadlines: Reply due by 11/15/2007. (tb, ) (Entered: 11/07/2007) |
| 11/12/2007 | 21 | RESPONSE re 6 Answer to 1 Complaint *United Nations* filed by JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY. (Attachments: # 1 Exhibit Corruption# 2 Exhibit Corruption# 3 Exhibit money Laundering# 4 Exhibit Racketeering# 5 Exhibit Enterprise# 6 Exhibit Fraud# 7 Exhibit US BANKS# 8 Exhibit Terrorism# 9 Exhibit Enemy Act# 10 Exhibit Wire Fraud# 11 Exhibit BNP PARIBAS# 12 Exhibit UNITED NATIONS# 13 Exhibit Enemy# 14 Exhibit Corruption# 15 Exhibit Money Laundering# 16 Exhibit BHP# 17 Exhibit Jordan# 18 Exhibit US CONTACT# 19 Exhibit ENEMY# 20 Exhibit terrorism# 21 Exhibit Money Laundering)(SINGH, JUGVIR) Modified on 11/13/2007 (lc, ). (Entered: 11/12/2007) |
| 11/14/2007 | 22 | REPLY to opposition to motion re 11 MOTION to Dismiss *Pursuant to Rules 12(b)(1), 12(b)(6) and 12(b)(7)* filed by COMMONWEALTH OF AUSTRALIA. (Prominski, John) (Entered: 11/14/2007) |
| 11/26/2007 | 23 | ORDER granting 11 Defendant's Rule 12(b)(1) Motion to Dismiss; denying 19 Motion to Amend/Correct, and dismissing the case for the reasons stated in the Memorandum Opinion issued separately this day. Signed by Judge John D. Bates on 11/26/07.(ah) (Entered: 11/26/2007) |
| 11/26/2007 | 24 | MEMORANDUM OPINION accompanying final Order issued separately this day. Signed by Judge John D. Bates on 11/26/07. (ah) (Entered: 11/26/2007) |
| 03/10/2008 | 25 | MOTION to Set Aside,MOTION to Vacate judgment ordered |

| | | |
|---|---|---|
| | | 11/26/07 pursuant to Rule 60 and its sub chapters and reher case [23] Order on Motion to Dismiss,, Order on Motion to Amend/Correct, [24] Memorandum & Opinion, by JUGVIR INDER SINGH (td, ) (Entered: 03/12/2008) |
| 03/17/2008 | [26] | Memorandum in opposition to re [25] MOTION to Set Aside [23] Order on Motion to Dismiss,, Order on Motion to Amend/Correct, [24] Memorandum & Opinion MOTION to Vacate *Judgment* filed by COMMONWEALTH OF AUSTRALIA. (Attachments: # [1] Text of Proposed Order)(Prominski, John) (Entered: 03/17/2008) |
| 03/27/2008 | [29] | REPLY to opposition to motion re [27] Emergency MOTION to Reopen Case *VACATE ORDER* filed by JUGVIR INDER SINGH. (td, ) (Entered: 03/28/2008) |
| 03/28/2008 | [27] | Emergency MOTION to Reopen Case *VACATE ORDER* by JUGVIR INDER SINGH (Attachments: # [1] Statement of Facts MEMORANDUM OF POINTS, # [2] Exhibit PATTERN OF DURESS, # [3] Exhibit ADMISSION OF DEFENDANT, # [4] Errata ADMITTANCE OF TERRORISM, # [5] Exhibit AIDING ABETTING IRAQ, # [6] Exhibit IRAQ IN US SENATE, # [7] Exhibit VISA APPLICATIONS OOFICIAL DUTIES)(SINGH, JUGVIR) (Entered: 03/28/2008) |
| 03/28/2008 | [28] | REPLY to opposition to motion re [13] Emergency MOTION for Preliminary Injunction, [16] First MOTION for Hearing, [11] MOTION to Dismiss *Pursuant to Rules 12(b)(1), 12(b)(6) and 12(b)(7)*, [19] Emergency MOTION to Amend/Correct *Citizenship*, [25] MOTION to Set Aside [23] Order on Motion to Dismiss,, Order on Motion to Amend/Correct, [24] Memorandum & Opinion MOTION to Vacate *order* filed by JUGVIR INDER SINGH. (Attachments: # [1] Statement of Facts MEMORANDUM OF POINTS, # [2] Exhibit PATTERN OF DURESS, # [3] Exhibit ADMISSION OF DEFENDANT, # [4] Exhibit DISCOVERY OF OFFICIALS ACTS, # [5] Exhibit AIDING ABETTING IRAQ, # [6] Exhibit AIDING ABETTING IRAQ, # [7] Exhibit MONEY TAKEN IN LA BY DEFEDANTS)(SINGH, JUGVIR) (Entered: 03/28/2008) |
| 03/31/2008 | [30] | ORDER denying [27] Plaintiff's Motion to Reopen Case; denying [25] Plaintiff's Motion to Set Aside ; denying [25] Plaintiff's Motion to Vacate. Signed by Judge John D. Bates on 3/31/08.(ah) (Entered: 03/31/2008) |
| 04/02/2008 | [31] | RESPONSE TO ORDER OF THE COURT re [30] Order on Motion to Reopen Case, Order on Motion to Set Aside, Order on Motion to Vacate, [23] Order on Motion to Dismiss,, Order on |

| | | |
|---|---|---|
| | | Motion to Amend/Correct, 24 Memorandum & Opinion, 14 Order on Motion for Preliminary Injunction filed by JUGVIR INDER SINGH. (Attachments: # 1 Statement of Facts MEMORANDUM IN SUPPORT, # 2 Exhibit CHILD ABUSE, # 3 Declaration UN CHILD ABUSE REPORT, # 4 Exhibit AUSTRALIA ADMITTANCES, # 5 Exhibit AUSTRALIA LAW, # 6 Exhibit HAGUE CHILD CUSTODY LAW)(SINGH, JUGVIR) (Entered: 04/02/2008) |
| 04/02/2008 | 32 | Emergency MOTION to Alter Judgment by JUGVIR INDER SINGH (Attachments: # 1 Statement of Facts Constitutional Tort, # 2 Declaration Violations of Rights, # 3 Exhibit manifest injustice, # 4 Declaration UN unborn rights, # 5 Affidavit NARA PARTY, # 6 Exhibit Futile efforts in Australia, # 7 Exhibit Futile commission efforts in Australia, # 8 Declaration un standards, # 9 Exhibit australian violations, # 10 Supplement Australian Law dissertation, # 11 Supplement UN CHILD AMICUS, # 12 Errata child abuse)(SINGH, JUGVIR) (Entered: 04/02/2008) |
| 04/02/2008 | | MINUTE ORDER denying 32 Plaintiff's Motion to Alter Judgment, for the reasons stated in the Order of March 31, 2008. Plaintiff is advised that any further filings save a notice of appeal may be deemed redundant and ordered stricken from the record. SO ORDERED. Signed by Judge John D. Bates on 4/2/08.(ah) (Entered: 04/02/2008) |
| 04/07/2008 | 33 | NOTICE OF APPEAL as to 30 Order on Motion to Reopen Case, Order on Motion to Set Aside, Order on Motion to Vacate, 23 Order on Motion to Dismiss,, Order on Motion to Amend/Correct, 24 Memorandum & Opinion, 14 Order on Motion for Preliminary Injunction by JUGVIR INDER SINGH. Fee Status: No Fee Paid. Parties have been notified. (Attachments: # 1 Appendix Additional Service Addresses)(SINGH, JUGVIR) (Entered: 04/07/2008) |
| 04/08/2008 | 34 | Amended NOTICE OF APPEAL by JUGVIR INDER SINGH. (Attachments: # 1 Appendix additional addresses, # 2 Exhibit ORDER BEING APPEALED, # 3 Errata ORDER BEING APPEALED)(SINGH, JUGVIR) (Entered: 04/08/2008) |
| 04/08/2008 | 35 | NOTICE *waiver of fees* by JOHN DOES, JUGVIR INDER SINGH, ESTATE OF THE SINGHDEREWA FAMILY re 28 Reply to opposition to Motion,, 8 Order on Motion for Miscellaneous Relief, 23 Order on Motion to Dismiss,, Order on Motion to Amend/Correct, 24 Memorandum & Opinion, 29 Reply to opposition to Motion, 7 Notice of Appearance, 6 |

Answer to Complaint, 17 Memorandum in Opposition, 12 Fox/Neal Order, 30 Order on Motion to Reopen Case, Order on Motion to Set Aside, Order on Motion to Vacate, 31 Response to Order of the Court,, 1 Complaint, 26 Memorandum in Opposition, 5 Summons Returned Executed, 4 Summons Returned Executed, 14 Order on Motion for Preliminary Injunction, 22 Reply to opposition to Motion, 15 Memorandum in Opposition, 21 Response to Document,, (Attachments: # 1 Affidavit Fee Waiver, # 2 Statement of Facts income statement, # 3 Statement of Facts employment, # 4 Statement of Facts support statement, # 5 Statement of Facts cash flow statement, # 6 Statement of Facts change of events statement, # 7 Statement of Facts future income statement, # 8 Statement of Facts non assets statement)(SINGH, JUGVIR) (Entered: 04/08/2008)

## PACER Service Center

### Transaction Receipt

| | | |
|---|---|---|
| | 04/08/2008 07:59:25 | |
| **PACER Login:** | js5182 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-01170-JDB |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JugvirInder Singh,

Plaintiff,

v.                                    Civil Action No.  07-1170 (JDB)

Commonwealth of Australia et al., Defendants.


