# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

JUGVIR INDER SINGH et al.            )
                                     )
            Plaintiffs               )
                                     )
            V                        )     CASE NO 1:07-CV-01170
                                     )     JUDGE J.D.BATES
                                     )
COMMONWEALTH OF AUSTRALIA            )
et al.                               )
            Defendants

## NOTICE TO THE COURT OF DEFEDANTS VIOLATION OF MISPRISON OF TREASON TITLE 18 of the USC 2382

The plaintiffs through the complaints so filed states that the defendants violated TITLE

18 of the USC 2382 "Misprison of Treason" provides that:

> Whoever owing allegiance to the United States and has knowledge of the
> commission of any treason against them, conceals and does not, as soon as may
> be practicable, disclose and make known the same to the President or to some
> judge in the United States, or to the governor or to some judge or justice in a
> particular state is guilty of misprision of treason and shall be fine under this title
> or imprisoned not more than seven years or both.

By the same reason set forth in the plaintiff's complaint and the entire supporting

documentation contained in the plaintiff's docket this court should address to the parties

named a formal communication that this court has received information of a serious

nature , which although as yet unproved, is nevertheless demanding of immediate and

unbiased investigation suggesting that all or some of the defendants herein may be guilty

of the crime of treason by exchanging, selling buying informing, deceiving and

concealing transaction between the defendants and a stated enemy of the united states of

America being IRAQ.

Declaring that court recognizes the inappropriateness of referring the matter alleged

herein to the Federal Bureau of Investigation, the Attorney General of the United States,

or other officers of the Executive Branch, as they maybe themselves implicated in, or subject to the direction or control of superior officers, who are implicated in the matters alleged in this case. and requesting that the communication to whom from the court may be addressed consider, and take such actions as after deliberation they deem necessary and appropriate, consistent with their responsibilities and prerogatives under the constitution of the United States, to investigate and prosecute the defendants.

1. The plaintiffs have alleged the defendants were concealing from the President of the United States, George W. Bush, Vice President Richard Cheney, Secretary of Defense Donald H. Rumsfeld, National Security Advisor Condoleeza Rice, then Acting Chairman of the Joint Chiefs of Staff, General Richard Meyers, then NORAD chief General Ralph E. Eberhart and senior political advisor Karl Rove, General Colin Powell, Secretary of State and George J. Tenet Director of the Central Intelligence Agency and others that the defendants were aiding and abetting the enemy of the United States in Iraq engaging in money laundering, murder, extortion, illegal activities while black mailing public officials and threatening whistleblowers with ominous threat of death.

2. That the defendants made huge profits with the concealed transactions with the enemy of the united states in the following areas (1) war preparations, and the international trade in weapons both legal and illegal (2) oil, gas and related energy services (3) "white collar crime" e.g. embezzlement, failing disclose to the Securities and Exchange Commission the profit and loss from the transactions, money laundering, blackmailing public officials world wide.

3. The department of Homeland Security is patterned after "Operation Pheonix" a Vietnam war era program, headed by William Colby and Tom Ridge, the Director of Homeland Security participated in "Operation Phoenix" and in parts of the world accused as a WAR Criminal responsible for the deaths of over 60,000 men women and children.  HE is skilled in the arts of intelligence and was duped by the defendants while being present in the United States.

4. During this time of dealing and transacting with the enemy of the United States the defendants entertained one Richard Armitage, a man involved with Richard Secord

and Col. Oliver North in multiple crimes in the middle east region referred to as the "IRAN- CONTRA".

5. Although not a defendant in the case Saddam Hussein and George H. W. Bush the president's father were partners in Iraq and the defendant's present transactions in the millions of dollars, concealed from the elder President and the Chicago Branch of Banca Nazaionale de Lavoro alerted the American people on the aiding on abetting of the enemy by the defendants in some OIL lease deals.

6. Plaintiff respectfully submits the Court's Duty as a" person in authority" referred to in 18 USC ‖‖4 and address a formal communication to Speaker of the House of Representatives, Minority Leader, the Majority Leader of the Senate, Chairman of the House of Representatives on the Judiciary and the ranking minority member of the said committee that his court has received information of a serious nature which, although as yet unproved, is never the less demanding of immediate and unbiased investigation suggesting that all of the defendants herin named may be guilty of all or some of the crimes enumerated on the complaint of the recognizing the inappropriateness of referring this matter alleged to the Federal Bureau of Investigation and other officers of the Executive Branch who may be implicated

7. The defendants have in the process of concealed transactions with the enemy caused predicate acts of murder, kidnapping, arson, extortion, fraud in connection with identification documents, wire fraud, misuse of visas, permits and other documents, interference with commerce, racketeering, laundered money from Iraq profits, engaged in monetary transactions in property derived from illegal activity, .

NOTICE HAS BEEN GIVEN TO JUDGE JOHN D.BATES

SOME BENCHMARKS OF THE TREASON TRANSACTIONS

1. Exhibit 1 will show that the defendants allowed shipped from GEELONG Australia to the enemy some goods signed by Harbormaster Ruben R. Erestain.

2. Exhibit 2 will show that defendants counseled concealing of money to be laundered through BNP PARIBAS BANK in New York.

3. Exhibit 3 will show that the defendants were dealing with companies in the United States, listed on the Securities and Exchange Commission and moving goods illegally to the enemy.

4. Exhibit 4 will show that money was being laundered through American Express in the United States for the Account of a company owned by Saddam Hussein's son Alia Transport, through Jordan.

5. Exhibit 5 will show money laundering methods of Iron Filings claimed in the enemy territory to offset accounts of companies with contacts in the United States being BHP BILLITON for some oil concessions.

6. Exhibit 6 will show and confirm that BNP PARIBAS in New York was used by the SAVAS group to launder enemy money through the United States

7. Exhibit 7 will show the PROJECT ROSE conspiracy and teams of people involved where defendants actively aimed at concealing transaction from the American people.

8. Exhibit 8 identifies an Iraqi enemy on the DECK of 52 being HE MEHDI SALEH in Bagdad Iraq. It confirms the dealings of the defendants in Iraq.

9. Exhibit 9 is the ALIA Company itself being a confirmation of handling goods delivered to the enemy. These are the WMD trucks.

   a. Alia for Transportation and General Trade Company

   b. • A Jordanian company based in Amman, Jordan

   c. • Owned 51% by the Al-Khawam family based in Iraq

   d. Chairman is Mr Hussain Al-Khawam

   e.  Directly reporting to him is the General Manager, Mr Othman Al-Absi (AWB's most frequent contact)

   f. • Apparently 49% owned by the Iraqi Ministry of Transport

   g. • The company was formed in 1995 as a joint venture with the Iraqi Ministry of Transport

   h. • Al-Khawam's clan is prominent in southern Iraq and in Jordan. His father led a rebellion against the British mandate in Iraq in 1920 and against a British-backed government in 1935.'

     i.   The document concludes with a statement that AWB's strategy includes the full engagement of Australian Government support.

10. Exhibit 10 is the Alia introduction confirming delivery of the defendant's goods in IRAQ the enemy of the United States.

11. Exhibit 11 Arthur Anderson of the United States confirms an investigation on the Oxley- Sarbanes standard of accounting to account for the transactions profit and loss and ethics.

12. Exhibit 12 confirms and validates that the defendants and their agents were moving in and out of IRAQ a declared enemy of the United States during the stated period.

     a.   Delegation led by Andrew Lindberg (August 2002) to Baghdad agreed to settle the contamination of the 'Iron Filings' vessels by paying them USD 6 pmt for each vessel total = USD 2,016,133

After being approached by Tigris Petroleum AWB and IGB have agreed to allow the new contract to be the conduit for a repayment of USD 8,375,000 owed to Tigris by IGB for a cargo of wheat shipped in 1996. IGB have agreed to raising the contract price by the debt amount and when payments are made under the Letter of Credit AWB will pay Tigris its debt less AWBs recovery fee.

We have suggested the following during our last two visits.