**ORDER**

Plaintiff moves the Court to issue a preliminary injunction to enjoin "the defendants and their agents . . . from exercising any rights whatsoever over Nara Avalon von Neumann Singhderewa," who he claims to be his six-year-old daughter.  Mot. at 1. To prevail on a motion for a preliminary injunction, the movant must demonstrate (1) that he is substantially likely to succeed on the merits of the suit, (2) that, without the injunction, he would suffer irreparable harm for which there is no adequate legal remedy, (3) that the injunction would not substantially harm other parties, and (4) that the injunction would not substantially harm the public interest.  *Al-Fayed v. Central Intelligence Agency*, 254 F.3d 300, 303 (D.C. Cir. 2001); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1505-06 (D.C. Cir. 1995).  The burden is on the movant to demonstrate a clear entitlement to the extraordinary and drastic remedy of preliminary injunctive relief.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Plaintiff bases his motion in part on the fact that only one of the three named defendants, Australia, has submitted to this Court's jurisdiction.  *See* Mot. at 2. That is not a basis for affording him the relief he seeks.  He has not shown, moreover, that he

will be able to overcome the substantial jurisdictional question this case presents and

therefore has not demonstrated the

first requirement for issuing a preliminary injunction. Plaintiff's vague assertions that the

alleged behavior forming the basis of the complaint "cumulatively continues to cause"

him injury, Mot. at 2, do not present the type of exigent circumstances amounting to

irreparable injury necessary to satisfy the second requirement for a preliminary

injunction. Besides, an "order granting an injunction . . . shall set forth the reasons for its

issuance . . . be specific in terms. . . [and] describe in reasonable detail, and not by

reference to the complaint or other document, the act or acts sought to be restrained."

Fed. R. Civ. P. 65(d). Neither plaintiff's motion nor his proposed order specifies the acts

to be enjoined beyond those sought ultimately as relief in the complaint. Accordingly, it

is

      **ORDERED** that plaintiff's motion for a preliminary injunction [Dkt. No. 13] is

**DENIED**.

                s/      JOHN D. BATES    United
States District Judge Dated: October 16, 2007 -

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

Jugvir Inder Singh, Plaintiff,

v.                                              Civil Action No.  07-1170 (JDB)

Commonwealth of Australia et al., Defendants.

### ORDER

Plaintiff moves pursuant to Fed. R. Civ. P. 60 to vacate the Order of November 26, 2007, dismissing this case for lack of subject-matter jurisdiction.  Such motions are committed to the sound discretion of the trial court to grant or deny and "need not be granted unless the district court finds that there is an intervening change in controlling law, the availability of new evidence or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (citations and internal quotation marks omitted).  Plaintiff provides no grounds for vacating the dismissal order.  Accordingly, it is

**ORDERED** that plaintiff's motions to set aside or vacate [Dkt. Nos. 25, 27] are **DENIED**.

s/      JOHN D. BATES    United
States District Judge Dated: March 31, 2008

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUGVIR INDER SINGH et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| V | ) | CASE NO 1:07-CV-01170 |
| | ) | JUDGE JOHN D.BATES |
| | ) | |
| COMMONWEALTH OF AUSTRALIA | ) | |
| et al. | ) | |
| Defendants | | |

RESPONSE TO COURT ORDER AND MOTION FOR RECONSIDERATION TO

REAHEAR AND REOPEN AND THE MEMORANDUM OF POINTS AND

AUTHORITIES IN SUPPORT TO A HEIGHTENED REVIEW OF

"EXTRAORDINARY CIRCUMSTANCE" AND MANIFEST UNJUSTICE TO THE

PLAINTIFFS

ABSTRACT :

The ORDER DATED MARCH 31 2008 is based primarily on Firestone vs. Firestone and

does not prevent manifest injustice.  Like in verbatim Firestone matter the ORDER

admits the motion to vacate is based on Fed R. Civ P 60 and erroneously anchors its

decision to deny the motion, on a Rule 59(e) motion "is discretionary" and need not be

granted unless the district court finds that there is an "intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice." *National Trust v. Department of State,* 834 F. Supp. 453, 455 (D.D.C

1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama*

*Historical Ass'n v. Christopher,* 49 F.3d 750 (D.C. Cir. 1995) (quoting *Virgin Atlantic*

*Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.), *cert. denied* 113

S. Ct. 67 (1992)).   Application of Rule 59(e) plaintiffs states would create

1. United States to be a nessessary and essential party to the case and would make
   the judgment moot.

2. Would make Nara Singhderewa a minor, that has the right to counsel and present
   being represented by the plaintiff a necessary and essential party to the case and
   being that the ORDER Nov 26th 2007 states she is non-party would make the
   judgement moot.

3. As representative and father of the minor the plaintiff represents the minor in a
   pro se and forma paupers capacity and being that this capacity was denied
   automatically creates non party minor the right to representation and makes the
   order null and void. EXHIBIT ONE

In the Firestone family multi year case, a review of the district court's refusal to vacate a

judgment under Federal Rule of Civil Procedure 59(e) for abuse of discretion. *See*

*Browder v. Director, Ill. Dep't of Corrections,* 434 U.S. 257, 263 n.7 (1978) (discussing

the analogous Rule 60(b)). Leave to amend a complaint under Rule 15(a) "shall be freely

given when justice so requires." FED. R. CIV. P. 15(a); *see Foman v. Davis,* 371 U.S.

178, 182 (1962). Although the grant or denial of leave to amend is committed to a district

court's discretion, it is an abuse of discretion to deny leave to amend unless there is

sufficient reason, such as "undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment." *Foman,* 371 U.S. at 182.  SEE ORDER DATED 26th Nov 2007 there is no reason given to deny leave to amend the case.

After the district court dismissed the complaint with prejudice, Russell III and Myrna could amend their complaint only by filing, as they properly did, a 59(e) motion to alter or amend a judgment combined with a Rule 15(a) motion requesting leave of court to amend their complaint. *See Confederate Memorial Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C. Cir. 1993) (describing the procedure). Rule 15(a)'s liberal standard for granting leave to amend governs once the court has vacated the judgment. *See* 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1489 at 694 (2d ed. 1990). But to vacate the judgment, Appellants must first satisfy Rule 59(e)'s more stringent standard. *See id.* Therefore, we first determine whether the district court abused its discretion in failing to vacate the original dismissal with prejudice. If it did, we then ask whether the district court abused its discretion in denying Russell III and Myrna leave to file their amended complaint.  See ORDER dated 26th November 2007.

With respect to the first issue, we conclude that the denial of the 59(e) motion was an abuse of discretion because the dismissal of the original complaint *with prejudice* was erroneous. Even assuming that the district court properly dismissed the complaint, neither the determination that Russell III and Myrna's claims were time-barred, nor the determination that their complaint failed to plead fraud with particularity support a

dismissal *with prejudice.* As we have repeatedly held, courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint. *See, e.g., Richards v. Mileski,* 662 F.2d 65, 73 (D.C. Cir. 1981); *Jones v. Rogers Memorial Hosp.,* 442 F.2d 773, 775 (D.C. Cir. 1971). In *Richards* we made clear that, because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred. *See Richards,* 662 F.2d at 73. A dismissal *with prejudice* is warranted only when a trial court "determines that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.' " *Jarrell v. United States Postal Serv.,* 753 F.2d 1088, 1091 (D.C. Cir. 1985) (quoting *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962)).

Failure to plead fraud with particularity likewise does not support a dismissal with prejudice. To the contrary, leave to amend is " "almost always' " allowed to cure deficiencies in pleading fraud. *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir. 1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice,* 9.03 at 9-34 (2d ed. 1986)).

Turning then to the Rule 15(a) issue, we find error in the district court's complete failure to provide reasons for refusing to grant leave to amend. The Supreme Court stated in *Foman* that while the decision to grant or deny leave to amend is within the trial court's discretion, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." 371 U.S. at 182. We too have emphasized that a proper exercise of discretion requires that the district court provide

reasons. *See Parker v. Baltimore & Ohio R.R.,* 652 F.2d 1012, 1018, 1020 (D.C. Cir. 1981) (reversing district court's denial of leave to amend, and remanding to the district court either to grant plaintiff leave to amend or provide sufficient reasons for its denial).

the District of Columbia's three-year statute of limitations for claims based on fraud, intentional infliction of emotional distress, and interference with judgments. *See* D.C. Code § 12-301(8) (1995). Under District of Columbia law, a tort action accrues "when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C. 1989); *see also Goldman v. Bequai,* 19 F.3d 666, 671-72 (D.C. Cir. 1994). Fraudulent concealment, however, tolls the running of the statute of limitations. In *Larson v. Northrop Corp.,* we held that to prove fraudulent concealment, plaintiffs must " "show (1) that defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence.' " 21 F.3d 1164, 1172 (D.C. Cir. 1994) (quoting *Foltz v. U.S. News & World Report, Inc.,* 663 F. Supp. 1494, 1537 (D.D.C. 1987), *aff'd,* 865 F.2d 364 (D.C. Cir.), *cert. denied,* 490 U.S. 1108 (1989) (alteration in original)). Generally, fraudulent concealment requires that the defendant make an affirmative misrepresentation tending to prevent discovery of the wrongdoing. *See Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1491 (D.C. Cir. 1989). A failure to disclose by one who has a duty to do so-such as someone standing in a fiduciary or confidential relationship-also can establish fraudulent concealment. *Id.* at 1496. Once a plaintiff shows fraudulent concealment, a defendant wishing to assert "a defense based on the plaintiff's lack of due diligence must show

something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell*, 866 F.2d at 1491.  SEE ORDER  Nov 26th 2007.