• Offsetting the debt against the Outstanding debt to 'Tigris petroleum' (approx USD 8.35 million)

• Reducing the any new contract price [sic] by the amount of the rebate on a pmt basis

• Repaying the debt through the provision of aid in some form - Wheat, Health supplies etc.

However, in discussion with the Minister of Trade he has continually, insisted on repayment directly as an addition to the inland transport and said that this was his understanding of the agreement with Andrew Lindberg - Michael Long was present and confirms that this was discussed. Now that the new contract has been concluded ISM need a sign off to organise this payment when shipments start.

13. Exhibit 13 confirms the existence of TIGRIS PETROLEUM and the shipment of goods to IRAQ and the methods of money laundering.

CASE 1:07 cv-01170-JDB   Document 35   Filed Saturday, July 12, 2008 Page 6 of 11

14. Exhibit 14 is the Bank of New York Audit Trail confirming the use of the United States Banks for laundering enemy money being through American Express in WTC Building no.7 of all things.

15. Exhibit 15 might be the shipment of the Weapons of Mass Destruction from Toowoomba, Queensland, Australia to the enemy of the Unites of America.

16. Exhibit 16 puts BHP petroleum and Iraq and dealing of money laundering on the same page.

17. Exhibit 17 is the international money laundering scheme of the defendants of include a Ronly from Europe to defraud America.

18. Exhibit 18 is the SWIFT Bank of New York and Credit Suisse transaction of using United States Banks for enemy laundered money by the defendants.

19. Exhibit 19 is the Jet Setter life of the High and Mighty defendants as they confirm entering and leaving Bagdad with laundered money and illegal deals with the enemy of the United States of America.

20. Exhibit 20 DFAT fax is confirmation that defendants are DFAT not any individual or entity validating and discussing movement of goods in Huge Quantities from Geelong Australia.

   a. Hargreaves thereby disclosed to the Australian Government the gist or substance of legal advice that AWB had obtained (as at the relevant dates at which he made his disclosures) that there was no evidence of:

   b. corruption by AWB

   c.  side payments or after sales payments by AWB to the former Iraqi regime

   d. • any knowledge on the part of AWB that Alia was connected with the Iraqi regime or that payments were being channelled by Alia to that regime

   e. • any conduct by AWB that resulted in breaches of the United Nations' sanctions

   f. any other wrongdoing or improper conduct by AWB in connection with the supply of wheat to Iraq under the OFF Programme.

   g. Hargreaves' memorandum of 25 June 2005 makes it plain that he deliberately deployed AWB's legal advice in his dealings with the

Australian Government. He did so as part of AWB's strategy to secure the continued support of the Federal Government, both generally and in relation to AWB's dealings with the IIC and the United States Government. Hargreaves also deployed the advice in pursuit of the objectives that he set out in his memorandum; they included protecting and defending the reputation of AWB both within Australia and overseas, and minimising any attack by US wheat interests on AWB's position as the exclusive manager of wheat exports from Australia.

21. Communications between a lawyer and client which facilitate a crime or fraud are not protected by legal professional privilege. This principle is often referred to as the 'fraud exception' to legal professional privilege, but this does not capture its full reach. The principle encompasses a wide species of fraud, criminal activity or actions taken for illegal or improper purposes and extends to 'trickery' and 'shams'. As the fraud exception is based on public policy grounds, it is sufficiently flexible to capture a range of situations where the protection of confidential communications between lawyer and client would be contrary to the public interest.

22. Plaintiffs will make and application to present larger document attachments to present more evidence to include:

   a. Allegations of Corrupt Payments: On 20 April 2005, Hargreaves attended at the Australian Embassy in Washington DC to brief Ambassador Michael Thawley and members of his staff. The uncontested evidence before me includes a statutory declaration by Anastasia Carayanides, a Minister Counsellor (Commercial) at the Embassy in Washington, who attended the briefing by Hargreaves. The statutory declaration records that Hargreaves made statements to the following effect:

'... "I think that AWB has cooperated with the IIC and that the IIC now has a better appreciation of AWB operations under OFF. AWB has not been involved in paying bribes in Iraq. I think the IIC will conclude that AWB was not knowingly involved in breaching sanctions, or at worst that it was unwittingly involved." When someone asked what he meant by that statement, he replied in words to the following effect: "The IIC is looking at the use of a fictitious trucking company. But I'm confident that AWB does not

fall in that category." To my knowledge, Mr Hargreaves referred to Alia by name for the
first time either in this meeting or in the meeting on 15 June 2005 (see paras 36-37
below).'

Hargreaves made a further presentation to Embassy staff on 15 June 2005 at which
Hargreaves told Ms Carayanides and others that:

'... "I can assure you that AWB has not been involved in any illicit payments to the Iraqi
regime or breaches of sanctions. AWB has conducted an internal audit and an
independent legal review by a law firm, and both had found no wrongdoing."

...

"AWB has done nothing wrong. It has not been involved in breaking sanctions. All of
AWB's contracts were approved by the UN. No-one in AWB is aware of paying
kickbacks to Iraq."

...

"Alia is a Jordanian trucking company that provided real trucking services to AWB in
Iraq. Alia unloaded ships at Umm Qasr directly on to its trucks and delivered the wheat
throughout the country. As far as AWB knew Alia was not a front company. AWB was
not aware of Alia channelling money to Iraq".'

75 On 25 June 2005, in consultation with AWB's legal advisers, Hargreaves prepared a
memorandum for Lindberg to speak to at a board meeting of AWB that was scheduled
for 28 June 2005. The memorandum apprised board members of meetings which AWB
had held with key elements of the Federal Government, including the Australian
Embassy in Washington, and expanded on those meetings as follows:

'Meetings with Federal Government
• Chairman and MD met with
o PM's office – senior Foreign Affairs Advisor
o John Anderson and his chief of staff
o Alexander Downer
o Warren Truss
o Heads and other officials of DFAT and DAFF
• Provided briefing on progress so far with IIC and our deep concern over AWB's
treatment so far and that AWB might become victim of its cooperation
• Alerted them to possibility of adverse [findings] including possibility of finding AWB
has wilfully breached sanctions through the trucking arrangements
• Sought their advice on impact if AWB withdrew from process
• Reassured them that:
o AWB has QC's opinion it has not breached sanctions
o AWB complied with the guidelines laid down by the relevant authorities

o AWB had no knowledge of any connection between the trucking company and the former regime during the OFF program
o AWB has found no evidence of fraud or corrupt payments etc
• Overall the meetings were very satisfactory for AWB
• While there is concern over damage to reputation of Australia and AWB, the feedback from all parties was:
o AWB should continue to engage in the process
o That Fed Gov't is ready to back AWB but this would be difficult if AWB withdraws from process
o No indication from any individual or any meeting that Fed Gov't was distancing itself from AWB in this process
o Strong support came from Minister Downer who indicated he saw it as his responsibility to defend AWB
o Their view of the facts was that:
• AWB had followed the process
• AWB did what it was instructed to do
• AWB did not know, could not have known of any connection between the trucking company and the former regime.'

76 Later in the memorandum, Hargreaves identified the commercial objectives which AWB was pursuing:

'Our objectives
1. Protect and defend the reputation of AWB both within Australia and overseas
2. To minimize any attack by US wheat interests on the single desk selling system arising from this report
3. To manage the media, politics in Canberra and domestic stakeholders in order to avoid any need for a further inquiry into AWB's role in OFF
4. To manage the media and politics in the United States with the aim of containing this issue and preventing our involvement in the OFF Program from becoming the subject of inquiry by Congressional Committees
5. Avoiding any impact on our relationship with Iraq or other customers.'
77 Hargreaves had a further meeting in Washington DC with Ms Carayanides at some time in the period between 16 June 2005 and September 2005. In the course of this meeting, Hargreaves was asked whether the amount paid by AWB to Alia for trucking services was reasonable. Ms Carayanides said that he responded in words to the following effect:

'"Yes, he thought it was reasonable, because it reflected the costs of insurance and transportation throughout the country in difficult circumstances. Alia was providing a real service, and AWB was paying for that service. It was the only trucking company that was reliable and that AWB could use to off load wheat into trucks at Umm Qasr. No one in AWB knew of any money being channeled to the Iraqi regime through Alia. AWB had conducted an independent legal review which hadn't turned up any wrongdoing".'