## ARGUMENT I

## WAIVER OF SOVERIGN IMMUNITY

Plaintiffs argue that the International Covenant on Civil and Political Rights ('ICCPR') read in conjunction with the ATCA constitutes the requisite waiver of sovereign immunity. The United States ratified the ICCPR in 1992. It provides in relevant part:

Each State party to the present Covenant undertakes: (a) to ensure that any person whose rights or freedoms herein recognized are violated shall have an effective {22 F.Supp.2d 353, 365} remedy, notwithstanding that the violation has been committed by persons acting in an official capacity; (b) to ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities.ICCPR Article 2(3) (a-b).

"No one can read the significant Supreme Court cases on sovereign immunity ... without concluding that the field is a **mass of confusion**; and if he ventures beyond that to attempt some reconciliation of the courts of appeals decisions, he will find confusion compounded."

Antonin Scalia (Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice), letter dated May 10 1976 to the Chairman, Subcommittee on Administrative

Practice and Procedure, U.S. Senate Judiciary Committee, pertaining to to the ensuing P.L. 94-574, amending the Administrative Procedure Act to waive sovereign immunity for "relief other than money damages", 5 U.S.C. § 702, Oct. 21 1976 (U.S. Congress 94-2, House Judiciary Committee, H.R. Rep. No. 94-1656, Sept. 22 1976, SuDoc 94-2:H.rp.1656, Serial Set 13134-12), 1976 USCCAN 6121, 6145, *via* 1976 WestLaw 14066, Leg.Hist. (103 kb), **bold-face** added.  The U.S. Supreme Court has admitted its confusion and confessed *(below)* that it made the very same mistake the Judge did in the *Jama* case. Recovering partially from their confusion, the Supreme Court indicated that sovereign immunity pertains to a *remedy* and not to a claim (a 'cause of action'). The ATCA provides no remedy, merely (as the Judge correctly observed) subject-matter jurisdiction.  EXHIBIT TWO

*Ratification of International Covenant on Civil and Political Rights* {10 kb txt, 302 kb pdf} (U.S. Congress 102-2, Senate Executive Report No. 102-23, March 24 1992), **bold-face** added. Senate Resolution (April 2 1992), ratifying the ICCPR treaty {cited above}. The Declarations and Reservations (323 kb) (UNHCR, Geneva) also quote the content of the U.S. Senate resolution.

The ATCA provides the subject matter jurisdiction (international-law tort claims by aliens), as detailed above. The DJA provides the remedy (declaratory judgment), as detailed above. And, the APA provides the waiver of sovereign immunity for a U.S. Court to award that remedy as detailed above.

The APA (which waives sovereign immunity for "relief other than money damages" on any type of claim for which the U.S. Court has jurisdiction) is like the *Tucker Act* (which

waives sovereign immunity for relief by money damages on non-tort contract claims, and "taking" claims, for which the U.S. Court has jurisdiction) {463 U.S. 206, 212}:

In *United States v. Testan*, 424 U.S. 392, 398, 400 (1976), and in *United States v. Mitchell*, 445 U.S. at 538, this Court employed language suggesting that the *Tucker Act* does not effect a waiver of sovereign immunity. Such language was not necessary to the decision in either case. *See infra*, at 217-218. Without in any way questioning the result in either case, we conclude that this isolated language should be disregarded. If a claim falls within the terms of the *Tucker Act*, the United States has presumptively consented to suit.

Congress plainly agreed with Judge Cardozo and was *determined* that U.S. Courts should **stop** creating injustice and hatred, should **stop** giving the United States blanket immunity for the wrongdoings of its officials, should **stop** rubber-stamping their actions, should **stop** thereby licensing them to violate the law, and, instead, should **apply their minds** case-by-case to whether some special factor, in that particular case, *justified* immunity. And, the U.S. Department of Justice agreed with Congress, through their spokesman who is now himself a U.S. Supreme Court Justice {1976 USCCAN 6145}:

It is not the intent of the Department nor, as I understand it, the intent of the drafters of this bill, that all of the cases which have heretofore been disposed of on the basis of sovereign immunity would in the future {1976 USCCAN 6146} be entertained and adjudicated by the courts. To the contrary, one of the very premises of the proposal is the fact that many (indeed, I would say most) of the cases disposed of on the basis of sovereign immunity could have been decided the same way on **other legal grounds**, such

as: lack of standing; lack of ripeness; availability of an alternative remedy in another court; express or implied statutory preclusion of judicial review; commission of the matter by law to agency discretion; privileged nature of the defendant's conduct; failure to exhaust administrative remedies; discretionary power to refuse equitable relief; and the 'political question' doctrine."

# ARGUMENT II

## MANIFEST INJUSTICE

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id*. ¶ 42.  "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable' We are led to see justice as fairness, as the greatest mutual advantage, as the minimax relative concession, as reciprocity, as the terms of a society-wide agreement that cannot reasonably be rejected, as reversibility, as impartiality and the image is embodied in a woman blindfolded holding a balance.  The plaintiff has argued that the manifested injustice already ruled "unjustifiable" and admitted in an order also denies the plaintiff categorical imperative identified justice as universalizability as recognized by International norms already.

In the UNITED STATES DISTRICT COURT WESTERN DISTRICT OF KENTUCKY AT LOUISVILLE CIVIL ACTION NO. 3:04CV-338-H JAMES H. O'BRYAN et. al. PLAINTIFFS V. HOLY SEE DEFENDANT

Plaintiffs allege first that the Holy See violated its international law obligations under the Universal Declaration of Human Rights and the Convention on the Rights of

the Child.  Second, Plaintiffs allege that Defendant, "by and through its agents, servants and employees," breached duties owed to Plaintiffs. Those duties included the duty to provide safe care, custody, and control to the minor children entrusted to Roman Catholic; the duty to warn parents of those children that the priests and other clerics to whom they entrusted their children were known perpetrators of childhood sexual abuse; and the duty to report known or suspected perpetrators of childhood sexual abuse to the appropriate authorities. Third, Plaintiffs allege that the Holy See breached fiduciary duties owed to Plaintiffs, including but not limited the duty to warn parents of children placed in the care, custody, and control of known perpetrators of childhood sexual abuse and the duty to report known or suspected perpetrators of child sexual abuse to the appropriate authorities. Fourth, Plaintiffs allege that Defendant's conduct constitutes an outrage and infliction of emotional distress.  Fifth and sixth, in claims solely against the Holy See in its capacity as an incorporated association and head of an international religious organization, Plaintiffs allege torts of deceit and misrepresentation.  Plaintiffs also seek a variety of injunctive relief.  EXHIBIT FOUR

No one disputes that the tortious activity exception is restricted to cases in which the personal injury, death, or damage to or loss of property occurs in the United States.  28 U.S.C. § 1605(a)(5). The actual personal injuries complained of in this suit – the sexual abuse of Plaintiffs and purported Class Members – meet that requirement.  However, the analysis does not end here. The Seventh and D.C. Circuits have added the requirement that the tortious act or omission (in addition to the actual personal injury) must occur in the United States.  *See Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 379 (7th Cir. 1985); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517,

1524 (D.C. Cir. 1984).[2] The Ninth Circuit has a slightly different rule, holding that "if plaintiffs allege *at least one entire tort* occurring in the United States, they may claim under § 1605(a)(5)."  *Olsen v. Government of Mexico*, 729 F.2d 641, 646 (9th Cir. 1984) (emphasis added).  The Sixth Circuit has not considered this additional requirement.