CASE 1:07 cv-01170-JDB    Document 35    Filed Saturday, July 12, 2008 Page 10 of 11

The plaintiffs through the complaints so filed states that the defendants violated TITLE 18 of the USC 2382 "Misprison of Treason" provides that:

> Whoever owing allegiance to the United States and has knowledge of the commission of any treason against them, conceals and does not, as soon as may be practicable, disclose and make known the same to the President or to some judge in the United States, or to the governor or to some judge or justice in a particular state is guilty of misprision of treason and shall be fine under this title or imprisoned not more than seven years or both.

23  The scope of conduct caught by the principle has been articulated in a variety of ways, often without particular precision: Propend at 545. Classic formulations have spoken of communications in furtherance of a 'crime or fraud': R v Cox and Railton (1884) 14 QBD 153 ('R v Cox') at 165; a 'criminal or unlawful proceeding': Bullivant v Attorney-General (Vic) [1901] AC 196 ('Bullivant') at 201; 'any unlawful or wicked act': Annesley v Anglesea (1743) 17 St Tr 1139 at 1229; and 'all forms of fraud and dishonesty such as fraudulent breach of trust, fraudulent conspiracy, trickery, and sham contrivances'.

23  Some authorities have expressed the principle as applicable to prevent a 'fraud on justice' in a broad sense. The concept of a 'fraud on justice' was adopted by Lander J in Gartner v Carter [2004] FCA 258 ('Gartner v Carter') to deny protection to a communication between a lawyer and client for the purpose of the client putting assets beyond the reach of the legitimate claims of secured creditors: at [130] and [139]-[140].

23  The principle extends to 'trickery' and 'shams'. A 'sham' refers to steps which take the form of a legally effective transaction but which the parties intend should not have the apparent, or any, legal consequences: Equuscorp Pty Ltd v Glengallan Investments Pty Ltd (2004) 218 CLR 471; see also Beazley v Steinhardt (1999) 106 A Crim R 21; affirmed on appeal in [1999] FCA 1255 ('Beazley'). The recent case of Australian Securities & Investments Commission v Mercorella (No 3) [2006] FCA 772 provides an example of the denial of legal professional privilege to documents in furtherance of a sham transaction. In that case, creditors of a managed investment scheme claimed privilege over documents relating to securities obtained from the defendant and certain companies in the scheme. The transactions were allegedly

CASE 1:07 cv-01170-JDB    Document 35    Filed Saturday, July 12, 2008 Page 11 of 11

entered into so as to advance those creditors' interests over the interests of other creditors to the scheme. Mansfield J found that the communications were prima facie in furtherance of a sham and, as such, were not privileged. After referring to Lander J's decision in Gartner v Carter and Barclays Bank plc v Eustice [1995] 4 All ER 511 ('Barclays Bank'), his Honour stated at [95]:

"/s

Jugvir Inder Singh

# Alia for Transportation & General trade Co.
## Amman, Jordan
### "At a Glance"

**March 2005**

**Mr. HUSSAIN K. Al Farhood** – Chairman
**Mr. OTHMAN Al Absi** – General Manager

### KEY MEETING OBJECTIVES:

1. Recognition of ALIA's support for providing discharge and transport services in Iraq in a very challenging environment and their ongoing help organising training groups from the IGB.

2. Appreciation of ALIA's ongoing commitment to improve the discharge operation and the port infrastructure at Umm Qasr and so reduce supply chain costs for AWB.

3. We are looking to finalise details over a transport contract to support the new 2.6 million mt contract when Letter of Credit is received.

4. We are looking to elicit the Chairman's view on the Future of Iraq in regards to the Political, Social and Economic environment and the composition and policies of the new government.

5. We are looking to introduce AWB Chartering to Alia as a possible fee for service opportunity re other origin freight to Iraq and will discuss other possibilities re US Wheat, co-operation in Umm Qasr.

### KEY POINTS

- AWB has been using Alia's services since 1998 and their service

- Chairman is well connected in Iraqi Political Circles and has always proved to be very well informed about key issues inside Baghdad over the last couple of years.

- Alia is in discussion with US Trading Companies (With US government support) to provide Ocean Freight from the US and Inland transport from Tartous to Iraq

### PERSONAL PROFILE:

The Chairman Mr. Hussain belongs to the powerful Khawam family in Iraq and also sits on the board of Riyadh Investment Group (diversified holding company for Khawam Family interests) He lives in Amman, Jordan at present.

Directly reporting to the Chairman is the General Manager Mr Othman Al-Absi. Mr. Othman is AWB's most frequent contact and manages the discharge and transport operation at Umm Qasr/other ports.

### COMPANY BACKGROUND

Alia is a diversified transport and logistics company providing inland transport services to AWB and is involved in relaunching Iraqi Airways, truck management, coastal vessels, shipping and agency services

HDD.0014.1161

**US DOLLAR PAYMENT REQUEST**                                        0

DIVISION REQUESTING PAYMENT                    CHARTERING

AWB.0081.0013 — R

AMOUNT                                         US$723,000.00

DATE PAYMENT REQUESTED                         4/10
                                               29-Sep-00

                                                                3000

                **PAYMENT DETAILS**

PAYMENT DETAILS - NAME OF VESSEL &             230 Sept 2000
            B/LADING DATE

| Trucking fee | 48200.00  mt | US$15.00 | US$723,000.00 |

| | Total Remittance | US$723,000.00 | 1118000 |

**BANKING DETAILS**

| | CORRESPONDENT BANK (in the USA) | ACCOUNT OF | A/C NUMBER AND NAME OF BENEFICIARY |
|---|---|---|---|
| | American Express Bank N.Y. New York | The Jordan National Bank | Alia for Transportation and General Trade |
| ADDRESS | Account: | P.O.BOX 2103 Amman - Jordan | Ref :Trucking Fee: / AWB |
| SWIFT CODE | aelbus 33 | | |
| ABA No. | | | |

**AUTHORISED SIGNATORIES**



REQUESTED BY:                    AUTHORISED BY:

29-Sep-00  David Cowan           Michael Watson

WST.0002.0131



ARTHUR ANDERSEN

**Privileged & Confidential**

5 September 2000

Ms Alifia Sachak
Senior Corporate Counsel
AWB Limited
Ceres House
528 Lonsdale Street
MELBOURNE VIC 3000

Arthur Andersen
A Member Firm of Andersen Worldwide SC

360 Elizabeth Street
Melbourne VIC 3000

GPO Box 5151AA
Melbourne VIC 3001

Tel  61 3 9286 8000
Fax 61 3 9286 8100
DX 288 Melbourne

Dear Ms Sachak

Re:    **Investigation of International Business Transactions Conducted by the International Marketing Group**

Further to our meetings with Mr Tim Goodacre and Mr Charles Stott, this is to confirm our understanding of the arrangements made with you for Arthur Andersen to provide assistance in the above matter.

**Our Understanding of Your Needs**

We understand that AWB Limited (AWB) has concerns about the integrity of international business transactions conducted by the International Marketing Group. You are seeking independent assistance in determining the existence of any illegal or unethical behaviour and any failure of the control systems. We are mindful of your concerns that any investigation must be conducted discreetly so as not to alert anyone of your concerns.

**Scope and Approach**

As discussed, for purposes of discretion our inquiries will be conducted covertly under the guise of and in tandem with an Arthur Andersen, Business Process Review. This project will give sufficient cover for us to conduct our investigations.

Our work, to be performed under your direction in conjunction with our Business Process team, will involve an initial assessment of this matter. Our general activities are described below. However, it may also be appropriate that we perform other tasks identified during the course of this engagement, or to conduct a forensic examination of certain computer systems and facilities.

The first phase of our work subject to these arrangements will be limited to assessing the nature and extent of possible fraud, bribery, corruption or misconduct, and any related circumstances. The requirement for and extent of further work is dependent on the outcomes of this initial phase. Any further work will be subject to a separate job arrangement letter.