EXHBIT FIVE

Subsequently, Chief Justice Rehnquist, speaking for a unanimous Supreme Court, discussed the issue in *Argentine Republic v. Amerada Hess Shipping Corp.*, *supra*. The Court did hold that § 1605(a)(5) is "limited by its terms . . . to those cases in which the damage to or loss of property occurs *in the United States*." *Id.* at 439 (emphasis in original).  The Court then concluded that "[b]ecause respondents' *injury* unquestionably occurred well outside [the United States], the exception for noncommercial torts cannot apply."  *Id.* at 441 (emphasis added).  The Court then discussed the fact that a tort may have had effects in the United States, drawing a distinction between § 1605(a)(5) and § 1605(a)(2), under which a foreign state may be liable for commercial activities "outside the territory of the United States" that have a "direct effect" inside the United States. 28 U.S.C. § 1605(a)(2). It said that "Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States." *Amerada Hess*, 488 U.S. at 441.  EXHIBIT SIX   EXHBIT SEVEN  While the Supreme Court's conclusions are not completely clear, its language suggests a view that both the injury and the tortious act or omission must occur in the United States. This is strong enough language for this Court to adopt the same view. Here, Plaintiffs allege torts that occurred both outside and inside the United States. Plaintiffs concede that the *acts* of

*Defendant itself* were all "committed outside the United States." *See* Plaintiffs' Response

Brief at 27. Moreover, any omissions committed by the Holy See itself clearly occurred

outside of the United States.  , Plaintiffs allege that acts and omissions by agents of the

Holy See inside the United States caused personal injuries. Specifically, Plaintiffs allege

that Defendant's agents, officials, and employees failed to report known or suspected

child abuse, failed to warn parishioners about known or suspected pedophiles in child-

care positions, failed to provide adequate care to children entrusted to its churches and

school, failed to maintain the premises of churches and schools in a reasonably safe

condition, and failed to adequately supervise or control known or suspected sexual

predators. *Id.* at 17. These torts – both acts and omissions – alleged to have been

committed by the "Defendant's agents, officials, and employees" *in the United States* all

certainly occurred within the United States, and thus squarely fall under the tortious

activity exception of FSIA. Having concluded that some of Plaintiffs' claims meet the

tortious conduct exception to FSIA's general rule of immunity, the Court must now

consider a final issue.  This concerns "the exception within the exception." FSIA will not

allow a tort claim, even against officials or employees of the Holy See whose acts and

injuries occur in the United States where those officials were exercising their

discretionary function.  Called the discretionary function exception, it exempts claims

"based upon the exercise or performance or the failure to exercise or perform a

discretionary function regardless of whether the discretion be abused." 28 U.S.C. §

1605(a)(5)(A).  EXHIBIT EIGHT

The discretionary function exception of the FSIA is modeled after the corresponding exception in the Federal Tort Claims Act ("FTCA") and is interpreted and applied consistent with FTCA law. *See, e.g., Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987). This exception appears based upon the policy view that foreign states should be immune from the consequences of discretionary acts of employees, even within the scope of their employment.  Courts have found that both the FTCA and FSIA exceptions are intended to preserve immunity "for decisions grounded in social, economic, and political policy." *In re Terrorist Attacks of September 11, 2001*, 349 F.Supp.2d 765, 794 (S.D.N.Y. 2005) (internal citations and quotations omitted).  Consequently, the discretionary function exception preserves immunity for planning-level decisions, as opposed to operational-level decisions.  *Id.* (citations omitted).

Defendant must satisfy two elements to avail itself of FSIA immunity under the discretionary function exception. First, the challenged action must be discretionary; that is, it must involve "an element of judgment or choice."  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). In the FTCA context, this prong means that if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply.  *Berkovitz*, 486 U.S. at 536. Second, and even if the challenged action did involve an element of judgment or choice, "a court must determine whether that judgment is of the kind the discretionary function exception was designed to shield." *Id.*; *Gaubert*, 499 U.S. at 322-23. The Supreme Court explained this prong in *Berkovitz* in the following manner: The basis for the discretionary function exception was Congress'

desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy. *Berkovitz*, 486 U.S. at 536 (internal citations omitted).

To answer the questions posted by the two *Berkovitz* elements, the Court must define Plaintiffs' negligence claims by their constituent elements.  These claims can be distilled into three principal omissions, as laid out in the Complaint: that (1) Defendants failed to *provide safe care* to children entrusted to their care; that (2) Defendants *failed to warn* parishioners that their children would be under the care of known or suspected pedophiles*;* and that (3) Defendants *failed to report* known or suspected child abuse to the appropriate authorities . *See*  EXHIBIT NINE

For the reasons that follow, only the first group of claims meets the discretionary function test and are exempt from suit.

The first claim seems to be essentially a negligent hiring claim: that the Defendant hired persons whom it knew or suspected were child sexual abusers and place them in positions where they could sexually abuse children. Applying the first prong of the *Berkovitz* test, such personnel decisions appear to involve a discretionary activity. Not surprisingly, courts have generally held that negligent hiring decisions are protected by the discretionary function exception. *See, e.g., United States v. Gaubert*, 499 U.S. 315, 332-34 (1991) (holding that claims involving management decisions, including the "negligent selection of directors and officers," were barred by the discretionary function exception); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions

relating to hiring . . . usually involve policy judgments of the type Congress intended the discretionary function to shield").  Although Defendant's hiring decisions may have indeed been negligent, the discretionary function exception to the FSIA protects such decisions. Therefore, Plaintiffs' negligence claim based upon the "duty to provide safe care, custody, and control" of minor children in Catholic schools and churches cannot proceed.  EXHIBIT NINE

The second negligence claim is that Defendant failed to warn parishioners that their children would be under the care of known or suspected pedophiles, allegedly pursuant to a policy promulgated by the Holy See itself.  Under the tests laid out in *Berkovitz* and *Gaubert*, the decision by the bishops, archbishops, and other clergy not to warn parishioners would appear to be a decision specifically prescribed by that policy. Therefore, their decisions do not satisfy the first prong of the *Berkovitz* test, because they did not involve "an element of judgment or choice." Therefore, the alleged failure of the Holy See's officials and employees to warn parishioners that their children would be under the care of known or suspected pedophiles is not a decision protected by the discretionary function exception.  EXHBIT TEN

Finally, Plaintiffs' claim that Defendant's officials and employees failed to report known or suspected perpetrators of child sexual abuse to the relevant state and local authorities.  Like the failure to warn claim, Plaintiffs claim that the Holy See's employees and officials failed to report child sexual abuse to the appropriate authorities pursuant to a policy promulgated by the Holy See. Again, as alleged, this decision did not involve an "an element of judgment or choice" because an established policy required the action. Thus, liability for such decision is not barred by the discretionary function exception.

John Rawls's "justice as fairness," where a sense of fairness impels all adult members of society to accept those principles of justice that it would be rational to adopt in an "original position." In this original position, all initial endowments disappear behind a "veil of ignorance." If people had no endowments, or had equal ones, or were ignorant of what they had, it would be pararational for them to agree that inequalities are to be evened out except if they work to the advantage of the least favored among them. This, Rawls's "difference principle," is the product of prudential reason once fairness has led all to ignore any initial advantages they may have.  The plaintiffs have argued manifested injustice applying Rawl's standard of fairness where Fairness as initial equality is an axiom of justice as fairness.  Plaintiffs argue the prevent the manifest injustice of

1.      Inalienable Rights guaranteed be the plaintiffs Nara Singhderewa and Jugvir Inder Singh for the next 12 years.   EXHIBIT NINE and ORDER OF NOV 26th 2007.

2.      Universal Declaration of Human Rights

3.      The Declaration of Basic Principles of Justice for Victims of Crime and Power

4.      The Convention against Torture and other Cruel, Inhuman or Degrading Treatment of Punishment.

5.      International Convention on the protection of the Rights of all migrant workers and members of their families

6.       United Nations Rules for the Protection of the Juveniles Deprived of Liberty

7.      Declaration on the Right and Responsibility of Individuals, Groups, and Organs to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms.

8.      International Covenant on Civil and Political Rights

9. Child Right Conventions

10. Torture Victim Prevention Act {TVPA], 1991 Act

11. Federal Kidnapping Act of 1932.

12. the Uniform Child Custody Jurisdiction Act ,

13. Parental Kidnap Prevention Act as applicable,

14.  National Center of missing and Exploited Children Assistance Act,

15. Civil Aspects of Hague International Child Abduction,,

16. the National Child Search Assistance Act,

17. International Parental Kidnapping Crime Act

18. Child Abuse Prevention and Enforcement Act (CAPE) Act known as "Jennifer's Law.

19. Violated and derogated Title 18 Chapter 213 §3283.

20.  Violated and derogated 28 U.S.C. §1606 28 U.S.C. §1606 and caused assault.

21. Violated and derogated 18 U.S.C Part 1 Chapter 95 §1959 or. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

22. Violated and derogated 1961(1) and (5) of Title 18 of the U.S. Code 1962(a) and (d) RICO and conspired to keep hostage and victimize the plaintiffs as well as violate and derogate Title 19 of U.S. §§ 1341 and 1343 (mail and wire fraud), §1512(b)(2) (obstruction of justice) and §2314 interstate transportation offenses of 18 U.S.C.A. §1961(1) and (5)

1.      23. Violated and derogated 18 U.S.C. 28 U.S.C. §§1605(a) (2), (a) (5), and (a) (7).

2.      24. Violated and derogated the Constitutional Right of the Plaintiffs

3.      25. Violated and Derogated the Civil Liberties of the plaintiff. With the egregious violations of nearly 25 core values of civilized nations the defendant cannot be covered in

FSIA under "grace and comity" of the people of the United States of America.

At trial the plaintiffs will show the admittance of the defendant that they have signed agreements and here we examine in detail one such agreement signed by the defendant, being the most ratified agreement in the world and under the focus of "grace and comity" of the defendant and examine how the pattern of conduct of defendant in defying the agreements it claims it has signed.  The defendant has derogated and violated , recognition of the inherent dignity and of the equal and inalienable rights of members of the human family which is the foundation of freedom, justice and peace in the world by claiming that it has sovergeinty over the dignity, equal and inalienable rights of the plaintiffs and that the defendant is above the law that itself as sovereign has signed being the Convention of Child Rights.