At the conclusion of this phase we will provide you with an investigation matrix, outlining further activities and avenues of inquiry that may assist you to fully resolve this matter. We will keep you informed on the likely need for further work as the assessment phase progresses and will not commence any further inquiries until agreement has been reached with you.

WST.0002.0132



Australian Wheat Board
Page 2
5 September 2000

Our experience is that in these matters the success of the inquiries usually hinges on information gathered and avenues of inquiry identified as a result of probing interviews with a variety of people.

Our work, to be performed under your direction will include:

- Conducting inquiries, interviewing staff and third parties;

- Interviewing former staff (only on your direction);

- Analysing the available information in this matter;

- Reviewing personnel files and other avenues of inquiry;

- Conducting an assessment of processes;

- Assessing physical security and access to key documents;

- Assessing the integrity risks relating to identified areas;

- Assessing your exposure to the Commonwealth Criminal Code anti-bribery provisions; and

- Performing other tasks identified during the course of this engagement.

We will discuss these issues with you as the investigation progresses.

At the conclusion of this phase we will provide you with an investigation matrix. We will also outline further activities and avenues of inquiry that may assist you to fully resolve this matter. We will keep you informed on the likely need for further work as the investigation progresses and will not commence any further inquiries until agreement has been reached with you.

We will keep our written product to a minimum with a view to spending the greatest amount of time on site work, interviews and contact with personnel. We will not prepare or otherwise issue a written report unless requested by you to do so. Any work product which we prepare for you is to be used solely to assist you in rendering legal advice to AWB and/or in anticipation of litigation and will not be used for any other purpose or made public without our written permission. If you prepare a report on this matter that refers to our work, you agree to make available to us that report prior to its issuance. You agree that we may read the report and verify the accuracy of references to our work. We will communicate to you any errors; misleading items or significant omissions we identify and work with you to resolve any such matters.

We understand that all communications between our respective firms, as well as any materials or information developed or received by us pursuant to this arrangement, whether oral or written, are protected by applicable legal privileges and, therefore, will be treated by us as confidential. Accordingly, we agree, subject to applicable law or court order, not to disclose any of our communications, or any of the information we receive or develop in the course of our work for you, to any person or entity apart from your firm or such other persons or entities as your firm may designate.

If access to or disclosure of any of the materials in our possession relating to this arrangement is sought by a third party, we will promptly notify you of such action, and co-operate with you concerning our response thereto. ~~the instructions~~ from your firm to the above, ~~however~~ We will only respond to a third party with your approval.

WST.0002.0133

Australian Wheat Board
Page 3
5 September 2000

Notwithstanding anything contained herein to the contrary, if you intend to publish or otherwise reproduce any of Arthur Andersen's work product or to make reference to Arthur Andersen in any document that contains other information, you agree to (i) provide Arthur Andersen with a draft of the document to review, and (ii) obtain Arthur Andersen's written approval for inclusion of Arthur Andersen's name or work product in such document before the document is printed and distributed.

The services to be provided under this letter do not include the giving of testimony or appearances by Arthur Andersen in any legal or arbitration proceedings. Upon your determination that such testimony or appearances are necessary, and if we agree, that work will be the subject of a separate arrangement letter. If, as a result of the services hereunder, we are subpoenaed by a third party or ordered by a court of law to appear as a witness at trial or produce documents in respect of the services performed hereunder, you agree on behalf of AWB to cover and/or reimburse Arthur Andersen for all costs incurred, including but not limited to preparation time, out of pocket expenses, travel time and expenses and other reasonable costs incurred.

From time to time, quality control procedures are performed by firm personnel not assigned to the engagement to assure us that our work meets our professional standards. ~~If you so request in writing~~ we will advise you prior to the application of any of these quality control procedures and determine with you if there are any steps we should take to protect the legal privileges related to communications between us.

We are not aware of any situations which, in our view, constitute actual conflicts of interest and which would impair our ability objectively to provide assistance in the above matter.

We take no responsibility for monitoring for possible conflicts that could arise during the course of the engagement, although we will inform you promptly should any come to our attention. We reserve the right to resign from this engagement at any time if conflicts of interest arise or become known to us that, in our judgement, would impair our ability to perform objectively.

Charges for our work will be based on the level of staff and the time required to complete the assignment, plus out-of-pocket expenses. Our fees and the fee arrangements are quoted in the letter addressed to Mr Tim Goodacre outlining the Business Process Review. ~~We will also charge on the same basis for responding to any subpoenas and/or enquiries with representatives of the authorities or regulators and any other similar work we are required to perform related to this engagement.~~ Any other work outside the scope of this engagement will be the subject of a separate engagement letter.

The amounts payable under the letter referred to above have been calculated without reference to Goods and Services Tax ("GST"). Arthur Andersen is entitled to and will charge you an amount equal to the amount of any GST applicable to supplies and services made pursuant to this agreement.

We intend to provide AWB with the services of some our most experienced people for this project. Paul MacKellar, Partner, Business Fraud and Investigation Services (BFIS) will lead this engagement. Andrew Tuohy, Manager, and several of our senior consultants will perform the work.

WST.0002.0134

Australian Wheat Board
Page 4
5 September 2000

Except to the extent finally determined to have resulted from the wilful or reckless misconduct of Arthur Andersen: (i) Arthur Andersen's maximum aggregate liability to you for any reason, including Arthur Andersen's negligence, relating to the services under this letter shall be limited to the fees paid to Arthur Andersen for the portion of the work giving rise to liability; and (ii) You agree on behalf of AWB that AWB will indemnify and hold harmless Arthur Andersen from any claims, liabilities costs and expenses (including defence costs) associated with any third party claim arising from or relating to Arthur Andersen's services under this letter. This provision shall continue to apply after any termination of this arrangement and during any dispute between the parties.

We are pleased to have been asked to serve you in this matter, and you may be assured this assignment will be given our closest attention. Should you wish to discuss this matter further please do not hesitate to contact Paul MacKellar on 9286 8075 or mobile 0418 363074.

To confirm your agreement with the arrangements and the indemnity please sign the enclosed copy of this letter and return it to Paul MacKellar.

Yours faithfully

ARTHUR ANDERSEN

Agreed:...............................................

Dated:  ...............................................

Enc.



AWB.0136.0466



**FACSIMILE**

# AWB
## LIMITED

**AWB LIMITED**
ACN 081 890 459

Ceres House
528 Lonsdale Street
Melbourne Vic 3000

GPO Box 4562
Melbourne Vic 3001
Australia

Telephone
03 9209 2000

Facsimile
03 9670 2782

| To | Mr Yousif A. Rahman Director General | From | Mark Emons |
|---|---|---|---|
| Company | Grain Board of Iraq | Direct Fax | +613 9 670 5539 |
| Fax | 0011 9641 414 0860 | Direct Phone | +613 9 209 2035 |
| No. of pages (including front cover)  1 | | Date | 5 April 2000 |
| Subject | AWB Visit to Baghdad | | |

If you have not received all pages please contact the sender.
This facsimile is strictly confidential and intended solely for the named addressee.
If you have received this document in error please notify us immediately and destroy this copy.

Dear Sir,

Due to a change in travel commitments we are having to change our arrival date in Baghdad. With your agreement our intention is now to arrive in Baghdad on the evening of Monday 10th April. We would hope then to meet with your goodselves on the morning of Tuesday 11th. We will then depart Baghdad early on Wednesday morning.

AWB General Manager Mr Edward Laskie will be carrying a personal message for Minister Saleh from our Chairman Mr Flugge which he would like to pass to you.

Our Chairman has asked me to discuss with you while I am in Baghdad the issue of the position of the United Nations on trucking fee and also future phases of the Food for Oil program.

Please could you confirm that these dates are suitable as soon as possible before our departure on Thursday this week.