Among other "justices as ...," and next only to Rawls's, the most influential is probably Thomas Scanlon's (1982) justice as unrejectability. Brian Barry's (1995) "justice as impartiality" is a synthetic derivative of both, with a preponderance of Scanlon. The three together incorporate most of the currently dominant mainstream theory that, or so I shall argue, treats justice as a matter of social choice rather than, as in the traditional approach, a quality of individual acts.  Common law tort is simply "a civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages."[15] More concretely, common law torts typically involve four elements: (1) a common law duty from one individual to others; (2) that is breached through action or inaction; (3) that causes; (4) injury to another individual.[16] Constitutional torts track the same four elements except that the duty originates from the Constitution instead of the common law. Rather than running between two private individuals, a constitutional

duty runs between a government official or municipality and the private individual. While the defendant in a common law tort action may happen to be a government official or municipality, the defendant in a constitutional tort action is always a government official.

In Rawls, once he has led people into the original position (and some auxiliary assumptions are made), agreement on distributive principles is a matter of mutual advantage; it has instrumental value. In Scanlon's contractualist theory, in sharp contrast to Rawls, agreement need not yield mutual advantage in order to be reached. It may yield it accessorily, but people do not seek it to make themselves better off in the ordinary narrow sense. They seek it because they are motivated by a common desire for agreement that is inherent in morality (Scanlon 1982: 128).

So far, there is nothing implausible or far-fetched in Scanlon's construction. Less extravagantly than Rawls, it does not require harsh and heroic renunciation of initial advantages. It is easier to take it that people wish to live in agreement with each other, on the basis of which they can mutually justify their conduct (ibid.: 117) than that they commit themselves to a distributive rule that deprives the more favored among them of any advantage over the less favored.

In Scanlon, for the agreement to produce unrejectable rules that will be morally wrong to transgress, the agreement must be both informed and unforced (ibid.: 110-11). The information condition can, I believe, be safely accepted, but what about the condition of unforcedness?

Unforcedness, as Scanlon explains it, means not only that no party must be coerced to agree, but that none must be in a "weak bargaining position" enabling others "to insist on better terms" (ibid.: 111). But better than what? Manifestly, there is a hidden norm both for bargaining strength (none must be in a stronger or weaker position than the norm) and for the terms eventually struck in the bargain (they must not be better for some, worse for others). But if such a norm is tacitly pre-set, the desired bargaining solution will be a disguised initial condition of the theory and not a theorem of it. Though Scanlon, to his credit, refrains from saying so, we may take it that people starting from initially equal endowments would find rules providing for continuing equality unrejectable--they are left with no ground for rejection. Hence, they would find inequality in breach of the agreement unjust. This is plausible, but how interesting is it?

All we know of the common desire for agreement is that all are "moved by it to the same degree" (ibid.: 111). But what degree, how high? Given a very high degree, a variety of widely divergent terms may all be unrejectable. Nothing ensures a determinate solution. This might not matter much if the whole set of possible solutions were just by virtue of being unanimously agreed upon, or if there were independent means of identifying a unique just solution, or at least a just subset within the possible set. Would the test of "reasonableness" provide such a means? Or, what is a different proposition, is it that only reasonable terms are truly unrejectable? But what, then, is the test of reasonableness? How do we recognize it?

I would submit that we are inadvertently moving back and forth between what are, in fact, two theories separated by the idea of reasonableness, which acts as a "cutout." On

the near side, there is a theory in which the desire for agreement and initial equality jointly produce a bargaining solution, which is both unrejectable and normatively unique because it must correspond to the tacit norm built into the initial conditions (i.e., that the terms must not be "better for some and worse for others"). On the far side of the cutout, we find a much simpler theory. Among possible bargaining solutions, there is at least one set of terms that is reasonable. Since it is unreasonable to reject that which is reasonable, these terms will be unrejectable by reasonable persons, hence they will be just. There is no need for a desire for agreement, and it does not matter whether initial endowments were equal or not, for all will agree to their reasonable redistribution.

Justice as impartiality, then, whether obtained via the "original position" or via a special meaning given to reasonableness, entails equality of valuable endowments and the enforcement of that equality over time.

Justice becomes a matter of satisfying a selection criterion or choice rule (e.g., "choose the state of affairs no one can reasonably reject") by which a state of affairs is identified as "just," in the same way as other selection criteria, choice rules, or choice mechanisms identify a state of affairs as socially "chosen" or "preferred." Fairness, unanimity, non-rejection, veto right held by the "dictator" (e.g., the worst-placed individual or group) fit very well into the *modus operandi* of social choice theory.

Torts are recognized in immemorial and near-universal cross-cultural conventions that condemn and sanction murder, maiming, trespass, theft, and other offenses against person and property. They are not problematical for the present purpose. Duties are conventionally recognized moral imperatives, and their breaches are conventionally condemned but typically not sanctioned. Unlike obligations, duties do not have the rights

of another person as their logical corollary; but neglect of duty is generally taken to disqualify an act from being just. Duties, too, are largely unproblematical for the theory of justice.

There are at least two (and perhaps more than two) ways of looking at such pairwise agreements. One is to find that the agreement, by virtue of being untainted by force, fraud, or unconscionability, is just, since those concerned jointly chose it, rather than something else. By extension, the distributive consequence of the totality of all such agreements, past and present, is a just distribution. The other view is that the agreement was just if and only if the values exchanged or promised under it have been justly come by.it

A door was installed by a Congress of a different era — the first Congress, in its first session, in 1789, when the U.S. was not a superpower — and it was long forgotten, until 1980 (*Filartiga*). It's a door built especially for foreigners. And — as it wasn't crafted to deny justice, but to enable justice — it's plain and simple and it's not decorated with exceptions:

"Sec. 1350. — **Alien's action for tort**

The district courts shall have original **jurisdiction** of any civil action by an **alien** for a **tort** only, committed in violation of the **law of nations** or a treaty of the United States."

Under this provision, U.S. Courts can apply their full-range of remedies to any wrongdoing they find: actual damages, punitive damages, injunctions, declaratory judgments.

The U.S. Congress will not permit a foreign nation to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials *(Foreign Sovereign Immunity Act)*. So too U.S. Courts should not permit the United States itself to hide behind sovereign immunity to evade money damage accountability for the international crimes of its officials.

"Sec. 702. — **Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking **relief other than money damages** and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a **judgment or decree may be entered against the United States**: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

*A. Use of the Acts in the Human Rights Context*

The United States affords certain domestic rights of action for persons claiming to be victims of human rights abuses, regardless of where they occur. The Alien Tort Claims Act (ATCA) provides that "district courts shall have original jurisdiction of any civil

action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[14] The Torture Victim Protection Act (TVPA), recently passed by Congress, provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual."[15]  This subject matter has never been addressed by the court and although a previous ORDER states the claim of torture and court fails to clarify why ATCA is beyond the subject matter jurisdiction of the court.

The ATCA, which traces its origins to the first Judiciary Act of 1789 but lay virtually unused for 200 years, has found new life as a means for aliens to sue in U.S. federal courts for damages from alleged human rights violations occurring around the world.[16] The ATCA was enacted along with the Judiciary Act of 1789 in part to allow a forum in the United States for bringing pirates of the high seas to justice.[17] Others have viewed the legislative intent behind the ATCA as being rooted in "what the Founders understood to be the nation's duty to propagate and enforce those international law rules that directly regulated individual conduct."[18] In 1975, Judge Henry [*pg 921] Friendly discussed the ATCA and remarked that "[t]his old but little used section is a kind of legal Lohengrin; although it has been with us since the first Judiciary Act . . . no one seems to know whence it came."[19]

Regardless of the debate about the origins of Judge Friendly's "legal Lohengrin,"[20] plaintiffs have recently relied upon the ATCA as a means of remedying violations of human rights around the world.[21] For example, in *Filartiga v. Pena-Irala*,[22] a Paraguayan citizen sued the Inspector General of Police of Asuncion for kidnapping and torturing to

death his son, Joelito Filartiga.[23] The United States Court of Appeals for the Second Circuit upheld the jurisdiction of the United States District Court for the Eastern District of New York under the ATCA, even though both the plaintiff and the defendant were Paraguayan and all of the relevant actions took place in Paraguay.[24] "'[I]nternational law confers fundamental rights upon all people vis-a-vis their own governments,' including the right to be free from torture."[25] In holding that a United States court could hear claims [*pg 922] regarding torts that violated international law, regardless of where they occurred, the district court relied upon the doctrine of transitory torts, which provides that "liability for certain tortious acts follow[s] the tortfeasor, such that he could be subject to suit for th[ose] act[s] in any forum."[26] Now the complaint so completely clear where even the defendants have admitted that the even took place in Australia or even India.  Clever maneuvering of the FISA does not render the ATCA beyond the jurisdiction of subject matter.

The TVPA apparently endorsed *Filartiga*'s approach to the ATCA.[27] The TVPA was enacted in 1992, and its legislative history indicates its drafters' intent to address official, government-sanctioned torture or extrajudicial killing.[28] The TVPA is inherently linked to the ATCA, and by no means was intended to replace it.[29] Unlike the ATCA, the TVPA is not a jurisdictional statute. Thus, a TVPA plaintiff must establish its jurisdiction via the ATCA, or through some other means such as the general federal question jurisdiction from section 1331.[30]   The court ORDER denying the plaintiff a Preliminary Injunction, his daughter, being unprecedented in the history of the United States where the United States has gone to war in Vietnam and Iran over hostages still whitewashes the subject of ATCA and TVPA subjects within its jurisdiction.