Best regards

Mark Emons
Regional Manager

*The Australian Grains Marketer*

L:\MED\SK\MARKETS\M EAST\IRAQ\FAXES\mac542000b

WST.0012.0100

# Attachment 13

| Trevor Flugge | 01-Jun-01 - 30-Jun-01 | Calendar |
|---|---|---|

**Friday, June 1**

| 09:00 | 09:30 | Gerard to pickup from Pacific International, deliver to airport |
|---|---|---|
| 10:05 | 12:10 | Melbourne/Brisbane, Qantas flight QF616 |
| | | Arrive Brisbane 12:10pm |
| 13:05 | 15:20 | Brisbane/Cairns Qantas QF616 |
| | | arrives Cairns 3:20pm |
| 17:45 | 20:00 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Saturday, June 2**

| 13:00 | 14:30 | Informal buffet lunch - Pacific Flavours Brasserie |
|---|---|---|
| 15:00 | 17:00 | Sightseeing activities |
| 18:00 | 22:30 | Welcome dinner - Great Aussie BBQ - Pool deck 4th floor - dress: |
| | | smart casual (tie not necessary) |
| 19:00 | 20:00 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Sunday, June 3**

| 06:30 | 10:00 | between 6:30am-10:00am breakfast is served in Pacific Flavours |
|---|---|---|
| | | Brasserie |
| 07:30 | 07:45 | Depart hotel walk to Marlin jetty |
| 07:45 | 09:15 | Quicksilver cruise boarding at Marlin Jetty for golfers to Port Douglas |
| 09:30 | 10:00 | Transfer to Sheraton Mirage golf club |
| 10:00 | 16:30 | Tee off for AWB/KOFMIA Golf Tournament |
| 16:30 | 17:15 | Depart Sheraton Mirage transfer to jetty for return trip to Cairns |
| 19:00 | 22:45 | Magic Million Celebration Dinner - 2nd floor - The Michaelmas Cay |
| | | Ballroom - Dress: smart casual (tie not necessary) |
| 21:00 | 22:15 | Accommodation - Sofitel Reef Hotel, 35-41 Wharf Street, Cairns. |
| | | Phone: 07 4030 8888, Fax: 07 4030 8777 |

**Monday, June 4**

| - All Day - | | Foundation Day - WA Public Holiday |
|---|---|---|
| 06:30 | 09:30 | breakfast is served in Pacific Flavours Brassiere |
| 10:35 | 12:55 | Cairns/Ayers Rock, Qantas QF689 |
| | | arrives Ayres Rock 12:55pm |
| 14:15 | 15:50 | Ayers Rock/Perth Qantas QF1923 |
| | | Arrives Perth 3:50pm |

**Tuesday, June 5**

| 07:00 | 20:00 | Keep free |
|---|---|---|

**Wednesday, June 6**

| 07:00 | 19:00 | Keep free |
|---|---|---|
| 10:00 | 11:30 | Phone hookup re Prospectus |

**Thursday, June 7**

| 14:15 | 16:30 | 2:15pm - Tour of the CBH Kwinana port terminal facility |
|---|---|---|
| | | 2:45pm - 4:15pm  Co-operative Bulk Handling Limited - launch of the |
| | | CBH Teacher's Guide - The Granary Museum, CBH Kwinana Grain |
| | | Terminal, Kwinana Beach Road, Rockingham (reception 9237 9601) - |
| 18:00 | 19:30 | Perth - Rabobank Agribusiness speech WA Club, 101 St George's |
| | | Terrace, Perth  (Andre 08 9224 7587) |

**Friday, June 8**

| 11:00 | 14:00 | Perth - CBH& GPWA meeting, CEO & Chairman of 3 organisations, |
|---|---|---|

WST.0012.0101

possible merger.  GWPA 14/172 St Georges Terrace, Perth

**Saturday, June 9**

**Sunday, June 10**

| | | |
|---|---|---|
| 16:30 | 22:10 | Perth/KL - Malaysian Airlines MH124 |
| 23:00 | 23:45 | Accommodation: Kuala Lumpur, Shangri La, 11 Jalan Sultan Ismail, Kuala Lumpur.  Phone 603 232 2388, Fax, 603 230 1514 |

**Monday, June 11**

| | | |
|---|---|---|
| - All Day - | | Queens's Birthday Holiday - all states except WA |
| 08:00 | 16:00 | KL |
| 19:00 | 20:00 | Accommodation: Kuala Lumpur, Shangri La, 11 Jalan Sultan Ismail, Kuala Lumpur.  Phone 603 232 2388, Fax, 603 230 1514 |

**Tuesday, June 12**

| | | |
|---|---|---|
| 09:50 | 10:35 | Subang/Penang,  Malaysian Airlines MH1928 |
| 16:40 | 17:55 | Penang/Singapore Eva Airways BR286 |
| 22:45 | 23:45 | Singapore/London  Qantas flight QF9 |
| | | arrive London Wednesday 13 June 5:15am |

**Wednesday, June 13**

| | | |
|---|---|---|
| 05:15 | 06:15 | Arrive London, Heathrow |
| 12:30 | 14:00 | Lunch with BER - venue to be advised |
| 14:30 | 16:30 | IGC Industry round table - Cabot Hall conference room Canary Wharf, London |
| 18:00 | 20:00 | IGC welcome reception, Institute of Directors, 116 Pall Mall, London |
| 19:30 | 21:45 | Dinner with Nidera - venue to be advised |
| 21:45 | 22:15 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Thursday, June 14**

| | | |
|---|---|---|
| 07:30 | 08:30 | Breakfast with GTC |
| 10:00 | 17:45 | IGC conference - Queen Elizabeth II Conference Centre, broad Sanctuary, Westminster, London |
| 19:30 | 22:00 | Dinner with Club Demeter - venue to be advised |
| 22:30 | 23:45 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Friday, June 15**

| | | |
|---|---|---|
| - All Day - | | FYI - Executive meeting 8:00-11:00am |
| 09:30 | 12:30 | Meeting with CWB - Greg Arason, President & CEO; Bill Spafford, Vice President, Sales & Market Development; Jean-Benoit Gauthier, Senior Marketing Manager; Chris Gillen, Marketing Manager; Brian White, Vice President (Acting) Market Analysis |
| 14:00 | 15:00 | Meeting with Ben Gill, President, National Farmers Union, Agriculture House, 164 Shaftesbury Av, London |
| 16:00 | 17:00 | Meeting with Prof Allan Buckwell, Director of Policy, Country Landowners Association, 16 Belgrave Square, London.  Phone 020 7235 0511, Fax 020 7235 4696 |
| 19:00 | 20:00 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park Corner, London. Tel:  44 20 7409 3131 Fax: 44 20 7493 3476 |

**Saturday, June 16**

| | | |
|---|---|---|
| 09:00 | 17:15 | London |
| 19:00 | 20:00 | Accommodation: Inter Continental, 1 Hamilton Place, Hyde Park |



WST.0012.0102



Corner, London. Tel: 44 20 7409 3131
Fax: 44 20 7493 3476

**Sunday, June 17**

| | | |
|---|---|---|
| 09:00 | 14:00 | London |
| 15:35 | 18:10 | London, Heathrow/Geneva British Airways, BA730 |
| | | Departs Heathrow 3:35pm arrives Geneva main terminal 6:10pm |
| 19:00 | 20:00 | Accommodation: Hotel Intercontinental Geneve, 7-9 Chemin du |
| | | Petit-Saconnex, 1211 Geneva, Switzerland  - Tel: 41 22 919 3939 |
| | | Fax: 41 22 919 3838 |

**Monday, June 18**

| | | |
|---|---|---|
| 08:00 | 08:15 | Geneva - Pickup by Embassy driver |
| 08:30 | 10:00 | Briefing session with Dr Geoff Raby, Ambassador & Permanent |
| | | Representative |
| 13:00 | 14:30 | Lunch hosted by Ambassador Raby |
| 19:00 | 20:00 | Accommodation: Hotel Intercontinental Geneve, 7-9 Chemin du |
| | | Petit-Saconnex, 1211 Geneva, Switzerland  - Tel: 41 22 919 3939 |