Litigants have recently invoked the ATCA and the TVPA to attempt to vindicate human rights abuses abroad, perhaps most notably in the case of *Kadic v. Karadzic*,[31] the suit against Radovan Karadzic, wartime leader of the self-proclaimed Bosnian-Serb republic, for various atrocities and brutal acts allegedly committed by the Bosnian-Serb military forces.[32] In *Kadic*, a three-judge panel of the U.S. Court of Appeals for the Second Circuit held that the plaintiffs established the necessary federal subject matter jurisdiction under the ATCA and had brought forth allegations that, if proven true, could be remedied by the ATCA and the TVPA: "[The ATCA] appears to provide a remedy for the appellants' allegations of violations and official torture, and the Torture Victim Act also appears to provide a remedy for their allegations of official torture, [thus] their causes of action are statutorily authorized."[33] The cases against Karadzic went back to trial, resulting in over $5 billion in judgments being entered against him.[34]

Debate remains over the appropriateness of hearing these types of human rights cases in American courts, especially in cases involving foreign parties and acts that took place in foreign lands seeming to have little connection to the United States.[35] In the words [*pg 924] of Karadzic himself in a letter to United States District Judge Peter K. Leisure, who presided over the billion dollar case, "Can you really hope to find truth, or do justice, or protect rights of people in distant nations? . . . Do you really believe that attaching a U.S. dollar sign to human tragedy around the world by empty judgments in uncontested lawsuits is a step toward peace or justice?"[36] However, many view these cases as wholly appropriate, as they often serve as the sole means for exposing human rights violators, have significant deterrent effects, and help the healing process of victims.[37] For example, Judge Leisure stressed that "[i]t's very important that the United States of America rises

to the occasion when these things happen, and we not just wait for the United Nations war crimes tribunal."[38]   Then the manifest unjustice to the plantiffs in this case that there infact United States Connection and even then the court has found it necessary to lay aside the fact that the complaint was bought under this act.

A number of barriers can impede litigants proceeding under the ATCA and the TVPA. For example, the Foreign Sovereign Immunities Act of 1976[39] (FSIA) generally bars jurisdiction over foreign sovereigns in United States courts[40] and can pose problems for human rights litigants. However, the FSIA has been construed as having exceptions allowing ATCA and TVPA suits against foreign government officials who act beyond the scope of their power, for example, by committing an act such as torture that a government [*pg 925] would not publicly endorse.[41] While the case law is by no means clear cut,[42] the exceptions are allowing victims of alleged human rights abuses their day in American courts.[43] Other hurdles, such as the Act of State doctrine[44] and the doctrine of forum non conveniens,[45] can also prevent ATCA and TVPA litigants from having their cases heard in U.S. courts.[46]   The plaintiff seek clarification from the court why it states that the manifest unjustice of it partner and signatory can capture and keep concealed for a lifetime father from a child and it must pass an ORDER that states something to the effect that the defendants a permitted in the case to torture and sexually abuse perhaps in the "White House" even and in public a 6 (SIX) year old girl.

## B. Jurisdiction Under the ATCA and the TVPA

SEE ORDER Plaintiff then "filed a Human Rights Complaint with the National Human Right Commission against the State Actors of Australia and others." *Id*. ¶ 42. "[T]he Human Rights Direction . . . observed that the defendant's action[s] were 'unjustifiable'

A striking aspect of the ATCA and the TVPA is that they can be used in a U.S. court in a case involving a foreign plaintiff, a foreign defendant, and activity that occurred outside the United States.[47] In [*pg 926] U.S. courts, it is necessary for plaintiffs to establish that the court has subject matter jurisdiction over the claim, and that it has personal jurisdiction over the defendant.[48]

To establish subject matter jurisdiction under the ATCA, a plaintiff must demonstrate that "three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)."[49] In fact, the ATCA has been interpreted as granting federal subject matter jurisdiction and creating a cause of action when a plaintiff "can establish that the abuses allegedly inflicted upon her constitute violations of international law."[50] "[T]he torturer has become -- like the pirate and slave trader before him -- *hostis humani generis*, an enemy of all mankind."[51] As a result, the United States can claim universal subject matter jurisdiction for certain offenses "significant enough to threaten the interests 'of civilization everywhere.'"[52] The notion of universal [*pg 927] jurisdiction is based on the principle that states can claim jurisdiction "'to define and punish certain offenses recognized by the community of nations as of universal concern,' . . . even where no other recognized basis of jurisdiction is present."[53] Although court in ORDER finds these offences and knows that the foundation of

civilized society is a stake if it grants sovereigns the power to steal and hold hostage minors.

The use of this type of universal jurisdiction over violations of human rights is not restricted to the United States.[54] Many other countries have created criminal penalties for human rights violators and war criminals on the basis of treaty obligations, such as the 1948 Genocide Convention.[55] Belgium, Denmark, France, Germany, Israel, Spain, and Switzerland, for example, have done their part domestically to prosecute non-nationals for war crimes and violations of human rights.[56] One needs only to look at the current case against former Chilean head of state Augusto Pinochet to note the worldwide use of universal jurisdiction.[57] While many of these examples of universal jurisdiction apply to criminal prosecutions, other countries have applied these principles in civil cases in the same spirit as the ATCA and the TVPA.[58]

The process of negotiating a Hague jurisdiction and judgments convention is a significant undertaking, and all parties involved should be commended for the steps that have already been taken.[175] The benefits of a judgments convention have been well documented.[176] One of the potential consequences, apart from possible constitutional conflicts and having to reorganize domestic jurisdictional law,[177] is the effect of the proposed convention on domestic efforts to enforce human rights around the world, via the ATCA, TVPA, and other similar legislation. The foregoing discussion attempted to present some of the possible structures the final convention could take, and the potential consequences these structures could have on ATCA and TVPA actions, and on human rights litigation in other parts of the world.

If anything, the negotiators should be aware that a project such as the proposed convention, in whatever form it eventually takes, could positively or negatively impact ATCA and TVPA litigation. First of all, keeping a human rights provision as it appears in the current draft of the proposed convention should not do anything to adversely affect human rights litigation, but even then there is room for argument that it could help or hurt. Second, if the proposed convention removes its current human rights exception, it could hinder human rights enforcement. On the other hand, the convention could still be beneficial to human rights litigation in this form, since in many ATCA cases one could claim that jurisdiction was based on more than just a tagging basis.[178] Finally, the proposed convention could allow the automatic enforcement and recognition of judgments in human rights cases when jurisdiction is based on an approved white list ground, or when based on an approved ground that would be exorbitant outside of a human rights setting. Furthermore, in many ways independent of the use of a human provision, the proposed convention could make its jurisdiction, enforcement, and recognition [*pg 952] sections openly discriminatory to noncontracting states in the style of the Brussels and Lugano conventions.

Above all, it is important to remember Judge Robb's comment in *Tel-Oren v. Libyan-Arab Republic*,[179] an ATCA case, that "[i]t is one thing for a student note-writer to urge that courts accept the challenges involved. It is an entirely different matter for a court to be asked to conduct such a [highly-sensitive and political] hearing successfully. The dangers are obvious."[180] The same is true for the negotiators. These potential formats are easier said than done.

In the context of the implementation of the proposed convention's required, permitted, and prohibited lists, it is also worth noting that there will be some variation in the interpretation of whether a case actually falls within one list versus another. Justice Marshall's choice of words in *Kulko v. Superior Court*[181] is all the more relevant: "[F]ew answers will be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'"[182] Furthermore, many are correct to highlight the practical reality of underenforcement of human rights judgments in the courts of the world.[183] Additionally, there are always potential problems with the enforcement of the convention itself, since states often sign on to treaties with the best of intentions, only to breach their terms when push comes to shove.[184] However, "in an [*pg 953] interdependent world, most countries will often have little choice but, sooner or later, to do business with each other."[185] *See* Anne-Marie Burley, *The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor*, 83 AM. J. INT'L L. 461, 461-62 (1989).

The plaintiffs, *See* Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 814 n.23 (D.C. Cir. 1984) (Bork, J., concurring). Another view on the legislative intent behind the ATCA is that of national security: there was concern that refusing access to the courts to aliens could provoke international hostility. *See id.* at 783-84 (Edwards, J., concurring) (quoting Alexander Hamilton's belief that "the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned," for "[t]his is not less essential to the preservation of the public faith, than to the security of the public tranquillity"). *But see id.* at 816, 821 (Bork, J., concurring) (expressing the view that concerns over national security warrant against hearing ATCA cases). As the opinions in *Tel-Oren* demonstrate, there is no real consensus as to what Congress meant to do in

enacting the "legal Lohengrin." *See* Jeffrey Rabkin, Note, *Universal Justice: The Role of Federal Courts in International Civil Litigation*, 95 COLUM. L. REV. 2120, 2125-26 (1995) (discussing national security and other views on the legislative intent of the ATCA).