**Tuesday, June 19**

| | | |
|---|---|---|
| 11:00 | 12:10 | Geneva/Paris, Air France AF1643, |
| 13:15 | 19:15 | Paris/Amman, Air France AF672 |
| 21:00 | 22:00 | Accommodation, Marriott Amman, Issam Al Ajlouni St, Shmeisani |
| | | Amman Jordan, Phone 9626 560 7607, Fax 9626 567 0100. |

**Wednesday, June 20**

| | | |
|---|---|---|
| 07:00 | 08:45 | Amman |
| 09:30 | 20:30 | Depart Amman, drive to Baghdad - Grains board to arrange driver |

**Thursday, June 21**

| | | |
|---|---|---|
| 08:00 | 16:30 | Baghdad |

**Friday, June 22**

| | | |
|---|---|---|
| 09:00 | 19:00 | Depart Baghdad, drive to Amman |
| 22:15 | 23:45 | Amman/Cairo, Egyptair MS815 |
| 23:45 | 23:55 | Accommodation, Marriott Cairo Hotel & Casino, Saraya El Gezira |
| | | Street, Zamalek, Cairo.  Phone 202 735 8888, Fax 202 735 6667 |

**Saturday, June 23**

| | | |
|---|---|---|
| 09:00 | 17:15 | FSFM Board meeting, Cairo |
| 19:15 | 23:50 | Cairo/Dubai, Emirates Airlines EK402 |

**Sunday, June 24**

| | | |
|---|---|---|
| 02:45 | 14:10 | Dubai/Singapore, Emirates Airlines EK68 - Arrives Melbourne 0025 |
| | | Monday 25 June |
| 15:20 | 23:45 | Singapore/Melbourne Emirates Airlines EK68, departs Singapore |
| | | Sunday 24 June, 3:20pm, arrives Melbourne Monday 25 June 12:25am |

**Monday, June 25**

| | | |
|---|---|---|
| 00:25 | 00:30 | Arrive Melbourne 12:25am |
| 00:30 | 01:30 | Gerard to pickup from airport - deliver to Pacific Hotel |
| 10:00 | 14:45 | Australian Wool Services, 369 Royal Parade, Parkville - Markus |
| | | Ziemer expecting you and will have papers ready |
| 15:00 | 16:00 | Board briefing with Richard Fuller |
| 19:00 | 20:00 | Accommodation: Pacific International, 471 Little Bourke Street, |
| | | Melbourne.  Phone 03 9607 3000, fax 03 9642 3822 |

**Tuesday, June 26**

| | | |
|---|---|---|
| 12:30 | 13:30 | Corporate Risk Committee meeting - including lunch |

5i

WST.0012.0103

| 13:45 | 15:45 | AWB (International) Limited Board meeting |
| 17:00 | 18:00 | Listing Committee meeting |
| 19:00 | 20:00 | Board dinner - The Australian Club |
| 22:00 | 23:00 | Accommodation: Pacific International, 471 Little Bourke Street, Melbourne.  Phone 03 9607 3000, fax 03 9642 3822 |

**Wednesday, June 27**

| 08:30 | 12:30 | AWB Limited Board Meeting |
|       |       | 12:00md guests arrive - Gordon Dickinson, Brett Paton, UBS Warburg |
| 12:30 | 14:00 | Board Luncheon |
| 17:30 | 18:00 | Gerard to pickup from AWB - deliver to airport |
| 18:35 | 20:35 | Melbourne/Perth QF481 |

**Thursday, June 28**

**Friday, June 29**

| 19:00 | 23:45 | Perth - sleepover |

**Saturday, June 30**

52

ROS_216C_0020

# The Bank of New York
## Audit Trail Report

Page: 7
Date: 09/12/2000
Time: 17:27:10

| | Item# | Status | Src Currency | Destination | Pay Currency | TRN/System Msg |
|---|---|---|---|---|---|---|
| FT | 7 | Sent | USD | NEW YORK - USD | USD | FTJ0009126703222 |

VAX Transmission Date/Time: 9/12/2000 02:25

A/C:

Amount: 576,450.00

Value Date: 09/12/2000

Your Ref: 49847

Related Ref:

Funds Type: SAME DAY

Advise By: MAIL

Bene Is Bank: N

Charges: OUR

AWB.0064.0040 _ R

**Beneficiary**

ID:

ALIA FOR TRANSPORTATION & GEN TRADE
JORDAN

**Beneficiary's Bank**

ID: SWIFT     JONBJOAX

JORDAN NATIONAL BANK PLC
HEAD OFFICE/INTERNATIONAL DIVISION
QUEEN MOOR ST-P.O. BOX 3103
AMMAN 11181, JORDAN

**Intermediary**

ID: SWIFT     AEIBUS33

AMERICAN EXPRESS BANK LTD.
NEW YORK AGENCY
7 WORLD TRADE CENTER, 8FL
NEW YORK, NEW YORK 10048

**By Order Of**

Description:

**Details Of Payment**

**Bank To Bank**

| Ent By/Dt: | HILERINEJ | App By/Dt: | | Ver By/Dt: | ANDREW |
|---|---|---|---|---|---|
| 09/12/2000 15:20:25 | | | | 09/12/2000 16:59:26 | |

 

AWB.0102.0176

**BHP Petroleum**

13 September, 2000

## To Whom It May Concern

BHP Petroleum has agreed to restructure its commercial interests in Iraq by transferring to
The Tigris Petroleum Corporation Limited, ('Tigris') 57/63 Line Wall Road, Gibraltar
(Registered in Gibraltar number 76644) with effect from 1 September 2000 all its right title and
interest relating to all Iraqi Assets and Liabilities.

In particular BHP Petroleum has assigned to Tigris all its rights to receive value from the Grain
Board of Iraq, or its assignee, in relation to the cargo of grain delivered by the Australian Wheat
Board to the Iraq Grain Board in January 1996 on the MV Ikan Sepat, which cargo was financed
by BHP Petroleum at a cost of US$ 5 million (US Dollars five million), which rights are
hereinafter referred to as 'Grain Board Receivable'.

Tigris is hereby authorised to discuss the Grain Board Receivable with the appropriate parties and
to negotiate details and terms of payment as Tigris in its sole discretion shall deem appropriate,
without further BHP Petroleum involvement.  Payments made in relation to the Grain Board
Receivable should be made as directed by Tigris.

Yours faithfully

**P S Aiken**
President BHP Petroleum

# UNCLASSIFIED
# DECLASSIFIED


DFT.0001.0490

17/1/06

626/34

Date:    26/11/02 12:30
Sender: Paul Stephens
To:      Don Cuddihy
Priority: Normal
Subject: Re:COMMERCIAL-IN-CONFIDENCE:

Don

I spoke to OIP and Treasury who said AWB has one of two options

1. If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2. If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas. Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

I hope this is clear. If not, please let me know.

Paul


_____Reply Separator_____
Subject:    COMMERCIAL-IN-CONFIDENCE:
Author:     Don Cuddihy
Date:       25/11/02 17:36


Paul,

During the dispute over alleged contamination of some AWB Ltd wheat which arrived in Iraq earlier this year, AWB Ltd accepted that some of the cargoes were tainted with iron fillings.  It agreed to accept a lower price for the 'tainted' wheat.

In this contect, AWB Ltd has asked me whether there's a mechanism for refunding the money paid by Iraq for the faulty wheat.  The only warranty arrangements I am aware of require AWB Ltd to supply replacement wheat, rather than to refund monies paid.

Grateful if you could ask OIP what AWB Ltd's options are in this case.