For an extensive list of ATCA cases against nonstate defendants, see Deborah L. Zimic, *Foreign Sovereign Immunity-Exceptions to Foreign Sovereign Immunity-The Foreign Sovereign Immunities Act Does Not Prohibit Invocation of the Alien Tort Claims Act to Exercise Federal Court Jurisdiction over a Foreign Nation's Non-Commercial Tort in Violation of International Law*, 28 VA. J. INT'L L. 221, 223 n.9 (1987). Ironically, one of the few instances before 1980 in which the ATCA (actually, a predecessor to it) was successfully invoked as a ground of jurisdiction was in *Bolchos v. Darrell*, 3 F. Cas. 810 (D.S.C. 1795) (No. 1607), in which a French citizen sought restitution for slaves taken from a Spanish ship seized at war. The earlier use of the ATCA to protect a slaveholder's "property" is ironic given the statute's current use to protect human rights.

Sung Teak Kim, Note, *Adjudicating Violations of International Law: Defining the Scope of Jurisdiction Under the Alien Tort Statute-Trajano v. Marcos*, 27 CORNELL INT'L L.J. 387, 392 (1994) (quoting *Filartiga*, 630 F.2d at 885).

The doctrine of transitory torts holds that a person may be liable in courts of any country for an act wherever it is committed. See William S. Dodge, The Historical Origins of the Alien Tort Statute: A Response to the "Originalists," 19 HASTINGS INT'L & COMP. L. REV. 221, 234 n.95 (1996). Apart from the human rights context, it has been applied to other situations as well. See, e.g., Darnell v. Rupplin, 371 S.E.2d 743, 745 (N.C. Ct. App.

1988) (alienation of affections as a transitory tort), cited in Jennifer E. McDougal, Comment, Legislating Morality: The Actions for Alienation of Affections and Criminal Conversation in North Carolina, 33 WAKE FOREST L. REV. 163, 185 n.155 (1998); Peter Nicolas, Comment, The Use of Preclusion Doctrine, Antisuit Injunctions, and Forum Non Conveniens Dismissals in Transnational Intellectual Property Litigation, 40 VA. J. INT'L L. 331, 354 (1999) (patent infringement as a transitory tort).

*See* SENATE COMM. ON THE JUDICIARY, THE TORTURE VICTIM PROTECTION ACT OF 1991, S. REP. NO. 102-249, at 4 [hereinafter TORTURE VICTIM PROTECTION ACT] (discussing the ATCA and *Filartiga*, and explaining that *Filartiga* "has met with general approval"); *see also* David P. Kunstle, Note, Kadic v. Karadzic: *Do Private Individuals Have Enforceable Rights and Obligations Under the Alien Tort Claims Act?*, 6 DUKE J. COMP. & INT'L L. 319, 343 (1996) ("[A]s indicated by both the language and the legislative history of the TVPA, congressional reaction to *Filartiga*'s interpretation of the ATCA was anything but hostile.").

*See* TORTURE VICTIM PROTECTION ACT, *supra* note 27, at 3 ("The TVPA would establish an unambiguous basis for a cause of action that has been successfully maintained under an existing law, section 1350 . . . . Section 1350 has other important uses and should not be replaced.").70 F.3d 232, 237 (2d Cir. 1995) (holding that a district court could hear claims of torture committed against Muslim women allegedly committed by Serbian troops); *see also* Hilao v. Estate of Marcos, 103 F.3d 767 (9th Cir. 1996) (allowing a class action by Philippine nationals against a former Philippine president's estate for violations of human rights); *In re* Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493 (9th Cir. 1992) (allowing an action under ATCA by a Philippine

citizen against the daughter of the former Philippine president, claiming wrongful death of her Philippine son caused by torture); National Coalition Gov't v. Unocal, Inc., 176 F.R.D. 329 (C.D. Cal. 1997) (denying a motion to dismiss of an oil company sued for violations of ATCA in connection with allegations of forced labor on a pipeline project); Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995) (awarding damages under ATCA and TVPA for violations of international law including summary execution or "disappearance," torture, arbitrary detention, and cruel, inhuman and degrading treatment). *See* Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 (1981) (explaining that a case may be dismissed at the discretion of the trial court on the grounds of forum non conveniens if an alternative forum has jurisdiction to hear the case, and when the chosen location would "'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems'" (quoting Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947))). *Piper* suggests, however, that ATCA cases might not be completely in danger. For example, where a remedy in an alternative forum is "so clearly inadequate or unsatisfactory that it is no remedy at all," an unfavorable change in law between the forums would be relevant. *Id.* at 254. Similarly, "dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." *Id.* at 254 n.22. Keeping in mind the statement from the legislative history of the TVPA that "[a] state that practices torture and summary execution is not one that adheres to the rule of law," TORTURE VICTIM

Plaintiffs have a due process right to have their claims heard, and under current Supreme Court doctrine, tag jurisdiction is allowed to satisfy this right. *See* Harold G. Maier, *A Hague Conference Judgments Convention and United States Courts: A Problem and a Possibility*, 61 ALB. L. REV. 1207, 1235-36 (1998) (arguing that reasonable, permissive rules allowing tag jurisdiction would align with the Supreme Court's attitude towards jurisdictional rules).

1. There is one place in which one's privacy, intimacy, integrity and inviolability are guaranteed - one's body, a unique temple and a familiar territory of sensa and personal history. The defendant torturer, invades, defiles and desecrates this shrine. He does so publicly, deliberately, repeatedly and, often, sadistically and, with undisguised pleasure. Hence the all-pervasive, long-lasting, and, frequently, irreversible effects and outcomes of torture invoke "extraordinary circumstances" and the ORDER does not prevent this manifest injustice

2. In a way, the plaintiff's, torture victim's own body is rendered his worse enemy. It is corporeal agony that compels the sufferer to mutate, his identity to fragment, his ideals and principles to crumble. The body becomes an accomplice of the tormentor, an uninterruptible channel of communication, a treasonous, poisoned territory so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice

3. The plaintiff fosters a humiliating dependency of the abused on the perpetrator. Natural needs denied and are wrongly perceived by the plaintiff, victim as the direct causes of his degradation and dehumanization. As he sees it, he is rendered bestial not by the defendants as sadistic bullies around him but by his own flesh

and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

4. The concept of "body" can easily be extended to "family", or "home". Torture is often applied to kin and kith, compatriots, or colleagues. This intends to disrupt the continuity of "surroundings, habits, appearance, relations with others", as the CIA put it in one of its manuals. A sense of cohesive self-identity depends crucially on the familiar and the continuous. By attacking both one's biological body and one's "social body", the victim's psyche is strained to the point of dissociation so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

5. Beatrice Patsalides describes this transmogrification thus in "Ethics of the unspeakable: Torture survivors in psychoanalytic treatment":

   a. "As the gap between the 'I' and the 'me' deepens, dissociation and alienation increase. The subject that, under torture, was forced into the position of pure object has lost his or her sense of interiority, intimacy, and privacy. Time is experienced now, in the present only, and perspective - that which allows for a sense of relativity - is foreclosed. Thoughts and dreams attack the mind and invade the body as if the protective skin that normally contains our thoughts, gives us space to breathe in between the thought and the thing being thought about, and separates between inside and outside, past and present, me and you, was lost."

6. Defendants as Torturers robs the victim of the most basic modes of relating to reality and, thus, is the equivalent of cognitive death. Space and time are warped

by child/father deprivation. The self ("I") is shattered. The tortured have nothing familiar to hold on to: family, home, personal belongings, loved ones, language, name. Gradually, they lose their mental resilience and sense of freedom. They feel alien - unable to communicate, relate, attach, or empathize with others so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

7.  Defedants torture splinters early childhood grandiose narcissistic fantasies of uniqueness, omnipotence, invulnerability, and impenetrability. But it enhances the fantasy of merger with an idealized and omnipotent (though not benign) other - the inflicter of agony. The twin processes of individuation and separation are reversed and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

8.  Torture is the ultimate act of perverted intimacy. The torturer invades the victim's body, pervades his psyche, and possesses his mind. Deprived of contact with father child  and starved for child/father interactions, the prey bonds with the predator. "Traumatic bonding", akin to the Stockholm syndrome, is about hope and the search for meaning in the brutal and indifferent and nightmarish universe of the earth as a torture cell so invokes "extraordinary circumstances" ORDER does not prevent this manifest injustice.

9.  The abuser becomes the black hole at the center of the victim's surrealistic galaxy, sucking in the sufferer's universal need for solace. The victim tries to "control" his tormentor by becoming one with him (introjecting him) and by appealing to the monster's presumably dormant humanity and empathy so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

10. This bonding is especially strong when the torturer and the tortured form a dyad and "collaborate" in the rituals and acts of torture (for instance, when the victim is coerced into selecting the torture implements and the types of torment to be inflicted, or to choose between two evils) such as entering suit after suit and police report after police report and approaching every conceivable agency in the world and so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice.

11. The psychologist Shirley Spitz offers this powerful overview of the contradictory nature of torture in a seminar titled "The Psychology of Torture" (1989):

12. "Torture is an obscenity in that it joins what is most private with what is most public. Torture entails all the isolation and extreme solitude of privacy with none of the usual security embodied therein ... Torture entails at the same time all the self exposure of the utterly public with none of its possibilities for camaraderie or shared experience. (The presence of an all powerful other with whom to merge, without the security of the other's benign intentions.) ORDER does not prevent this manifest injustice

   a. A further obscenity of torture is the inversion it makes of intimate human relationships. The interrogation is a form of social encounter in which the normal rules of communicating, of relating, of intimacy are manipulated. Dependency needs are elicited by the interrogator, but not so they may be met as in close relationships, but to weaken and confuse. Independence that is offered in return for 'betrayal' is a lie. Silence is intentionally

misinterpreted either as confirmation of information or as guilt for 'complicity'.

b. Torture combines complete humiliating exposure with utter devastating isolation. The final products and outcome of torture are a scarred and often shattered victim and an empty display of the fiction of power."