Regards

Don

## USD PAYMENT REQUEST

AWB.0196.0065_R

| | |
|---|---|
| DIVISION REQUESTING PAYMENT | Chartering |
| AMOUNT | -US$125,892.31 |
| DATE PAYMENT TO BE MADE | 2̶5̶ -26-Sep-00 |
| PAYMENT DETAILS | |
| PAYMENT DETAILS - NAME OF VESSEL & B/LADING DATE | |

*Credit Applied to reduce Pmt. ∴ Reduce Debtos so that actual pmt is low.*

SO   MV      ✓   ~~BOR~~ Ronly ~

MV      Frt

V2/4   120420
US$267,508.94
~US$393,401.25   500530

to   500530   433,500 00.
SO   411820    18 423.75
SO   230120    21 675.00 . WITHHELD

| | Total Remittance | ~US$125,892.31 | 1118600 |
|---|---|---|---|

**NKING DETAILS**

| CORRESPONDENT BANK (in the USA) | ACCOUNT OF | A/C NUMBER AND NAME OF BENEFICIARY |
|---|---|---|
| Bank of New York | Credit Suisse Geneva | Ronly Holdings Ltd |
| **ADDRESS** New York | Case Postale 2153 1211 Geneva 2 Switzerland | Ref: Naree/ AWB |

**CHIPS UID**

**RISED SIGNATORIES**

| REQUESTED BY: 26-Sep-00 David Cowan | AUTHORISED BY: Eddie Collis |
|---|---|

DR   B̶F̶B̶ 500530   393,401·25-

CR   120420   267,508·95

CR   118600   125,892.31

∴ *Amt owed by Ronly Holdings Ltd in 120420 is reduced via offset.*   LB 10/00   V2/6

Fax sent by  : 612 93645176        FAX TEST                18/01/06  17:51    Pg:  1/2

# UNCLASSIFIED
# DECLASSIFIED

17/1/06

DFT.0001.0490



626/34

**Date:** 26/11/02 12:30
**Sender:** Paul Stephens
**To:** Don Cuddihy
**Priority:** Normal
**Subject:** Re:COMMERCIAL-IN-CONFIDENCE:

Don

I spoke to OIP and Treasury who said AWB has one of two options

1. If there are additional shipments of wheat to go to Iraq under the contract in question, AWB can give a discount to Iraq when it receives its next invoice for those additional shipments.

2. If there are no further shipments under the contract, AWB can transfer funds to the Iraq escrow account operated by BNP Paribas. Any such transfer would have to clearly acknowledge the LC number (and any other relevant details) that would tie the refund explicitly to the AWB contract and would enable Treasury and BNP to ensure that the money is assigned back to the relevant phase and sector.

I hope this is clear. If not, please let me know.

Paul

_____Reply Separator_____
Subject:     COMMERCIAL-IN-CONFIDENCE:
Author:      Don Cuddihy
Date:        25/11/02 17:36


Paul,

During the dispute over alleged contamination of some AWB Ltd wheat which arrived in Iraq earlier this year, AWB Ltd accepted that some of the cargoes were tainted with iron fillings. It agreed to accept a lower price for the 'tainted' wheat.

In this contect, AWB Ltd has asked me whether there's a mechanism for refunding the money paid by Iraq for the faulty wheat. The only warranty arrangements I am aware of require AWB Ltd to supply replacement wheat, rather than to refund monies paid.

Grateful if you could ask OIP what AWB Ltd's options are in this case.

Regards

Don

AWB.0129.0161

From: Michael Long
Sent: Wednesday, 6 November 2002 11:08:00 AM
To: Executive
Subject: Tigris / BHP / IGB

Update re Tigris petroleum / BHP debt


Michael


----- Forwarded by Michael Long/HO/AWB on 06/11/2002 12:09 -----

        Chris Whitwell
        06/11/2002 09:50

                To: "Norman Davidson-Kelly" <ndk@menaenergy.com>
                cc: "Chris Whitwell" <cwhitwell@awb.com.au>, "Dominic Hogan"
        <dhogan@awb.com.au>, Michael Long/HO/AWB@AWB
                Subject: Re: your email

        This document has been read by:        Message:
        Michael Long
Norman

It was good to meet you on our last trip and we briefed Sabah as to the
results of our discussions. briefly they are as follows :

Had a first meeting with Dr Yousif where we put you approximate figures
forward - however we emphasised that any agreement on the final actual
figures had to be reached between Tigris representatives and appropriate
persons in the govt  - we were only facilitating possible repayment.

we took the following approx figures you gave us.

Date  Compound Int: Simple Interest

26th Jan 2001  USD8,050,000 USD7,500,000
26th Jan 2002 USD8,855,000 USD8,000,000
26th Oct 2002 USD9,519,000 USD8,375,000

We suggested the following proposal

1. offsetting vessel claims (iron filings) against Tigris (BHP) debt -
2. Balance of debt to be recovered against new business (load up contract). -
approx USD7.5 million (if using compound)
3. No further vessel claims would be used as offset - but would need to be
redirected through UN account.

Yousif referred the issue to the Minister who we met that evening.

The minister wants to keep the two issues (vessel claims and Tigris debt)
separate. He stated that the simple Interest amount on the Tigris debt had
received approval for repayment and that he felt  through loading up the next
Phase provided this opportunity.

Given that the next phase is due for discussion in Dec it was agreed that it

AWB.0129.0162

was important that Tigris have arranged figures and agreed them prior to then. Sabah told us of your plans to be there this month.

We discussed with Sabah the possible difficulties in incorporating the entire debt into one 500 K contract. Suggested some alternate pressure could be bought to bear on the Govt by yourselves to increase the tonnage of next phase to make things easier. he said he would discuss this with you.

I don't have your telephone numbers but happy to discuss further if you wish. plse call me on my mobile - plse bear in mind UK is 11 hours behind Australia.

regards

Chris Whitwell
Account Manager
Phone: (613) 9209 2044
Fax: (613) 9670 5539
Mobile (61) 419 833 356


        "Norman Davidson-Kelly" <ndk@menaenergy.com>
        01/11/2002 05:57
        Please respond to "Norman Davidson-Kelly"

            To: "Dominic Hogan" <dhogan@awb.com.au>
            cc: "Chris Whitwell" <cwhitwell@awb.com.au>
            Subject: Visit to Baghdad


I understand from Sabah that the trip went reasonably well.  Give me a call when you get back, and we can catch up.

Mike finds his e-mails to me get bounced back, but maybe you will have better luck.

N

AWB.0157.0499

# Project Rose
## Joint Board Committee
## AWB Limited and
## AWB (International) Limited
## Minutes of the Committee Meeting
## held on 27 April 2005

### *Glen Erin Vineyard Retreat, Rochford Road, Lancefield*

| | | |
|---|---|---|
| **COMMITTEE MEMBERS:** | **Mr Brendan Stewart** | **Chair** |
| | **Mr Robert Barry** | |
| | **Mr Andrew Lindberg** | |
| | **Mr Clinton Starr** | |
| | **Mr Peter Polson** | |
| **OTHER DIRECTORS:** | **Mr Steve Chamarette** | |
| | **Mr Ian Donges** | |
| | **Mr Brendan Fitzgerald** | |
| | **Mr Wayne Gibson** | |
| | **Mr Warrick McClelland** | |
| | **Mr Xavier Martin** | |
| | **Mr Chris Moffet** | |
| | **Mr John Schmoll** | |
| | **Mr John Simpson** | |
| **IN ATTENDANCE:** | **Dr Richard Fuller** | |
| | **Mr Jim Cooper** | |
| | **Mrs Delphine Cassidy** | |
| | **Mr Paul Ingleby** | |
| | **Ms Sarah Scales** | |
| | **Ms Jill Gillingham** | |
| | **Mr Charles Stott** | |
| | **Mr Michael Thomas** | |
| | **Mr Peter Geary** | |
| | **Mr John Maher** | |

## 1. OPENING OF MEETING / DECLARATIONS OF INTEREST

The Chairman declared the meeting open at 4:00pm.

## 2. PROJECT ROSE

The Managing Director briefed the Committee on Project Rose, including the following issues:

- L PP

..........…………….....………..                                     **Date:**
Chairman

AWB.0157.0500

LPP

The Board <u>discussed</u> the Managing Director's Report on Project Rose.

3.    **<u>CLOSE</u>**

The Chairman declared the meeting closed at 4:15pm.