13. Obsessed by endless ruminations, demented by pain and a continuum of sleeplessness death sentence with his child - the plaintiff victim regresses, shedding all but the most primitive defense mechanisms: splitting, narcissism, dissociation, projective identification, introjection, and cognitive dissonance. The plaintiff victim constructs an alternative world, often suffering from depersonalization and derealization, hallucinations, ideas of reference, delusions, and psychotic episodes so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

14. Sometimes the plaintiff victim comes to crave pain - very much as self-mutilators do - because it is a proof and a reminder of his individuated existence otherwise blurred by the incessant torture. Pain shields the sufferer from disintegration and capitulation. It preserves the veracity of his unthinkable and unspeakable experiences so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

15. This dual process of the victim's alienation and addiction to anguish complements the perpetrator's view of his quarry as "inhuman", or "subhuman". The torturer, defendant, assumes the position of the sole authority, the exclusive fount of meaning and interpretation, the source of both evil and good.

16. Torture is about reprogramming the plaintiff victim to succumb to an alternative exegesis of the world, proffered by the abuser. It is an act of deep, indelible, traumatic indoctrination. The abused, plaintiff also swallows whole and assimilates the torturer's negative view of him and often, as a result, is rendered suicidal, self-destructive, or self-defeating so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

17. From the cases till now filed public since April 3rd 2005 this, torture has no cut-off date. The sounds, the voices, the smells, the sensations reverberate long after the episode has ended - both in nightmares and in waking moments. The victim's ability to trust other people - i.e., to assume that their motives are at least rational, if not necessarily benign - has been irrevocably undermined. Social institutions are perceived as precariously poised on the verge of an ominous, Kafkaesque mutation. Nothing is either safe, or credible anymore so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

18. Plaintiff, victim, typically react by undulating between emotional numbing and increased arousal: insomnia, irritability, restlessness, and attention deficits. Recollections of the traumatic events intrude in the form of dreams, night terrors, flashbacks, and distressing associations so invokes "extraordinary circumstances".

19. The tortured plaintiffs seems to have developed compulsive rituals to fend off obsessive thoughts. Other psychological sequelae reported include cognitive impairment, reduced capacity to learn, memory disorders, sexual dysfunction, social withdrawal, inability to maintain long-term relationships, or even mere intimacy, phobias, ideas of reference and superstitions, delusions, hallucinations,

psychotic microepisodes, and emotional flatness so invokes "extraordinary circumstances". ORDER does not prevent this manifest injustice

20. Depression and anxiety are very common. These are forms and manifestations of self-directed aggression. The sufferer rages at his own victimhood and resulting multiple dysfunction. He feels shamed by his new disabilities and responsible, or even guilty, somehow, for his predicament and the dire consequences borne by his nearest and dearest. His sense of self-worth and self-esteem are crippled so invokes "extraordinary circumstances".  ORDER does not prevent this manifest injustice

21. In a nutshell, torture victim, plaintiff, suffer from a post-traumatic stress disorder (PTSD). Their strong feelings of anxiety, guilt, and shame are also typical of victims of childhood abuse, domestic violence, and rape. They feel anxious because the perpetrator's behavior is seemingly arbitrary and unpredictable - or mechanically and inhumanly regular so invokes "extraordinary circumstances".

22. Plaintiff feels guilty and disgraced because, to restore a semblance of order to their shattered world and a modicum of dominion over their chaotic life, they need to transform themselves into the cause of their own degradation and the accomplices of their tormentors so invokes "extraordinary circumstances".  SEE EXHBIT TEN

23. The CIA, in its "Human Resource Exploitation Training Manual - 1983" (reprinted in the April 1997 issue of Harper's Magazine), summed up the theory of coercion thus:

    a. "The purpose of all coercive techniques is to induce psychological regression in the subject by bringing a superior outside force to bear on his will to resist. Regression is basically a loss of autonomy, a reversion to an earlier behavioral level. As the subject regresses, his learned personality traits fall away in reverse chronological order. He begins to lose the capacity to carry out the highest creative activities, to deal with complex situations, or to cope with stressful interpersonal relationships or repeated frustrations."

24. Inevitably, in the aftermath of torture, its victims feel helpless and powerless. This loss of control over one's life and body is manifested physically in impotence, attention deficits, and insomnia. This is often exacerbated by the disbelief many torture victims encounter, especially if they are unable to produce scars, or other "objective" proof of their ordeal. Language cannot communicate such an intensely private experience as pain so invokes "extraordinary circumstances".  ORDER does not prevent this manifest injustice

25. Spitz makes the following observation:

    a. "Pain is also unsharable in that it is resistant to language ... All our interior states of consciousness: emotional, perceptual, cognitive and somatic can be described as having an object in the external world ... This affirms our capacity to move beyond the boundaries of our body into the external, sharable world. This is the space in which we interact and communicate with our environment. But when we explore the interior state of physical pain we find that there is no object 'out there' - no external, referential

content. Pain is not of, or for, anything. Pain is. And it draws us away from the space of interaction, the sharable world, inwards. It draws us into the boundaries of our body."

26. Bystanders resent the tortured because they make them feel guilty and ashamed for having done nothing to prevent the atrocity. The victims threaten their sense of security and their much-needed belief in predictability, justice, and rule of law. The victims, on their part, do not believe that it is possible to effectively communicate to "outsiders" what they have been through. The torture chambers are "another galaxy". This is how Auschwitz was described by the author K. Zetnik in his testimony in the Eichmann trial in Jerusalem in 1961.Kenneth Pope in "Torture", a chapter he wrote for the "Encyclopedia of Women and Gender: Sex Similarities and Differences and the Impact of Society on Gender", quotes Harvard psychiatrist Judith Herman:

   a. "It is very tempting to take the side of the perpetrator. All the perpetrator asks is that the bystander do nothing. He appeals to the universal desire to see, hear, and speak no evil. The victim, on the contrary, asks the bystander to share the burden of pain. The victim demands action, engagement, and remembering."

27. But, more often, continued attempts to repress fearful memories result in psychosomatic illnesses (conversion). The victim wishes to forget the torture, to avoid re-experiencing the often life threatening abuse and to shield his human environment from the horrors. In conjunction with the victim's pervasive distrust, this is frequently interpreted as hypervigilance, or even paranoia. It seems that the

victims can't win. Torture is forever.  SEE EXHIBIT TEN THIS IS MANIFEST INJUSTICE.

28. Therefore, the following claims should remain against the defendants, negligent failure to report, negligent failure to warn, breach of fiduciary duty (insofar as that breach involved the failure to report and the failure to warn), outrage and emotional distress, violations of the customary law of human rights, and claims under the doctrine of *respondeat superior*. The Court should remain open to reconsidering its decision that the United States-based sovereigns for purposes of FSIA if further contrary evidence emerges during the litigation and rehear the matter based on manifest injustice.

29. The constitutional tort remedy is unique because it requires courts to focus on how constitutional provisions apply to injuries suffered by individuals. As a result, it has pushed the courts to understand constitutional provisions as (1) providing rights that protect individuals from certain governmental inflictions of harm; and (2) regulating the discretion of government officials to harm or allow harm to befall individuals.

30. Plaintiffs Constitutional tort actions, individuals claim that they have been harmed by either government action or the failure of the government to act despite an established obligation to intervene.[138] Individuals bring such actions not just to make a general point about how the world should be ordered but because they have been injured. Damages, provided for in constitutional tort actions, are a natural remedy for such harm. As the Supreme Court has observed, "Historically, damages have been regarded as the ordinary remedy for an invasion of personal

interests in liberty."[139] The availability of a damage action for constitutional harms gives individuals an incentive to press claims based on constitutional provisions.[140] As one commentator has noted, the constitutional tort action "gave lawyers an incentive to conceive of past, tort-like harms in constitutional terms."[141]

S/

_____

JUGVIR INDER SINGH

Pro Se

Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.   )
          )
   Plaintiffs   )
          )
   V      )  CASE NO 1:07-CV-01170
          )  JUDGE BATES
          )
COMMONWEALTH OF AUSTRALIA )
et al.         )
   Defendants  )

# ORDER

UPON DUE CONSIDERATION of the plaintiffs Response to the defendants motion to oppose rehearing and vacating order and Memorandum Points Supporting and any opposition is thereto, herby

ORDERED: CASE IS WITHIN THE RULE 60 and subchapters and is set for rehearing. The plaintiff have shown that Nara Singhderewa is a necessary and essential party and has been admitted as a party.

Plaintiffs have shown the United States of America is a necessary and essential party and has been admitted as a party.

In admitting United States and Nara Singhderewa the plaintiffs have been given leave to amend the complaint for constitutional Torts.

The plaintiffs allege and have shown a Constitutional Tort theus comply with Rule 59(e).

The plaintiff as per Rule 60 may bring a new case quoting this ORDER in another court.

ORDERED: CASE IS SET FOR JURY TRIAL.

ENTERED this _____day of _____2007.

_____

UNITED STATES DISTRICT JUDGE

JOHN.D. BATES