..............................................    **Date:**
**Chairman**

C:\Documents and Settings\Millerja\Local Settings\Temp\Notes1FB9FF\995 - 27 April 2005 - Project Rose Committee Meeting.doc

L30 - 0021

Ple 136

Author: Charles Stott at _AWB_CORP_PO
Date:      12/5/95  1:31 PM
Priority: Normal
TO: John Lawrenson
TO: Ron Storey
CC: Peter McKeown
CC: Charles Stott
Subject: BHP/Iraq

**AWB.0129.0002**

---------------------------------- Message Contents ----------------------------------

John/Ron,

Contrary to DFAT's legal advice we have now received UN approval for
Iraq transactions to proceed on the basis of; "Cash payment to be
received through third parties".

In light of this decision the BHP transaction, structured slightly
differently, is now able to proceed. Prescott is expected to provide
the green light within the next few days.

Under the old mechanism the IGB was to open a 5 year deferred payment
L/C in favour of the AWB. The IGB was to pay cash or deliver oil in
substitution for cash if UN restrictions on oil exports were
terminated. The  AWB was to assign its payment  and oil receipt rights
to BHP and in return the AWB would receive cash from BHP on bill of
lading date.



The new mechanism, which is still to be negotiated with BHP, should
simply be COD. BHP will then be left to make its own arrangements with
the Iraq's.

As for DFAT, clearly their legal interpretation of UN sanctions was
wrong. However, DFAT are certainly not prepared to concede this
point. In fact, they claim that it is only because of Australia's
excellent standing in the UN that our applications breeze through
without close scrutiny.

This position doesn't wash with me.

DFAT throughout this process have postulated over what the UN
legislative drafters intent was at the time of establishing the rules
and as a result they have applied a far stricter interpretation than
the UN. This sanctimonious position is inhibiting our trading
relationship with Iraq and has resulted in lost opportunities. DFAT may
be motivated by the fact that Evan's is rumored to be seeking the
penultimate UN job, or that Australia is currently lobbying for a seat
on the security council.

Irrespective of the reasons, I believe the AWB shouldn't miss the
opportunity to tactfully feed into the system our  concern that
trading opportunities with Iraq are being lost because of DFAT's
strict interpretation of UN sanctions. I understand that Prescott will
raise BHP's concerns with Costello when they meet for lunch next week.
However, we should also act given the AWB's entire Iraqi business was
at risk.

I believe our reaction should be communicated informally via John
and, or Trevor.

Your comment/reaction/suggestions would be appreciated.

Charles

29.FEB.2000  14:54    SAVAS OIL INT.SRL ROME-ITALY                    NR.676    P.1



AWB.0057.0058_₂

**AKARA BLDG - 24 DE CASTRO STREET - WICKHAMS CAY I - ROAD TOWN - TORTOLA - BRITISH V. ISLANDS**

**TO   :  AWB Limited**
          **Kind attention of Mr. REX LISTER**

**From:  Petr LOSSEV**

**Re.  :  Amendments to:**  UEB L/C LCIM 2111026 dated 22/02/2000,
                          BNP NY L/C Y713867, BUYER REF.NO. 99/52/143,
                          UN approval for          MT
                          S/AC.25/1999/986/OC.50173/Corr.1/Ext.2

                          UEB L/C LCIM 2111028 dated 22/02/2000,
                          BNP NY L/C Y713190, BUYER REF.NO. 99/54/70,
                          UN approval for          MT
                          S/AC.25/1999/986/OC.50071/Corr.1/Ext.1

**Rome,  29.02.2000**                    **Total pages (including cover page) : 6**

**Dear Mr. LISTER,**

Thank you very much for fax dated 29.02.2000 concerning the requested amendments to
both L/Cs covering          MT of wheat under Contract A4907.

We agree with all your requests for amendments and we will instruct our Bank accordingly
upon receipt of the extensions for the validity and shipment period from BNP NY (in the
enclosed copy of our telex to GBI you will see that we are doing all our best to speed up
the matter).

We also enclose 4 pages with extensions of UN approvals for both quantities.

With all our thanks and best regards, we remain,

Very truly yours,

Petr LOSSEV

General Director

Via L. Settembrini, 30          Ul. Bolshaya Ordynka,          Rue de la Cité, 3
00195 - Roma - Italia          20/4 building 7                1204 Genève Switzerland
Tel. (06) 361-24-14            109017 Moscow, Russia          Tel. (0041) 22 319 64 04
Fax (06) 361-24-15            Tel. (095) 951 33 26           Fax (0041) 22 319 64 01
Tlx. 622501 - SAVAS I          Fax (095) 961 26 19            Tlx. 413100 ITC CH
                               Tlx. 614919 SAVAS RU

L30 - 0021

Ale 136

```
Author:  Charles Stott at _AWB_CORP_PO
Date:    12/5/95  1:31 PM
Priority: Normal
TO: John Lawrenson
TO: Ron Storey
CC: Peter McKeown
CC: Charles Stott
Subject: BHP/Iraq
```

AWB.0129.0002

--------------------------------- Message Contents ---------------------------------

John/Ron,

Contrary to DFAT's legal advice we have now received UN approval for Iraq transactions to proceed on the basis of; "Cash payment to be received through third parties".

In light of this decision the BHP transaction, structured slightly differently, is now able to proceed. Prescott is expected to provide the green light within the next few days.

Under the old mechanism the IGB was to open a 5 year deferred payment L/C in favour of the AWB. The IGB was to pay cash or deliver oil in substitution for cash if UN restrictions on oil exports were terminated. The AWB was to assign its payment and oil receipt rights to BHP and in return the AWB would receive cash from BHP on bill of lading date.



The new mechanism, which is still to be negotiated with BHP, should simply be COD. BHP will then be left to make its own arrangements with the Iraq's.

As for DFAT, clearly their legal interpretation of UN sanctions was wrong. However, DFAT are certainly not prepared to concede this point. In fact, they claim that it is only because of Australia's excellent standing in the UN that our applications breeze through without close scrutiny.

This position doesn't wash with me.

DFAT throughout this process have postulated over what the UN legislative drafters intent was at the time of establishing the rules and as a result they have applied a far stricter interpretation than the UN. This sanctimonious position is inhibiting our trading relationship with Iraq and has resulted in lost opportunities. DFAT may be motivated by the fact that Evan's is rumored to be seeking the penultimate UN job, or that Australia is currently lobbying for a seat on the security council.

Irrespective of the reasons, I believe the AWB shouldn't miss the opportunity to tactfully feed into the system our concern that trading opportunities with Iraq are being lost because of DFAT's strict interpretation of UN sanctions. I understand that Prescott will raise BHP's concerns with Costello when they meet for lunch next week. However, we should also act given the AWB's entire Iraqi business was at risk.

I believe our reaction should be communicated informally via John and, or Trevor.

Your comment/reaction/suggestions would be appreciated.

Charles

U0095

From: Nigel Edmonds-Wilson
Sent: Wednesday, 3 October 2001 3:31:00 PM
To: Annette Bury
Subject: Insurance - equipment to Iraq

Hi Annette,

As part of AWB's existing agreements and contracts with the Grain Board of Iraq, I am organising some equipment to be supplied to Iraq.

We are now nearing the time when we can look at shipping the equipment, via the port of Umm Qasr, Iraq.

I need your assistance for two things:

Firstly, we have some equipment in Toowoomba which needs to be insured from the time it leaves Toowoomba to the time it is delivered onto a vessel travelling to Umm Qasr. (Toowoomba to Melbourne via road freight, then temporarily store at either Agrifood or Prograin, until we can put onto a suitable vessel in either Melbourne, Geelong, Port Adelaide or Port Lincoln).

Secondly, we need to insure the goods for their travel whilst on board the vessel (some will be containerised and travel as deck cargo, other, smaller equipment will travel in the Master's care).

Costings of the above equipment are as follows:

Deck Cargo approximately = AUD          (GST excl)
Master's care approximately = AUD       (GST excl)

Please advise me the correct process and contact me if you require any further info. Your assistance is greatly appreciated.

Regards,

Nigel Edmonds-Wilson
ext 2111

Also please note, we will be shipping some more equipment in the near future and will require insurance cover then also.

AWB.5064.0315_R